**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| USI Insurance Services LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>Alliant Insurance Services, Inc., a California Corporation, William J. Havard II and Jane Doe Havard, husband and wife, and Robert Engles and Jane Doe Engles, husband and wife,<br><br>Defendants. | No. CV-23-00192-PHX-SMB<br><br>**ORDER** |

Pending before the Court is Plaintiff USI Insurance Services LLC's ("USI") Motion for a Temporary Restraining Order ("TRO"). (Doc. 2). Defendants Alliant Insurance Services Inc. ("Alliant"), William J. Havard ("Havard"), Jane Doe Havard, Robert Engles ("Engles"), and Jane Doe Engles filed a Response, (Doc. 18). The Court held oral argument on February 8, 2023. Having considered the parties briefing and arguments, and the relevant law, the Court will **deny in part and grant in part** USI's Motion for the reasons explained below.

## I.    BACKGROUND

USI's Complaint includes the following claims: (1) breach of contract (against Havard and Engles); (2) breach of the duty of good faith and fair dealing (against Havard and Engles); (3) breach of the duty of loyalty (against Havard and Engles); (4) tortious

interference with contract (against all Defendants); (5) aiding and abetting breach of the duty of loyalty (against Alliant); and (6) declaratory judgment (against Alliant).  (Doc. 1 at 18–21.)  The claims center on multiple covenants signed by Defendants Havard and Engels while employed by USI.  They are summarized as follows:

> • **_Confidentiality During and Following Term._** During the Term and for five (5) years after Producer is no longer employed … for any reason, they will not use or disclose any Confidential Information of the Company, any Predecessor or any USI Company except under limited circumstances… [outlined in the agreements].

> • **_Non-Solicitation of Clients and Active Prospective Clients_**…. (a) During the Term and for two (2) years after Producer is no longer employed … for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit Insurance Services in competition with the Company to any Client Account; (ii) consult for any Client Account with respect to Insurance Services in competition with the Company; (iii) sign a broker of record letter with any Client Account to provide Insurance Services in competition with the Company; or (iv) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account, which is a Client Account of the Company at the time of such solicitation, that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment ….
> (b) During the Term and for six (6) months after Producer is no longer employed… Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit Insurance Services in competition with the Company to any Active Prospective Client; (ii) consult for any Active Prospective Client with respect to Insurance Services in competition with the Company; or (iii) sign a broker of record letter with any Active Prospective Client to provide Insurance Services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment….

> • **_Non-Acceptance / Non-Service of Clients and Active Prospective Clients_**…. (a) During the Term and for two (2) years after Producer is no longer employed… Producer shall not, directly or indirectly, on behalf of any

Competitive Business in any capacity: (i) sell, provide, or accept any request to provide Insurance Services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide Insurance Services in competition with the Company to any Client Account; in each case with respect to any Client Account, which is a Client Account of the Company at the time of such solicitation, that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder…. (b) During the Term and for six (6) months after Producer is no longer employed … Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide Insurance Services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide Insurance Services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment….

• ***Non-Interference With Employees***… Producer agrees, during the Term and for two (2) years after Producer is no longer employed … Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company who is employed by the Company at the time of such solicitation or hiring and with whom Producer worked or obtained knowledge about as a result of Producer's employment with the Company....

(Doc. 2 at 5–6.)  The following terms are defined in the agreement as follows:

**(a) "Active Prospective Client"** means any Person or group of Persons who the Company specifically solicited or had documented plans to solicit within the six (6) months preceding the termination of Producer's employment hereunder.

* * * *

**(c) "Client Account"** means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by the Company for such carrier or other entity) which is or was serviced by the Company in connection with the Company's business,

regardless of whether such services are provided by, or through the licenses of the Company or any shareholder, employee or agent of the Company.
\* \* \* \*

**(e) "Competitive Business"** means any Person engaged in the production, distribution, marketing or sale of a Competitive Product. Where a Competitive Business is part of a larger business involving both competitive and non- competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

**(f) "Competitive Product"** means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the Company, in existence, which Producer or the Company has sold, marketed, distributed or developed in the last two (2) years of Producer's employment with the Company, or about which the Producer has acquired Confidential Information.

**(g) "Confidential Information"** means… any information of the Company, any Predecessor and/or a USI Company to which Producer has access, that is not already generally available to the public … including but not limited to: (i) the identity, authority and responsibilities of key contacts and decision-makers employed by the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (ii) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iii) the terms and conditions of benefits and compensation plans of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iv) the information furnished to the Company or any Predecessor in confidence by any Client Account or Active Prospective Client; (v) the business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company, its corporate affiliates or any Predecessor; (vi) the lists of the Client Accounts or Active Prospective Clients of the Company or any Predecessor, and any analyses and compilations thereof … (ix) any and all other proprietary information of the Company, any Predecessor or a USI Company, including any information contained within a proprietary database….
\* \* \*

**(i) "Goodwill"** means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's or any Predecessor's investment in repeated contacts, business transactions, Confidential Information, or other efforts…. \* \* \* \* (n) "Predecessor" means any Person, in its capacity

as predecessor-in- interest to the assets of the Company. * * * * (q) "USI Business" means the businesses provided by the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(*Id.* at 7–8.)

> USI further asserts the parties agreed to the following:
> If a court were to find that any covenants in their respective Employment Agreements exceeded the permissible scope or limit, 'such covenants shall be reformed to the maximum permissible time or scope limitations' and that "[i]f a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") . . . to the minimum extent necessary to permit the remaining terms to be enforced."

(*Id.* at 8.)

USI is a company providing insurance, risk management, and other related services to customers. (*Id.* at 3.) USI's insurance brokers, also called "producers" are employed to "identify, solicit, and service clients and develop and foster relationships with those clients for the benefit of USI." (*Id.*) USI asserts it provides its producers with "leads, training, education, business development opportunities, financial support, access to insurers and underwriters, and infrastructure to support these efforts." (*Id.*) Moreover, USI alleges their producers work with clients to discuss renewal options for repeat business, cross-selling opportunities for other USI products, and obtaining referrals. (*Id.* at 3–4.)

USI alleges that in 2017 it purchased all issued and outstanding equity interests in Wells Fargo Insurance Services, USA Inc., ("WFIS")—the corporation Havard and Engles worked at prior to becoming USI employees. (*Id.* at 4.) WFIS was then renamed USI Insurance Services National, Inc. ("USIN"), but later merged into USI Insurance Services, LLC ("USI"). (*Id.*) USI assets it's the assignee and successor-in-interest to WFIS and USIN. (*Id.*)

After the purchase and merger, USI alleges it offered Havard and Engles producer positions to maintain customer accounts and business goodwill. (*Id.*) USI attests that Havard and Engles were offered positions with the same client accounts they held from WFIS, and that the offers were contingent upon accepting the terms of their respective

employment agreements.  (*Id.*)  USI alleges that Havard and Engles accepted their offers and became employees on November 30, 2017.  (*Id.*)  Additionally, USI contends that both Defendants were provided with additional compensation in the form of a retention bonus payment, and for Havard an acquisition bonus on top of that.  (*Id.*)

USI contends that Havard and Engles agreed to the following terms: (1) as producers they held a responsibility for maintaining and enhancing USI's goodwill with client accounts and relationships, as well as prospective clients; (2) that USI had a "reasonable, necessary and legitimate business interest" in protecting USI's "Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business"; and (3) the terms of the agreement were necessary and reasonable for protecting those interests.  (*Id.* at 4–5.)  Furthermore, USI alleges that Havard and Engles acknowledged a duty of loyalty to USI and "agreed to use their best efforts to perform their duties and responsibilities 'faithfully, diligently, and completely,'" in furtherance of USI.  (*Id.* at 5.)

USI also contends that Havard and Engles acknowledged in their agreements that their services were "of a special unique, and extraordinary character[,]" that "it would be extremely difficult or impracticable to replace such services[,]" and that "any damage caused by [Havard or Engles] breach of [the limited covenants] of the Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate. . . ." (*Id.* at 8.)  Furthermore, USI asserts Havard and Engles agreed that if they violated the section of the agreement regarding limited covenants, USI was entitled to injunctive or other equitable relief in addition to other available rights or remedies.  (*Id.*)

USI notes that regarding the termination provision, Havard and Engles agreed to the following:

> ***Termination by the Company***. The Company may terminate Producer's employment  hereunder by giving written notice to Producer.  The termination of employment shall be effective on the date specified in such notice.

- 6 -

> ***Termination by Producer.*** Producer may terminate Producer's employment… by giving at least sixty (60) days written notice to the Company. The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may: (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Producer to cease performing any services… until the termination of employment.

(*Id.* at 8–9.) USI also argues that as the successor and assignee of WFIS, USI is authorized to enforce the terms Havard and Engles agreed to. (*Id.* at 9.)

USI alleges that on November 8, 2022, Alliant's Senior Vice President Andy Orear ("Orear") began contacting Engles to recruit him, Havard, and other USI employees to join Alliant and resign from USI. (*Id.*) USI further alleges that as of August 2022, Orear contacted at least 58 USI employees to recruit them to join Alliant. Additionally, USI asserts that since August 2022, Orear has sent at least 240 LinkedIn communications to USI employees. (*Id.*)

Next, USI alleges that in the last five years, USI has been in litigation with Alliant in numerous cases nationwide regarding "Alliant knowingly, and providing substantial assistance to, USI producers to resign effective immediately, [and] encouraging USI clients to move their business from USI to Alliant, in breach of the producers' contractual obligations to USI." (*Id.*) USI directly cites to a Minnesota state court's partial summary judgment order in favor of USI where the judge found that "Alliant corporate representatives did not explain why [the producer] began servicing her former USI clients [in violation of her post-employment restrictions] and instead stated that it relied on the advice of counsel." (*Id.*; *see also* Doc. 1-2 at 48.)

On January 24, 2023, USI alleges that Havard resigned from USI via email and effective immediately—thus failing to provide 60 days' notice. (Doc. 2 at 10.) USI next alleges that on January 25, 2023, Engles also resigned from USI by email, effective immediately. (*Id.*) USI contends that neither Defendant provided USI with a transition plan for the clients they were responsible for. (*Id.*) USI also alleges that "[c]oncurrently, the following members of Havard's and/or Engle's service teams at USI also tendered their

1   resignations, via email on Wednesday, January 25, 2023, effective immediately: Jenise

2   Purser ('Purser'), Amy Phalen ('Phalen'), Lori Hartman ('Hartman'), and Justin Walsh

3   ('Walsh')."  (*Id.*)  That same day, USI alleges it had scheduled a meeting with the same

4   service team to coordinate client transitions, but none showed up to the meeting and instead

5   resigned hours after it was scheduled.  (*Id.*)

6        USI alleges that no later than January 25, 2023, Havard, Engles, Phalen, Walsh, and

7   Hartman's LinkedIn profiles were updated to show new employment at Alliant.  (*Id.*)  USI

8   asserts that upon information and belief, Havard, Engles, and their teams were immediately

9   employed by Alliant.  (*Id.*)

10       USI argues that the purpose of the 60 days' notice provision in their employment

11  agreements was to provide USI time to transition client accounts and relationships to new

12  producers to maintain goodwill with customers.  (*Id.*)  USI also alleges that Havard and

13  Engles had a combined book of client business worth over $3.7 million to USI.  (*Id.*)  As

14  such, USI argues that by immediately joining Alliant—a direct USI competitor—and

15  publicizing that they had done so, Havard and Engles violated their agreements and

16  "hampered USI's ability to maintain and continue its goodwill and relationship with client

17  accounts" they serviced.  (*Id.* at 10–11.)

18       USI alleges that Havard and Engles coordinated "this *en masse* resignation from

19  USI with the knowledge and substantial assistance of Alliant."  (*Id.* at 11.)  Furthermore,

20  USI argues Havard and Engles "have breached, and intend to further and imminently

21  breach, the covenants of their agreements by soliciting or servicing for Alliant additional

22  client accounts that they managed or serviced for USI."  (*Id.*)  USI alleges this is

23  demonstrated by a previous USI client, who was serviced by Havard, already taking steps

24  to move a portion of its business to Alliant.  (*Id.*)  Likewise, USI alleges that another client

25  "explicitly referenced their long-term relationship with Havard in a call with USI regarding

26  their business being moved to Alliant."  (*Id.*)  Lastly, USI alleges that multiple of Havard's

27  USI clients "gave a broker of record letter to Alliant which, upon information and belief,

28  would not have moved in total to Alliant without Havard's solicitation, direct or

otherwise." (*Id.*)  For these reasons, USI argues that Havard and Engles are violating the covenants set forth in their agreements which has caused, and will continue to cause, irreparable injury to USI for which money damages are inadequate.  (*Id.*)

## II.    LEGAL STANDARD

Under Rule 65 of the Federal Rules of Civil Procedure, a party may seek injunctive relief if it believes it will suffer irreparable harm during the pendency of an action.  The analysis for granting a TRO is "substantially identical" to that for a preliminary injunction.  *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001); *Cochran v. Rollins*, No. CV07-1714-PHX-MHMJRI, 2008 WL 3891578, at *1 (D. Ariz. Aug. 20, 2008).  "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'"  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.  *Winter*, 555 U.S. at 20.  "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied."  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).  Under this "serious questions" variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another."  *Lopez*, 680 F.3d at 1072.

## III.    DISCUSSION

### A.  Likelihood of Success on the Merits

USI's requested TRO stems from their breach of contract and breach of the duty of good faith and fair dealing claims.   These claims are based on the 60 day notice requirement, the non-solicitation, and non-acceptance/non-service agreements discussed above.   Defendants argue that the agreements are not enforceable.

Arizona law provides that:

> A restrictive covenant is reasonable and enforceable when it protects some legitimate interest of the employer beyond the mere interest in protecting itself from competition such as preventing competitive use, for a time, of information or relationships which pertain peculiarly to the employer and which the employee acquired in the course of the employment.

*Bed Mart, Inc. v. Kelley*, 45 P.3d 1219, 1221 (Ariz. Ct. App. 2002) (cleaned up).   Put differently, "[n]on-compete and non-solicitation restrictions are enforceable if they are 'no broader than necessary to protect the employer's legitimate business interest.'"   *Orca Commc'ns Unlimited, LLC v. Noder*, 314 P.3d 89, 95 (Ariz. Ct. App. 2013), *decision aff'd and ordered depublished on other ground*, 337 P.3d 545 (2014) (quoting *Hilb, Rogal & Hamilton Co. of Arizona v. McKinney*, 946 P.2d 464, 467 (Ariz. Ct. App. 1997)).

Thus, "to be enforceable, the covenant must be reasonable with respect to its duration, its geographic scope, and the range of employee's activities affected." *Unisource Worldwide, Inc. v. Swope*, 964 F. Supp. 2d 1050, 1064 (D. Ariz. 2013).   Whether a restrictive covenant is reasonable is a question of law.   *Valley Med. Specialists v. Farber*, 194 Ariz. 363, 366 (1999).   "The burden is on the party wishing to enforce the covenant to demonstrate that the restraint is no greater than necessary to protect the employer's legitimate interest, and that such interest is not outweighed by the hardship to the employee and the likely injury to the public." *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1286 (Ariz. 1999).   Moreover, restrictive covenants "are strictly construed against the employer." *Amex Distrib. Co., Inc. v. Mascari*, 724 P.2d 596, 600 (Ariz. Ct. App. 1986).

USI also argues for a TRO based on the breach of fiduciary duty claim and tortious interference with contract.

### i.    60 Day Notice

USI argues that Havard and Engles violated their contractual obligation by failing

- 10 -

to give 60 days' notice prior to leaving.  There is no dispute that they gave no notice and were working for Alliant the day after resigning from USI.   Defendants argue that even if there was a breach of this notice requirement, a TRO on this basis cannot issue because it cannot be specifically enforced.  The Court agrees that a contract for personal services cannot be specifically enforced.  *Engelbrecht v. McCullough*, 292 P.2d 845, 846 (Ariz. 1956).  However, the relief requested is to prohibit Havard and Engles from working for Alliant during the 60 day notice period.  As such, it must be analyzed as a non-compete clause, but there is no such clause in the contract.  Therefore, the Court finds that a TRO cannot be based upon the 60 day notice requirement and USI's only remedy is money damages.

### ii.   Non-solicitation, Non-acceptance, Non-Service

USI argues that Havard breached his non-solicitation agreement by soliciting at least one USI client to give a broker of record letter to Alliant just days after his departure from USI.  (Doc. 2 at13.)  The Complaint alleges that "[m]ultiple other USI clients previously serviced, in part, by Havard gave a broker of record letter to Alliant which, upon information and belief, would not have moved in total to Alliant without Havard's solicitation, direct or otherwise."  (Doc. 1 at 17 ¶ 55.)  But there are no allegations that clients of Engles have left USI.  Defendants argue that Plaintiffs have also failed to provide any evidence that Havard has solicited clients, only that some clients left USI.  Havard's sworn declaration says that he has not solicited any of his USI client accounts since departing USI.  (*See* Doc. 18-1 at 7.)  He also said that he has not serviced any USI clients since his departure.  *Id.*  Havard also declared that some of his USI clients were also clients of Alliant, and thus already had a relationship with Alliant.  *Id.*  The Court finds that the mere allegations raise questions about the veracity of Havard's declaration and creates serious questions about the merits.  However, the evidence presented does not show a likelihood of success on the merits at this point in time.

Defendants also argue that the non-solicitation, non-acceptance, and non-servicing covenants are unenforceable.  The Court declines to address the enforceability of the

covenants at this time because there is currently no evidence of a breach.  Additionally, the briefing on the validity of the covenants is not complete as Plaintiffs did not have the ability to reply and respond to these arguments.  Therefore, the Court will leave this issue to be addressed at the preliminary injunction stage.

### iii.   Breach of Duty of Loyalty

"Under Arizona law, the elements of a breach of fiduciary duty claim are 'the existence of a duty owed, a breach of that duty, and damages causally related to such breach.'"  *Tribal Behav. Health LLC v. Reeves*, No. CV-22-00926-PHX-SPL, 2022 WL 2290563, at *4 (D. Ariz. June 24, 2022), opinion clarified, No. CV-22-00926-PHX-SPL, 2023 WL 183677 (D. Ariz. Jan. 13, 2023) (quoting *Surowiec v. Cap. Title Agency, Inc.*, 790 F. Supp. 2d 997, 1004 (D. Ariz. 2011)).  In Arizona, an employee owes his or her employer a fiduciary duty, which includes a duty of loyalty.  *Firetrace USA, LLC v. Jesclard*, 800 F. Supp. 2d 1042, 1052 (D. Ariz. 2010).

Here, USI argues that Havard and Engles violated this duty of loyalty by failing to provide any advance notice of resignation or transition plan for the clients they serviced, encouraging their entire service team to leave USI before they resigned, and immediately joined Alliant and publicized that they had done so.  However, the duty of loyalty ends once the employment relationship ends.  *Id.*  There is no ongoing violation to be restrained by an injunction, so this cannot form the basis of a TRO.

### iv.   Tortious Interference with Contract

To establish a tortious interference claim, a claimant must show: (1) a valid contract or business expectancy existed; (2) the interferer had knowledge of such business contracts or expectancy; (3) there was intentional interference causing a breach of the contract or business expectancy; and (4) resultant damages. *Neonatology Assocs. v. Phx. Perinatal Assocs. Inc.*, 164 P.3d 691, 693 (Ariz. Ct. App. 2007).  USI alleges that it has a valid contract with Havard and Engles and a legitimate business expectancy with its clients. Alliant had knowledge of the 60 day notice requirement and other restrictive covenants as evidenced by the Court's finding in a Minnesota state court's partial summary judgment

order.  (*See* Doc. 1-2 at 43–58.)  USI alleges that Alliant is engaged in systematically stealing its employees and clients.  The evidence presented at this point that was not disputed by Defendants is that the Senior Vice President for Alliant began contacting Engles beginning on November 8, 2022.  He has contacted at least 58 USI employees since August 2022 to recruit them, sent 240 LinkedIn communications to USI employees since August 2022, and Alliant has been found liable for similar conduct in Minnesota.

Alliant argues that there is no evidence of improper contact with USI clients or employees and that the 60 day notice rule is not mandatory.  The Court disagrees with both arguments.  As discussed above, there is evidence of improper contact with USI employees.  The notice requirement is mandatory for producers.  Per the language of the contract, there are two ways for termination to occur.  Either the producer may give 60 days notice or USI may terminate producer's employment by giving written notice.  There is no other alternate option for the producer.  He/she may terminate his/her own employment by giving 60 days notice.  The Court finds there is a likelihood of success on the merits of this claim.

**B. Irreparable Harm**

Irreparable harm is harm for which there is no adequate remedy at law, such as money damages.  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance.  Demonstrating irreparable harm is not an easy burden to fulfill."  *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (internal quotation marks and citation omitted); *see also Dalkita, Inc. v. Distilling Craft, LLC*, No. 18-cv-01398-PAB-SKC, 2018 WL 6655628 (D. Col. Dec. 19, 2018).

The majority of USI's argument of irreparable harm relates to violations of the restrictive covenants by Havard and Engles and the damage caused by these violations to USI's goodwill.  However, as noted earlier, the Court finds no evidence that Engles is violating any of the restrictive covenants (other than the 60 day notice) and it's mostly speculative evidence that Havard is violating these restrictions.  If there is no ongoing

violation, there can be no irreparable harm from Havard and Engles

However, there will be irreparable harm if Alliant is able to continue enticing employees to violate the 60 day notice rule.  Each time Alliant does that, it creates difficulties for USI to transition their clients which harms their goodwill and continuity of service.  The Ninth Circuit has recognized that "intangible injuries, such as damage to ongoing recruitment efforts and goodwill , qualify as irreparable harm" *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc*., 944 F.2d 597, 603 (9th Cir. 1991); *see also Krueger Invs., LLC v. Cardinal Health 110, Inc*., No. CV 12-618-PHX-JAT, 2012 WL 3028349, at \*5 (D. Ariz. July 24, 2012) ("Courts can consider economic hardship, actual or threatened loss of customers, business reputation, and goodwill in determining the presence and sufficiency of irreparable harm.").    The Court finds irreparable harm in Alliant's efforts to recruit employees to leave without giving 60 days notice.

### C. Balance of Equities

"In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) ("In assessing whether the plaintiffs have met this burden, the district court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'" (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir.1980))).

Granting an injunction against Havard and Engles would result in them being without a job for a period of time, which would be inequitable.  However, granting an injunction against Alliant does no harm to Alliant, but protects USI's legitimate interest in keeping employees from leaving without notice.

### D. Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982))

1   (quotation marks omitted).  It is true that "[c]ourts have held that the public interest is
2   served by protecting a company's right to proprietary information, business operations, and
3   contractual rights," and that "enforcing these covenants is consistent with the public policy
4   of protecting a company's interest in its customer base from unfair competition." *Compass*
5   *Bank v. Hartley*, 430 F.Supp. 2d  973, 983 (D. Ariz. 2006).  However, it is also true that
6   "Arizona law does not look kindly upon restrictive covenants." *Unisource Worldwide*, 964
7   F. Supp. 2d at 1063.  Indeed, in Arizona, "[r]estrictive covenants that tend to prevent an
8   employee from pursuing a similar vocation after termination of employment" are especially
9   disfavored.  *GlobalTranz Enters. Inc. v. Murphy*, No. CV-18-04819-PHX-ROS, 2021 WL
10  1163086, at *4 (D. Ariz. 2021) (quoting *Bryceland v. Northey*, 772 P.2d 36, 39(Ariz. Ct.
11  App. 1989)); *see also Unisource Worldwide*, 964 F. Supp. 2d at 1063.

12          Furthermore, given that USI has not established irreparable harm caused by Havard
13  or Engles, the public interest does not favor a TRO.  *See Super Chefs, Inc. v. Second Bit*
14  *Foods, Inc.*, No. CV-15-00525-SJO (FFMx), 2015 WL 12914441, *5 (C.D. Cal. June 11,
15  2015) ("[G]iven that Plaintiff has not shown irreparable harm, the Court finds that a
16  preliminary injunction has not been shown to be in the public interest."); *Sunbelt Rentals,*
17  *Inc. v. Victor*, No. C 13-4240 SBA, 2014 WL 492364, *11 (N.D. Cal. Feb. 5, 2014) (finding
18  that "the public interest will not be served by entering an injunction to prevent conduct
19  which [the plaintiff] has not shown has or is likely to occur").

20          Simply put, enforcing unenforceable covenants on former employees does not serve
21  the public interest.   However, protecting an employer from a competitor knowingly
22  interfering with contracts is in the public interest.  Competition is a good thing, but it must
23  be fair.

24  **IV.   CONCLUSION**
25          Accordingly,
26          **IT IS ORDERED** granting in part and denying in part Plaintiff's Motion for a TRO.
27  (Doc. 2.)
28          **IT IS FURTHER ORDERED** that, Defendant Alliant Insurance Services, Inc.

and all its respective officers, agents, servants, employees, and persons acting in concert of participation with them are enjoined and restrained from: (1) Directly or indirectly encouraging, inducing, or otherwise facilitating any employee of USI who Alliant knows has a 60 day resignation notice provision in his or her USI employment agreement to terminate his or her employment with USI effective immediately or otherwise prior to the end of the required notice period;

**IT IS FURTHER ORDERED THAT** this Order shall continue in full force and effect until the Hearing on the Preliminary Injunction sought in this matter, which will be scheduled by later order;

**IT IS FURTHER ORDERED** denying all other requests for a TRO;

**IT IS FURTHER ORDERED THAT** the Court has exercised its discretion to determine that no bond shall be required and that this Order shall be effective immediately;

**IT IS FURTHER ORDERED** that parties discuss scheduling and whether the hearing on the preliminary injunction should be combined with trial on the merits.  The parties shall submit an agreed upon scheduling proposal or, if no agreement is reached, a joint statement that includes each parties' proposal by no later than February 13, 2023.

Dated this 9th day of February, 2023.

Honorable Susan M. Brnovich
United States District Judge