**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| USI Insurance Services LLC, | No. CV-23-00192-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Alliant Insurance Services Incorporated, et al., | |
| Defendants. | |

Pending before the Court is Plaintiff USI Insurance Services LLC's ("USI") Motion for a Preliminary Injunction ("Motion") (Doc. 2), as amended by the Amended Complaint (Doc 52). Defendants Alliant Insurance Services, Inc. ("Alliant"), William J. Havard ("Havard"), Jane Doe Havard, Robert Engles ("Engles"), and Jane Doe Engles filed a Response to the original Motion (Doc. 18) but have yet to file an Answer. The Court held a two-day evidentiary hearing April 25–26, 2023 and closing arguments on May 2, 2023. Having considered the briefing, arguments, evidence, and relevant law, the Court will deny USI's Motion.

## I.     BACKGROUND

This case resulted from Havard and Engles' swift transition from their employment at USI to new positions with Alliant. USI provides insurance, risk management, and related services. (Doc. 2 at 3.) USI employs insurance brokers called "producers" to "identify, solicit, and service clients and develop and foster relationships with those clients." (*Id.*) Havard and Engles began working as producers for USI in 2017. (*Id.* at 4.) On January

24 and 25, 2023, Havard, Engles, and defendants Jenise Purser and Justin Walsh—who worked on Havard and Engles' team at USI—resigned from USI.  (Doc. 52 at 25–26.) These defendants immediately began working for Alliant, in similar roles.  (*Id.* at 27.)

On January 30, 2023, USI sought a temporary restraining order and a preliminary injunction to prevent Alliant from: (1) encouraging or facilitating any USI employee with a 60-day notice provision in their employment agreement from immediately terminating his or her employment; (2) directly or indirectly causing any former USI employee to breach the restrictive covenants from their employment agreements; (3) employing Havard and Engles during the 60-day notice period from their employment agreements.  (Doc. 2 at 1–2.)  USI also sought to enjoin Havard and Engles from working for Alliant within the 60-day period and "further breaching the post-employment restrictive covenants" described in their employment agreements.  (*Id.* at 2.)  On February 9, 2023, this Court granted USI's request in part and enjoined Alliant from encouraging or facilitating any USI employee whose employment agreement included a 60-day notice provision from immediately terminating his or her employment.  (Doc. 22 at 15–16.)  The Court denied all of USI's other requests and set a preliminary injunction hearing, which was held on April 25 and 26.  The Court makes the following factual findings from that hearing.

## II.     FACTUAL FINDINGS

### A.     Employment Agreements

USI acquired Wells Fargo Insurance Services USA, Inc. in 2017.  (Docs. 104 at 153; Ex. 2 at 1; Ex. 62 at 1.)  Both Havard and Engles worked for Wells Fargo when USI acquired it (Ex. 2 at 1; 62 at 1), and they became producers[1] for USI.  (Doc. 104 at 153–54.)  Their primary focus as producers was to "source new clients, take care of relationships with existing clients, build goodwill in the community, [and] connect with centers of

---

[1] Engles received a demotion in August or September 2022 to the position of "producer account executive."  (Doc. 105 at 106–07.)  USI's representative, Benjamin Greer, testified that the responsibilities and expectations were essentially the same for the two roles, but the producing account executives had lower commission percentages and lower expectations for outreach.  (Doc. 104 at 154–55.)

influence with insurance carriers." (*Id.*)  Havard specifically worked as the head of USI's Phoenix environmental pollution liability team, while Engles specialized in commercial property and casualty.  (*Id.*)

Havard and Engles signed nearly identical employment agreements with USI. Justin Walsh and Jenise Purser, members of Havard's environmental liability service team that supported Havard's USI clientele (*see* Docs. 105 at 159, 194, 216), signed similar agreements.  However, Walsh and Purser's employment agreements did not include a 60-day notice provisions as a condition of resignation, whereas Havard and Engles' did.  (Ex. 2; 62; 86; 206.)  The relevant terms from those agreements are as follows:

> • ***Confidentiality During and Following Term.*** During the Term and for five (5) years after Producer is no longer employed … for any reason, they will not use or disclose any Confidential Information of the Company, any Predecessor or any USI Company except under limited circumstances… [outlined in the agreements].
>
> • ***Non-Solicitation of Clients and Active Prospective Clients****…. (a) During the Term and for two (2) years after Producer is no longer employed … for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit Insurance Services in competition with the Company to any Client Account; (ii) consult for any Client Account with respect to Insurance Services in competition with the Company; (iii) sign a broker of record letter with any Client Account to provide Insurance Services in competition with the Company; or (iv) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account, which is a Client Account of the Company at the time of such solicitation, that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment ….
>
> (b) During the Term and for six (6) months after Producer is no longer employed… Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit Insurance Services in competition with the Company to any Active Prospective Client; (ii) consult for any Active Prospective Client with respect to Insurance Services in competition with the Company; or (iii) sign a broker of record letter with any Active Prospective Client to provide Insurance Services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of

Producer's employment…

• ***Non-Acceptance / Non-Service of Clients and Active Prospective Clients….*** (a) During the Term and for two (2) years after Producer is no longer employed… Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide Insurance Services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide Insurance Services in competition with the Company to any Client Account; in each case with respect to any Client Account, which is a Client Account of the Company at the time of such solicitation, that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder…. (b) During the Term and for six (6) months after Producer is no longer employed … Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide Insurance Services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide Insurance Services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment….

• ***Non-Interference With Employees***… Producer agrees, during the Term and for two (2) years after Producer is no longer employed … Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company who is employed by the Company at the time of such solicitation or hiring and with whom Producer worked or obtained knowledge about as a result of Producer's employment with the Company....

(Doc. 2 at 5–6.) The following terms are defined in the agreement as follows:

**(a) "Active Prospective Client"** means any Person or group of Persons who the Company specifically solicited or had documented plans to solicit within the six (6) months preceding the termination of Producer's employment hereunder.

* * * *

**(c) "Client Account"** means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is

performed by the Company for such carrier or other entity) which is or was serviced by the Company in connection with the Company's business, regardless of whether such services are provided by, or through the licenses of the Company or any shareholder, employee or agent of the Company.
* * * *

**(e) "Competitive Business"** means any Person engaged in the production, distribution, marketing or sale of a Competitive Product. Where a Competitive Business is part of a larger business involving both competitive and non- competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

**(f) "Competitive Product"** means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the Company, in existence, which Producer or the Company has sold, marketed, distributed or developed in the last two (2) years of Producer's employment with the Company, or about which the Producer has acquired Confidential Information.

**(g) "Confidential Information"** means… any information of the Company, any Predecessor and/or a USI Company to which Producer has access, that is not already generally available to the public … including but not limited to: (i) the identity, authority and responsibilities of key contacts and decision-makers employed by the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (ii) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iii) the terms and conditions of benefits and compensation plans of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iv) the information furnished to the Company or any Predecessor in confidence by any Client Account or Active Prospective Client; (v) the business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company, its corporate affiliates or any Predecessor; (vi) the lists of the Client Accounts or Active Prospective Clients of the Company or any Predecessor, and any analyses and compilations thereof … (ix) any and all other proprietary information of the Company, any Predecessor or a USI Company, including any information contained within a proprietary database….
* * *

**(i) "Goodwill"** means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's or any Predecessor's investment

in repeated contacts, business transactions, Confidential Information, or other efforts…. * * * * (n) "Predecessor" means any Person, in its capacity as predecessor-in-interest to the assets of the Company. * * * * (q) "USI Business" means the businesses provided by the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(*Id.* at 7–8.)

USI further asserts the parties agreed that:

if a court were to find that any covenants in their respective Employment Agreements exceeded the permissible scope or limit, 'such covenants shall be reformed to the maximum permissible time or scope limitations' and that "[i]f a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") . . . to the minimum extent necessary to permit the remaining terms to be enforced."

(*Id.* at 8.)

The relevant contract terms from Walsh and Purser's employment agreements are as follows:

4.5 ***Non-Solicitation of Clients and Active Prospective Clients***. In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees that:

(a) During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit Insurance Services in competition with the Company to any Client Account; (ii) consult for any Client Account with respect to Insurance Services in competition with the Company; sign a broker of record letter with any Client Account to provide Insurance Services in competition with the Company; or (iv) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account, which is a Client Account of the Company at the time of such solicitation, that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company. If the duration herein of two (2) years after Employee is no longer employed with the Company is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during Employee's employment with the Company and for eighteen (18) months after Employee is no longer employed with the Company, for any reason. If the duration herein of eighteen (18) months after Employee is no longer employed with the Company is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during Employee's employment with the Company and for twelve (12) months after Employee is no longer employed with the Company, for any reason.

(b) During Employee's employment with the Company and for six (6) months after Employee is no longer employed with the Company, for any reason, Employee shall not, without the Company's prior written consent,

- 6 -

directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit Insurance Services in competition with the Company to any Active Prospective Client; (ii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iii) sign a broker of record letter with any Active Prospective Client to provide Insurance Services in competition with the Company; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last six (6) months of Employee's employment with the Company.

(Doc. 52 at 17.)

4.6 ***Non-Acceptance / Non-Service of Clients and Active Prospective Clients***. In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees that:

(a) During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide Insurance Services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide Insurance Services in competition with the Company to any Client Account; in each case with respect to any Client Account, which is a Client Account of the Company at the time of such solicitation, that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company. If the duration herein of two (2) years after Employee is no longer employed with the Company is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during Employee's employment with the Company and for eighteen (18) months after Employee is no longer employed with the Company, for any reason. If the duration herein of eighteen (18) months after Employee is no longer employed with the Company is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during Employee's employment with the Company and for twelve (12) months after Employee is no longer employed with the Company, for any reason.

(b) During Employee's employment with the Company and for six (6) months after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide Insurance Services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide Insurance Services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last six (6) months of Employee's employment with the Company.

(*Id.* at 18.)

## B.   Resignations

Alliant's efforts to recruit Havard and Engles began in November 2022.  Havard

and Engles, friends and longtime lunchmates, became open to Alliant's offers of employment after becoming dissatisfied with their positions at USI. Havard complained that USI overemphasized soliciting new clients, at the cost of his relationships with existing clients. He cited one example of USI sending his clients letters containing threats to cancel coverage despite the insurance carrier itself not threatening to do so. Engles described how USI demoted him and how that demotion resulted in his reduced compensation. Havard resigned on January 24, 2023, via email. Havard testified that he did not decide to leave USI for Alliant until the morning he submitted his resignation email. Engles discovered Havard's resignation from LinkedIn later that day. Benjamin Greer, USI's Phoenix property and casualty team lead, called a strategy meeting for the following day and invited Engles to participate. Also contemplating resigning, Engles thought it was inappropriate to attend the strategy meeting and so he submitted his own resignation email on January 25, 2023.

Between Alliant's initial contact with Havard and Engles, and their eventual resignations, both continued to service their client accounts at USI. On January 9, 2023, Havard set up a client dinner with Revantage (client) and Beazley (insurance carrier) for later that month, on January 31. (Ex. 321 at 1–2.) On January 17, 2023, Engles had an email exchange with Greer about a potential client. (Ex. 283.) Both Havard and Engles also continued to communicate with other USI employees to service USI clients.

Justin Walsh and Jenise Purser's resignations followed shortly after Engles'. Both Walsh and Purser continued to service USI clients up until they resigned. Walsh sent his resume to Alliant on January 24th, 2023, the day Havard resigned. (Doc. 105 at 149.) Walsh testified that he was working on closing multiple deals when Greer scheduled the strategy meeting. (*Id.* at 195–96.) He did not attend the strategy meeting, citing his anticipation of a written offer of employment from Alliant. (*Id.* at 197.) On January 25th, 2023, USI had restricted Purser's work computer access. (*Id.* at 214.) Purser told Greer that she had not planned to resign before her access was restricted, but she ultimately resigned later that day. (*Id.* at 214–15.) She emailed Greer about two client accounts that

1    required USI's swift attention and action.  (*Id.* at 50.)  Walsh and Purser immediately began

2    working for Alliant upon their resignations from USI.  (*Id.* at 51, 202, 220.)

3                   **C.    Events Following Resignations**

4           The unexpected resignations of the four aforementioned employees disrupted the

5    status quo in USI's phoenix office.  On the morning of January 26th, 2023—the business

6    day following Engles, Walsh, and Purser's resignations—Greer organized a team to

7    continue USI's service of its clients.  (Doc. 104 at 171.)  Greer solicited help from forty-

8    four other USI employees across the country over a multi-week span to aid this effort,

9    which he described as chaotic.  (*Id.* at 171, 209.)  Greer personally contacted Havard's

10   former clients and discussed one instance where USI had failed to address a client need in

11   a timely fashion.  (*Id.* at 176–78.)  However, a USI employee had emailed Greer to inform

12   him that that client urgently required assistance.  (*Id.* at 178.)  Greer discussed another

13   client, Revantage, that moved its business away from USI because the risk manager "knew

14   nobody at USI any longer."  (*Id.* at 183.)  One of the other disruptions Greer described was

15   lost mentorship opportunities for young environmental producers that in the wake of

16   Havard's departure were "struggling and floundering."  (*Id.* at 192.)  But Greer could not

17   identify any clients that left because of the service USI provided during this period of

18   disruption.  (Doc. 105 at 59.)

19            **III.    LEGAL STANDARD**

20          Under Rule 65 of the Federal Rules of Civil Procedure, a party may seek injunctive

21   relief if it believes it will suffer irreparable harm during the pendency of an action.  "A

22   preliminary injunction is 'an extraordinary and drastic remedy, one that should not be

23   granted unless the movant, by a clear showing, carries the burden of persuasion.'"  *Lopez*

24   *v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S.

25   968, 972 (1997) (emphasis omitted)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555

26   U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as

27   of right.").

28          A plaintiff seeking a preliminary injunction must show that (1) he is likely to

succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.  "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied."  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).  Under this "serious questions" variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another."  *Lopez*, 680 F.3d at 1072.

## IV.    DISCUSSION

### A.  Likelihood of Success on the Merits

USI's request for a preliminary injunction stems from its breach of contract and breach of the duty of good faith and fair dealing claims.  These claims are based on the 60-day notice requirement, the non-solicitation, and non-acceptance/non-service agreements discussed above.  Defendants argue the agreements are not enforceable.

Arizona law provides that:

> A restrictive covenant is reasonable and enforceable when it protects some legitimate interest of the employer beyond the mere interest in protecting itself from competition such as preventing competitive use, for a time, of information or relationships which pertain peculiarly to the employer and which the employee acquired in the course of the employment.

*Bed Mart, Inc. v. Kelley*, 45 P.3d 1219, 1221 (Ariz. Ct. App. 2002) (cleaned up).  Put differently, "[n]on-compete and non-solicitation restrictions are enforceable if they are 'no broader than necessary to protect the employer's legitimate business interest.'"  *Orca Commc'ns Unlimited, LLC v. Noder*, 314 P.3d 89, 95 (Ariz. Ct. App. 2013), *decision aff'd and ordered depublished on other grounds*, 337 P.3d 545 (2014) (quoting *Hilb, Rogal & Hamilton Co. of Ariz. v. McKinney*, 946 P.2d 464, 467 (Ariz. Ct. App. 1997)).

Thus, "to be enforceable, the covenant must be reasonable with respect to its duration, its geographic scope, and the range of employee's activities affected."  *Unisource*

1    *Worldwide, Inc. v. Swope*, 964 F. Supp. 2d 1050, 1064 (D. Ariz. 2013).   Whether a

2    restrictive covenant is reasonable is a question of law.  *Valley Med. Specialists v. Farber*,

3    982 P.2d, 1277, 1280 (Ariz. 1999).  "The burden is on the party wishing to enforce the

4    covenant to demonstrate that the restraint is no greater than necessary to protect the

5    employer's legitimate interest, and that such interest is not outweighed by the hardship to

6    the employee and the likely injury to the public."  *Id.* at 1286.  Moreover, restrictive

7    covenants "are strictly construed against the employer."  *Amex Distrib. Co., Inc. v.*

8    *Mascari*, 724 P.2d 596, 600 (Ariz. Ct. App. 1986).

9         USI also requests injunctive relief based on the breach of fiduciary duty claim and

10   tortious interference with contract.

11        **i.      60-Day Notice**

12        In its TRO ruling, the Court determined that injunctive relief would be inappropriate

13   because specific performance of the notice requirement is akin to a contract for personal

14   services.  (Doc. 22 at 10–11) (citing *Engelbrecht v. McCullough*, 292 P.2d 845, 846 (Ariz.

15   1956)).  USI did not assert during the preliminary injunction hearing that this provision

16   *could* be enforced, and as such the Court will not address it.

17        **ii.     Non-solicitation, Non-acceptance, Non-Service**

18        USI argues that Havard breached his non-solicitation agreement by soliciting at least

19   two clients, Revantage and CBRE, to move their business to Alliant and by servicing

20   CBRE, Store Capital, and Western National Group—former USI clients.  The Revantage

21   risk manager testified that she transitioned Revantage's business to Alliant because she no

22   longer knew anyone at USI.  (Schultz Dep. 21:6–11; 58:14–19.)  USI points to an email by

23   CBRE employee Chris Nassa saying "[Havard's] team is still at USI and apparently aren't

24   leaving until the end of the week, which is obviously confidential."  (Doc. 104 at 145; Ex.

25   131.)  However, USI submitted no evidence of Havard soliciting a client.  Revantage and

26   CBRE's apparent intent to follow Havard, the producer with which they had developed a

27   professional relationship, does not necessarily amount to solicitation.  The Court finds no

28   likelihood of success on this claim.

USI also argues that Havard breached his non-service agreement by servicing former USI clients. The metadata associated with emails and attachments to CBRE, Store Capital, and Western National Group show that Havard was the author of the cited summary reports. (Ex. 102 (Store Capital); 103 (CBRE); 104 (WNG); 105 at 217–31.) That metadata shows Havard prepared these summaries and they were not subsequently modified before being transmitted to clients. The Court thus finds a likelihood of success on the claim that Havard breached the non-service agreement based on the facts. The enforceability of this covenant is discussed below.

USI raises similar arguments that Engles solicited at least one client, AvAir, to move its business to Alliant. The Court disagrees. USI relies on the conduct of Eric Harper to assert that Engles' solicitation of AvAir was indirect. Harper admitted to lying to AvAir's point of contact, Bob Knox, about Engles inspiring the call—Harper used his proximity to Engles as a cold call technique to entice Knox's business. (Doc. 105 at 252–53.) Harper provided a detailed description of how he discovered Knox's phone number. (*Id.* at 254.) Knox admitted that Engles did not attempt contact Knox after Engles resigned. (Doc. 104 at 22–23.) And the Court finds Engles' testimony credible, where he stated he never asked Harper to call Knox on his behalf and that he thought Harper "was just being a salesman." (Doc. 105 at 128.) The Court thus finds no likelihood of success on this claim.

USI asserts a breach of their non-service agreement because Walsh and Purser have serviced many former USI client accounts since they began working for Alliant. Walsh testified to servicing at least ten former USI clients while at Alliant. (*Id.* at 157–58.) Purser admitted she has serviced at least eleven former USI clients while at Alliant. (*Id.* at 225–26.) Alliant argues neither Walsh nor Purser serviced these clients until after the clients executed broker-of-record letters and after the rescission period expired. Alliant further argues that at that point, Alliant was no longer "in competition with" USI, meaning Walsh and Purser did not violate section 4.6 of their agreements. The Court disagrees. The evidence at the hearing showed that clients often change brokers and brokerage firms are always angling to gain new clients at a competitor's expense. Expiration of the rescission

period does not end the competition.  Factually, the Court finds a likelihood of success on this claim.

Defendants argue that the non-solicitation, non-acceptance, and non-servicing covenants are unenforceable.  The Court rejects Defendants' assertion that the restrictive covenants apply only to actions taken by Wells Fargo Insurance Services.  The employment agreements discuss assignment and Greer adequately testified that USI acquired all of Wells Fargo Insurance Services.  However, the Court found breaches only to the non-service agreements signed by Havard, Walsh, and Purser, the Court's analysis will be limited to whether their non-servicing agreements are enforceable. Defendants argue that the non-acceptance/non-service covenant is unenforceable because it serves no legitimate interest.  Alliant cites to *Getman v. USI Holdings Corp.*, No. 05-3286-BLS2, 2005 WL 2183159, at *3 (Mass. Super. Ct. Sept. 1, 2005) where a Massachusetts court held that such a provision is not enforceable.  Also, in *Vulcan Steel Structures, Inc. v. McCarty*, 764 S.E.2d 458, 462 (Ga. Ct. App. 2014), the Georgia Court of Appeals held that covenants restricting an employee from accepting unsolicited work from former clients are unenforceable.  Arizona law does not necessarily forbid such agreements and instead requires courts to balance the employer and employee's competing interests.  *See, e.g.*, *Valley Med.*, 982 P.2d at 1283–84 ("[I]n the commercial context, the employer's interest in its customer base is balanced with the employee's right to the customers. Where the employee took an active role and brought customers with him or her to the job, courts are more reluctant to enforce restrictive covenants.").  The duration of restrictive covenants in the commercial context is reasonable "'only if it is no longer than necessary for the employer to put a new man on the job and for the new employee to have a reasonable opportunity to demonstrate his effectiveness to the customers.'"  *Id.* at 1284 (quoting *Amex Distrib. Co., Inc. v. Mascari*, 724 P.2d 596, 604 (Ariz. Ct. App. 1986)).  USI did not address the enforceability of this covenant, and the Court finds these cases persuasive.  Therefore, the Court preliminarily finds them unenforceable thus rendering the claims without a likelihood of success.

Additionally, the non-service agreements appear unreasonably broad. Havard's non-service agreement prohibits him from providing insurance services to a USI client, accepting a broker of record letter from a USI client they regularly serviced within the past two years, for a two-year period. The agreement also prohibits for a six-month term the providing of any services to an "active prospective client" or accepting a broker of record letter for such a client. Walsh and Purser's agreements prohibit them for two years from selling, providing, or accepting a request to provide insurance services to a USI client they regularly serviced, and they may not accept a broker of record letter. Walsh and Purser's agreement includes two step-down provisions, lowering the temporal limits by six months (to 18 months or 12 months) if the longer durations are determined to be unreasonable.

The Court finds that USI has not carried its burden to establish that these restrictive covenants are enforceable. The business interest USI has repeatedly asserted is its goodwill with its clients. (*See* Doc. 52 at 5 ¶ 33.) But the Court heard considerable testimony about the hyper-competitive nature of the insurance services market and the turnover of clients and policies based on pricing, relationships, needs, etc. Greer testified that roughly 15% of insurance brokerage clients change firms annually. (Doc. 105 at 29–30.) He also testified that nearly 40% of clients in a producer's book of business would leave USI even if the producer does not violate any restrictive covenants. (*Id.* at 31.) Considering this market turnover, the Court is currently unpersuaded that the two-year periods (or even the twelve-month step-down period in Walsh and Purser's agreement) is sufficiently tailored to protect client goodwill. However, the Court invites additional briefing (during the dispositive motion stage, should this case so proceed) from the parties as to the enforceability of these provisions.

### iii.   Breach of Duty of Loyalty

USI did not assert the breach of the duty of loyalty during the preliminary injunction hearing, and as such the Court will not address it.

### iv.   Tortious Interference with Contract

To establish a tortious interference claim, a claimant must show: (1) a valid contract

or business expectancy existed; (2) the interferer had knowledge of such business contracts or expectancy; (3) there was intentional interference causing a breach of the contract or business expectancy; and (4) resultant damages. *Neonatology Assocs. v. Phx. Perinatal Assocs. Inc.*, 164 P.3d 691, 693 (Ariz. Ct. App. 2007).

USI argues Alliant interfered with the employment agreements it had with the four individual defendants.  The four individual defendants' employment agreements were valid.  Testimony from each of the individual defendants shows that Alliant knew they were employed at USI.  Bledion Dizdari, Alliant's representative, testified that Alliant did not instruct Havard or Engles to resign effective immediately—or with 60-days' notice as contemplated in their employment agreements either—because Alliant does not provide legal advice.  (Doc. 105 at 304.)  Instead, Alliant recommends and financed independent legal counsel.  (*Id.* at 304–05.)  Defendants cite *Burns v. Talon Grp., Inc.*, to argue that USI cannot establish the third factor of its tortious interference claim because Alliant's recruitment of the individual defendants was a "legitimate competitive purpose[], and not an improper act."  No. CV 04-411 TUC JMR, 2007 WL 9724464, at *4 n.2 (D. Ariz. Sept. 30, 2007).  The Court agrees that Alliant's conduct is consistent with legitimate competitive purposes, and as such USI has failed to carry its burden to establish a likelihood of success on the merits.

**B. Irreparable Harm**

Irreparable harm is harm for which there is no adequate remedy at law, such as money damages.  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance.  Demonstrating irreparable harm is not an easy burden to fulfill."  *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (cleaned up).

USI asserts it has a protectable interest in preventing Defendants from interfering with its goodwill with clients.  And by violating their employment agreements, USI argues the individual defendants have damaged that goodwill.  While the Court recognizes that

goodwill can qualify as irreparable harm, *see Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc*., 944 F.2d 597, 603 (9th Cir. 1991), the Court finds no such irreparable harm has been established here.  As the Court noted, *supra* Sec. II, Greer corralled many USI employees to mitigate whatever chaos resulted from the individual defendants' departures.  Greer discussed the avalanche of emails he was receiving in as a result of this chaos.  The one client that moved its business away from USI did so after another USI employee informed Greer that action needed to be taken on that account.  Greer failed to timely respond to that client's needs.  Greer also discussed lost mentorship opportunities for junior producers.  No clients left because USI's service dropped to an unacceptable level, although Revantage moved its business to Alliant because Revantage's risk manager had no working relationships with the remaining USI employees.  Even so, Revantage's move to Alliant is consistent with the expected loss of business Greer described as routine in the industry.  As such, the Court finds that USI has not carried its burden to establish an irreparable harm.

## C. Balance of Equities

"In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) ("In assessing whether the plaintiffs have met this burden, the district court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'" (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir.1980)).

Granting an injunction against the individual defendants would not prohibit them from working for Alliant.  Preventing Alliant from encouraging more USI employees to leave and disregard notice provisions would not damage any parties or stifle competition. The Court finds the balance of equities favors USI.

## D. Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard

for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)) (quotation marks omitted).  It is true that "[c]ourts have held that the public interest is served by protecting a company's right to proprietary information, business operations, and contractual rights," and that "enforcing these covenants is consistent with the public policy of protecting a company's interest in its customer base from unfair competition." *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006).  However, it is also true that "Arizona law does not look kindly upon restrictive covenants." *Unisource Worldwide*, 964 F. Supp. 2d at 1063.  Indeed, in Arizona, "[r]estrictive covenants that tend to prevent an employee from pursuing a similar vocation after termination of employment" are especially disfavored.  *GlobalTranz Enters. Inc. v. Murphy*, No. CV-18-04819-PHX-ROS, 2021 WL 1163086, at \*4 (D. Ariz. 2021) (quoting *Bryceland v. Northey*, 772 P.2d 36, 39 (Ariz. Ct. App. 1989)); *see also Unisource Worldwide*, 964 F. Supp. 2d at 1063.

Furthermore, given that USI has not established irreparable harm, the public interest does not favor injunctive relief.  *See Super Chefs, Inc. v. Second Bit Foods, Inc.*, No. CV-15-00525-SJO (FFMx), 2015 WL 12914441, \*5 (C.D. Cal. June 11, 2015) ("[G]iven that Plaintiff has not shown irreparable harm, the Court finds that a preliminary injunction has not been shown to be in the public interest."); *Sunbelt Rentals, Inc. v. Victor*, No. C 13-4240 SBA, 2014 WL 492364, \*11 (N.D. Cal. Feb. 5, 2014) (finding that "the public interest will not be served by entering an injunction to prevent conduct which [the plaintiff] has not shown has or is likely to occur").

Enforcing unenforceable covenants on former employees does not serve the public interest.  However, protecting an employer from a competitor knowingly interfering with contracts is in the public interest.

///

///

///

///

- 17 -

## V.   CONCLUSION

Accordingly,

**IT IS ORDERED** denying USI's Motion for a Preliminary Injunction.  (Doc. 2.)

Dated this 2nd day of June, 2023.

Honorable Susan M. Brnovich
United States District Judge