**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| USI Insurance Services LLC, | No. CV-23-00192-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Alliant Insurance Services Inc., a California corporation, William J. Havard II and Jane Doe Havard, husband and wife, Robert Engles and Jane Doe Engles, husband and wife, Jenise Purser and John Doe Purser, husband and wife, and Justin Walsh and Jane Doe Walsh, husband and wife, | |
| Defendants. | |

Pending before the Court is Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 76). Plaintiff filed a response (Doc. 90), and Defendants filed a reply (Doc. 91). After reviewing the parties' arguments and the relevant case law, the Court will deny Defendants' Motion.

## I.    BACKGROUND

This case stems from the resignation of four USI Insurance Services ("USI") employees and their subsequent swift reemployment at Alliant Insurance Services ("Alliant"). To rule on the present Motion, the Court must take the allegations of material fact as true and construe them in favor of the nonmoving party— here, Plaintiff. *See Cousins v. Lockyer*, 568 F.3d 1063, 1067 (2009). USI's Amended Complaint (Doc. 52) includes the following claims: (1) breach of contract (against Havard, Engles, Purser, and Walsh); (2) breach of the duty of good faith and fair dealing (against Havard and Engles);

(3) breach of the duty of loyalty (against Havard and Engles); (4) tortious interference with contract (against all Defendants); (5) aiding and abetting breach of the duty of loyalty (against Alliant); and (6) declaratory judgment (against Alliant). (*Id.* at 29–33.) The claims relate to multiple covenants signed by Defendants Havard, Engels, Purser, and Walsh ("Employee Defendants") while employed by USI.  These covenants are summarized as follows:

> • ***Confidentiality During and Following Term.*** During the Term and for five (5) years after Producer is no longer employed . . . for any reason, they will not use or disclose any Confidential Information of the Company, any Predecessor or any USI Company [except under limited circumstances outlined in the agreements].

> • ***Non-Solicitation of Clients and Active Prospective Clients*** . . . . (a) During the Term and for two (2) years after Producer is no longer employed . . . for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit Insurance Services in competition with the Company to any Client Account; (ii) consult for any Client Account with respect to Insurance Services in competition with the Company; (iii) sign a broker of record letter with any Client Account to provide Insurance Services in competition with the Company; or (iv) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account, which is a Client Account of the Company at the time of such solicitation, that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment . . . .
> (b) During the Term and for six (6) months after Producer is no longer employed . . . Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit Insurance Services in competition with the Company to any Active Prospective Client; (ii) consult for any Active Prospective Client with respect to Insurance Services in competition with the Company; or (iii) sign a broker of record letter with any Active Prospective Client to provide Insurance Services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment . . . .

• ***Non-Acceptance/Non-Service of Clients and Active Prospective Client*** . . . (a) During the Term and for two (2) years after Producer is no longer employed . . . Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide Insurance Services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide Insurance Services in competition with the Company to any Client Account; in each case with respect to any Client Account, which is a Client Account of the Company at the time of such solicitation, that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder . . . .(b) During the Term and for six (6) months after Producer is no longer employed . . . Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide Insurance Services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide Insurance Services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment . . . .

• ***Non-Interference With Employees*** . . . Producer agrees, during the Term and for two (2) years after Producer is no longer employed . . . Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company who is employed by the Company at the time of such solicitation or hiring and with whom Producer worked or obtained knowledge about as a result of Producer's employment with the Company . . . .

(Doc. 52 at 5–8, 11–13, 17–18, 21–23.)  The following terms are defined in the agreement as follows:

**(a) "Active Prospective Client"** means any Person or group of Persons who the Company specifically solicited or had documented plans to solicit within the six (6) months preceding the termination of Producer's employment hereunder.

**(c) "Client Account"** means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity

to the extent third party administration claims processing or underwriting is performed by the Company for such carrier or other entity) which is or was serviced by the Company in connection with the Company's business, regardless of whether such services are provided by, or through the licenses of the Company or any shareholder, employee or agent of the Company.

(e) **"Competitive Business"** means any Person engaged in the production, distribution, marketing or sale of a Competitive Product. Where a Competitive Business is part of a larger business involving both competitive and non- competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

(f) **"Competitive Product"** means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the Company, in existence, which Producer or the Company has sold, marketed, distributed or developed in the last two (2) years of Producer's employment with the Company, or about which the Producer has acquired Confidential Information.

(g) **"Confidential Information"** means . . . any information of the Company, any Predecessor and/or a USI Company to which Producer has access, that is not already generally available to the public . . . including but not limited to: (i) the identity, authority and responsibilities of key contacts and decision-makers employed by the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (ii) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iii) the terms and conditions of benefits and compensation plans of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iv) the information furnished to the Company or any Predecessor in confidence by any Client Account or Active Prospective Client; (v) the business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company, its corporate affiliates or any Predecessor; (vi) the lists of the Client Accounts or Active Prospective Clients of the Company or any Predecessor, and any analyses and compilations thereof . . . (ix) any and all other proprietary information of the Company, any Predecessor or a USI Company, including any information contained within a proprietary database . . . .

(i) **"Goodwill"** means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's or any Predecessor's investment in repeated contacts, business transactions, Confidential Information, or other efforts to develop lasting relationships.

(n) **"Predecessor"** means any Person, in its capacity as predecessor-in-interest to the assets of the Company.

(q) **"USI Business"** means the businesses provided by the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(*Id.* at 8–9, 13–14, 18–20, 23–24.)

USI further asserts the parties agreed to the following:

"If a court were to find that any covenants in their respective Employment Agreements exceeded the permissible scope or limit, 'such covenants shall be reformed to the maximum permissible time or scope limitations' and that "[i]f a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") . . . to the minimum extent necessary to permit the remaining terms to be enforced."

(*Id.* at 9, 15, 20, 24.)

USI provides insurance, risk management, and other related services to customers. (*Id.* at 3.)  USI's insurance brokers, also called "producers" are employed to "identify, solicit, and service clients and develop and foster relationships with those clients for the benefit of USI." (*Id.*)  USI asserts it provides its producers with "leads, training, education, business development opportunities, financial support, access to insurers and underwriters, and infrastructure to support these efforts." (*Id.* at 4.)  Moreover, USI alleges their producers work with clients to discuss renewal options for repeat business, cross-selling opportunities for other USI products, and obtaining referrals. (*Id.*)

USI alleges that in 2017, it purchased all issued and outstanding equity interests in Wells Fargo Insurance Services, USA Inc., ("WFIS")—the corporation Havard and Engles worked at prior to becoming USI employees. (*Id.*)  WFIS was then renamed USI Insurance Services National, Inc. ("USIN"), but later merged into USI Insurance Services, LLC

("USI").  (*Id.*)  USI asserts that it is the assignee and successor-in-interest to WFIS and USIN.  (*Id.*)

After the purchase and merger, USI alleges it offered Employee Defendants positions to maintain customer accounts and business goodwill.  (*Id.* at 4–5, 10–11, 16, 20.)  USI attests that Havard and Engles were offered positions with the same client accounts they held from WFIS, and that the offers were contingent upon accepting the terms of their respective employment agreements.  (*Id.*)  USI alleges that Employee Defendants became employees on November 30, 2017.  (*Id.*)  USI also contends that Employee Defendants were provided with additional compensation in the form of a retention bonus payment, and that they paid Havard an additional acquisition bonus.  (*Id.*)

USI further alleges that Employee Defendants agreed to the following terms: (1) as producers they held a responsibility for maintaining and enhancing USI's goodwill with client accounts and relationships, as well as prospective clients; (2) that USI had a "reasonable, necessary and legitimate business interest" in protecting USI's "Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business" and (3) the terms of the agreement were necessary and reasonable for protecting those interests.  (*Id.* at 10–11, 16, 21.)  Furthermore, USI alleges that Havard and Engles acknowledged a duty of loyalty to USI and "agreed to use their best efforts to perform their duties and responsibilities 'faithfully, diligently, and completely'" in furtherance of USI.  (*Id.* at 5, 11.)

USI also contends that Havard and Engles acknowledged in their agreements that their services were "of a special unique, and extraordinary character[,]" that "it would be extremely difficult or impracticable to replace such service[s]" and that "any damage caused by [Havard or Engles] breach of [the limited covenants] of the Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate. . . ."  (*Id.* at 9–10, 15.)  Furthermore, USI asserts Havard and Engles agreed that if they violated the limited covenants section of the agreement, USI was entitled to injunctive or other equitable relief.  (*Id.*)

Additionally, USI notes that, Havard and Engles agreed to the following termination provision

> *Termination by Producer.* Producer may terminate Producer's employment… by giving at least sixty (60) days written notice to the Company. The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may: (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Producer to cease performing any services . . . until the termination of employment.

(*Id.*)  USI also argues that as the successor and assignee of WFIS, USI is authorized to enforce the terms Havard and Engles agreed to.  (*Id.* at 10, 15.)

USI alleges that on November 8, 2022, Alliant's Senior Vice President Andy Orear ("Orear") began contacting Engles, Havard, and other USI employees to resign from USI and join Alliant.  (*Id.* at 25.)  USI further alleges that as of August 2022, Orear contacted at least 58 USI employees to recruit them to join Alliant.  (*Id.*)  Additionally, USI asserts that since August 2022, Orear has sent at least 240 LinkedIn communications to USI employees.  (*Id.*)

Next, USI alleges that in the last five years, it has been in nationwide litigation with Alliant regarding "Alliant knowingly providing substantial assistance to USI producers to resign effective immediately and encouraging USI clients to move their business from USI to Alliant, in breach of the producers' contractual obligations to USI."  (*Id.* at 25.)  USI directly cites to a Minnesota state court's partial summary judgment order in favor of USI where the judge found that "Alliant corporate representatives did not explain why [the producer] began servicing her former USI clients [in violation of her post-employment restrictions] and instead stated that it relied on the advice of counsel."  (*Id.*)

USI alleges that on January 24, 2023, Havard resigned from USI via email and effective immediately—thereby failing to provide the contractually required 60 days' notice.  (*Id.* at 25–26.)  USI next alleges that on January 25, 2023, Engles also resigned from USI by email, effective immediately.  (*Id.* at 26.)  USI contends that neither Defendant provided USI with a transition plan for the clients they "abandoned."  (*Id.* at 25–26.)  USI

also alleges that concurrently, Jenise Purser, Amy Phalen, Loni Hartman, and Justin Walsh, who were all members of Havard and/or Engle's service teams at USI, also tendered their resignations via email on January 25, 2023, effective immediately.  (*Id.* at 26.)  That same day, USI alleges it had scheduled a meeting with these employees to coordinate client transitions, but they did not show up to the meeting and instead resigned hours after it was scheduled.  (*Id.*)

USI alleges that no later than January 25, 2023, Havard, Engles, Phalen, Walsh, and Hartman's LinkedIn profiles were updated to show new employment at Alliant.  (*Id.*)  USI asserts that upon information and belief, Alliant hired Havard, Engles, and their teams immediately.  (*Id.* 26–27.)  USI argues that the purpose of the 60 days' notice provision in their employment agreements was to provide USI time to transition client accounts and relationships to new producers to maintain goodwill with customers.  (*Id.* at 27.)  USI also alleges that Havard and Engles had a combined book of client business worth over $3.7 million to USI.  (*Id.*)  As such, USI argues that by immediately joining Alliant—a direct USI competitor—and publicizing that they had done so, Havard and Engles violated their agreements and "severely hampered USI's ability to maintain and continue its goodwill and relationship with client accounts."  (*Id.*)

USI alleges that Havard and Engles coordinated "this *en masse* resignation from USI with the knowledge and substantial assistance of Alliant."  (*Id.*)  Furthermore, USI argues Havard and Engles "have breached, and intend to further and imminently breach, the covenants of their agreements by soliciting and/or servicing for Alliant additional client accounts that they managed or serviced for USI."  (*Id.*)  USI alleges that "more than one" USI client that was previously serviced by Havard has taken steps to move a portion of its business to Alliant.  (*Id.*)  Similarly, USI alleges that another client "explicitly referenced its long-term relationship with Havard in a call with USI regarding its business being moved to Alliant."  (*Id.*)  Lastly, USI alleges that multiple of Havard's USI clients "gave a broker of record letter to Alliant which, upon information and belief, would not have moved in total to Alliant without Havard's solicitation, direct or otherwise."  (*Id.*)  More

- 8 -

1  than 100 broker of record ("BOR") letters have been sent to USI from clients moving their

2  business to Alliant after the resignation of Havard and Engles.  (*Id.* at 28.)

3       USI also alleges that they continue to uncover additional evidence of the

4  Defendants' wrongdoing.  (*Id.*)  USI points to a voicemail left for USI client AvAir from

5  Alliant employee Eric Harper.  (*Id.*)  In this voicemail, Mr. Harper said "Robert asked me

6  to give you a call. Uh, we all made a transition over. I'm in California so I can call everyone.

7  Um, Robert can take your call, he just can't make calls right now. Uh, we are getting all

8  that straightened out hopefully very very soon. But he wanted me to touch base with you,

9  kinda fill you in on what's going on. And please call him at any time. And uh, we are

10 working on transitioning all his clients over here. It is a thousand times better shop. But I

11 can explain all that to you. So, if you have a moment, please call me . . . ." (*Id.*)  USI alleges

12 that when AvAir returned Mr. Harper's call, he admitted that he obtained the client's

13 contact information from Engles and proceeded to solicit their business.  (*Id.*)

14 Additionally, USI alleges that emails were sent from Alliant employees to contacts at both

15 CBRE Group, Inc. and USAA regarding insurance coverage.  (*Id.* at 28–29.)  Both

16 businesses were former USI clients and were managed or serviced by Purser, Walsh, and

17 Havard.  (*Id.*)

18 **II.   LEGAL STANDARD**

19      To survive a Rule 12(b)(6) motion for failure to state a claim, a complaint must meet

20 the requirements of Rule 8(a)(2).  Rule 8(a)(2) requires a "short and plain statement of the

21 claim showing that the pleader is entitled to relief," so that the defendant has "fair notice

22 of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*,

23 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  This

24 requirement is met if the pleader sets forth "factual content that allows the court to draw

25 the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft*

26 *v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of

27 action, supported by mere conclusory statements, do not suffice."  *Id.*  Plausibility does not

28 equal "probability," but requires "more than a sheer possibility that a defendant has acted

1  unlawfully." *Id.*  A dismissal under Rule 12(b)(6) for failure to state a claim can be based
2  on either (1) the lack of a cognizable legal theory or (2) insufficient facts to support a
3  cognizable legal claim.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.
4  1988).  A complaint that sets forth a cognizable legal theory will survive a motion to
5  dismiss if it contains sufficient factual matter, which, if accepted as true, states a claim to
6  relief that is "plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at
7  570).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's
8  liability, it 'stops short of the line between possibility and plausibility of 'entitlement to
9  relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

10     In ruling on a Rule 12(b)(6) motion to dismiss, the well-pled factual allegations are
11  taken as true and construed in the light most favorable to the nonmoving party.  *Lockyer*,
12  568 F.3d at 1067.  However, legal conclusions couched as factual allegations are not given
13  a presumption of truthfulness, and "conclusory allegations of law and unwarranted
14  inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696,
15  699 (9th Cir. 1998).  A court ordinarily may not consider evidence outside the pleadings in
16  ruling on a Rule 12(b)(6) motion to dismiss.  *See United States v. Ritchie*, 342 F.3d 903,
17  907 (9th Cir. 2003).  "A court may, however, consider materials—documents attached to
18  the complaint, documents incorporated by reference in the complaint, or matters of judicial
19  notice—without converting the motion to dismiss into a motion for summary judgment."
20  *Id.* at 908.

21  **III.   DISCUSSION**

22     As discussed above, Plaintiff brought several claims in its First Amended
23  Complaint, which Defendants now seek to dismiss.  The Court will discuss each in turn.

24     **A. Breach of Contract**

25     First, Defendants argue that the breach of contract claim against all individual
26  Defendants, and specifically Havard, should be dismissed.  (Doc. 76 at 4.)  These claims
27  are based on the 60-day notice requirement, the non-solicitation, and the non-
28  acceptance/non-service agreements outlined above.  As a threshold matter, Defendants

argue that the term "the Company" was used in some of the provisions at issue, and that this term does not refer to USI. (Doc. 76 at 4–5.) They argue that the term instead refers to WFIS, which became defunct when it merged with USI. (*Id.* at 5.) Therefore, they contend that these provisions do not protect USI, and that Havard and Engles were not bound by these provisions. (Doc. 76 at 4–7.) Plaintiff counters that as a successor and assignee of WFIS, USI is authorized to enforce the terms of the agreements. (Doc. 90 at 4.) Plaintiff also argues that it is inappropriate to litigate the meaning of this term at this stage of the case. (*Id.*)

The Court recognizes that interpretation of this term is important to the claims. However, it also acknowledges that this is not the appropriate stage in litigation to resolve this issue. Motions to dismiss are meant to test the sufficiency of the complaint, not resolve any factual disputes. *See JK ex rel. R.K. v. Dillenberg*, 836 F. Supp 694, 700 (D. Ariz. 1993) (a motion to dismiss is not "a procedure for resolving a contest about the facts or the merits of the case.") (internal citation omitted). Here, Defendants ask the Court to move beyond the sufficiency of the allegations and turn to contract interpretation. But dismissal based on contract interpretation is not within the realm of a 12(b)(6) motion. *See ABC Water LLC v. APlus Water LLC*, No. CV-18-04851-PHX-SPL, 2019 WL 3858193, at *2 (D. Ariz. Aug. 16, 2019). At this point, it would be premature for the Court to delve into contractual interpretation. *Seitz v. Rheem Mfg. Co.*, 544 F. Supp. 2d 901, 910 (D. Ariz. 2008); *see also Johnson v. KB Home*, 720 F. Supp 2d 1109, 1118 (D. Ariz. 2010). Moreover, the arguments presented demonstrate that the parties must have the opportunity to develop the record—including on the applicability and meaning of specific contractual terms. *See Affiliated FM Ins. Co. v. Hill Phoenix Inc.*, No. CV-22-00450-PHX-JJT, 2023 WL 244494, at *2 (D. Ariz. Jan. 18, 2023). Accordingly, the Court will not analyze contractual terms in this ruling.

For the breach of contract claim, Plaintiff must allege "the existence of a contract between the plaintiff and defendant, a breach of the contract by the defendant, and resulting damage to the plaintiff." *Snyder v. HSBC Bank, USA, N.A.*, 913 F. Supp. 2d 755, 779 (D.

1   Ariz. 2012) (quoting *Warren v. Sierra Pacific Mortg. Servs., Inc.*, No. CV-10-02095-PHX-

2   NVW, 2011 WL 1526957, at *3 (D. Ariz. Apr. 22, 2011).

3           Defendants contend that there is no factual support for the allegations that any

4   individual defendant solicited prior USI clients, improperly accessed client information, or

5   that prior USI clients moved to Alliant due to their solicitation.  (Doc. 76 at 8–9.)

6   Therefore, they claim that the breach of contract claim is merely speculative.  (*Id.* at 8–10.)

7   Defendants also argue that the allegations surrounding this claim are conclusory and do not

8   contain any supporting factual enhancements.  (*Id.* at 9.)  Plaintiff counters by pointing to

9   non-conclusory facts alleging how Havard and Engles breached the relevant covenants.

10  (Doc. 90 at 6.)  Specifically, Plaintiff points to the several allegations regarding Havard's

11  immediate resignation from USI, recruiting former USI employees, and moving prior USI

12  clients over to Alliant.  (*Id.* at 6–7.)  Plaintiff further argues they sufficiently alleged that

13  Havard's breach both caused and will continue to cause injury to USI.  (*Id.* at 8.)  The Court

14  agrees with Plaintiff.

15          Plaintiff has sufficiently pled in accordance with the requirements of this claim.

16  First, the Plaintiff has properly pled the existence of a contract.  (Doc. 52 at 29.)  Second,

17  the Plaintiff has provided sufficient factual content to allow the Court to draw a reasonable

18  inference of the alleged misconduct.  Plaintiff specifically alleges numerous instances of

19  conduct that outline Havard's alleged breach.  (*Id.* at 25–30.)  These allegations are not

20  conclusory or speculative.  Rather, they are detailed and connect to each of the covenants

21  that Havard and Engles allegedly breached.  (*See id.*)  Although currently these are merely

22  allegations, they are allegations that meet the relevant pleading requirements.  There are

23  sufficient facts presented to support a cognizable claim against the individual Defendants,

24  including Havard.  Taken together, these factual allegations form a plausible claim that

25  each individual Defendant breached various provisions in their contracts with USI.

26          Third, Plaintiff has sufficiently asserted that Havard's breach caused and will

27  continue to cause injury to USI.  (*Id.* at 27–28.)  Accordingly, USI has met the applicable

28  pleading standard with their breach of contract claim.  Therefore, the Court will deny

- 12 -

Defendants' Motion as to the breach of contract claim.

### B.  Breach of Duty of Good Faith and Fair Dealing - Havard

Plaintiff next claims that Havard breached the covenants of good faith and fair dealing owed to USI.  (Doc. 52 at 30.)  In Arizona, the duty of good faith and fair dealing is implied in every contract.  *Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986).  "The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship."  *Id.*  A claim for breach of the duty of good faith and fair dealing requires a contractual relationship.  Without a contract, the duty does not apply.  *See Walter v. F.J. Simmons & Others*, 818 P.2d 214, 222 (Ariz. Ct. App. 1991) (agent dismissed from bad faith claim "because he owed no contractual duty to act in good faith or deal fairly").  A party can breach this duty "both by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in way not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain."  *Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 435 (Ariz. Ct. App. 2002) (internal citation omitted).

Here, Defendants again dispute that the contract itself even applies due to the use of the term "the Company."  (*See* Doc. 76 at 2, 5.)  Again, the Court will not resolve this issue today.  Defendants also repeat many of the same arguments as made for the breach of contract claim—namely that this claim is also conclusory, speculative, and lacks factual support.  (*Id.* at 8–10.)  Plaintiff counters with similar responses, pointing to instances of Havard's conduct that allegedly breached the duty.  (Doc. 90 at 7–8.)  This is the same conduct referenced in the breach of contract claim.  (*See id.* at 6–7.)

Due to Havard's contractual relationship with USI, he owed a duty of good faith and fair dealing.  The conduct alleged here constitutes a breach of that duty.  Specifically, this conduct impaired the benefits USI would receive from the contract—that their employees would not leave and take their clients to a competitor.  Through his actions, Plaintiff asserts that Havard prevented USI from receiving the benefits of their contract.

1    Plaintiff has cited specific instances of alleged conduct that met this standard, including

2    alleged violations of various provisions and the allegation that he coordinated an exodus

3    of clients and fellow former employees from USI to Alliant.  (*Id.* at 6–7.)  The Court can

4    draw a reasonable inference of this alleged misconduct under this cognizable legal theory.

5    Accordingly, Plaintiff has met the applicable pleading standard, and the Court will deny

6    Defendants' Motion on this count as to Defendant Havard.

7         **C. Breach of the Duty of Loyalty – Havard and Engles**

8         Defendants also seek to dismiss the duty the fiduciary duty loyalty claim against

9    Havard and Engles.  (Doc. 76 at 10.)  Plaintiff pled this claim as a breach of the *fiduciary*

10   duty of loyalty.  (Doc. 52 at 30–31.)  However, Plaintiff now frames it as a *contractual*

11   duty, referencing Section 2.4 of the employees' contract with USI.  (Doc. 90 at 8.)  These

12   are distinct claims.  Any breach of a *contractual* duty of loyalty falls within the breach of

13   contract claim.  Due to its framing in the complaint, the Court will analyze this claim as a

14   fiduciary duty of loyalty.  In short, Plaintiff claims that Havard and Engles owed a *fiduciary*

15   duty of loyalty to act in the best interests of USI and that they breached that duty.  (Doc.

16   52 at 31.)

17        In Arizona, an employee owes his or her employer a fiduciary duty, which includes

18   a duty of loyalty.  *Security Title Agency, Inc. v. Pope*, 200 P.3d 977, 989 (Ariz. Ct. App.

19   2008).  Under this duty, an employee is precluded from actively competing with his or her

20   employer during the period of employment.  *See id.*; *see also* Restatement (Third) of

21   Agency § 8.04 (2006) ("Throughout the duration of an agency relationship, an agent has a

22   duty to refrain from competing with the principal . . . .").  After the termination of an

23   employment relationship a former employee is free to compete—provided there is no

24   enforceable non-compete agreement.  *McCallister Co. v. Kastella*, 825 P.2d 980, 982–83

25   (Ariz. Ct. App. 1992).

26        Defendants argue that Havard and Engles did not owe a legal duty to provide any

27   advance notice of their resignation or a create a transition plan.  (Doc. 76 at 10.)  Defendants

28   also assert that the complaint does not allege any facts that either named Defendant

encouraged their "entire service team" to leave USI. (*Id.* at 10–11.) Lastly, Defendants argue that joining a direct competitor and publicizing their change in employment does not constitute a breach of the duty of loyalty. (*Id.* at 11.) Plaintiff asserts that Havard and Engles breached this duty "failing to provide any advance notice of resignation or transition plan for the USI clients they serviced, encouraging their entire service team to leave USI en masse with no transition plan for USI' clients, and immediately joining a direct USI competitor —Alliant—and publicizing that they had done so." (Doc. 52 at 31.) Taken together, Plaintiff alleges that Havard and Engles compounded their other contractual breaches by acting against the best interests of USI and its business, and thereby damaged USI. (Doc. 90 at 8.)

This claim also survives Defendants' Motion. Plaintiff sufficiently alleges a connection between Harvard and Engles' departure and the immediate departure of their former USI team. (Doc. 52 at 26.) Plaintiff also alleges that Harvard and Engles coordinated the en masse resignation, as evidenced by the concurrent resignations of other employees. (*See id.*) There are sufficient allegations showing that Havard and Engles began to compete with USI *before* their departure. In turn, these allegations form a plausible claim that these Defendants breached their duty of loyalty to USI. However, their duty of loyalty to USI ended on the day of their resignation. *See Taser Int'l, Inc. v. Ward*, 231 P.3d 921, 926 (Ariz. Ct. App. 2010). The other alleged violations of the employment agreement occurred *after* Havard and Engles left USI and moved to Alliant. Any competition after their resignation falls within the purview of their employment agreement. As such, any potential breach of this agreement is properly covered by the breach of contract claim—not a separate tort claim for the breach of the duty of loyalty.

In short, the allegations for this claim also meet the applicable pleading requirements. Accordingly, the Court will deny Defendants' Motion as to the duty of loyalty claim against Havard and Engles.

### D. Tortious Interference with Contract – Alliant

Next, Defendants seek dismissal of Plaintiff's tortious interference with contract

claim against Alliant.  (Doc. 76 at 13.)  To establish a tortious interference claim, Plaintiff must show that (1) a valid contract or business expectancy existed; (2) the interferer had knowledge of such business contracts or expectancy; (3) there was intentional interference causing a breach of the contract or business expectancy; and (4) resultant damages. *Neonatology Assocs. v. Phx. Perinatal Assocs. Inc.*, 164 P.3d 691, 693 (Ariz. Ct. App. 2007).  Defendants argue that Plaintiff's allegations relating to this claim are insufficient and do not "explain or show how Alliant was aware of Plaintiff's purported relationships and expectancies."  (Doc. 76 at 14.)  Defendants also argue that some Plaintiff's later allegations are mere recitations of the cause of action, which fall short of the relevant pleading standards.  (*Id.*)  Alternatively, Plaintiff argues that Defendants overlook their more specific allegations, namely that Alliant knowingly provided substantial assistance to USI employees to resign and was aware of USI's employment contracts based on past litigation with USI.  (Doc. 90 at 11.)

First, putting aside Defendants' contention regarding the term "the Company" that the Court has already addressed, Plaintiff has sufficiently pled the first element.  Second, Plaintiff has sufficiently alleged that USI had knowledge of these employment agreements through past litigation.  (Doc. 52 at 25.)  Third, Plaintiff alleges numerous examples as to how Alliant facilitated Havard's and Engles' alleged breaches of their employment agreements.  These allegations include actions by an Alliant employee to recruit USI employees and that Alliant specifically brought over USI employees in hopes of gaining USI clients.  (*Id.* at 26–28.)  These allegations are not speculative, but rather are based in specific factual allegations.  And fourth, Plaintiff has properly pled resultant damages by referring to alleged damaged contractual and business relationships.  (*Id.* at 31.)

Taken together, Plaintiff has also met the relevant pleading standards for this claim. As a result, Defendants' Motion will be denied as to the tortious interference with contract claim against Alliant.

### E.  Aiding and Abetting the Breach of Duty of Loyalty - Alliant

Finally, Defendants seek to dismiss Plaintiff claim that Alliant knew or was

generally aware that Havard and Engles owed USI a duty of loyalty and substantially assisted or encouraged them in breaching that duty.  (Doc. 52 at 32.)  To state a claim for aiding and abetting, a plaintiff must allege facts showing: (1) a primary tortfeasor committed a tort causing injury to the plaintiff; (2) the defendant knew that the primary tortfeasor's conduct constituted a breach of duty; (3) the defendant substantially assisted or encouraged the primary tortfeasor in the achievement of the breach.  *Wells Fargo v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 31 (Ariz. 2002).

Defendants primarily assert that Plaintiff has failed to satisfactorily allege the third element.  (Doc. 76 at 15.)  Defendants contend that Plaintiff failed to allege that Alliant committed any independent act that *substantially* assisted or encouraged the alleged breach of loyalty by Havard and Engles.  (*Id.*)  Defendants also argue that Plaintiff has not pled any independent tortious act by Alliant that was unlawful.  (*Id.* at 17.)  Plaintiff counters that it alleged Alliant was aware of the postemployment restrictions of USI employees.  (Doc. 90 at 13.)  Plaintiff also notes that it alleged that an Alliant employee solicited a client of Engles, which supports an inference that Engles encouraged this Alliant employee to solicit his clients.  (*Id.* at 14.)  Taken together, Plaintiff argues that this is sufficient to survive a motion to dismiss.  (*Id.* at 13.)  The Court agrees.

In short, the allegations sufficiently track the elements to state a plausible claim under the relevant pleading standards  Plaintiff asserts that Havard and Engles moved to Alliant with Alliant's knowledge and substantial assistance, while knowing that Havard and Engles were breaching their agreements with USI.  Again, motions to dismiss are meant to test the sufficiency of the complaint, not resolve any factual disputes.  *See Dillenberg*, 836 F. Supp at 700.  Here, this claim is sufficiently pled and can move forward.  Accordingly, the Court will deny Defendants' Motion as to the aiding and abetting the breach of duty of loyalty claim against Alliant.

## IV.   CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED denying** Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 76).

Dated this 12th day of December, 2023.

Honorable Susan M. Brnovich
United States District Judge