# EXHIBIT A

[Page 1]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

USI Insurance Services, LLC, a Delaware limited liability company,

Plaintiff,

vs.

Alliant Insurance Services, Inc., a California corporation, William J. Havard, II, and Jane Doe Havard, husband and wife, Robert Engles and Jane Doe Engles, husband and wife, Jenise Purser and John Doe Purser, husband and wife, and Justin Walsh and Jane Doe Walsh, husband and wife,

Defendants.

No. 2:23-cv-00192-SMB

VIDEOTAPED DEPOSITION OF ROBERT PATRICK ENGLES

Phoenix, Arizona
March 31, 2023
9:57 a.m.

CERTIFIED COPY

Reported by:
CARRIE A. CARIATI
Registered Professional Reporter
Certified Realtime Reporter
Certified LiveNote Reporter
Arizona CR No. 50355
carrie@carriereporting.com

CARRIE REPORTING, LLC
Certified Reporters
2415 East Camelback Road
Suite 700
Phoenix, AZ 85016
(480)429-7573

[Page 2]

I N D E X


| WITNESS: | EXAMINATION | PAGE |
|---|---|---|
| ROBERT PATRICK ENGLES | | |
| | BY MS. YEE | 7 |
| | BY MR. STEPHENS | 140 |


E X H I B I T S


| DEPOSITION EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Declaration of Robert Engles | 12 |
| 2 | Defendant Robert Engles' Answers and Objections to Plaintiff's First Set of Interrogatories | 22 |
| 3 | Phone log, Bates No. ENGLES00000368 | 27 |
| 4 | Messages, Bates Nos. ENGLES00000001 through 10 | 31 |
| 5 | Message, Bates No. ENGLES00000029 | 38 |
| 6 | Messages, Bates Nos. ENGLES00000011 and 35 | 39 |
| 7 | Messages, Bates Nos. ENGLES00000030 through 32 | 42 |
| 8 | E-mail, with attachment, Bates Nos. ALLIANT00001190 through 1209 | 44 |
| 9 | Voicemail recording, Bates No. USI004623 | 51 |
| 10 | E-mail series, with attachment, Bates Nos. USI004309 through 4326 | 59 |
| 11 | E-mail, with attachment, Bates Nos. ENGLES00000285 through 320 | 64 |


[Page 3]

E X H I B I T S (continued)


| DEPOSITION EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| 12 | E-mail series, Bates No. ALLIANT00000001 | 66 |
| 13 | Messages, Bates Nos. ENGLES00000033 through 34 | 67 |
| 14 | Messages, Bates Nos. ENGLES00000037 through 45 | 72 |
| 15 | E-mail, with attachment, Bates Nos. ENGLES00000068 through 98 | 75 |
| 16 | E-mail, with attachments, Bates Nos. ENGLES00000099 through 221 | 85 |
| 17 | Messages, Bates Nos. ENGLES00000051 through 54 | 90 |
| 18 | Binder, Key Phone Numbers | 96 |
| 19 | Messages, Bates Nos. ENGLES00000047, 48, and 50 | 99 |
| 20 | Message, with attachment, Bates Nos. ENGLES00000282 through 284 | 100 |
| 21 | E-mail series, Bates No. USI004306 | 104 |
| 22 | Messages, Bates Nos. ENGLES00000016 through 17 | 106 |
| 23 | Messages, Bates Nos. ENGLES00000055 through 58 | 109 |
| 24 | Appointment, Bates No. USI004475 | 115 |
| 25 | E-mail, Bates Nos. ENGLES00000321 through 322 | 116 |
| 26 | E-mail, with attachment, Bates Nos. ENGLES00000154 through 184 | 117 |
| 27 | Messages, Bates Nos. ENGLES00000060 through 64 | 120 |


[Page 4]

E X H I B I T S (continued)


| DEPOSITION EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| 28 | LinkedIn profile | 131 |
| 29 | Message, Bates No. ENGLES00000018 | 133 |
| 30 | E-mail, Bates No. USI003937 | 134 |
| 31 | Message, Bates No. ENGLES00000012 | 136 |
| 32 | Termination Return of USI Intellectual Property, Bates Nos. USI016170 through 16171 | 138 |

[Page 5]

VIDEOTAPED DEPOSITION OF ROBERT PATRICK ENGLES was taken on March 31, 2023, commencing at 9:57 a.m. at the law offices of Snell & Wilmer, L.L.P., One East Washington Street, Suite 2700, Phoenix, Arizona, Arizona, before CARRIE A. CARIATI, RPR, CRR, CLR, CARRIE REPORTING, LLC, 2415 East Camelback Road, Suite 700, Phoenix, Arizona, a Certified Reporter in the State of Arizona.

COUNSEL APPEARING:
For the Plaintiff:
Snell & Wilmer, L.L.P.
By: JOSHUA WOODARD
JENNIFER R. YEE
DELILAH R. CASSIDY
One East Washington Street
Suite 2700
Phoenix, Arizona 85004
For the Defendants:
Morgan, Lewis & Bockius LLP
By: TIMOTHY J. STEPHENS
101 Park Avenue
New York, New York 10178

Also present: Samantha Elliott, videographer

[Page 6]

VIDEO TECHNICIAN: Good morning. My name is Samantha Elliott, certified legal video specialist, with K-Video Productions. Our court reporter is Carrie Cariati representing Carrie Reporting, LLC, located at 2415 East Camelback Road, Suite 700, Phoenix, Arizona.
We are at Snell & Wilmer, One East Washington Street, Suite 2700, Phoenix, Arizona, to take the deposition of Robert Engles in the United States District Court District of Arizona, case of USI Insurance Services, LLC, versus Alliant Insurance Services Incorporated, et al.
The date is March 31, 2023, and the time is 9:58 a.m. The attorneys will now introduce themselves and anyone else present on their behalf, noticing party first, please, and then the court reporter will swear in the witness.
MS. YEE: Good morning. Jennifer Yee on behalf of plaintiff USI Insurance Services, LLC. With me are my colleagues Josh Woodard and Delilah Cassidy.
MR. STEPHENS: Timothy Stephens from Morgan, Lewis & Bockius on behalf of the defendants.

[Page 7]

ROBERT PATRICK ENGLES,
a witness herein, having been first duly sworn by the Certified Court Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. YEE:
Q. Mr. Engles, why did you resign from USI without providing 60 days' notice?
A. I didn't think I had to provide notice.
Q. And what did you base that belief on?
A. Review of the employee handbook and the Wells agreement.
Q. Did you base that belief on anything else besides the employee handbook and your agreement?
A. Not that I am aware of.
Q. Did you coordinate with Alliant to resign from USI without providing 60 days' notice?
A. Alliant didn't urge me not to provide notice.
Q. I appreciate your answer, but my question was actually did you coordinate with Alliant to resign from USI without providing 60 days' notice --
MR. STEPHENS: Please note my form objection.

[Page 8]

MS. YEE: I'm sorry, go ahead.
MR. STEPHENS: Please note my form objection.
THE WITNESS: I coordinated with Alliant for employment. I did not coordinate them to not provide notice that I was going to terminate my employment.
BY MS. YEE:
Q. Was that something you coordinated by yourself?
MR. STEPHENS: I object to the form.
THE WITNESS: That's a decision I made.
BY MS. YEE:
Q. Did anyone at Alliant tell you to not give 60 days' notice before resigning from USI?
A. No.
Q. Did you give Eric Harper information about the clients you provided services for during your last two years of employment at USI?
MR. STEPHENS: I object to form.
MS. YEE: What is the matter with that question, Tim?
MR. STEPHENS: As to timing.
MS. YEE: What part of the timing?
MR. STEPHENS: Are you talking about when they worked together at USI or some other time?
MS. YEE: Oh, I can clarify the question,

[Page 9]

thank you.
BY MS. YEE:
Q. Mr. Engles, to clarify my prior question, during your employment at Alliant, did you give Eric Harper information about the clients you serviced --
A. No.
Q. -- during your -- I'm sorry, let me finish my question.
A. Yeah.
Q. During your employment at Alliant, did you give Eric Harper information about the clients you serviced during your last two years of employment at USI?
A. No.
Q. Do you consider clients information like their identities or the insurance that they purchase confidential?
A. I don't know what is considered confidential. Do I consider client names confidential?
Q. Yeah, I will repeat my question. Perhaps that will help.
Do you consider clients information, such as their identities or the insurance that they purchase, confidential?
MR. STEPHENS: Objection to form. Vague.
THE WITNESS: I guess confidential to my

[Page 10]

prior employer, is that what you are talking about?
BY MS. YEE:
Q. Yes.
A. I don't know what the -- I would assume yes.
Q. Mr. Harper [sic], have you been deposed before?
A. My name is not Mr. Harper.
Q. Oh, excuse me, I'm sorry.
Mr. Engles, have you been deposed before?
A. No.
Q. I am going to go over a couple of ground rules to make your testimony a little bit smoother and quicker today. You understand that you have just taken an oath to tell the truth just like if you were sitting in a court of law, correct?
A. Yes.
Q. And are you taking any medications that would prevent you from giving truthful or accurate testimony here today?
A. No.
Q. Is there anything else that would prevent you from giving truthful or accurate testimony here today?
A. No.
Q. You can ask me to rephrase a question, if necessary. I may do that on my own just to help get a clean transcript, but you can certainly ask if you don't

[Page 11]

understand a question. In fact, I encourage you to, okay?
A. Thank you.
Q. And if we can avoid talking over one another, that will also help the court reporter get a clean transcript.
A. I'll try.
Q. And if you could give verbal responses like "yes" or "no" instead of "uh-huh" or "uh-uh," that will also help the court reporter get a clean transcript.
We will take breaks as necessary, and just let us know if you need a break. The only thing I ask is, if there is a pending question, you answer my question before we go on break, okay?
A. Yeah.
Q. Mr. Engles, are you married?
A. Yes.
Q. And what is your wife's name?
A. Hope. Hope Lorraine Engles.
Q. How long have you been married?
A. 14 and a half, maybe 15 years. She would kill me for that.
Q. Where do you live?
A. Anthem.
Q. What is your address?
A. 2112 West Hemingway Court, Anthem, Arizona

[Page 12]

85086.
Q. How long have you lived at that address?
A. About 13 years, roughly.
Q. What is your current position at Alliant?
A. First vice president.
Q. Who was your employer before you went to work for Alliant?
A. USI -- or Wells Fargo.
Q. What was your position at USI?
A. Vice president.
Q. Did you enjoy your work at USI?
A. I enjoyed working with the clients.
(Deposition Exhibit No. 1 was marked for identification by the reporter.)
BY MS. YEE:
Q. Mr. Engles, the court reporter has handed you an exhibit marked Exhibit No. 1. If you could take a quick look at it and let me know when you are ready.
A. Okay.
Q. If you turn to page 4 of that document, is that your signature?
A. Yes, it is.
Q. And do you see that statement, "I declare under penalty of perjury that the foregoing is true and correct"?

[Page 13]

A. Yes.
Q. So would it be fair to say that this is your under oath declaration that you signed?
A. I believe so.
Q. Okay. And if you turn to page 2 of that document, I am going to ask you a couple of questions. And in paragraph 3 of that document, the second sentence on line 10 says: "I became an employee of USI when USI acquired Wells Fargo in 2017."
Do you see that?
A. I do.
Q. Is that your understanding of the nature of your employment 2017 until you resigned?
A. My understanding is that I was an employee of Wells Fargo Insurance and that USI had acquired Wells Fargo Insurance.
Q. And you received your compensation payments from USI starting in late 2017, correct?
A. Yes, they paid me.
Q. Going down to line 16, do you see the sentence that says: "I resigned from USI because I had become disenchanted with the work atmosphere and found what I believe is a better opportunity at Alliant"?
A. Yes.
Q. Why were you disenchanted with the work

[Page 14]

atmosphere at USI?
A. There was several reasons. The -- there was an individual there that was the commercial lines manager. He, on several occasions, acted inappropriately with respect to yelling at me in front of other employees at USI. He made statements that were crazy.
He claimed that he was a gangster from Florida and that he didn't care about management. And if we would question him on service work, he would just lose it. I did bring that to my manager's attention, and it didn't appear that anything was ever done about that.
Q. Who was that -- oh. I'm sorry, go ahead.
A. No, go ahead.
Q. Who is that commercial lines manager you are referring to?
A. Jack Lansdale.
Q. And I believe interrupted you, so please go ahead.
A. That's okay.
There was also issues with service work and just the -- you know, the book of business I worked on was spread across multiple account managers, which is -- which is hard to manage. They were trying to institute different processes to fix certain servicing issues while I was there, but those processes didn't seem like they

[Page 15]

were working.
For example, we had a large renewal coming up for a renewal for an account in San Diego. They had assigned it to a new person who was a seasoned account manager. I had followed up with her for about three or four months asking her: Hey, this is going to be a tough renewal. We need to be ahead of it. What are we going to do to -- have you gotten the request to the client? Have you got it out to market?
About, I would say, seven weeks roughly prior to the renewal, she and I texted back and forth. I followed up with her again, and she said that she was out of town but that she promised she would work on it when she got back. And that was already a month late. We had already put the client in a bad position, tough risk to write. We knew we needed months to work on it.
So I brought it to -- to my manager's attention, who brought it to the commercial lines manager's attention. It was again a problem dealing with the commercial lines manager trying to get that -- he thought that I was just trying to make him look bad, and I said: No. We need to get this work done.
And so they eventually assigned it to one of the new -- I don't know if he was an account rep or account manager at the time, who had very little

[Page 16]

experience working on that account. A few weeks working with him on the account trying to get it out to market and do things, it was clear that he didn't have experience to work on the type of account we were working on.
It was a complex property placement, high risk, wildfire zone in San Diego. I brought back up to the commercial lines manager -- I brought it to his manager and said: "Look, I don't know that" -- and I can't remember exactly what I told her -- "I don't know that he has the experience to do this."
She brought it to the commercial lines manager; the commercial lines manager lost it. And I can't recall what -- how it actually got -- what the assignments were at that point, but then I basically took over the property placement and did the property placement myself and worked with Doris, his supervisor, and Doris made the rest of the placement.
We presented it to the client the day before the renewal, and it was just poor -- poor service. But there were several issues like that that had gone on over the past year to two years.
Q. Who was the first account manager that you were referring to who you had the issues with delay and the like?
A. Vicki Hodge. I believe it was Vicki Hodge.

[Page 17]

Q. And who was your immediate manager that you elevated this to that you were referring to just now?
A. Ben Greer. The supervisor of the account manager that I elevated it to by the time it got to that point was Doris Van Leeuwen. Doris Van Leeuwen then escalated my e-mail to Jack Lansdale.
Q. In your declaration you go on to say, quote, I believe -- excuse me -- that you found, quote, what I believe is a better opportunity at Alliant, close quote.
Why was the opportunity at Alliant better?
A. Multiple reasons. The offer, the financial offer of employment was good. I believed Alliant had a good reputation in the market and had a good servicing platform that they utilized to deploy services.
Q. Was there any other reasons that the offer from Alliant -- or excuse me -- the opportunity at Alliant was better?
A. I am sure there were, but I can't recall. Those are the core.
Q. If you go down to line 23 of your declaration on that same page, it says: I certainly left my USI accounts in fine order and had provided the USI team members who worked on my accounts with everything they needed for USI to continue to service the accounts, including up-to-the-minute status descriptions I circulated to the

[Page 18]

team members before my departure.
Do you see that?
A. Yes.
Q. Which team members are you referring to in that statement?
A. I can't recall who I sent e-mails to. I can't recall who I sent e-mails to the night, like, the 23rd and 24th -- it was the 24th -- I believe the night of the 24th that I tried to take any outstanding items in my inbox and forward to the team members that were on the account. You got to remember I worked with anywhere from 8 to 12 people on the book of business I worked on.
Q. Were the 8 to 12 people that you worked with on your book of business inclusive of Ms. Purser, Ms. Phalen, Ms. Hartman, or Mr. Walsh in the Phoenix office?
A. Those are not the people I am referring to.
Q. Which people are you referring to?
A. The people I worked with?
Q. Correct.
A. Oh, man, it is a lot. Erica Krahn, Andrea Krahn, Ashley Ballesteros, Emily Greer, Ronnie -- I think her last name is Signelli, the account manager that was on Zucrum -- I can't remember his name -- Barb Villa --
Q. I'm sorry, Barb?
A. Villa, V-I-L-L-A, I think is how you pronounce

[Page 19]

-- or spell her last name.
And I can't remember the other names right now.
Q. And your testimony is that you provided them up-to-the-minute status descriptions immediately before your departure on January 25th?
A. I didn't provide all of them with e-mails but any outstanding items I had that I believed were needed to be addressed, I had sent e-mails to individuals to deal with.
I think I sent an e-mail to Erica Krahn about -- Kowalski Construction was one -- advising her I had a conversation -- I can't remember everything in the e-mail, but I believe I advised her I had a conversation with the rep at Kowalski stating his concerns about timing around the renewal and that it was very important the renewal be presented this date, that he was going out of town, and that she needed to be aware of these things, and there were a few e-mails of that nature.
Q. Did you send those the night before you resigned from USI?
A. I did.
Q. Would it be fair to state that the night before you resigned from USI you intended to resign and go work at Alliant?

[Page 20]

A. I did not make the decision -- true decision to work for Alliant until I hit send on the e-mail I sent to Ben Greer resigning.
Q. And why is that?
A. I had not decided yet if I was going to take that job or not.
Q. Did you have any concerns or something causing you pause that led to you not deciding until you hit send on that e-mail?
A. I was at Wells Fargo for 13 years -- I think it was 13 and a half years. I had made a career there, and it was a tough decision.
Q. If you turn to the next page of your declaration starting on line 1 of page 3, it says: "I firmly believe USI's complaint that I did not give 60 days' notice is a smokescreen. USI had no intention to keep me around for any transition period."
Do you see that?
A. Yes.
Q. What do you base your belief on that "USI had no intention to keep me around for any transition period"?
A. I had seen two people leave that actually gave notice and from my vantage it appeared that they just basically got boxed out. I don't even think they were in the office for the last seven weeks of their employment.

[Page 21]

Q. What's those two peoples' names you just referred to?
A. Nick Baxter, another gentleman was Jeremy Groham.
Q. Jeremy?
A. Groham.
Q. Further down on that page starting on line 26, there is a sentence that starts like this: "I do not believe, however, that it would serve any legitimate business interest of USI if I were enjoined from performing insurance services for former USI clients who decide, without any solicitation or inducement by me, to become Alliant clients."
Do you see that?
A. Which -- where is it?
Q. So starting on the bottom of page 3, line 26.
A. Okay. Got it. Okay.
Q. There is a sentence that starts: "I do not believe ...."
Do you see that?
A. Yes.
Q. And it goes onto the top of page 4 to the end of line 2.
A. Yes.
Q. Do you think companies have legitimate business

[Page 22]

interests in their client relationships?
A. Could you repeat the question?
Q. Sure.
MS. YEE: Go ahead, Carrie.
(The following requested portion of the record was read back by the reporter.)
"QUESTION: Do you think companies have legitimate business interests in their client relationships?"
THE WITNESS: Yes.
BY MS. YEE:
Q. If you look at page 4, line 4, that same page, that final paragraph, paragraph No. 12 says: "Finally, although I am not aware that USI has accused me of doing so, I have not misappropriated or improperly used or disclosed any materials or information that could conceivably be deemed confidential or proprietary to USI."
Do you see that?
A. Yes.
Q. Is that a truthful statement?
A. Yes.
Q. You can go ahead and set that aside.
(Deposition Exhibit No. 2 was marked for identification by the reporter.)

[Page 23]

BY MS. YEE:
Q. Mr. Engles, the court reporter has handed you a document marked Exhibit No. 2 that is labeled "Defendant Robert Engles' Answers and Objections to Plaintiff's First Set of Interrogatories."
Do you see that?
A. Yes.
Q. And if you flip to the back page, page 20 of that document, it says that you have reviewed the foregoing answers and objections and you declare under penalty of perjury -- and I am paraphrasing here -- that the foregoing factual representations are true and correct.
Do you see that?
A. Yes.
Q. And that's your signature there dated March 13th, correct?
A. Yes.
Q. Okay. Did you review these discovery responses before you signed?
A. Yes.
Q. Okay. Let's go ahead and flip to page 9 of that document. And if you look on line 9 of page 9, it says: "During his communications with customers, Defendant" -- which is you -- "directly and indirectly referenced the

[Page 24]

Engles Agreement and contractual restrictions therein."
Do you see that?
A. Yes.
Q. It goes on to say: "Engles' recollection of such communication follows."
Do you see that?
A. Yes.
Q. If you go down to the first bullet point, it talks about a call you received from Dean Rosenloff, president of Van Horn Aviation.
Do you see that?
A. Yes.
Q. And do you see that it refers to Mr. Van Horn [sic] being upset because you didn't give him a heads up about your departure from USI to Alliant?
A. He is not Mr. Van Horn.
Q. Oh, I'm sorry. Mr. Rosenloff was upset that you "did not give him a 'heads up' about his departure from USI ...."
Do you see that?
A. Yes.
Q. And do you recall that conversation?
A. Yes, I recall the conversation. I couldn't give you a detail through detail of the conversation.
Q. Do you remember generally what Mr. Rosenloff

Q. Okay. Do you recall what Mr. Orear said in this voicemail to you that he references in this message?
A. I don't.
Q. But he seems to indicate that he wants to connect with you in this January 3rd message; is that right?
A. Yes.
Q. Would it be fair to say that your discussions with Mr. Orear about becoming employed by Alliant were moving forward as of January 3rd?
A. We had continued dialogue. The holidays happened. I don't know when we really started picking up the dialogue again, but we had continued dialogue about discussions with being employed at Alliant.
Q. And how far had that dialogue progressed by January 3rd?
A. I don't know how to answer that question. What do you mean by "progressed"? Like, they had told me about Alliant; I had the meeting with Andy in December. I can't remember if I had calls prior to this, but it was just kind of continued dialogue about am I interested, do I want to continue discussions.
I don't believe I had -- they had given me, like, a verbal offer at that point if that is what you are asking, but I am not sure.



Q. Did you intend to leave USI as of January 3, 2023?
A. I was uncertain.
Q. You can go ahead and set that one aside.
(Deposition Exhibit No. 7 was marked for identification by the reporter.)
BY MS. YEE:
Q. Mr. Engles, the court reporter has handed you a document marked Exhibit No. 7.
Do you see that?
A. Yes.
Q. This document appears to be a message to a number that we previously established belonged to Jay Fischer dated January 13, 2023.
Do you see that?
A. Yes.
Q. And in this message you asked: What is your e-mail address?
Do you see that?
A. Yes.
Q. Why were you asking for Mr. Fischer's e-mail address?
A. I don't recall at that point, but I mean, I -- I think by that date we had gone further down the path, I think we had the discussion about, like, actually moving,



and I believe -- and I don't know if I did or he did -- but I was going to send him my employment agreement with Wells.
Q. And why were you going to send Mr. Fischer your employment agreement with your current employer?
A. I can't remember if I initiated it or he initiated, but I believe there is verbiage in the agreement that requires me to. So I don't know if he initiated that or I did, but that's -- one of us discussed sending it so I got his e-mail address to send him the employment agreement.
Q. And in the following page of that exhibit he responds back with his Alliant e-mail address, correct?
A. Yes.
Q. And then if you turn to the last page, he says: Got it! I am on a plane, but let's chat when you have time.
A. Yes.
Q. Do you see that?
A. Yes.
Q. What did, to your knowledge, he want to chat with you about after seeing your employment agreement?
MR. STEPHENS: I object to the form.
THE WITNESS: Yeah. I don't -- I don't recall. I mean, it could be about employment with



Alliant.
BY MS. YEE:
Q. Did Mr. Fischer tell you that he wanted to evaluate your current employment agreement for any restrictions with your current employer?
A. I don't know if he brought up, like, covenants or not. He wanted to look at the agreement.
(Deposition Exhibit No. 8 was marked for identification by the reporter.)
BY MS. YEE:
Q. Mr. Engles, the court reporter has handed you a document marked Exhibit No. 8.
Do you see that?
A. Yes.
Q. This appears to be an e-mail from you at your Gmail address to Mr. Fischer at Alliant dated January 13, 2023.
Do you see that?
A. Yes.
Q. And attached to that e-mail is your employment agreement.
Do you see that?
A. Yes.
Q. And as of this date, were you planning to leave USI?

[Page 45]

A. I did not know if I was going to accept employment from another company or not.
Q. So as of this date, you didn't know you were planning to work at Alliant?
MR. STEPHENS: I object to the form.
THE WITNESS: No. I was actually talking to other brokerages too as well.
BY MS. YEE:
Q. Which other brokerages were you talking to?
A. Liberty had reached out around the same time, Liberty Underwriters.
Q. Did you send anybody at Liberty Underwriters your employment agreement?
A. I believe so, yes.
Q. Who did you send it to?
A. I don't know if it was the recruiter, her name is Nazarin, or the gentleman I had been speaking to, Jonathan Axel, and it could have been someone else but it was either -- I spoke I think to two or three different people at Liberty, one being Jon and I think it was Jon who I had sent my employment agreement to.
Q. Were there any other companies that you were currently speaking with about potentially becoming employed there during this time frame in January of 2023?
A. I had previously spoken to a gentleman at

[Page 46]

AssuredPartners. I can't remember his name. But that was back probably in the same time, like, October, November, December. I can't recall what the time was. I did not follow up with that gentleman, though.
Q. You did not send that gentleman at AssuredPartners your current employment agreement?
A. No.
Q. Are there any other companies that fall into this category that we are talking about here of companies that you were in discussions with about potential employment?
A. Not that I recall.
Q. So would it be fair to say it is three: Alliant, Liberty Underwriters, and AssuredPartners?
A. Three that I -- I did what?
Q. That you were in discussions with during this time period about potential employment.
A. Yes.
Q. And of these three, you sent your current employment agreement to two of them, Liberty Underwriters and Alliant?
A. Correct.
Q. Okay. If you turn to page 4 of your employment agreement that you attached, it contains a definition of confidential information about halfway down the page in

[Page 47]

section G.
Do you see that?
A. Yes.
Q. And starting about five lines down in that paragraph, it says that confidential information is including, but not limited to, the identity, authority, and responsibilities of key contacts and decision-makers employed by the client accounts or prospective clients of the company or any predecessor.
Do you see that?
A. I'm sorry, I got distracted. You are on confidential information section?
Q. Correct. So section G, halfway down the page, there is a Romanette i, which looks like a "i" about five lines down.
A. Yes.
Q. And it says that confidential information is including, but not limited to, the identity, authority, and responsibilities of key contacts and decision-makers employed by the client accounts or active prospective clients of the company or any predecessor.
Do you see that?
A. Yes.
Q. Did you have any questions about that provision at the time you signed this agreement?

[Page 48]

A. I don't recall.
Q. Okay. You were paid a retention bonus payment at the time you received this agreement?
A. No.
Q. You were not?
A. Correct, you are right. I'm sorry. I don't know if it is part of this agreement. We were -- I can't recall what it was. We -- so we were paid a bonus. I just can't recall when it was. It was five years ago. I don't know if it was a retention bonus or bonus by Wells to go over. But, yes, we were paid a bonus in, like, year one, and I can't recall what that was.
Q. Okay. You would agree with me, though, starting on page 9 of this agreement, going on to page 10, it articulates that you are eligible for a retention bonus payment, correct?
A. Yeah, yes.
Q. And then going down further on page 10, it talks about the timing of when that retention bonus would be paid, correct?
A. Yes.
Q. Okay. If you turn a couple pages forward to page 15 of the agreement, this talks about termination and down in section 8.2, it says: "Termination by Producer."
Do you see that?

[Page 49]

A. Yes.
Q. And that language there says: Producer may terminate Producer's employment hereunder by giving at least 60 days' written notice to the company.
Do you see that?
A. I see that.
Q. Do you read that as optional or mandatory?
A. Optional.
Q. And why do you read that as optional?
A. Because the verbiage states that I "may" give notice and then the employee handbook specifically says that we are at will. So I had thought that my employment with Wells was at will; they could fire me or I could leave at any time.
Q. So you are saying the verbiage "may" is what led you to believe in this agreement that giving 60 days' notice was optional?
MR. STEPHENS: I object to the form.
THE WITNESS: That along with the employee handbook.
BY MS. YEE:
Q. If you flip a couple pages back to page 13 of that agreement, section 7.6 talks about Nonacceptance and Nonservice of Clients and Active Prospective Clients.
Do you see that?

[Page 50]

A. Yes.
Q. And later on in 7.6(a), it says: During the term and for two years after producer is no longer employed for any reason, producer shall not, directly or indirectly, on behalf of any competitive business in any capacity -- and then it goes on to list some restrictions.
Do you see that?
A. Yes.
Q. What is your understanding of that restriction?
A. I am not an attorney --
MR. STEPHENS: Object to the form.
THE WITNESS: Oh.
BY MS. YEE:
Q. And by the way, I am not asking for your legal interpretation. I am asking for your personal understanding.
A. Sure. The gist of what this reads is that I can't -- let me read it. Hold on.
I mean, the gist is I can't service or solicit accounts that I wrote or managed with Wells for the prior two years.
Q. And what does the language "directly or indirectly" mean to you? Again, not asking for a legal interpretation, just your personal understanding.
A. That I can't solicit -- I can't call clients and

[Page 51]

ask them for their business.
Q. Do you think other people can call clients that you serviced during your last two years of employment on your behalf?
A. On my behalf?
Q. Correct.
A. No.
Q. You can go ahead and set that aside.
MR. STEPHENS: Can we take a break whenever --
MS. YEE: Yeah. I've just got one item and then we will be good for a break.
MR. STEPHENS: All right.
(Deposition Exhibit No. 9 was marked for identification by the reporter.)
BY MS. YEE:
Q. Mr. Engles, the court reporter has handed you a document marked Exhibit No. 9. That document is an audio file that was produced in this case and it's on a thumb drive, and I am going to play you that audio file and ask you some questions about it.
"Hey, Bob, my name is Eric Harper. I work at Alliant Insurance Services with Robert Engles, formerly USI, Wells Fargo. Robert asked me to give you a call. We all made the transition over. I am in California, so I

[Page 52]

can call everyone. Robert can take your call; he just can't make calls right now. We are getting all that straightened out hopefully very, very soon.
"But he wanted me to touch base with you, kind of fill you in on what is going on, and please call him at the any time. And we are working on transitioning all his clients over here. It is a thousand times better shop, but I can explain all that to you. So if you have a moment, please call me at (949) 351-7737. Thank you."
BY MS. YEE:
Q. Mr. Engles, do you recognize the voice of who is on that audio recording?
A. I do.
Q. And whose voice is that?
A. Eric Harper.
Q. And what is Mr. Harper's job title?
A. At USI or Alliant?
Q. Well, let's start with USI.
A. I am not sure if it was a VP or EVP at USI. I believe he was an EVP at -- I think he is a vice president at Alliant.
Q. So he was previously employed by USI, now he is employed with you at Alliant; is that fair?
A. He is employed at Alliant, yes.
Q. And that's where you are currently employed?

[Page 57]

former clients to Alliant? I was not.
MS. YEE: Okay. We can go ahead and take a break.
MR. STEPHENS: Thank you.
VIDEO TECHNICIAN: Off the record at 11:07.
(Recess ensued from 11:07 a.m. until 11:21 a.m.)
VIDEO TECHNICIAN: Back on the record at 11:22.
BY MS. YEE:
Q. Mr. Engles, you understand you are still under oath, correct?
A. Yes.
Q. Okay. We were previously discussing in Exhibit 8 you sending your employment agreement with your current employer to Jay Fischer at Alliant.
A. Yes.
Q. Do you see that?
A. Yes.
Q. And then you had a meeting after you sent that e-mail with Mr. Fischer at Grayhawk, correct?
A. I don't recall if it was before or after.
Q. Okay. And I previously asked you a question about whether or not you discussed your contractual restrictions with your current employer during your

[Page 58]

meeting with Mr. Fischer at Grayhawk.
Do you recall that?
A. With -- discuss Wells with -- when you say current employer I am thinking Wells, so I apologize for that. I recall the question, yes.
Q. Okay. And you had answered that he had not asked you about your contractual restrictions. I just want to be clear. Did you raise the issue of your contractual restrictions with your employer during your meeting with Mr. Fischer at Grayhawk?
MR. STEPHENS: I object to the form.
THE WITNESS: I don't -- I don't recall if we discussed the contract at that meeting or not.
BY MS. YEE:
Q. Okay. And you also testified that the night before you resigned from USI you had e-mailed 8 to 10 people some up to-the-minute updates regarding some outstanding client items.
Do you recall that testimony?
A. I don't believe I said --
MR. STEPHENS: I object to form.
THE WITNESS: I don't believe I said I e-mailed 8 to 10 people. I believe it was I worked with 8 to 10 people.

[Page 59]

BY MS. YEE:
Q. I see. And do you remember approximately how many of those 8 to 10 people you worked with you e-mailed the night before your resignation from USI?
A. I don't recall.
Q. And when you sent those e-mails providing updates the night before you resigned from USI, did you tell any of those coworkers that you were resigning?
A. No.
Q. And why not?
A. I don't know. I didn't see any reason to tell them.
Q. Would it be fair to say, though, that you intended to resign as of the night before you actually resigned from USI?
A. I did not know if I was going to truly resign until literally I hit send on the e-mail resigning.
Q. So why did you forward updated info to your coworkers the night before if you didn't know you were going to resign until you hit send on the e-mail?
A. Because I was thinking about it.
(Deposition Exhibit No. 10 was marked for identification by the reporter.)
BY MS. YEE:
Q. Mr. Engles, the court reporter has handed

[Page 60]

you a document marked Exhibit No. 10, the first page of which appears to be an e-mail from you to Mr. Havard on January 17, 2023.
Do you see that?
A. Yes.
Q. And lower down in the thread, Kpish Goyal e-mailed you a proposal that he had received from someone at Alliant.
Do you see that?
A. Yes.
Q. Do you have any understanding as to why Mr. Kpish forwarded you a proposal he received from Alliant while you were working at USI?
A. We were asking to work on and provide options on his workers' compensation insurance.
Q. Okay. So as of January 17, 2023, you were trying to secure this business for workers' compensation insurance for Kpish's company on behalf of USI?
A. Yes.
Q. Okay. Attached to Kpish's e-mail, which you forwarded to Mr. Havard, are some proposal documents related to the proposal from Alliant.
Do you see that?
A. Yes.
Q. Did you discuss these documents with Mr. Havard?

[Page 65]

Mr. Fischer asked you for these documents?
A. No.
Q. Were you planning to leave USI at the time you sent this e-mail on January 20th?
A. I was considering it. I will say this, though, I believe the intent on sending these was -- they were part of the employment agreement. I think that was the -- but I am not sure.
Q. So in other words, this was a follow up to you sending your USI employment agreement to Mr. Fischer on the 13th as reflected in Exhibit 8?
A. Yeah, I am not sure.
Q. Did you have a verbal conversation with Mr. Fischer that preceded you sending this e-mail about your USI equity offer letters?
A. I don't know if he texted, e-mailed, or called me about them.
Q. But you think that likely occurred?
A. Sure.
Q. Okay. And at the time you sent this e-mail to Mr. Fischer attaching your USI equity offer letters, were you planning to join Alliant?
A. I was considering it.
Q. Were you seriously considering it?
A. I don't know how -- I don't know. I was going

[Page 66]

back and forth on whether or not I was considering joining.
Q. Do you remember how Mr. Fischer responded to you sending him these documents that are reflected in Exhibit No. 11?
MR. STEPHENS: I object to the form.
THE WITNESS: I do not.
BY MS. YEE:
Q. You don't remember?
A. How he responded to me sending this (indicating)?
Q. Correct.
A. No.
Q. Okay.
(Deposition Exhibit No. 12 was marked for identification by the reporter.)
BY MS. YEE:
Q. The court reporter has handed you a document marked Exhibit No. 12.
Do you see that?
A. Yes.
Q. And that appears to be an e-mail from Jay Fischer to you dated January 20, 2023.
Do you see that?
A. Yes.

[Page 67]

Q. And it has the subject line: Stock purchase agreements.
Do you see that?
A. Yes.
Q. And Mr. Fischer sends you a thumbs up sign. Does that help refresh your recollection about the substance of your discussions with Mr. Fischer on January 20th?
A. No. I think that is just confirming that he got it.
Q. Okay.
(Deposition Exhibit No. 13 was marked for identification by the reporter.)
BY MS. YEE:
Q. Mr. Engles, this document marked Exhibit No. 13 contains some text messages that we previously identified as a phone number belonging to Jay Fischer to you on January 20, 2023.
Do you see that?
A. Yes.
Q. And Mr. Fischer asks you -- or excuse me, he tells you: When you want to talk B shares and how they work, call me.
Do you see that?
A. Yes.

[Page 68]

Q. And then a little over an hour and a half later on page 2, he texts you: That's a good deal. Good negotiating.
Do you see that?
A. Yes.
Q. As of January 20, 2023, were you negotiating regarding your compensation at Alliant?
A. I don't know that the dates on here (indicating) are correct. I don't recall what date it was. We did discuss shares and compensation around this date, but I think that is an incorrect date.
Q. Why do you think that is an incorrect date?
A. I had thought -- I thought it was the 21st or 22nd, but I can't recall.
Q. These documents were produced by you, correct?
A. By the attorneys, correct, yes.
Q. Yes. And you provided documents to your attorneys to produce to us in this case, correct?
A. I gave them access to my phone and everything else, yeah.
Q. Do you have any reason to believe that data on your phone was altered or -- or otherwise compromised that would render this date incorrect on this exhibit?
A. I don't. I just don't -- the dates are off I think, but I don't know. It is by a day or something.

[Page 69]

Q. And by B shares, are you talking about options at Alliant?
A. I don't know if you would consider them options.
Q. What would you consider them?
A. Stock.
Q. The opportunity to purchase stock or actual equity?
A. As part of the employment agreement -- well, I just -- I don't know how to answer that question.
Q. Would it help if the court reporter restated it?
A. Sure.
(The following requested portion of the record was read back by the reporter.)
"QUESTION: And by B shares, are you talking about options at Alliant?
"ANSWER: I don't know if you would consider them options.
"QUESTION: What would you consider them?
"ANSWER: Stock.
"QUESTION: The opportunity to purchase stock or actual equity?"
THE WITNESS: What do you mean by "actual equity" I guess is the question?
BY MS. YEE:
Q. Sure. So a certain class of stock in Alliant,

[Page 70]

for example, might be a type of equity that you received. Is that what you were referring to when you mentioned that?
A. I believe so.
Q. And if you go to page 2 of that exhibit, Mr. Fischer messaged you: That's a good deal. Good negotiating.
Do you see that?
A. Yes.
Q. Was there a phone call in between these two text messages that occurred?
MR. STEPHENS: With Mr. Fischer?
MS. YEE: Yes.
THE WITNESS: I believe so, yes.
BY MS. YEE:
Q. And what was the substance of that phone call?
A. Was the offer, was what they were willing to pay me if I came over to Alliant.
Q. And what was the offer that Mr. Fischer articulated to you during that phone call on January 20?
A. It was not Mr. Fischer who articulated an offer to me.
Q. Let me back up a second.
So you had a phone call with Mr. Fischer between these two text messages on January 20; is that

[Page 71]

right?
A. Again, I don't know if these dates are correct, but yes.
Q. But Mr. Fischer is not the one who discussed with you the terms of your proposed compensation?
MR. STEPHENS: Object to the form.
THE WITNESS: He had initial discussions with me on what it would look like, and then I had discussions with another person with Mr. Fischer on the phone.
BY MS. YEE:
Q. I see. And was that other person --
A. Bled.
Q. I want to make sure I pronounce his name correctly. Bledion Dizdari?
A. I can't pronounce his name, so ...
MR. STEPHENS: Bledion Dizdari.
BY MS. YEE:
Q. Dizdari. Would it be okay if I call him "Bled"?
A. He goes by "Bled."
Q. You had a conversation with Mr. Fischer and Bled about your compensation at Alliant?
A. Yes.
Q. Okay. And --
A. It was a conversation and text.

[Page 72]

Q. Okay. That helps.
(Deposition Exhibit No. 14 was marked for identification by the reporter.)
(Off the record.)
BY MS. YEE:
Q. Mr. Engles, the court reporter handed you a document marked Exhibit 14.
Do you see this document?
A. Yes.
Q. And this contains a January 20th text message from Bled to you and the phone number that starts with 510 that we previously identified with Jay -- as Jay Fischer.
Do you see that?
A. Yes.
Q. And this text message looks like it is separate from the text messages in Exhibit 13 we discussed.
Do you see that?
A. Yes.
Q. So in this text message, Bled texts you an offer of salary, sign on, year one, year two, and then equity.
Do you see that?
A. Yes.
Q. And is this what you were previously testifying to just a moment ago about the conversation you had with Mr. Fischer and another person about your compensation?

[Page 73]

A. Bled, yes.
Q. Okay. And you followed up and asked in the text message on page 2: Could there be an option to take year 1 and year 2 in stock?
Do you see that?
A. Yes.
Q. And then Bled responded to you, "yes," on the next page.
Do you see that?
A. Yes.
Q. And you go onto the next page labeled ENGLES 40, and it says, "I agreed to the above." That's what you texted Mr. Fischer and Bled; is that correct?
A. Yes.
Q. So would it be fair to say that as of January 20, 2023, at 7:20 p.m. you had agreed to the terms of your compensation offered to you by Alliant?
A. I had not accepted employment at Alliant at that portion -- I agreed to, like, that's a good offer, that's what I was agreeing to.
Q. Okay. And Mr. Fischer on the next page texts you back, "Nice," exclamation point.
Do you see that?
A. Yes.
Q. And then if you turn one more page forward it

[Page 74]

appears there is another text from Bled that contains some additional compensation terms for you.
Do you see that?
A. Page what?
Q. ENGLES 42.
A. Yes.
Q. And then in the next page, ENGLES 43, Bled says: Final deal.
Do you see that?
A. Yes.
Q. Okay. And you text back on January 20, 2023: Works.
Do you see that?
A. Yes.
Q. Okay. So would it be fair to say that the compensation outline that Mr. Dizdari texted you on January 20, 2023, at 8:30 p.m. worked for you?
A. It was the -- it was a good offer. That's what I was referring to.
Q. Okay.
A. At that time I didn't know if I was going to leave and accept the offer from Alliant or stay at USI.
Q. Mr. Bled followed up the text message two days later with an agreement for you to review and send back to him, which was reflected on the final page of this

[Page 75]

exhibit.
Do you see that?
A. Yes.
Q. And was that your Alliant employment agreement he sent you?
A. I am not sure.
(Deposition Exhibit No. 15 was marked for identification by the reporter.)
BY MS. YEE:
Q. Mr. Engles, the court reporter has handed you a document marked Exhibit No. 15. This is an e-mail from you to yourself dated January 22nd, 2023, attaching an Alliant employment agreement.
Do you see that?
A. Yes.
Q. Does that help refresh your recollection about what agreement Mr. Dizdari sent you on January 22nd?
A. No.
Q. How did you receive this Alliant employment agreement?
A. I thought the agreement was sent to me via -- I believe I received the agreement on the 24th or the 25th.
Q. So how would you have this agreement in your possession to e-mail to yourself on January 22nd if you didn't receive it until the 24th or the 25th of January?

[Page 76]

A. I don't know if I got it to review it prior. I don't know. I don't recall.
Q. If you turn to the Alliant employment agreement that is attached to this e-mail, on page 3 of 17 of that agreement there is title and duties.
Do you see that that in section 2(a)?
A. Yes.
Q. And that articulates that your job title will be first vice president producer and that your duties and responsibilities will include soliciting customers and producing, servicing, and retaining new and existing customers in accounts for and on behalf of Alliant, and then it goes on to list some other duties.
Do you see that?
A. I do.
Q. Are those the same job duties approximately you had while employed as a producer at USI?
A. I believe so.
Q. And if you go to the next page of that document, page 4 out of 17, at the top of the page subsection D says that you will not, without Alliant's written approval and consent or unless allowed by Alliant's written policies, place or cause to be broadcast, disseminated, or published, including on LinkedIn, Facebook, or any other social media account of employee, any advertising of

[Page 81]

A. No, I just --
MR. STEPHENS: Wait a minute. Those are two different questions. I object to the form.
BY MS. YEE:
Q. You can go ahead and answer.
A. What was the question? Which one?
Q. Yes. Was my question unclear?
A. Well, I would just have to spend more time reading it. I am not an attorney so I -- I need to understand it better.
Q. But just based on your nonlegal read of it, is it your understanding that it is optional for you to provide Alliant with written notice of your proposed date of departure if you resign?
A. Just by brief review, I do think it is.
Q. And why do you think that is?
A. Because it uses the term "may," but it is -- it says what it says, so ...
Q. Okay. And in your interpretation the use of the word "may" in that sentence means that everything stated in there is optional?
A. I would have to spend more time reading it. I am not an attorney. So, I mean, you are asking me specific questions about this part of the contract.
I mean, I guess, yes, I think it is

[Page 82]

optional.
Q. Okay. If you go to page 14 of 17 of that agreement, do you see there is an indemnity provision at section 12?
A. Yes.
Q. And do you understand what an indemnity is? Again, I am not asking for your legal opinion, but just do you generally understand what it means?
A. Yes.
Q. And what is your general understanding of what an indemnity is?
A. If I am working on behalf of my employer and something happens that they will protect me.
Q. And Alliant made an indemnity offer to you in this section 12 of the agreement, correct?
A. I don't -- I believe this is just their standard employment contract.
Q. And would it be fair to say they provided this copy to you?
A. Yes.
Q. And they are indemnifying you for claims brought against you arising out of or related to the termination of your employment with your latest employer.
Do you see that?
A. Yes.

[Page 83]

Q. And was that important to you as far as your offer of employment from Alliant?
A. It is now.
Q. Was it important to you at the time you received this agreement?
A. It was included in the agreement so it was -- I guess it was nice to have. I don't know that I would say it is important, but it is definitely important now.
Q. Was there any specific reason that you felt or you feel that this is important?
MR. STEPHENS: I object to the form.
THE WITNESS: You guys are suing me.
BY MS. YEE:
Q. Did you have any reason to suspect that you would be sued when you left Alliant [sic] by providing no notice --
A. No.
Q. Or excuse me, I'm sorry, I misstated the question. Let me state that again.
Did you have any reason to suspect that you would be sued when you left USI without providing any notice?
A. When I left Wells, I did not believe I would be sued. I thought I acted in good ...
MS. YEE: Now might be a good time for a

[Page 84]

lunch break. You guys want to take a break?
MR. STEPHENS: Sure.
VIDEO TECHNICIAN: Off the record at 11:57.
(Recess ensued from 11:57 a.m. until 12:48 p.m.)
VIDEO TECHNICIAN: Back on the record at 12:48.
BY MS. YEE:
Q. Mr. Engles, you understand you are still under oath, correct?
A. Yes.
Q. Okay. If you could pull out Exhibit 11, that was an e-mail from you to Jay Fischer dated January 20th.
Do you recall that?
A. I don't -- I just don't recall the date on the e-mail.
Q. Okay. But you recall me asking you some questions about this e-mail?
A. Yes.
Q. If you turn to the attachment couple pages in at ENGLES 288 in the bottom right-hand corner, there is a signature there about halfway down the page and a date 9/30/2020.
Do you see that?
A. Yes.

A. I got a mess over here.
Q. This was the document I was hunting for so you are not the only one.
A. Sorry.
Q. You are fine.
Okay. On the third page of that Exhibit No. 3, there is some phone entries on these phone logs dated January 23, 2023, towards the bottom.
Do you see that?
A. What was the date?
Q. January 23, 2023.
A. Yes.
Q. And you see they are highlighted in blue.
Do you see that?
A. I do.
Q. And the number associated with those blue highlights is (516) 567-5579.
Do you see that?
A. Yes.
Q. And if you go back to Exhibit 17, Bled's phone number is listed as (516) 567-5579.
Do you see that?
A. Yes.
Q. Would it be fair to say that those three highlighted entries on that page are phone calls with Bled



and you on January 23, 2023?
A. I would assume, yes.
Q. And does this indicate or help refresh your recollection about your conversations with Bled on January 23, 2023?
A. No.
Q. You don't recall what you discussed during these phone calls?
A. I had several calls with Bled about employment with Alliant, but, no, I don't remember the specifics about each call.
Q. And you don't specifically remember the substance of your calls with Bled two days before you resigned on January 23, 2023; is that right?
A. Well, it was about employment with Alliant.
Q. Any specifics about employment with Alliant?
A. I mean, I just don't recall what other than -- no, I don't recall.
Q. And do you recognize the phone number that is highlighted in pink right above that on the same page, (602) 524-4424?
A. Yes.
Q. And whose phone number is that?
A. Bill Havard.
Q. So would be it fair to say that on the 23rd of



January you had, it looks like, two phone calls with Mr. Havard right before you had at least one phone call with Mr. Dizdari on the 23rd?
MR. STEPHENS: Object to the form.
THE WITNESS: It does look like it was right before. And I talk to Bill every day.
BY MS. YEE:
Q. So is it your testimony that you were not discussing your conversation or anticipated conversation with Bled during your call with Mr. Havard that particular day?
A. I did not discuss my conversations with Bled with Bill.
Q. Okay. And if you go to the next page of that document, there is a couple of phone numbers that are highlighted in purple with an asterisk next to it, and it looks like you had seven phone calls on January 23rd with that phone number that is circled there.
Do you see that?
A. Which?
Q. It is circled in purple with an asterisk next to it.
A. The 9344 number?
Q. Yes, (602) 640-9344.
Do you see that?



A. Yes.
Q. And who were those phone calls to, do you recall?
A. I do not.
Q. Do you recall who else you spoke to besides Mr. Havard and Bled on January 23rd?
A. I do not.
Q. And again, you don't remember who those seven phone calls with were?
A. I -- I don't recognize the number.
Q. Okay.
(Deposition Exhibit No. 18 was marked for identification by the reporter.)
BY MS. YEE:
Q. Mr. Engles, the court reporter has handed you a binder marked Exhibit No. 3 [sic], and I want to ask you to turn to tab 3 of that binder.
A. Oh.
Q. Mr. Engles, does tab 3 of this binder help refresh your recollection about who the phone number belongs to that is listed as (602) 640-9344?
A. It does.
Q. And who does that phone number belong to?
A. Scott Rodgers.
Q. And who was Scott Rodgers?

[Page 97]

A. Scott Rodgers was counsel that I hired prior to leaving.
Q. Prior to leaving USI?
A. I believe so, yes.
Q. And I don't want to hear about the substance of your conversations with Mr. Rodgers, but was there something that occurred during your conversations with Bled that led you to call Mr. Rodgers seven times on January 23rd?
A. Bled had suggested if I was going to consider the employment with them that I seek transition counsel or an attorney to discuss it with, so I did.
Q. And why did you need transition counsel?
MR. STEPHENS: Object to the form.
THE WITNESS: I -- it was just suggested.
BY MS. YEE:
Q. And you followed that suggestion?
A. I did.
Q. And you previously testified that you were not worried about being sued when you left USI at the time you left USI, correct?
A. Correct.
Q. If you turn to the next page of that exhibit, there is some phone calls --
A. In the --

[Page 98]

Q. Yes, in -- I'm sorry, thank you. Exhibit 3.
There is some phone calls starting on January 24, 2023, listed at the top.
Do you see that?
A. Yes.
Q. And the phone calls circled with an asterisk in purple are to the phone number (602) 640-9344.
Do you see that?
A. Yes.
Q. And we previously established that is Mr. Rodgers' phone number, correct?
A. Yes.
Q. And if you look, you had seven phone calls with him on that day, January 24; is that right?
MR. STEPHENS: I object to the form.
THE WITNESS: It is what it says here, yes.
BY MS. YEE:
Q. And again, I don't want to know the substance of your conversation with Mr. Rodgers, but was there something that was causing you concern that led you to have that many phone calls with Mr. Rodgers on that particular day?
A. No.
Q. If you go down a little further on January 25, 2023, starting at 1:07 p.m., there is two entries in the

[Page 99]

phone records for phone calls, one incoming and one outgoing with Mr. Rodgers.
Do you see that?
A. January 25th, what time?
Q. Starting at 1:07 p.m.
A. Yes.
Q. And that was the day you resigned from USI, correct?
A. Yes.
Q. Okay. You can go ahead and set that aside.
(Deposition Exhibit No. 19 was marked for identification by the reporter.)
BY MS. YEE:
Q. Mr. Engles, the court reporter has handed you a document marked Exhibit No. 19. These appear to be text messages with you and Bled and the 510 area code phone number that we previously discussed as belonging to Jay Fischer.
Do you see that?
A. Yes.
Q. And in that text message that is on the first page of this exhibit dated January 23rd, you asked: Can you send the PEDP back. Thanks.
Do you see that?
A. Yes.

[Page 100]

Q. And what is the PEDP?
A. I can't remember the -- what it stands for. I can't remember what it stands for.
(Deposition Exhibit No. 20 was marked for identification by the reporter.)
BY MS. YEE:
Q. Mr. Engles, this document marked Exhibit No. 20 is an e-mail from you to yourself dated January 24, 2023.
Do you see that?
A. Yes.
Q. And it says "signed PEDP" is the attachment.
Do you see that?
A. Yes.
Q. And if you flip to the next page, it is a document called Alliant Prospective Employee Departure Protocols.
Do you see that?
A. I do.
Q. And if you flip to the very last page of that exhibit, that appears to be your signature on the back dated January 24th, 2023.
Do you see that?
A. I do see it.
Q. Does that help refresh your recollection about what "PEDP" means?

[Page 109]

Q. And what leads you to believe that you spoke to Mr. Havard about Mr. Harper's resignation?
A. Because I am sure I would have said something, you know.
Q. Why?
A. Eric -- Eric had resigned. His LinkedIn profile got updated.
Q. Do you remember what you said to Mr. Havard --
A. I don't.
Q. -- about Mr. Harper's resignation?
A. I do not.
(Deposition Exhibit No. 23 was marked for identification by the reporter.)
BY MS. YEE:
Q. The court reporter has handed you a document marked Exhibit No. 23. These appear to be text messages that you exchanged with Bled on January 24, 2023.
Do you see that?
A. I do.
Q. And the first text message Bled asks you: Can I call you later?
Do you see that?
A. I do.
Q. And had you called Bled on January 24th to discuss something?

[Page 110]

A. I don't recall. I am sure I did.
Q. And if you flip a couple pages forward, the third page of that exhibit is a text message from you to Bled on that same day January 24th at 12:28 p.m.
Do you see that?
A. I see it.
Q. And it says: Signed doc attached.
Do you see that?
A. I do.
Q. Do you know what you were referring to when you said: Signed doc attached?
A. I don't.
Q. Was it your Alliant employment agreement?
A. I don't believe so.
Q. And why don't you believe so?
A. Because I don't believe I signed my Alliant -- I don't believe -- at that date, the 24th, I don't think at that time I even decided I was going to accept the offer from Alliant yet.
Q. If you turn back to Exhibit 20, that's the e-mail to yourself dated January 24th that attaches a Prospective Employee Departure Protocols signed by you.
Do you see that?
A. I do. I do see it.
Q. Is that what you were referring to when you

[Page 111]

texted Bled and said: Signed doc attached?
A. That is Exhibit 20, the PEDP?
Q. Yes.
A. It -- it probably is, but I am not sure.
Q. Okay. Thank you.
Do you have a habit of sending documents via text message like as an attachment to a text message?
A. I think everyone does it now like texting back and -- yeah. I mean, I don't know that I always send stuff back and forth via text, but every once in a while I guess.
Q. So you do have a practice or a habit of doing that?
MR. STEPHENS: Object to the form.
THE WITNESS: I wouldn't call it a habit.
BY MS. YEE:
Q. But you have done that before, sent a document as an attachment to a text message?
A. I believe I have, yeah.
Q. And the last page of that Exhibit 23 that we were just talking about a moment ago has a message from you to Bled on January 24, 2023, at 12:49 p.m.
Do you see that?
A. I do.
Q. And it says: On the contract, isn't EBITDA calc

[Page 112]

at the end of year 3 for year 4 and 5. Give me a shout on how that works.
A. I see it.
Q. And were you asking Bled about your compensation at Alliant in this text message?
A. I was asking them about their offer and how their offer worked.
Q. And at the time you sent this text message, is it fair to say you were seriously considering becoming employed by Alliant?
A. Yeah, but the time is -- I just don't know if the 12:49 is correct, but in the afternoon of January 24th and the morning of January 25th, I started to become serious about accepting employment at Alliant.
Q. Did you tell Mr. Greer on January 24th in the afternoon that you were seriously considering becoming employed by Alliant?
A. I did not.
Q. Why not?
A. I -- I did not know if I was going to accept this offer literally until I hit send on the -- my resignation the following day.
Q. Is there any other reason, other than your uncertainty about whether or not you were going to actually hit send on the document like you just mentioned

that you didn't discuss this with Mr. Greer on the afternoon of January 24th?
A. Why I didn't discuss a potential employment agreement with a different employer, why I didn't talk to Ben about that?
Q. Correct, why you didn't talk to him about leaving USI and going to Alliant.
A. Is there another reason?
Q. Yes, that's my question.
A. If I would have told -- I believe if I would have told Ben I was considering employment somewhere else, I would have been terminated on the spot.
Q. And what leads you to that belief?
A. Just how the office works.
Q. Is there anything specific about how the office works that leads you to that belief?
A. No.
Q. Later that same day Mr. Greer invited you to a strategy meeting about the handling of accounts at USI.
Do you recall that?
A. I do.
Q. And did you understand what the reason for that meeting was?
A. I believe he had put it in text or e-mails or calendar invite or -- or I think he even left a voicemail.



Q. And what do you recall about the purpose of that meeting?
A. He wanted to go through the -- Bill Havard's accounts and strategize about how to retain those accounts.
Q. Did you end up attending that meeting?
A. I thought attending that meeting, if I was going to accept employment at Alliant, would be a very bad thing to do.
Q. Why?
A. And so --
Q. Oh. I'm sorry. Go ahead.
A. At that point on the evening of the 24th and the morning of the 25th, I started to really consider leaving, and I didn't want to be in a meeting where USI, Wells Fargo, discussed strategy on retaining accounts, because if I left, I thought that would -- that's unethical I thought. I thought it would be unethical for me to attend that meeting if I sat through that and left a week or two weeks later.
Q. But you didn't leave a week or two weeks later; you left the same day as that meeting, correct?
A. That meeting is one of the reasons that I actually left on the 25th.
Q. Why?



A. Because I didn't feel comfortable with them talking about accounts and strategy meetings around retaining those accounts and what they were going to do if I was going to leave.
Q. That's presumably confidential information that helps them stay competitive as a business, right?
MR. STEPHENS: Object to the form.
THE WITNESS: Strategy -- internal strategy meetings?
BY MS. YEE:
Q. Yes.
A. Depending on what is discussed in those meetings.
Q. You would agree with my statement though?
MR. STEPHENS: Object to the form.
THE WITNESS: I would agree depending on what is discussed in those meetings.
(Deposition Exhibit No. 24 was marked for identification by the reporter.)
BY MS. YEE:
Q. Mr. Engles, this document marked Exhibit No. 24 is an appointment from Ben Greer to Justin Walsh, Jenise Purser, Amy Phalen, Lori Hartman, you and Brian Snow, subject line, "Strategy Meeting - Re Handling of Accounts," with a start time of -- excuse me, a start date



of January 25, 2023.
Do you see that?
A. I do.
Q. And is this the meeting you were referring to that you were not comfortable attending because you felt it would be unethical?
A. I believe the dates -- the date is correct, but the time is incorrect.
Q. And I will represent to you that -- well, strike that.
(Deposition Exhibit No. 25 was marked for identification by the reporter.)
BY MS. YEE:
Q. Mr. Engles, the court reporter has handed you a document marked Exhibit No. 25. This appears to be a DocuSign generated e-mail to you on January 25th at 9:56 a.m.
Do you see that?
A. I do.
Q. And it says that Chris Arce at Alliant was sending you a document that was entitled producer EA.
Do you see that?
A. I do.
Q. Is it your understanding that this was Alliant providing you the employment agreement to review and sign?

[Page 117]

A. I believe so, yeah.
Q. Would it be fair to say that by the morning of January 25th you had decided to resign from USI and become employed at Alliant?
A. Sometime that morning I resigned, so ...
Q. So the answer is yes?
A. Yes, I resigned that morning.
Q. Okay. And you signed this agreement that same morning, correct?
A. I signed this agreement later that morning.
(Deposition Exhibit No. 26 was marked for identification by the reporter.)
BY MS. YEE:
Q. The court reporter has handed you a document marked Exhibit No. 26. This appears to be a DocuSign generated e-mail from Chris Arce at Alliant to you dated January 25, 2023, at 10:33 a.m.
Do you see that?
A. I do. I do.
Q. And do you see where it says: "All parties have completed Employment Agreement"?
A. I see it.
Q. And if you flip to the next page, might be two pages forward on yours, the cover page for your Alliant employment agreement is attached.

[Page 118]

Do you see that?
A. This page (indicating)?
Q. Yes.
A. I see it.
Q. And if you flip to the last page of that exhibit, which is labeled ENGLES 184, is that your DocuSign signature there?
A. I need readers, I'm sorry.
Yeah, I believe so.
Q. Okay. So would it be fair to say as of January 25, 2023, at 10:33 a.m., you had a signed employment agreement with Alliant?
A. I don't recall exactly what time, but it was sometime during the day on the -- the 25th.
Q. And you have no reason to doubt the timestamp on this particular e-mail, do you?
A. On some of other docs, they don't look right, so I don't know. But I did sign my agreement later in the morning, lunchtime, of -- on the 25th.
Q. And did anything change in your employment agreement from this version that you signed and the version that was provided to you on January 22nd?
A. I don't know.
Q. So if you pull up Exhibit 15 --
A. We got a lot now. Which one is Exhibit 15?

[Page 119]

Q. It is a January 22nd, 2023, e-mail attaching an Alliant employment agreement.
A. I got it right here. It was at the bottom of the pile. I'm sorry.
Q. That's okay. Okay. If you could just put Exhibit 15 and Exhibit 26 side by side, one of these documents appears to be a draft and the other one you signed.
Do you see that?
A. Yes.
Q. Are you aware of any changes being made to your Alliant employment agreement between the draft and the final executed version?
A. Not that I recall but I think there was changes in -- we had negotiated comp, so there could be changes in comp, but other than that, I just don't recall.
Q. So you didn't specifically ask for other provisions in your agreement to be added or changed other than perhaps compensation?
A. From what I recall. I could have, I just don't remember.
Q. Okay. What did you do following your execution of your Alliant employment agreement on the morning of January 25th?
A. I think it was the afternoon, but again, I am

[Page 120]

not sure on the timing. I went to the Alliant office.
Q. Did you do anything else before you went to the Alliant office?
A. When I was at home -- I think I was at home -- I was at home on the 25th and then came down to -- no, I mean, not that I recall, I don't ...
Q. Did you go to have lunch to celebrate?
A. No.
Q. Did you go have drinks somewhere to celebrate?
A. No. I came from my house and met Chuck McDaniel, which is at the Alliant office. In front of Alliant office is The Camby. So I met Chuck at The Camby, and then we walked up.
Q. Is The Camby the hotel on Camelback?
A. It is part of our office complex, yes.
Q. It is part of the office complex, I see. Thank you for clarifying.
(Deposition Exhibit No. 27 was marked for identification by the reporter.)
BY MS. YEE:
Q. Mr. Engles, the court reporter just handed you a document marked Exhibit No. 27. This appears to be a text message from you to Bled on January 25th at 11:15 a.m.
Do you see that?
A. I do.

[Page 121]

Q. And it looks like you are asking him a question about some stock and deferred comp.
Do you see that?
A. I do.
Q. And you said: I do not believe they can mess with it. The stock was purchased and not grants. If they do, will Alliant make me whole on it?
Do you see that?
A. I do.
Q. Were you referring to USI messing with your stock or deferred comp?
A. My prior employer, yeah.
Q. Okay. And you asked him if Alliant will make you whole on it. Did you mean that to inquire whether Alliant would pay you if USI somehow withheld something you are entitled to?
A. So I was not sure in the stock that I purchased if I resigned if I would be able to retain the gains that I made in that, and that's what I e-mailed him about, like, if -- if the gains -- if they were retaining gains in the stock and they only give back the net of what I put in, would they make me whole on it.
Q. And by make you whole, do you mean add to your compensation at Alliant?
A. I don't know how you put it but paying me for

[Page 122]

whatever equity lost.
Q. And by paying you, you mean Alliant paying you?
A. Yes, yes.
Q. Did Bled ever answer your question that you sent in this text message about whether Alliant will make you whole on it?
A. I don't recall if he texted back or called me. He -- he did.
Q. And what did he say?
A. He said yes.
Q. Alliant -- I'm sorry, strike that.
Did Bled tell you that Alliant would make you whole on any loss of gains that you referred to in this text message in Exhibit 27?
A. Yes.
Q. And if you flip back to the second page of that exhibit labeled ENGLES 61, you text Bled at 3:20 p.m.: "Just resigned."
MR. STEPHENS: I object to form.
MS. YEE: What is wrong with the form?
MR. STEPHENS: There has been numerous testimony about the timestamp being wrong. I saw you have a discussion about UTC time versus the local time, and this is time stamped 3:20. I think that you are asking the witness something that he didn't understand what you

[Page 123]

are asking because you were attributing a time to it that is just written here.
MS. YEE: Oh, I see. Well, thank you for clarifying.
BY MS. YEE:
Q. Mr. Engles, let me ask you about the timestamp on this message. It was previously your testimony that you resigned sometime in the morning on January 25th, correct?
A. I sent an e-mail to Ben Greer at 8, 9:00 resigning, correct.
Q. Okay. And in this text message that is at ENGLES 61, you are sending a text message to Bled saying, "Just resigned," correct?
A. No, because this text (indicating) occurred before I signed this agreement (indicating).
Q. Okay. But you did say in this text message that you just resigned, correct?
A. I did say that, but this text occurred before I signed the Alliant employment agreement.
Q. Okay. Thank you for clarifying.
Do you recall approximately how long it was from when you e-mailed Ben Greer to resign and when you sent a text message to Bled saying you resigned?
A. I don't.

[Page 124]

Q. Okay. And if you flip to the next page of that document, there is a text message from you to Bled saying: Just following up. I am at The Camby. Can't go up until I sign.
Do you see that?
A. I do.
Q. And is The Camby the Alliant office complex that you were previously discussing?
A. The -- the -- yes.
Q. Okay. And why were you are coordinating with Bled about when to go into the Alliant office?
A. I was not allowed into the Alliant office until I signed the employment agreement, and at this time this agreement had not been executed yet.
Q. I see. So you were coordinating when you signed that Alliant employment agreement with when you stepped foot in their office?
A. Basically, they said: Look, you have to be employed to come in, and you need to execute the agreement agreeing -- taking employment.
Q. And you did that according to this e-mail at Exhibit 26?
A. Say that again, I'm sorry.
Q. And you did execute this employment agreement which is reflected in Exhibit 26?

[Page 125]

A. I did.
Q. Okay.
A. But this text is not at 4:34. This text is at like -- I don't recall the time but in the morning.
Q. Okay. And who told you you can't go up until you sign?
A. Chuck McDaniel.
Q. And you previously referenced meeting Mr. McDaniel in front of the Alliant office?
A. That is in front of the Alliant office. There is a circle. Here's The Camby, and here's the office. It is literally the same complex.
Q. I see. Is that where the AMC movie theatre is?
A. It is right down the way.
Q. I know where you are talking about.
And did you call Mr. McDaniel to arrange for the meeting or how did that meeting come about?
A. I believe I called him.
Q. And was Mr. McDaniel in Phoenix specifically to onboard you at Alliant or were you aware he was there for a different purpose?
A. I didn't know why he was there.
Q. Okay. So why did you call Mr. McDaniel to meet you in front of the Alliant office?
A. If I recall correctly, I believe Bled said, hey,

[Page 126]

Chuck will be there. I don't believe I even met Chuck prior -- what was the question again? I'm sorry. I am trying to think of the day. It is a blur.
Q. Yeah.
(The following requested portion of the record was read back by the reporter.)
"QUESTION: So why did you call Mr. McDaniel to meet you in front of the Alliant office?"
THE WITNESS: It was just an easy place to meet.
BY MS. YEE:
Q. Did Mr. McDaniel show you to your new office?
A. No, not initially. I sat down in there for a certain amount of time before I executed this and then -- and then he did.
Q. So did you execute this Alliant employment agreement from home and then drive to the Alliant office?
A. I did not.
Q. Where did you execute the Alliant employment agreement?
A. I believe I was in The Camby.
Q. Like in the parking lot or were you elsewhere in the complex?
A. I was in The Camby.
Q. The Camby hotel?

[Page 127]

A. Yes.
Q. Okay. Is there like a bar or restaurant?
A. There is a big bar and then an area you can sit.
Q. Were you on, like, your personal laptop when you were there doing that?
A. I believe I did it on my phone.
Q. Oh, I see. And after you met with Mr. McDaniel, walk me through what you did on your first day at the Alliant office.
A. I walked up to the office. I didn't -- I can't recall if it was the -- I mean, we walked up to the office. We really didn't do much -- there was no work going on on the first day of work. Came up to the office, I mean, other than that, I don't really recall.
Q. How long did you spend at the Alliant office on your first day?
A. I don't know. I don't know if -- maybe a couple of hours. I just don't remember.
Q. Was anybody else at the Alliant office with you on your first day other than Mr. McDaniel?
A. Bill was in the office.
Q. Bill Havard?
A. Yes.
Q. Anyone else beside you, Mr. Havard, and Mr. McDaniel in the Alliant office on your first day of

[Page 128]

work there?
A. I believe there were two -- I am trying to remember correctly. The -- I can't remember if he did -- if Chuck had anything with him, the receptionist, Rex is one of the Alliant guys that works there on different stuff. When I walked in the office, it was just Bill and I -- Bill, Chuck, the receptionist, Rex, and I just can't recall if there was others.
Q. Had Mr. Walsh joined you at Alliant by that point?
A. Not when I walked in the office I don't believe so.
Q. Had Ms. Purser joined you at Alliant by that point on the 25th?
A. I don't believe so.
Q. Had Ms. Phalen joined you at Alliant on the 25th by that point?
A. When I walked in the office?
Q. When you were there on your first day, correct.
A. Yeah. I don't know -- they were not in the office when I walked in. I don't know if it was like the afternoon of the 25th or, to be frank, the 26th or 27th when they came to the office.
Q. So within a day or two Mr. Walsh, Ms. Purser, Ms. Phalen, and Ms. Hartman came to work at the Alliant

[Page 129]

office with you?
A. I know Justin did a couple days later. It was a day or a couple days -- I don't remember the timing, but those -- Justin, and I don't know -- I can't remember her name. Is it Amy Phalen?
Q. Um-hum.
A. Amy -- I think those two came either that afternoon or the next day, and then I don't recall if it was a couple days later that Jenise came because I think she came after those two.
Q. Okay. And Ms. Hartman, do you recall when she showed up at the Alliant office?
A. I do not.
Q. And if you go back to Exhibit 24, this is the strategy meeting and handling of accounts that Ben Greer attempted to set up for you and others that we discussed.
Do you remember those questions?
A. I do.
Q. And you did not attend this meeting, correct?
A. I did not attend that strategy meeting with them. Let me find this real quick.
Q. Okay.
A. I should put these in order.
Oh. No, I did not attend this meeting.
Q. And as far as you know, did Justin, Jenise, Amy,

[Page 130]

or Lori attend this meeting?
A. I do not know.
Q. But you know that a couple days later they all showed up to work at the Alliant office?
A. It was a day or a couple -- yes.
Q. Did you update your LinkedIn profile to reflect your new employment at Alliant?
A. I did.
Q. When did you do that?
A. The -- I don't recall the time, but it was I believe the late afternoon of the 25th I did.
Q. Did you do that while you were sitting in Alliant's office?
A. No.
Q. Where did you do that from?
A. I was driving home, and I believe I pulled into a Home Depot parking lot and updated my Alliant -- my LinkedIn stuff.
Q. Why did you pull into a Home Depot parking lot to update your LinkedIn profile on January 25th?
A. I had stopped to have a cigarette.
Q. Is there a reason you didn't want to wait until you got home to update your LinkedIn profile?
A. I was just on my phone like -- this is embarrassing -- smoking a cigarette in the parking lot and

[Page 131]

I updated it.
(Deposition Exhibit No. 28 was marked for identification by the reporter.)
BY MS. YEE:
Q. Mr. Engles, the court reporter handed you a document marked Exhibit No. 28. Would you agree with me this is your LinkedIn profile?
A. It is not the prettiest setup. I could format it a little different, but I believe it is, yes.
Q. And would you agree with me that your LinkedIn profile announced to the world that you were a first vice president at Alliant Insurance Services immediately following your employment at USI Insurance Services?
A. I -- I updated it with my new employer information.
Q. And in your LinkedIn profile you note on page 4 of that exhibit that USI Insurance Services was formerly Wells Fargo Insurance Services, correct?
MR. STEPHENS: I object to the form.
THE WITNESS: I don't see it.
BY MS. YEE:
Q. Page 4 about halfway down the page, it says partner, vice president, USI Insurance Services, and then three lines below that, it says, paren, formerly Wells Fargo Insurance Services.

[Page 132]

Do you see that?
A. So I didn't want to look like -- in insurance timing is a lot, right, how long you have been at a place. So by putting USI there, I didn't want it -- I wanted to be honest about it, like the 12 years versus breaking it up, right? So -- but I do see what you are saying.
MS. YEE: Okay. I think now would be a good time for a break.
MR. STEPHENS: Okay.
VIDEO TECHNICIAN: Off the record at 2:03.
(Recess ensued from 2:03 p.m. until 2:18 p.m.)
VIDEO TECHNICIAN: Back on the record at 2:18.
BY MS. YEE:
Q. Mr. Engles, you understand that you are still under oath, correct?
A. Yes.
Q. Do you have any understanding how Justin, Jenise, Amy, and Lori came to be employed at Alliant within days of you taking a job there?
A. No.
Q. Going back to the day of your resignation, Mr. Greer texted you asking to talk with you before the strategy meeting.

[Page 133]

Do you recall that?
A. I do. In the -- well --
Q. Actually, I have a document I am going to hand you that I am going to ask you about.
(Deposition Exhibit No. 29 was marked for identification by the reporter.)
BY MS. YEE:
Q. Do you have Exhibit 29 in front of you?
A. I do.
Q. Okay. And that is the January 25th text message from Ben Greer to you wanting to talk with you before the strategy meeting; is that fair?
A. Well, it is -- but it is dated -- like the timestamp on it is 3:10.
Q. Yes, I understand there is a question about the timestamp.
But my question to you was: Do you recall Mr. Greer asking to talk with you before the strategy meeting on the morning of the 25th?
A. I do.
Q. Okay. And did you end up ever having that discussion with Mr. Greer before the strategy meeting on the 25th?
A. I did not.
Q. And why not?

[Page 134]

A. I don't know the timing on this, but shortly after on the 25th mid-morning sometime I resigned.
Q. And you were intending to resign that morning which is why you didn't meet with Mr. Greer before the strategy meeting?
A. Him pulling me into the strategy meeting is actually one of the reasons that I pushed and resigned when I did.
Q. Okay. You can put that document aside.
(Deposition Exhibit No. 30 was marked for identification by the reporter.)
BY MS. YEE:
Q. The court reporter has handed you a document marked as Exhibit 30. This is an e-mail from you to Ben Greer on January 25th, and it says: "Ben, please accept this e-mail as notice of my formal resignation."
Do you see that?
A. I do.
Q. And the following statement is: "I appreciate the years we have worked together and thank you."
Do you see that statement?
A. Yes.
Q. Did you appreciate the years you had worked together with Ben Greer?
A. In some ways, yes.

[Page 135]

Q. In what ways did you not appreciate the years you had worked together with Ben Greer?
A. I had vocalized concerns over servicing and some incidents that were going on with the commercial lines manager and some other things, and I didn't believe that he took any action on them.
Q. Other than the circumstance you just testified to about Mr. Greer not taking action on those particular items, did you otherwise appreciate the time you had worked with him?
A. From what I can recall.
Q. Is there a reason why you didn't tell Mr. Greer in person that you were resigning?
A. No.
Q. Is there a reason that you sent an e-mail instead of having a different form of discussion with Mr. Greer about your resignation?
A. Not that I can recall, no.
Q. Did you get any sort of congratulations following you becoming employed by Alliant?
A. By -- sure.
Q. And who did you get those congratulations from?
A. Several people. My wife, but like several people IM'd me and reached out and -- IM'd, instant messaged.

[Page 136]

Q. And when you say "instant messaged," what platform you are referring to?
A. LinkedIn.
Q. And who messaged you on LinkedIn providing you congratulations about becoming employed at Alliant?
A. Oh, that's a tough one. I mean, there was a chain of 30 or 40 people I think that responded. Evan Burks from AB Staffing. It was a lot of people I think that ...
Q. Do you think that is because you had built up relationships with a lot of people in the course of your work for USI?
A. I have relations -- I built up relationships my entire life I think.
Q. Including your time at USI, correct?
A. At Wells, yeah.
Q. And did Eric Harper congratulate you?
A. I believe he did.
Q. Do you remember how he congratulated you?
A. I don't know if he responded on the update to LinkedIn or IM'd me. I don't recall.
(Deposition Exhibit No. 31 was marked for identification by the reporter.)
BY MS. YEE:
Q. The court reporter has handed you a document

[Page 137]

marked Exhibit No. 31. This appears to be an e-mail from Eric Harper to you on January 26, 2023.
Do you see that?
A. I do.
Q. Do you think this was one of the LinkedIn messages you received or --
A. Yes.
Q. -- that you just previously testified to?
A. I do believe it is a -- I believe it is from LinkedIn, I mean.
Q. And in this message Mr. Harper is congratulating you on the new role and says: Awesome. Welcome to the team.
Correct?
A. That's what it says.
Q. Do you remember receiving this?
A. Yes.
Q. And would you consider yourself on Eric Harper's team?
A. I think by "team" he meant Alliant.
Q. Do you recall receiving a request from USI to return to property and complete a form related to property return?
A. I got -- I don't -- I did get correspondence from USI. I don't recall a return property one. I am

[Page 138]

sure I got something.
Q. The court reporter has handed you a document marked Exhibit No. 32. Page 2 of this document appears to be a letter to you dated January 30, 2023, via FedEx overnight.
Do you see that?
A. I do.
(Deposition Exhibit No. 32 was marked for identification by the reporter.)
BY MS. YEE:
Q. Do you remember receiving this letter via FedEx?
A. I believe so.
Q. And this is Cecille DePiero from USI asking you to complete, sign, and date the enclosed form.
Do you see that?
A. I do.
Q. And if you flip to the first page of that exhibit, it says: Termination Return of USI Intellectual Property.
Do you see that?
A. I do.
Q. And there is a couple of spots for you to place a checkmark down below for items you have returned to USI, such as Omni Solutions Workbooks, Omni Library Pages, and other items listed in the bullet points there.

[Page 139]

Do you see that?
A. I do.
Q. And the final bullet point there is: Client List or any other Customer Information.
Do you see that?
A. I see it.
Q. Did you fill out and return this form to USI?
A. I don't believe so, no.
Q. Why not?
A. I don't -- "return of intellectual property" -- well, some of the stuff isn't intellectual property, correct. Customer information, customer names, that is not intellectual property, but I don't have anything that I believe would be on this list.
Q. So you didn't keep anything in your possession following your resignation from USI that falls into this list on page 1 of Exhibit 32?
A. Not that I am aware of.
Q. Okay.
A. And when I left -- not that I am aware of, no.
Q. Okay. And when you left, did you return all your property to USI?
A. I believe I had a key card still and I don't know what else, but I mailed that back.
Q. Did you leave anything in the office at USI?

[Page 140]

A. My -- I had several personal items in the office that were there, yes.
Q. Did you have any USI property that you left in the office when you resigned?
A. Any USI property?
Q. Correct, like a laptop, for example.
A. Yes, I believe I left the laptop in the office.
Q. Did you use any other USI equipment to perform your work for USI, such as an iPad or thumb drives or things like that?
A. I didn't use any other -- Wells owned equipment? No.
Q. Okay.
MS. YEE: That's all the questions I have.
MR. STEPHENS: I have a few questions.

EXAMINATION

BY MR. STEPHENS:
Q. Mr. Engles, going to a point you touched on earlier, do you yourself consider the name of a client account you worked on at USI or at Wells Fargo to be the confidential information of USI or Wells Fargo?
MS. YEE: Form.
THE WITNESS: The name of an account?

BY MR. STEPHENS:
Q. The name of an account.
MS. YEE: Form.
THE WITNESS: No.
BY MR. STEPHENS:
Q. Now that you work at Alliant, would you consider the name of a client that you may in the future work on at Alliant to be the confidential information of Alliant?
A. No.
Q. Why not?
A. The name of an account?
Q. The name of an account.
A. The account owns its own name. My competitors, both that I've competed against and brokers in other shops know the accounts I work on, wholesalers know the accounts that I work on, carriers know the names of the accounts I work on. That is just not -- no, I do not.
Q. With respect to something like client policy information, client's policy numbers, the coverage or lines of business covered by the policies, the expiration dates, things like that that are locatable in the clients own insurance policies, would you consider that information to be the insurance brokers' confidential information?
A. No.



Q. Why not?
A. I believe the customer owns the policies that they procure. The carrier has that information, the wholesalers have that information. That's not ...
Q. In any event, when you joined Alliant and thereafter, have you disclosed a list of the identities of your client accounts to Alliant?
A. I have not.
Q. Did you disclose to Alliant the clients' policy information?
A. I have not, no.
Q. And you -- did you disclose to Alliant key contacts at those clients that you may have worked on at USI or Wells Fargo?
A. No.
MR. STEPHENS: Those are my questions. Thank you.
MS. YEE: No further.
VIDEO TECHNICIAN: This concludes today's deposition. Off the record at 2:33.
(Proceedings adjourned at 2:33 p.m.)

ROBERT PATRICK ENGLES

Message

**From:** Robert Engles [rengles1100@gmail.com]
on behalf of Robert Engles <rengles1100@gmail.com> [rengles1100@gmail.com]
**Sent:** 1/13/2023 1:33:49 PM
**To:** jay.fischer@alliant.com
**BCC:** jfischer@alliantazure.mail.onmicrosoft.com
**Subject:** Agreement - Engles
**Attachments:** Phoenix - Engles, Robert Patrick - Executed.pdf

Sent from Mail for Windows

EXHIBIT 8
WITNESS Engles
DATE 3 31 23
CARRIE A. CARIATI RPR CRR

*Execution Version*

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT ("**Agreement**"), effective as of the Effective Date (as defined below), is by and between Wells Fargo Insurance Services USA, Inc., a North Carolina corporation (the "**Company**"), and Robert Patrick Engles ("**Producer**"). The Company and Producer are referred to hereinafter each individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

WHEREAS, pursuant to that certain Stock Purchase Agreement (the "**Purchase Agreement**") by and between USI Insurance Services LLC, a Delaware limited liability company ("**USI LLC**") and Wells Fargo & Company, a Delaware corporation ("**Seller**"), USI LLC will purchase from Seller all of the issued and outstanding shares of capital stock of ACO Brokerage Holdings Corporation, a Delaware corporation ("**ACO**"); and

WHEREAS, ACO owns, directly or indirectly, all of the issued and outstanding equity interests of the Company; and

WHEREAS, contingent upon the closing of the transactions contemplated by the Purchase Agreement (the "**Closing**"), and provided this Agreement is accepted in full by Producer, the Company desires to employ Producer on the terms and conditions herein and Producer is willing to accept employment on such terms and conditions; and

WHEREAS, Producer's covenants herein are a material inducement for the Company to enter into this Agreement; and

WHEREAS, Producer acknowledges and agrees that by virtue of employment with the Company, Producer will receive a direct financial benefit and other good and valuable consideration; and

WHEREAS, Producer hereby acknowledges and agrees that the Retention Payment (as defined below) is a separate and additional payment to which Producer is not otherwise entitled and constitutes material and sufficient consideration to induce Producer to enter into this Agreement; and

WHEREAS, by virtue of past employment with the Company or any Predecessor and future employment with the Company, Producer:

(a) had, has, and will continue to have, as applicable, access to, and has gained and will continue to gain knowledge of, Confidential Information of the Company, any Predecessor and/or any USI Company, the unauthorized use and/or disclosure of which could cause material and irreparable harm to the Company or any USI Company; and

(b) had, has, and will have, as applicable, significant responsibility for maintaining and enhancing the Goodwill of the Company with respect to the Company's Client Accounts and relationships with prospective clients and will have training and access to certain of the Company's customers and suppliers and, as such, has developed, will continue to develop, or will develop close and direct relationships with such customers and suppliers; and

(c) has developed, will continue to develop and/or will develop, as applicable, close and direct relationships with the officers, directors, partners, employees, agents, suppliers, licensees, and/or other business relations of the Company or any USI Company; and

(d) has benefitted, will continue to benefit and/or will benefit, as applicable, from the Company's investment of time, money and trust in Producer and will gain a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company, and, as a result, had, has, and will continue to have, the ability to harm or threaten the Company's legitimate business interests; and

(e) has made use of, and will continue to make use of, Producer's significant skills, training and experience; and

(f) for these and other reasons, will render services to the Company that Producer acknowledges are special, unique or extraordinary; and

WHEREAS, Producer acknowledges and agrees that the Company (on behalf of itself and the USI Companies) has a reasonable, necessary and legitimate business interest in protecting its own and the USI Companies' assets, Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business, and that the terms and conditions set forth below are reasonable and necessary in order to protect these legitimate business interests; and

NOW THEREFORE, in consideration of the recitals, representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, including Producer's employment with the Company, the receipt and adequacy of which are conclusively acknowledged, the Parties, intending to become legally bound, agree as follows:

**AGREEMENT**

1. **DEFINITIONS.** Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them, which the Company may modify from time to time:

(a) "**Active Prospective Client**" means any Person or group of Persons who the Company specifically solicited or had documented plans to solicit within the six (6) months preceding the termination of Producer's employment hereunder.

(b) "**Cause**" shall mean (i) commission by Producer of a willful and material act of dishonesty in the course of Producer's duties hereunder; (ii) conviction of Producer by a court of competent jurisdiction of a crime constituting a felony or conviction in respect of any act involving fraud, dishonesty or moral turpitude; (iii) Producer's performance under the influence of illegal drugs or the abuse of legal drugs, or continued habitual intoxication, during working hours, after the Company shall have provided notice to Producer and given Producer 30 days within which to commence rehabilitation with respect thereto, and Producer shall have failed to commence such rehabilitation or continued to perform under the influence after such rehabilitation; (iv) frequent or extended, and unjustifiable (not as a result of incapacity or disability) absenteeism which shall not have been cured within 30 days after the Company shall have advised Producer of its intention to terminate Producer's employment for Cause, in the event such condition shall not have been cured; (v) Producer's personal, willful and continuing misconduct or gross negligence that is injurious to the Company's reputation or business; (vi) refusal to perform duties and responsibilities described in this Agreement (or as they may be assigned from time to time), or to carry out reasonable and lawful directives of the Regional CEO or such Regional CEO's designee, including with respect to execution of any material policy; in each case which, if capable of being cured, shall not have been cured within 60 days after the Company shall have advised Producer of its intention to terminate Producer's employment for Cause; or (vii) material non-compliance with the terms of this Agreement.

(c) "**Client Account**" means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by the Company for such carrier or other entity) which is or was serviced by the Company in connection with the Company's business, regardless of whether such services are provided by, or through the licenses of the Company or any shareholder, employee or agent of the Company.

(d) "**Coded to Producer**" means all policies and other business coded to Producer, as determined in good faith by the Company based on standards generally used in the insurance industry. In the event of a dispute it shall be the Company's sole and absolute discretion to determine the coding attributable to Producer.

(e) "**Competitive Business**" means any Person engaged in the production, distribution, marketing or sale of a Competitive Product. Where a Competitive Business is part of

a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

(f) "**Competitive Product**" means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the Company, in existence, which Producer or the Company has sold, marketed, distributed or developed in the last two (2) years of Producer's employment with the Company, or about which Producer has acquired Confidential Information.

(g) "**Confidential Information**" means at any date, any information of the Company, any Predecessor and/or a USI Company to which Producer has access, that is not already generally available to the public (unless such information has entered the public domain and become available to the public through fault of the Party to be charged hereunder), including but not limited to: (i) the identity, authority and responsibilities of key contacts and decision-makers employed by the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (ii) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iii) the terms and conditions of benefits and compensation plans of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iv) the information furnished to the Company or any Predecessor in confidence by any Client Account or Active Prospective Client; (v) the business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company, its corporate affiliates or any Predecessor; (vi) the lists of the Client Accounts or Active Prospective Clients of the Company or any Predecessor, and any analyses and compilations thereof; (vii) the information that is password-protected; (viii) all internal memoranda and other office records, including electronic and data processing files and records; (ix) any and all other proprietary information of the Company, any Predecessor or a USI Company, including any information contained within a proprietary database; and (x) any and all other information that constitutes a trade secret under applicable law.

(h) "**Effective Date**" means the Closing date.

(i) "**Goodwill**" means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's or any Predecessor's investment in repeated contacts,

business transactions, Confidential Information, or other efforts to develop lasting relationships.

(j) "**Insurance Services**" means the services provided by any of the USI Companies, including, without limitation, providing any insurance agency, brokerage and related services, including, without limitation, (i) the sale or brokerage of employee benefit products and services and other related consulting and administrative services, (ii) the sale or brokerage of property and casualty products and services, risk management and loss control services, third party administration, the analysis of loss exposures and designs, loss reserves and rate reviews, self-insurance consulting, reinsurance and excess stop loss (both specific and aggregate) placement, the management of insurance programs, the management and oversight of, and responsibility for, clients in the insurance brokerage industry.

(k) "**Net Commissions and Fees**" means all commissions and fees received and actually collected by the Company, specifically on a policy Coded to Producer, less payments to external service providers such as, but not limited to vendors and value-added service providers, and/or to other USI Companies, and any sponsorships and/or charitable contributions made to a client by the Company, unless otherwise provided for by local USI practice. "Net Commissions and Fees" shall not include any overrides or profit-sharing; interest on premiums on deposit; or contingent, bonus, excess, supplemental, non-standard, annually computed, non-specific volume based, or any other similar commissions or fees.

(l) "**New**" means any policy lines of coverage for a new client or any new policy lines of coverage for an existing client written by the Company or the other USI Companies, as the case may be. New will not encompass any client for which similar coverage was "In-Force" in the previous twelve (12) months and such business will be considered Renewal business. For policies with a coverage period of more than twelve (12) months, New shall be determined by the Company in accordance with the Company's policies in effect at such time.

(m) "**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, or a governmental entity (or any department, agency, or political subdivision thereof).

(n) "**Predecessor**" means any Person, in its capacity as predecessor-in-interest to the assets of the Company.

(o) "**Producer's Book of Business**" means the annual Net Commissions and Fees received by the Company on Client Accounts Coded to Producer.

(p) "**Renewal**" means the second and any subsequent year of any New coverage. For policies with a coverage period of more than twelve (12) months, Renewal shall be determined by the Company in accordance with the Company's policies in effect at such time.

(q) "**USI Business**" means the businesses provided by the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(r) "**USI Companies**" or "**USI Company**" means USI Advantage Corp., a Delaware corporation ("**USI**"), its subsidiaries (including USI LLC and the Company), and any entity under the control (as defined in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, without regard to whether any party is a "registrant" under such Act) of USI, and any of their successors or assigns.

2. **POSITION, RESPONSIBILITIES AND TERM**

2.1 ***Position and Responsibilities***. On the terms and conditions in this Agreement, and conditioned upon the Closing, the Company shall employ Producer as a producer for the Company. Producer shall perform all services and duties customarily attendant to such position, including the goals outlined in any applicable Producer expectation form as amended from time to time, and such other services and duties commensurate with such position as prescribed from time to time by Producer's Regional Chief Executive Officer or his/her designee (hereinafter, the "**Regional CEO**"). Nothing in this Agreement shall confer upon Producer any right to continued employment hereunder or interfere with the Company's right to change the terms and conditions of Producer's employment hereunder.

2.2 ***Insurance Licenses***. Producer shall obtain and retain the proper licenses for all lines of insurance solicited and serviced by Producer. Notwithstanding anything to the contrary in this Agreement, Producer acknowledges Producer is not entitled to any commissions for sales or servicing of policies within a line of insurance if Producer is not properly licensed for such line of insurance.

2.3 ***No Conflicts of Interest***. During Producer's employment hereunder, Producer agrees not to accept other employment or perform any activities or services that would be inconsistent with this Agreement or would interfere with or present a conflict of interest concerning Producer's employment with the Company. Producer agrees to comply with all business practices and ethical conduct requirements set forth in writing by USI and/or the Company in employee manuals and other publications.

2.4 ***Duty of Loyalty***. Producer acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully, diligently and completely perform all duties and responsibilities hereunder in furtherance of the business of any USI Company.

2.5 ***Term***. This Agreement, including Producer's employment hereunder, shall commence on the Effective Date and continue until terminated pursuant to Section 8 (the "**Term**").

3. **COMPENSATION AND BENEFITS**

3.1 ***Draw***. The Company agrees to pay Producer commissions, calculated pursuant to Section 3.2, and a recoverable draw against such future commissions in an amount determined by the Company based on Producer's Book of Business ("**Draw**"); provided, however, that the Company may adjust Producer's Draw upward or downward in its discretion to fairly reflect the commissions Producer will likely earn based on Producer's Book of Business. The Draw shall be offset by commissions earned by Producer pursuant to this Agreement. The Draw will be payable in equal installments by the Company (or another USI Company designated by the Company) according to its normal payroll practices.

3.2 ***Calculation of Commissions***. The Company agrees to pay Producer commissions calculated in accordance with the following policies:

(a) Forty percent (40%) of annual Net Commissions and Fees received by the Company on Client Accounts for New policies (and thirty percent (30%) on New surety products), subject to Section 3.2(e) below, assigned and Coded to Producer as the sole originating/selling and sole servicing producer in accordance with the Company's producer compensation policies. For the avoidance of doubt, Producer shall not be paid commissions for New policies on accounts below the account minimums set forth in Section 3.2(e) below.

(b) Twenty-five percent (25%) of annual Net Commissions and Fees received by the Company on Client Accounts for Renewal policies (and thirty percent (30%) on Renewals of surety products and zero percent (0%) on Renewals of personal lines policies), subject to Section 3.2(e) below, assigned and Coded to Producer as the sole originating/selling and sole servicing producer in accordance with the Company's producer compensation policies. For the avoidance of doubt, Producer shall not be paid commissions for (i) Renewal policies on personal lines policies or (ii) accounts that fall below the account minimums set forth in Section 3.2(e) below.

(c) An amount determined on a case by case basis by the Company for Client Accounts where a substantial portion of fee based revenue is attributable in whole or part to Producer's efforts as an originating/selling or servicing producer.

(d) An amount determined by the Company's policies then in effect on Client Accounts, including cross-sold business and transferred business, for which Producer is not both the sole originating/selling producer and the sole servicing producer.

(e) No commission will be paid on Client Accounts Coded to Producer that generate annual Net Commissions and Fees of less than Ten Thousand Dollars ($10,000) on commercial property and casualty, or Ten Thousand Dollars ($10,000) on employee benefits. Notwithstanding the foregoing, (i) there shall be no account minimum for medical malpractice clients and (ii) there shall be no account minimum on surety products.

(f) Producer's commissions shall be reduced by payments to co-brokers, sub-brokers, and sub-producers (including commissions and fees), referral fees, and return commissions, so that the Company's total payments to all Persons from the Net Commissions and Fees do not exceed any applicable maximum commission percentages under Company policy as amended from time to time.

(g) Producer's commissions shall be reduced by, and Producer shall have an ongoing duty to return to the Company, any commissions previously paid to Producer on premiums or fees subsequently refunded or not collected by the Company. Producer shall be subject to any Company policies regarding charges to and/or deductions from commissions in effect at the time such commissions are determined. Producer shall also be subject to any Company policies, as amended from time to time, regarding bad debts and write-offs from clients that require reimbursement from Producer.

(h) Producer's commissions shall not be considered earned until all charges and/or deductions have been made pursuant to this Agreement and the Company's compensation policies. In addition, such commissions only become earned by Producer if: (i) the business transaction is completed during Producer's employment hereunder; and (ii) Producer is still employed hereunder on the date the Company receives such commissions.

3.3 ***Payment of Commissions***. The Company shall calculate, no less often than quarterly, commissions earned by Producer and received by the Company. Earned commissions shall be offset against: (a) Producer's Draw for the prior periods; and (b) if applicable, expenses reimbursed in excess of Producer's expense allowance. Earned commissions in excess of such offsets, if any, shall be due and payable as soon as they can be reasonably calculated but no later than sixty (60) days after each quarter. If Producer's Draw and any other applicable offsets for such period exceed Producer's earned commissions, such shortfall may be offset against installments of Producer's Retention Payment under Section 4 and/or installments of Producer's Draw for subsequent quarters and Producer's Draw for the subsequent quarter may be reduced commensurate with current earned commission levels to minimize the risk of a shortfall in the new period.

3.4 ***Commissions Upon Termination***. Producer acknowledges that Producer shall not be eligible to earn or receive any commissions received by the Company after Producer is no longer employed hereunder because Producer will no longer be performing the essential duties of Producer's position which form the basis for such compensation. Accordingly, if Producer's employment hereunder is terminated for any reason, including death, the Company shall calculate commissions earned by Producer and received by the Company prior to Producer's termination. Earned commissions shall be offset against: (a) Producer's Draw for the prior periods; and (b) if applicable, expenses reimbursed in excess of Producer's expense allowance. Earned commissions in excess of such offsets, if any, shall be due and payable as soon as they can be reasonably calculated but no later than sixty (60) days after the effective date of Producer's termination. No further commissions shall be due or payable after such payment. If Producer's Draw and any other applicable offsets for such period exceed Producer's earned commissions, such shortfall shall be due and payable to the Company within sixty (60) days after the effective date of Producer's termination.

3.5 ***Right to Modify***. The Company may modify the policies and terms in Section 3 by giving at least thirty (30) days written notice to Producer, provided, however, that the Company may not modify the commission percentages set forth in Section 3.2(a) and 3.2(b) prior to the end of the Measurement Period without Producer's consent. For the avoidance of doubt, the Company may modify any commission percentages following the end of the Measurement Period. Producer's continued employment hereunder following any change shall be considered sufficient consideration for, and acceptance of, such change.

3.6 ***Tax Withholding***. The Company shall deduct from all payments and benefits under this Agreement any taxes required to be withheld and/or paid pursuant to federal, state and local taxing authorities.

3.7 ***Benefits***. Producer shall be entitled to benefits, other than paid time off, on the same terms generally provided to similar employees of the Company. Notwithstanding the foregoing, nothing contained in this Agreement shall require the Company to establish, maintain or continue any of the benefit plans already in existence or hereafter adopted for producers of the Company, or restrict the right of the Company to amend, modify or terminate such benefit plans.

3.8 ***Paid Time Off***. Producer shall not accrue or be entitled to any paid time off ("**PTO**") under this Agreement or the Company's PTO policy.

4. **RETENTION BONUS PAYMENT.** Producer shall be eligible for a special retention bonus payment (the "**Retention Payment**").

4.1 ***Amount.*** The amount of the Retention Payment shall be equal to ninety percent (90%) of the average annual Net Commissions and Fees received by the Company (subject to the exceptions set forth at the end of this Section 4.1) in each case, for Client Accounts assigned and Coded to Producer as the sole originating/selling and sole servicing employee during each of (a) the period beginning on the first anniversary of the Effective Date and ending one (1) day prior to the second anniversary of the Effective Date, (b) the period beginning on the second anniversary of the Effective Date and ending one (1) day prior to the third anniversary of the Effective Date and (c) the period beginning on the third anniversary of the Effective Date and ending one (1) day prior to the fourth anniversary of the Effective Date (collectively, the "**Measurement Period**"). By way of example, if the Effective Date is December 1, 2017, and Net Commissions and Fees in Producer's book of business (subject to the exceptions set forth at the end of this Section 4.1) are $900,000 for the year beginning December 1, 2018 and ending November 30, 2019 $1,000,000 for the year beginning December 1, 2019 and ending November 30, 2020, and $1,100,000 for the year beginning December 1, 2020 and ending November 30, 2021, the amount of the Retention Payment would be $900,000 (the average of $900,000, $1,000,000 and $1,100,000 equals $1,000,000, multiplied by ninety percent (90%) equals thereto). When calculating the Net Commissions and Fees received by the Company, the following Net Commissions and Fees shall be excluded and not counted toward the Retention Payment (i) Client Accounts transferred to Producer by the Company or a USI Company, (ii) life insurance, other heaped commission life and health insurance products, and any heaped commission property and casualty insurance products, (iii) Net Commissions and Fees for Client Accounts that do not meet the account minimums required to receive commissions as set forth in this Agreement, any amendment thereto or any modification pursuant to Section 3.5, and (iv) large, non-recurring, and unusual commissions and fees, each as reasonably determined by the Company.

4.2 ***Timing and Eligibility.*** The Company shall pay Producer fifty percent (50%) of the Retention Payment within forty-five (45) days following the end of the Measurement Period, and the remaining fifty percent (50%) of the Retention Payment shall be paid to Producer on the payroll date immediately following the first anniversary of the payment of the first installment. Continuing on with the example in Section 4.1 above, the first installment of $450,000 would be paid within forty-five (45) days after November 30, 2021, and the remaining installment of $450,000 would be paid on the payroll date immediately following the one (1) year anniversary of the date of payment of the first installment. If Producer's employment with the Company terminates or Producer is not actively employed on the dates the installment payments under this Section 4.2 are due, Producer shall not earn or be paid such installment. Notwithstanding the foregoing, if Producer is employed by the Company as of the last day of the Measurement Period and the Company thereafter terminates Producer's employment without Cause, or Producer's employment terminates by reason of death or disability, or if Producer becomes employed by a successor or assign of the Company, then Producer or

Producer's estate shall nevertheless be eligible to receive any installment payment Producer would otherwise be eligible to receive, in accordance with the timetable set forth in this Section 4.2. For the avoidance of doubt, if (i) the Company terminates Producer's employment with Cause before or after the Measurement Period, (ii) Producer resigns or terminates employment for reasons other than death or disability after the Measurement Period, or (iii) Producer is not actively employed with the Company for any reason before the end of the Measurement Period, then in each case, Producer shall not earn or be paid any installment of the Retention Payment that Producer has not already been paid. Each installment of the Retention Payment is subject to offset as set forth in Section 3.3.

5. **EXPENSES**. During the Term, the Company shall reimburse Producer, in accordance with and subject to Company and USI policy, as amended from time to time, for expenses reasonably and properly incurred by Producer in connection with the performance of Producer's duties hereunder and the conduct of the business of the Company.

6. **COMPANY PROPERTY**. Producer acknowledges and agrees all Confidential Information of the Company, including information transferred from any Predecessor under the Purchase Agreement, and/or of the USI Companies, which Producer has access to, receives or generates in the course of providing any USI Business, shall be the sole property of the Company and/or USI Companies, as the case may be, and shall remain with the Company and/or USI Companies upon termination of Producer's employment. Producer further acknowledges and agrees that Producer has no ownership rights to any Client Accounts and that the Client Accounts are owned by the Company and/or USI Companies.

7. **COVENANTS**

7.1 ***Confidential Information***. The Company agrees to provide Producer with Confidential Information to assist Producer in the course and scope of Producer's duties. Producer acknowledges that the Company's agreement to provide this Confidential Information to Producer is in consideration for, and ancillary to, Producer's agreement to the other terms in this Agreement.

7.2 ***Confidentiality During and Following Term***. During the Term and for five (5) years after Producer is no longer employed hereunder, for any reason, Producer will not use or disclose any Confidential Information of the Company, any Predecessor or any USI Company except: (a) in the normal course of business on behalf of any USI Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Producer shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure).

7.3 ***Defend Trade Secrets Act Required Notice***. Notwithstanding anything in this Agreement to the contrary, pursuant to the Defend Trade Secrets Act of 2016, Producer acknowledges and understands that:

(a) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(b) An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

7.4 ***Assignment and Ownership of Intellectual Property***. Producer acknowledges and agrees that any Intellectual Property (as defined herein) shall be "works made for hire" under the United States Copyright Act and that the Company shall be deemed the inventor, author and exclusive owner thereof together with all related intellectual property rights and exploitation rights for the longest period permitted by law. To the extent, if any, that any Intellectual Property is not deemed a "work made for hire" or that Producer is otherwise deemed to retain any rights, title or interest in or to any Intellectual Property, Producer hereby irrevocably transfers and assigns to the Company all rights, title and interest Producer may have or acquire to such Intellectual Property, without additional compensation, and hereby irrevocably waives any so-called moral rights of authors or other special rights which Producer may have or acquire therein. "**Intellectual Property**" means any advertisements, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works of authorship, computer software programming of any nature, discoveries, techniques, copyrights, patents, trademarks or the like, conceived or made by Producer in whole or in part during the Term: (a) using Producer's relationship with the Company; (b) using Confidential Information or the Company's time, resources, facilities, supplies, equipment or trade secrets; (c) relating to the Company's present or future business; or (d) resulting from Producer's work for the Company.

7.5 ***Non-Solicitation of Clients and Active Prospective Clients***. In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written

consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit Insurance Services in competition with the Company to any Client Account; (ii) consult for any Client Account with respect to Insurance Services in competition with the Company; (iii) sign a broker of record letter with any Client Account to provide Insurance Services in competition with the Company; or (iv) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account, which is a Client Account of the Company at the time of such solicitation, that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder. If the duration herein of two (2) years after Producer is no longer employed hereunder is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during the Term and for eighteen (18) months after Producer is no longer employed hereunder, for any reason. If the duration herein of eighteen (18) months after Producer is no longer employed hereunder is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during the Term and for twelve (12) months after Producer is no longer employed hereunder, for any reason.

(b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit Insurance Services in competition with the Company to any Active Prospective Client; (ii) consult for any Active Prospective Client with respect to Insurance Services in competition with the Company; or (iii) sign a broker of record letter with any Active Prospective Client to provide Insurance Services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment hereunder.

7.6 ***Non-Acceptance / Non-Service of Clients and Active Prospective Clients.*** In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide Insurance Services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide Insurance Services in competition with the Company to any Client Account; in each case with respect to any Client Account, which is a Client Account of the Company at the time of such solicitation, that Producer managed or regularly serviced and/or about which

Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder. If the duration herein of two (2) years after Producer is no longer employed hereunder is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during the Term and for eighteen (18) months after Producer is no longer employed hereunder, for any reason. If the duration herein of eighteen (18) months after Producer is no longer employed hereunder is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during the Term and for twelve (12) months after Producer is no longer employed hereunder, for any reason.

(b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide Insurance Services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide Insurance Services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment hereunder.

7.7 ***Non-Interference With Employees***. In consideration of Producer's employment with the Company, and for other good and valuable consideration, Producer agrees, during the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company who is employed by the Company at the time of such solicitation or hiring and with whom Producer worked or obtained knowledge about as a result of Producer's employment with the Company. If the duration herein of two (2) years after Producer is no longer employed hereunder is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during the Term and for eighteen (18) months after Producer is no longer employed hereunder, for any reason. If the duration herein of eighteen (18) months after Producer is no longer employed hereunder is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during the Term and for twelve (12) months after Producer is no longer employed hereunder, for any reason.

7.8 ***Tolling***. Producer agrees the duration of the covenants in this Agreement shall be extended by any period of time in which Producer is in breach of any such obligations and the extended duration shall be measured from the date of the court order granting injunctive relief.

7.9 ***Purpose of Restrictions***. The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from Producer's knowledge of the Company's Confidential Information or misuse of the Company's Goodwill. Producer agrees that the time, geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

7.10 ***Modification***. If a court finds any covenants in this Agreement exceed the permissible time, geographic or scope limitations, such covenants shall be reformed to the maximum permissible time, geographic or scope limitations. If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the minimum extent necessary to permit the remaining terms to be enforced. The Company may unilaterally limit the scope of these covenants.

7.11 ***Independent Enforcement***. Each of the covenants in this Agreement shall be construed as an agreement independent of (i) any other agreements or (ii) any other provision in this Agreement, and the existence of any claim or cause of action by Producer against the Company or any USI Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Producer or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants in Section 7 of this Agreement. The Company shall not be barred from enforcing any of the covenants in Section 7 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement with Producer.

8. **TERMINATION**

8.1 ***Termination by the Company***. The Company may terminate Producer's employment hereunder by giving written notice to Producer. The termination of employment shall be effective on the date specified in such notice.

8.2 ***Termination by Producer***. Producer may terminate Producer's employment hereunder by giving at least sixty (60) days written notice to the Company. The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may: (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Producer to cease performing any services hereunder until the termination of employment.

8.3 ***Payments Upon Termination***. If Producer's employment hereunder is terminated pursuant to Section 8, the Company shall: (a) reimburse Producer for any expenses properly incurred through the date of termination pursuant to Section 5; and (b) pay

Producer any earned and payable commissions through the date of termination (in excess of Producer's Draw and any other applicable offsets) pursuant to Section 3.4.

8.4 ***Miscellaneous Termination Provisions***. Upon termination of Producer's employment hereunder, Producer hereby irrevocably promises to:

(a) Immediately return to the Company any and all property of any of the USI Companies in Producer's possession or control, including electronic devices and equipment, corporate credit cards and building keys, including any and all such property acquired as a result of employment with any Predecessor.

(b) Immediately destroy or return to the Company, as directed by the Company, any and all documents, data or other materials (and all copies thereof) in Producer's possession or control, whether in written, digital or other form, which contain or refer to any Confidential Information, including any and all such materials acquired as a result of employment with any Predecessor.

(c) Not access any of the USI Companies' internal or restricted premises, records, files, databases, networks, websites, emails, voicemails, or other communications.

(d) For two (2) years after Producer is no longer employed hereunder, for any reason, provide each new employer with a copy of Section 7 of this Agreement prior to taking any position with such new employer.

(e) Subject to obligations under applicable laws and regulations, not publicly make any statements or comments that disparage the reputation of any of the USI Companies or their senior officers or directors.

9. **REMEDIES**. Producer acknowledges: (a) the services to be rendered by Producer are of a special, unique, and extraordinary character; (b) it would be extremely difficult or impracticable to replace such services; (c) the material provisions of this Agreement are of crucial importance to the Company; and (d) any damage caused by Producer's breach of Section 7 of this Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation. Accordingly, Producer agrees, if Producer violates Section 7 of this Agreement, the Company shall, in addition to any other rights or remedies of the Company available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction. Producer agrees to waive any requirement for the Company to post a bond.

10. **PRODUCER'S REPRESENTATIONS AND WARRANTIES**

10.1 ***Disclosure of Agreements; No Conflict***. Producer represents and warrants that Producer has supplied to the Company all agreements between Producer and any

Person, other than the Company, that employed or otherwise retained Producer within the past five (5) years. Producer further represents and warrants that Producer's execution of this Agreement and performance of the duties contemplated hereunder do not conflict with, and are not impaired by, any law, rule, regulation, or court order by which Producer is bound.

10.2 ***No Confidential Information***. Producer represents and warrants that Producer has not taken any confidential information from any Person that employed or otherwise retained Producer, that Producer has no such confidential information in Producer's possession or control, and that Producer will not use any such confidential information in the performance of Producer's duties hereunder.

10.3 ***No Copyright Materials***. Producer represents and warrants that Producer has not taken any copyrighted materials from any Person that employed or otherwise retained Producer, that Producer has no such copyrighted materials in Producer's possession or control, and that Producer will not use any such copyrighted materials in the performance of Producer's duties hereunder.

10.4 ***No Restrictive Purchase Agreements***. Except with regard to any employment agreements with the Company, Producer represents and warrants that Producer is not and has not been subject to any agreement (e.g. asset purchase agreement, stock purchase agreement), within the past ten (10) years, whether heretofore expired or not, which prevents or restricts Producer from competing with any Person and/or soliciting any clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees).

10.5 ***Clients of Former Employers or Entities***. Producer represents and warrants to the Company that, during any period of time in which such Producer was subject to any restrictions prohibiting Producer from competing with, or soliciting the clients, customers or business of such other organization, individual or business entity, that Producer has not made any contact with any clients of any Person that employed or otherwise retained Producer, within the past five (5) years, concerning Producer's business relationship with the Company or concerning a prospective business relationship with such client in violation of such restrictive covenant. Producer further represents and warrants that Producer will not, without prior express direction of the Regional CEO, solicit any clients of any Person that employed or otherwise retained Producer, within the past five (5) years in violation of such restrictive covenant.

10.6 ***Employees of Former Employers or Entities***. Producer represents and warrants that Producer has not made and will not make, without prior express direction of the Regional CEO, any contact with any employees of any Person that employed or otherwise retained Producer, within the past five (5) years, concerning a prospective employment relationship with the Company.

10.7 ***No Ownership Rights to Client Accounts***. Producer represents and warrants to the Company that Producer has no direct or indirect ownership rights to any Client Accounts of the Company and expressly acknowledges that the Client Accounts are owned by the Company and/or a USI Company.

11. **ENTIRE AGREEMENT**. No agreements or representations, oral or otherwise, express or implied, have been made with respect to Producer's employment hereunder except as set forth in this Agreement. This Agreement supersedes and preempts any prior oral or written understandings, agreements or representations by or between Producer and the Company or any Predecessor, including without limitation, any previous employment or other similar agreement between the Producer and the Company or any Predecessor, which may have related to the subject matter hereof in any way.

12. **AMENDMENT**. Except as set forth in Sections 3.5, 7.10, 14, and other provisions herein as to which the Company expressly reserved the right to modify, no amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought.

13. **GOVERNING LAW.** This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona, without regard to principles of conflicts of law.

14. **SEVERABILITY**. The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the minimum extent and in the manner necessary to render it valid, legal, and enforceable. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

15. **WAIVERS**. No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or a waiver of any other breach or default. Failure to enforce any provision of this Agreement shall not be deemed a waiver of that provision or any other provision of this Agreement.

16. **ASSIGNMENT**. Producer may not assign any rights (other than the right to receive income hereunder) under this Agreement without the prior written consent of the Company. Producer's obligations under this Agreement inure to the Company, its successors and assigns. The Company may, at any time and without Producer's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor. Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the Effective Date.

| WELLS FARGO INSURANCE SERVICES USA, INC. | PRODUCER |
|---|---|
| By: ______________________ | By: ______________________ |
| Ernest J. Newborn, II<br>Secretary | Robert Patrick Engles |

Appointment

**From:** Ben Greer [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=c293cd31ef16478f8fa2f84c21ebe20b-Ben Greer]
**Sent:** 1/24/2023 9:33:14 PM
**To:** Justin Walsh [justin.walsh@usi.com]; Jenise Purser [jenise.purser@usi.com]; Amy Phalen [amy.phalen@usi.com]; Lori Hartman [lori.hartman@usi.com]; Robert Engles [robert.engles@usi.com]; Brian Snow [brian.snow@usi.com]
**BCC:** PH2 North [PH2.North@usi.com]

**Subject:** Strategy Meeting - Re Handling of Accounts
**Location:** PH2 North

**Start:** 1/25/2023 4:00:00 PM
**End:** 1/25/2023 5:00:00 PM
**Show Time As:** Tentative

**Required Attendees:** Justin Walsh; Jenise Purser; Amy Phalen; Lori Hartman; Robert Engles; Brian Snow

EXHIBIT 24
WITNESS Engles
DATE 3/31/23
CARRIE A. CARIATI RPR CRR

Message

**From:** Chris Arce via DocuSign [dse_na3@docusign.net]
**Sent:** 1/25/2023 9:56:38 AM
**To:** Robert Engles [rengles1100@gmail.com]
**Subject:** Employment Agreement

Alliant

Chris Arce sent you a document to review and sign.

REVIEW DOCUMENT

**Chris Arce**
Chris.Arce@alliant.com

Robert Engles,

Please DocuSign Robert Engles - AIS EPH Producer EA - 01.25.23.docx

Thank You, Chris Arce

Powered by **DocuSign**

**Do Not Share This Email**
This email contains a secure link to DocuSign. Please do not share this email, link, or access code with others.

**Alternate Signing Method**
Visit DocuSign.com, click 'Access Documents', and enter the security code:
03B6FCB68614410CA639FB2F9F75BB553

**About DocuSign**
Sign documents electronically in just minutes. It's safe, secure, and legally binding. Whether you're in an office, at

EXHIBIT 25
WITNESS Engles
DATE 3 31 23
CARRIE A. CARIATI RPR CRR

home, on-the-go -- or even across the globe -- DocuSign provides a professional trusted solution for Digital Transaction Management™.

**Questions about the Document?**
If you need to modify the document or have questions about the details in the document, please reach out to the sender by emailing them directly.

**Stop receiving this email**
Report this email or read more about Declining to sign and Managing notifications.

If you are having trouble signing the document, please visit the Help with Signing page on our Support Center.

Download the DocuSign App

This message was sent to you by Chris Arce who is using the DocuSign Electronic Signature Service. If you would rather not receive email from this sender you may contact the sender with your request.

in



# Robert Engles

Commercial Insurance Consulting & Sales
Phoenix, Arizona, United States
920 followers · 500+ connections

Sign in to follow

Alliant Insurance Services

National Alliance

Websites

## About

Specialties: P&C Insurance

## Articles by Robert

EXHIBIT 28
WITNESS Engles
DATE 3/31/23
CANDIE A. CASIAT RPR CRR




**Wells Fargo invests more than $8 million in Arizona communities in 2015**
By Robert Engles
Mar 17, 2016

**Now open! Wells Fargo Insurance Benefit Analytics and Benchmarking Survey.**
By Robert Engles
Feb 3, 2016

By Robert Engles
Dec 4, 2015

## Activity

**Marijuana use has become a grey area with varying state legalization colliding with a still federally-illegal tag. Additional job protections for...**
Liked by Robert Engles

**We are proud to announce, for the third year in a row, AvAir was awarded the No. 1 position on Airline Economics' Aviation 100 "Parts Supplier of the...**
Liked by Robert Engles

**Business Advisors and Consultants: Are you ready to help your clients 10X their businesses in 2023? And are YOU ready for a new way to expand your...**

## Experience

### First Vice President
Alliant Insurance Services
Jan 2023 - Present · 1 month
Phoenix, Arizona, United States

### Partner - Vice President
USI Insurance Services
Sep 2010 - Jan 2023 · 12 years 5 months
Phoenix, Arizona Area
(Formerly Wells Fargo Insurance Services)

### Risk Management and Insurance Sales and Consulting
Wells Fargo
Sep 2010 - Dec 2017 · 7 years 4 months
Phoenix, AZ
Wells Fargo Insurance was acquired by USI on December 2017.

### Commercial Insurance Sales & Consulting
The Mahoney Group
Nov 2006 - Sep 2010 · 3 years 11 months
Commercial insurance and risk management sales and consulting

### Account Manager
Flagstaff Insurance

**Account Manager**
Arthur J. Gallagher
Jan 2003 - Jun 2005 · 2 years 6 months
Account Manager

**Account Manager**
Elkins Jones Insurance Ageny
Jan 1999 - Jan 2003 · 4 years 1 month
Account Manager.

**Account Manager**
National Business Insurance Agency (NBIA) (acquired by Elkins Jones)
Jan 1999 - Jan 2001 · 2 years 1 month
West Hollywood, CA

## Education

**National Alliance**
CIC - Life and Health
2008 - 2008

**National Alliance**
CRM - Principles of Risk Management
2007 - 2007

**National Alliance**
CIC - Agency Management
2006 - 2006

2005 - 2005

**National Alliance**

CIC - Commercial Casualty / Legal Liability

2001 - 2001

## Recommendations received

**Lynne Lovell CLU ChFC CIC CRM ARM CPCU**

"I have worked with Robert since he joined The Mahoney Group. During that time, Robert has never hesitated to offer help and guidance to others when there is a need; he has a wealth of information and vast networking capabilities. I have been the recipient of great comments on Robert's ability to bring the market to the client by creating a mutually beneficial working relationship. Robert has also been an important part of the local Arizona Central RIMS Chapter. As a local chapter sponsor, he goes out of his way to help the Board ensure that chapter members have an association that brings value to the risk management and insurance industry."

**Skip Rawstron**

"Robert is a very fast study and has learned more in his years in the insurance industry than many people do in their careers. Robert always knew what he didn't know and more importantly knew who and where to get the answer to any question posed to him. Robert was well liked by his peers and respected by his underwriters. He is a very bright individual who will go a long way in this industry."

2 people have recommended Robert

Sign in to view

## View Robert's full profile

Contact Robert directly

Sign in to view full profile

## People also viewed



**Nadir Ali**
Computer Engineer
Greater Phoenix Area

**Sandra Hsin**
KPPC
Taiwan

**Denise Wynn**
VP, Marketing at Aon Risk Services
Los Angeles, CA



**Scott Brau**
Client Manager at Atlas MedStaff
United States

**frank demartino**
Insurance Agent at USI Insurance Services
Nesconset, NY



**Sandra Clay**
VP Administration at USI Insurance Services
Englewood, CO



**Karthik Balakrishna**
Sales and Service Operations Support at Kronos
Bengaluru



**Raina Moss**
Young5s Kindergarten Teacher
Sterling Heights, MI



**Thomas Clark**
Senior Pastor at WORLD DELIVERANCE CHRISTIAN CENTER
United States

Pleasant Hill, CA

Show more profiles

**Looking for career advice?**

Visit the Career Advice Hub to see tips on accelerating your career.

View Career Advice Hub

## Others named **Robert Engles**

**robert engles**

Cadd designer at AECOM

Red Lion, PA

**Robert Engles**

Project manager at Allstar Marketing Group, LLC

Minneapolis, MN

**Robert Engles**

--

United States

**Robert Engles**

Building Surveyor at CIOB Oceania

Warrington

11 others named Robert Engles are on LinkedIn

See others named **Robert Engles**

## Add new skills with these courses

**Graphic Design History: The Arts and Crafts Movement**

**Skip-Level Meetings**

See all courses

## Robert's public profile badge

Include this LinkedIn profile on other websites

**Robert Engles**
Commercial Insurance Consulting & Sales

First Vice President at Alliant Insurance Services

National Alliance

View profile

View profile badges

© 2023

About

Accessibility

User Agreement

Privacy Policy

Your California Privacy Choices

Cookie Policy

Copyright Policy

Brand Policy

Guest Controls

Community Guidelines

Language

Sent: 1/26/2023 1:09 AM
Email From: Eric Harper
Email To: Robert Engles

Congrats on the new role! Awesome! Welcome to the team!

31
Engles
3 31 23

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

USI Insurance Services, LLC, a Delaware limited liability company,

Plaintiff,

vs.

Alliant Insurance Services, Inc., a California corporation; William J. Havard II and Sabrina Havard, husband and wife, Robert Engles and Hope Engles, husband and wife, et al.,

Defendants.

No. 2:23-cv-00192-SMB

VIDEOTAPED DEPOSITION OF ROBERT ENGLES

Phoenix, Arizona
March 29, 2024
10:12 a.m.

PREPARED FOR:
CERTIFIED COPY

Reported by:
SABRINA L. STERENFELD
Registered Professional Reporter
Arizona CR NO. 51002

CARRIE REPORTING, LLC
Certified Reporters
17505 North 79th Avenue
Suite 301-C
Glendale, AZ 85308
(480)429-7573

INDEX


| WITNESS | ON PAGE |
|---|---|
| ROBERT ENGLES | |
| Examination by MS. CASSIDY | 5 |


* * *

EXHIBITS


| EXHIBITS | DESCRIPTION | MARKED ON PAGE |
|---|---|---|
| No. 1 | Text Message - ENGLES00000413 - 416 | 9 |
| No. 2 | Text Message - ENGLES00000435 - 440 | 11 |
| No. 3 | Text Message - ENGLES00000444 | 12 |
| No. 4 | Text Message - ENGLES00000410 | 14 |
| No. 5 | Email Thread - ALLIANT00043172 -43184 | 18 |
| No. 6 | Text Message - ENGLES00000428 - 433 | 21 |
| No. 7 | Email to Cafferelli - ALLIANT00044209 | 29 |
| No. 8 | Text Message - ENGLES00000426 - 427 | 38 |
| No. 9 | Email from Lou Timpanaro - VHA000237 | 47 |
| No. 10 | Outlook Invite VHA000004 - VHA000178 | 53 |
| No. 11 | Email to Paul5254 - ENGLES00000375 | 71 |




VIDEOTAPED DEPOSITION OF ROBERT ENGLES was taken on March 29, 2024, commencing at 10:12 a.m. at the law offices of SNELL & WILMER L.L.P., One East Washington Street, Suite 2700, Phoenix, Arizona, before SABRINA L. STERENFELD, CR, RPR, Phoenix, Arizona, a Certified Reporter in the State of Arizona.

COUNSEL APPEARING:
For the Plaintiffs:
SNELL & WILMER L.L.P.
By: Delilah R. Cassidy, Esq.
Joshua R. Woodard, Esq.
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
(602) 382-6000
dcassidy@swlaw.com
jwoodard@swlaw.com

For the Defendants:

MORGAN LEWIS & BOCKIUS
By: Timothy J. Stephens, Esq.
101 Park Avenue
New York, New York 10178
(212) 309-6805
timothy.stephens@morganlewis.com

Also present: Brian Downey, videographer



VIDEOGRAPHER: Good morning. We are now on the record. Today's date is March 29, 2024, and the time is 10:12 a.m. My name is Brian Downey, legal video specialist with K-Video Productions. Our court reporter is Sabrina Sterenfeld representing Carrie Reporting, LLC, located at 17505 North 79th Avenue, Suite 301-C, Glendale, Arizona.

We are at Snell & Wilmer, LLP, One East Washington Street, Suite 2700, Phoenix, Arizona, to take the deposition of Robert Engles in the United States District Court, District of Arizona, case of USI Insurance Services, LLC, versus Alliant Insurance Services Incorporated, et al.

The attorneys will now introduce themselves and anyone else attending with them, noticing party first, please, and then the court report will swear in the witness.

MS. CASSIDY: Good morning. Delilah Cassidy on behalf of USI Insurance Services, LLC, the plaintiff, and I will be joined by Joshua Woodard momentarily.

MR. STEPHENS: Timothy Stephens, Morgan, Lewis & Bockius on behalf of the defendants.



ROBERT ENGLES,

the witness herein, having been first duly sworn by the Certified Reporter, was examined and testified as follows:

EXAMINATION

BY MS. CASSIDY:

Q. Good morning, Mr. Engles. I know we met out in the lobby just a moment ago.
A. Morning.
Q. But thank you for being here today. I just want to go over some ground rules to make your testimony smoother and quicker.
Do you understand that you're here to give testimony under oath in the lawsuit filed against you and others by USI Insurance Services?
A. I do.
Q. Are you taking any medications that would prevent you from giving truthful and accurate testimony today?
A. No.
Q. Is there anything else that would prevent you from giving truthful and accurate testimony today?
A. No.
Q. I will not speak while you're speaking, and if you could do the same so the court reporter can get a

communications that were subsequent to that, just to clarify.

MR. STEPHENS: So what's the question?

MS. CASSIDY: I just wanted to clarify for the record.

MR. STEPHENS: Clarify what? Your question? What is the question?

BY MS. CASSIDY:

Q. Mr. Engles, the calls that you had with Mr. Rosenlof on or after June 6, 2023, not referencing any calls that you had with him prior to that date, do you remember the substance of those conversations?

A. Do I remember what I spoke to Dean about after June 6th or before June 6th? I'm sorry.

Q. After June 6th.

A. Again, I spoke to him about various things. Dean is also a personal friend. So various stuff, I guess. I mean...

Q. Did you speak with Mr. Rosenlof -- sorry.

Did you speak with Mr. Timpanaro about Van Horn Aviation on or after June 5th, 2023?

A. You -- like, the difference between June 5th and June 6th means, like, nothing, respectfully. I don't mean that -- like, the dates are a blur.

Have I spoken to Lou about Van Horn?



MS. CASSIDY: Could you read back the question?

(The court reporter read back requested portion of transcript.)

THE WITNESS: I don't know the dates that I've spoken to Lou regarding Van Horn. So I don't -- like, you're giving me a definitive date. I have no idea.

MR. STEPHENS: She said on or after.

THE WITNESS: I'm sure I have.

BY MS. CASSIDY:

Q. Do you remember how many times you've spoken with Mr. Timpanaro about Van Horn Aviation on or after June 5th, 2023?

A. I do not.

Q. Do you remember speaking with Mr. Timpanaro about Van Horn Aviation prior to June 5th, 2023, but since the time you've joined Alliant?

A. I do not.

Q. Mr. Engles, have you provided insurance services to Van Horn Aviation since you've joined Alliant?

A. I think that depends on what you mean by "insurance services."

Q. What services have you provided to Van Horn Aviation since joining Alliant?

A. I mean, I don't know that I've provided services



to Van Horn. Lou's team and the aviation team handle that account.

Q. Do you have any involvement with the Van Horn Aviation account at Alliant?

A. Dean does call, again, because we're friends, and I speak -- so I'm -- like, my involvement, I do talk to Dean when he calls and, most of the time, defer those to the aviation team.

Q. So just to clarify, when Mr. Rosenlof calls you since the time you've joined Alliant, in connection -- those calls are in connection with your involvement in the Van Horn Aviation account and not for personal reasons?

MR. STEPHENS: I object to the form. Vague question. Do you mean after the account moved over to Alliant?

MS. CASSIDY: I'll re-ask the question. Sorry.

BY MS. CASSIDY:

Q. Since the Van Horn Aviation account moved to Alliant, have you had communications with Mr. Rosenlof in connection with the insurance services that Alliant provides to that account?

A. Again, I think it depends on what you mean by "insurance services."

Q. I appreciate it. My question was a little



different. It was about your involvement with Alliant providing insurance services to the Van Horn Aviation account. So just to clarify --

A. I'm sorry.

Q. -- what is your involvement at Alliant with the Van Horn Aviation account since Van Horn Aviation moved its insurance business over to Alliant?

A. Dean will -- Dean knows me. So he'll call me for various reasons and I speak to him, and then I will defer whatever needs to be done back to the team that's handling that account.

Q. And your conversations with Mr. Rosenlof that you just referenced are about Van Horn Aviation's account at Alliant, at least in part; correct?

A. Yes.

(Deposition Exhibit 10 was marked for identification.)

BY MS. CASSIDY:

Q. Mr. Engles, do you have a document in front of you that is marked Exhibit 10?

A. Um-hum.

Q. The first page of this document appears to be an Outlook invite. If you look at the bottom under "Organizer," it says, "Robert P. Engles."

Do you see that?

A. I do.
Q. And the subject of this invite is "Meet at Van Horn - Early Dinner After"; yes?
A. I see it.
Q. And the location just underneath that, do you recognize the address that's listed there?
A. I do.
Q. And what is your understanding as to what that address is?
A. I believe that's Van Horn's address.
Q. And this Outlook invite is for a -- the meeting at Van Horn - early dinner after on August 1st, 2023; correct?
A. Yeah, I don't know if the dates are correct or not, or the times, but I see it.
Q. Mr. Engles, did you attend the meeting at Van Horn that's referenced in this Outlook invite that you organized on August 1st, 2023?
A. I don't know if I organized this meeting. One, I didn't organize this meeting, if it was sent -- if I -- I don't recall sending this invite. But if it came from me, it was by request of someone else.
Two, I don't know -- I did attend a meeting at Van Horn, but I don't know if this was the date or not.
Q. Mr. Engles, do you remember attending an early



dinner with individuals at Van Horn Aviation on August 1st, 2023?
A. I just don't recall the date. I did go to dinner with individuals at Van Horn.
Q. Have you been to Van Horn Aviation's facility since the time you joined Alliant?
A. Yeah. I just -- yeah, we attended this meeting there.
Q. If you could flip to the next page. Mr. Engles, do you see that this appears to be an email from you at your Alliant email address on August 1st, 2023, to Dean Rosenlof and you copy Mr. Timpanaro and an individual named Wendy Galati.
Do you see that?
A. I see it.
Q. And the subject of the email is "Loss Runs."
Do you see that?
A. I do.
Q. In the body of the email, do you see that you write "Thank you for your time today. We appreciate it"?
Do you see that?
A. Yes.
Q. Do you understand -- do you know what you were referring to when you say "your time"?
A. I don't remember.



Q. Do you remember having a meeting with Mr. Rosenlof on August 1st, 2023?
A. I just don't -- I had a -- I did attend a meeting, but I don't remember what date it was.
Q. Mr. Engles, do you know any reason that you would write "today" in this meeting -- sorry, in this email?
A. I do not.
Q. Sorry. That's my fault.
Do you know any reason that you would write "today" in this email dated August 1st, 2023, if you had a meeting with Mr. Rosenlof on a different date?
A. I don't even remember sending this email. I mean, clearly I did, but I don't -- like, I don't even remember sending this.
MS. CASSIDY: Could you read back my question?
(The court reporter read back requested portion of transcript.)
THE WITNESS: I have no clue if this is referring to the time I attended a meeting or not. I don't.
BY MS. CASSIDY:
Q. In the meetings that you had with Mr. Rosenlof during your time at Alliant, do you remember what was



discussed during those meetings?
MR. STEPHENS: Object to the form.
THE WITNESS: Lou and his team had discussions about Van Horn, and -- I mean, really about Van Horn and who Van Horn is and what they do.
BY MS. CASSIDY:
Q. Mr. Engles, what was your involvement in those meetings with Mr. Rosenlof during the time that you were at Alliant?
MR. STEPHENS: Objection to the form. You mentioned -- you're now saying "meetings." You mentioned a meeting before. You're now saying "meetings"?
MS. CASSIDY: Sorry. Earlier, he had said that he had -- he's met with him times that he can't recall, plural. Sorry.
THE WITNESS: Ask the question --
BY MS. CASSIDY:
Q. Have you had more than one meeting with Mr. Rosenlof since joining Alliant in person?
A. I don't -- I don't -- I don't recall.
Q. Have you met with Mr. Rosenlof in person since joining Alliant?
A. I have.
Q. What was your involvement in those meetings -- sorry, in that meeting that you recall having with

Mr. Rosenlof since the time that you joined Alliant?
A. Can you repeat the question?
Q. Yes. What was your involvement in the meeting that you had with Mr. Rosenlof and that meeting that occurred since the time that you joined Alliant?
A. Just being there. Like, I didn't have involvement in the meeting.
Q. Did you say anything during this meeting that you had with Mr. Rosenlof since the time that you joined Alliant?
A. I am sure I did. I'm sure I said hello and how you doing and pleasantries.
Q. Why were you at the meeting?
A. Because -- I don't know if it was Dean or Lou that asked me to join. I can't remember, but someone asked me to join the meeting, so I did.
Q. Did you tell Mr. Rosenlof at that meeting that you could not provide services to his account Van Horn Aviation?
A. I did not have that conversation with him.
Q. Have you told Mr. Rosenlof since Van Horn Aviation moved their account to Alliant on January 5th, 2023 --
MR. STEPHENS: Object to form. Did you mean June 5th?



BY MS. CASSIDY:
Q. Sorry. Since Van Horn Aviation moved its account to Alliant, have you told Mr. Rosenlof that you cannot provide services to the Van Horn Aviation account?
A. I have not.
Q. Why not?
MR. STEPHENS: I object to the form.
THE WITNESS: I don't know that I am providing services to Van Horn Aviation. Lou and his entire team are servicing that account.
BY MS. CASSIDY:
Q. I understand. My question was slightly different.
Why have you not told Mr. Rosenlof that you can't provide services to his account?
MR. STEPHENS: Object to the form.
BY MS. CASSIDY:
Q. At Van Horn -- sorry.
Why have you not told Mr. Rosenlof that you cannot provide services to Van Horn Aviation during your time at Alliant since the account moved to Alliant?
A. I think my prior answer answers that question.
Q. Why did you send Mr. Rosenlof loss runs as indicated in this email in front of you?
A. I'm assuming someone from -- one, I don't



remember doing it. But two, I'm assuming someone from Lou's team asked me to. I mean, I just don't remember.
Q. Who is Wendy Galati?
A. She is a -- I don't know what her title is, but she is a member of Lou's team.
Q. And what is Lou's position at Alliant, if you know?
A. He is an aviation broker. He runs an aviation team.
Q. In your experience at Alliant, do other producers -- sorry.
Since the time that you've joined Alliant, have other producers at Alliant asked you to send loss runs or claim reports to client accounts other than Mr. Timpanaro?
A. I think so.
Q. What producers have asked you to do that other than Mr. Timpanaro?
A. I can't recall exactly, but I mean, it's not uncommon.
Q. Would you, during your time -- sorry.
During your time at USI, did you -- do you recall sending Mr. Rosenlof loss runs or claims reports in connection with servicing Van Horn Aviation's account?
A. I mean, I don't recall.



Q. Do you recall other producers at USI ever asking you to send loss runs or claims reports to client accounts at USI?
A. I don't recall specifically, but I'm sure it could happen.
Q. You can put that aside.
Mr. Engles, you previously testified that you reviewed USI's employee handbook prior to your departure from USI, but since the time that you began exploring employment opportunities at Alliant.
Do you recall that testimony?
A. No.
Q. Do you recall reviewing USI's employee handbook after you began having employment opportunity conversations with Alliant?
A. I -- I don't recall what date I reviewed the employee handbook.
Q. Do you remember reviewing the employee handbook at USI?
A. I know I did. I just don't remember. It's been a year and a half, almost two years, I think. I don't recall when.
Q. Do you know where you -- where you got the employee handbook that you reviewed during your time at USI from?

the client accounts that you worked -- sorry. Strike the question.

Since your last deposition, has anyone at Alliant told you not to solicit the client accounts that you worked on during your last two years of employment at USI?

A. Yeah, I believe so.

Q. Who told you?

A. On the solicit, I think it's in the paperwork and was during the on-boarding process. I just can't remember.

Q. You don't remember -- has a specific person told you not to solicit verbally?

A. Yeah, I mean, the when -- that's a year -- 15 months ago. So I just don't remember who -- who -- I just don't remember who it was.

Q. Sorry. Just to clarify, my question is: Since your last deposition --

A. Oh.

Q. -- has anyone at Alliant told you not to solicit --

A. I don't recall -- I don't recall any conversation since November, I think it was.

MR. STEPHENS: November? Just so we're clear, she's asking your last deposition.



Do you know the date of his last deposition because the witness just said the November and pretty sure it wasn't November?

THE WITNESS: I'm sorry. Terrible with dates.

BY MS. CASSIDY:

Q. No problem.

A. I can answer the question regardless. I don't recall.

Can we take, like, a two-minute break because I got to use the restroom really bad?

MS. CASSIDY: I'm actually done with my questions.

THE WITNESS: Oh, okay. I'm sorry.

MS. CASSIDY: Unless you have anything further. Okay. So if you have any questions.

MR. STEPHENS: You are finished with your questions?

MS. CASSIDY: I'm finished with my questions, yes.

THE WITNESS: I'm swimming.

MR. STEPHENS: So why are we taking a break? Are you done?

MS. CASSIDY: I was asking if you have questions.



MR. STEPHENS: I do not have questions.

MS. CASSIDY: If you want to take a break.

MR. STEPHENS: I do not have questions.

MS. CASSIDY: Okay. That's all.

VIDEOGRAPHER: This concludes today's deposition of Robert Engles. We are off the record at 12:28 p.m.

(The deposition concluded at 12:28 p.m.)

________________________
ROBERT ENGLES



STATE OF ARIZONA )
) ss
County of MARICOPA)

BE IT KNOWN that the foregoing proceedings were taken by me, SABRINA L. STERENFELD, a Certified Reporter, in and for the County of Maricopa, State of Arizona; that the witness before testifying was duly sworn to testify to the whole truth; that the questions propounded to the witness and the answers of the witness thereto were taken down by me in shorthand and thereafter reduced to typewriting under my direction; that the witness will read and sign said deposition; that the foregoing pages are a true and correct transcript of all proceedings had, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

I FURTHER CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206(J)(1)(g)(1) and (2).

Sabrina L. Sterenfeld 51002
____________________ __________
Certified Reporter CR Number

____________________ __________
Certified Reporter April 10, 2024
(Signature)

I CERTIFY that this Registered Reporting Firm has complied with the ethical obligations set forth in ACJA 7-206(J)(1)(g)(1) and (2).

Carrie Reporting, LLC R1064
____________________ __________
Registered Reporting Firm RRF Number

____________________ __________
Registered Reporting Firm April 10, 2024
(Signature)

## James Van Horn

| | |
|---|---|
| **Subject:** | Meet at Van Horn - Early dinner after |
| **Location:** | 1510 W Drake Dr, Tempe, AZ 85283 |
| **Start:** | Tue 8/1/2023 2:00 PM |
| **End:** | Tue 8/1/2023 5:00 PM |
| **Show Time As:** | Tentative |
| **Recurrence:** | (none) |
| **Meeting Status:** | Not yet responded |
| **Organizer:** | Robert P. Engles |



Exhibit 10
Witness Engles, R
Date 3/21/24
Sabrina S. Sterenfeld, CR, RPR

**Dean Rosenlof**

| | |
|---|---|
| **From:** | Robert P. Engles <Robert.Engles@alliant.com> |
| **Sent:** | Tuesday, August 1, 2023 10:23 PM |
| **To:** | Dean Rosenlof |
| **Cc:** | Wendy Galati; Lou Timpanaro |
| **Subject:** | Loss Runs |
| **Attachments:** | AIG Loss Runs.pdf; 1911876_1981438_Loss Run(1).pdf; 1911870_1981432_Loss Run(3).pdf |

Dean,

Thank you for your time today. We appreciate it.. Attached are the loss runs / claims reports from Starr and AIG for your file.


**Robert P. Engles, CIC**
First Vice President
**Real Estate & Risk Management**
[illegible]

[illegible]
[illegible]
[illegible]

C: 623.229.8084

Alliant.com


https://www.alliant.com/Industry-Solutions/Real-Estate/Pages/default.aspx" style='position:absolute;margin-left:-2.15pt;margin-top:-10.1pt;width:66.85pt;height:15.1pt;z-index:251659264;visibility:visible;mso-wrap-style:square;mso-width-percent:0;mso-height-percent:0;mso-wrap-distance-left:9pt;mso-wrap-distance-top:0;mso-wrap-distance-right:9pt;mso-wrap-distance-bottom:0;mso-position-horizontal:absolute;mso-position-horizontal-relative:text;mso-position-vertical:absolute;mso-position-vertical-relative:text;mso-width-percent:0;mso-height-percent:0;mso-width-relative:margin;mso-height-relative:margin' o:button="t">

**The More Rewarding Way to Manage Risk**

CA License: 0D16347



VHA000178

# EXHIBIT C

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

---

| | |
|---|---|
| USI Insurance Services, L.L.C., a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>Alliant Insurance Services, Ins., William J. Havard, II and Jane Doe Havard, husband and wife, and Robert Engles and Jane Doe Engles, husband and wife,<br><br>Defendants. | No. CV-23-00192-SMB<br><br>Phoenix, Arizona<br>April 25, 2023<br>9:03 a.m. |

**BEFORE: THE HONORABLE SUSAN M. BRNOVICH, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**PRELIMINARY INJUNCTION HEARING - DAY 1**

**(PAGES 1 - 236)**

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiff:

SNELL & WILMER, LLP
By: **Ms. Jennifer R. Yee, Esq.**
**Mr. Joshua R. Woodard, Esq.**
**Ms. Delilah Cassidy, Esq.**
1 E Washington St., Ste. 2700
Phoenix, Arizona 85004

CARDEN LIVESAY LIMITED
**Mr. Joshua W. Carden, Esq.**
419 E Juanita Ave., Ste. 103
Mesa, AZ 85204

For the Defendant:

COPPERSMITH BROCKELMAN, PLC
By: **Ms. Jill J. Chasson, Esq.**
2800 N Central Ave., Ste. 1900
Phoenix, Arizona 85004

MORGAN LEWIS & BOCKIUS, LLP
**Mr. John Bramble, Esq.**
1000 Louisiana St., Ste. 4000
Houston, TX 77002

MORGAN LEWIS & BOCKIUS, LLP
**Mr. Seth Gerber, Esq.**
2049 Century Park E, Ste. 700
Los Angeles, CA 90067

MORGAN LEWIS & BOCKIUS, LLP
**Mr. Timothy J. Stephens, Esq.**
101 Park Ave.
New York, NY 10178

A. I work for AvAir.
Q. What is your position at AvAir?
A. I am the chief financial officer.
Q. How long have you been the chief financial officer of AvAir?
A. About -- about three months.
Q. Did you hold another position at AvAir before you were chief financial officer?
A. Yes, I did.
Q. What position was that?
A. Chief accounting officer.
Q. Are you familiar with USI Insurance Services?
A. Yes, I am.
Q. How are you familiar with USI?
A. USI is the broker service that provides our insurance coverage.
Q. And by "our insurance coverage," do you mean AvAir's?
A. Correct, AvAir's insurance coverage.
Q. Who was the insurance producer at USI who you primarily worked with?
A. Robert Engles.
Q. Did you recently stop working with Mr. Engles?
A. Yes, we did.
Q. Why did you recently stop working with Mr. Engles?
A. He left USI.

Q. Do you know where Mr. Engles works now?
A. I believe it's Alliant.
Q. Did you receive a phone call from anyone at Alliant in February of this year?
A. Yes, I did.
Q. Who did you receive a phone call from at Alliant?
A. Eric Harper.
Q. What is your understanding of Mr. Harper's position at Alliant?
A. That he's an insurance broker.
Q. What number did Mr. Harper call you on in February?
A. (480)481-6519.
Q. Is that your office line?
A. Yes, it is.
Q. Did Mr. Harper leave you a voicemail?
A. Yes, he did.
Q. Does AvAir have a regular practice of recording voicemails you receive on your office line?
A. Yes.
MS. YEE: Could we please play Exhibit Number 98.
(Exhibit Number 98 was played.)
MS. YEE: Your Honor, for the record, that's stipulated Exhibit Number 98 that's already been admitted into evidence.
THE COURT: Well, just to be clear, although you

stipulated to it, I'm not admitting anything unless it's actually referred to or used at some point, so I'll keep a list of which ones you use.

So 98 is admitted.

MS. YEE: Thank you, Your Honor.

BY MS. YEE:

Q. Mr. Knox, do you recognize that audio recording that was just played?

A. Yes.

Q. And what is that audio recording that was just played?

A. That's a recording of my voicemail.

Q. Was that a recording of your voicemail from Mr. Harper?

A. Yes, indeed.

Q. Is that a true and correct copy of the voicemail Mr. Harper left you on your office line in February?

A. Yes, indeed.

Q. Had you ever spoken to Mr. Harper before he called and left you that voicemail in February?

A. No.

Q. What did you do after you received that voicemail from Mr. Harper in February?

A. I called him back the next day.

Q. What did Mr. Harper say to you when you called him back the next day?

A. We exchanged typical introductory pleasantries, and then he

A. Mr. Engles did not.
Q. Okay. Thank you. Appreciate the clarification.
THE COURT: Any redirect?
MS. YEE: No redirect, Your Honor.
THE COURT: All right. You may step down.
THE WITNESS: Thank you.
THE COURT: Thank you.
Your next witness.
MS. CASSIDY: Your Honor, the plaintiff would like to call Tim Porreca. He's standing outside.
THE COURT: Okay.

TIM PORRECA,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE COURT: You can have a seat.
THE WITNESS: Good morning.
THE COURT: Good morning.
Go ahead.

DIRECT EXAMINATION

BY MS. CASSIDY:
Q. Good morning. Could you please introduce yourself to the Court.
A. Hi. My name is Tim Porreca.
Q. Mr. Porreca, what do you do for a living?
A. I'm the corporate vice president and chief technology

officer for USI Insurance Services.
Q. How long have you worked for USI?
A. 31 years.
Q. Wow, that's a long time. You must really like USI?
A. I get to travel to neat and wondrous places like this.
Q. What are your job duties at USI?
A. I'm responsible for USI's data centers, all their computer infrastructure, and user support and telecommunications.
Q. Mr. Porreca, are you familiar with ShareFile?
A. Yes.
Q. Does USI use ShareFile?
A. Yes.
Q. What is ShareFile?
A. ShareFile is a file sharing service similar to Box or Dropbox.
Q. Why would someone use ShareFile as opposed to just sending a document through an e-mail?
MR. GERBER: Objection. Calls for speculation.
THE COURT: The objection is overruled.
THE WITNESS: The e-mails are generally limited to attachments of sizes of 25 meg, so if you have a larger file, you need to find another way to send it.
BY MS. CASSIDY:
Q. How does USI use ShareFile?
A. We provide it to some of our employees so that they can

share files that are larger than 25 meg with our business partners and clients.
Q. So how does ShareFile work?
A. You log into ShareFile. You can either drag and drop a file into ShareFile or upload one from your desktop.
Q. Can anyone get into ShareFile?
A. You need to -- you need to have an account to log into ShareFile, or somebody else needs to provide you with access.
Q. How does someone provide you with access to ShareFile?
A. There is two ways. One is you can invite someone to be what ShareFile calls a client, which is someone who can log in but does not have access to have their own account, or you can create a unique link for that file or folder that anybody can click on and download the files.
Q. Does USI run ShareFile or is it a third-party application?
A. It's a third-party application owned by Citrix.
THE COURT: And what?
THE WITNESS: Owned by Citrix.
THE COURT: Oh, okay.
MS. CASSIDY: Your Honor, could Mr. Porreca move a little closer to the microphone. I'm having a little trouble hearing.
Thank you.
BY MS. CASSIDY:
Q. Mr. Porreca, I want to direct your attention to Exhibit 100

which should be on your screen.

Mr. Porreca, do you recognize this document?

A. Yes.

Q. What is it?

A. This is the usage log from USI's ShareFile account for most of the month of January.

Q. And does this ShareFile log pertain to all USI employees?

A. This log is just filtered down to the participants in this case.

Q. Where did this report come from?

A. This is a standard report that you can download from -- from the subject's website as an administrator. It's called a usage report.

Q. How is this particular report created?

A. This was a report that one of my employees created while we were on the phone for me.

Q. Can you see ShareFile logs going back further than January 2023?

A. The current limitation is to go back 90 days.

Q. What does this log show?

A. This shows all the activity in ShareFile of every file folder that was uploaded, downloaded, or accessed within the ShareFile system.

MS. CASSIDY: Your Honor, plaintiff moves to admit Exhibit 100.

THE COURT: 100 will be admitted.
BY MS. CASSIDY:
Q. So it looks like there is a lot of information on this document. Could you break it down a little bit?
We have the date and time and activity on the left-hand column. In column B --
MS. CASSIDY: Could you highlight column B, please.
BY MS. CASSIDY:
Q. -- that has Item Name at the top.
Do you know what these items are?
A. Yes. Citrix calls an item either a file or a folder. These are all documents that were uploaded from USI's file system into ShareFile.
Q. Do you recognize the information in any of these documents -- sorry, items? Excuse me.
A. Yeah, it's a variety of PDF, zip files, e-mails, Excel documents related to USI clients.
Q. Do we know how far back -- do you know how far back the particular items go, in terms of date and time?
A. These documents appear to go back to 2017.
Q. Can you look at the first few cells, cells 2 through 7, in particular.
A. Uh-huh.
Q. Do you have any understanding of which USI client accounts -- client's account these particular items pertain to?

A. Those would relate to STORE Capital.
Q. How about cells 690 through 791?
It's a large document.
A. Yeah, 690 starts a bunch of documents for CBRE, Coldwell Bank Real Estate.
Q. And CBRE -- do you understand CBRE to be a USI client?
A. Yes, very much so.
Q. And column D has the heading at the very top that says, User?
A. Uh-huh.
Q. Do you see that?
A. Yes.
Q. There is some cells in that column D that have names, while others say anonymous. Why is that?
A. So the names will be associated with somebody who had a login into the system, whether it be an employee login or a guest client login. If somebody creates just a link for that particular folder or document, then we don't know who the person is, so it's listed as anonymous.
MS. CASSIDY: If you could scroll over to the right-hand column.
BY MS. CASSIDY:
Q. You'll see a column that has IP addresses, column G.
Do you see that?
A. Yes.

Q. Can you use the IP address to identify those anonymous users?

A. In some cases, yes, if the IP address is part of a range owned by a company, then you could. But, in most cases, those IP addresses are owned by much larger organizations who give those out on a -- you know, each time you log in, so every time you log in, you might get a different address.

MS. CASSIDY: If you could scroll back over to the top.

BY MS. CASSIDY:

Q. If you could direct your attention to cells 2 through 10.

Mr. Porreca, are these downloads after January -- or, sorry, are these -- let me rephrase.

Mr. Porreca, are these ShareFile activities on or after January 25th, 2023?

A. Yes.

Q. Do you know if any of these activities were internal or external to USI?

A. If you scroll to the right and look at the IP address, anything internal at USI would start with that 139.60 address, so those -- those first ten are not.

Q. How many documents did the employees identified on the ShareFile log upload between January 4th, 2023, and January 25th, 2023?

A. I believe it was a little more than 600. I think 250 were

Bill Havard and Justin Walsh alone.
Q. Are those just uploads?
A. Yes.
Q. So that doesn't even include downloads, views, et cetera?
A. Yeah. They would all be listed separately, yes.

MS. CASSIDY: If you could scroll over all the way to the left.

BY MS. CASSIDY:
Q. Mr. Porreca, when was the last upload of any of the employees identified in this ShareFile log who are parties to this case?
A. The last upload, January 24th, in the -- in the late afternoon.
Q. Thank you, Mr. Porreca.

Now, I want to turn to a different topic. I'm going to -- on your screen you'll be seeing Exhibit 105, which the parties stipulated to admitting.

THE COURT: 105 will be admitted.

BY MS. CASSIDY:
Q. Do you see Exhibit 105 on your screen, Mr. Porreca?
A. Yes.

MS. CASSIDY: If you could scroll all the way to the left of the document. Thank you.

BY MS. CASSIDY:
Q. Mr. Porreca, are you familiar with this document?

A. Yes.
Q. What is it?
A. That is the metadata that was provided by Alliant for all the documents they provided in discovery for this case.
Q. So for those of us who don't speak technology, aren't fluent in that language, what is metadata?
A. Metadata is data about data. It is fields of information that tell you something about the documents, so the name of the document, when it was last modified, the size, how much -- who created it, things such as that.
Q. If you look at a piece of paper, can you see that paper's metadata?
A. No, it's electronic.
Q. If you're looking at an electronic file, though, can you read metadata?
A. Yes, it's generally human readable. It's in text form.
Q. Where did this particular metadata in Exhibit 105 come from?
A. This -- this metadata came from Alliant and was loaded into Excel.
Q. Was this metadata altered before it was loaded into the Excel?
A. No.
MS. CASSIDY: If you could highlight column J with -- and J 1.

BY MS. CASSIDY:
Q. You'll see it says, File Author.
Do you see that?
A. Yes.
Q. What does it mean if a person is the author of a document in the metadata?
A. That's the person who created the document.
Q. How does the metadata know who created the document?
A. Whoever is logged into that computer at that time, it uses that name.
Q. Okay. So now I want to show you another document. This is Exhibit 101.
MS. CASSIDY: Which the parties stipulated to admitting this one as well, Your Honor.
THE COURT: 101 will be admitted.
MS. CASSIDY: I apologize, Your Honor, we have to switch applications to see the native Excel sheet in the trial viewer. We have to go in and out of the --
BY MS. CASSIDY:
Q. All right. Mr. Porreca, do you see Exhibit 101 on your screen?
A. Yes.
Q. Do you recognize this exhibit?
A. Yes.
Q. What is this document?

A. This is an e-mail from Justin Walsh at Alliant in regards to CBRE's 2023 renewal that came from Alliant.
Q. And what is the date of this e-mail?
A. February 17th, 2023.
Q. Have you seen this e-mail before?
A. Yes.
Q. Where?
A. This was part of the documents that Alliant provided to us in this case.
Q. Do you see the Bates label in the bottom right-hand corner of this document?
A. Yes.
Q. And that Bates label is Alliant 1281, and for -- if we go to page 2 of the document, the Bates label for the end of the e-mail on the bottom right-hand corner is Alliant 1282. Is that --
A. Yes.
Q. Once it blows up. There we go.
MS. CASSIDY: If we can turn to the third page of the exhibit and, again, to the Bates label in the bottom right-hand corner.
BY MS. CASSIDY:
Q. Do you see that, Mr. Porreca?
A. Yes.
Q. And is that Bates label Alliant 1283?

A. Correct, yes.
Q. And this is the first Bates label for the attachment to that e-mail, correct?
A. Correct.
Q. What is this attachment?
A. This is a comparison renewal summary for the CBRE program for March 2023.
MS. CASSIDY: If we could blow up the third page of this exhibit.
BY MS. CASSIDY:
Q. Mr. Porreca, what's the title of this document?
A. CBRE Client Program 2023 Pollution Renewal Summary, February 17, 2023.
Q. And the Bates label for this begins at 1283?
A. Correct.
MS. CASSIDY: Scroll down the Bates label for the end of this document.
BY MS. CASSIDY:
Q. The bottom right-hand corner, 1288.
Do you see that?
A. Yes.
MS. CASSIDY: If we could turn back to the metadata, Exhibit 105. It may take a moment.
If we could go to cell 232, please, and all the way to the right. I'm sorry, excuse me, the left.

BY MS. CASSIDY:

Q. Mr. Porreca, do you see cell 232 on your screen highlighted?

A. Yes.

Q. Do you see the Bates labels for that, Alliant 1281 through Alliant 1282?

A. Yes.

Q. Is this the metadata for the e-mail that Mr. Walsh sent that you identified in Exhibit 101?

MR. GERBER: Objection. Calls for speculation, lacks foundation, 720 and 801.

THE COURT: What's your response?

MS. CASSIDY: Your Honor, we established the Bates labels for Exhibit 101, and these are the Bates label that are right there. Mr. Porreca testified that the metadata was provided by Alliant and has not been altered when loaded into this spreadsheet.

THE COURT: The objection is overruled.

BY MS. CASSIDY:

Q. Mr. Porreca, is this the metadata for the e-mail that Justin Walsh sent that was identified in Exhibit 101?

A. Yes.

MS. CASSIDY: If we could scroll over to column J. Sorry, not column J, the file author column.

BY MS. CASSIDY:

Q. Do you see that? Do you see the file author column for that particular e-mail that Justin Walsh sent in Exhibit 101?
A. Yes.
MS. CASSIDY: Could we highlight the author for that particular exhibit in cell 232. And if we could just keep cell 232 highlighted.
Thank you.
BY MS. CASSIDY?
Q. Mr. Porreca, who does the metadata provided by Alliant designate as the author of that e-mail?
A. Justin Walsh.
Q. And why is that?
A. He was the one who sent the e-mail.
MS. CASSIDY: If we could go down to cell 233 and then all the way back to the left, please.
BY MS. CASSIDY:
Q. Mr. Porreca, do you see in columns 1 and 2 the Bates labels for this particular document are 1283 through 1288?
A. Yes.
Q. And are those the Bates labels for the client renewal summary dated February 17th, 2023, that were identified -- that was identified in Exhibit 101?
A. Yes.
Q. Why is there -- why is the metadata different for the e-mail versus the attachment?

A. So the attachment is its own entity. That attachment could have been created by somebody else. It would have different modified dates, et cetera.
Q. So for this client renewal summary, who does the metadata designate as the author?
A. Bill Havard.
Q. And what does that mean?
A. That means Bill was the creator of that document.
Q. How are you able to tell -- how is the metadata able to tell that Bill Havard created the CBRE Client Renewal Summary dated February 17th, 2023?
A. When a document is created, the file author is set and then that doesn't change. You may have somebody -- it may be modified by somebody else, but the author is -- remains static.
Q. Speaking of that, if you could look at the column that says, Create Date.
What date was the CBRE Client Renewal Summary identified in Exhibit 101 created?
A. February 17th, 2023, at 11:04.
Q. And when was that document last modified?
A. The same -- the same date, it was 11:04 on the same date, so it was created and then never modified.
Q. So could Mr. Walsh who sent the original e-mail have received an old PDF client renewal summary that Bill Havard created and then edited it?

A. If he had modified it, then the modified date would be different than the create date.
Q. Based on the create date and last modified date, were any edits made to this document by anyone once it was converted to a PDF?
A. No.
Q. Does the metadata show that anyone else touched this document before it became a PDF?
A. No.
Q. Is there any evidence in the metadata that indicates anyone other than Bill Havard is the author of this document?
A. No.
Q. Was CBRE one of the client accounts that had documents uploaded to the ShareFile in January 2023 by the defendants based on the log in Exhibit 100?
A. Yes.
Q. I want to ask you about -- a few other questions of the metadata.
MS. CASSIDY: If we could pull up Exhibit 102.
THE COURT: 102 will be admitted.
MS. CASSIDY: Thank you, Your Honor.
BY MS. CASSIDY:
Q. Mr. Porreca, do you see what is labeled as Exhibit 102 on your screen?
A. Yes.

Q. Do you recognize this document?
A. Yes.
Q. What is it?
A. This is another e-mail from Justin Walsh, this one regarding STORE Capital's renewal summary.
Q. And what's the date of this e-mail?
A. February 27th, 2023.
Q. Have you seen this document before?
A. Yes.
Q. Where?
A. This was part of the discovery provided by Alliant in this case.
MS. CASSIDY: If we could turn to page 3 of the exhibit.
BY MS. CASSIDY:
Q. Mr. Porreca, do you see page 3 of the exhibit on your screen?
A. Yes.
Q. And what is this document?
A. This is another renewal summary, this time for STORE Capital, comparing the expiring and new terms of the policy for April.
Q. And what is the date of this client renewal summary for STORE Capital?
A. This document is dated February 27th, 2023.

Q. And if you -- do you see the Bates label in the bottom right-hand corner of this document?
A. Yes.
Q. Is it Alliant 6262?
A. Yes.
Q. And if we scroll to the end of this attachment, is the Bates label Alliant 6266 when it gets there?
MS. CASSIDY: If we could zoom in. Yes.
BY MS. CASSIDY:
Q. Okay. Do you recognize the name STORE Capital?
A. Yeah, it's one of USI's clients.
Q. And STORE Capital was one of the client accounts that was identified -- that you identified in the January 2023 ShareFile log in which defendants uploaded documents in January of 2023 in Exhibit 100?
A. Yes, it was.
MS. CASSIDY: If we can put on the screen Exhibit 103. Again, Your Honor, this is one the parties stipulated to admit.
THE COURT: 103 will be admitted.
BY MS. CASSIDY:
Q. Mr. Porreca, do you see Exhibit 103 on your screen?
A. Yes.
Q. Do you recognize this document?
A. Yes.

Q. What is it?
A. This is another e-mail from Justin Walsh about -- this one is a CBRE renewal summary for March.
Q. What's the date of this e-mail?
A. February 27th, 2023.
Q. Have you seen this e-mail before?
A. Yes.
Q. Where?
A. This was another one of the documents provided by Alliant.
MS. CASSIDY: If we could turn to page 6 of Exhibit 103.
BY MS. CASSIDY:
Q. Mr. Porreca, do you see page 6 of the exhibit on your screen?
A. Yes.
Q. What is this document?
A. This is a renewal summary for CBRE.
Q. What is the date of the renewal summary?
A. February 27th, 2023.
Q. And this -- was this the attachment to the e-mail that you just identified that Justin Walsh sent to CBRE?
A. Yes.
Q. Do you see in the bottom right corner the Bates label for this document?
A. Yes.

Q. And is that Alliant 6334?
A. Yes.
Q. Going through the end of this attachment to Alliant 6337.
Mr. Porreca, do you see the Bates label for the end of that CBRE Client Renewal Summary dated February 27th, 2023?
A. Yes.
Q. Is it Alliant 6337?
A. Yes, it is.
Q. One last e-mail I want to show you marked as Exhibit 104.
MS. CASSIDY: Again, Your Honor, stipulated to admit this exhibit.
THE COURT: 104 will be admitted.
MS. CASSIDY: Thank you.
BY MS. CASSIDY:
Q. Mr. Porreca, do you see Exhibit 104 on your screen?
A. Yes, I do.
Q. Do you recognize this document?
A. Yes.
Q. Where have you seen it before?
A. This is another one of the e-mails that was provided by Alliant.
Q. And what is it?
A. It's an e-mail from Justin Walsh regarding the Western National Group Pollution and Portfolio Renewal Summary.
Q. And what's the date of this e-mail?

A. February 27th, 2023.

MS. CASSIDY: If we could scroll down to the next page of this exhibit.

BY MS. CASSIDY:

Q. Mr. Porreca, what is this document?

A. This is the renewal summary comparison sheet for Western National Group.

Q. And what's the date of this document?

A. February 27th, 2023.

Q. Do you see the Bates label on the bottom right corner?

A. Yes.

Q. Is it Alliant 6418?

A. Yes.

MS. CASSIDY: And if we could go to the end of this exhibit. Sorry, not to the end of the exhibit, to the end of the attachment, the first attachment.

BY MS. CASSIDY:

Q. Is the ending Bates label of the client renewal summary Alliant 6422?

A. Yes.

Q. So to confirm the Bates labels for the Western National Group Client Renewal Summary dated February 27th, 2023, are Alliant 6418 through Alliant 6422?

A. Yes.

Q. All right. Mr. Porreca, now I want to flip back to

Exhibit 105.

If we could review the metadata for these client renewal summaries.

MS. CASSIDY: If we could go to cell 1140.

If we could highlight that cell 1140.

There we go.

BY MS. CASSIDY:

Q. Mr. Porreca, do you see the Bates labels for the beginning and end of this document?

A. Yes.

Q. And are they Alliant 6262 and Alliant 6266?

A. Yes.

Q. And those are the Bates labels for the CBRE -- or, sorry. Excuse me. Those are the --

Mr. Porreca, those are the Bates labels for the STORE Capital Client Renewal Summary dated February 27th, 2023, that you identified in Exhibit 102?

A. Can you scroll to the right a little?

Yes.

Q. And that's just the metadata for the attachment, the renewal summary, not the e-mail?

A. That's the attachment, yeah.

Q. Okay. Who does the metadata designate -- sorry. Excuse me.

Who does the metadata provided by Alliant designate as

the author of the STORE Capital Client Renewal Summary dated February 27th, 2023?
A. Bill Havard.
Q. Why is that?
A. He's the one who created the document.
MS. CASSIDY: If we could go down to cell 1144.
BY MS. CASSIDY:
Q. Mr. Porreca, do you see the Bates labels on there, Alliant 6334 and Alliant 6337?
A. Yes.
Q. And are those the Bates labels for these -- for the CBRE renewal summary dated February 27th, 2023, that you identify in Exhibit 103?
A. Yes.
Q. And who does the metadata provided by Alliant in this case designate as the author of that February 27th, 2023, client renewal summary?
A. Bill Havard.
Q. Why is that?
A. He was the author. He was the creator of the document.
Q. Going to cell 1161. Do you see the Bates labels there, Alliant 6418 through 6422?
A. Yes.
Q. Are those the Bates labels for the Western National Group 2023 Pollution Renewal Summary, February 27th, 2023, that you

reviewed in Exhibit 104?
A. Yes.
Q. And who does the metadata provided by Alliant identify as the author of that document?
A. Bill Havard.
Q. What does that mean?
A. That means he created that document.
MS. CASSIDY: Your Honor, I pass the witness.
THE COURT: Okay.

CROSS-EXAMINATION

BY MR. GERBER:
Q. Good morning.
A. Good morning.
Q. Are you a certified forensic examiner?
A. No.
Q. Have you taken any courses in computer forensics?
A. No.
Q. Have you ever testified as a forensic expert?
A. No.
Q. I'd like to talk about the ShareFile.
Is that a software application that USI allows producers and other employees to use?
A. Yes.
Q. It's used in the regular course of business, correct?
A. Correct.

Compensation and Benefits.
And before we get to the details of the compensation and benefits section of section -- I'm sorry, of Exhibit 2, in 2022 you earned more than $2.7 million, correct?
A. I believe so, yes.
Q. And in 2022 and early this year, you did not receive a W-2 from Wells Fargo, correct, for wages earned; isn't that correct?
A. I believe so. I'd have to look at my W-2 to see the employer, but I believe you're right, yes, sir.
Q. Same answer for 2021, correct, you did not receive a W-2 from Wells Fargo?
A. I'd have to look, but I believe you're right.
Q. Same answer for 2020, correct?
A. Again, I'd have to look, but I believe you're correct.
Q. Same answer for 2019, correct?
A. I'd have to look.
Q. You believe I'm correct?
A. I'd have to look.
Q. In section 3.1 of Exhibit 2, a portion of the $2.7 million that you earned in 2022 consisted of commissions consistent with this section, correct?
A. Could you -- could you rephrase the question?
Q. Sure.
A. I'm sorry. I'm not trying to --

THE COURT: Okay. So we're going to take a ten-minute break and we'll see you in ten.

MR. WOODARD: Thank you.

(Recess taken, 10:30 a.m. - 10:40 a.m.)

THE COURT: Go ahead.

BY MR. WOODARD:

Q. Mr. Havard, I'd like to direct your attention to section 3.7 of Exhibit 2. You'll see it's a section entitled Benefits.

Do you see the section about two-thirds of the way down entitled Benefits?

A. I do.

Q. And in 2022 you received benefits consistent with section 3.7, correct?

A. I believe so, yes, sir.

Q. And, I'm sorry, there was just a cough. I couldn't hear you.

A. Yes, sir, I believe so.

Q. Thank you.

If you go to section 4 on the next page, there is a section entitled Retention Bonus Payment.

And do you see at the top there it says, producer shall be eligible for a special retention bonus payment?

A. Yes, I see that.

Q. And you received a portion of this retention bonus identified in section 4.1, correct?

A. Correct.
Q. And if you go to section 5 on the next page under Acquisition Bonus, you received an acquisition bonus consistent with section 5, correct?
A. Yes.
Q. You never went to USI and said, I understand I just made $2.7 million in 2022, I understand I just received benefits consistent with this exhibit that we're just looking at, but this isn't right because I don't have a relationship with USI? You never said that, correct?
A. Correct.
Q. And you never offered to return the $2.7 million after it had been paid by USI, correct?
A. Correct.
Q. You took USI's money in 2022, you took the benefits in 2022, both of which you earned, all is outlined in Exhibit 2, and you never told anyone at USI that the employment agreement doesn't provide to you, at the time you were employed by USI, correct?
A. I took the -- yes, but we disagree on what was owed for the retention bonus.
Q. Other than that, it was all true, correct?
A. Yes, sir.
Q. You value professionalism, correct?
A. I try to, yes.

Do you see that?
A. I do see that.
Q. You sold and serviced policies that lasted one year, correct?
MR. WOODARD: I'm done with that exhibit. Thank you so much.
THE WITNESS: Yes, there were some policies that were annual or one year.
BY MR. WOODARD:
Q. You sold and serviced policies that lasted three years, correct?
A. Yes, sir.
Q. You sold and serviced policies that lasted five years, correct?
A. Yes, sir.
Q. And you even sold and serviced policies that lasted ten years, fair?
A. Yes.
MR. WOODARD: If we can go to Exhibit 366, please.
BY MR. WOODARD:
Q. You testified earlier about 366, and this is the template that you prepared, correct?
A. Yes, it appears to be.
Q. And isn't this true, that this is a comparison of policies amongst a variety of carriers, and those policies are set forth

A. I do see that.
Q. It's true you told Mr. Nassa that your team was leaving USI and went to Alliant?
A. Not even remotely true.
MR. WOODARD: If we can go to 136, please.
BY MR. WOODARD:
Q. 136, in the second e-mail down from the top, there is an e-mail from Mr. Nassa to Mr. Holdridge. Do you see that? And that e-mail is dated February 10, 2023, at 7:31 a.m.
A. I do see that, yes, sir.
Q. In the e-mail Mr. Nassa says, Bill cannot be out front for another month-and-a-half due to contractual restrictions on the transition. I will send you the folks who are working our account for now, but have no fear of who is pulling the strings.
Do you see that?
A. I do see -- that's the first time I'm seeing that. Yes, I see that.
Q. I read that correctly, correct?
A. Yes, sir.
Q. And you told Mr. Nassau, don't worry, can't be out front, I'll pull the strings?
A. No, I did not.
Q. You told Mr. Nassa that you would service his account?
A. No, I did not.

A. No, I did not. I mean, it's a piece of it, I mean, but you got -- I mean, you're accusing me of --
Q. Can you please just answer the question?
A. No, I did not do that.
Q. But you testified just a moment ago that you told clients, I cannot help you, true?
A. Something to those words, yes.
MR. WOODARD: Your Honor, if I can just have 30 seconds.
THE COURT: Yeah.
MR. WOODARD: Thank you.
BY MR. WOODARD:
Q. Mr. Havard, did you store any USI information on a personal Cloud storage application?
A. I think historically I might have used Box or Dropbox from time to time to get files to underwriters or receive files from clients.
Q. So the answer is yes?
A. Yes.
MR. WOODARD: That's all the questions we have, Your Honor, for Mr. Havard.
THE COURT: Okay. You may step down, Mr. Havard.
THE WITNESS: Oh, sorry.
THE COURT: Your next witness.
MR. CARDEN: Yes, Your Honor. We're going to call

sales team reporting directly to me, and by dotted line, as we call it, to handling the service team also.
Q. How many service team members and sales team members do you have reporting to you, approximately, today?
A. About 25 producers and producing AEs, and 50-ish service team.
Q. How did you come to work with USI?
A. My agency was acquired in 2014.
Q. And you've been with USI since?
A. Yeah.
Q. Do you know Mr. Havard?
A. I do.
Q. Do you know Mr. Engles?
A. I do.
Q. How do you know both of those individuals?
A. I worked with them the five years since the Wells Fargo acquisition.
Q. And that was in when, approximately?
A. 2017.
Q. And what was Mr. Havard doing when he was working underneath you?
Was Mr. Havard working underneath you?
A. Yes.
Q. And what was he doing at that time when he was reporting to you while he was with USI?

A. He was a producer and the head of our environmental pollution liability insurance team.
Q. And how many folks were on Mr. Havard's team when he was with USI?
A. Him and four.
Q. And you mentioned you know Mr. Engles. What was his position at the time he was with USI?
A. He was a commercial property and casualty producing AE.
Q. An AE is?
A. It's like a producer, they just have a little different comp plan, little different expectation, but it's very similar.
Q. Similar to producers?
A. Yes, almost identical except with some slight differences.
Q. So let's talk about each of those. Can you please describe for the Court what the duties of a producer are.
A. Their primary responsibility is to source new clients, take care of relationships with existing clients, build goodwill in the community, connect with centers of influence with insurance carriers, people all over our market. The environmental team worked all over the country.
Q. And how about, what were the duties of Mr. Engles as an AE while he was with USI?
A. As a producing AE, they were, essentially, identical, except the expectation of outreach was not quite as much, little different comp plan, slightly lower commission

percentage, but, essentially, the same expectation.
Q. When Mr. Havard was reporting to you, did you, as his supervisor, consider him to be successful?
A. Yes.
Q. Why?
A. He generated a lot of business for us. I interacted with him relatively frequently. He was a veteran. He didn't need much supervision or interaction, but I interacted with him enough to feel like I had a good relationship with him and I liked working with him.
Q. Did you -- based upon your observation, do you believe Mr. Havard had good relationships with USI clients?
A. Yes.
Q. And how do you -- what was your observation of how he built that up, that relationship up?
A. Well, there were lots of scenarios. He's talented, knows the product well. He traveled the country meeting with clients, taking them to dinner, investing in their charitable causes, connecting with COIs, golfing with him. I've golfed with him with prospects. Anything that a salesperson would do, he did and he did it well.
Q. Based upon your observation, was Mr. Engles successful while he was at USI?
A. Yes.
Q. In what ways was Mr. Engles successful?

A. So he has a different skill set than Bill's, but he's a smart insurance guy. He knows a lot about insurance. Frankly, sometimes I was very grateful to have him on the team because he helped me out with things that I didn't know how to do.
Q. Did Mr. Havard have an employment agreement?
A. He did.
Q. Same question for Mr. Engles?
A. Yes.
Q. Are you familiar with those agreements?
A. I am.
Q. Are you familiar with a provision regarding resignation in those agreements?
A. I am.
Q. And are -- or was a producer like Mr. Havard allowed to resign from USI?
A. Yes.
Q. And if Mr. Havard had elected to resign pursuant to the employment agreement, what was your expectation of how that resignation was to be effectuated?
A. The language of the agreement says they can terminate their employment by giving a 60-day notice to us.
Q. And is that the same for Mr. Engles' employment agreement?
A. Yes.
Q. Are there other USI producers and AEs, to your knowledge, subject to similar resignation provisions?

MR. WOODARD: If we could admit 211, please.

THE COURT: Yes. 211 will be admitted.

MR. WOODARD: Go to Exhibit 109, please.

BY MR. WOODARD:

Q. Do you see Exhibit 109 on the screen?

A. I do.

Q. Are you familiar with this e-mail chain?

A. I am.

Q. It appears at the top of this e-mail chain it's an e-mail from Tammy Rhiner at McCormack Baron to you.

Do you see that?

A. Yes.

Q. And does this look to be like a true and correct copy of this particular e-mail?

A. Yes. I'm familiar with this, yeah.

Q. And do you use and keep e-mails in the ordinary course of business?

A. We do.

MR. WOODARD: And if you could un-highlight that, please, and let's get to the first page of this exhibit.

If you could go up just a little so we can see the header of that e-mail.

BY MR. WOODARD:

Q. Do you see at the bottom of, it says Exhibit 109-3, this is an e-mail from you to info@McCormack Baron?

Do you see that?
A. I do.
Q. And you'll see that you mention to that particular e-mail address -- well, let me pause for a minute.
Why did you send it to a general address at info@McCormack Baron as opposed to an individual?
A. I was struggling to find the right e-mail address to get the information to this account, so I -- so when a producer leaves, our financial -- one of our financial people gives me an Excel worksheet that has all the data on it, including contact people. And I had sent an e-mail to this client with the contact information that was populated, which I was told comes out of what the environmental team had in the systems for contact information, and I got a bounce back.
And so I went on their website. I hunted through their website. I found who I thought might be the right person, which was the risk manager, which was Tammy Rhiner. I guessed at the e-mail address. But there was also an e-mail address on the contact page that had the info., and so I sent it to both just hoping to get it to the right person, and Tammy responded that I had guessed right.
Q. And is this --
A. It was the right person. I'm sorry. And she was the right person.
Q. Does this appear to be a true and correct copy of this

particular e-mail you sent to Ms. Rhiner?
A. Yes.
MR. WOODARD: And if we can kind of scroll up through the e-mail chain just so Mr. Greer can see it.
BY MR. WOODARD:
Q. Do you see that you're included on the next e-mail in that e-mail chain?
A. Yes.
MR. WOODARD: And, Your Honor, we'd like to admit this Exhibit 109.
MR. GERBER: No objection.
THE COURT: 109 will be admitted.
BY MR. WOODARD:
Q. So if we go to, again, back to the first e-mail in the chain, this is your e-mail to Ms. Rhiner. And it says here that the team has changed.
Do you see that?
A. I do.
Q. And why did you want to reach out to McCormack Baron and inform that entity that the team had changed?
A. Because the -- we had policies that -- we were the broker for their environmental insurance program. We had policies written for them. And they were on the list of clients of Bill Havard's book.
MR. WOODARD: And if we scroll up in the e-mail chain.

That's great.

BY MR. WOODARD:

Q. You see Ms. Rhiner e-mails you back, and she e-mails you on Tuesday, January 31st. And she says, thank you for reaching out. I am the correct person for all things insurance. She goes on to state, I understand the challenges USI is facing because Bill and his team leaving abruptly, however, the timing of your e-mail was too late.

Do you see that?

A. I do.

Q. What was your reaction when you got that e-mail?

A. I was disappointed. I mean, I was working as fast as I could to get to everyone, as was the team, and we just got to her too late. She needed help -- essentially, the day Bill resigned, she needed help from the team, or very close to that date, and she -- she was getting no answers. And then she found out -- I don't know how she found out that -- maybe it was from me -- anyway, the people were gone.

Oh, there was a Matthew Cox. He is a guy in California, who he sent me an e-mail into my own e-mail inbox and said, please contact her. And because I was so busy working on all the other stuff, by the time I got to my own e-mail inbox, I found it later, that he did try to contact me and say you need to get with her. She needs help.

With them leaving, with whole team leaving with no

notice and just no transition cold turkey, throwing us right into a fire, I just couldn't get to her in time. And, you know, it's a significant account. We lost it. They moved it to Gallagher because we just couldn't get to them fast enough.
Q. When you refer to the Bill in this e-mail that we just looked at, who are you referring to?
A. Bill Havard.
Q. And had Mr. Havard provided 60 days' notice of his resignation, would you have anticipated this response from Ms. Rhiner?
MR. GERBER: Objection. Calls for speculation.
THE WITNESS: If the team -- if --
THE COURT: The objection is overruled. Go ahead.
THE WITNESS: I'm sorry.
THE COURT: It's okay. Go ahead.
THE WITNESS: If Mr. Havard and the team -- and/or the team would have been available to help, it would have been completely different.
MR. WOODARD: Let's go up the e-mail chain just a little bit, please.
BY MR. WOODARD:
Q. And you'll see at the e-mail about midway down the page that's on your screen, you e-mail Ms. Rhiner on Tuesday, January 31st, at 7:27 p.m.

Do you see that?
A. I do.
Q. And you indicate that you're sorry you were unable to get the notice of the change in the USI team assigned sooner.
Do you see that?
A. I do.
Q. And it goes on to say that Bill and his team left without notice and in violation of his employment contract.
What was your understanding of how Bill and his team left in violation of Mr. Havard's contract?
A. Well, I think the employment agreement is clear. The discussion about it being unclear and -- is, to me, difficult to understand. We've had multiple -- multiple producers leave. They've all run these employment agreements through lawyers, and all the lawyers seem to be pretty clear about the 60-day notice requirement, about the nonsolicitation, nonacceptance, nonservice, and they've all fulfilled it except one. And once he was notified and things started to happen, he -- he also lived within the contract.
Q. So, in the second-to-last paragraph, you say, we will do everything we can to assist you with what is needed.
Why were you offering your assistance on a client you had just lost?
A. Well, every broker loses business. And my position is and what -- the way -- I train all the producers in our office.

And the position is that every broker loses business, and when you lose business, they immediately become a prospect and you immediately begin working to win them back.

And she was interacting in a way that was -- a manner that I thought there was a chance at doing that. This e-mail string gets very positive near the end. We still lost the account though.

MR. WOODARD: Your Honor, I'd like to admit Exhibit 109. Oh, I think it's already admitted, excuse me.

If we can go to Exhibit 230, please.

BY MR. WOODARD:

Q. Are you familiar with this exhibit?

A. I am.

Q. And you'll see about midway down it appears to be an e-mail from Mr. Snow to Kpish Goyal.

Do you see that?

A. I do.

Q. And you are cc'd on the e-mail, correct?

A. I am.

Q. And it looks like Mr. Snow is informing Mr. Goyal that Robert Engles and Bill Havard have resigned from USI.

Do you see that?

A. Yes.

MR. WOODARD: And if we can go to the top of that e-mail chain.

of things cause significant trouble.

If Bill had just left, that would be troublesome. He's a strong player in the environmental market. But if the entire team had stayed, we would have managed this process almost without a beat. We would have had to add another person to the team to -- you know, because a lot of work fell on Bill's plate, so we would have had to add another person or two to the team, but if things had gone the way the contract is written, the agreement is written. And USI in good faith enters into those agreements with producers and pays significant funds for those.

The defendants in this case got, in their retention payments and their acquisition payments, is nearly $4 million in agreement -- or, no, it's over 4 million, almost $4.1 million it's what they were paid in the -- in negotiating these contracts. And five years ago when they joined us, or when they joined us and they agreed to the terms of these agreements, they were significantly compensated for agreeing to the terms of these agreements.

And so they're written this way to make sure the clients are taken care of. Because the clients don't like to be dropped into a fire either. We don't like it. I mean, this has been my weekend and night job since they left for the last three months. And it causes mayhem. And it's not just me. Literally everybody who had full-time jobs before they left, 44

people are now -- part of their day is now managing the Havard, Engles, Walsh, Purser environmental team in Arizona's problem. And, you know, we're doing a good job. Not one client has called us up and said, look, you guys -- since the team is gone, you suck. We're firing you. Not one has said that, but we're having to work our butts off to do it.

MR. WOODARD: If we can go to Exhibit 1 --

BY MR. WOODARD:

Q. Oh, before we get to the next exhibit. You had mentioned that there is great expense on developing goodwill. Can you share with the Court what type of costs USI incurs to -- when Mr. Havard and Mr. Engles were developing that goodwill.

A. Yes. So there is all kinds of expenses involved, but Bill's a good example. So Bill and I communicated well together, I thought. I thought we had a good relationship.

There was not an expense he came to me with that I refused to pay. He would say, look, I'm flying to New York, I'm meeting with so-and-so and so-and-so. I'm going to have to take him to dinner. It's going to be a $1,000 or $1,500 dinner. I never one time said no to any of those.

He needed a $10,000 contribution for STORE Capital in November. When he's negotiating with Alliant to leave, him and Eric Harper pushed us to pay $10,000 to STORE Capital to support one of their charitable causes. We paid it, because we -- we build -- we work very hard to build goodwill in the

marketplace and it's expensive to do that.
Q. Is STORE Capital -- was STORE Capital a client of USI at the time in late 2022?
A. Yes.
Q. Are they now?
A. No.
MR. WOODARD: We can go to Exhibit 108, please.
BY MR. WOODARD:
Q. And, Mr. Greer, 108 is a compilation that I will represent are BORs. It is a significantly long document, certainly willing to go through it, but can you just explain to the Court what a BOR is.
A. So it stands for broker of record letter. And when a person who is buying insurance wants to change from one broker to another, they can usually do it by putting a letter on their letterhead saying I want to switch from X broker to Y broker. They sign it. It has to be signed by an officer. It's sent to the broker that is going to be taking over the account. That broker typically sends it to the insurer. The insurer notifies the other broker that they've been fired, and they have five to ten days, typically, to get them talked out of doing it, and then they can issue a rescinding letter and keep it.
But that usually works. Some carriers won't accept midterm broker of record letters, they may get done at an expiration date, but that's probably 10 percent of the time,

This is an e-mail from Lori Hartman on August 16, 2022, at 4:26 p.m., Universal Standard Time, around the same time. It also attaches the current X list.

And if we show you 221A, is that an expiration list?

A. It appears so.

Q. Okay. And did you -- were you aware when you went through Mr. Havard's e-mails before you verified the first amended verified complaint, or in April verified the supplemental interrogatory responses, were you aware of these e-mails showing the same expiration list being sent to you week, after week, after week around the same time?

MR. WOODARD: Objection. It was not sent to Mr. Greer.

MR. GERBER: It was sent to Mr. Havard.

THE WITNESS: Ask your question again. I'm sorry.

BY MR. GERBER:

Q. Sure.

When you verified the first amended complaint and verified in April the supplemental interrogatory responses, did you go back and check to see whether Mr. Havard had received these expiration lists around the same time of day, week, after week, after week, going all the way back to August 2022?

A. I -- I didn't. I don't know how that pertains to the answer, but I did not.

Q. Okay. So what was the information upon which you formed

the belief that the expiration list was sent by Lori Hartman on January 24th to serve as a hit list?

A. The --

MR. WOODARD: Your Honor, objection. To the extent that calls for attorney-client privilege, I'd ask the Court to sustain that. To the extent Mr. Greer knows it otherwise, of course, no objection in that regard.

THE COURT: Do you understand the objection?

THE WITNESS: No. If he could ask the question again, I think I can get there.

THE COURT: Well, do you understand the objection?

So the question was: What was the basis for your belief that the expiration list was sent --

THE WITNESS: As a hit list.

THE COURT: -- by Lori Hartman as a hit list? If it doesn't include information you gained from talking with an attorney, then you can answer.

THE WITNESS: I can answer it. Okay. I think I can answer it.

The -- the protocols of the Arizona office is the producers don't get expiration lists, the account managers do. It's the account manager's job to make sure we don't miss any of this stuff.

When Bill testified earlier that he was involved in worrying about these renewals, that's outside of the typical

protocol of the office. It's the account managers. It would be Justin Walsh and Jenise -- Jenise's job to make sure that none of these are missed. That's not the producer's job.

And the reason producers are not routinely given these lists is because it's usually not the service team that leaves in scenarios like this, it's the producer. And if the producer has these lists, they have a hit list. So this was outside of protocol and very unusual.

Now, the fact that it was norm for the environmental team means that they either were not privy to the protocol or they were violating it. And, you know --

BY MR. GERBER:

Q. Please tell the Court where this protocol is written down.

A. It's not. We have -- we manage a $300 million commission business. We have protocols every day. I issued a protocol on Friday to the -- to the commercial lines manager and said communicate it to your team however you need to do it. We changed -- we changed operating protocols all the time. This one hadn't been changed in a long time though.

Q. So it violated some unwritten protocol. Is that your testimony, sir?

A. We manage a business. We manage a business of all kinds of protocols, and almost none of them are written down.

Q. Is there any particular meeting where you told Mr. Havard about this unwritten protocol at USI?

MR. GERBER: On the contract.
THE COURT: The objection is overruled.
THE WITNESS: So ask your question again.
BY MR. GERBER:
Q. Was this agreement ever amended to clarify who the employer was for Mr. Havard after the acquisition? Yes or no?
A. I don't view it as unclear of who the employer is.
Q. Okay. So it says the employer is Wells Fargo?
A. Well, so USI purchased -- we have the stock transaction. We purchased everything of Wells Fargo, whatever the entity is that we purchased. It was -- it was a stock transaction. We bought all the liabilities, all the assets, everything of that company, and then it was transitioned into another entity, and then everything was rolled up into -- into the USI master company.
MR. GERBER: Let's take a look at Exhibit 328, which is stipulated, Your Honor.
THE COURT: 328 is admitted.
MR. GERBER: Thank you, Your Honor.
BY MR. GERBER:
Q. This is a USI notice about legal entity changes that was sent to USI associates after the acquisition, true?
A. I -- I don't know that.
Q. Okay. Well, it says, important legal entity changes. Have you ever seen this before?

A. I may have. It's not super familiar to me. It's not dated, so I don't know when this applies.
Q. Well, do you see it says in the second sentence, we will be merging the legacy WF entity USI Insurance Services National, Inc., formerly known as Wells Fargo Insurance Services USA, Inc., into our parent entity.
Do you see that language?
A. Okay. Yeah.
Q. Okay. So now my question is, if you look down under the additional specific location office impacted entities, do you see where it says, legacy WF Dallas, Houston, San Antonio, and it says, the former entity, USI Insurance Services National, Inc., is merged into USI Southwest, Inc.?
A. Okay. Yeah.
Q. Okay. So is that what happened, that USI Insurance Services National, Inc., merged into USI Southwest, Inc.?
MR. WOODARD: Objection. Foundation.
THE COURT: The objection is sustained.
BY MR. GERBER:
Q. Isn't it true that after this notification of legal entity change, the defendants' W-2s indicated their employer was USI Southwest, Inc., right?
MR. WOODARD: Same objection.
THE COURT: The objection is overruled.
If you can answer.

THE WITNESS: Ask it again.
BY MR. GERBER:
Q. The W-2s for the defendants after this notice of legal entity changed indicated the employer was USI Southwest, Inc., right?
A. Well, I think Bill Havard's W-2 that was shown earlier as an exhibit had USI Southwest, Inc., on it as his employer, didn't it?
Q. Yes. Let's go through for each of the defendants.
MR. GERBER: 257, please.
THE COURT: Well, before you do that --
MR. GERBER: Yes.
THE COURT: -- we're going to break for the evening.
MR. GERBER: All right.
THE COURT: So you can step down.
THE WITNESS: Okay.
THE COURT: And we'll see everybody at 9:00 a.m. tomorrow morning.
(Proceedings concluded at 4:27 p.m.)
* * *

C E R T I F I C A T E

I, CHRISTINE M. COALY, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 30th day of April, 2023.

/s/ Christine M. Coaly
Christine M. Coaly, RMR, CRR

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

USI Insurance Services, L.L.C., a Delaware limited liability company,

Plaintiff,

vs.

Alliant Insurance Services, Ins., William J. Havard, II and Jane Doe Havard, husband and wife, and Robert Engles and Jane Doe Engles, husband and wife,

Defendants.

No. CV-23-00192-SMB

Phoenix, Arizona
April 26, 2023
9:05 a.m.

**BEFORE: THE HONORABLE SUSAN M. BRNOVICH, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**PRELIMINARY INJUNCTION HEARING - DAY 2**

**(PAGES 237 THROUGH 549)**

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiff:

SNELL & WILMER, LLP
By: **Ms. Jennifer R. Yee, Esq.**
**Mr. Joshua R. Woodard, Esq.**
**Ms. Delilah Cassidy, Esq.**
1 E Washington St., Ste. 2700
Phoenix, Arizona 85004

CARDEN LIVESAY LIMITED
**Mr. Joshua W. Carden, Esq.**
419 E Juanita Ave., Ste. 103
Mesa, AZ 85204

For the Defendant:

COPPERSMITH BROCKELMAN, PLC
By: **Ms. Jill J. Chasson, Esq.**
2800 N Central Ave., Ste. 1900
Phoenix, Arizona 85004

MORGAN LEWIS & BOCKIUS, LLP
**Mr. John Bramble, Esq.**
1000 Louisiana St., Ste. 4000
Houston, TX 77002

MORGAN LEWIS & BOCKIUS, LLP
**Mr. Seth Gerber, Esq.**
2049 Century Park E, Ste. 700
Los Angeles, CA 90067

MORGAN LEWIS & BOCKIUS, LLP
**Mr. Timothy J. Stephens, Esq.**
101 Park Ave.
New York, NY 10178

**P R O C E E D I N G S**

THE COURT: Can we have Mr. Greer come back up.

Mr. Greer, you're still under oath from yesterday. Do you understand?

THE WITNESS: I do.

MR. GERBER: Good morning, Your Honor.

THE COURT: Good morning.

MR. GERBER: Good morning, Mr. Greer.

THE WITNESS: Good morning.

BENJAMIN GREER,

called as a witness herein, having been previously duly sworn, resumed the stand and continued to testify as follows:

CONTINUED CROSS-EXAMINATION

BY MR. GERBER:

Q. When we left off, we were talking about who the employer is, or was for the individual defendants.

MR. GERBER: I'd like to mark my next exhibit, which is 257, which is a stipulated exhibit, Your Honor.

THE COURT: 257 will be admitted.

BY MR. GERBER:

Q. The W-2 for William Havard indicates his employer is USI Southwest, Inc., not USI Insurance Services, L.L.C., correct?

A. That's what the W-2 says.

MR. GERBER: I'd like to mark as my next Exhibit 258, which is stipulated, Your Honor.

THE COURT: 258 will be admitted.

BY MR. GERBER:

Q. The W-2 for Robert Engles indicates his employer is USI Southwest, Inc., not USI Insurance Services, L.L.C., correct?

A. That's what the W-2 says.

MR. GERBER: I'd like to mark as my next Exhibit 259, Your Honor. It's stipulated.

THE COURT: 259 will be admitted.

BY MR. GERBER:

Q. The W-2 for Justin Walsh indicates his employer is USI Southwest, Inc., not USI Insurance Services, L.L.C., correct?

A. I see that.

Q. Is that correct?

A. That's what the W-2 says.

MR. GERBER: I'd like to mark as my next Exhibit 260, Your Honor. It's stipulated.

THE COURT: 260 will be admitted.

BY MR. GERBER:

Q. The W-2 for Jenise Purser indicates her employer was USI Southwest, Inc., not USI Insurance Services, L.L.C., correct?

A. That's what the W-2 says.

MR. GERBER: I'd like to mark 273, it's stipulated. I think it may have already been admitted, but if not.

THE COURT: Yes, it is.

MR. GERBER: Thank you, Your Honor.

BY MS. YEE:
Q. In paragraph 3 on page 2, can you please read the first full sentence in line 10.
A. Yes. From 2010 until late 2017, I worked at Wells Fargo Insurance Services, Wells Fargo. I became an employee of USI when USI acquired Wells Fargo in 2017.
Q. Thank you.
MS. YEE: You can take that exhibit down.
BY MS. YEE:
Q. You received your compensation payments from USI starting in late 2017, correct?
A. Yes.
Q. And in 2022 you were paid over $594,000 in wages from USI, correct?
A. I -- I don't recall exactly, but that sounds correct.
Q. You signed an employment agreement in connection with USI's acquisition of Wells Fargo in 2017, correct?
A. Yes.
Q. And you provided a copy of your employment agreement to Alliant before you became employed by Alliant, correct?
A. I did.
MS. YEE: Could we please bring up Exhibit Number 39.
THE COURT: 39 will be admitted.
BY MS. YEE:
Q. Mr. Engles, do you recognize this document marked Exhibit

A. Excuse me. Can you repeat that?
Q. Sure.
Alliant's instruction to you to comply with your employment agreement did not include telling you to give 60 days' notice of your resignation to USI, correct?
A. Alliant did not tell us whether to give notice or not.
Q. And I appreciate your answer, but my question was just slightly different.
You previously testified that Alliant representatives gave you instructions to comply with the terms of your employment agreement, correct?
A. Correct.
Q. Okay. And Alliant's instruction to you in that regard did not include telling you to give 60 days' resignation notice to USI, correct?
A. Alliant did not tell me to give 60 days' notice, they did not.
Q. Okay. Thank you.
And, similar question. Alliant's instruction to you regarding complying with the terms of your employment agreement did not include telling you to refrain from directly or indirectly soliciting or servicing your former clients at USI, correct?
A. Alliant advised me not to solicit former clients.
Q. They did advise you to not solicit former clients as part

of their instructions to you to comply with your employment agreement?
A. They did tell me not to solicit clients, yes.
Q. Okay. When did Alliant tell you not to solicit your former clients at USI?
A. Both prior and after I began employment with Alliant.
Q. Was that a verbal instruction?
A. It was both verbal and written.
Q. And where was it verbal? Or, I'm sorry, that's a bad question.
Who gave you that verbal instruction?
A. I believe it was -- if I remember correctly, I believe it was Jay and Bled, Jay and/or Bled.
Q. Mr. Fischer and Mr. Dizdari?
A. Yes.
Q. And where was the written instruction from Alliant for you to refrain from directly or indirectly soliciting or servicing your former clients at USI?
A. I don't know if it was servicing them. I just can't remember what the -- there was a PEDP form that we went through.
Q. The Prospective Employee Departure Protocols?
A. Yes.
Q. Okay. And you resigned from USI without providing 60 days' notice, correct?

A. I did not believe I had to, yeah.
Q. I understand your belief, but my question was slightly different.
You resigned from USI without giving 60 days' notice, correct?
A. Correct.
Q. Okay. And you resigned effective immediately, correct?
A. I did.
Q. Okay. Before you resigned from USI, you spoke to Mr. Dizdari about resigning from USI, correct?
A. I spoke to him about coordinating when I would start at Alliant.
Q. Is it your testimony that you did not speak to Mr. Dizdari about resigning from USI?
A. I'm sure I spoke to him about resigning, but it was more about when I wanted to start employment with Alliant.
Q. Okay. But, as part of that discussion, you talked about resigning from USI, correct?
A. I'm sure I did.
Q. Okay. You also spoke with Bill Havard about your employment opportunity at Alliant before you resigned from USI, correct?
A. I had spoken to him generally that I was talking to different brokers, including Alliant.
Q. Did you speak specifically with Mr. Havard about your

employment opportunity that you were given by Alliant before you resigned from USI?
A. I did not tell Mr. Havard that I had a formal offer, no.
MS. YEE: Could we bring up Exhibit 35 again, please.
BY MS. YEE:
Q. Mr. Engles, these are your interrogatory responses that were sworn under penalty of perjury, correct?
A. I believe so, yes.
Q. And we just looked at these a few minutes ago, correct?
A. Yes.
Q. And if we go to page 11 of those responses, I'm going to direct your attention to line 22.
It says, before resigning from USI, defendant also spoke with Havard about defendant's general dissatisfaction with USI, desire for a job change, and his employment opportunity with Alliant.
Did I read that correctly?
A. You did.
Q. Okay. You speak with Bill Havard pretty much every day, correct?
A. I do.
Q. When you were working in the office at USI, you went to lunch with Mr. Havard almost every day, correct?
A. Every day that we went in, yes, correct, just about.
Q. Before you resigned from USI, you negotiated with

about your employment opportunity at Alliant, correct?
A. I spoke to him about being unhappy at USI, and that I was considering options, and that I had spoken to a number of different agencies and brokers.
Q. And your sworn interrogatory responses that we just looked at a few minutes ago indicated that you discussed your employment opportunity at Alliant with Mr. Havard.
Do you recall that testimony?
A. I see what that says, but I -- if you're asking if I discussed my offer of employment with Mr. Havard, I did not.
Q. So employment opportunity and offer of employment are different items to you as referred to in that interrogatory response?
A. Yes.
Q. The following day, on January 25th, is when you resigned from USI, correct?
A. Yes.
Q. Three resignations of three USI producers three days in a row, correct?
A. It would appear so, yes.
Q. Mr. Harper, Mr. Havard, and then you, all in a row, correct?
A. All in a row?
Q. Monday, Tuesday, Wednesday of that week?
A. Eric resigned on Monday, Bill resigned on Tuesday, and I

resigned on Wednesday.
Q. On the same day that Mr. Havard resigned, Ben Greer invited you to a meeting to discuss how to strategize the handling of Mr. Havard's client accounts, correct?
A. He did. That was one of the reasons that I resigned on the 25th.
MS. YEE: Could we pull up Exhibit 52, please.
BY MS. YEE:
Q. This is a meeting invite from Ben Greer to Justin Walsh, Jenise Purser, Amy Phalen, Lori Hartman, Robert Engles, Brian Snow, dated January 24th, 2023, correct?
A. Yes.
Q. And I'll represent to you that this is in Universal Coordinated Time, so this is actually seven hours ahead of Arizona, per stipulation.
So would it be fair to say that on the afternoon of January 24th is when you were initially invited to this strategy meeting by Ben Greer?
A. Yes.
Q. And you never attended this strategy meeting on January 25th, did you?
A. I did not. I had resigned.
Q. And instead you signed your employment agreement with Alliant on January 25th, correct?
A. I signed my employment agreement with Alliant after I

Q. Or at the Camby, yes, in front of Alliant's office on the 25th, correct?
A. That is correct, yes.
Q. And Chuck McDaniel had told you that you couldn't go up into Alliant's office until you signed the Alliant employment agreement, correct?
A. Yes.
Q. Bill Havard was in Alliant's office on January 25th, your first day of employment there, correct?
A. I found that out when I walked into the office, yes.
Q. And, within a couple of days, Justin Walsh, Jenise Purser, and Amy Phalen all joined you working at the Alliant Phoenix office, correct?
A. They didn't join -- you're saying that kind of odd. They don't work on my team, so they didn't join me working there, but they had joined Alliant over that one or two -- one to three-day period. I just can't recall the exact dates. Yes.
Q. Yeah, and let me ask a better question.
Within a couple days, Justin Walsh, Jenise Purser, and Amy Phalen came to work in person at the Alliant Phoenix office where you were working, correct?
A. They did, yes.
Q. And while you were driving home on January 25th, you stopped in a parking lot to update your LinkedIn profile, correct?

Services, correct?
A. Yes.
Q. You didn't list USI Southwest, Inc., correct?
A. I don't know when I updated that to show USI Insurance, but that is what it says, USI Insurance Services, yes.
Q. Okay. And it doesn't say Wells Fargo Insurance Services as your prior employer right there on that line, correct?
A. Well, so my employment agreement was with Wells Fargo Insurance Services. And the reason I did this is because, in our business, there is -- it's important to have longevity, right.
USI had purchased Wells Fargo Insurance Services, so I wanted to keep the 12 years and 5 months versus delineate between 6 years, 5 years, or whatever it was.
Q. In fact, in the parenthetical below USI Insurance Services, you explicitly noted that it was formerly known as Wells Fargo Insurance Services, correct?
A. I see that.
Q. Eric Harper congratulated you on your new role at Alliant, correct?
A. Multiple people sent me instant messages and comments on LinkedIn when I updated my profile, yes.
Q. And Eric Harper was one of those people who congratulated you on your new role at Alliant, correct?
A. He was. You showed me the instant message.

confidential to my prior employer. Is that what you are talking about?

My answer was: Yes.

And then your answer was: I don't know what the -- I would assume, yes.

Did I read that correctly?

A. I see it, yes.

MS. YEE: Thank you. You can put that down.

BY MS. YEE:

Q. You were given access to confidential information during your employment at Alliant -- I'm sorry. Strike that.

You were given access to confidential information during your employment at USI, correct?

A. Yes.

Q. And you believe that companies have legitimate business interests in their client relationships, correct?

A. I do, yes.

Q. And you understood that under your prior employment agreement you were not allowed to service or solicit client accounts that you wrote or managed in your last two years of employment, correct?

A. In my employment agreement with USI, that I wasn't to solicit, yes.

Q. You also understood that other people could not call clients on your behalf who you had serviced during your last

Q. And do you recall principally with whom at Alliant you had discussions? I know we heard earlier testimony about Mr. Fischer. With whom, principally, did you have discussions?
A. All the people or just the majority?
Q. The people with whom you principally had discussions, not some administrative --
A. Yeah. Andy Orear, Jay Fischer, Bled Dizdari, and -- what's his name -- Chuck McDaniel.
Q. How did the conversations start? Who did you have the first conversation with?
A. Andy Orear had reached out to me via LinkedIn and sent me an instant message.
Q. That was in November of 2022?
A. It was early November, yes.
Q. And then did you meet with Mr. Fischer?
A. I did.
Q. Okay. And when, approximately, did you meet with him?
A. I believe it was late December.
Q. And where was that?
A. It was at a restaurant in Grayhawk golf course.
Q. And you also spoke with Mr. Dizdari?
A. I did.
Q. And you also spoke with Mr. McDaniel?
A. I did.
Q. When did you speak to Mr. McDaniel?

A. Sure, but we had other small chat. I can't remember exactly what we spoke about, but 11 minutes is not a long call.

MS. YEE: We can take that exhibit down.

BY MS. YEE:

Q. You previously testified that you partnered with Mr. Harper and he was a mentor to you in the past, correct?

A. Yes.

Q. You did not partner with Mr. Harper to work on AvAir, correct?

A. No.

Q. You previously testified that the phone numbers and e-mails of your client contacts who you serviced at USI you have not turned over to anyone at Alliant.

Do you recall that testimony?

A. Yes.

Q. If Mr. Harper is free to do whatever he wants because he's in the state of California, why didn't you give him the phone numbers and e-mails of your clients?

A. That's not something I would do.

MS. YEE: No further questions, Your Honor.

THE COURT: All right. You may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you.

MS. YEE: Your Honor, we'd like to call Justin Walsh.

THE COURT: Okay.

JUSTIN WALSH,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. YEE:

Q. Mr. Walsh, your position at USI was vice president, environmental, correct?
A. Yes.
Q. And your immediate supervisor at USI was Bill Havard until he resigned, correct?
A. That is correct.
Q. You became an employee of USI in 2017, correct?
A. Yes.
Q. When did you submit a copy of your resumé to Alliant?
A. Sometime on January 24th, I believe.
Q. That was the day before you resigned from USI, correct?
A. Correct.

MS. YEE: Can we please put up Exhibit 65 on the screen.

THE COURT: 65 will be admitted.

BY MS. YEE:

Q. In going to the second page of that exhibit, Mr. Walsh, this is the first page of your resumé that you submitted to Alliant, correct?
A. It is.

first call.
Q. Okay. And, in the second call, is that when Mr. Greer told you that Bill Havard had resigned?
A. Yes, I believe so.
Q. During one of your phone calls with Mr. Greer the morning of January 24th, he asked you to contact the others on the environmental team to start calling clients, correct?
A. I believe the way it was worded, he wanted me to contact the other team members to just inform them of what was going on and to, you know, make sure that they were okay, and then also for me to start calling clients to let them know we were going to continue to service their accounts.
Q. And when I say others on the environmental team, do you understand that I mean Jenise Purser, Amy Phalen, and Lori Hartman?
A. Yes.
Q. You were the most senior member of that environmental service team, comprised of you, Ms. Purser, Ms. Phalen, and Ms. Hartman at that point on January 24th, correct?
A. Correct.
Q. You were the lead?
A. Yes.
MS. YEE: Can we please pull up Exhibit 268.
Now let's blow up the e-mail at the bottom of that first page.

Q. And the phone number that's highlighted in purple is (480)776-9672.

Do you recognize that number?

A. I believe that's Jenise Purser.

Q. So on the evening of January 24th after you had a verbal offer of employment from Alliant --

A. Uh-huh.

Q. -- you had calls with Chuck McDaniel at 4:55 and 5:02 p.m., correct?

A. I believe those were just -- I don't know if those are incoming or outgoing, based off of this, but I believe I just left Chuck voicemails.

Q. I believe one of those is outgoing at 4:55 and one of those is incoming at 5:02.

Do you see that in the destination column?

A. Okay.

Q. Now, immediately after you called Chuck McDaniel at 4:55 --

A. Uh-huh.

Q. -- p.m., you called Jenise Purser, correct?

A. Yes, I did.

Q. You had a two-minute phone call with Jenise?

A. That's what it appears, yeah.

Q. And immediately after your 5:02 p.m. incoming phone call from Chuck McDaniel, you had a two-minute phone call with Jenise Purser, correct?

A. Yeah, that's what it appears to be.

MS. YEE: Thank you. We can take that exhibit down.

BY MS. YEE:

Q. At some point on the morning of January 25th, you decided you were going to accept Alliant's job offer, correct?

A. Yeah, at some point on the 25th, yes, that's correct.

Q. Now, the morning of January 25th Mr. Greer updated the meeting invite to move it back by 30 minutes, correct?

A. Yeah, I don't know -- I know it changed. I can't remember what -- what the difference was, but, yes, the meeting changed.

MS. YEE: Let's take a look at Exhibit 66.

BY MS. YEE:

Q. Mr. Walsh, this is a meeting appointment from Ben Greer to you, Jenise Purser, Amy Phalen, Lori Hartman, Robert Engles, and Brian Snow, and the start time is listed as January 25th, 2023, at 4:30 p.m.

Do you see that?

A. I do.

Q. And I'll represent to you that that's Universal Coordinated Time, which is slightly confusing and seven hours ahead.

A. Uh-huh.

Q. But that would be 8:30 a.m. Arizona time.

A. Okay.

Q. Would it be fair to say that this is the meeting invite, or the second meeting invite you received from Mr. Greer on the

Chapman. I don't -- and I didn't even have a computer to even see this e-mail at the time, so I have no idea what you're talking about.

Q. I appreciate your response, but my question was:

Do you have any understanding as to how Mr. Harper came to that conclusion that he informed Mr. Nassau, Mr. Chapman, Mr. Holdridge, and Mr. Mengel about, regarding you and Bill not being in a position to work on this project?

A. I have no idea. I wasn't involved.

Q. But about two weeks later you received clearance from Ms. Long, your supervisor, to work on this CBRE project, correct?

A. Mid-February, I did, yeah.

Q. In fact, Ms. Long called you and told you that you were clear to work on several client accounts that you previously worked on during your last two years of employment at USI, correct?

A. Correct.

Q. And those accounts she cleared you to work on include CBRE Group?

A. Yes.

Q. STORE Capital Corporation?

A. Yes.

Q. Allied Aviation Service Company?

A. Yes.

Q. The Related Companies?
A. Yes.
Q. USAA Real Estate?
A. Yes.
Q. Western National Group?
A. Yes.
Q. Rudin Management?
A. Correct, yes.
Q. Starwood Mortgage Capital?
A. Yes.
Q. Beacon Capital?
A. I believe so, yes.
Q. Brennan Management?
A. Yes.
Q. In fact, on February 14th, you began contacting those clients and telling them that you and Jenise Purser were cleared to work on their client account, correct?
A. I don't know if I reached out to every single one of them, but, yeah, several of them.

MS. YEE: Please pull up Exhibit 75.

THE COURT: 75 will be admitted.

BY MS. YEE:
Q. Mr. Walsh, this is the e-mail you sent to Brian DiDonato at CBRE on February 14th letting him know that you and Ms. Purser were cleared to work on CBRE's account, correct?

A. No.
Q. Mr. Walsh, I want to show you what we've marked as Exhibit 259.
Are you familiar with this document?
A. I am.
Q. What is it?
A. This would be my W-2 for the 2022 calendar year.
Q. And what does this W-2 state as your employer's name?
A. It would be USI Southwest, Inc.
Q. Did you ever enter into a nonsolicitation agreement with USI Southwest, Inc.?
A. No, I did not.
Q. Ever enter into a no service agreement with USI Southwest, Inc.?
A. No, I did not.
Q. Did you ever enter into any type of agreement with USI Southwest, Inc.?
A. No, I don't believe so.
MR. BRAMBLE: Those are my questions, Your Honor.
THE COURT: Okay.

REDIRECT EXAMINATION

BY MS. YEE:
Q. Mr. Walsh, you would agree with me that USI and Alliant are competitors, correct?
A. Yeah.

them to call you back. And you might say something like, so-and-so told me to call you, you know, back to, like I said, I sent you this e-mail, I left you a voicemail, whatever it is, just to get them on the phone.

So if I just left, hi, this is Eric Harper from Alliant calling about your insurance, nine out of ten times, maybe ten out of ten, I wouldn't get a return phone call.

Q. On that voicemail you say, Robert can take your call, he just can't make calls now. Why were you telling him that Robert can take your call?

A. Because USI wasn't allowing Robert to have any type of contact with his clients and left him in the dark. And when you're an insurance broker, you're a trusted advisor, and I wanted Robert to tell Mr. Knox himself, professional courtesy, hey, by the way, I can't work on your account. I can't solicit your business.

Q. To your knowledge, did Mr. Knox ever reach out to Robert?

A. I don't know.

Q. Before speaking or calling Bob Knox, did you tell Robert Engles that you were calling upon his clients?

A. I did.

Q. And what was his reaction?

A. He said I can't stop you from doing that.

Q. Did he ask you to do it?

A. No.

is obviously confidential.

Do you see that?

A. I do.

Q. Did you tell Mr. Nassa that Bill's team is still at USI and aren't leaving until the end of the week?

A. No. I told Mr. Nassa that it's a high probability that team members will follow a producer, it could be one week, two weeks, or whatever, when they leave a firm. And if history plays itself out the same, then there is a high probability that they'll apply for a job at Alliant.

Q. Mr. Harper, did you tell Christopher Nassa at CBRE that Bill's team and their employment plans are confidential?

A. No, I did not.

MS. YEE: Thank you. We're done with that exhibit.

Can we please play the audio file that's marked Exhibit Number 98.

(Exhibit Number 98 audio file was played.)

BY MS. YEE:

Q. Mr. Harper, that's your voice, correct?

A. Correct.

MS. YEE: No further questions.

MR. STEPHENS: No redirect.

THE COURT: All right. You may step down.

THE WITNESS: Thank you.

THE COURT: Thank you.

Q. And there was also an assumption made that legal fees associated with Mr. Havard's transition would reduce his total possible compensation at Alliant, correct?
A. That is correct.
Q. And so it's fair to state that Alliant made an assumption that there would be legal fees and expenses associated with Mr. Havard's transition to Alliant, correct?
A. That is correct. And, for that reason, Mr. Havard is enticed to act appropriately so that is as little as possible, otherwise it impacts his pocket directly.
MR. GERBER: Your Honor, may I have five of the 15 minutes?
THE COURT: Yes.
You can ask two more questions.
MR. WOODARD: Thank you, Your Honor.
Your Honor, in order to expedite this, opposing counsel and I agree to admit Exhibit 122 into evidence, and that is a sheet that was referenced by Mr. Dizdari in his deposition. And so we'd like to admit 122.
MR. GERBER: No objection to its admission.
THE COURT: 122 will be admitted.
BY MR. WOODARD:
Q. And, Mr. Dizdari --
MR. WOODARD: Could you please go to Exhibit 117.
BY MR. WOODARD:

Q. And, Mr. Dizdari, you see this e-mail from Mr. Harper to Mr. Nassa dated January 26, 2023, correct?
A. I do.
Q. And if you can go to the attachment on that. There is an attached BOR draft.
A. I see that.
Q. And then if you go to the next page, there is a list of projects.
Do you see that?
A. I see that.
Q. And you'll see there is 28 projects and 9 pending projects.
Do you see that?
A. I don't have the opportunity to count, but I'll take your word for the number.
Q. You testified that it's very likely that Alliant was not working on these projects prior to getting the BOR, correct?
A. Yes, that's very likely that we were not.
Q. And you said one option that Mr. Harper had when he prepared this was that he could have memorized these 37 projects by identity and entity names, and he could have memorized this in order to complete this project list, correct?
A. It's a possibility that he could have.
MR. WOODARD: Thank you. That's all I have, Your Honor.
MR. GERBER: Thank you.

C E R T I F I C A T E

I, CHRISTINE M. COALY, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 30th day of April, 2023.

/s/ Christine M. Coaly
Christine M. Coaly, RMR, CRR

Case 2:23-cv-00192-SMB Document 21 Filed 01/05/23 Page 1 of 17

**COPPERSMITH BROCKELMAN PLC**
Jill J. Chasson (019424)
*jchasson@cblawyers.com*
Austin Yost (34602)
*ayost@cblawyers.com*
2800 N. Central Ave., Suite 1900
Phoenix, AZ 85004
Phone: 602.381.5481

**MORGAN, LEWIS & BOCKIUS LLP**
Timothy J. Stephens (NY Bar No. 2655355)
*timothy.stephens@morganlewis.com*
*Pro Hac Vice* application forthcoming
101 Park Ave
New York, NY 10178-0060
Phone: 212.309.6805

**MORGAN, LEWIS & BOCKIUS LLP**
Adam E. Wagmeister (CA Bar No. 287534)
*adam.wagmeister@morganlewis.com*
*Pro Hac Vice* application forthcoming
2049 Century Park East, Suite 700
Los Angeles, CA 9006
Phone: 310.907.1000

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| USI Insurance Services, LLC, a Delaware limited liability company,<br>Plaintiff,<br><br>v.<br><br>Alliant Insurance Services, Inc., William J. Havard II and Jane Doe Havard, husband and wife; and Robert Engles and Jane Doe Engles, husband and wife,<br>Defendants. | No. CV-23-00192-PHX-SMB<br><br>**DECLARATION OF ROBERT ENGLES** |

ROBERT ENGLES hereby declares under 28 U.S.C. § 1746 as follows:

1. I am a defendant in the above-entitled litigation. I respectfully submit this declaration in opposition to the application by plaintiff USI Insurance Services, LLC ("USI") for a temporary restraining order. Unless otherwise stated, I have personal knowledge of the facts and circumstances set forth herein.

2. I have worked in the insurance brokerage industry for over twenty years. I am principally a broker of commercial property and casualty insurance policies, and I assist clients in placing their commercial insurance needs with insurance carriers.

3. From 2010 until late 2017, I worked at Wells Fargo Insurance Services ("Wells Fargo"). I became an employee of USI when USI acquired Wells Fargo in 2017.

4. I resigned from USI on the morning of January 25, 2023, by email to Ben Greer, my manager and the head of USI's Arizona Property & Casualty group. I dutifully carried out my work duties for USI up until my resignation. I left my USI laptop on the desk in my USI office in Phoenix and mailed my laptop power cord and identification badge to that office .

5. After I resigned from USI, I became an employee of Alliant Insurance Services, Inc. ("Alliant"). I resigned from USI because I had become disenchanted with the work atmosphere and found what I believe is a better opportunity at Alliant. I had been exploring new job opportunities for quite some time and was interviewing with other potential employers in the industry. I also had an offer from a commercial insurance broker other than Alliant. Simply stated, I wanted out of USI.

6. I am aware that USI has complained that I did not give 60 days' notice of my resignation, and that I did not provide USI with a "transition plan." While I am not aware of any requirement that I provide USI with a formal "transition plan," I certainly left my USI accounts in fine order and had provided the USI team members who worked on my accounts with everything they needed for USI to continue to service the accounts, including up-to-the minute status descriptions I circulated to the team members before my departure.

7. I firmly believe that USI's complaint that I did not give 60 days' notice is a smokescreen. USI had no intention to keep me around for any transition period. After my resignation, USI immediately cut off my systems access and has not asked me for any transitioning assistance. Similarly, despite telling me in a letter delivered a few days after my resignation that I was still considered an employee, that same letter directed me "not to contact any USI clients or perform any services on behalf of the Company, except as directed by Ben Greer." No such direction has been provided.

8. I also came to learn from some clients, who reached out to me after my departure (not the reverse), that USI told them that I was no longer employed by USI. This is true, but the Court would have a hard time knowing that given USI's contrary position in its papers that I should be forced out of my new job at Alliant because I am still employed by USI. In fact, I am no longer employed by USI and USI has been telling that to seemingly everyone.

9. With a very limited exception, the USI team members who worked on my accounts at USI were not the same ones that left USI to go to Alliant. In fact, of the USI staff members named in USI's complaint, only Jenise Purser worked on a few of my accounts, for purposes of issuing insurance certificates and invoices. So far as I am aware and can recall, the others – Amy Phalen, Lori Hartman and Justin Walsh – did not work on my accounts.

10. USI states that "Havard and Engles coordinated this *en masse* resignation of employees from USI with the knowledge and substantial assistance of Alliant." (Complaint ¶ 54) I did not coordinate any resignations of USI employees. At no time did I solicit or induce Ms. Purser, Ms. Phalen, Ms. Hartman or Mr. Walsh to leave USI to go to Alliant. At no time did I solicit or induce Bill Havard to leave USI to go to Alliant.

11. I did not tell my clients in advance that I would be leaving USI to go to Alliant. I have not solicited any of my USI client accounts since departing USI. I have not accepted any unsolicited business or performed any insurance services on behalf of any USI client since my departure. I do not believe, however, that it would serve any legitimate business interest

of USI if I were enjoined from performing insurance services for former USI clients who decide, without any solicitation or inducement by me, to become Alliant clients. That circumstance would seriously disserve the clients.

12. Finally, although I am not aware that USI has accused me of doing so, I have not misappropriated or improperly used or disclosed any materials or information that could conceivably be deemed confidential or proprietary to USI.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 6, 2023.

______________________________

ROBERT ENGLES

Message

**From**: Eric Harper [Eric.Harper@alliant.com]
on behalf of Eric Harper <Eric.Harper@alliant.com> [Eric.Harper@alliant.com]
**Sent**: 1/26/2023 4:28:10 PM
**To**: Nassa, Christopher @ Risk [Chris.Nassa@cbre.com]
**Subject**: CBRE Group, Inc BOR - All Projects
**Attachments**: CBRE Group, Inc BOR - All Projects.doc

Chris

See attached BOR for the TCC projects. Existing and pending. Please send it back as soon as possible. We are sending everything out tomorrow morning

Thanks Eric

**Eric Harper**
Executive Vice President, Managing Director
Real Estate & Hospitality
Alliant Insurance Services, Inc.
CA License No. 0840988

C 949.351.7737
C 949.344.3401
**Alliant.com**

**[To be typed on Client's Letterhead]**

**January 26, 2023**

RE: Broker of Record Authorization for **CBRE Group, Inc.**
**Builder's Risk Policies Per the attached List**

To whom it may concern:

This letter confirms that as of **January 26, 2023**, and **CBRE Group, Inc. / CBRE, Inc.** has appointed Alliant Insurance Services, Inc. as our exclusive insurance broker for the above captioned policies. This appointment of Alliant Insurance Services, Inc. rescinds all previous appointments on file, and shall remain in full effect until it is cancelled in writing.

Alliant Insurance Services, Inc. is hereby authorized to negotiate directly with any interested company with respect to changes to existing insurance policies and in closing, changing, increasing or canceling insurance carried under temporary binders or cover notes. We understand, however, that they will not share responsibility for any return premiums and/or commissions due on coverage not placed by them, nor for any deficiencies in the insurance program to which this letter applies until they have had a reasonable opportunity to make a review and to provide us with their recommendations. Please waive any waiting periods in connection with the appointment of Alliant Insurance Services, Inc.

This letter also constitutes your authority to furnish Alliant Insurance Services, Inc. with all information it may request related to our insurance policies, contracts, rates, renewals, surveys, reserve studies, retention reports and any other financial or administrative information it may wish to obtain for its study of our present and future needs in connection with the insurance programs to which this letter applies. We request that you do not communicate such information to anyone else.

This recognition of Alliant Insurance Services, Inc. as our broker entitles it to all commissions and service allowance paid by your company in conjunction with its placement, installation, and servicing of our insurance contracts.

If you have any questions regarding this authorization, please do not hesitate to contact me. Thank you for your cooperation and assistance with this matter.

Sincerely,

**Name of Signee**
**Title of Signee**

cc: Alliant Insurance Services, Inc.

CBRE Projects

USLP Tracy VI Owner, LLC (Distribution)
Central Park Station
HS PDX Brooklyn, LLC
TC Park Aldea Phase 2 Venture
HS Arvada Olde Town Venture, LLC
TC KRCC, LLC
TC FCC Owner III, LLC
USLP Tracy VI Owner, LLC
Manassas Logistics Center, LLC
Canyon Road Logistics Venture, LLC
HS MLK Venture, LLC
DRI/TCC Downsville I, LLC
Corner 63 Venture, LLC
PR III/ Crow Smith Rio, LLC
PR III/ HSR Central Par Denver I Owner, LLC
Grove ATX Block 2, L.P
DRI, TCC West Falls, LLC (West Falls Church Mob)
PR III Crow Raintree Residential
Kingwood Residences HTX, LLC
CRP/ TCC Kirkwood Owner, LLC
Parkin Section I Urban Renewal, LLC
TC MidAtlantic Development V, Inc (6400 Sheriff Rd)
Karlin Duval, LLC
Metro 63
Zoe Vista Sorrento Development, LLC
SBOB, LLC
Park on Carroll Owner, LLC
River and Rainey Venture, LLC

CBRE Pending Projects

2311 Westheimer Houston, LLC
240 Twin Dolphin
1114 W Carrol B
HS 2900
MLK Venture, LLC
TC Morgan Hills, Venture
Terminal 106 , LLC
Kirlin Dual, LLC
Multi Family Tower

** Please make sure to add all the missing pending Projects for Trammel Crew to the above list.

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

USI Insurance Services, LLC, a Delaware limited liability company,

Plaintiff,

v.

Case No: 2:23-cv-00192-SMB

Alliant Insurance Services, Inc., a California corporation, William J. Harvard II and Sabrina Harvard, husband and wife, Robert Engles and Hope Engles, husband and wife, Jenise Purser and Adam Purser, husband and wife, Justin Walsh and Sara Walsh, husband and wife,

Defendants.

VIDEOTAPED DEPOSITION OF
JAMES ERIC HARPER
TUESDAY, JUNE 25, 2024
11:02 A.M.
COSTA MESA, CALIFORNIA



Videotaped Deposition of James Eric Harper, taken on behalf of the Plaintiff, before Mindy Pierce, Certified Shorthand Reporter Number 10087, for the State of California, with principal offices in the County of Orange, commencing at 11:02 a.m. on Tuesday, June 25 2024, at 600 Anton Boulevard, Suite 1400, Costa Mesa, California 92626.

* * *

APPEARANCES OF COUNSEL:

FOR PLAINTIFF:
SNELL & WILMER, LLP
BY: JOSHUA R. WOODARD, ESQ.
BY: DELILAH R. CASSIDY, ESQ.
One East Washington Street
Suite 2700
Phoenix, Arizona 85044-2556
(602) 382-6000

FOR DEFENDANTS:
MORGAN LEWIS
BY: DEBRA FISCHER, ESQ.
2049 Century Park East
Suite 700
Los Angeles, California 90067-3109
(310) 907-1111

ALSO PRESENT: Leann Emmott, Videographer



I N D E X


| EXAMINATION | | PAGE |
|---|---|---|
| By Mr. Woodard | | 6 |

| EXHIBITS | | PAGE |
|---|---|---|
| 1 | Email from Mr. Dizdari Dated 12/19/2022 | 17 |
| 2 | Email from Mr. Dizdari Dated 1/6/2023 | 26 |
| 3 | Email from Eric Harper Dated 1/24/2023 | 31 |
| 4 | Email from Eric Harper Dated 1/25/2023 | 32 |
| 5 | Email from Katie Dowdy Dated 1/25/2023 | 34 |
| 6 | Email from Natasha Caravia Dated 1/27/2023 | 36 |
| 7 | Email from Natasha Caravia Dated 1/27/2023 | 42 |
| 8 | Email from Eric Harper Dated 1/26/2023 | 43 |
| 9 | Email from Eric Harper Dated 1/27/2023 | 47 |
| 10 | Email from Bruce Thorne Dated 2/1/2023 | 49 |
| 11 | Attachment for Exhibit 10 Alliant PowerPoint Presentation | 50 |
| 12 | Email from Stacy Martin Dated 2/7/2023 | 52 |




(EXHIBITS CONTINUED)


| EXHIBITS | | PAGE |
|---|---|---|
| 13 | Handwritten document Cold-calling list | 55 |
| 14 | Email from Eric Harper Dated 2/24/2023 | 58 |
| 15 | Email from MaryLynn Lurz Dated 2/14/2023 | 59 |
| 16 | Email from Brian Gentner Dated 2/21/2023 | 62 |
| 17 | Email from Eric Harper Dated 2/24/2023 | 63 |
| 18 | Email from Lori Markson Dated 4/18/2023 | 64 |

**clients?**
A. That's correct. Same. No one did at Alliant.
**Q. Did anyone at Alliant instruct you not to solicit certain clients that either Mr. Havard or Mr. Engles worked with while at USI?**
A. No. He did not.
MR. WOODARD: Can we mark that as Exhibit 1.
(WHEREUPON, EXHIBIT 1 WAS MARKED, FOR THE RECORD.)
BY MR. WOODARD:
**Q. Mr. Harper, do you have Exhibit 1 in front of you?**
A. If the "Ex. 1" means Exhibit 1, yes, I do.
**Q. It does. Thank you.**
**You'll see on page 1 of Exhibit 1, this is an email from Mr. Dizdari to an email address scaravia@gmail.com. Do you see that?**
A. I do.
**Q. Are you familiar with the email in the "to" line?**
A. I am.
**Q. Whose email is that?**
A. That's my wife's email.
**Q. Did you instruct Mr. Dizdari to use your**

Page 17

**wife's email in connection with possible employment at Alliant?**
A. Based on what I'm looking at, I believe I did.
**Q. Why?**
**MS. FISCHER: Object to form.**
**Why did he --**
**It's unclear what the request "why" is.**
**BY MR. WOODARD:**
**Q. Why did you instruct Mr. Dizdari to use your wife's email regarding possible employment at Alliant?**
A. I don't remember why.
**Q. You'll see in Mr. Dizdari's email he attaches the final agreement that you discussed. Do you see that in the body of the email?**
**MS. FISCHER: Object to form.**
**THE WITNESS: Are you talking about this right here?**
**MR. WOODARD: Correct.**
**THE WITNESS: Yes. I see that.**
**BY MR. WOODARD:**
**Q. What discussions did you have with Mr. Dizdari regarding your employment with Alliant prior to this email?**

Page 18

**MS. FISCHER: Object to the form of the question.**
**THE WITNESS: I can't remember what we talked about prior to this email.**
**BY MR. WOODARD:**
**Q. Did you negotiate terms of your possible employment with Alliant with Mr. Dizdari prior to December 19, 2022?**
**MS. FISCHER: Object to the form of the question.**
**THE WITNESS: I don't recall what I talked specifically -- specifics with Bled; Mr. Dizdari.**
**BY MR. WOODARD:**
**Q. You ultimately signed an employment agreement with Alliant; correct?**
A. I did.
**Q. Do you recall if the attachment to Exhibit 1, which is a draft employment agreement, differed from the final employment agreement that you signed with Alliant?**
**MS. FISCHER: Object to the form of the question.**
**THE WITNESS: Are you --**
**So I understand the question, are you asking me if this is a different agreement than what I**

Page 19

**signed?**
**BY MR. WOODARD:**
**Q. I'm asking whether you recall any changes to the attachment to Exhibit 1 were made prior to the time you signed your agreement with Alliant.**
A. I don't recall.
**Q. Fair to state that as of December 19, 2022, you knew that you were going to resign from USI and accept employment with Alliant?**
**MS. FISCHER: Object to the form of the question.**
**THE WITNESS: Could you ask that again, please.**
**MR. WOODARD: Sure.**
**Can you please repeat that question?**
(WHEREUPON, THE QUESTION WAS READ BY THE REPORTER, AS FOLLOWS:
"Q. Fair to state that as of December 19, 2022, you knew that you were going to resign from USI and accept employment with Alliant.")
THE WITNESS: I can't remember.
BY MR. WOODARD:
**Q. At any time between December 19th, 2022 up until the date you resigned from USI on January 23rd**

Page 20

**of 2023, did you ever express to Mr. Dizdari that you may not ultimately come over to Alliant?**
A. I can't remember what Bled and I talked about; Mr. Dizdari.
**Q. Do you ever recall sending an email to Mr. Dizdari saying that you've changed your mind and you don't want to be employed by Alliant?**
A. I don't recall sending an email like that.
**Q. If you go to page 12 of 16 of the employment agreement, there's a Bates number at the bottom right-hand corner that says Alliant 814.**
A. Um-hum.
**Q. You'll see that there's a section, e-1, and that section is entitled "non-solicitation customers." Do you see that?**
A. I do.
**Q. And I'm just going to highlight a few portions of it. If you'd like to read this whole paragraph, you're certainly welcome to do so.**
**MS. FISCHER: I would suggest that you read it if he's going to ask you questions.**
**THE WITNESS: I would like to. Can I get my glasses?**
**MR. WOODARD: Of course.**
**THE WITNESS: Where were we?**

Page 21

**BY MR. WOODARD:**
**Q. We're on paragraph e-1 on page 12 of 16 of the Alliant employment agreement. And if you can just take a moment to read just that subparagraph, e-1.**
A. Okay.
Okay.
**Q. Is it your understanding that this paragraph restricts you from soliciting Alliant customers to discontinue doing business with Alliant during your employment with Alliant?**
**MS. FISCHER: Object to the form of the question. Calls for a legal conclusion.**
**THE WITNESS: I'm not sure. I can't speak on behalf of Alliant.**
**BY MR. WOODARD:**
**Q. I'm just asking: Is it your understanding that this paragraph prohibits you from soliciting Alliant customers, during your employment with Alliant, to discontinue the relationship with Alliant?**
**MS. FISCHER: Same objections.**
**THE WITNESS: I'm not sure I understand the question.**
**BY MR. WOODARD:**

Page 22

**Q. Do you have any understanding of what this paragraph prevents you from doing while at Alliant?**
**MS. FISCHER: Same objection.**
**THE WITNESS: Again, I don't fully understand the paragraph and I don't want to speak on behalf of Alliant.**
**BY MR. WOODARD:**
**Q. I'm just asking your own personal understanding. Let me phrase it a different way.**
**During your employment at Alliant, do you believe it's okay to solicit Alliant customers to send their work to a competitor of Alliant?**
**MS. FISCHER: Object to the form of the question.**
**THE WITNESS: So the customer's information, in my opinion, is the customer's information. So how Alliant views that or not, I guess we'd have to ask the customer.**
**BY MR. WOODARD:**
**Q. Let's set aside paragraph e-1 for just a moment. I'm asking if you believe it's okay for you to instruct an Alliant customer to go send their business to a competitor of Alliant while you're at Alliant?**
**MS. FISCHER: Object to the form of the**

Page 23

**question. It's been asked and answered.**
**THE WITNESS: I don't know. I mean --**
**BY MR. WOODARD:**
**Q. So you have no opinion of whether that's appropriate or inappropriate conduct?**
**MS. FISCHER: Object to the form of the question.**
**THE WITNESS: I'm not sure.**
**BY MR. WOODARD:**
**Q. You can go to the next page, please. There's a paragraph 10 entitled, "No conflict of interest." Do you see that?**
A. I do.
**Q. You'll see the first sentence of that paragraph says, "During the period of employee's employment, employee must not engage in any work, paid or unpaid, that creates an actual or potential conflict of interest with Alliant." Do you see that?**
A. I do.
**Q. Do you believe it would be a violation of conflict of interest policy for you, during your employment with Alliant, to inform an Alliant customer that you were going to leave Alliant, go to a competitor, and that you would assist that client**

Page 24

we partner with on placements of deals.
**Q. In your email to Mr. Kim, you indicate, "Sit on this until I give you the green light. Very important we wait until I have a big block of BORs to file." Do you see that?**
A. I do.
**Q. Why were you giving Mr. Kim instructions to sit on that until you gave the green light?**
A. I can't recall why I stated that.
**Q. Why was it important that you waited until there was a big block of BORs to file?**
A. I don't know. Don't remember.
**Q. Sitting here today, are you aware of -- is there an advantage to file a big block of BORs all at once?**
**MS. FISCHER: Object to the form of the question.**
**THE WITNESS: Not that I'm aware of.**
**BY MR. WOODARD:**
**Q. Were you trying to keep a big block of BORs secret for a while?**
**MS. FISCHER: Object to the form.**
**THE WITNESS: I don't recall what I was trying to do.**
**BY MR. WOODARD:**

Page 33

**Q. Do you recall giving Mr. Kim the green light?**
A. Are you asking me if I recall ultimately giving him the green light to file the BOR?
**Q. Correct.**
A. I'm sure I did. We filed it.
**Q. Do you know when you instructed Mr. Kim to file that?**
A. I do not.
(WHEREUPON, EXHIBIT 5 WAS MARKED, FOR THE RECORD.)
BY MR. WOODARD:
**Q. Do you have Exhibit 5 in front of you?**
A. I do.
**Q. You'll see that this is an email from Katie Dowdy to you. And the email is dated January 25th, 2023.**
A. I do.
**Q. And Ms. Dowdy indicates that the zip folder includes BORs that Derek sent out. Do you see that first portion of that first sentence?**
A. I do.
**Q. Do you have an understanding of who Derek is?**
A. I believe that's Derek Cady who works with

Page 34

Katie out of the Denver office.
**Q. Did you instruct Ms. Dowdy for Derek to send out BORs?**
A. I can't remember what I did.
**Q. Do you work directly with Derek Cady?**
A. From time to time we work together on accounts.
**Q. Did you discuss with Derek Cady BORs to send at or near January 25th, 2023?**
A. Again, I can't remember what we discussed.
**Q. Had you met Mr. Cady at that time?**
A. I can't remember.
**Q. Did you have any discussions with Katie Dowdy regarding BORs to send out?**
A. I can't remember that either.
**Q. Where's Katie Dowdy located, if you know?**
A. Denver, Colorado.
**Q. How did you know to work with Ms. Dowdy regarding BORs that needed to be sent out?**
A. I can't remember how we got paired up with Katie.
**Q. Do you recall who paired you up?**
A. I do not.
**Q. Same question for you and Derek: Do you recall who paired you and Derek up?**

Page 35

A. I do not.
**Q. Do you recall whether you spoke with Katie or Derek prior to January 25th, 2023 regarding BORs?**
A. I can't remember when we spoke.
**Q. Do you recall Ms. Dowdy being ready to assist you to send out BORs when you started with Alliant on January 23rd, 2023?**
A. I can't remember what we set up.
**Q. Do you know who --**
**Did you discuss with anyone at Alliant how to get BORs sent out?**
A. I don't recall.
**Q. Do you recall discussing that with Alliant prior to your employment starting with Alliant?**
A. Prior to my employment starting with Alliant, I didn't discuss anything of that nature with Alliant.
**Q. Meaning the BORs?**
A. Correct.
(WHEREUPON, EXHIBIT 6 WAS MARKED, FOR THE RECORD.)
BY MR. WOODARD:
**Q. Do you have Exhibit 6 in front of you?**
A. I do.
**Q. You'll see this is an email from Natasha**

Page 36

BY MR. WOODARD:
Q. Do you have Exhibit 12 in front of you?
A. I do.
Q. You'll see that this is an email from Stacy Martin to Carrie Stein, and you're CCd there, and the email is dated February 7th of 2023. Do you see that?
A. I do.
Q. And do you know Stacy Martin?
A. I do.
Q. Is she based out of the Irvine office?
A. She is.
Q. And Ms. Martin indicates to Ms. Stein that Ms. Martin was going to be the main point of contact for any pollution items for US RE Company. Do you see that?
A. I do.
Q. Did you assign Ms. Martin to be the main point of contact for this client?
A. Could you please repeat the question?
Q. Sure.
Did you assign Ms. Martin to be the main point of contact for any pollution items for US RE?
A. I don't recall.
Q. Do you know who did?

Page 53

A. I do not.
Q. As an account executive lead, would Ms. Martin be able to assign herself to be the main point of contact on a client?
MS. FISCHER: Object to the form of the question.
THE WITNESS: I don't know.
BY MR. WOODARD:
Q. Did Ms. Martin report to you on February of 2023?
A. She didn't report to me directly. Were we on the same team? Is that what you're asking?
Q. I'll ask both. Did she report to you in February of 2023?
A. No.
Q. Were you on the same team?
A. Yes.
Q. Do you know why Mr. Havard was not assigned as the main point of contact for pollution items for US RE Company?
MS. FISCHER: Object to the form.
THE WITNESS: I do not.
BY MR. WOODARD:
Q. Did Ms. Martin work with you while at USI?
A. She did.

Page 54

Q. Did she come over approximately at the same time from USI over to Alliant as you did?
MS. FISCHER: Object to the form.
THE WITNESS: I don't recall exactly when Ms. Martin came over to Alliant.
BY MR. WOODARD:
Q. Fair to state that as of February 7th, 2023 she was with Alliant; correct?
A. I believe so. Yes.
Q. Was Ms. Martinez at USI at the time you resigned?
A. I don't recall.
(WHEREUPON, EXHIBIT 13 WAS MARKED, FOR THE RECORD.)
BY MR. WOODARD:
Q. Do you have Exhibit 13 in front of you?
A. I do.
Q. Is this your handwriting?
A. It is.
Q. There's some words at the very top of Exhibit 13. Can you read what that says?
A. "Michael in Denver has access."
Q. Do you know who you were referring to at that time?
A. I can only speculate.

Page 55

Q. What was the purpose of this document?
MS. FISCHER: Object to the form of the question.
THE WITNESS: Cold calling document.
BY MR. WOODARD:
Q. Why these particular clients on this cold calling list?
A. These are all ex-Wells Fargo bank cross-sell customers.
Q. Did Mr. Engles ask you to solicit these particular clients?
A. No. He did not.
Q. Does this list comprise all of the former Wells Fargo clients that you're aware of?
A. Not that I'm aware of.
Q. So why are these particular clients identified on this cold call list?
A. I can't remember.
Q. Are you aware that Mr. Engles serviced these clients while at USI?
A. I am.
Q. Do you recall soliciting all of the clients identified in this list at the time you were with Alliant?
A. I do.

Page 56

**THE WITNESS: Thank you for your time.**

**VIDEOGRAPHER: Madam Court Reporter, do you want to get orders on the record?**

**THE REPORTER: Just instructions. You want the original to go -- I have your email. Is that where you want it to go?**

**MS. FISCHER: Whatever we usually do is what I would say. And I have a call in five minutes.**

**THE REPORTER: Okay. Thank you.**

**VIDEOGRAPHER: Sorry, Ms. Fischer, did you want a copy of the video before you run?**

**MS. FISCHER: I do not order anything. You can talk to my secretary whose name I gave you.**

**VIDEOGRAPHER: And Mr. Woodard, did you want it synced with the video?**

**MR. WOODARD: Yes, please.**

**VIDEOGRAPHER: Okay. Great.**

**This ends Volume 1 of the video deposition of James Eric Harper. The time is 12:54 p.m. We are off the record.**

(WHEREUPON, THE DEPOSITION WAS CONCLUDED AT 12:54 P.M.)



I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings were made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

In witness thereof, I have this date subscribed my name.

Dated: _______________

________________________

Mindy Pierce

CSR No. 10087



ERRATA SHEET

If any corrections to your proceeding are necessary, indicate them on this sheet, giving the change, page number, line number and reason for change.

PAGE LINE FROM TO

____ ____ _____________________ _____________________

Reason _________________________________________________

____ ____ _____________________ _____________________

Reason _________________________________________________

____ ____ _____________________ _____________________

Reason _________________________________________________

____ ____ _____________________ _____________________

Reason _________________________________________________

____ ____ _____________________ _____________________

Reason _________________________________________________

____ ____ _____________________ _____________________

Reason _________________________________________________

____ ____ _____________________ _____________________

Reason _________________________________________________

____ ____ _____________________ _____________________

Reason _________________________________________________

_________________________________ _____________________

Signature Date



I, James Eric Harper, hereby certify under penalty of perjury under the laws of the State of ___________ that the foregoing is true and correct.

Executed this ____________ day of ________________ 20___, at __________________________

___________________________

James Eric Harper

Message

**From:** Eric Harper [Eric.Harper@alliant.com]
on behalf of Eric Harper <Eric.Harper@alliant.com> [Eric.Harper@alliant.com]
**Sent:** 1/26/2023 6:21:36 PM
**To:** Nassa, Christopher @ Risk [Chris.Nassa@cbre.com]; Chapman, Dillon @ Houston [DChapman@trammellcrow.com]
**CC:** Holdridge, Neal @ Southern California [NHoldridge@trammellcrow.com]; Mengel, Chris @ Houston [CMengel@trammellcrow.com]
**Subject:** RE: Instructions - 2311 Westheimer

To all,

You may not of realized Bill and Justin aren't in a position to work on this project. I've taken them off the email chain as it appears you have inadvertently include them. Kindly keep them off communications going forward.

Thanks Eric

**Eric Harper**
Executive Vice President, Managing Director
Real Estate & Hospitality
Alliant Insurance Services, Inc.
CA License No. 0C40988

C 949.351.7737
C 949.344.3401
**Alliant.com**

Alliant

**From:** Nassa, Christopher @ Risk <Chris.Nassa@cbre.com>
**Sent:** Thursday, January 26, 2023 4:27 PM
**To:** Chapman, Dillon @ Houston <DChapman@trammellcrow.com>; Bill Havard <bill.havard@alliant.com>; Justin Walsh <justin.walsh@alliant.com>
**Cc:** Holdridge, Neal @ Southern California <NHoldridge@trammellcrow.com>; Eric Harper <eric.harper@alliant.com>; Mengel, Chris @ Houston <CMengel@trammellcrow.com>
**Subject:** Re: Instructions - 2311 Westheimer

This message has originated outside the organization.

All

I need to issue a letter which authorizes them to work on our business. That will happen tomorrow. Until then I don't think they can respond (and bill and Justin might not be able to work on the account for a period of time...but rest assured this won't be an issue).

Typically, an invoice is issued days/week after binding.

EXHIBIT 8
Eric James Harper
6-25-24

**Chris Nassa**
SVP
CBRE | Insurance Risk Management
304 Main Ave, #345 | Norwalk, CT 06851
P +1 203 820 7550
chris.nassa@cbre.com

Follow CBRE: CBRE.com | LinkedIn | Twitter | Instagram | Facebook | Weibo | WeChat

---

**From:** Chapman, Dillon @ Houston <DChapman@trammellcrow.com>
**Sent:** Thursday, January 26, 2023 7:24:06 PM
**To:** bill.havard@alliant.com <bill.havard@alliant.com>; justin.walsh@alliant.com <justin.walsh@alliant.com>
**Cc:** Nassa, Christopher @ Risk <Chris.Nassa@cbre.com>; Holdridge, Neal @ Southern California <NHoldridge@trammellcrow.com>; Eric Harper <eric.harper@alliant.com>; Mengel, Chris @ Houston <CMengel@trammellcrow.com>
**Subject:** FW: Instructions - 2311 Westheimer

Bill and Justin,

Could you please provide an invoice for the Westheimer environmental insurance procurement? It seems that the final number is $133,257.90 based on the attached correspondence.

Note that we are targeting binding and closing either Monday afternoon 1/30 or Tuesday 1/31.

Best,
Dillon

**From:** Mengel, Chris @ Houston
**Sent:** Thursday, January 26, 2023 11:00 AM
**To:** bill.havard@usi.com; justin.walsh@usi.com
**Subject:** Instructions - 2311 Westheimer

Hi Justin and Bill,

In anticipation of closing for 2311 Westheimer, I wanted to reach out to receive/confirm wiring instructions to forward along to the Title Company. We are planning to have Title disburse funds to all involved parties which will hopefully accelerate payment to our partners and counterparties.

Please email me with up to date wiring instructions and feel free to give me a call if you have any questions.

Thanks,
Chris Mengel

Chris Mengel | Senior Associate
High Street Residential | Trammell Crow Company
2800 Post Oak Blvd., Ste. 400 | Houston, TX 77056
T 713.963.4010 | C 412.980.4953
cmengel@trammellcrow.com
www.trammellcrow.com/houston
www.highstreetresidential.com

Details about the personal data CBRE collects and why, as well as your data privacy rights under applicable law, are available at **CBRE – Privacy Policy.**

Michael to
Denver has access

Zoom info - website
Sales force -

v-met with her -
2/13 - Essential Properties Cha-Ma Zoom info
'sha" "mA" 626-215-5326

2/13 - AB Staffing Evan Sicks CEO Zoom Info
website 480-719-7271

2/13 - Paul Johnson Drywall Stacy & Cole Zoom info
sales force - Bob, Kendles 602-319-7473

2/13 - Van Horn Aviator Dean 480-483-4202
Roseloff Zoom:

2/13 Zucrum Foods Zoom: 520-281-9100
JC Juan Carlos office gave cell 520-313-7241

2/13 * Task Aerospace: Fred Kaplan 708 ~~200~~ 202 ~~202~~ 6984
COO Ausnet: EAM - ↑

2/14 All Valley Home Health Care: Kelly - 602-703-1776
Zoom. 602-253-8690

2/14 * Zonq: Tori Myers consultant CPA Firm 520-490-5233
web site ~~Zoom~~: 520-327-5501 (Robert)

2/14 Paxton Air: Cyndy McGown 480-610-3500
website. President + Owner

2/13 Au Air: Bob Knox 480-481-6519 Zoom
CFO

EXHIBIT 13
Eric
James Harper
6-25-24