# EXHIBIT AA

Joshua R. Woodard (#015592)
Jennifer R. Yee (#029651)
Delilah R. Cassidy (#037407)
SNELL & WILMER L.L.P.
One East Washington Street, Suite 2700
Phoenix, Arizona 5004-2556
Telephone: 602.382.6000
Facsimile: 602.382.6070
E-Mail: jwoodard@swlaw.com
jryee@swlaw.com
dcassidy@swlaw.com
*Attorneys for Plaintiff USI Insurance Services, LLC*

Snell & Wilmer L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| USI Insurance Services, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>Alliant Insurance Services, Inc., a California corporation, William J. Havard II and Sabrina Havard, husband and wife, and Robert Engles and Hope Engles, husband and wife, Jenise Purser and Adam Purser, husband and wife, Justin Walsh and Sara Walsh, husband and wife,<br><br>Defendants. | No. 2:23-cv-00192-SMB<br><br>**PLAINTIFF USI INSURANCE SERVICES, LLC'S FIRST SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFF (NON-EXPEDITED)** |

Pursuant to Fed. R. Civ. P. 33, Plaintiff USI Insurance Services, LLC ("Plaintiff" or "USI"), supplements it's responses to Defendants Alliant Insurance Services, Inc.'s ("Alliant"), William J. Havard II's ("Havard"), Robert Engles' ("Engles"), Jenise Purser's ("Purser"), and Justin Walsh's ("Walsh") (Havard, Engles, Purser, and Walsh, together, are "Individual Defendants") (all collectively, are "Defendants") Second Set of Interrogatories (the "Interrogatories").

/ / /

/ / /

discovery. Plaintiff also objects to this Interrogatory to the extent it requests information about the Individual Defendants' Active Prospective Clients because Havard, Purser, and Walsh did not utilize USI's system for tracking customer prospects—the CRM, and Engles did not promptly and sufficiently update the CRM. Thus, except as provided in response to Interrogatory No. 1 above, USI lacks knowledge and information sufficient to provide a response.

Plaintiff also objects to this Interrogatory to the extent it requests that Plaintiff state "*all* facts" that support its overarching allegations and central claims for breach of contract against the Individual Defendants. This causes the Interrogatory to be overbroad, seek some irrelevant information, and unduly burden Plaintiff with reciting *each and every fact*, regardless of whether it is material or already known by Defendants.

Subject to the forgoing objections, and without waiver of the same, and where applicable, pursuant to Federal Rule of Civil Procedure 33(d), Plaintiff will state all principal and material facts that form the basis of the Complaint (as defined in the Interrogatories) and are presently known to Plaintiff supporting USI's contention that any Individual Defendant has solicited, accepted business from, or performed services for any Client Account or Active Prospective Client in breach of their Employment Agreement.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

**Plaintiff's response to this Interrogatory is CONFIDENTIAL pursuant to the Protective Order.**

Plaintiff maintains its original objections and response above, and without waiver of the same, and where applicable, pursuant to Federal Rule of Civil Procedure 33(d), Plaintiff responds to this Interrogatory as follows: An important part of USI's business is the relationships and goodwill that it creates, develops, and maintains with its clients. These relationships and goodwill are developed by hiring and training skilled personnel, and through those personnel, identifying and satisfying client needs, and otherwise developing a solid reputation in the business community. USI also relies on the service team members

who support the producers to identify and satisfy client needs and develop client relationships for the benefit of USI.

In 2017, USI purchased all issued and outstanding equity interests of Wells Fargo Insurance Services, USA Inc. ("WFIS"), the corporation where Individual Defendants worked (the "Purchase"). WFIS was renamed USI Insurance Services National, Inc. ("USIN"), then merged into USI Insurance Services, LLC—the Plaintiff in this litigation. *See* USI001111–001221.

In conjunction with the closing of the Purchase, and to maintain and continue the business goodwill and customer accounts it had acquired from WFIS, USI offered Purser and Walsh positions on the service team as an Account Executive—Environmental and Vice President—Environmental, respectively, to become effective upon the closing of the Purchase. In their positions, Purser and Walsh would be working with the same client accounts as they had for WFIS so they could continue to develop and maintain goodwill with those accounts for USI. Both of their offers were contingent upon their acceptance of certain terms and conditions set forth in their respective Employment Agreements. Purser and Walsh signed their Employment Agreements. Closing on the Purchase occurred on November 30, 2017, at which time Purser and Walsh became USI employees.

As consideration for Purser and Walsh entering into their respective Employment Agreements, USI provided each separate and additional compensation to which they would not otherwise be entitled in the form of a Retention Bonus Payment. Each acknowledged that, in their respective roles at USI, they had and would continue to have significant responsibility for maintaining and enhancing the goodwill of USI with respect to its client accounts and relationships with prospective clients. Purser and Walsh further acknowledged that USI, on behalf of itself and its affiliates, had a "reasonable, necessary and legitimate business interest" in protecting USI's "Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business" and that the terms and conditions of their respective Employment Agreements were reasonable and necessary to protect those interests.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

To protect USI's goodwill and other business interests, and in consideration for the Retention Bonus Payment and other good and valuable consideration, Purser and Walsh agreed to limited post-employment covenants prohibiting them from using and/or disclosing Confidential Information (the "Confidentiality" provision) for five years, soliciting Client Accounts for two years and Active Prospective Clients for six months (the "Non-Solicitation" covenant), accepting or servicing Client Accounts for two years and Active Prospective Clients for six months (the "Non-Service" covenant), and interfering with USI's relationship with its employees on behalf of a competitor by soliciting or inducing them to leave USI or breach their USI employment agreements for two years (the "Non-Interference" covenant) (collectively, "Restrictive Covenants"). Purser and Walsh agreed that the above-listed limitations were reasonable and necessary to protect USI's confidential information, goodwill, and other business interests. *See* Plaintiff's First Amended Verified Complaint Ex. D (Purser's Employment Agreement) & Ex. E (Walsh's Employment Agreement).

In further response, Plaintiff incorporates by reference its responses, including all supplements and documents referenced therein, to Alliant's, Havard's, and Engles' Expedited Interrogatories Nos. 5 and 6 describing the terms in Havard's and Engles' respective Employment Agreements including the Restrictive Covenants, their acknowledgment that they owed a contractual duty of loyalty to USI, and that they agreed to provide 60-days' written notice to USI before terminating their employment. Plaintiff further incorporates those responses which detail Senior Vice President for Alliant, Andy Orear's ("Orear") contacts with Engles and other USI employees to recruit them to resign their USI employment and work for Alliant, and Havard's and Engles' coordination—with the knowledge and substantial assistance of Alliant—of the Individual Defendants' and Havard's two remaining service team members, Amy Phalen's ("Phalen") and Lori Hartman's ("Hartman") *en masse* resignations from USI without providing advance notice or a transition plan for their Client Accounts followed by their immediate employment at Alliant.

Snell & Wilmer L.L.P. LAW OFFICES One East Washington Street, Suite 2700 Phoenix, Arizona 85004-2556 602.382.6000

team showed up for the meeting and each of their resignations were submitted to USI within hours afterwards.

In further response to this Interrogatory, Plaintiff identifies the contractual duty of loyalty that Havard and Engles owe to USI by way of their Employment Agreements. Each of them promised that while they were employed, and during the 60-day transition period, they owed USI this duty of loyalty and thereby would act in the best interest of USI. Havard's and Engles' failures to comply with this contractual promise violated their Employment Agreements.

Except as otherwise provided herein, Plaintiff maintains its original objections and responses above.

**INTERROGATORY NO. 10:**

Identify all contracts with which any Defendant has allegedly interfered, and state which Defendant(s) allegedly interfered with each contract.

**RESPONSE TO INTERROGATORY NO. 11:**

Plaintiff objects to this Interrogatory to the extent it requests information already in Defendants' possession, including information Plaintiff provided to Defendants during expedited discovery, and because it requests information that is the subject of ongoing discovery.

Plaintiff also objects to this Interrogatory on the grounds that it contains conjunctive questions as it includes two subparts. Plaintiff also objects to this Interrogatory to the extent it seeks information about every single contract with which any Defendant interfered. As drafted, this Interrogatory would require Plaintiff to detail the contracts for numerous USI employees who (for example) Orear contacted to recruit, induce to resign from their USI employment, and join Alliant without giving notice in violation of their various contracts in the hope of gaining USI's clients. Such is unduly burdensome and disproportional to the needs of this case.

Subject to the forgoing objections, and without waiver of the same, and where applicable, pursuant to Federal Rule of Civil Procedure 33(d), Plaintiff will not identify the

Snell & Wilmer L.L.P. LAW OFFICES One East Washington Street, Suite 2700 Phoenix, Arizona 85004-2556 602.382.6000

Individual Defendants' employer changed to USI on November 30, 2017 when USI closed on its purchase of all issued and outstanding equity interests of WFIS, which was renamed USI Insurance Services National, Inc. ("USIN") and then merged into USI Insurance Services, LLC—the plaintiff in this action and the assignee and successor-in-interest to WFIS/USIN. The Individual Defendants accepted employment at USI to continue to develop and maintain business goodwill with the customer accounts USI had acquired from WFIS. The Individual Defendants remained employed by USI from November 30, 2017 through January 24, 2023 for Havard, and January 25, 2023 for Engles, Purser, and Walsh.

DATED January 29, 2024.

SNELL & WILMER L.L.P.

By: */s/ Delilah R. Cassidy*
Joshua R. Woodard
Jennifer R. Yee
Delilah R. Cassidy
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
*Attorneys for Plaintiff USI Insurance Services, LLC*

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

**VERIFICATION**

I, Benjamin Greer, am authorized to make this verification on behalf of USI Insurance Services, LLC ("USI"). I certify under oath that the foregoing First Supplemental Responses to Defendants' Second Set of Interrogatories (Non-Expedited) are complete and correct as of the time they were made based on the best knowledge, information, and belief of USI, formed after a reasonable inquiry.

Dated 1/29/2024.

DocuSigned by:
Benjamin A. Greer
4612DF4F36834F3...
Benjamin Greer

# EXHIBIT BB

Joshua R. Woodard (#015592)
Jennifer R. Yee (#029651)
Delilah R. Cassidy (#037407)
SNELL & WILMER L.L.P.
One East Washington Street, Suite 2700
Phoenix, Arizona 5004-2556
Telephone: 602.382.6000
Facsimile: 602.382.6070
E-Mail: jwoodard@swlaw.com
jryee@swlaw.com
dcassidy@swlaw.com
*Attorneys for Plaintiff USI Insurance Services, LLC*

Snell & Wilmer L.L.P. LAW OFFICES One East Washington Street, Suite 2700 Phoenix, Arizona 85004-2556 602.382.6000

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| USI Insurance Services, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>Alliant Insurance Services, Inc., a California corporation, William J. Havard II and Sabrina Havard, husband and wife, and Robert Engles and Hope Engles, husband and wife, Jenise Purser and Adam Purser, husband and wife, Justin Walsh and Sara Walsh, husband and wife,<br><br>Defendants. | No. 2:23-cv-00192-SMB<br><br>**DECLARATION OF THOMAS R. LINN IN SUPPORT OF USI INSURANCE SERVICES, LLC'S MOTION FOR SUMMARY JUDGMENT** |

I, Thomas R. Linn, having personal knowledge of the facts stated herein and being over the age of 18 years, of sound mind, and fully competent to make this Declaration, hereby declare under penalty of perjury under the laws of the United States that the matters set forth herein are true and correct to the best of my knowledge and belief, except as to the matters stated upon information and belief and, as to those, I believe them to be true; however, in compiling this information, information has been supplied by others and I am relying in part upon their representations.

1. I have extensive experience in the insurance industry. I served as the Chief Financial Officer of three different organizations, one of which was a large insurance agency, and oversaw the buying of commercial insurance policies of each of those firms. I also served as the Executive Vice President of the nation's largest insurance agency consulting firm, MarshBerry. During my 22-year tenure at MarshBerry, I provided consulting services to insurance agencies and intermediation services for mergers and acquisitions for more than 100 transactions with total transaction value exceeding $2 billion.

2. The statements in this declaration are also contained in the expert report I submitted in this matter on August 6, 2024.

**<u>Producer and Customer Service Representative (CSR) Employment Contracts</u>**

3. In my experience, approximately 75-90% of insurance producers and most senior CSRs in this industry are bound by employment contracts that include restrictive covenants. Large agencies require that nearly all their producers and senior CSRs be subject to contracts that contain certain restrictive covenants. More specifically, producer and CSR contracts usually contain one or more of the following restrictive covenants, among other elements met to enhance continuity of service to clients upon a producer's departure:

- Confidentiality restrictions, to require current and former employees to keep certain information private
- Non-solicit restrictions, to prevent a former employee from soliciting a company's clients or customers after the former employee's association with the company ends
- Non-compete restrictions, to prohibit a former employee from working for a competitor or opening a competing business after leaving an employer
- Non-solicitation or interference with employee restrictions, to restrict a former employee from disrupting, damaging, impairing or interfering with their former employer's business, specifically when it comes to soliciting other employees from the company
- Non-servicing restrictions, to prevent a former employee from accepting or participating in the servicing of the business from a company's customers, even if the employee didn't initiate contact with the customer

The periods of these restrictions may range from 1–5 years.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

4. These restrictive covenants are important for maintaining and enhancing the goodwill of insurance agencies with respect to their clients and protecting an insurance agency's business interests.

5. Havard's and Engles' USI employment agreements contained the following restrictive covenant with respect to non-solicitation and non-servicing of clients:

> ***Non-Solicitation of Clients and Active Prospective Clients***. In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:
>
> During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit Insurance Services in competition with the Company to any Client Account; (ii) consult for any Client Account with respect to Insurance Services in competition with the Company; (iii) sign a broker of record letter with any Client Account to provide Insurance Services in competition with the Company; or (iv) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account, which is a Client Account of the Company at the time of such solicitation, that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder. If the duration herein of two (2) years after Producer is no longer employed hereunder is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during the Term and for eighteen (18) months after Producer is no longer employed hereunder, for any reason. If the duration herein of eighteen (18) months after Producer is no longer employed hereunder is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during the Term and for twelve (12) months after Producer is no longer employed hereunder, for any reason.
>
> During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit Insurance Services in competition with the Company to any Active Prospective Client; (ii) consult for any Active Prospective Client with respect to Insurance Services in competition with the Company; or (iii) sign a broker of record letter with any Active Prospective Client to provide Insurance Services in competition with the Company; in each case with respect to any Active

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment hereunder.

***Non-Acceptance / Non-Service of Clients and Active Prospective Clients***. In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide Insurance Services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide Insurance Services in competition with the Company to any Client Account; in each case with respect to any Client Account, which is a Client Account of the Company at the time of such solicitation, that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder. If the duration herein of two (2) years after Producer is no longer employed hereunder is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during the Term and for eighteen (18) months after Producer is no longer employed hereunder, for any reason. If the duration herein of eighteen (18) months after Producer is no longer employed hereunder is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during the Term and for twelve (12) months after Producer is no longer employed hereunder, for any reason.

During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide Insurance Services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide Insurance Services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment hereunder.

6. These restrictive covenants are well within industry standards for producer agreements. For example, Havard's and Engles' Alliant employment agreements contain a restrictive period of two years and the following restrictive covenant as it pertains to the

"interference" with customers, which is very similar to the restrictions specified in their USI employment contracts:

> ***Employment Period***. During Employee's employment at Alliant or any of its Affiliates, in order to protect Alliant's legitimate business interests, including Trade Secrets, Confidential Information, and client relationships, and consistent with Employee's obligations to act in good faith and exclusively for the benefit of Alliant while employed by Alliant or any of its Affiliates, Employee shall not, either directly or indirectly, and whether on Employee's own behalf or on behalf of any person, firm, partnership, association, corporation or business organization, entity or enterprise other than Alliant or one of its Affiliates), solicit or attempt to solicit Customers or Prospective Customers for the purpose of performing or supervising the performance of Business Services, induce or attempt to induce Customers, Prospective Customers, or suppliers of Alliant or any of its Affiliates to discontinue business with Alliant or any of its Affiliates, or knowingly interfere with the relationship between any Customer, Prospective Customer, supplier, or any other business relation and Alliant or any of its Affiliates.

> ***Post-Employment Restricted Period***. During the Restricted Period, in order to protect Alliant's legitimate business interests, including Trade Secrets, Confidential Information, and client relationships, Employee shall not, either directly or indirectly, and whether on Employee's own behalf or on behalf of any person, firm, partnership, association, corporation or business organization, entity or enterprise: (i) solicit or attempt to solicit Customers of Alliant or any of its Affiliates for the purpose of performing or supervising the performance of Business Services; (ii) induce or attempt to induce the termination, non-renewal or diminishment of any Business Services to any such Customers or any suppliers of Alliant or any of its Affiliates; or (iii) knowingly interfere with any relationship between any such Customer, supplier, or any other business relation and Alliant or any of its Affiliates. These restrictions shall apply only to those Customers or suppliers of Alliant or any of its Affiliates with whom Employee had contact or made contact, or about whom Employee obtained Confidential Information or Trade Secrets, within the course of Employee's employment with Alliant or an Affiliate of Alliant within the 24-month period immediately preceding the beginning of the Restricted Period. Nothing herein is intended to diminish any existing or later-enacted statutory protections afforded to Trade Secrets or other proprietary information. The Parties expressly agree that all such statutory protection will be given full force and effect for so long as any covered information qualifies for such protection.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

7. Havard's and Engles' USI employment agreements contained the following restrictive covenant with respect to non-solicitation and non-interference with employees:

> ***Non-Interference with Employees***. In consideration of Producer's employment with the Company, and for other good and valuable consideration, Producer agrees, during the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company who is employed by the Company at the time of such solicitation or hiring and with whom Producer worked or obtained knowledge about as a result of Producer's employment with the Company. If the duration herein of two (2) years after Producer is no longer employed hereunder is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during the Term and for eighteen (18) months after Producer is no longer employed hereunder, for any reason. If the duration herein of eighteen (18) months) after Producer is no longer employed hereunder is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during the Term and for twelve (12) months after Producer is no longer employed hereunder, for any reason.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

8. This restrictive covenant is well within industry standards for producer agreements. For example, Havard's and Engles' Alliant employment agreements contain the following restrictive covenant as it pertains to the non-solicitation and non-interference with employees which is very similar to the USI restrictions:

> ***Employment Period***. While employed by Alliant or any of its Affiliates, Employee shall not, either directly or indirectly, except in the interest of Alliant or any of its Affiliates, call on, solicit, or attempt to induce any other officer, employee, or independent contractor of Alliant or any of its Affiliates to terminate his or her employment or relationship with Alliant or any such Affiliate, and shall not assist any other person or entity in such a solicitation (regardless of whether any such officer, employee, or independent contractor would commit a breach of contract by terminating his or her employment).

> ***Post-Employment Restricted Period***. During the Restricted Period, Employee shall not, either directly or indirectly, call on, solicit, or attempt to induce any person who is, or during the 12 month period immediately preceding the beginning of the Restricted Period was, an officer, employee,

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

or independent contractor of Alliant or any of its Affiliates with whom Employee had contact or made contact within the course of Employee's employment with Alliant or an Affiliate of Alliant to terminate his or her employment or relationship with Alliant or any of its Affiliates, and shall not assist any other person or entity in such a solicitation (regardless of whether any such officer, employee, or independent contractor would commit a breach of contract by terminating his or her employment). Nothing in this Agreement prohibits Employee from hiring an individual who responds to a job posting made available to the general public so long as Employee does not solicit or otherwise initiate such contact during the Restricted Period.

9. The USI employment agreements executed by Purser and Walsh contain most of the same restrictive covenants as the producer agreements described above and, as such, are also consistent with industry standards.

DATED November 14, 2024.

Thomas R. Linn

4875-5409-2281

# EXHIBIT CC

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA
-----------------------------------------
USI INSURANCE SERVICES, LLC, a Delaware limited liability company,
Plaintiff,

Case No.:
23-cv-00192-PHX-SMB

v.
ALLIANT INSURANCE SERVICES, INC., a California Corporation, WILLIAM J. HAVARD II and SABRINA HAVARD, husband and wife, and ROBERT ENGLES and HOPE ENGLES, husband and wife, JENISE PURSER and ADAM PURSER, husband and wife, JUSTIN WALSH and SARA WALSH, husband and wife,
Defendants.

-----------------------------------------

30(B)(6) VIDEOTAPED DEPOSITION OF
ALLIANT INSURANCE SERVICES
BY BLEDION DIZDARI
TUESDAY, JUNE 11, 2024
10:30 A.M.

Reported by: Adrienne M. Mignano, RPR
Job Number: J11364375



June 11, 2024
10:30 A.M.
New York, New York

Videotaped Deposition of BLEDION DIZDARI, held at the offices of Morgan Lewis & Bockius, 101 Park Avenue, New York, New York, pursuant to Notice, before Adrienne M. Mignano, a Notary Public of the State of New York.



A P P E A R A N C E S:

SNELL & WILMER
Attorneys for Plaintiff
One East Washington Street
Suite 2700
Phoenix, Arizona 85004
BY: JOSHUA R. WOODARD, ESQ.
DELILAH CASSIDY, ESQ.
JENNIFER YEE, ESQ.

MORGAN LEWIS & BOCKIUS LLP
Attorneys for Defendants
101 Park Avenue
New York, New York 10178
BY: TIMOTHY J. STEPHENS, ESQ.

A L S O P R E S E N T :

GIL PERETZ
Legal Video Specialist



THE VIDEOGRAPHER: Good morning. We are on the record and the time now is 10:40. Today's date is June 11, 2024. This is Media 1 in the video deposition of Mr. Bledion Dizdari in the matter of USI Insurance Services, LLC versus Alliant Insurance Services, Inc., et al., Case Number CV-23-00192-PHX-SMB.

My name is Gil Peretz. I'm the legal videographer with Shereck Video, in association with Esquire. Today we are at the offices of Morgan Lewis, located at 101 Park Avenue on the 39th Floor.

Would counsel please identify themselves and state whom they represent.

MR. WOODARD: Good morning. Josh Woodard, and joining me today via Zoom is Jennifer Yee and Delilah Cassidy, representing plaintiff, USI Insurance Services.

MR. STEPHENS: Timothy Stephens, from Morgan Lewis & Bockius,

B. Dizdari

and Affirmative Defenses to the Complaint, was marked as Dizdari Exhibit 5 for identification, as of this date.)

BY MR. WOODARD:
Q Do you have Exhibit 5 in front of you?
A Yes.
Q You'll see Exhibit 5 is the Defendants' Answers and Affirmative Defense to the Complaint.
Do you see that on the caption?
A I see that.
Q If you can please go to page 17.
MR. STEPHENS: I'll just note for the record that there are missing letters and things in this copy. It is just weird. I'm not going to stop your questioning. I'll just note for the record that it appears to be an imperfect copy, and I don't know why.
MR. WOODARD: I noticed that too, Tim, thank you. I believe the content is there, but if anything comes up, let



B. Dizdari

me know.
MR. STEPHENS: Fine.
BY MR. WOODARD:
Q Do you have the affirmative defenses on page 17 in front of you?
A I do.
Q And you'll see there are three affirmative defenses there, and Mr. Stephens is correct that the formatting is odd, but you'll see the first affirmative defense indicates that "USI's Complaint fails under the doctrine of unclean hands, waiver and estoppel."
Do you see that?
A I don't. Can you point me to it, please.
Q Sure. It is paragraph 1 under "Affirmative Defenses," and it indicates there three doctrines, unclean hands, waiver and estoppel?
A I see it.
Q What facts does Alliant have to support that USI's Complaint fails under the doctrine of unclean hands?



B. Dizdari

A Well, we know for one that Mr. Engles was demoted, and we also know that Mr. Havard was treated, quote-unquote, as a child and wasn't given proper authority to run his business there.
Q What facts does Alliant have to support that Alliance -- I'm sorry, that USI's Complaint fails under a waiver doctrine?
A I'd have to review that. I don't have the facts on that one.
Q Estoppel?
A Or the estoppel.
Q Paragraph 2 of the affirmative defenses, about midway through, indicates that "Alliant's alleged conduct was at all times justified and undertaken in the good faith exercise of a valid, lawful and legitimate business purpose."
Do you see that?
A I see that.
Q What is Alliant's legitimate business purpose as referenced in affirmative defense number 2?



B. Dizdari

A Well, Alliant has a right to attract employees, and in speaking with them, we think that we do it the right way by attracting them onto our platform. And then onboarding somebody like a Mr. Havard onto our platform, we give the proper guidance to somebody like Mr. Havard. And through every step of the way, we're guiding him in good faith and lawful and legitimate, so that he is doing the exit and coming to Alliant without any material from USI, without talking to his colleagues when he was at USI or without talking to his clients while he was there.
Q Is that advice that Alliant gave Mr. Havard prior to him joining Alliant?
A That is advice that I have given Mr. Havard, and it has been reiterated in our prospective employee departure protocols document that he reviewed and we reviewed with him and he signed and dated, as well as we recommended transition counsel, who I would presume reiterated all of this advice.
Q Paragraph 3 of the affirmative

B. Dizdari

A Generally the same for everybody that we hire --

MR. WOODARD: Let's go ahead --

A -- here --

MR. WOODARD: I'm sorry.

A -- that we've hired here at Arizona.

MR. WOODARD: Let's go ahead and take a break. I think I may be done.

THE WITNESS: Okay.

THE VIDEOGRAPHER: We are going off the record. The time now is 13:54.

(Thereupon, a recess was taken, and then the proceedings continued as follows:)

THE VIDEOGRAPHER: We are back on the record. The time now is 14:04.

MR. WOODARD: Mr. Dizdari, thank you for being here today. That's all the questions I have at this time. I am going to keep the deposition open as it relates to Alliant's refusal to respond to topic 25.

Tim, any questions?



MR. STEPHENS: Refreshing myself on what's topic 25 is. I see we did object to that. I would object to not closing the deposition and do object, but with that, I'll just ask for the permission to read and sign for the witness, and I have no questions.

THE VIDEOGRAPHER: This concludes the video deposition of Mr. Dizdari. The time is approximately 14:04. We are off the record.

-----------------------
BLEDION DIZDARI

Subscribed and sworn to
before me this day
of , 2024.

_______________________




--------------- I N D E X ---------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| BLEDION DIZDARI | | |
| | MR. WOODARD | 5 |

---------------- EXHIBITS ----------------

| DIZDARI EXHIBITS | | FOR ID. |
|---|---|---|
| Exhibit 1 | Plaintiff's Rule 30(b)(6) Second Notice of Deposition of Defendant Alliant Insurance Services, Inc. | 6 |
| Exhibit 2 | Rule 30(b)(6) Deposition Reference Sheet, 12 pages | 8 |
| Exhibit 3 | Rule 30(b)(6) Deposition Reference Sheet, 55 pages | 10 |
| Exhibit 4 | Financials of Alliant Insurance Services | 10 |
| Exhibit 5 | Defendants' Answers and Affirmative Defenses to the Complaint | 12 |
| Exhibit 6 | E-mail from Bledion Dizdari to Eric Harper dated 12-1-22, plus attachment | 18 |
| Exhibit 7 | E-mail from Bledion Dizdari to Eric Harper dated 12-19-22, plus attachment | 22 |
| Exhibit 8 | E-mail chain, top e-mail from David Orleans to Jay Fischer dated 1-26-23 | 25 |
| Exhibit 9 | E-mail from Bruce Thorne to Joseph Markling dated 2-1-23, plus attachment | 33 |





------------ EXHIBITS CONTINUED------------

| | | |
|---|---|---|
| Exhibit 10 | E-mail series from Carrie Stein to Cathy Moran, top e-mail dated 2-6-23 | 38 |
| Exhibit 11 | E-mail appointment from Sarah Tighe to Peter Carpenter dated 1-11-23 | 42 |
| Exhibit 12 | E-mail from Chris Arce to Chuck McDaniel dated 1-24-23, plus attachments | 48 |
| Exhibit 13 | Text chain between Bledion Dizdari and Robert Engles | 63 |
| Exhibit 14 | E-mail chain, top e-mail from Sarah Tighe to Bledion Dizdari dated 1-25-23 | 67 |
| Exhibit 15 | E-mail chain, top e-mail from Bridgette Castillo to Eric Harper dated 1-26-23 | 76 |
| Exhibit 16 | E-mail chain, top e-mail from Linda Shin to Charles McDaniel dated 1-26-23 | 82 |
| Exhibit 17 | E-mail chain, top e-mail from Brad Pedersen to Lou Timpanaro dated 4-6-23 | 87 |

Page 149

C E R T I F I C A T E

STATE OF NEW YORK )
: SS
COUNTY OF NEW YORK)

I, Adrienne M. Mignano, a Registered Professional Reporter and Notary Public within and for the State of New York, do hereby certify:

That BLEDION DIZDARI, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of June, 2024.

Adrienne M. Mignano

ADRIENNE M. MIGNANO

Page 150

DEPOSITION ERRATA SHEET
Our Assignment No: J11364375
Case Caption:
USI Insurance Services LLC
vs.
Alliant Insurance Services, Inc.
DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

SIGNATURE__________________DATE:__________
BLEDION DIZDARI

Subscribed and sworn to on the ____ day of ____________, 20__ before me,
__________________________________________
Notary Public,
in and for the State of _________________

Page 151

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:__________________________________
Reason for change:______________________________

Page No._____Line No._____Change to:__________________________________
Reason for change:______________________________

Page No._____Line No._____Change to:__________________________________
Reason for change:______________________________

Page No._____Line No._____Change to:__________________________________
Reason for change:______________________________

Page No._____Line No._____Change to:__________________________________
Reason for change:______________________________

Page No._____Line No._____Change to:__________________________________
Reason for change:______________________________

Page No._____Line No._____Change to:__________________________________
Reason for change:______________________________

SIGNATURE:_______________DATE:_______
BLEDION DIZDARI

Page 152

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:__________________________________
Reason for change:______________________________

Page No._____Line No._____Change to:__________________________________
Reason for change:______________________________

Page No._____Line No._____Change to:__________________________________
Reason for change:______________________________

Page No._____Line No._____Change to:__________________________________
Reason for change:______________________________

Page No._____Line No._____Change to:__________________________________
Reason for change:______________________________

Page No._____Line No._____Change to:__________________________________
Reason for change:______________________________

Page No._____Line No._____Change to:__________________________________
Reason for change:______________________________

SIGNATURE:_______________DATE:_______
BLEDION DIZDARI

# EXHIBIT DD

UNITED STATES DISTRICT COURT
For the
District of Arizona

USI INSURANCE SERVICES, LLC
Plaintiff

Civil Action No. 2:23-00192-SMB

v.

ALLIANT INSURANCE SERVICES INC., et al

APRIL 26, 2024

VIDEOTAPE DEPOSITION OF CHRISTOPHER NASSA

A P P E A R A N C E S:

S&W LAW OFFICES
Attorneys for the Plaintiff
One East Washington Street
Phoenix, Arizona 85004
(602)382-6281
jwoodard@swlaw.com
BY: JOSHUA R. WOODARD, ESQ., CHRISTOPHER MURRAY,ESQ., and DELILAH CASSIDY, ESQ.(via Zoom)

MORGAN LEWIS
Attorneys for the Defendant
101 Park Avenue
New York, New York 10178-0060
(212)309-6805
timothy.stephens@morganlewis.com
BY: TIMOTHY J. STEPHENS, ESQ.

BRYAN, CAVE,LEIGHTON, PAISNER, LLP
Attorneys for the CBRE
1290 Avenue of the Americas
New York, New York 10104-3300
(212)541-1228
cbcesare@bclblaw.com
BY: CHRISTINE CESARE, ESQ.

REPORTED BY:
ROBERT MILLER
LICENSED SHORTHAND REPORTER
JOB NO. 96874

. . . Videotape Deposition of Christopher Nassa, being of lawful age, held pursuant to the Federal Rules of Civil Procedure, before Robert Miller, a duly qualified Court Reporter and Notary Public, within and for the State of Connecticut, held at the CBRE Group, 201 Tresser Boulevard, Stamford, Connecticut on April 26, 2024 at 10:36 a.m.

S T I P U L A T I O N S

IT IS HEREBY stipulated and agreed by and among counsel for the respective parties that all formalities in connection with the taking of this deposition including time, place sufficiency of notice and the authority of the officer before whom it is being taken may be and are hereby waived.

IT IS further stipulated and agreed that objections other than as to form are reserved to the time of trial.

IT IS further stipulated that the proof of the qualifications of the Notary Public before whom the deposition is being taken is hereby waived.

IT IS further stipulated and agreed that the reading and signing of said deposition by the witness is hereby not waived.



THE VIDEOGRAPHER: We are now on the record at 10:36 a.m. on April 26, 2024 in Stamford, Connecticut for the videotape deposition of Christopher Nassa, in the matter of USI Insurance versus Alliant Insurance Services, Inc., et al, pending in the State of Arizona, Case Docket Number 2:23-cv-00192-SMB.

I am Greg Jacques the videographer for Legal Presentations Solutions, of Hartford, Connecticut.

Would counsel please identify themselves for the record.

MR. WOODARD: Good morning, Joshua Woodard on behalf of USI Insurance Services. With me here today is Christopher Murray.

MR. STEPHENS: Timothy Stephens, Morgan Lewis on behalf of the defendants.

MS. CESARE: Christine Cesare with the law firm of Bryan Cave Leighton Paisner on behalf of CBRE, representing Mr. Nassa here today.

MR. WOODARD: And the plaintiff would like a copy of the transcript,

MR. STEPHENS: As would the



defendant.

THE VIDEOGRAPHER: Our court reporter is Robert Miller of Robert Miller Reporting, who will now swear in the witness.



C H R I S T O P H E R N A S S A,

called as a witness, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, and under pains and penalties of perjury, testified as follows:

THE NOTARY: Please state your full name and address for the record.

**THE WITNESS: Christopher Nassa, 19 Linwood Avenue, Riverside, Connecticut.**

DIRECT EXAMINATION BY MR. WOODARD:

Q Mr. Nassa, good morning. My name is Joshua Woodard on behalf of USI Services. When we briefly met this morning you kindly said please call me Chris. Is that okay during the deposition?
**A It is Josh, thanks.**
Q You understand you are under oath today?
**A Yes, I do.**
Q Do you know Bill Havard?
**A I do.**
Q Did you speak to Mr. Havard about your deposition?
**A Yes.**

BY MS. WOODARD:
Q Chris, do you have Exhibit 2 in front of you?
A I do.
Q You will see Exhibit 2 are some texts between you and Mr. Harper?
A Okay.
Q Do you see that?
A I do.
Q In the first page of Exhibit 2, you ask Mr. Harper, "Did Bill take his team with him?" Do you see that?
A I do.
Q Then you follow up with an email also to Mr. Harper just moments later that says, "He sent an email this morning that made it sound like they are staying back." Do you see that?
A I do.
Q And Eric Harper responds in the last page of Exhibit 2, yes, correct?
A Yes.
Q So, is it fair to state as of the date of Mr. Harper's text message on page 3 of Exhibit 2, that you knew Mr. Havard's team was leaving USI, correct?
MS. CESARE: Object to the form.



BY MR. WOODARD:
Q You can answer.
A Fair.
(At which time an Email Chain was marked Plaintiff's Exhibit Three for Identification.)

BY MS. WOODARD:
Q Chris, do you have Exhibit 3 in front of you?
A Yes.
Q You will see about midway down page 1 of Exhibit 3, this is an email from you to Mr. Harper?
A Yes.
Q And you indicate to Mr. Harper you're requesting, "When are we getting a BOR to sign. TCC folks starting to ask what's up. And you end, Also getting calls from USI management." Do you see that?
A Yes.
Q Why not simply just tell USI in response to their calls that you were transferring the CBRE work to Alliant?
A At this point, I think there was a lot of uncertainty as to what the situation was, who was where, who was doing what. I didn't want to obviously



burn any bridges with USI as they were the broker of record on our account. And I knew there were situations potentially where we were going to have USI involved with finding pieces of business for us which I believe they did in a couple of weeks -- interim period.
Q You will see Mr. Harper responds and asks if you're free and that he needs help with the BORs? Do you see that?
A I do.
Q And did you speak to Mr. Harper in response to his emails to you?
A I'm going to assume yes. A year and months ago, I don't remember specifically, but I am sure I did.
Q Do you recall what help he needed?
A I don't.
Q Do you recall helping him?
A I know we prepared BORs to be issued, yes.
Q When you say we prepared BORs, does that mean CBRE prepared the BORs?
A I don't specifically recall, but it's not unusual CBRE would prepare the BOR at the end.
Q So, in this case, Alliant would prepare the BOR and send it to you. That would not be unusual?



MR. STEPHENS: Object to the form.
BY MR. WOODARD:
Q In your experience that would not be unusual?
A Absolutely not.
(At which time the Emails referred to were marked Plaintiff's Exhibit Four for Identification.)

BY MS. WOODARD:
Q Now, you got Exhibit 4 in front of you?
A I do.
Q You will see that this is on page 1 of Exhibit 4, this is an email from Mr. Harper to you. And it's sent on January 26, 2023?
A Yes.
Q And Mr. Harper says, "See attached BOR for the TCC projects. Existing and pending". Do you see that?
A I do.
Q If you flip to that third page of Exhibit 2, which is the list of projects and pending projects. Do you see that?
A I do.
Q If you go down to the pending projects, can

you tell me to the best of your recollection each of those pending projects, how long those had been pending as of January 26, 2023?
**A I honestly don't know the answer to that.**
Q Do you know any of them, how long they had been pending at that time, even if approximate?
**A The only one here that even rings a bell with me is the Westheimer, because I know that was happening during the period this was going down. I remember seeing email traffic that I believe was earlier in the month of January there was correspondence happening, but I really don't remember the specificity of it.**
Q The Westheimer Project ultimately that insurance policy was bound, correct?
**A It was.**
Q Were there policies bound with respect to these other projects that are listed under the pending projects section?
**A I don't know.**
Q Do you have an understanding how Mr. Harper came up with the list of projects in pending projects?
**A I don't.**
Q Do you recall providing to Mr. Harper the list of projects and pending projects prior to the



time he sent you this email in Exhibit 4?
**A I do not recall?**
(At which time the Email Chain was marked Plaintiff's Exhibit Five for Identification.)

BY MS. WOODARD:
Q Chris, do you have Exhibit 5 in front of you?
**A I do.**
Q You will see at the bottom of page 1 of Exhibit 5 there's a partial email. You can flip to the second page and see Mr. Mengel's signature block. But the email is from Mr. Mengel to Mr. Havard and Mr. Walsh. Do you see that email?
**A I do.**
Q Do you know who Mr. Mengel is?
**A I do.**
Q Who is he?
**A Just a person that works for our TCC business.**
Q And that is Trammell Crow Company?
**A Yes.**
Q You will see that Mr. Mengel sends to Mr. Havard and Mr. Walsh at their usi.com email address.



Do you see that?
**A Yes.**
Q And then if you go to page 1 of Exhibit 5, you will see this is an email from Dillon Chapman to Mr. Havard and Mr. Walsh at their Alliant address. Do you see that?
**A I do.**
Q Do you know who Dillon Chapman is?
**A I do.**
Q And who is Dillon Chapman?
**A Somebody, I believe, he works for Chris on the team at TCC.**
Q I am sorry, for who?
**A I believe, he works for Chris Mangel. One of them is the boss and one is the underling. I don't remember who is who.**
Q Do you have an understanding of how Mr. Chapman knew to send this email to Mr. Havard and Mr. Walsh?
**A I don't.**
Q Have you ever talked to Mr. Chapman about that issue?
**A No, I did not.**
Q I didn't hear you.
**A No, I don't.**



Q At the top of Exhibit 5 you will see this is an email from you to Mr. Chapman, Mr. Havard and Mr. Walsh. Do you see that?
**A I do.**
Q And you indicate that you needed to issue a letter which authorizes them to work on our business. Who are you referring to when you talk about them? Is that Mr. Havard and Mr. Walsh?
**A It would be Alliant specifically.**
Q And then in your third sentence of that email you state, until then I don't think they can respond. Who are you referring to when you say they in that sentence?
**A Bill and Justin.**
Q In parenthesis you say and Bill and Justin might not be able to work on the account for a period of time. Why did you include that?
**A Based on my knowledge of how, you know, when people leave companies, sometimes there's guard leave. A lot of times they can't work on an account for a period of time. I assume that would be the case here.**
Q Did anyone inform you of that or that was an assumption?
**A Total assumption.**

Q You go on to state that, "But rest assured that wouldn't be an issue". Why wouldn't that be an issue that Mr. Havard and Mr. Walsh would not be able to work on the account
**A I had talked to Eric at that point and had assurances from Eric that was going to continue to run smoothly.**
Q Did Mr. Harper indicate to you that everything was going to be running smoothly because Mr. Havard would be working behind the scenes, behind the curtains, anything in that regard?
MR. STEPHENS: Object to the form.
**THE WITNESS: In advance of this email?**
MR. WOODARD: Yes.
**THE WITNESS: I do not recall.**
BY MR. WOODARD:
Q How about after this email?
**A At some point Eric said to me Bill is here. Bill is behind the scene making sure things would run smoothly. Something to the effect of that.**
Q Do you remember when Mr. Harper told you that?
**A Sometime post -- I remember it was after this week because I remember the craziness of this**



**week, but I don't remember the specificity of that.**
Q Is it fair to state that Mr. Harper told you things would run smoothly because Mr. Havard would be working behind the scene within a couple of weeks of this email?
MR. STEPHENS: Objection to the form.
**THE WITNESS: I don't remember the time specifically.**
BY MR. WOODARD:
Q Did you have an understanding that Mr. Havard would be pulling the strings?
MR. STEPHENS: Object to the form.
MS. CESARE: Same objection.
BY MR. WOODARD:
Q You can answer.
**A I know those are my words, but those are words I use all the time.**
Q I appreciate that Chris, but do you have an understanding that Mr. Havard would be pulling the strings regarding the insurance services that Alliant would provide in doing so behind the scenes?
**A I had an understanding that Mr. Havard would be behind the scenes making sure things run smoothly.**



Q And do you have that understanding based upon communications from Mr. Harper?
**A Yes.**
Q And you have that understanding also because you knew Mr. Havard was working behind the scenes, fair?
MR. STEPHENS: Object to the form.
MS. CESARE: Same objection.
BY MR. WOODARD:
Q You can answer.
**A No, I didn't know specifically. I was told that by Eric.**
(At which time an Email Chain was marked Plaintiff's Exhibit Six for Identification.)

BY MS. WOODARD:
Q Do you have Exhibit 6 in front of you?
**A I do.**
Q You will see at the top of page 1 of Exhibit 6 there's an email from you to Mr. Holdridge dated January 27th of 2023?
**A Yes.**
Q And you indicate to Mr. Holdridge in that email that environmental is turning into a bit of a



headache. Do you see that?
**A I do.**
Q Why did you mention that to Mr. Holdridge?
**A So, Neil Holdridge was very involved in a lot of the environmental insurance placements that happened. He was kind of the environment guy from TCC. There was a lot of back and forth at this time as to who was doing what. I remember deals like Westheimer was trying to bind, and trying to get done. It was turning into a bit of headache on that part.**
Q Was the headache the result of whether it was going to be bound by USI versus Alliant?
**A I don't specifically recall.**
Q Was the headache the result of the team at USI who had been working on the Westheimer account having left USI and joining Alliant?
**A I don't know if they had left at this point. I think they were still there and responding to emails.**
Q What was the catalyst of the headache, do you recall?
**A The catalyst of the headache was there was just a lot of back and forth happening on deals as to do you know anyone at USI. So, we were trying to figure out if our team was still there, if they were**

Q You write to Mr. Harper, My trust in you must not be understated here. You trusted Mr. Harper to do CBRE's insurance brokerage business, correct?

**A Correct.**

Q And you still do?

**A Still to this day, yes.**

Q At the time Mr. Harper left USI and joined Alliant, was Mr. Harper familiar with CBRE's insurance needs?

MR. WOODARD: Foundation.

**THE WITNESS: Yes.**

BY MR. STEPHENS:

Q To your knowledge, was Mr. Harper familiar with CBRE's insurance needs?

**A Yes.**

Q Those are my questions. Thank you.

REDIRECT EXAMINATION BY MR. WOODARD:

Q Chris, when Mr. Stephens was asking you whether Mr. Harper gave you a heads-up that Mr. Havard would be leaving, there was a long pause. It is true that Mr. Harper told you that Mr. Havard was unhappy at USI while Mr. Harper was at USI, correct?

MR. STEPHENS: I object to the form.

**THE WITNESS: Yes.**



BY MR. WOODARD:

Q Are you aware of anyone at CBRE or a CBRE affiliated entity such as Brian Dedonato, for example, that spoke with Mr. Havard between the time Mr. Havard left USI and the time you spoke with Mr. Havard in approximately April of 2023?

**A I am not aware.**

Q No further questions.

MR. STEPHENS: I have nothing further.

THE VIDEOGRAPHER: Going off the record at 12:27.

(At 12:27 the deposition was concluded.)



STATE OF CONNECTICUT)
) ss:
COUNTY OF HARTFORD )

I, Robert Miller, a Notary Public, do hereby certify that Christopher Nassa was by me first duly sworn, to testify the truth, the whole truth, and nothing but the truth, and that the above deposition, was recorded stenographically pursuant to Notice by me and reduced to printed transcript by me.

I FURTHER CERTIFY that the foregoing transcript of the said deposition is a true and correct transcript of the testimony given by the said witness at the time and place specified hereinbefore.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and seal of office at West Hartford, Connecticut, this 10th day of May, 2024.

Robert Miller

Robert Miller, Notary Public

My Notary Commission Expires
February 29, 2028



C E R T I F I C A T I O N O F D E P O N E N T

I, Christopher Nassa, have read the foregoing transcript of the testimony given at the deposition held on April 26, 2024, and it is true and accurate to the best of my knowledge as originally transcribed or with the changes as noted on the attached Errata Sheet.

________________________

CHRISTOPHER NASSA

Subscribed and sworn to before me

this __________ day of _________________, 2024.

Sent: 1/24/2023 10:10:51 PM
From: Chris Nassa <+12038207550>
To: Harper, Eric <19493517737>;Chris Nassa <+12038207550>

Did Bill take his team with him?

PLAINTIFF'S 2 ID
WITNESS:
DATE: 4-26-24

ROBERT MILLER REPORTING SERVICES

Sent: 1/24/2023 10:10:57 PM
From: Chris Nassa <+12038207550>
To: Harper, Eric <19493517737>;Chris Nassa <+12038207550>

He sent an email this morning that made it sound like they are staying back

Sent: 1/24/2023 10:49:32 PM
From: Harper, Eric <19493517737>
To: Harper, Eric <19493517737>;Chris Nassa <+12038207550>

Yes