# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

USI INSURANCE SERVICES, LLC, a Delaware limited liability company,

Plaintiff,

vs. Case No.: CV-23-00192-PHX-SMB

ALLIANT INSURANCE SERVICES, INC., a California corporation, WILLIAM J. HAVARD II and SABRINA HAVARD, husband and wife; and ROBERT ENGLES and HOPE ENGLES, husband and wife, JENISE PURSER and ADAM PURSER, husband and wife; JUSTIN WALSH and SARA WALSH, husband and wife,

Defendants.

___________________________________

VIDEO-RECORDED DEPOSITION
REMOTELY TAKEN VIA ZOOM CONFERENCE OF
THOMAS RICHARD LINN
WEDNESDAY, NOVEMBER 13, 2024
EXCLUDING CONFIDENTIAL PORTION

Stenographically Reported by:
Linda E. Marquette
RPR, CLR, CA CSR No. 11874; UT No. 13725361-7801
Job No. 10152901



UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

USI INSURANCE SERVICES, LLC, a Delaware limited liability company,

Plaintiff,

vs. Case No.: CV-23-00192-PHX-SMB

ALLIANT INSURANCE SERVICES, INC., a California corporation, WILLIAM J. HAVARD II and SABRINA HAVARD, husband and wife; and ROBERT ENGLES and HOPE ENGLES, husband and wife, JENISE PURSER and ADAM PURSER, husband and wife; JUSTIN WALSH and SARA WALSH, husband and wife,

Defendants.

_______________________________

- EXCLUDING CONFIDENTIAL PORTION -

VIDEO-RECORDED DEPOSITION REMOTELY TAKEN VIA ZOOM CONFERENCE of THOMAS RICHARD LINN, taken on behalf of Defendants, with everyone appearing at their remote address, and the witness appearing at Laguna Niguel, California, commencing at 9:36 a.m. (PST), and concluding at 5:46 p.m. (PST), on Wednesday, November 13, 2024, before Linda E. Marquette, RPR, CLR, CA Certified Shorthand Reporter No. 11874 and UT No. 13725361-7801.



APPEARANCES:

(All parties appearing remotely.)

For Plaintiff:

BY: JOSHUA R. WOODARD, ESQ.
SNELL & WILMER
1 E Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000
602.382.6070 fax
jwoodard@swlaw.com

For Defendants:

BY: SETH M. GERBER, ESQ.
MORGAN LEWIS & BOCKIUS LLP
2049 Century Park East
Suite 700
Los Angeles, California 90067
310.907.1000
seth.gerber@morganlewis.com

ALSO PRESENT:
Koryn Coalson, Videographer/Zoom host
Kate Schillinger
Bart Westmoreland
John Bramble



I N D E X


| WITNESS: | PAGE |
| --- | --- |
| THOMAS RICHARD LINN | |
| EXAMINATION BY MR. GERBER | 9 |
| EXAMINATION BY MR. WOODARD | 301 |
| FURTHER EXAMINATION BY MR. GERBER | 307 |

PREVIOUSLY MARKED EXHIBITS

| | |
| --- | --- |
| Exhibit 40 Arizona Department of Insurance & Financial Institutions web page for Insurance Professionals (2 pages) | 26 |
| Exhibit 37 IRMI web page with definition of "broker" (1 page) | 28 |
| Exhibit 38 IRMI web page with the definition of "agent" (1 page) | 28 |
| Exhibit 1 Thomas R. Linn Report dated 8/6/2024 (18 pages) | 52 |
| Exhibit 27 Exhibit A Marsh USA Inc. Non-Solicitation Agreement (5 pages) | 89 |
| Exhibit 28 Exhibit B Restrictive Covenants Agreement Marsh McLennan (10 pages) | 90 |
| Exhibit 53 Declaration of Paul Rodriguez in Support of Plaintiffs' Ex Parte Application for a Temporary Restraining Order, Order to Show Cause Re: Preliminary Injunction, and Expedited Discovery in the case of Lockton Companies vs AON Risk Insurance Services West, Inc. (30 pages) | 92 |

Page 9

EXAMINATION
BY MR. GERBER:
**Q. Good morning, Mr. Linn. How are you?**
A. Good. How are you?
**Q. I'm fine. Thank you for asking.**
**Would you please state your full name for the record?**
A. Thomas Richard Linn.
**Q. Where do you reside?**
A. My residence is Incline Village, Nevada. Well, we also --
**Q. Where?**
A. We also have a home here in Laguna Niguel which is where I'm at now.
**Q. Which is your primary address?**
A. Incline Village.
**Q. What is the address?**
A. The physical address is 725 Allison, A-L-L-I-S-O-N, Allison Drive, Incline Village, Nevada 89451.
**Q. What is the address of your home in Laguna Niguel?**
A. 12 Glastonbury, Laguna Niguel, California 92677.
**Q. Have you ever been deposed before?**

Page 10

A. I have.
**Q. How many times?**
A. I was deposed three or four times, 15, 20 years ago, in that range. And I was deposed one other time six months ago.
**Q. Were you testifying as an expert witness in any of those depositions?**
A. Yes.
**Q. Have you had a chance to meet with the counsel for USI before today's deposition?**
A. Yes.
**Q. Even though you've been deposed and are an expert I'm going to go through some basic ground rules with you.**
**Okay?**
A. Yes.
**Q. Unless there's an objection and an instruction not to answer the question, you have to answer even if counsel objects.**
**Do you understand that?**
A. Yes.
**Q. If you don't understand any of my questions, let me know and I'll do my best to clarify it. But, if you answer a question, the judge and the jury may presume you understood the**

Page 11

**question before you answered.**
**Do you understand that?**
A. Yes.
**Q. Do you understand your testimony today is under oath?**
A. Yes.
**Q. Have you taken any drugs or medication or alcohol in the last 24 hours which would affect your ability to testify today truthfully and accurately?**
A. No.
**Q. Are you suffering from any injury or illness which would affect your ability to testify truthfully and accurately today?**
A. No.
**Q. Do you understand you will have an opportunity to review the written transcription of everything that's stated on the record today so that you can make any changes or corrections?**
A. Yes.
**Q. Do you understand that if you make any material changes or corrections, I reserve the right to comment upon those at time of trial?**
A. Yes.
**Q. I don't want you to guess at any point today or speculate.**

Page 12

**Do you understand that?**
A. Yes.
**Q. I am, however, entitled to your best estimate even if you don't know a specific date or number.**
**Do you understand that?**
A. Yes.
**Q. Who did you meet with to prepare to testify today?**
A. I met with the attorneys at Snell Wilmer.
**Q. Which ones?**
A. Josh Woodard, Jennifer -- Jennifer Yee and Delilah Cassidy.
**Q. When did you meet?**
A. Oh, we've met a handful of times but the depo prep was Monday midday.
**Q. Was it by video or in person?**
A. Video.
**Q. How long did you meet with USI's counsel to prepare to testify today?**
A. I think we talked about two and a half hours. We also spoke for about an hour last night. And maybe 20 minutes this morning.
**Q. Did you discuss any facts which pertain to your opinions in this case?**

Page 13

A. The focus of my testimony does not include facts. On my scope is industry standards and pricing of insurance agencies. So while we might have talked about facts, I have not focused on them and I don't intend to use them in my testimony. Other than the contracts that were signed with Alliant.

**Q. What facts did you talk about with counsel?**

A. I don't recall. The focus hasn't been on the facts.

**Q. Okay.**

A. Well, one thing I did ask about was the -- there was a -- a download of -- or a share -- a series of share files created by Mr. Havard and -- that included apparently a great deal of confidential information. And so I did ask about those and -- and we talked about that.

**Q. What was discussed regarding the share files?**

A. Just that he created a large number of share files just a few weeks before his departure and put a large amount of confidential -- confidential data in those files.

**Q. Did you review the data in the files?**

Page 14

A. No.

**Q. Did somebody tell you that was confidential data?**

A. Yes.

**Q. Who told you that?**

A. The attorneys.

**Q. Do you know what the files were?**

A. No.

**Q. Do you know whether or not those files were downloaded by anybody?**

A. No.

**Q. Do you know whether any of the defendants downloaded any of those share file links?**

A. No. Like I said, that was not the focus of my testimony. And the facts of the case are not the focus of my testimony so I didn't inquire in depth about that, those facts.

**Q. So I understand, your opinion is not based on any of the facts of this case; is that correct?**

A. With the exception of the review of the files -- I mean, I'm sorry, the contracts that were signed by the defendants with USI and both -- and Alliant. And also I read Mr. Cozen's [sic] report and Mr. Bones' report and am prepared to testify on appropriate EBITDA multiples and pricing in the

Page 15

industry.

**Q. Did you -- did you review any other information in forming your opinions?**

A. I called a partner of mine a few days ago just to confirm that there hadn't been any changes in the industry pricing.

**Q. Who is that?**

A. Chris Darst. He's a partner at MarshBerry.

**Q. What did he tell you?**

A. He told me there had been no change since my retirement, which was March 31st, 2021 -- '22. I'm sorry, March 31st, 2022. He said the pricing -- the activity in the market had not changed much. There's a few -- you know, some buyers had kind of risen up and are more aggressive today than they were a few years ago. Others have become less aggressive. But, overall, the market hadn't really changed. The buyers are slightly more selective for quality. They are less interested in -- in businesses and books of business of low quality.

**Q. Did you speak with Mr. Darst or -- regarding the pricing in the market prior to issuing your expert report?**

A. Since my retirement I've spoke to my

Page 16

ex-partners every three or four months, and it would be -- you know, naturally I ask how's the market going? If there had been any changes. So yes, I've had several conversations with my ex-partners over the last few years about the status of the market for insurance agencies.

**Q. To be clear, you retired from MarshBerry on March 31, 2022, correct?**

A. That's correct.

**Q. You issued your report on August 6, 2024, correct?**

A. That's correct.

**Q. You did not work for MarshBerry at any time between your retirement and the issuance of your report, correct?**

A. That's correct.

**Q. Did you still have access to MarshBerry's data systems after you retired?**

A. No.

**Q. Okay. In forming your opinions in your report of August 6, 2024, who did you speak with at MarshBerry?**

A. I didn't speak with anybody at MarshBerry regarding forming my opinions.

**Q. You mentioned a -- (audio interruption.)**

Page 37

**Q. Do you know which firms acquired those confidential firms?**
A. No.
**Q. Do you know what products lines they sold to consumers?**
A. Yes.
**Q. Is that another assumption?**
A. It's not an assumption, it's a certainty that the business had -- this is the same mix of business that we worked with for 20 years. Certainly if we were -- if we worked with a -- a -- a range of business that's different, they would bring it up. We actually had -- the MarshBerry actually does have some business that is different than when I was there. And we've -- we've talked about that. But that's outside the M&A scope and not related to these EBITDA multiples.
**Q. In any of your discussions with Mr. Walkotten, Wepler, Darst or anyone else from MarshBerry, did you talk about acquisitions of books of business as opposed to acquisitions of firms?**
A. No. We talked generally about agency multiples. We didn't differentiate between the two.
**Q. Do you understand there's a difference between the acquisition of a book of business of**

Page 38

**clients as opposed to acquiring an entire brokerage firm?**
A. I do.
**Q. But you didn't ask any of them what the market was pricing for books of business, fair?**
A. No. Because I already know what it is. It's been the same discounting for years. So it's -- it's not anything that I'd find relevant.
**Q. Why don't you believe the price to buy a book of business of clients is relevant?**
A. I didn't say the -- the price wasn't relevant. I said the discount as -- the discount from -- when we -- from a full service agency versus a book of business that discounting hasn't changed, ever and -- or for years. And so I would -- it's not relevant in our discussion.
**Q. What is --**
A. That discounting varies substantially depending on the nature of the book of business, the quality of the book of business, the size of the book of business, the age of the producers. There's many factors that affect the multiple of all these businesses, but certainly especially for books of business.
**Q. What is the range of the discount?**

Page 39

A. It could be -- you might pay -- it could -- it could be as high as 13 times still or it might be as low as maybe nine or at the absolute lowest, eight. In terms of multiples of EBITDA.
**Q. Now, you mentioned there are various factors that can affect that discount, true?**
A. Yes.
**Q. Age?**
A. Age of the producers is a factor. If -- all things being equal, if you had one book of business with, say, two producers and they were in the prime of their career, that's going to be more valuable than the exact same book of business with two producers who are in their 60s and approaching retirement.
**Q. Why would a book of business with producers who are in the prime of their career agewise be more valuable?**
A. It's just like a sports team. When you have two teams with the same record and one team's younger than the other team, the younger team is more valuable because it has a longer runway and longer positive future typically.
Same with producers. When producers approach retirement -- the -- the primary function

Page 40

of producers is writing new business. And as they approach retirement their likelihood to be big new business producers declines. So the industry discounts the value of books of business and agencies where producers are, you know, approaching retirement versus those that aren't.
**Q. How old is Bill Havard?**
A. I don't know.
**Q. How old is Robert Engles?**
A. I don't know.
**Q. Do you know whether Bill Havard was approaching retirement?**
A. No.
**Q. What other factors affect the discount?**
A. There's numerous factors. Let's go through them. The location, so typically agencies and books of business located in urban centers are worth more.
Growth rates, very important. If you have two -- two agencies, everything the same, one's growing at 5 percent, the other one's growing at 10 percent, well, certainly the 10 percent agency is worth more.
The quality of the carriers is a big factor. If one agency has carriers that are poorly

Page 41

rated or generally have poor reputations versus another one has quality carriers, that affects the value.

Quality of the service staff is a factor. If you have high quality support people, well-trained, able to work independently, and properly staffed, that's an agency that's worth more -- worth more than an agency that has poorly trained people, understaffed or overstaffed.

There's even very qualitative things like morale. You know, profitability history. List goes on and on.

**Q. Did you -- well, did you do any research in forming your opinions to look at comparable acquisitions?**

A. I have firsthand comparable acquisitions that I used to form my opinion.

**Q. My question was focused on research. Did you go into any databases like DealStats or MarshBerry's databases and run searches for comparable acquisitions?**

A. No. I don't need to do that. I've spent my whole career in this industry. I have firsthand experience with numerous transactions of comparable, very comparable transactions.

Page 42

Just prior to my retirement, I represented sellers on two transactions both in the $30 million range. Both in urban -- well, one was in an urban center. The other was -- had six offices spread out throughout a state. And both those transactions sold for 13 and a half times EBITDA down. Does not include the earnout.

They -- in looking at -- if you compare it to, say, the Phoenix office for USI, the Phoenix office at USI would be more valuable because it was a one central location versus the one firm that I -- that I represented just prior to my retirement where they had six locations spread throughout a state.

And the other firm, also 30 million, also sold for 13 and a half times, had a morass of -- of corporations and ownership that we had to unwind. So both those factors, discounted value and they each went for 13 and a half times EBITDA, excluding the earnout.

**Q. What are the names of those two firms?**

A. That's confidential. I won't share that.

**Q. Well, you're relying that in forming your opinions, sir. What are the names of the two firms?**

A. It's confidential. I won't share.

**Q. Well, if it's confidential, why did you just discuss what they were sold for?**

A. Because I didn't share the name. I didn't share the location.

**Q. Well, how are we, sir, supposed to vet the accuracy and truthfulness of your expert opinion if you won't even tell us what the acquisitions were?**

MR. WOODARD: Objection, form.

A. I've told you repeatedly, I can't share that. It's confidential information. I can't share the name.

BY MR. GERBER:

**Q. Well, I believe by discussing the dollar amounts and putting this as a basis for opinion you're obligated to tell us, sir, who those companies were.**

MR. WOODARD: Objection, form.

BY MR. GERBER:

**Q. Are you refusing to tell us the names of the companies you're basing your opinion on?**

A. I'm refusing to share confidential information, yes.

**Q. Okay. So you're happy to share how much those companies were sold for and to base your expert opinions on, but you just are going to conceal from us who those companies are, true?**

Page 43 (above) — Page 44

MR. WOODARD: Objection, form.

A. I was happy to share those firms as examples of pricing in the marketplace --

BY MR. GERBER:

**Q. I didn't --**

A. -- in such a way that you're unable to determine who the firms are.

**Q. I didn't ask you to share anything about those firms. I asked you a simple question of whether you did research to look at comparable acquisitions and you volunteered that you based your opinion on these two acquisitions that occurred prior to your retirement. And now you're refusing to tell us which firms were acquired.**

A. That's correct. I viewed that sharing that information is example of research.

**Q. Are you basing your expert opinion on those acquisitions?**

A. I'm basing my expert opinion on 20 years -- 22 years' experience when our firm handled 60 to 100 transaction a year for 20 years and I personally handled six to ten transaction a year for 20 years.

**Q. Let's try again.**

(Simultaneous cross-talk.)

Page 45

A. -- over a hundred transactions.
BY MR. GERBER:
**Q. Let's try again, Mr. Linn. Focus on my question.**
A. What's the question?
MR. WOODARD: Objection, form.
Seth, please let Mr. Linn complete his answer.
MR. GERBER: I -- I -- I'm not going to let him evade answering the question, Mr. Woodard. The question was --
MR. WOODARD: I'm just asking for a professional -- hold on. I'm just asking -- (audio interruption.)
(Simultaneous cross-talk.)
MR. GERBER: I hear you. Stop making speeches. Stop making speeches, Mr. Woodard.
MR. WOODARD: Seth, please --
MR. GERBER: Make a proper evidentiary objection. No, I'm not going to listen to you make speeches. I'm not going to let you do that. You're going to stick to proper objections. Control yourself.
BY MR. GERBER:
**Q. Mr. Linn, my question is a simple one.**

Page 46

MR. WOODARD: Objection, form.
BY MR. GERBER:
**Q. Are you basing --**
MR. GERBER: Let me finish my question, Counsel, and then you can object. That's how it works.
MR. WOODARD: I'm objecting to the earlier comment.
MR. GERBER: Okay. I'm asking --
MR. WOODARD: Objection to form.
MR. GERBER: -- a new question. Counsel, you're obstructing this proceeding. Stop.
BY MR. GERBER:
**Q. Mr. Linn, my question is a simple one. Are you basing your expert opinion on those two acquisitions you mentioned which occurred prior to your retirement in March of 2022? Yes or no?**
MR. WOODARD: Objection, form.
A. No, I'm basing it on my 22 years of experience.
BY MR. GERBER:
**Q. Are there any specific acquisitions that you are basing your -- your expert opinion on?**
A. I'm basing my expert opinion on 22 years of experience with hundreds of transactions that our

Page 47

firm handled and approximately a hundred that I, personally, handled. That's what I'm basing my opinion on.
**Q. Which of those hundreds of transactions do you believe are comparable acquisitions for purposes of your opinion?**
A. The way you price agencies, it's -- there's many factors that drive comparisons. So you have to look -- it's rare where you're going to get a perfect comparison. But you can say this agency had a little older staff. This agency had a higher growth rate. This agency had a better reputation. You put all those together to determine what a pricing might be. But, ultimately, the price is set by the market.
And my opinion on pricing is based on bona fide, real offers received from institutional deep pocket buyers who were, in most cases, buying multiple agencies every year. So my opinion is based on the amount that those parties were willing to pay for agencies and books of business.
**Q. I'll ask my question again. Mr. Linn, which acquisitions specifically are you basing your opinion on?**
MR. WOODARD: Objection, form.

Page 48

A. All -- all of the acquisitions in my experience. All of them.
BY MR. GERBER:
**Q. And the ones -- you were at MarshBerry for 22 years; is that right?**
A. Yes.
**Q. So you're basing your opinion on acquisitions over 22-year time period?**
A. It's the -- I'm basing my opinion based on my experience on what buyers are willing to pay, institutional deep pocket buyers. The pricing changed over time.
**Q. Mr. Linn -- Mr. Linn, focus on my question. You said previously you're basing them on all of your experience. And my question is, are you basing your multiple on all 22 years of acquisitions that you were involved with at MarshBerry?**
A. I'm basing my multiple on the judgment I learned -- I gained after 22 years of experience. The multiple is influenced by the current marketplace. And -- and so I'm basing the multiple on what the current marketplace was at my retirement time.
**Q. What was that multiple as of your retirement in March of 2022?**

Page 49

A. They ranged from, you know, a low of -- of nine times to a high of 14.
**Q. Can you identify any specific acquisitions upon which you base that opinion that the multiple at the time of your retirement in the March of 2022 ranged from 9 X to 14 X EBITDA?**
A. As I told you, I can't share specific acquisitions because it's confidential.
**Q. You can't tell us which firms were acquired, true?**
A. There are lists of firms that were acquired in that time frame. I can't recall, you know, back three years ago which -- exactly which firms. There are public lists of firms that are acquired.
**Q. You can't tell us how much each firm was acquired for, true?**
A. I could tell -- well, I can't tell you because it's confidential. I would know what certain of them were acquired for if they were handled by MarshBerry.
**Q. You can't tell us the revenue of each of those acquired firms, true?**
A. Same answer.
**Q. You can't tell us whether those firms were**

Page 50

**growing their revenue year over year or not, correct?**
A. Same answers. Confidential. Some of that information is public and you could go back and -- and sort it out possibly. But I can't share with you confidential information.
**Q. Can you name a single comparable transaction which you based your opinion on?**
MR. WOODARD: Objection, form.
A. I told you, I'm not going to share confidential information.
MR. GERBER: Why don't we take five minutes.
MR. WOODARD: Can we take ten, Seth?
MR. GERBER: Sure.
MR. WOODARD: Thanks.
VIDEOGRAPHER: The time is now 10:29 a.m. We're going off the video record.
(Recess was taken from 10:29 a.m. to 10:41 a.m.)
VIDEOGRAPHER: The time is now 10:41 a.m. and we're back on the video record.
BY MR. GERBER:
**Q. Do you understand your testimony is still under oath?**

Page 51

A. Yes.
**Q. What is your hourly rate?**
A. $750 per hour.
**Q. How much have you billed for your work on this matter, including today?**
A. My first billing was approximately $25,000. And I have about $20,000 yet to be billed to date.
**Q. Has any time been written off?**
A. No.
**Q. Did you sign an engagement letter?**
A. Yes.
**Q. Are you entitled to any bonus for any reason?**
A. No.
**Q. Is your fee contingent on the outcome of the matter?**
A. No.
**Q. Have you received any other compensation or gifts from the lawyers or USI?**
A. No.
MR. GERBER: I'm going to mark Exhibit 1, which is your report.
///
///

Page 52

(Exhibit 1 was marked for identification by the Certified Shorthand Reporter.)
BY MR. GERBER:
**Q. And I'll display that on the screen for you, Mr. Linn. Can you see that?**
A. Yes.
**Q. Okay. Exhibit 1 -- and I'll just scroll through it -- is the expert report issued as of August 6, 2024 by Thomas R. Linn. Is this the expert report that you prepared in this matter?**
A. Yes.
**Q. Did you draft this language yourself?**
A. I had an assistant who did the first draft and then I reviewed it and edit it -- edited it thoroughly.
**Q. Is everything in the report true and accurate to the best of your belief?**
A. Yes.
**Q. Let's take a look at your CV, which is on Bates No. 18. I'm scrolling down to it. Okay. Do you see the document Bates numbered Linn 18?**
A. Yes.
**Q. It's titled "Thomas R. Linn Bio." Is that your CV, sir?**

Page 77

**Q. insurance broker was free to compete for the business of his former clients that he shared with Bill Havard and Robert Engles, the value of those client relationships to USI was zero?**
MR. WOODARD: Objection, form.
A. No, I don't agree. And --
BY MR. GERBER:
**Q. Why not?**
A. -- the reason is because if Mr. Havard had honored all of the elements of his producer agreement, USI would have been able to continue to retain that business and compete -- compete successfully against Harper. Harper would not have the confidential information. He wouldn't have the relation- -- the, you know, the support staff who have deep relationships with the clients. He wouldn't have the -- let's see, he doesn't have the confidential information. He doesn't have the support staff who talk to the client every day. I mean, those are the first two things -- big things that I think would inhibit him.
He doesn't have a -- if -- a transition process occurring in which Havard is transitioning the business to another party, so if Havard had lived up to all of the elements of the producer

Page 78

agreement, there's no reason to believe that USI could -- could not continue to retain that business and continue with that business.
**Q. What confidential information was improperly taken, used or disclosed by any of the defendants?**
A. I don't know. That wasn't part of my scope.
**Q. Do you -- are you aware of any facts indicating that any of the defendants solicited any other defendants or USI employees to leave and join Alliant?**
A. I -- that was not part of my scope. I am aware of certain suspicious activities. I can share that with you. But it was not part of my scope and not part of my testimony -- opinion.
**Q. You haven't seen any documents, emails, text messages or any other evidence showing solicitation of other USI employees by the defendants, correct?**
A. No, that was not part of my scope.
**Q. Okay. Are you aware of any contractual provision requiring any of the defendants to provide a transition plan or cooperate in transitioning clients?**

Page 79

A. My understanding is the USI contract required a 60-day notice which would have provided USI an opportunity to, you know, prepare a transition plan. I don't know if -- if let's -- if Havard, for instance, had to participate in that. But a transition -- it would have provided time to prepare a transition plan.
**Q. My question is, is there any specific provision in the contracts that obligates any of the individual defendants to provide a transition plan?**
MR. WOODARD: Objection, form.
A. I don't know.
BY MR. GERBER:
**Q. Have you read the contracts?**
A. I have. I can read them now again if you want me to and --
**Q. We'll get there. We have a long day ahead of us.**
A. Okay.
**Q. But, sitting here today, you don't recall --**
A. I don't recall. No, I --
**Q. Okay. You mentioned that the contracts, quote, "required," end quote, 60 days' notice. That's what you testified just now, correct?**

Page 80

A. That's correct.
**Q. Did USI use the word "required" in the notice provision?**
A. If I could look at the contracts.
**Q. Please.**
A. I can tell you I interpreted it -- interpreted it to mean required --
**Q. That's not -- that's not my question.**
A. Right.
**Q. I'll repeat it so we have a clear record.**
**Did USI use the word "required" in the Notice of Termination provision in Section 9.2?**
A. Give me a -- a minute.
**Q. Take a minute.**
**Have you read 9.2 now?**
A. Oh, 9.2. Oh, I didn't hear you say that.
**Q. Yes. It's 9.2.**
A. I was about to ask you.
**Q. And you have to look at Bill Havard or Robert Engles's agreements. There's no notice provision in the other two.**
A. That's -- that's where I have it. Yeah. I'm looking at it.
**Q. Would you like me to display it on the screen for you, sir?**

Page 81

A. I see it here. I'm just looking to see if there's any other elements of the agreement that might be appropriate.
**Q. I think the only other place where "required" is mentioned is in the heading that says "Defend Trade Secrets Act Required Notice"?**
A. Is where?
**Q. Well, "required" is mentioned three times in the agreement but it's not in Section 9.2, I can tell you that.**
A. Well, to answer your question, I do not see the word "required" in paragraph 9.2.
**Q. Okay. You saw the word "may," correct? Producer may?**
A. That's correct.
**Q. Is it your interpretation that the word "may" means the same thing as "required"?**
MR. WOODARD: Objection, form.
A. My interpretation of the contract was that the producer was required to give 60-days notice. Why would there be even this paragraph in here if it was only -- if it was "may." But I'm not an attorney. I'm not willing to opine on the interpretation of that paragraph.
///

Page 82

BY MR. GERBER:
**Q. Well, you're here to testify as an expert witness on what's an industry standard restrictive covenant, right?**
A. Yes. And I can tell you industry standard is to require 30 to 60 days' notice. That is industry standard.
**Q. Okay. So this agreement is inconsistent with industry standards because it doesn't use the word "require," right?**
MR. WOODARD: Objection, form.
A. I -- I -- sure. Yeah, if that's the way you want to -- yeah, okay.
BY MR. GERBER:
**Q. You just testified that it's industry standard to require 60 days' notice. Did I hear that correctly?**
A. Thirty to 60 days' notice.
**Q. Okay. So it's industry standard to require 30 to 60 days' notice; is that your opinion, sir?**
A. Yes.
**Q. Did you review agreements with other insurance brokerage firms in forming that opinion?**
A. Yes.

Page 83

**Q. Which insurance brokerage firms require 30 to 60 days' notice -- well, let's start with 60 days' notice. Other than -- put USI aside. What other insurance brokerage firms -- or strike that.**
**What insurance brokerage firms require a departing producer to provide 60 days' advance notice?**
A. As part of our process at MarshBerry in evaluating insurance agencies to -- as a buyer or evaluating a potential client as a seller, we would review all producer agreements. So, I and my staff had literally reviewed hundreds of producer agreements. So, my opinion is based on the review of hundreds of producer agreements over 20 years.
**Q. Okay. Which -- I appreciate that you've reviewed a lot of agreements in your career. Can you name any insurance brokerage firms --**
A. I'm not going to name.
**Q. -- let -- let me finish my question, sir.**
**Can you identify any insurance brokerage firms that require 60 days' advance notice before a producer resigns?**
A. With our clients we had very strict confidentiality and I'm not going to name any names.
**Q. You can't identify a single brokerage firm**

Page 84

**that require 60 days' advance notice, correct?**
MR. WOODARD: Objection.
A. I can identify many firms that require notice but I'm not going to share it with you because it would be a violation of my confidentiality commitment.
BY MR. GERBER:
**Q. You realize, sir, that many agreements, including USI, state that when a producer leaves he or she is required to show that agreement to the competitive firm, right?**
A. I don't -- I -- that is certainly an industry standard --
**Q. Okay.**
A. -- for a competing firm to look at those.
**Q. Right.**
A. I don't know --
**Q. So they're not confidential agreements. You agree with that, right?**
A. I'm sorry, say it again.
**Q. They're not confidential if they're to be shared with competitors, right?**
A. I don't know. I'm not a -- I'm not an attorney. I can't --
**Q. Well, you're -- you're -- you're here to**

**Q. Okay. Well, I'll represent to you it does not since I represent them.**
A. I'm sorry. I couldn't hear you. Could you repeat the question?
**Q. I'll represent to you that there's no 30- or 60-day advance notice requirement, okay?**
A. Okay.
**Q. Having now seen agreements from Marsh and Aon and we've talked about Alliant, Brown & Brown and Assured Partners, is it your testimony still, Mr. Linn, that it is industry standard for an insurance brokerage firm to provide 30 -- to mandate 30- or 60-days' advanced notice of a resignation?**
A. That continues to be my testimony -- that -- my testimony and my opinion based on my experience and the agreements that I've seen.
**Q. That's not what you said in your report, is it?**
A. What did I say? Show me that.
**Q. Well, in your expert report you didn't state that it's industry standard to provide -- strike that.**
**Your expert report does not state that it's industry standard for brokerage firms to require 30- or 60-days' advance notice, correct?**



A. My report said that notice periods generally range between 30, 60 days. Many producer contracts also require the assured to give the agency reasonable notice of intent to resign.
**Q. Your report says many producer contracts also required their producer to give agency -- the agency reasonable notice of intent to resign. The notice period generally range between 30 or 60 days. That's what's stated in your report, correct?**
A. That's correct.
**Q. That's different than what you just testified, isn't it?**
A. No. My testimony was that it was industry standard to provide 60 days' notice. The fact -- I didn't say every single agency required that -- (audio interruption.)
(Simultaneous cross-talk.)
BY MR. GERBER:
**Q. Well, where in your report do you say it's industry standard for a brokerage firm to require a producer to give 30 or 60 days? Can you tell me where you said that in your report, sir?**
A. My report is a definition throughout of industry standards. I can tell you it was my intent that that sentence: Many producers -- many producer



contacts [sic] also required the notice to give agency reasonable notice of intent to resign. And the notice periods generally range between 30, 60 days. That is an industry standard. There are exceptions but that is my opinion.
**Q. Okay. When you say "many producer contracts" which brokerage firms?**
A. I've told you before, I'm not going to share confidential information.
**Q. Well, can you -- I've now shown you that agreements with the two largest insurance brokerage firms in the world, Aon and Marsh, don't require it. Alliant doesn't require it. Brown & Brown doesn't require it. Assured Partners doesn't require it.**
**Can you name any other insurance brokerage firms that require 60 days' notice?**
A. I'm not going to share that information.
**Q. Can you identify any insurance brokerage firms that require 30 days' notice?**
A. I can -- there are many, many that require 30, 60 days' notice. It's very reasonable and it's very common.
**Q. Which ones?**
A. I'm not going to identify specifics.
**Q. You can't identify it because you're not**



**aware of any; isn't that correct, Mr. Linn?**
A. I -- I don't recall specific agencies right now but I'm certain that if I was to go back into my files, I could find many that have 30- to 60- day notice and -- and many examples of that.
**Q. Well, in forming your opinions did you go through and survey your files to see which brokerage firms require 30 or 60 days' notice and which ones do not?**
A. No, I don't have access to those files anymore.
**Q. So you just came up with this opinion without reviewing any contracts, right?**
A. The basis of my opinion was 20 years of experience of reducing producer con- -- of reviewing producer contracts. I know what -- what's required in those contracts. I know what's in those contracts.
**Q. But you can't identify any of them?**
A. I'm not going to identify any, no.
MR. WOODARD: Seth, can we take a break when you're at a good point?
MR. GERBER: Why don't we take a lunch break. I know we're almost at noon my time. I'm happy to do 30, 45 minutes, whatever you prefer?

**Q. Anything else?**
A. No.
**Q. Where in your report do you discuss that opinion?**
A. Starts on page 3 of my report and continues through page 4. And, again, it might be touched on elsewhere in the report. I see here there's some discussion of it on page 5 as well.
**Q. With respect -- (audio interruption.)**
(Simultaneous cross-talk.)
BY MR. GERBER:
**Q. I'm sorry, I didn't mean to cut you off. You were saying?**
A. Yeah, so it's -- it's -- it's touched on starting on page 5 and I see it continues all the way to page 6. And it could be elsewhere in the report as well.
**Q. Do you intend to offer any other opinions on that topic other than what's reflected in your report?**
A. No.
**Q. With respect to the fourth category where you are retained to explain:**
[As read.]
"The purpose, typical content and



prevalence of producer employment contracts in the insurance industry."
What did you rely on in forming that opinion?
A. I relied again on my 22 years of experience of reviewing those contracts and I also relied on the review of the Alliant contract.
**Q. Anything else?**
A. No.
**Q. Can you identify any specific contracts of any insurance brokerage firms or agencies that you relied on other than USI and Alliant?**
A. I will not disclose. I don't recall specifically, but -- and even if I did, I wouldn't share it.
**Q. Where is your opinion on that topic reflected in your report?**
A. Starts on page 8 and concludes page 13 and there was some discussion on page 6. And could be elsewhere in the report as well.
**Q. Other than what's reflected in your report, do you intend to offer any other opinions on this topic at trial?**
A. I do not.



**Q. With respect to the fifth category it says you were retained to provide an expert opinion regarding -- to:**
**"Describe the industry standards for producer restrictive covenants."**
**Do you see that?**
A. Yes.
**Q. What did you rely on in forming that opinion?**
A. My experience of reading, you know, and reviewing, you know, hundreds of these agreements over 20 years.
**Q. Anything else?**
A. No.
**Q. Where is that opinion reflected in your report?**
A. That's in the same portion. It's in pages 8 through 13. And it -- there might be a few comments here and there elsewhere in the report.
**Q. Do you intend to offer any other opinions on this topic at trial?**
A. No.
**Q. Are the industry standards set forth in writing anywhere?**
A. No.



**Q. Who sets the industry standards?**
A. The insurance industry sets certain expectations. I base -- I'd say I base those standards on what my experience was that buyers would require in order to pay the market price. So, I'd say that the buyers are setting that standard. And this is what they require in order to get, you know, market prices for agencies.
**Q. When you obtained a license as an insurance broker in California, did the courses you studied or books you read or the test explain these industry standards?**
A. No. No.
**Q. Okay. Have you ever attended a seminar where these industry standards were described?**
A. No.
**Q. Are you aware of any publications describing these industry standards?**
A. I'm not. I think that part of -- knowledge of those standards -- knowledge of what the buyers are looking for is part of the value that we brought to our clients. So when we set with a client and consulted with them and provided them with direction on how to increase the value of their agency, we would look to those standards to what the

buyers would require to get the, you know, market price.
**Q. Is there any website describing these industry standards?**
A. No.
**Q. Is there any --**
A. Not that I know of.
**Q. Is there any industry organization that sets forth these industry standards?**
A. Not that I know of.
**Q. Have you ever lectured about these industry standards?**
A. Several times I spoke to groups of agencies at our conferences or even ad hoc meetings about what buyers expect to -- to max, you know, to get the market value for your agency and that these are the standards you need to -- these are the types of things you need to deliver if you want the best price, market price for your agency. And I would have -- I shared that within my Apex peer group that, you know, it's typically 12 agencies at a time, many times.
And I also shared that -- and sometimes there would be groups of agencies that would get together that we would call on, you know, five to



ten, and we would present our services or talk about the industry. I shared it in that environment as well.
**Q. Do you have any PowerPoint presentations, notes or speeches that you wrote that describe these industry standards?**
A. I do not.
**Q. Have you ever written an article about these industry standards?**
A. I don't believe I have, no.
**Q. Have you ever attended a course at any college or university regarding these industry standards?**
A. No. Again, this is the value, part of the value, big part of the value that MarshBerry brought to our consulting clients, is advising them that this is what buyers would expect. I guess I'm dividing -- defining the industry standards to -- to a large extent on this is what makes the best agency that will get the best value.
**Q. Did you invent these industry standards?**
A. No.
**Q. Then where did they come from?**
A. They came from demands from the buyers for, typically, things like producer agreements for



certain ratios for attrition rates. For instance, the -- if your attrition rate is 88 percent, that's a poor attrition rate. You're not going to get the same value as an agency that has a 94 percent attrition rate. And we would talk about that with our agencies constantly, really, because attrition rates are so very important.
**Q. If you have an attrition rate of 85 percent, how would that factor into a value?**
A. That's reduced your value. 85 percent.
**Q. How much?**
A. What's that?
**Q. By how much?**
A. Oh, there's many factors that affect the value besides just attrition rate but that's a poor attrition rate.
**Q. If an insurance brokerage firm had an 85 percent attrition rate as opposed to 92 or 90 percent, would that decrease the value?**
A. Most often. I mean, there are certain types of business that have just naturally higher attrition rates. And those types of firms need to have higher new business rates to offset that. You know, if -- if you're in that particular segment of the market, it might be acceptable. But for general



insurance commercial agencies, 85 percent would prompt a, you know, remediation process.
**Q. What do you mean "a remediation process"?**
A. Our remediation process would be where we would help -- help the agent -- agency develop processes to improve their attrition rate. Things like initiating the renewal process more timely, being more -- have more -- broader in terms of getting insurance quotes from a greater number of insurance carriers. You know, demanding, you know, four-hour turnaround time for any phone call, stuff like that. You know, client service-type items.
**Q. Other than the report you prepared as an expert witness being paid by USI, can you identify any document setting forth these industry standards?**
A. No, not that -- not that put these things together in one place, no.
**Q. All right. Let's go to the next topic. You were engaged to provide an expert opinion to:**
[As read.]
"Provide a general description of the market for insurance agencies and books of businesses, including the typical pricing for such assets."

Page 133

emails. I didn't review much of the data because it wasn't germane to my report and wasn't part of my scope.

**Q. Do you know why you were copied on documents from USI's legal counsel that weren't germane to your retention to offer expert opinions?**

A. I think I was just in the email string. I -- I don't know why specifically.

**Q. Well, do you read the emails you receive from USI's legal counsel?**

A. I would look at them and if it had something that was -- pertained to my scope, I would -- I would study it. But if it didn't, I'd -- I'd move on. I'd ignore it.

**Q. Did any of the emails that you received from USI's legal counsel pertain to your opinions?**

A. I don't recall. I don't recall anything specific but there might have been something.

**Q. What facts or assumptions did USI's legal counsel provide to you?**

A. For purposes on my opinion, I didn't use any facts or assumptions other than the Alliant contracts. And I also had the -- the retention payments that USI paid to -- to Havard and Engles, and I think Purser and Walsh as well. Yes, Purser

Page 134

and Walsh. I think I got that information from -- from USI, from the attorneys from USI. I don't think that was actually in the complaint.

**Q. Did anyone tell you that Bill Havard and Robert Engles walked away from retention payments when they changed brokerage firms?**

A. No.

**Q. That's new information?**

A. I don't know that, yeah. No. If that's true, it's new to me.

**Q. Who did you speak with at USI's management?**

A. I was on phone calls with -- Ed Bowler was on the call. I was on the calls with Lindsey Morgan and his -- what's his name, Brian. Who was a -- like a data analyst, I think.

**Q. Brian Snow?**

A. No. I don't -- he was -- I don't recall his name. And --

(Simultaneous cross-talk.)

BY MR. GERBER:

**Q. Brian, though?**

A. Brian, yeah.

**Q. Okay.**

A. That is my best recollection. And I was

Page 135

on calls where Chris Murray and Bart were on the call.

**Q. Bart Westmoreland?**

A. Yes.

**Q. What did you discuss with Mr. Bowler?**

MR. WOODARD: Objection to the extent that those conversations included counsel.

Tom, I instruct you to answer only the facts or data that was provided to you that you considered in forming your opinion. Or the assumptions that you relied upon in forming your opinion to the extent that counsel was involved. If you had separate conversations without counsel involved, you can respond to the question.

A. I did not rely on any facts or assumptions that were provided to me from counsel. And I didn't have any separate conversations.

BY MR. GERBER:

**Q. What facts or assumptions did Lindsey Morgan give to you?**

A. Well, the purpose of the call was to determine what the -- what amount of business USI had retained versus how much had been lost when Havard and Engles left. And that was the purpose of the call with both Lindsey and Brian. I

Page 136

participated on the call to make -- to help Lynton and advise Lynton to make sure he got the right information.

**Q. What did you tell Mr. Lynton [sic]?**

A. I told -- well, actually, I told -- well, it was a discussion with Lindsey and -- and Brian that what we're looking for is business that was actually retained -- that was retained. We want to separate the business -- of the Havard and Engles books of business we want to separate that which the firm had retained and that which the firm had lost. Because the firm that -- the business that it retained should not be included in the damages calculation.

**Q. Did you tell Mr. Lynton anything else?**

A. I advised him on how to -- to make sure he normalized income properly and -- and -- and -- and consistent with the industry standards and -- and make sure he didn't get, for instance, compensation. He didn't put a -- a retention bonus wouldn't be a -- a compensation for -- a compensation item for purposes of calculating the EBITDA. So I advised him on how to properly normalize income -- or profit EBITDA for our industry, for the insurance industry, because he's not familiar with the industry at the

time.
**Q. Did you tell him anything else?**
A. I advised him on the multiples, on what multiple -- I shared with him industry -- the overview of the industry, that there were numerous buyers, voracious buyers, that prices were high. I shared with him, you know, my experience on what multiples are appropriate.
I -- I shared with him what the appropriate multiple would be for a firm like the Phoenix office and what the appropriate multiple would be for a book of business that included Havard and Engles. I didn't use -- I generally used ranges. I didn't say you have to be at 14.35. I would say -- you know, I would have said something like it's, you know, 14 plus.
**Q. Who are the voracious buyers?**
A. LERA, AssuredPartners, Baldwin Risk Partners, World Industries, HUB International. Those are a few that just come to mind.
There's others that I -- I can't think of right now. There's approximately, what did I say? I -- because I counted them up for the report. There's six publicly held brokers and more than 15 private -- private equity funded brokers, insurance



brokers. And numerous large regionals. Just about every large regional is in the market to buy insurance agents.
**Q. With respect to the six publicly held brokers, did you include Marsh and Aon?**
A. I did not.
**Q. Did you discuss any specific acquisitions by any of those voracious buyers?**
A. No.
**Q. What facts and assumptions did you discuss with Brian?**
A. With Brian it was just trying -- making sure he clearly understood what we were looking for to determine what business of Engles and Havards had been retained by USI. Apparently their system couldn't get at that information easily and he had to do a, you know, fair amount of analytical work to -- to, you know, tie that number down.
**Q. What direction did you give to him?**
A. I told him what we're looking for is really a -- what's called a PIF, a policies in force. We want to know all the policies in force that have been retained and the insurance commissions related to those policies in force.
**Q. Did -- are you aware of any insurance**



**policies that USI sold to the clients at issue in which USI has not been fully paid its commission or fee?**
A. No. I'm not aware.
**Q. Are you aware of any insurance policies for accounts that BOR'd to Alliant that have been canceled and resold at Alliant?**
A. Just through discussions and, you know, background. I understand there were numerous BORs that went to Alliant. I don't know specific names, et cetera. I did not use that data, that information for my report or my opinion however.
**Q. A BOR isn't a cancelation of a policy, correct?**
A. It is not.
**Q. A broker -- what is a broker of record?**
A. It's transferring the broker or the RB agent, they're used interchangeably, from one -- from one insurance agency to another.
**Q. So it's just like an appointment of a new insurance broker for an existing policy; is that correct?**
A. Made by the client, yes.
**Q. Client has to decide to sign a broker of record letter, correct?**



A. That's correct.
**Q. Clients can't be taken against their will from one insurance brokerage firm to another by a producer, right?**
A. That's correct.
**Q. A broker of record letter's typically a one- or two-page form letter that is put on the client's letterhead and signed by the client, right?**
A. That's correct.
**Q. Insurance carriers typically provide the incumbent brokerage firm with a five- to ten-day window to try and save the client relationship before the broker of record letter becomes effective, correct?**
A. I don't know. I know that they provide them a grace period. I'm not exactly sure what the amount is. And I suspect -- I believe it changes -- you know, different companies have different grace periods. But there's a -- yes, I -- that's -- yeah, the concept's correct, yes.
**Q. Even after the effective date of a broker of record letter the client can decide to go back to its former brokerage firm at any time, true?**
A. They can sign another broker of record letter, then send it back.

Page 177

**Q. Are you offering -- (audio interruption.)**
(Simultaneous cross-talk.)
A. The -- the numbers are so clear there's -- would be no reason to do that.
BY MR. GERBER:
**Q. Are you offering any opinions as to the legality and enforceability of restrictive covenants?**
A. I'm not.
**Q. Are you offering any opinions as to whether USI's restrictive covenants are valid and enforceable under applicable law?**
A. No, I'm not an attorney.
**Q. Are you offering any opinions as to whether USI's restrictive covenants are reasonable under applicable law?**
A. No. My opinion relates to the impact that those restrictive covenants have on the value of the business and are they conformed with industry standards in the -- in the business and industry as required by buyers.
**Q. Do industry standards or applicable law govern the enforceability of restrictive covenants?**
A. I -- I -- I assume applicable law, of course.

Page 178

**Q. Do insurance brokerage firms use overly broad industry standard restrictive covenants?**
MR. WOODARD: Objection, form.
A. I guess I don't know what -- no, I guess would be my answer.
BY MR. GERBER:
**Q. Are you aware of any courts that have determined that what you have described as industry standard restrictive covenants are void and unenforceable under applicable law?**
A. No, I -- I didn't -- that's not my -- part of my scope.
**Q. Have you analyzed any court cases to determine whether the so-called industry standard restrictive covenants are void and unenforceable?**
A. No, that's not part of my scope.
**Q. Is a nonsolicitation of customer provision for two years industry standard?**
A. Yes.
**Q. Is a no-accept and no-service provision industry standard, in your opinion?**
A. Yes.
**Q. Are you aware of insurance brokerage firms that have used those types of industry standard restrictive covenants in jurisdictions where they are void and unenforceable?**

Page 179

A. As I said, I observed -- I've observed that numerous -- most agencies in California, based on my observations, continue to have that language in their agreements, while I understand -- my belief -- my understanding is and I don't -- I don't know this for certain, that they aren't enforceable in California.
**Q. Are you aware that the use of what you have described as industry standard restrictive covenants in California constitutes unfair competition under California law?**
A. No, that's not part of my scope. Not part of my expertise.
MR. GERBER: All right. I'm going to mark Exhibit 44 as my next exhibit.
(Exhibit 44 was marked for identification by the Certified Shorthand Reporter.)
BY MR. GERBER:
**Q. And I'll display that on the screen for you. This is a summary judgment order that I obtained in a prior decision I handled in California Superior Court in 2015 in a case involving Aon, the second largest insurance brokerage firm in the world.**

Page 180

**Do you see that, October 6 --**
A. I do.
**Q. -- 2015 order from the Court?**
A. I do.
**Q. Okay. I'll direct your attention on the second page. It says:**
[As read.]
"The covenants not to compete contained in the stock agreements of plaintiffs Baldwin, Bellasis, Busch Droz, et cetera, and the residual stock agreement, the nonsolicitation agreement and the Edde employment agreement are unenforceable pursuant to Business and Professions Code Section 16600."
Do you see that language?
A. I do.
**Q. Okay. Is this the first time you're learning that the second largest insurance brokerage firm in the world was using void and unenforceable industry standard restrictive covenants in the state of California?**
A. It's the first time I'm learning of this

**Q. Okay. That's a broad range.**
**What percentage of the insurance brokerage firm -- or what percentage of the contracts include a one-year nonsolicitation covenant?**
A. I couldn't say. I couldn't say without really guessing.
**Q. Can you give me any percentage for that entire range?**
A. I'll tell you the -- what I can tell you is that two to three years is the most common that we would see. One year would be less common. Four and five years we actually recommend against because that is -- then it's, you know, it's hard to convince anybody that they should be bound up for that long. But we did see four and five years. But percentagewise I -- I couldn't guess.
**Q. Does it vary depending on the jurisdiction?**
A. No. Not that I -- no.
**Q. Does it vary depending on whether the agreement was signed in connection with an acquisition of a brokerage firm?**
A. Oh, if you talked about agreements signed in connection with an acquisition, that's a different animal. So I haven't -- I haven't put



that into -- that's -- none of my opinions are tied to that acquisition.
**Q. Okay.**
A. If you have an acquisition, then the enforceability, my understanding is, it moves up substantially. But my opinions in this report are assuming that there -- that none of these -- that these agreements are not tied to an acquisition.
**Q. Can you name any insurance brokerage firms that use a five-year nonsolicitation covenant that was signed not in connection with an acquisition?**
A. I can't. As I told you that, that is fairly rare and we advise against it.
**Q. Are you aware that in the decisions I've shown you, I believe the Getman case, a one-year restrictive covenant, nonsolicitation covenant was deemed appropriate as a duration?**
A. I was not aware of that.
**Q. Okay. So you haven't analyzed with respect to either Wells Fargo cases or USI cases whether courts have determined whether a nonsolicitation covenant exceeding 12 months is appropriate?**
A. No. That's not part of my scope. The legality and enforceability of the -- of the



covenants is not my scope. My scope was to say what is most typical and most common in the industry. And I used as a guideline kind of what the buyers demand.
**Q. Are you offering any opinions with respect to the interpretation of any provisions in the agreements with Havard, Engles, Walsh or Purser?**
A. No, I don't think so. I hesitate. I mean, I -- I'm unsure what you mean by interpretations but I don't believe so, no.
**Q. Well, for example, let's take the notice provision Section 9.2. Are you offering any opinion in this case as to whether that language means that Havard or Engles was required to provide 60 days' advance notice?**
A. That's not part of my opinion, no.
**Q. Okay. Have you read the entirety of those agreements?**
A. Yes.
**Q. Do you understand that there's a difference between the words "require," "must," and "shall" as opposed to the word "may"?**
A. Of course I do.
**Q. In the agreements are you aware -- well, in the employment agreement with Havard are you**



**aware that the word "shall" is used 89 times?**
A. No.
**Q. Are you aware that the word "required" is used three times?**
A. No.
**Q. Are you aware that the word "may" is used 21 times?**
A. No.
**Q. Are you aware that there is a notion that you must read a contract in the entirety and -- and that the words must be interpreted in accordance with their plain meaning?**
A. That sounds like a legal concept and that's not my expertise.
**Q. Okay. Are you aware that Bill Havard was an at-will employee?**
A. My reading of the agreement, he was not. That's -- of his agreement?
**Q. Yes.**
A. Does it say that he's an at-will employment -- employee?
**Q. Well, you -- you tell me. You read the agreement.**
A. Well, I didn't -- I didn't memorize the entire agreement. Let me take a look at it.

MR. GERBER: Well, let -- let me put on the screen Exhibit 3 and I'll drop it in the chat box.

(Exhibit 3 was previously marked for identification by the Certified Shorthand Reporter.)

BY MR. GERBER:

**Q. Exhibit 3 is on the screen. Let me see. Am I sharing that? Yes, I am sharing it. It -- you'll see that Exhibit 3 is the employment agreement for William Jay Havard II.**

**Do you see that?**

A. I do.

**Q. Okay. You've read this agreement, correct?**

A. I have.

**Q. Okay. Is it for a fixed term?**

A. I don't recall. I'd have to read it again now.

**Q. Well, let me show you Exhibit -- let me show you Section 2.5. It says:**

**"Term. This agreement, including producer's employment hereunder, shall commence on the effective date and continue until terminated**



**pursuant to Section 9 ..."**

**Do you see that language?**

A. I do.

**Q. Is that a fixed duration for a particular number of years?**

MR. WOODARD: Objection, form.

A. I would have to read Section 9 to determine that.

BY MR. GERBER:

**Q. Okay. You've read Section 9.2 already today but I'll take you there again. Does Section 9.2 provide a fixed term?**

MR. WOODARD: Objection, form.

A. No.

BY MR. GERBER:

**Q. Is it your understanding that Mr. Havard was an at-will employee?**

MR. WOODARD: Objection, form.

A. At-will employee is a legal term and I don't have an opinion on legal terms. I'm not an attorney.

BY MR. GERBER:

**Q. Well, as a -- a former CFO, and someone who's handled or overseen hundreds of transactions of businesses, what's your understanding of what an**



**at-will employee is?**

MR. WOODARD: Objection, form.

A. An at-will employee, my understanding, is where either party can terminate the employment with no notice at any time for no reason.

BY MR. GERBER:

**Q. Are you aware that USI told Mr. Havard he was an at-will employee?**

MR. WOODARD: Objection, form.

A. No. It's outside my scope.

BY MR. GERBER:

**Q. Do you know whether Robert Engles was an at-will employee?**

A. Robert Engles had -- his contract was identical to Havard's, wasn't it, I believe. And so it would have the same language. I would say he's not an at -- at-will employee based on what we just read just now because it doesn't say that either party can terminate at any time with no notice and for any reason.

**Q. Are you aware that USI told Robert Engles, Bill Havard, Justin Walsh and Jenise Purser that they were at-will employees who could terminate their employment relationship at any time with or without notice?**



MR. WOODARD: Objection, form.

A. No. That's outside my scope.

MR. GERBER: Well, let me show you Exhibit 52.

(Exhibit 52 was previously marked for identification by the Certified Shorthand Reporter.)

BY MR. GERBER:

**Q. And I'll place that on the screen. This is a letter that was sent to Mr. Havard from Ed Bowler who you spoke with in forming your opinions. It's dated December 22nd, 2021.**

**Do you see that?**

A. I do.

MR. WOODARD: Objection, form.

MR. GERBER: Your objection -- objecting to my question: Do you see that?

MR. WOODARD: It was the lead-up to the question I was objecting to, that he relied upon Ed Bowler in forming his opinion.

MR. GERBER: Well, he did speak to Ed Bowler. I think we've established that but, okay, your objection -- (audio interruption.)

(Simultaneous cross-talk.)

MR. WOODARD: Your question -- hold on.

Page 233

Your question was he relied upon Ed Bowler, that was my objection. Not --
(Simultaneous cross-talk.)
MR. GERBER: Oh, fair point.
MR. WOODARD: -- he was not -- (audio interruption.)
MR. GERBER: That's right. I -- you're right. He didn't read his depo and he's consciously ignored that. You're correct.
Okay. Let me go on to the next -- let me go on to the next question.
MR. WOODARD: So unprofessional, Seth.
Objection.
Go ahead. Just answer -- ask your questions, please.
MR. GERBER: I will.
BY MR. GERBER:
**Q. All right.**
(Simultaneous cross-talk.)
MR. WOODARD: Save your arguments for the Court.
BY MR. GERBER:
**Q. In this letter of December 22nd, 2021, Mr. Bowler, who you spoke with but did not rely on in forming your opinions, told Mr. Havard, quote:**

Page 234

[As read.]
"Except as modified in this letter, all terms and conditions of your employment" -- "of your agreement shall remain in effect. Nothing in this letter modifies your at-will employment relationship," end quote.
Do you see that language?
A. I do.
**Q. Is this the first time you're seeing this letter?**
A. It is.
**Q. USI didn't give you this letter, correct?**
A. That's correct.
**Q. Ed Bowler didn't tell you about this letter, right?**
A. I already told you, I didn't have any facts or assumptions in -- in developing my opinions.
**Q. Okay. Does seeing this letter for the first time change your view as to whether or not Mr. Havard, Mr. Engles, Jenise Purser and Justin Walsh were at-will employees?**
MR. WOODARD: Objection, form.

Page 235

A. Again, that's outside my scope. My -- my scope did not include determining if they were at-will employees or not.
BY MR. GERBER:
**Q. Okay. So you're not making any opinion as to whether they could resign with or without notice because they were at-will employees, correct?**
A. That's correct. My -- my opinion is that their -- their contract was within industry standards, reasonable and typical of the industry.
MR. GERBER: I'm going to place the next exhibit in front of you. It's Exhibit 11.
(Exhibit 11 was previously marked for identification by the Certified Shorthand Reporter.)
BY MR. GERBER:
**Q. It's the USI Employee Handbook effective January 2021. Have you ever seen this document?**
A. No.
**Q. Did USI provide you with a copy of this document --**
A. No.
**Q. -- in forming your opinions?**
A. No.
**Q. Did Ed Bowler tell you about this**

Page 236

**document?**
A. No.
**Q. Okay. In the handbook that was provided to Mr. Havard, Mr. Engles, Mr. Walsh, Ms. Purser, it states, in bold, quote:**
[As read.]
"Your employment with USI is at will. This means that USI may change any term, condition or benefit of your employment and that your employment may be terminated by USI or by you at any time, with or without cause or prior notice."
See that language?
A. I do.
**Q. Is this the first time you're learning that USI told each of the individual defendants that they were at-will employees who could resign without prior notice?**
MR. WOODARD: Objection, form.
A. It's the first I've heard of it, yes.
BY MR. GERBER:
**Q. Does that change any of your opinions?**
A. No. As I said before, my opinion, my scope was to opine on the standards in the industry

I found.

MR. GERBER: Like to mark Exhibit 51.

(Exhibit 51 was previously marked for identification by the Certified Shorthand Reporter.)

BY MR. GERBER:

**Q. This is what I found just by running a simple Google search for client transition sample clauses. And there are examples in here.**

[As read.]

"Client Transition. If requested ... community services ... service" -- "service provider agrees to ... work with community services to ensure ... the orderly transition of clients ... to a new service provider ..."

Right? That -- you could include similar language like that in an agreement if you wanted to make that mandatory, right?

A. I guess so. This, again, isn't part of my scope or -- or my opinion.

**Q. Okay.**

A. I'm just telling you that, in my experience, I don't recall seeing transition plans



require -- require them as mandatory transition plans in producer agreements.

**Q. Right. Well, here's a -- another sample clause I found through Google search on a transition plan.**

[As read.]

"In the event of termination ... you could" -- "you could simply include a clause that says in the event of termination the producer will develop a transition plan. The producer agrees that it will take all actions and provide all information, required by the company to facilitate the transition of the producer's clients."

You could include a clause like that if you wanted a transition plan, right?

A. You could, but this -- again, this is -- is not part of my scope or my opinion. I'm not -- it's not my expertise to say what they should or shouldn't include. I'm just saying what I typically saw.

**Q. And you didn't -- you don't typically see clauses either like what I just showed you either**



**with a transition plan or client transition provision, right?**

A. You know, they might exist, you know, out there. But I didn't typically see them, no.

**Q. Okay. Do you believe one year is sufficient for a brokerage firm to introduce a new team to a client?**

A. I believe it's barely sufficient. We would advise our clients to go with two years, two to three years.

**Q. You think it takes two years to introduce a new service team?**

A. It takes two years to build a powerful relationship and -- and educate. All the parties go through two renewal processes to do that. Keep in mind, one year some of the renewal processes are occurring right -- you know, or just a -- a short -- just a few weeks after the departure of the producer.

So those, you know, are -- are typically challenging or could be challenging. So having two years, then, for those -- it's more for the -- the -- the renewals that occur early on, the first three or four months, that you really want the two years. And, you know, once -- after -- once you got



your feet on the ground then it's not as important. Eighteen months would be acceptable too.

**Q. How many employees are at USI?**

A. I don't know.

**Q. Do you know how many producers are at USI?**

A. No, I know it's -- it's a lot. They're a huge firm.

**Q. Are you aware that Ben Greer testified that USI has a deep bench of talented professionals?**

A. No.

**Q. Are you aware that Mr. Greer testified that USI didn't lose a single client for not being able to service the clients after the defendants left?**

A. No. I didn't review his -- his testimony.

**Q. Now, that I've told you that Mr. Greer testified that even though the defendants left -- resigned effective immediately, USI had a deep bench of talented professionals, marshaled a, quote-unquote, army of them to service the accounts and didn't lose a single client due to being unable to service those accounts, does that change your opinions in any way that you need a year to introduce a new service team?**

A. No. Again, my opinions are based on what

**for the diminution of value calculation? Sorry, it's late. Diminution of value calculation.**
A. Yes, I did.
**Q. What did you discuss about that?**
A. Well, typically -- I mean, generally anything in the $30 million size is going to get a platform valuation just on size alone. But further -- again, if we were representing that firm to sell -- MarshBerry, when I was with MarshBerry, was representing that firm to sell, we would seek out buyers who were looking to get into that urban market and didn't have a significant presence in that market. And that, tied to a very large operation, 30 million, which in our world is -- is quite large, that would certainly drive up platform pricing.
**Q. Did you have any discussions with Mr. Kotzin about what a realistic earnout amount is that's typically paid?**
A. Yes. I -- I told him to disregard anything he sees regarding maximum earnouts because maximum earnouts are rarely paid at the maximum. You'd -- actually, surprisingly often. But, nevertheless, I wouldn't use that. I don't think that's a realistic metric to use.



So what we want is realistic, you know, a kind of a rule of thumb is you might see a 10 percent earnout. You know, so what -- from the seller's point of view what -- in their view, in their mind what they're seeing is basically a 90 percent down payment and a 10 percent performance, I won't call it a bonus, a 10 percent -- for the -- to get the extra 10 percent, he'd only have to maintain the existing performance.
He doesn't have to improve his -- his performance. So as long as you maintain existing performance you'll get that 10 percent bonus. They -- they put lots of incentives in there, so if you can significantly improve existing performance, you could get a lot more. But in calculating a realistic earnout, the method used is what is if they maintain -- keep doing what they're doing, what are they going to get.
**Q. Did you provide Mr. Kotzin with the platform EBITDA deal multiple base of 13.2 X?**
A. No.
**Q. Did you provide Kotzin, Mr. Kotzin with the platform EBITDA deal multiple base and realistic earnout of 14.35 X?**



A. No. What I -- what I told --
**Q. Did you --**
A. -- Mr. Kotzin --
**Q. You answered the question.**
**Did you provide Mr. Kotzin with a roll in EBITDA deal multiple base of 8.3 X?**
A. I did not provide those specific numbers.
**Q. Did you provide Mr. Kotzin with a roll in EBITDA deal multiple base and realistic earnout of 8.81 X?**
A. Not those specific numbers. I gave him general ranges to expect and told him to also look at the -- the charts and graphs that we got from MarshBerry and -- and the -- and Reagan and Sica Fletcher.
**Q. If a producer leaves and complies with all restrictive covenants, 10 to 40 percent of the book of business may leave, correct?**
A. No. I disagree.
**Q. At Bates No. 8 of your report, let me pull it up. It's Exhibit 1.**
A. Maybe I misunderstood the question.
**Q. Okay. Well, let -- let's be clear. Let me show you your report. It's on the screen. Is it on the screen now? Let me share it.**



A. I see it.
**Q. Okay. So do you see at the bottom of page 5 of your report it says:**
[As read.]
"Assuming compliance with the applicable restrictive covenants regarding confidential information, a good producer with excellent client relationships might only move 10 to 40 percent of the book of business to a new agency due to the disadvantage of lacking access to the confidential information related to the potential client."
Do you see that language?
A. Yes, now I see it. Now, I understand the question.
**Q. Is that an accurate statement?**
A. Yes.
**Q. If a producer leaves and complies with all restrictive covenants, 10 to 40 percent of the book of business may leave, correct?**
A. It may, yes.
**Q. In that scenario does the producer provide 60 days' notice?**

Page 301

**Q. Based upon that, do you believe USI's employment agreement with Mr. Havard with respect to the solicitation of active prospective clients is consistent or inconsistent with industry standards?**
MR. GERBER: Object to form.
A. I believe it's consistent now that I read that. My interpretation prior was that it was a global prohibition which would be too broad. But now that I see this, I can see that the -- the restriction only applies for those clients that he solicited or -- or had information about in the last six months of employment. So that is definitely not too broad. That -- that limits it to a -- a small population and he would have the right to go after any other USI client around the world.
BY MR. WOODARD:
**Q. Do you recall the discussion in your testimony today about USI not including a provision about the servicing of clients when they first come over to USI?**
**Do you remember that testimony?**
A. You do.
**Q. And I believe there was a discussion regarding Section 11.5 of Mr. Havard's agreement which comes on page 17. Do you see that there?**

Page 302

A. I do.
**Q. And I believe there was testimony that nowhere in there did it prevent Mr. Havard or any producer who signed a similar agreement from servicing their former clients once they got to USI. Do you recall that series of questions and answers?**
A. Yes. As -- as I followed Mr. Gerber, as he -- followed him through the agreement, that was my impression at the time, is that the -- there was nothing in here to prohibit them from servicing our -- our working on it with other clients, servicing or accepting business.
**Q. If you go to Section 11.1 on the same page of Mr. Havard's agreement, about midway through that paragraph, it says:**
**"Producer further represents and warrants that producers execution of this agreement and performance of the duties contemplated hereunder do not conflict with and are not impaired by any law, rule, regulation or court order by which producer is bound."**
**Do you see that?**
A. I do.

Page 303

**Q. What's your understanding having had that sentence pointed out to you with respect to whether USI would permit a new producer or any producer from servicing their former clients with -- inside of a restricted covenant period?**
MR. GERBER: Object to form.
A. So now, that I read that I see that, you know, basically USI is saying that they expect the producer to live up to the agreements they've signed with their -- a prior agency and those agreements -- and having -- if those agreements included nonservicing and -- and handling of accounts, acceptance of accounts, that would be restricted according to this agreement. Basically -- basically USI is saying we want you to live up to your prior commitments and your prior agreement.
MR. WOODARD: Thank you, Mr. Linn. That's all the follow-up questions I have at this time.
MR. GERBER: I have some follow-up questions.

FURTHER EXAMINATION

BY MR. GERBER:
**Q. Mr. Linn, focusing on Section 11.1. Do you agree with me that that provision does not**

Page 304

**reference servicing or accepting business from clients?**
A. The way I interpreted that is it's that the execution of this agreement and performance of duties do not conflict with any rule, regulation, court order by which they're bound.
**Q. Right. Stop there. It doesn't state that it doesn't conflict with any agreement with a former employer, correct?**
A. (No response.)
**Q. Mr. Linn, Section 11.1 --**
A. I'm reading here.
(Simultaneous cross-talk.)
BY MR. GERBER:
**Q. -- does not state --**
A. That's correct.
**Q. It talks about not conflicting with any law, rule, regulation or court order. It doesn't mention agreements with prior employers, correct?**
A. That's correct.
**Q. And there's no reference to the word -- to the -- to -- strike that.**
**There's no reference in 11.1 to nonacceptance or nonservicing provisions in agreements with former employers, correct?**

Page 313

assistance today. Thank you.

VIDEOGRAPHER: Thank you.

The time is now 5:46 p.m. and we're going off the video record.

(Discussion held off the video record but still on the steno record as follows:)

COURT REPORTER: And can I get an email for the witness, please.

THE WITNESS: Tomlinn0467@gmail.com.

COURT REPORTER: Did anybody need a rough?

MR. GERBER: I don't need a rough.

MR. WOODARD: No, thank you.

(Deposition concludes at 5:46 p.m.)

***

Page 314

State of California )
)SS:
County of San Diego )

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken (X) remotely ( )live before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

Further, that if the case is pending in the Federal Court, before the proceedings were transcribed by me, review [X] was [ ] was not requested.

I further testify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED November 18th, 2024.

________________________________
LINDA E. MARQUETTE, CA CSR No. 11874,
RPR and Utah CSR No. 13725361-7801

Page 315

DECLARATION UNDER PENALTY OF PERJURY

Case Name: USI Insurance Services vs. Alliant Insurance Services

Date of Deposition: 11/13/2024

Job No.: 10152901

I, THOMAS RICHARD LINN, hereby certify under penalty of perjury under the laws of the State of ________________ that the foregoing is true and correct.

Executed this ______ day of __________________, 2024, at ____________________.

_________________________________
THOMAS RICHARD LINN

NOTARIZATION (If Required)

State of ________________

County of _______________

Subscribed and sworn to (or affirmed) before me on this _____ day of ____________, 20__, by________________________, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: ______________________________ (Seal)

Page 316

DEPOSITION ERRATA SHEET

Case Name: USI Insurance Services vs. Alliant Insurance Services

Name of Witness: Thomas Richard Linn

Date of Deposition: 11/13/2024

Job No.: 10152901

Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________