**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| USI Insurance Services LLC, | No. CV-23-00192-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Alliant Insurance Services Incorporated, et al., | |
| Defendants. | |

This case concerns Plaintiff USI Insurance Services LLC's ("USI") former employees' rapid resignations from USI and transitions to Defendant Alliant Insurance Services Incorporated ("Alliant") (collectively, the "Defendants" or "Alliant"). USI filed the instant lawsuit taking issue with the solicitation of its employees and clients. The parties now move for summary judgment on all of USI's claims and USI moves on Defendants' affirmative defenses (Doc. 238 (Defendants' Motion for Summary Judgment); Doc. 245 (USI's Motion for Summary Judgment)). The Motions are fully briefed (Doc. 278 (USI's Response); Doc. 282 (Defendants' Response); Doc. 315 (Defendants' Response (Sealed)); Doc. 318 (USI's Reply); Doc. 319 (Defendants' Reply)). Having considered the parties' briefs and the applicable law, the Court will grant both Motions in part and deny the same in part.

## I.    BACKGROUND

USI and Alliance are competing insurance brokerages. (Doc. 239 ¶ 1; Doc. 246 ¶ 18.) Defendants William Havard and Robert Engles are insurance brokers (also referred

to as producers) that formerly worked for USI.  (Doc. 239 ¶ 5.)  Havard handled the environmental clients and Engles handled the others.  (Doc. 239 ¶ 10.)  Defendants Justin Walsh and Jenise Purser were members of Havard's team, with Walsh being the most senior under Havard (Havard, Engles, Walsh, and Purser are collectively the "Individual Defendants").  (Doc. 246 ¶ 4.)  Amy Phalen and Lori Hartman were also members of Havard's team but are not parties to this suit.  (*Id.*)  Eric Harper is also not a party but was a USI employee based out of California who worked on many of the same clients as Havard.  (Doc. 239 ¶ 69.)

In late 2022, Havard and Engles began discussing employment opportunities with Alliant and would go on to send their USI employment agreements to Alliant.  (Doc. 246 ¶¶ 21, 30.)  They were both dissatisfied with USI and talked amongst themselves about being unhappy and opportunities with other brokerages, including Alliant.  (Doc. 246-2 at 133–34; Doc. 296-2 at 5.)  Harper was also part of some of these conversations.  (Doc. 296-2 at 5.)  On January 23, 2023, Harper met with Michael Dauro, Alliant's Senior Vice President ("VP") and Charles McDaniel, Alliant's Executive VP and Senior Managing Director of Real Estate and Hospitality, who both had flown out to California integrate him into Alliant.  (Doc. 246-3 at 151–52.)  Harper resigned from USI that same day.  (Doc. 246 ¶ 26.)  Dauro and McDaniel then flew to Arizona to meet with Havard, who had resigned from USI in the morning of January 24.  (Doc. 246-3 at 151–52; Doc. 246-2 at 135.)  That afternoon, before Havard met with the Alliant VPs, Walsh, Purser, Phalen, and Hartman received word that Havard resigned and submitted employment applications to Alliant.  (Doc. 247-5 at 2, 4; Doc. 246-3 at 26, 158.)  Walsh interviewed with McDaniel that same day and received verbal offer of employment, while the others would meet with McDaniel and Dauro and receive offers the following day (January 25).  (Doc. 246 ¶ 2; Doc. 246-3 at 5, 140–49, 151; Doc. 295-2 at 9–10; Doc. 296-2 at 57.)  Engles also met with McDaniel and Dauro on January 25.  (Doc. 246 ¶ 25; Doc. 246-3 at 140–49, 151.)  The meetings totaled around an hour collectively, despite being held separately.  (Doc. 246 ¶ 25; Doc. 246-3 at 140–49, 151.)

- 2 -

In short, the Individual Defendants and Harper, Phalen, and Hartman all resigned from USI within three days of one another and joined Alliant.

Some of USI's clients, including those serviced by Havard and Engles, alluded to knowing that the team was moving to Alliant before the team fully resigned and Harper allegedly informed them of the move. (Doc. 246 ¶¶ 42, 70; Doc. 316 ¶ 70; *see also* Doc. 246-7 at 25, 27, 29–31; Doc. 246-2 at 103.) Around the time that the Individual Defendants resigned, Harper began soliciting various clients from USI that then transferred their accounts to Alliant. (*See, e.g.*, Doc. 239 ¶ 69; Doc. 246 ¶ 58.) Harper used a spreadsheet originating from USI to draft broker of record ("BOR") letter for at least one client to transition the account to Alliant. Havard's team sent the spreadsheet to the client before their departures, which Harper later received from the client after joining Alliant. (Doc. 246 ¶ 48; Doc. 246-4 at 65.) Some of USI's former clients also received renewal summaries for their account after transferring to Alliant in which the metadata shows that Havard authored and created the documents. (*See* Doc. 316 ¶ 67; Doc. 246-2 at 90–91; Doc. 104 at 108–10.) After joining Alliant, Havard, Walsh, Purser, and Phalen all serviced former USI clients at some point. (Doc. 316 ¶ 65.)

Havard and Engles' employment agreements with USI contained various restrictive covenants, including non-solicitation provisions (the "Non-Solicitation Provision"); non-service, non-accept provisions (the "Non-Service Provision"); non-interference provisions (the "Non-Interference Provision"); and confidentiality provisions. (Doc. 246 ¶ 5.) Their agreements also included a provision, providing that Havard or Engles may terminate their employment with 60-days' notice. (*Id.* ¶ 11.) Walsh and Purser signed similar agreements but without the notice provision. (*Id.* ¶ 5.) In general, these provisions prohibited the Individual Defendants from soliciting client accounts to a competitor, soliciting or inducing USI employees to resign and join a competitor, servicing or accepting work from USI's former clients while working for a competitor, and using confidential information outside the scope of employment with USI.

USI proceeded to file this lawsuit, alleging six counts: (1) breach of contract against

the Individual Defendants (Count I); (2) breach of the covenant of good faith and fair dealing against Havard and Engles (Count II); (3) breach of the duty of loyalty against Havard and Engles (Count III); (4) tortious interference with contract against Defendants (Count IV); (5) aiding and abetting breach of the duty of loyalty against Alliant (Count V); and (6) declaratory judgment against Alliant (Count VI).  (*See generally* Doc. 52.)  The parties now cross-move for summary judgment on these claims and USI moves for summary judgement on Defendants' affirmative defenses of estoppel, unclean hands, and waiver.  (Doc. 238; Doc. 245.)

## II.    LEGAL STANDARD

Summary judgment is appropriate in circumstances where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of a case under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes are genuine when the evidence could allow a reasonable jury to find in favor of the nonmoving party.  *Id.*  Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The court views "the evidence presented through the prism of the substantive evidentiary burden" that applies at trial.  *Anderson*, 477 U.S. at 254.  And must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The court must draw all reasonable inferences in the nonmovant's favor but must not weigh the evidence or make credibility determinations.  *Anderson*, 477 U.S. at 253, 255.

The movant carries the initial burden to demonstrate the basis for a motion for summary judgment, and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(c)(1)(A)–(B).  If this initial burden is not met, the nonmovant does not need to produce anything even if it would have the ultimate burden of persuasion at trial.

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). However, if the movant meets its burden, the nonmovant then has the burden of establishing that there is a genuine issue of material fact. *Id.* at 1103. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Zenith Radio Corp.*, 475 U.S. at 586. Bare assertions alone do not create a material issue of fact, and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 247–50 (citations omitted).

## III.    DISCUSSION

### A.    Breach of Contract (Count I)

#### 1.    60-Day Notice Provision

USI contends it is entitled to summary judgment on its breach of contract claim against Havard and Engles because they failed to provide 60-days' notice before resigning as required by their employment agreements. (Doc. 245 at 18–19; *see also* Doc. 240 at 95–114 (Havard's Employment Agreement), 116–134 (Engles' Employment Agreement).) Section 2.5 of the agreements provide that the term shall continue until it is terminated pursuant to Section 9 (Havard) or Section 8 (Engles) (hereafter, the "60-Day Notice Provision," respectively). (*See* Doc. 240 at 101, 110, 122, 130.) The 60-Day Notice Provision in turn provides that Havard and Engles "may terminate [their] employment . . . by giving at least sixty (60) days written notice to the company." (*Id.* at 110, 130.) USI argues that the use of "shall" in Section 2.5 and the use of "may" in 60-Day Notice Provision renders the notice mandatory because any other reading would render the provisions superfluous. (Doc. 245 at 18–19.) Alliant disagrees, contending Havard and Engles did not breach the provision because notice was voluntary. (Doc. 315 at 9–12; Doc. 238 at 12–15.) Alliant argues the "may" renders the provision permissive because their employment was at-will. (Doc. 315 at 9–12; Doc. 238 at 12–15.) At oral argument, Alliant clarified that the provision was ambiguous, and therefore the use of extrinsic evidence demonstrates the parties intended for it to be permissive. Alliant also argues that the "shall" in Section 2.5 simply affirms that the employment was not for a fixed term, there are other

1    provisions that affirm the at-will nature of the employment, there are other provisions that

2    use "shall" to impose mandatory notice requirements, USI's employee handbook and

3    acknowledgement forms indicate Havard and Engles' employment was at-will and that

4    notice was not generally required, and USI had a practice of accepting resignations without

5    such notice.  (Doc. 238 at 12–15; Doc. 315 at 9–12; *see also* Doc. 240 at 97.)

6        The parties' dispute is best understood as whether the provisions place an

7    affirmative duty on Havard or Engles to provide the notice prior to their departures.

8    Arizona courts apply ordinary interpretative principles to determine the parties' contractual

9    intent according to the plain and ordinary meaning of the terms, unless it can be shown a

10   special meaning was intended.  *Terrell v. Torres*, 456 P.3d 13, 15–16 (Ariz. 2020), *as*

11   *amended* (Feb. 21, 2020) (collecting cases).  "[T]he general rule is that an employment

12   contract of indefinite duration is terminable at will and that either party may terminate the

13   contract at any time for any reason or for no reason at all."  *Leikvold v. Valley View Cmty.*

14   *Hosp.*, 688 P.2d 170, 173 (Ariz. 1984).  Contracting parties can overcome this presumption

15   by including express terms, including specifying the duration of employment or limiting

16   the reasons for dismissal.  *Demasse v. ITT Corp.*, 984 P.2d 1138, 1143 (Ariz. 1999)

17   (explaining employment contracts are ordinarily unilateral, in which the employee's

18   performance provides the consideration to create the contract).  Where a contract is

19   susceptible to more than one meaning, extrinsic evidence may be used to interpret the

20   contract.  *ELM Retirement Ctr., LP v. Callaway*, 246 P.3d 938, 942 (Ariz. Ct. App. 2010);

21   *see also Berrey v. Plaintiff Inv. Funding LLC*, No. CV-14-00847-PHX-BSB, 2015 WL

22   1730926, at *3 (D. Ariz. Apr. 14, 2015) ("Under Arizona law, if a contract provision is

23   ambiguous, the interpretation of the contract presents an issue of fact.").

24       Despite Alliant's best efforts to inject ambiguity into the 60-Day Notice Provision,

25   there is only one reasonable reading.  While it is true that "may" is ordinarily permissive,

26   *see Garcia v. Butler*, 487 P.3d 256, 259 (Ariz. 2021), interpreting the provision to make

27   notice voluntary renders the provision to have no effect.  *See, e.g.*, *ELM Retirement*, 246

28   P.3d at 942 ("In interpreting a contract, [courts] do not construe one term in a way that

renders another meaningless.").  The term "may" can mean "have permission to" do something.  *See May*, Merriam-Webster available at https://www.merriam-webster.com/dictionary/may (last visited April 3, 2025).  Section 2.5 states: "This Agreement, including Producer's employment hereunder, *shall* commence on the Effective Date *and continue until terminated*." (*See, e.g.*, Doc. 240 at 101 (emphasis added).)  The 60-Day Notice Provision then provides how a producer may terminate the term.  Otherwise, the term continues until terminated by USI.  In other words, the provision permits Havard and Engles to exercise a right to terminate the term by providing the notice, which would otherwise not terminate.

Alliant's point that other provisions use "shall" to denote mandatory language is unavailing.  Alliant generally points to two contextual examples.  (*See* Doc. 239 ¶ 19.)  The first relates to the use of "shall" in the 60-Day Notice Provision, which reads:

> The termination of employment *shall* be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company *may*: (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Producer to cease performing any services hereunder until the termination of employment.

(*Id.* at 110, 130 (emphases added).)  The provision uses "shall" to define the effective date of the termination and uses "may" to permit USI to accept the termination or specify an earlier date and require the producer to cease activities until the effective date.  Again, the use of "may" to permit USI to take certain actions allows it to exercise a right to accelerate the termination date where it would otherwise continue until the 60-day period expires.  Regarding the second example, the provision generally defines "cause" for purposes of terminations for cause.  (*See, e.g.*, Doc. 240 at 97.)  "Cause" is defined as, for example:

> [F]requent or extended, and unjustifiable (not as a result of incapacity or disability) absenteeism which shall not have been cured within 30 days after *the Company shall have advised Producer of its intention to terminate* Producer's employment for Cause, in the event such condition shall not have been cured . . . .

(*E.g.*, *id.* (emphasis added).)  The "shall" in this definition is not ascribing affirmative conduct to USI.  It defines what constitutes "cause," in which 30-day notice is a prerequisite

1    to meet the definition.  The provisions serve different functions.

2          With respect to the at-will nature of employment, the parties have effectively

3    modified the at-will relationship.  Despite Arizona recognizing a presumption that

4    employment agreements are at-will and terminable at any time for any reason, the parties

5    may overcome this presumption with an express modification.  *See Demasse*, 984 P.2d

6    at 1143.  The 60-Day Notice Provision functions as a modification to the at-will

7    relationship.  The parties agreed that employment relationship remains terminable at any

8    time for any reason, so long as Havard or Engles' provide 60-day notice.  Now, this

9    necessarily requires a degree of anticipation, but this to allow USI to exercise the right to

10   accept their immediate resignations or have a transitory period to respond to the impending

11   departures.  Therefore, the Court finds that 60-day notice is mandatory under Havard and

12   Engles' employment agreements.  There is no dispute that Havard and Engles did not

13   provide 60-days' notice, and thus summary judgment in USI's favor for breach of this

14   provision is appropriate.

                           2.  Restrictive Covenants

16         USI alleges that the Individual Defendants breached various restrictive covenants

17   contained within their respective contractual agreements.  (*See generally* Doc. 52.)  The

18   law does not favor these restrictive covenants.  *Valley Med. Specialists v. Farber*, 982 P.2d

19   1277, 1281 (Ariz. 1999) (noting the restriction must do more than simply prohibit fair

20   competition).  The enforceability of restrictive covenants hinges on their reasonableness

21   under the circumstances.  *See Fearnow v. Ridenour, Swenson, Cleere & Evans, P.C.*, 138

22   P.3d 723, 725 (Ariz. 2006).  A restriction is unreasonable, and thus unenforceable, where:

23   (1) the restraint is greater than necessary to protect the employer's legitimate interest; or

24   (2) the interest is outweighed by the hardship to the employee and the likely injury to the

25   public.  *Farber*, 982 P.2d at 1283.  A legitimate interest includes "prevent[ing] competitive

26   use, for a time, of information or relationships which pertain peculiarly to the employer

27   and which the employee acquired in the course of the employment."  *Id.* at 1281 (citation

28   omitted); *see also Bryceland v. Northey*, 772 P.2d 36, 39 (Ariz. Ct. App. 1989) (noting it

1    is the employer's burden to establish a protectable interest).  Determining reasonableness

2    is a fact-intensive inquiry that turns on a case's particular facts.  *Farber*, 982 P.2d at 1283

3    (noting, however, the ultimate determination is a question of law).

*i.    Non-Solicitation Provision*

5        USI's solicitation claim only relates Havard and Engles.  (*See* Doc. 245 at 24.)  The

6    Non-Solicitation Provision in their agreements provides that they agreed to: (1) not directly

7    or indirectly solicit client accounts during their employment and for two years after on

8    behalf of a competitive business; and (2) to not directly or indirectly solicit active

9    prospective clients during their employment or for six months after on behalf of a

10   competitive business.  (*See* Doc. 240 at 107 (Havard), 127–28 (Engles).)

a.    Enforceability

12       USI moves for summary judgment that Non-Solicitation Provision is enforceable

13   because it protects its customer relationships generated by its employees in representing

14   USI's goodwill.  (Doc. 245 at 19–22.)  USI also argues the provision is reasonable because

15   it is limited in scope to identifiable targets, covers the minimum time it takes for a client to

16   go through a renewal cycle and to get comfortable, and is necessary for USI to deliver

17   competitive and timely services.  (*Id.*)  Alliant argues that any goodwill USI garnered via

18   the relationship was generated by the individual providers, not the company, and was

19   extinguished upon their departures.  (Doc. 238 at 16–18.)[1]  Alliant also argues that USI

20   was able to quickly staff a team to demonstrate effectiveness to clients upon the departures,

21   which cuts against the necessity of a two-year restriction.  (Doc. 315 at 14–15.)  USI

22   disagrees, arguing that its efforts show that two-years was necessary to demonstrate its

23   value to clients and evidence of hemorrhaging clients to Alliant shows the need for such

24   restrictions.  (Doc. 318 at 4–5.)

25       USI has established a protectable interest in its client relationships.  Customer

26   relationships are generally a protected interest where the clientele is an asset of value which

27   has been acquired through effort and expenditures over time.  *Farber*, 982 P.2d at 1284.

28   _____

[1] Alliant's enforceability arguments in its Motion pertain to the Non-Service Provisions
and do not address the Non-Solicitation Provision.  (Doc. 238 at 18–20.)

The employer's interest is balanced with the employee's right to the customers. *Id.* Restrictive covenants protect an employer's customer base by "preventing 'a skilled employee from leaving an employer and . . . luring away the employer's clients or business while the employer is vulnerable—that is—before the employer has had a chance to replace the employee with someone qualified to do the job.'" *Id.* (citation omitted). The replacement should have a reasonable opportunity to demonstrate effectiveness. *Amex Distrib. Co. v. Mascari*, 724 P.2d 596, 604 (Ariz. Ct. App. 1986). The Non-Solicitation Provision protects established relationships that "pertain peculiarly to the employer and which the employee acquired in the course of employment." *Farber*, 982 P.2d at 1281 (citation omitted). Havard and Engles are essentially selling an insurance product for compensation and the value they add through servicing a client is ancillary to that product. *Cf. id.* at 1284–85 (explaining a medical practice's patient base is not a protectable interest because the service a doctor provides is purely personal and dependent on his skills and abilities). Havard and Engles may have fostered the relationships while working at USI, but the company retains value in those relationships. *See id.* at 1284.

The parties heavily dispute whether two-years is reasonable. Alliant highlights that within forty-eight hours of Havard resigning, USI began staffing a team to tend to Havard's clients that that eventually totaled over forty team members within a few weeks. (Doc. 316 ¶ 16.) And within three months, USI was able to expand its relationship with some clients because USI demonstrated value to them even without Havard. (*See id.*; Doc. 239 ¶ 84; Doc. 296 ¶ 84; Doc. 240 at 222–23.) Alliant further argues Havard and Engles' clients may have long renewal cycles, but the clients frequently have additional needs, including needing new coverages, which would allow USI to establish its effectiveness to existing clients in under two years. (Doc. 315 at 14–15.) While this may be true for some clients, it may not be true for others. As a general matter, the two-year period allows USI the time to address insurance claims as they occur and to continue fostering the relationship free of the threat of solicitation before a client has an issue that requires USI's attention. Therefore, the Court finds two-years is reasonable. And even if the Court found otherwise,

1    the Non-Solicitation Provision contains step-down language that would kick the restriction

2    down to eighteen months, and if that's unreasonable, twelve months, which Alliant does

3    not argue would be unreasonable.  (*E.g.*, Doc. 240 at 107.)  Thus, the Court will proceed

4    to whether Havard or Engles breached the provision by soliciting any clients.

5                              b.  Breach

6            USI argues Havard and Engles breached the provision by directly and indirectly

7    soliciting client accounts by using Harper, and others at Alliant, to advertise their new

8    employment and encourage clients to move to Alliant.  (Doc. 245 at 24.)  USI premises its

9    solicitation theory on the assertion that an employee solicits clients whenever the "real

10   purpose" of interacting with clients is to maximize the possibility that they follow the

11   employee to his new company or uses another colleague as a proxy to service the client.

12   (Doc. 318 at 7–8 (citing *E*Trade Fin. Corp. v. Eaton*, 305 F. Supp. 3d 1029, 1034–35 (D.

13   Ariz. 2018); *Aitkin v. USI Ins. Servs.*, LLC, 607 F. Supp. 3d 1126, 1145 (D. Or. 2022)).)

14          Alliant argues that USI relies on speculation and conjecture and the evidence does

15   not establish that Havard or Engles solicited any clients, which it argues requires an

16   affirmative act.  (Doc. 238 at 15–17; Doc. 315 at 19–20.)  Alliant hones in the dispute on

17   ten "higher-revenue" clients alleged to have been solicited by Havard or Engles: (1)

18   Revantage (also referred to as Blackstone); (2) STORE Capital; (3) USAA Real Estate; (4)

19   Allied Aviation; (5) Vintners Distributors; (6) Western National Group; (7) CBRE; (8) Van

20   Horn Aviation; (9) Wolff Company; and (10) World Energy.  (*See* Doc. 316 at 15–20.)

21          Alliant is generally correct that USI's evidence lacks proof that Havard or Engles

22   acted affirmatively to solicit former clients if the evidence is viewed in isolation.  But

23   viewed cumulatively, USI's evidence may give rise to a reasonable inference that Havard

24   or Engles' used Harper as a proxy, whom was under no legally enforceable solicitation

25   provision, to transfer the client accounts to Alliant.  As the Court will explain, the evidence

26   cuts both ways for many of the clients precluding entry of summary judgment for either

27   party.  There are clients, however, that USI has failed to establish sufficient evidence that

28   Havard or Engles solicited those particular clients and summary judgment is appropriate

in those limited circumstances.

The Court proceeds by addressing relevant cited case law and then turns to the specific evidence disputed in this case. In *E\*Trade*, the defendant, under the guise of complying with finance regulations that required him to provide former clients with his new contact information, called and left messages for various clients seeking a telephone conversation, would only provide his new contact information over the phone, and inquired with one client to have her speak to another client about moving to his new company, in which the context suggested the defendant had already spoken to the other client before the inquiry. 305 F. Supp. 3d at 1033–35 (noting that defendant testified that he would only discuss a client moving to the new company if the client raised the subject). This Court reasoned that evidence demonstrates the "real purpose" for the defendant contacting former clients was to initiate and maximize the possibility they would follow him to his new company. *Id.* at 1035 (explaining that the defendant did not follow up with many of the clients to provide the required contact information that served as his excuse for making the call in the first place).

In *Aitkin*, USI attempted to use circumstantial evidence to establish indirect solicitation where the employee left USI abruptly, updated his LinkedIn profile to reflect new employment, and referred clients that had called him to his new colleagues and provided their contact information. 607 F. Supp. 3d at 1146 (noting USI had contacted many of the clients, causing many of them to contact the employee about his departure). The court noted that there was no evidence that the defendant attempted to divert the clients' business on the calls, nor did he disparage USI or ask them to leave USI, and no clients stated that the defendant had solicited them. *Id.* The court found that summary judgment was inappropriate for USI because disputes of fact remained about whether the employee's affirmative acts amounted to indirect solicitation. *Id.*; *see also Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 982 (D. Ariz. 2006) (finding the defendant used his wife as a proxy for indirect solicitation where he directed her to send mailers to former clients intending to solicit the clients' business). The court also found summary judgment was

inappropriate for the employee because some of the clients spoke with his colleagues who then facilitated transferring the accounts away from USI and some clients indicated that they anticipated that the employee would later work with them. 607 F. Supp. 3d at 1147.

These cases establish that some form of an affirmative act is necessary to trigger a solicitation or that there is sufficient circumstantial evidence to give rise to an inference the party's conduct amounted to a solicitation.

**Revantage:** The evidence shows that in early January 2023, prior to his resignation, Havard coordinated a meeting with Revantage, himself, Walsh, and an underwriter to discuss the renewal of Revantage's policy with USI. (Doc. 246-5 at 146; Doc. 247-9 at 2–3.) After Havard resigned, a Revantage employee removed Havard and Walsh from the meeting invite and changed it to be between Revantage, Alliant, and the underwriter. (Doc. 246-5 at 147, 148; 154; Doc. 247-9 at 15.) Neither Havard nor Walsh attended that meeting, and instead, various Alliant employees and executives attended the meeting. (Doc. 246 ¶ 50; Doc. 246-5 at 152.) Before the meeting occurred, Revantage's VP of North American Risk learned about Havard's resignation from one of her team members and another employee received a "kickback" email and she then called to congratulate him on his move. (Doc. 246 ¶ 52; Doc. 316 ¶ 52; *see also* Doc. 280-9 at 3–4.) The timeline, however, is not clear if the VP called to congratulate Havard before or after receiving the information about his resignation because the "kickback" email came after she made the call. The VP testified that she moved the account to Alliant after the call because Revantage was engaged in a time sensitive transaction and did not want to start from scratch with USI. (Doc. 246-5 at 148, 151; Doc. 247-9 at 7.) The VP was aware of a potential waiting period before Havard and his team could begin working, but knew Alliant would have capacity to immediately service the account based on her pre-existing relationship with another Alliant employee. (*Id.* at 149.)

The ultimate issue boils down to whether Havard, through setting up the meeting to renew Alliant's policy while at USI, then resigning, and Alliant executives attending that meeting gives rise to an inference that Havard indirectly solicited Revantage to Alliant.

Havard's declaration and the VP's testimony summarily rejects that any solicitation occurred, which refutes the evidence suggesting solicitation. *But see Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (noting conclusory and self-serving affidavits, lacking detailed facts are insufficient to create a genuine dispute of fact). The facts also tend to show that Havard made efforts before his resignation to set up the meeting for a renewal, setting in motion the VP's inquiry into moving Revantage accounts to Alliant, and then seeking a BOR letter after congratulating Havard on the move. A jury is better suited to weigh this evidence and make credibility determinations to find whether solicitation occurred.

**STORE Capital:** In November 2022, Havard and Harper requested that USI spend $10,000 for a sponsorship at a STORE Capital event. (Doc. 246 ¶ 56; Doc. 316 ¶ 56.) On January 19, 2023, Phalen sent an email to STORE Capital's Executive VP, with Havard, Walsh, and Purser included on the email, attaching a spreadsheet with a list of sites under its USI policy. (Doc. 246 ¶ 48; Doc. 246-4 at 65.) Then on January 24, the day after Harper resigned and the day Havard resigned, Harper called the Executive VP informing her that the USI team was moving to Alliant. (Doc. 246 ¶ 70; Doc. 316 ¶ 70.) Based on that conversation and an understanding that the services STORE Capital would receive from Alliant were the same as those it received from USI, the Executive VP confirmed that she had the all the information she needed to make the decision to move to Alliant. (Doc. 246 ¶ 70.) The Executive VP, however, also had an understanding that Harper did not have an expertise in environmental and pollution liability. (Doc. 246-4 at 54.) A few days later, the Executive VP had a call with Havard, but it is unclear what that call was about. (Doc. 246 ¶ 70.) In early February, Harper then inquired with STORE Capital about its policies and drafting BOR letters, in which a STORE Capital employee responded by attaching the spreadsheet Phalen had sent previously. (*See* Doc. 247-8 at 24–31.) A few weeks later, Walsh emailed STORE Capital a renewal summary for 2023, which summarized the quote. (Doc. 296 at 20 ¶ 25.) The metadata of that email indicated that Havard authored the document. (*Id.*)

Alliant contends that this evidence is speculative and there is no direct evidence that Havard or Engles signed, received, or sent the BOR letters to STORE Capital, no evidence that either Defendant instructed Phalen to send the spreadsheet or used that list to solicit the client, and that Walsh's email came after STORE Capital had already transitioned to Alliant. (Doc. 319 at 5.) Further, regarding the metadata, Alliant contends that it simply indicates Havard created a template but not that he modified the document to tailor it to a specific client. (Doc. 316 ¶ 67.)

Alliant's arguments miss the mark. The issue is not whether there is direct evidence that Havard or Engles communicated with STORE to solicit the account, it is the effect of the cumulative evidence in which the jury may infer solicitation occurred through Harper. First, the temporal proximity of the sponsorship involving both, Havard and Harper, suggest coordinated relationship building efforts around the time that Havard was becoming dissatisfied with USI. Second, Harper informed the Executive VP that business would continue as usual at Alliant, including environmental and pollution liability, despite lacking the same experience in the area as Havard. Third, the spreadsheet was sent to STORE Capital before the resignations and contained information that Harper later used to draft BOR letters after joining Alliant. Fourth, the metadata shows Havard authored and created the renewal summary, although he testified that he did not create, review, or edit the summary. (*See* Doc. 316 ¶ 67; Doc. 246-2 at 90–91; Doc. 104 at 108–10.) Havard also testified that he created various templates, in which the metadata reflects that he is the author, but Alliant fails to point to any evidence that another person modified the template to refute that Havard was the sole author. (*See* Doc. 104 at 51–52, 111–13.) The cumulative effect of this evidence gives rise to a reasonable inference that Havard and Harper engaged a concerted effort to use Harper as proxy to solicit STORE Capital. The jury, however, is better suited to weigh this evidence and adjudge Havard's credibility.

**USAA:** USI's sole evidence related to USAA pertains to an email between USAA and its consultant. The email contained and organizational chart prepared by Alliant that

included Havard and his team.  (*See* Doc. 240 at 194–96; Doc. 246-3 at 261–62.)[2]  There is no evidence that Havard or Engles participated in creating that chart, in sending the chart to the consultant, or in directing Alliant to create and send the chart.  Alliant argued this lack of evidence, (*see* Doc. 239 ¶ 66(c); Doc. 238 at 15; Doc. 319 at 5–6), and USI did not provide any additional evidence to support its allegations, (*see* Doc. 318 at 7–8; Doc. 246 ¶ 68; Doc. 296 at 19–20 ¶ 23).  The organization chart, on its own, does not provide a sufficient basis to infer that Havard or Engles breached the Non-Solicitation Provision by soliciting USAA when it is untethered from the actions of either Defendant.

**Allied Aviation:**  USI did not address Allied Aviation directly in its Motion or Statement of Facts.  (Doc. 240 at 18–19; Doc. 286 at 9–10.)  Alliant argues that the only evidence USI offers for this client is that Allied Aviation signed BOR letters and transferred its account to Alliant, and thus USI relies on mere assumptions that solicitation occurred.  (Doc. 238 at 15; Doc. 239 ¶ 66(d); *see also* Doc. 296 ¶ 66; Doc. 240 at 18–19.)  The fact that Allied Aviation transferred to Alliant under the BOR letters says nothing about Havard or Engles' participation.  The record is devoid of any evidence, circumstantial or direct, that indicates Havard or Engles engaged in solicitation and no reasonable juror could conclude that the existence of the BOR letter alone indicates they solicited Allied Aviation.

**Vintners:**  USI did not address solicitation of Vintners directly in its Motion or Statement of Facts.  Alliant asserts that there is no evidence of solicitation and Benjamin Greer, a USI representative, testified that he did not have any evidence of solicitation before Vintners transferred its accounts to Alliant.  (Doc. 239 ¶ 66(e); *see also* (Doc. 240 at 190–91, 197.)  USI rebuts the absence of evidence by asserting Mr. Greer is not the employee who had information on the solicitation.  (Doc. 296 ¶ 66.)  As Alliant argues, USI's rebuttal did not provide any evidence that proves solicitation occurred.  (Doc. 319 at 6.)  Like the lack of evidence for solicitation of Allied Aviation, the record is devoid of any evidence to prove Havard or Engles solicited Vintners.

---

[2]  USI does not point the Court to this email anywhere in the record.  (Doc. 246 at 19–20; Doc. 296 at 11 ¶ 67, 19–20 ¶ 23.)

**CBRE:**  Around the time that Havard resigned, Christopher Nassa at CBRE sent an email that indicated that Havard and his team were not leaving USI until later that week. (Doc. 246 ¶ 42; *see also* Doc. 246-7 at 25, 27, 29–31; Doc. 246-2 at 103.)  On January 26, 2023, the day after Mr. Nassa sent the email, Harper sent a draft BOR letter to Mr. Nassa that contained dozens of project names related to CBRE's environmental policies, which USI asserts that Alliant has provided no explanation for how Harper got that information. (Doc. 246 ¶ 51; *see also* Doc. 246-2 at 152.)  On February 10, Mr. Nassa sent another email indicating that Havard could not be "out front" due to "contractual restrictions" but to have "no fear who is pulling the strings."  (Doc. 246 ¶ 42.)  Mr. Nassa testified that he had this understanding based on a conversation with Harper.  (Doc. 246-7 at 27.)  And on February 17, Walsh sent CBRE a renewal summary in which the metadata indicated that Havard had authored the document and that it was never modified.  (Doc. 246 ¶ 67; Doc. 246-2 at 89–90.)

Alliant concedes that Harper solicited CBRE, however, it asserts that there is no evidence that Havard or Engles encouraged or directed him to do so.  (Doc. 238 at 16; Doc. 239 ¶ 66(g); *see also* Doc. 240 at 200–01.)  First, Alliant asserts that Mr. Nassa testified that his belief that Havard was taking his team to Alliant was based on an assumption that it would happen and no one, including Harper, told him that the team was going to leave. (Doc. 316 ¶ 42; Doc. 291 at 60–61.)  Second, Alliant points to Harper's Declaration where he states that he obtained the information for the BOR letter from CBRE, denies receiving the information from Havard or Engles, and denies soliciting CBRE on their behalf.  (Doc. 316 ¶ 51; Doc. 292 ¶ 6.)  Third, Alliant highlights Mr. Nassa's testimony where he indicated that Havard and Engles did not play a role in soliciting or transferring the CBRE account to Alliant.  (*See* Doc. 244 at 79.)

Whether the evidence supports that Havard participated in soliciting CBRE is a close call, although the particular facts have nothing to do with Engles.  It is undisputed that Havard resigned the day after Harper.  The day that Havard resigned, Harper texted Mr. Nassa appearing to confirm that Havard was taking his team to Alliant by responding

"Yes" to Mr. Nassa's question about the team moving to Alliant. (*See* Doc. 246-7 at 29–31.) Earlier that day, Purser, Walsh, Phalen, and Hartman had submitted application materials to Alliant after learning about Havard's resignation. Like with STORE Capital, the metadata shows that Havard may have been lingering in the background to solicit CBRE. There are serious unanswered questions about how Harper came to know that the team was leaving USI before they actually resigned and coincidentally just hours after the team submitted their applications. A jury could infer that Havard was pulling the strings while obscuring his involvement and relayed enough information to Harper or Alliant to keep CBRE informed on the team's movements.

**Western National Group:** USI once again points to the metadata for a renewal summary sent to Western National Group by Walsh that indicates Havard authored the document. (Doc. 246 ¶ 67; Doc. 296 at 20 ¶ 25; *see also* Doc. 246-2 at 94–95, 97–98.) Alliant disputes the metadata issue for the same reasons as it did for STORE Capital. (Doc. 316 ¶ 67.) Alliant further asserts that Mr. Greer testified that USI had no evidence of solicitation and argues that the temporal proximity between Western National Group signing BOR letters, which occurred on January 26, 2023, and Havard and Engels' resignations that occurred a couple days before is insufficient to show solicitation. (Doc. 319 at 6; Doc. 239 ¶ 66(f).)

Here, while the issue is once again a close call, the facts support a reasonable inference of solicitation to preclude summary judgment. Similar to STORE Capital and CBRE, a jury could infer solicitation from the temporal proximity of the resignations and the signing of the BOR letter, along with the metadata indicating that Havard was the author of the renewal summary. It is reasonable for a jury to find that Havard was similarly lingering in the background and participated in the solicitation of Western National Group.

**Van Horn Aviation:** USI asserts that Van Horn Aviation moved to Alliant after Engels resigned and Harper called its CEO to solicit the account. (Doc. 246 ¶ 62.) The CEO and Engels had various conversations after his resignation but before Van Horn Aviation signed a BOR letter. (*Id.*; *see also* Doc. 246-5 at 161–62.) Alliant argues USI's

allegations lack evidentiary support.  (Doc. 238 at 16.)  Alliant points to Mr. Greer's testimony that USI's evidence of solicitation pertains to a meeting between Engles and Van Horn Aviation before it transitioned to Alliant but of which Mr. Greer could not remember the exact date.  (Doc. 239 ¶ 66(h); *see also* Doc. 240 at 204–05, 207.)  Alliant also highlights that the CEO testified that Engles did not solicit the company's accounts and did not discuss insurance with him before transferring to Alliant.  (Doc. 292 at 55.)  Engles testified that he was friends with the CEO and would discuss personal topics but deferred insurance questions to the Alliant team.  (Doc. 293 at 3, 5.)

This evidence cuts both ways.  On one hand, the evidence tends to show that Engles had multiple conversations with Van Horn Aviation before it transferred its account to Alliant, and Engles indicated that he would refer questions to the Alliant team.  There is a reasonable inference in USI's favor that Engles' real purpose in those conversations and referral was to maintain a good relationship and maximize the chance the client followed him to Alliant.  On the other hand, the jury may agree with Engles' testimony that he did not attempt to induce Van Horn Aviation to move to Alliant and the conversations were unrelated to insurance.  Therefore, the jury is better suited to weigh this evidence and make credibility determinations to find whether Engles solicited Van Horn Aviation.  *See, e.g.*, *Aitkin*, 607 F. Supp. 3d at 1146–47 (finding the same under similar facts).

**Wolff Company:**  USI did not address Wolff Company directly in its Motion or Statement of Facts.  Alliant contends that USI failed to provide evidence of solicitation.  (Doc. 238 at 16.)  Alliant points to Mr. Greer's testimony where he indicated he believed Havard solicited Wolff Company because of an email that indicated he was moving his team to Alliant, but it does not appear that Havard was on the email chain.  (Doc. 239 ¶ 66(i); Doc. 240 at 205–06.)  In response, USI asserts there is an email where Wolff Company's Director, Richard Zahler, responded to an email from Harper in which Mr. Zahler had attached a draft BOR letter and asked for Havard's contact information.  (Doc. 296 at 21 ¶ 28; Doc. 296-2 at 62–64.)  USI contends that Havard used Harper as a proxy to solicit the account but has provided no evidence that connects Havard to Harper's

solicitation. The mere fact that the client inquired to Harper about Havard's contact information does not give rise to a reasonable inference that Havard somehow made any affirmative step to solicit Wolff Company. Absent more, USI has failed to establish Havard solicited Wolff Company.

**World Energy:** On February 15, 2023, World Energy's VP called Havard to discuss renewing its policy. (Doc. 246-4 at 39–40; Doc. 247-7 at 2.) The VP testified that Havard told him about his move Alliant but that he could not talk with him and referred him to Harper. (Doc. 246-4 at 40–42; Doc. 247-7 at 2.) Havard also indicated that USI should be able to find the files for World Energy to proceed and that while he was still with USI, he had everything he needed but was waiting to hear back from an underwriter on pricing. (Doc. 246-4 at 40; Doc. 247-7 at 2.) After Havard left, USI reached out to World Energy about Havard's resignation and informing it that the underwriter required an additional piece of information. (Doc. 247-7 at 3.) World Energy later decided to use a third-party rather than Alliant or USI. (Doc. 246-4 at 43–44.) USI contends that Havard's disorganization of the files is to blame for the loss of the client. (doc. 245 at 9.)

Alliant argues that the VP's testimony establishes that he did not feel pressured by Havard to contact Harper and did not suggest that he should contact Harper. (Doc. 291 at 66–68.) Alliant also argues that Havard directed World Energy back to USI by indicating that USI would be able to find the files for World Energy to proceed with its policy. (Doc. 319 at 8.) Alliant further rejects that World Energy went with a third-party due to any disorganization because it was the underwriter did not have the necessary files, not USI, and the client felt more comfortable going with the third-party because it handled some of its other policies. (Doc. 316 ¶ 43.)

At bottom, this is an issue of whether there was an attempted solicitation that resulted in the client moving to a third-party. During the call between World Energy and Havard, Havard indicated that he was not allowed to call his former clients but that he had been receiving favorable rulings in litigation and could switch jobs. (Doc. 247-7 at 2.) World Energy was uncertain at that time if Havard could continue to be its broker but

preferred that he remained the broker. (*Id.*)  At some point after the call, World Energy spoke with Harper about renewing the policy with Alliant. (Doc. 246-4 at 41–42.)  On these facts, even though World Energy went with a third-party and Havard and the client detest that he solicited its account, a dispute of fact remains about whether Havard attempted to solicit the World Energy by leaving the door open for the client to renew with Alliant and connecting it with Harper.  A jury is better suited to weigh this evidence to determine if his real purpose referring the client to Harper was to maximize the potential that Alliant would renew the policy.  *See E*Trade*, 305 F. Supp. 3d at 1035.  Whether the client went to Alliant is not material, the issue is whether the solicitation triggered the client to leave USI in the first place.

**AvAir:**  On February 14, 2023, Harper admitted to calling AvAir's CFO and leaving a voicemail in which he indicated that Engles could not make the call at the time but had asked him to place the call. (Doc. 246 ¶ 60; *see also* Doc. 246-2 at 73.)  Harper also indicated that they—alluding to the entire team—were working on transitioning clients over to Alliant. (Doc. 246 ¶ 60; *see also* Doc. 246-2 at 73.)  When the CFO returned the call, Harper continued to solicit the client. (Doc. 246 ¶ 61.)  Harper had not work on AvAir prior but became familiar with the client after having general conversation about various clients with Engles. (Doc. 246-2 at 141; Doc. 284 at 58.)  Harper testified that before calling the CFO, he told Engles that he was calling former clients at which point Engles told him that he could not stop him. (Doc. 246-2 at 149.)  Engles denies that he asked Harper to call the CFO. (*Id.*)  Harper denies the same, claiming that he found the CFO's contact information on his own. (*Id.*; Doc. 284 at 59–62.)  Harper also claims what he said on the voicemail was not true and was simply a cold-calling tactic to entice the CFO to return his call. (Doc. 246-2 at 149; Doc. 284 at 59–62.)  After Harper solicited AvAir, Engles asked Harper to refrain from using his name to solicit former clients. (Doc. 284 at 49–52.)

On these facts, the evidence cuts both ways.  While Harper and Engles both deny that Engles was involved soliciting AvAir, drawing inferences in USI's favor, Engles spoke

with Harper just before he left the voicemail and did not object to using his name to solicit clients until after the call was already made, suggesting a degree of complicity that a jury may weigh in making credibility determinations. (*See* Doc. 284 at 49–52.) Conversely, a jury may determine that, although Harper admitted to leaving the voicemail, he did so based entirely on questionable cold-calling techniques. Therefore, a dispute of fact remains about whether Engles participated in soliciting AvAir.

In short, the Court finds a dispute of material fact remains regarding Havard's involvement in the solicitation of the following clients: Revantage; STORE Capital; CBRE, Western National Group, and World Energy. Similar, a dispute of fact also remains regarding Engles' involvement in soliciting Van Horn Aviation and AvAir. The allegations for the other remaining clients lack evidentiary support to create a genuine dispute about whether solicitation occurred. Thus, the Court will grant summary judgment for Alliant relating to Havard and Engles' solicitation of USAA, Allied Aviation, Vintners, and Wolff Company.[3]

### ii.    *Non-Service Provision*

USI's theory for breach of the Non-Service Provision relates to the Individual Defendants, not just Havard and Engles. The dispute centers on what exactly the Non-Service Provision covers and many of the parties' arguments overlap with those pertaining to the Non-Solicitation Provision. (*See* Doc. 238 at 6, 7, 19–21.) Alliant argues the provision is unreasonable, and thus unenforceable, because it prohibits the Individual Defendants from accepting or servicing any client after joining Alliant, even if they never solicited the client. (*See* Doc. 239 ¶ 17.) Alliant contends that an interest in protecting customer relationships under the provision does not justify the restraint on the free-market

---

[3] As an ancillary matter, Alliant moves for summary judgment that the Individual Defendants updating their LinkedIn profiles does not constitute a breach of contract. (Doc. 238 at 22.) USI conceded that its claim is not that the update itself is a breach, but rather the fact the Individual Defendants updated their profile is circumstantial evidence of their calculated plans to move the former clients to Alliant. (Doc. 278 at 15 n.5.) "Merely informing customers of one's former employer of a change of employment, without more, is not solicitation." *Alpha Tax Servs., Inc. v. Stuart*, 761 P.2d 1073, 1075 (Ariz. Ct. App. 1988). There is no evidence that the updates incited or sought to incite any clients. The update reflects a change of employment without any further message or explanation. (Doc. 246-2 at 50–58.) The update does not change the Court's analysis.

and a client's ability to choose a provider.  (*Id.* at 19–21.)  USI does not dispute that the provision covers unsolicited clients.  (*See* Doc. 296 ¶ 17.)  USI, however, argues the provision is limited in scope by extending to the clients' accounts that the Individual Defendants managed or serviced regularly or in which they obtained confidential information about the client during the previous two years. (Doc. 278 at 19–20; Doc. 245 at 21; *see also* Doc. 240 at 108.)

To decide if restrictive covenants are enforceable, Arizona courts have based their decisions on the reasonableness of the restrictions applied to former customers, rather than looking at the relationship between the former employee and the customer.  *See Elec. Payment Providers, Inc. v. Kennedy*, No. 1 CA-CV-20-0382, 2021 WL 6087642, at *6 (Ariz. Ct. App. Dec. 23, 2021) (citing cases).  Under USI's argument, the restriction impedes a client's ability to seek the Individual Defendants' services unilaterally and voluntarily.  *See, e.g.*, *Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F. Supp. 3d 541, 570 (M.D. Pa. 2014) (finding a restrictive covenant that prohibited accepting unsolicited business from former clients was unreasonable because it restricted the employee's ability to earn a living and restrained free trade).  A client's choice to seek insurance coverage from the Individual Defendants after joining Alliant, through no solicitation of their own, undermines and tends to sever the continued existence of a protectable client relationship between that client and USI.  *See, e.g.*, *Hilb, Rogal & Hamilton Co. of Ariz. v. McKinney*, 946 P.2d 464, 465, 467 (Ariz. Ct. App. 1997) (reversing a grant of summary judgment that a non-solicitation provision was enforceable where the former client had terminated its relationship with the company seeking to enforce the restrictive covenant); *see also See Farber*, 982 P.2d at 1281 ("[A] covenant not to compete is invalid unless it protects some legitimate interest beyond the employer's desire to protect itself from competition.").

Perhaps USI retains a protectable interest in its client relationships for a limited time to make efforts to retain the client, but two years is unreasonable and harms the public interest.  *See id.* at 1281, 1283.  A two-year bar on serving former clients absent solicitation presents a different issue than the two-year bar on solicitation itself.  It operates as an

unfettered restraint on the public by effectively denying a client the ability to choose the desired provider for two years.  A client may choose to pursue the Individual Defendants at Alliant for any number of reasons, even if USI has demonstrated it can effectively service the account, but the provision impedes exercising that choice.  Therefore, the Court finds the provision unreasonably harms the public, and thus unenforceable.  Evaluating breach is no longer necessary.

### iii.    Non-Interference Provision

The Non-Interference Provision generally prohibits the Individual Defendants from soliciting or inducing USI employees to resign or to breach their employment agreements.  (*See, e.g.*, Doc. 240 at 108.)  USI contends it has a protected interest in maintaining its workforce and goodwill with employees.  (Doc. 245 at 24.)  Alliant does not dispute enforceability, and disputes only breach.  (Doc. 315 at 22–23.)  Given there is no dispute about enforceability and the provision protects employees from being improperly poached, which further protects USI's customer relationships by enabling USI to retain employees to demonstrate its effectiveness to a client, the Court finds the provision is enforceable.

USI argues that based on circumstantial evidence, the Individual Defendants breached the provision by coordinating with one another and Alliant to simultaneously depart from USI.  (Doc. 245 at 25; Doc. 278 at 16.)  Alliant argues USI lacks actual evidence that the Individual Defendants solicited or induced any USI employees to resign, and reasonable inferences cut in its favor.  (Doc. 315 at 22.)  Alliant also separately moves for summary judgment that neither Havard nor Engles breached the provision, arguing USI's evidence calls for mere speculation that they induced any employees to depart USI.  (Doc. 238 at 17–18; Doc. 319 at 13.)

As a preliminary matter, USI did not allege a breach of contract claim against Walsh or Purser based on a theory that they breached the Non-Interference Provision.  (*See* Doc. 52 at 29–30.)  Consistent with Alliant's presentation of the issue, the Court will evaluate the claim as it relates to Havard and Engles' breach only, beginning with the relevant timeline.  On November 30, 2022, Havard sent his employment agreement to Alliant.

(Doc. 246 ¶ 21.)  In December 2022, Engles met with Alliant.  (Doc. 246 ¶ 30.)  A few weeks later, Engles sent his employment agreement to Alliant and received an offer by January 20, 2023.  (Doc. 246-2 at 8; Doc. 247-1 at 12–13.)  At some point before Engles resigned, Engles and Havard spoke about being dissatisfied with USI and other employment opportunities generally, including with Alliant.  (Doc. 246-2 at 133–34; Doc. 296-2 at 5.)  Around January 22 or 23, Dauro and McDaniel travelled to California and met with Harper.  (Doc. 246-3 at 151–52.)  By the end of the trip, Harper had resigned and joined Alliant.  (Doc. 246-2 at 135.)

On January 24, McDaniel and Dauro then flew to Arizona to meet with Havard, and at around 11:00 AM, Havard resigned from USI.  (Doc. 241 at 8.)  At some point after Havard resigned, Mr. Greer called Walsh about the resignation.  (Doc. 239 ¶ 41; Doc. 246-3 at 4.)  After learning about the resignation, Walsh called Purser about Havard's departure.  (Doc. 241 at 26; *but see* Doc. 296 ¶ 47.)  An avalanche of applications to join Alliant followed Havard's resignation.  Purser applied by 12:15 PM.  (Doc. 247-5 at 4.)  Then, by 12:35 PM, Phalen applied, Walsh submitted his resume by 12:55 PM, and Hartman applied by 1:30 PM.  (Doc. 246-3 at 158; Doc. 246-3 at 26; Doc. 247-5 at 2.)[4] From about 2:30 PM to 5:00 PM, McDaniel called Walsh about joining with Alliant and after an in-person interview he extended an offer to Walsh.  (Doc. 246-3 at 5; *see also* Doc. 295-2 at 9–10; Doc. 296-2 at 57.)  Walsh would call Purser frequently throughout this time.  (Doc. 296 at 17 ¶ 11; *see also* Doc. 295-2 at 9–10; Doc. 296-2 at 57.)  The night ended with Havard having dinner and drinks with McDaniel and Dauro.  (Doc. 246-3 at 137.)

The following day, at around 7:30 AM, Mr. Nassa, sent an internal CBRE email that indicated Havard and his team were leaving USI, which he believed was true after speaking to Harper.  (Doc. 246 ¶ 42; *see also* Doc. 246-7 at 25, 29–31.)  Later in the morning, Engles, Walsh, Purser, Phalen, and Hartman each met with Dauro and McDaniel separately for less than ten minutes each over about an hour total.  (Doc. 246 ¶ 25; Doc. 246-3 at 140–49, 151.)  That afternoon, Engles met with McDaniel at Alliant's office and began working for

---

[4] The times reflect the point at which Alliant relayed the application materials internally, which required the individuals to have sent their materials at least before these times.

Alliant.  (Doc. 246 ¶ 35.)  Walsh, Purser, Hartman, and Phalen would also go on to meet with Dauro together as prospective employees at Alliant's office.  (Doc. 246 ¶ 26; Doc. 246-3 at 146–47.)  Later in the evening, Hartman asked Walsh for contact information to send her in resignation to USI.  (Doc. 246-3 at 35.)  Walsh testified that he did not respond. (Doc. 316 ¶ 38.)  Walsh, Purser, Phalen, and Hartman all resigned from USI and joined Alliant shortly thereafter.

For purposes of USI's Motion, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 447 U.S. at 254. Here, as noted, there is no direct evidence that Havard or Engles told any former USI employee to resign or to join Alliant.  Havard and Engles have provided declarations and testimony that they did not solicit or induce each other or Walsh, Purser, Phalen, or Hartman to resign.  (*See* Doc. 316 ¶¶ 33, 38.)  Walsh claims he did not know about Havard's resignation and learned of his departure from Mr. Greer, and in turn, Purser learned about the departure from Walsh.  (*See* Doc. 316 ¶ 38.)  Both deny that Havard induced them to resign.  (*Id.*)  Mr. Nassa indicated he was aware the team might be moving to Alliant, but his belief was based on what Harper told him, not Havard or Engles.  (*See* Doc. 291 at 60.)  A jury may believe the testimony and reasonably infer that Havard and Engles' moves were independently motivated by their unhappiness with USI and expressing frustrations to each other falls short of inducement.

On the flip side, the sequence of events is certainly suspect.  Alliant asks the Court to find that within a couple hours of Havard's resignation, Walsh, Purser, Phalen, and Hartman made the snap-decision to apply to Alliant.  All the while, Daruo and McDaniel were en route to Arizona to meet with Havard after visiting Harper the day prior.  Within hours of Walsh's application, McDaniel interviewed him and extended a verbal offer. Then, Daruo and McDaniel wine-and-dined Havard later that night.  (*See* Doc. 246-3 at 155–57.)  A few hours later, Harper texted Mr. Nassa, seemingly confirming that Havard was taking the team with him to Alliant.  (*See* Doc. 246-7 at 29–31.)  The following morning, Engles, Walsh, Purser, Phalen, and Hartman met with McDaniel and Daruo over

about an hour in total.  They all then proceed to resign from USI and join Alliant—again, occurring within about a day of Havard resigning.  It is entirely reasonable that a jury may find that evidence demonstrates Havard and Engles engaged in a coordinated effort to induce each other to resign—who had talked to each other about being dissatisfied with USI—and then induced the rest of the team to follow suit based on the rapid nature of their applications to Alliant and resignations from USI.  Therefore, summary judgement is inappropriate for either party.

*iv.    Confidentiality Provisions*

USI moves for summary judgement that the Individual Defendants breach the confidentiality provisions in their respective agreements.  (Doc. 245 at 25–26.)  USI did not plead a breach of contract claim based on breach of the confidentiality provisions.  (*See generally* Doc. 52.)  Therefore, the claim is not properly before the Court and USI's Motion is denied with respect to this theory.  *See, e.g.*, *Stallcop v. Kaiser Found. Hosps.*, 820 F.2d 1044, 1050 n.5 (9th Cir. 1987).  Alliant did not separately move on this issue.

**B. Breach of Duty of Good Faith & Fair Dealing (Count II)**

The law implies a covenant of good faith and fair dealing in every contract. *Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986).  "The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Id.*  "The duty arises by operation of law but exists by virtue of a contractual relationship."  *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 38 P.3d 12, 28 (Ariz. 2002), *as corrected* (Apr. 9, 2002).  A party can breach the implied covenant by (1) "exercising express discretion in a way inconsistent with a party's reasonable expectations"; or (2) "acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." *Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 435 (Ariz. Ct. App. 2002).  Generally, however, breach of the implied covenant must rest on allegations separate from those substantiating a breach of contract claim. *See Ipro Tech LLC v. Sun W. Mortg. Co. Inc.*, No. CV-17-04015-PHX-

- 27 -

DLR, 2019 WL 2106417, at *3 (D. Ariz. Mar. 21, 2019).

USI advances that Havard and Engles deprived USI of the benefit of 60-days' notice, in which during that period USI had a reasonable expectation that they would transfer or assist with transferring client accounts to a new team before their departures. (Doc. 245 at 17; Doc. 318 at 11; Doc. 278 at 22.) USI alleges that during this time, Havard and Engles were able to retain large amounts of client information for later use, did not leave their files in an orderly fashion, and declined to assist with the transition. (Doc. 278 at 22.) Alliant argues that USI's claim mirrors its breach of contract claim, thus it fails as a matter of law, and otherwise USI fails to prove bad faith or an unfair deprivation of reasonably expected benefits. (Doc. 238 at 23 (citing *Ipro*, 2019 WL 2106417, at *3).)

Alliant's reliance on *Ipro* is misplaced. There, the Court addressed a failure to perform that was the basis for a breach of contract and breach of implied covenant of good faith and fair dealing. *See Ipro*, 2019 WL 2106417, at *2–4. The Court found that there was a dispute of fact precluding summary judgment on the breach of contract claim about whether the parties agreed to extend a contact term and thus whether the defendant continue paying under the contract after the original term expired. *Id.* at *1–3. The defendant's failure to pay then served as the only evidentiary basis for the breach of the implied covenant. *See id.* at *4. Plaintiffs are generally allowed to plead alternative claims. Fed. R. Civ. P. 8(d). While Havard and Engles' failure to provide adequate notice under their employment agreements serves as a factual predicate to the breach of the implied covenant of good faith and fair dealing claim, USI's theory extends beyond that failure and goes to benefit it would have derived during that period had the notice been provided. *See, e.g.*, *Bike Fashion*, 46 P.3d at 435 ("[A] party may breach the implied covenant of good faith and fair dealing even if the express terms of the contract speak to a related subject."). It is the deprivation of that expected benefit that forms the basis for USI's breach theory.

First, USI's assertion that it had a reasonable expectation that it would have sixty days to transition client accounts with the help of Havard and Engles is up for debate. *See also Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1040 (Ariz. 1985) ("[T]he

relevant inquiry always will focus on the contract itself, to determine what the parties did agree to."); *Sw. Sav. & Loan Ass'n v. SunAmp Sys., Inc.*, 838 P.2d 1314, 1321 (Ariz. Ct. App. 1992) ("Courts are not constrained by textual omissions to abandon common sense and experience or to ignore the surrounding circumstances of an agreement."). What logically flows from Havard and Engles agreeing to provide 60-days' notice is that the notice triggers USI's right to choose how to proceed. This choice, however, presents a fork in the road. USI has the contractual right to: (1) do nothing and allow the employment to terminate after sixty days or (2) accept the resignation but provide an earlier termination date. (*See, e.g.*, Doc. 240 at 110.) Regardless of the path chosen, USI may also require Havard or Engles to cease performing any services until termination, whatever that date may be. (*Id.*). This is consistent with USI's proffered testimony, which indicates that notice provides time for a "baton passing," and in the same breath, that USI is "more than willing to pay the 60 days for the producer to effectively go on vacation for two months," but that determination depends on the facts and circumstances of the situation. (Doc. 246-3 at 254.)

At best, USI presents that it has an expectation to make a choice, and assuming its choice was to not accept the resignations immediately, USI would then have the choice to allow Havard and Engles to continue working or to essentially go on vacation until the date of termination. Assuming USI chooses to allow them to continue working, USI, then, is of the belief that it reasonably expects them to assist in the transition. USI, however, relies on speculation to reach this point. USI's evidence demonstrates that it is not clear what USI would do at that point. A jury could reasonably determine that, given Havard, Engles, and the other former employees' alleged impropriety, USI would have opted for immediate termination, and thus an expectation that they would further aid in the transition is illogical and unreasonable. Whether USI was deprived of a transition period is for the jury to decide.

Next, regarding the transfer of client information, USI relies on evidence relating to ShareFile uploads for which USI also relied on to support its improper breach of the confidentiality provisions claim. (*See* Doc. 245 at 26; Doc. 318 at 11–12; Doc. 246 ¶ 47.)

1   For this claim, USI argues here that whether the information is confidential is immaterial.

2   (Doc. 318 at 11–12 n.9.)

3       The implied covenant protects against a party "acting in ways not expressly

4   excluded by the contract's terms but which nevertheless bear adversely on the party's

5   reasonably expected benefits of the bargain." *Bike Fashion*, 46 P.3d at 435. It is

6   undisputed that the employment agreements prohibit use or disclosure of confidential

7   information, except under inapplicable circumstances. (*See, e.g.*, Doc. 240 at 106.) The

8   agreements also require Havard and Engles to destroy or return any confidential

9   information in their possession following termination. (*Id.* at 110.) The agreements also

10  impose a duty of loyalty. (*Id.* at 100.) It is not clear to the Court what is covered by the

11  express agreements and what is implied. USI's arguments are insufficient for the Court to

12  determine that as a matter of law that USI was deprived a benefit not already covered by

13  the contract.

14      Next, regarding the allegation that Havard and Engles did not leave their files in an

15  orderly fashion, this allegation does not actual address Engles. (*See* Doc. 316 ¶ 43.) As

16  previously discussed, Havard was working with World Energy on renewing its policy while

17  at USI and indicated that he had all the information he needed but was waiting to hear back

18  from the underwriters on pricing. (*See* Doc. 246-4 at 40; Doc. 247-7 at 2.) Havard

19  indicated to the client that USI should be able to find the necessary files to proceed on the

20  policy. (Doc. 246-4 at 40; Doc. 247-7 at 2.) After Havard left, USI notified World Energy

21  that the underwriter required an additional piece of information. (Doc. 247-7 at 3.) It is

22  unclear whether USI had the file when it appears the underwriter itself did not have the

23  file, and there is no explanation about the steps USI took to locate it to suggest

24  disorganization resulting from Havard. On these facts, assuming USI does have some

25  reasonable expectation in orderly files, a jury could reasonably infer this evidence does not

26  establish bad faith or an unfair attempt to conceal that information from USI. Thus, in

27  short, USI has failed to establish it is entitled to summary judgment as a matter of law for

28  its breach of the implied covenant of good faith and fair dealing claim.

**C. Breach the Duty of Loyalty (Count III) & Aiding and Abetting (Count V)**

In Arizona, an employee owes his employer a duty of loyalty. *Sec. Title Agency, Inc. v. Pope*, 200 P.3d 977, 989 (Ariz. Ct. App. 2008). "[A]n employee may not, absent agreement to the contrary, statute or other authority, compete with his or her employer concerning the subject matter of the employment." *Id.* But an employee may "make arrangements to compete." *Id.* (citation omitted). The line separating active competition and preparation is opaque. *Id.* Courts focus on the nature of the preparations to compete and consider all the circumstances of the case. *Id.* (noting an employee may not solicit co-workers to join a competing business). As the Arizona Court of Appeals has explained:

> [I]n deciding whether an employee impermissibly solicited co-workers, the trier of fact "should consider the nature of the employment relationship, the impact or potential impact of the employee's actions on the employer's operations, and the extent of any benefits promised or inducements made to co-workers to obtain their services for the . . . competing enterprise."

*Id.* at 990 (citation omitted).

Both parties move for summary judgment on the breach of the duty of loyalty claim, raising competing arguments about whether the evidence already discussed shows a breach. (*See* Doc. 238 at 24–25; Doc. 245 at 27–28.) Alliant additionally argues the claim is precluded as a matter of law under Arizona's economic loss rule. (Doc. 315 at 29–30.) The Court will address this issue first.

Under Arizona law, the economic loss rule generally limits "a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property." *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 P.3d 664, 670–71 (Ariz. 2010). The economic loss rule, however, does not bar all tort claims. *Firetrace USA, LLC v. Jesclard*, 800 F. Supp. 2d 1042, 1050 (D. Ariz. 2010). The application of the policy depends on context-specific policy considerations. *Flagstaff Affordable Housing*, 223 P.3d at 669. The Arizona Court of Appeals has clarified that "a contracting party is *limited wholly* to its contractual remedies for purely economic loss related to the subject of the parties' contract." *Cook v. Orkin Exterminating Co.*, 258 P.3d 149, 153 n.6 (Ariz. Ct. App. 2011) (holding that the economic loss rule barred

plaintiff's claims for negligence, misrepresentation, and fraud where claims were based on the defendant's failure to perform its promises under the parties' agreement)

It is unclear whether USI asserts its breach of the duty of loyalty claim as a tort or as sounding in contract.  USI's Complaint alleges that Havard and Engles owe a duty of loyalty under the employment agreements, in which they agreed to use their best efforts to perform all duties faithfully and diligently under the contract.  (Doc. 52 ¶¶ 32, 43; *e.g.*, Doc. 240 at 100.)  USI's actual claim does not specify that the alleged breach occurred under the contract, but rather the Complaint asserts that Havard and Engles breached the fiduciary duty of loyalty as employees.  (Doc. 52 ¶ 100.)

USI seemingly intends for the claim to sound in tort because it is the vehicle for the aiding and abetting breach of the duty of loyalty claim against Alliant.  *See Wells Fargo Bank*, 38 P.3d at 23, 26 (requiring the party accused of aiding and abetting to know the conduct it aids is a tort).  But if the USI intended for the claim to sounds in tort, the economic loss rule would bar the claim because a contracting party is limited wholly to contractual remedies for purely economic losses related to the subject of the employment agreements, i.e., the duty of loyalty provision.  *See Cook*, 258 P.3d at 153 & n.6 (explaining contract law policy favors upholding the parties' expectations where there has been no physical injury to sustain a tort action); *see also BMO Harris Bank NA v. Corley*, No. CV-22-00547-PHX-DWL, 2022 WL 4781944, at *12 (D. Ariz. Oct. 3, 2022) (barring a tortious interference claim under the economic loss rule because the harm giving rise to the claim was expressly addressed by the parties' contracts).  And if the tort claim is barred by the economic loss rule, then USI's aiding and abetting claim necessarily fails because the claim is predicated on Alliant knowing that it aided and abetted the commission of a tort.  *See Wells Fargo Bank*, 38 P.3d at 23, 26.  If the claim sounds in contract, however, the claim against Alliant also necessarily fails because the allegations are based on aiding the breach of a contract, not the commission of a tort.  Quite the catch-22.  Therefore, there is no feasible route for the aiding and abetting claim to survive and the Court will grant summary judgment in Alliant's favor on Count V.

Assuming USI did not intend to shoot itself in the foot, in considering all the facts and circumstances in this case, the Court concludes summary judgment is inappropriate for a breach of the duty of loyalty sounding in contract. The evidence demonstrates that in late-2022, Havard and Engles began talking with Alliant. Both individuals were on an email where Phalen sent a spreadsheet to STORE Capital that was later used by Harper to draft a BOR letter for STORE Capital to transfer its account to Alliant. Havard set up a meeting with Revantage while with USI that was later used by Harper after joining Alliant to solicit the client. Both individuals discussed their dissatisfaction with USI and resigned within a day of each other. On the same day that Havard resigned, Walsh, Purser, Phalen, and Hartman sent application materials to Alliant. Havard met with McDaniel and Dauro from Alliant for dinner that night even though he already accepted the role. The next day, which was the day Engles resigned, the four former USI employees met with Alliant and later resigned from USI. Havard and Engles' immediate resignations did not provide adequate notice to USI and impacted its ability to respond to the departures. Under these circumstances, and others the Court has already addressed, a jury could weigh this evidence and reasonably infer that Havard and Engles did or did not breach their duty of loyalty to USI by taking steps beyond mere preparation to compete with USI prior to their departures.

### D. Tortious Interference (Count IV)

Under Arizona law, the intentional tort of interference with contractual relations requires showing: (1) "existence of a valid contractual relationship," (2) "knowledge of the relationship on the part of the interfer[er]," (3) "intentional interference inducing or causing a breach," (4) "resultant damage to the party whose relationship has been disrupted," and (5) "that the defendant acted improperly." *Wells Fargo Bank*, 38 P.3d at 31; *see also Ulan v. Vend-A-Coin, Inc.*, 558 P.2d 741, 745 (1976) ("The tort has been expanded in Arizona to cover not only interference with valid contractual relations but also with business expectancies."). Tortious interference requires specific intent. *Antwerp Diamond Exch. of Am., Inc. v. Better Bus. Bureau of Maricopa Cnty., Inc.*, 637 P.2d 733, 740 (Ariz. 1981).

While the scope of USI's claim was initially unclear, (*see* Doc. 52 ¶¶ 103–08), USI

has clarified that the heart of its claim is that Alliant tortiously interfered with the Individual Defendant's USI agreements, (Doc. 278 at 26 & n.11), and the Individual Defendants tortiously interfered with USI's business expectancies, (*Id.* at 25 & n.10).  Alliant argues the economic loss rule bars the business expectancies claim.  (Doc. 319 at 15.)  Alliant also argues there is no evidence of Alliant's wrongfully interference.  (*Id.*)

The provisions that Alliant purportedly interfered with include the 60-Day Notice Provision, the Non-Solicitation Provision, the Non-Service Provision, and the Non-Interference Provision.  (Doc. 245 at 29; Doc. 278 at 26.)  Because the Court found the Non-Service Provision unenforceable, it need not reach interference with that particular provision.  With respect to the others, there are disputes of fact about whether Alliant improperly induced a breach.  For example, Alliant received Engles and Havard's employment agreements and were aware of the various provisions.  While Alliant did not affirmatively require Havard or Engles to provide proper notice, Alliant may have extended offers contingent on circumstances that would necessarily require breaching the provision, but the record is not clear what impact the offers had on Havard or Engles.  Alliant also played a role in hiring and recruiting Havard, after which Alliant and Harper worked to solicit STORE Capital.  Further, Alliant flew to Phoenix and met Havard after he had already resigned from USI, interviewed Walsh that same day, and in the following day, Engles, Walsh, Purser, Phalen, and Hartman all resigned.  The evidence certainly leads to an inference of an underlying package deal.  Further, a rapid transfer of the team further facilitated Alliant's ability to capture USI's clientele, which undermines a legitimate business interest in coordinating the employment offers.  At bottom, the jury could weigh this evidence and determine that Alliant intentionally induced the Individual Defendants to breach applicable provisions through improper means—i.e., Alliant doing so to gain an unfair timing advantage over USI to capture its clients.

As to the Individual Defendants tortiously interfering with USI's business expectancies, Alliant has not addressed the policy considerations underlying the application of the economic recovery rule, therefore the Court declines to formulate policy

arguments on its behalf. *See Flagstaff Affordable Housing*, 223 P.3d at 669. USI, however, only addressed this claim in its Response to Alliant's Motion for Summary Judgment. (*See* Doc. 278 at 25 n.10.) USI simply advances arguments that there is a dispute of fact about Havard and Engles' interference with its business expectancies. Thus, the issue is not squarely before the Court to determine whether tortious interference occurred as a matter of law, and at best, a dispute of fact remains about whether Havard or Engles intentionally interfered with any particular client accounts. Therefore, the Court will deny summary judgment for both parties here.

### E. Declaratory Judgment (Count VI)

Alliant moved for summary judgment that declaratory judgment is not available. (Doc. 238 at 30.) USI consents to dismissal of this claim. (Doc. 278 at 29.) Therefore, the Court will grant summary judgment for Alliant and dismiss this claim.

### F. Affirmative Defenses

#### 1. Estoppel

Estoppel applies if Havard or Engles relied in good faith on an assurance from USI that the 60-Day Notice Provision would not be enforced. *Ajilon Pro. Staffing, LLC v. Griffin*, No. CV-09-561PHXDGC, 2009 WL 1507559, at *9 (D. Ariz. May 29, 2009); *see also IFIXITUSA LLC v. Ifixit Corp.*, No. CV-21-00887-PHX-DGC, 2022 WL 3647788, at *4 (D. Ariz. Aug. 24, 2022) (noting an essential element of estoppel is detrimental reliance on a misrepresentation).

USI moves for summary judgment that estoppel is unavailable to Havard and Engles. (Doc. 235 at 30–31.) Alliant argues USI should be estopped from enforcing the provision because Havard and Engles relied in good faith on assurances that their employment was at-will based on their employee handbook and other materials. (Doc. 315 at 32; Doc. 316 ¶ 12.) Havard and Engles testified that they did not provide 60-days' notice because they did not think was required based on reading their employment agreements and the employee handbook. (Doc. 316 ¶ 12.) Havard also based his belief on a letter he received from USI's Chief Financial Officer Edward Bowler. (*Id.*)

Havard and Engel's beliefs are not based on any reasonable assurances or the objective evidence. The employee handbook provides that USI employees' employment is at-will and "may be terminated by USI or by [the employee] at any time, with or without cause or prior notice." (Doc. 243 at 4, 55–56.) The handbook further states that employees "desiring to terminate their employment . . . are urged to notify [USI] at least two weeks in advance . . . unless otherwise specified in a written employment agreement." (*Id.* at 55.) The handbook also provides:

> If certain terms and conditions of your employment are governed by the conditions of a written employment agreement, then the relevant provisions of that agreement shall take precedence over the affected policy as described in this Handbook, to the extent such policy contradicts or is inconsistent with such provision of the written agreement.

(*Id.* at 4, 56.) Next, Mr. Bowler sent a letter to Havard indicating that except as modified, the terms of the employment agreement remain intact and that nothing modified his at-will employment. (See Doc. 244 at 2.) There is no evidence that the handbook or the letter modified the notice requirement. In fact, the handbook suggests submitting a two-week notice, to consult the respective employee agreement, and that the employment agreement controls if there are any contradictions. Mr. Bower's letter also explained that the employment agreement remained unmodified. Additionally, Engles did not indicate he relied on this letter. There is simply a lack of evidence to suggest that USI made any assurances that Havard or Engles could reasonably rely on to conclude the notice requirement was modified or would not be enforced. As previously reasoned, the provision modifies the at-will relationship in that Havard and Engles may terminate their employment at any time with sufficient notice. Therefore, the Court will grant summary judgment in USI's favor on this affirmative defense.

### 2. Unclean Hands

The doctrine of unclean hands "bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted." *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989). "It is fundamental to [the] operation

of the doctrine that the alleged misconduct by the plaintiff relate directly to the transaction concerning which the complaint is made." *Id.* (citation omitted). Invoking the doctrine requires evidence that plaintiff acted in bad faith, unconscionably, or with morally reprehensible intent. *Ezell v. Quon*, 233 P.3d 645, 651 (Ariz. Ct. App. 2010); *see also Queiroz v. Harvey*, 205 P.3d 1120, 1122 (Ariz. 2009) (noting the doctrine generally requires proving willful inequitable conduct).

USI moves for summary judgment, arguing there is a lack of evidence to support it acted in bad faith. (Doc., 245 at 31.) Alliant argues four points of conduct demonstrate USI's bad faith: (1) accusing the Individual Defendants of failing to assist in the transition when USI rejected their help when offered; (2) accusing the Individual Defendants of scrambling files; (3) accusing the Individual Defendants of misappropriating the ShareFiles and "expiration lists" absent evidence; and (4) including restrictive covenants in Harper's agreements even though they are unenforceable under California law. (Doc. 315 at 33.)

As to the first issue, most of Alliant's proffered evidence does not show USI rejected the Individual Defendants' help. Havard indicated in his resignation letter that he was available to answer any questions related to clients he worked with, however, a letter from his counsel a few days later confirms that his intent was to cease working for USI immediately and could not be forced against his will to continue working for USI. (Doc. 241 at 8, 37.) Havard may have offered to help but contradicting evidence establishes he refused to continue to work for USI and went to work with a competitor. It is not reasonable to assume he would have continued to aid USI in retaining clients upon his resignation. Next, Alliant does not cite to any evidence pertaining to Engles and the evidence shows that he resigned the same day that Mr. Greer attempted to hold a meeting to address Havard's resignation and how to retain client accounts. (Doc. 246 ¶ 34.) With respect to Walsh, Alliant points to evidence that Walsh informed Mr. Greer about upcoming client renewals before he resigned but this evidence does not address whether he continued to offer to help, or USI rejected an offer after his departure. Finally, it is undisputed that Purser did continue to offer to help with a transition plan after her

resignation.  (Doc. 239 ¶ 52; Doc. 296 ¶ 52.)  But USI does not directly accuse her of failing to assist with the transition.  Therefore, Alliant failed to produce evidence demonstrating a dispute of fact exists regarding these accusations and summary judgment is appropriate on this narrow issue.

As to the ShareFile issue, as previously discussed there is a lack of evidence to support that the Individual Defendants left files in an unorganized manner or that USI does not have access to those files.  Alliant also points out that the Individual Defendants were authorized to use different computer protocols, USI had all the files, and Mr. Greer testified that there was no evidence that they intentionally scrambled any files.  (Doc. 316 ¶ 43; *see also* Doc. 284 at 28–29.)  As USI acknowledges, at the very least, there are possible disputes of fact.  (Doc. 318 at 15.)  Whether these files were easily accessible or obscured when they were on a shared network folder when USI had access to them all along at least raises a dispute of fact about whether USI willfully disregarded its access and accused the Individual Defendants of misconduct anyway.  Therefore, a grant of summary judgment for USI on Alliant's unclean hands defense is improper on this issue.

Next, as to the misappropriation of the ShareFiles and expiration lists, Alliant points to evidence that the Individual Defendants routinely sent the expiration lists and uploaded documents to ShareFile.  (Doc. 316 ¶¶ 46–47; Doc. 284 at 12.)  Alliant does not explain how this evidence establishes that USI acted improperly during this time.  The evidence relates to refuting that the Individual Defendants did not misappropriate any of the information and does not relate to USI's misconduct.  Therefore, Alliant failed to produce evidence demonstrating a dispute of fact exists regarding these accusations and summary judgment is appropriate on this narrow issue.

Last, regarding Harper's restrictive covenants, Alliant does not explain how or provide any authority to support that because Harper's restrictive covenants are void under California law, that fact somehow absolves the Individual Defendants of their contractual obligations under Arizona law.  Harper may have been free to solicit clients under California law, but that does not establish that USI acted in bad faith by attempting to

enforce the restrictive covenants against the Individual Defendants who agreed not to solicit clients, which includes using Harper as a proxy.  Therefore, Alliant failed to establish a genuine dispute of fact remains on this issue to support its unclean hands defense.  Thus, the Court will grant in part and deny in part summary judgment for USI as outlined.

### 3.  Waiver

USI moves for summary judgement on Alliant's waiver defense.  (Doc. 245 at 31.) Alliant argues that a jury could find USI waived its rights under Havard and Engles' employment agreements based on USI's treatment of the Harper agreement.  (Doc. 315 at 32.)  Waiver requires a voluntary and intentional relinquishment of a known right.  *Servs. Holding Co. v. Transamerica Occidental Life Ins.*, 883 P.2d 435, 443 (Ariz. Ct. App. 1994). This requires a clear showing of an intent to waive that right and may be inferred from conduct.  *Id.* at 443–44.  USI acknowledging that the restrictive covenants in Harper's agreement were void does not show that USI intended to waive its rights regarding the Individual Defendants that are governed under a different state's laws.  USI did not accept the immediate resignations and seeks to enforce its rights to the extent they are enforceable. Therefore, Alliant has failed to come forward evidence establishing USI waived any contractual rights and USI is entitled to summary judgment on this defense.

## IV.    CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED granting in part** and **denying in part** USI's Motion for Summary Judgment (Doc. 245) as outlined in the Order.

**IT IS FURTHER ORDERED granting in part** and **denying in part** Defendants' Motion for Summary Judgment (Doc. 238) as outlined in the Order.

**IT IS FURTHER ORDERED dismissing** Count V relating to USI's claims against Alliant for aiding and abetting breach of the duty of loyalty with prejudice.

…

…

1   **IT IS FURTHER ORDERED dismissing** Count VI relating to USI's claims for

2   declaratory judgement with prejudice.

3   Dated this 23rd day of April, 2025.

Honorable Susan M. Brnovich
United States District Judge