# EXHIBIT 1-16

# EXHIBIT E

[Page 1]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

USI Insurance Services, LLC, a Delaware limited liability company,
Plaintiff,
vs.
Alliant Insurance Services, INC., a California corporation; William J. Havard II and Jane Doe Havard, husband and wife; Robert Engles and Jane Doe Engles, husband and wife; Jenise Purser and John Doe Purser, husband and wife; and Justin Walsh and Jane Doe Walsh, husband and wife,
Defendants.

No. 2:23-cv-00192-SMB

VIDEOTAPED DEPOSITION OF JUSTIN WALSH

Phoenix, Arizona
April 5, 2023
9:09 a.m.

CERTIFIED COPY

Reported by:
SABRINA L. STERENFELD
Registered Professional Reporter
Arizona CR NO. 51002

CARRIE REPORTING, LLC
Certified Reporters
2415 East Camelback Road
Suite 700
Phoenix, AZ 85016
(480)429-7573

CARRIE REPORTING, LLC - Certified Reporters
(480) 429-7573

[Page 2]

INDEX

| WITNESS | ON PAGE |
|---|---|
| JUSTIN WALSH | |
| Examination by MS. YEE | 6 |

* * *

EXHIBITS

| EXHIBITS | DESCRIPTION | MARKED ON PAGE |
|---|---|---|
| No. 1 | USI015782 - USI015794 | 7 |
| No. 2 | USI004475 | 11 |
| No. 3 | HARTMAN00000001 - HARTMAN00000003 | 14 |
| No. 4 | USI004471 | 16 |
| No. 5 | ALLIANT00006002 - ALLIANT00006004 | 17 |
| No. 6 | ALLIANT00000003 | 21 |
| No. 7 | USI014496 | 23 |
| No. 8 | WALSH00000030 - WALSH00000031 | 24 |
| No. 9 | WALSH00000018 - WALSH00000021 | 26 |
| No. 10 | USI014491 | 29 |
| No. 11 | HARTMAN00000004 - HARTMAN00000005 | 30 |
| No. 12 | WALSH00000041 | 33 |

[Page 3]

| | | |
|---|---|---|
| No. 13 | ALLIANT00003090 - ALLIANT00003105 | 34 |
| No. 14 | ALLIANT00001946 - ALLIANT00001948 | 39 |
| No. 15 | ALLIANT00005339 | 44 |
| No. 16 | ALLIANT00004921 - ALLIANT00004924 | 48 |
| No. 17 | ALLIANT00005176 - ALLIANT00005182 | 51 |
| No. 18 | ALLIANT00004915 - ALLIANT00004918 | 54 |
| No. 19 | ALLIANT00005388 - ALLIANT00005392 | 57 |
| No. 20 | ALLIANT00005449 | 59 |
| No. 21 | ALLIANT00003346 - ALLIANT00003349 | 62 |
| No. 22 | ALLIANT00005173 - ALLIANT00005174 | 65 |
| No. 23 | ALLIANT00005326 - ALLIANT00005333 | 67 |
| No. 24 | ALLIANT00004838 - ALLIANT00004908 | 70 |
| No. 25 | ALLIANT00003717 - ALLIANT00003725 | 71 |
| No. 26 | WALSH00000045 - WALSH00000072 | 76 |
| No. 27 | Binder | 77 |

[Page 4]

VIDEOTAPED DEPOSITION OF JUSTIN WALSH was taken on April 5, 2023, commencing at 9:09 a.m. at the law offices of SNELL & WILMER, L.L.P., One East Washington Street, Suite 2700, Phoenix, Arizona, before SABRINA L. STERENFELD, CR, RPR, Phoenix, Arizona, a Certified Reporter in the State of Arizona.

COUNSEL APPEARING:
For the Plaintiff:
SNELL & WILMER, L.L.P.
By: Jennifer R. Yee, Esq.
Joshua R. Woodard, Esq.
Delilah R. Cassidy, Esq.
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
jryee@swlaw.com
jwoodard@swlaw.com
dcassidy@swlaw.com
For the Defendants:
MORGAN, LEWIS & BOCKIUS, LLP
By: Adam E. Wagmeister, Esq.
Century City
2049 Century Park East, Suite 700
Los Angeles, California 90067
adam.wagmeister@morganlewis.com

Also present: Jonathan Williams, Videographer

[Page 5]

VIDEOGRAPHER: Good morning. My name is Jonathan Williams, certified legal video specialist with K-Video Productions. The court reporter is Sabrina Sterenfeld representing Carrie Reporting, LLC, located at 2415 East Camelback Road, Suite 700, Phoenix, Arizona. We are at Snell & Wilmer, One East Washington Street, Suite 2700, Phoenix, Arizona to take the deposition of Justin Walsh in the United States District Court, District of Arizona, case of USI Insurance Services, LLC, versus Alliant Insurance Services, Incorporated, et al.

The date is April 5th, 2023, and the time is 9:09 a.m. The attorneys will now introduce themselves and anyone present on their behalf, noticing party first please, and then the court reporter will swear in the witness.

MS. YEE: Good morning. Jennifer Yee on behalf of USI Insurance Services. With me are Josh Woodard and Delilah Cassidy.

MR. WAGMEISTER: Good morning. Adam Wagmeister with Morgan Lewis, and we represent the defendants.

THE WITNESS: Justin Walsh.

JUSTIN WALSH,

the witness herein, having been first duly sworn by the Certified Reporter, was examined and testified as follows:

[Page 6]

EXAMINATION

BY MS. YEE:

Q. Mr. Walsh, since you became employed by Alliant, have you provided services to any clients that you serviced during your last two years of employment at your prior employer?
A. I have.
Q. Do those clients include CBRE Group?
A. They do.
Q. STORE Capital Corporation?
A. Correct.
Q. Allied Aviation Service Company?
A. Correct.
Q. Blackstone/Revantage?
A. No.
Q. The related companies?
A. Yes.
Q. USAA Real Estate?
A. Yes.
Q. Western National Group?
A. Yes.
Q. Rudin Management, and I'll spell Rudin, R-U-D-I-N?
A. Yes.
Q. Starwood Mortgage Capital?

[Page 7]

A. Yes.
Q. Beacon Capital?
A. Yes.
Q. Brennan Management?
A. Brennan, yes.
Q. Are there any other clients you have provided services to since becoming employed by Alliant that you serviced during your last two years of employment at your prior employer that I did not just name?
A. Not that I recall.
Q. Why have you provided services to the clients we just reviewed that you serviced during your last two years of employment at your prior employer while becoming employed by Alliant?
A. It was the client's request.
Q. Is there any other reason or is the client's request the only reason?
A. It's the client's request.
Q. Is the client's request the only reason or is there another reason?
A. I don't believe so.

(Deposition Exhibit 1 was marked for identification.)

BY MS. YEE:

Q. Mr. Walsh, the court reporter has handed you a

[Page 8]

document marked Exhibit Number 1. Can you please take a look at that document?
A. Sure. Okay.
Q. If you flip to the last page of that document, which is marked USI-15794 in the bottom right-hand corner, is that your signature where it says "Employee"?
A. That is my signature.
Q. Okay. Is it fair to say you signed this agreement?
A. I did sign this agreement.
Q. Okay. And if you flip to Page 5 of that agreement?
A. Okay.
Q. Do you see Section 2.1, "Retention Payment"?
A. Um-hum.
Q. And do you see it states that the company shall pay employee $112,000 payable in the following two installments?
A. I do see that.
Q. Were you paid a retention payment of $112,000?
A. I was -- yes. I don't recall the exact amount, but yes.
Q. You were paid a retention payment?
A. Um-hum.
Q. Okay. Were you paid that retention payment by

[Page 9]

USI?
MR. WAGMEISTER: Objection. Form.
THE WITNESS: Yeah, I don't recall who paid the actual payment -- who the payment came from, but I received a payment.
BY MS. YEE:
Q. Okay. You can go ahead and set that aside.
Who was your immediate supervisor in your prior employment?
A. Bill Havard.
Q. Are you familiar with Ben Greer?
A. I am.
Q. And who is Mr. Greer?
A. I don't recall what his title was, but he ran the office in Phoenix.
Q. Did Mr. Greer call you to talk to you about Mr. Havard's resignation?
A. He called me in the morning of the 24th, yeah, I believe, a couple times.
Q. And did you speak to Mr. Greer about the substance of Mr. Havard's resignation on that morning?
A. What do you mean "substance"?
Q. Like, what was the substance of the conversation?
A. The first conversation, he called me, he said he

[Page 10]

was concerned about Bill because he hadn't heard from Bill. And he said if I had heard from him and I felt comfortable reaching out to Ben, please do so.
Q. Do you mean comfortable reaching out to Ben Greer or comfortable reaching out to Bill Havard?
A. Comfortable reaching out to Ben Greer.
Q. Oh, okay.
A. Those were his words.
Q. And did you tell Mr. Greer that you would call Mr. Havard to determine --
A. No.
Q. -- what was up -- I'll restate my question so the court reporter can get a clean transcript.
Did you tell Mr. Greer that you would call Mr. Havard to ask him about his resignation?
A. No.
Q. Okay. And what else did you discuss with Mr. Greer that morning pertaining to Mr. Havard's resignation?
A. He had called me later on in the morning. I don't recall the exact time, but he had said -- I believe he had said that Bill had resigned, and he had asked me to contact others on the team and to start calling clients in order to -- I believe he said something to the effect of, get in front of this and to let people know -- clients

[Page 11]

know that we were going to continue to service the accounts.
Q. And when you testify "others on the team," do you mean Ms. Purser, Ms. Phalen and Ms. Hartman?
A. Correct.
Q. Okay. And did you receive a meeting invitation from Mr. Greer that day to talk about the transitioning of clients?
A. I don't recall when the invite came through, but I did receive an invite.
(Deposition Exhibit 2 was marked for identification.)
BY MS. YEE:
Q. Mr. Walsh, the court reporter has handed you a document marked Exhibit Number 2.
A. Um-hum.
Q. This appears to be a meeting invite from Mr. Greer to you and other individuals listed in the "To" line. Do you see that?
A. Yes.
Q. And do you see the subject line says, "Subject: Strategy Meeting - Re Handling of Accounts"?
A. Yes.
Q. And was this the meeting invite that we just referred to a few moments ago that Mr. Greer sent you that

[Page 12]

day?
A. I believe so.
Q. Did you have communications with any of your coworkers about this meeting invite?
A. I did.
Q. Which coworkers did you have communications with?
A. I believe each on my team: Jenise Purser, Amy Phalen, Lori Hartman.
Q. Let's start with Ms. Purser.
A. Um-hum.
Q. What did you discuss with Ms. Purser regarding this invite?
A. Just that she should accept.
Q. Anything else?
A. Not that I recall.
Q. How did you have that discussion, via phone, text message?
A. Probably phone. I don't recall.
Q. What about Ms. Phalen?
A. Same, she should accept.
Q. And Ms. Hartman?
A. Correct, she should accept.
Q. And did you have that conversation with Ms. Hartman by phone too?

[Page 17]

(Deposition Exhibit 5 was marked for identification.)
BY MS. YEE:
Q. Mr. Walsh, if you flip to the second page of the document marked Exhibit Number 5, this appears to be the first page of your resume; correct?
A. Yes.
Q. And if you flip to the third page of that exhibit, that appears to be the second page of your resume; correct?
A. Correct.
Q. And is your resume accurate and complete regarding your work history?
A. To the best of my knowledge.
Q. And in your work experience section, you stated your employer at this time was USI Insurance Services (Wells Fargo Insurance until 12/27) [sic].
Do you see that?
A. Until 12/17.
Q. Excuse me. That's correct. Let me restate that.
In your work experience section, you stated that your employer at the time was USI Insurance Services (Wells Fargo Insurance until 12/2017); is that correct?
A. Correct.

[Page 18]

Q. And who drafted this resume?
A. I did.
Q. Did you send this resume to anyone else at Alliant besides submitting it on the Alliant website?
A. No.
Q. And do you remember when you submitted this to the Alliant website?
A. I don't recall the exact time, sorry.
Q. That's okay. If you flip to the first page of this document, this appears to be an email from Pam Tabert dated January 24th, 2023, to Bledion Dizdari, and it attaches your resume.
Do you see that?
A. I do.
Q. And in the email Ms. Tabert says, "Hi Bled, attached is the resume for Justin Walsh for the AE Lead position. He listed his desired salary as negotiable."
Do you see that?
A. I do.
Q. Is it fair to state that by January 24th you had submitted your resume to Alliant in consideration for employment?
A. At some point on the 24th, yeah.
Q. Okay. You can go ahead and set that aside.
Did you have any conversations with anybody

[Page 19]

at Alliant on January 24th regarding your potential employment at Alliant?
A. I received a phone call in the afternoon.
Q. From who?
A. Chuck McDaniel.
Q. What did Mr. McDaniel say to you during that phone call?
A. Just that he wanted to interview me for an available position.
Q. Did he say anything else to you during that phone call?
A. No, it was a short, fairly brief phone call.
Q. And did you interview with Mr. McDaniel for the position?
A. I did.
Q. And when did that interview occur?
A. Later on on the 24th.
Q. Was that interview by phone?
A. In person.
Q. Where in person?
A. The Camby Hotel.
Q. Is that the Camby Hotel on Camelback close to the Biltmore?
A. Yep.
Q. What did Mr. McDaniel ask you during that job

[Page 20]

interview on January 24th?
A. He asked me about my background, where I worked previously, what I was doing, what my qualifications were, those type of questions.
Q. Did Mr. McDaniel ask you anything else besides questions about your background, or qualifications, or the other items you just listed?
A. Not that I recall.
Q. Did you have any other discussions with Mr. McDaniel during that job interview?
A. It was -- no, not that I recall. It was all based on what was in my resume.
Q. Did Mr. McDaniel offer you the job at the end of that job interview on the 24th?
A. He had offered -- it was a verbal -- he made a verbal offer to me at that interview.
Q. Did you accept the verbal offer that Mr. McDaniel made to you at the end of that job interview on January 24th?
A. There was no formal acceptance, no.
Q. How did you leave the end of the job interview? Did you tell Mr. McDaniel that you would get back to him?
A. I did. I told him I would think about it.
Q. Were you aware that any of your other coworkers at USI were planning to resign before they actually

[Page 21]

resigned?
MR. WAGMEISTER: Objection. Form.
THE WITNESS: No.
BY MS. YEE:
Q. Did you have any other communications with Mr. McDaniel on January 24th about your potential employment at Alliant other than your job interview that you just spoke about?
A. We spoke later in the evening, briefly.
Q. By phone?
A. By phone.
Q. And what did you discuss during that phone discussion with Mr. McDaniel later in the evening on January 24th?
A. When I got home from the interview, my wife had several questions about, you know, basic job-type stuff. Like benefits, and what was included, what type of benefits, that kind of stuff. And I didn't have any of that information, so I put a call in to Chuck.
Q. Did you email Mr. McDaniel about that as well?
A. I may have.
(Deposition Exhibit 6 was marked for identification.)
BY MS. YEE:
Q. Mr. Walsh, the court reporter has handed you a

[Page 22]

document marked Exhibit Number 6. This appears to be an email from you to Chuck McDaniel on January 24th.
Do you see that?
A. Yes.
Q. And you appear to be asking Mr. McDaniel about some details on Alliant's benefits plans in this email; correct?
A. Correct.
Q. And you close that email by saying that you were "Just trying to make sure my family won't have a lapse in medical coverage."
Do you see that?
A. Yes.
Q. Would it be fair to state that you knew you were going to resign and become employed at Alliant as of the date of this email?
A. No.
Q. And why not?
A. I was still considering the offer, and still my wife and I -- my wife and my son both have medical conditions, so that was part of the concern.
Q. When did you decide you were going to accept Alliant's job offer?
A. Some point in the morning of the 25th.
Q. On January 25th, did Mr. Greer send an amended

[Page 23]

meeting invite for the strategy meeting to discuss the handling of accounts?
MR. WAGMEISTER: Objection. Form.
THE WITNESS: I believe he may have.
(Deposition Exhibit 7 was marked for identification.)
BY MS. YEE:
Q. The court reporter has handed you a document marked Exhibit Number 7. This appears to be a meeting invite from Mr. Greer to you and others listed in the "To" line for the strategy meeting on January 25th.
Do you see that?
A. I do.
Q. And if you compare Exhibit 7 and Exhibit 2, it looks like the meeting got moved by 30 minutes. Do you see that?
A. Yes.
Q. Okay. And did you accept this meeting invite that is reflected in Exhibit Number 7?
A. I don't recall if I accepted this one or if I -- I know at one point I put "tentative." I just don't know if it was this one or not.
Q. Why did you put "tentative"?
MR. WAGMEISTER: Objection. Form.
THE WITNESS: At this point, I was already

[Page 24]

considering the offer, the verbal offer, from Alliant, and I didn't think it was fair to go to this meeting.
BY MS. YEE:
Q. And why didn't you think it was fair to go to this meeting if you were considering a verbal offer from Alliant?
A. I wouldn't want to sit in on a meeting if they are going to be talking about clients, client strategy. That's just not fair to them, not fair to me, and I don't want to be put in that position.
Q. When did you receive an offer of employment in writing from Alliant?
A. At some point on the 25th. I don't recall the exact time.
(Deposition Exhibit 8 was marked for identification.)
BY MS. YEE:
Q. Mr. Walsh, the court reporter has handed you a document marked Exhibit Number 8. This appears to be a DocuSign email from Lisa Kaucher to you dated January 25th, 2023.
Do you see that?
A. Yes.
Q. And in that document it says, "Dear Justin, Please see the attached offer letter for your review and

[Page 25]

signature. You will receive additional information and instructions from Alliant Human Resources."
Do you see that?
A. Yes.
Q. And in the subject line it says, "Complete with DocuSign: Alliant Insurance Services, Inc. - Offer of Employment - Justin Walsh.pdf."
Do you see that?
A. I do.
Q. Is it fair to state that you received a written offer of employment from Alliant on the morning of January 25th?
A. Yes.
Q. Okay. What did you do with this written offer of employment?
MR. WAGMEISTER: Objection. Form.
THE WITNESS: I reviewed it.
BY MS. YEE:
Q. Did you do anything else with the offer of employment from Alliant?
A. I signed it.
Q. Did you have any questions on the offer of employment from Alliant?
A. Not that I recall.
Q. Did you email the offer of employment from

[Page 26]

Alliant to yourself?
A. I don't recall. In all likelihood, yeah. I don't think I had to physically email it to myself. I think it came through DocuSign, but I have a copy of it.
(Deposition Exhibit 9 was marked for identification.)
BY MS. YEE:
Q. Mr. Walsh, the court reporter has handed you a document marked Exhibit Number 9.
A. Um-hum.
Q. This document appears to be an email from yourself to yourself at your Yahoo email address attaching a copy of your offer of employment at Alliant.
Do you see that?
A. I do.
Q. And if you flip to the last page of that document, that appears to be DocuSigned by you; correct?
A. Correct.
Q. And did you DocuSign this document?
A. Yes.
Q. Would it be fair to state that you signed this offer of employment from Alliant on or before 11:52 a.m. on January 25th?
A. I don't recall the exact time that I signed it, but sometime on the 25th.

[Page 27]

Q. And in order to email it to yourself, you would have had to have signed it first; correct?
A. That's accurate.
Q. Okay. And this offer letter on Page 2 notes that your position will be "Vice President Account Executive - Lead in our Phoenix office."
Is that your current position?
A. Yes.
Q. And it says that your start date will be Wednesday, January 25th. Was that your start date at Alliant?
A. I don't recall the exact -- what's on my record, my HR record, but yeah.
Q. To the best of your recollection, did you start at Alliant on January 25th?
A. To the best of my knowledge, I think I was an employee at that point.
Q. And this offer letter says you report to Saira [ph] Long?
MR. WAGMEISTER: Saira.
BY MS. YEE:
Q. Saira Long.
A. Saira Long, um-hum.
Q. Vice president, senior manager, operations?
A. Correct.

[Page 28]

Q. Is Ms. Long your supervisor at Alliant?
A. Yes.
(THE FOLLOWING TESTIMONY HAS BEEN DESIGNATED AS CONFIDENTIAL.)
BY MS. YEE:
Q. And this offer letter notes that you'll be paid a salary, which, if my math is correct, annualizes to $200,000; is that right?
A. Thereabouts, yes.
MR. WAGMEISTER: I'll designate this portion confidential.
BY MS. YEE:
Q. And you are also paid a signing bonus of $125,000; correct?
A. Correct.
Q. And if you flip to the next page, your first year bonus from Alliant, at the end of your first year, is $125,000; correct?
A. What page are you on?
Q. Last page of the exhibit.
MR. WAGMEISTER: I'll just object to form, and note that the document speaks for itself.
BY MS. YEE:
Q. I'm sorry. Second to last page.
A. Yeah, sorry, confused me.

[Page 29]

It does state that, yes.
Q. Okay. And is it your understanding that you're eligible for a first-year bonus in the gross amount of $125,000?
A. Correct.
Q. Okay.
MR. WAGMEISTER: If you're done asking about his comp, we can go off of confidential.
MS. YEE: Yes, I'm done.
(CONFIDENTIAL DESIGNATION CONCLUDED.)
BY MS. YEE:
Q. At some point, you declined Mr. Greer's amended meeting invite for the morning of January 25th; correct?
A. I believe so.
(Deposition Exhibit 10 was marked for identification.)
BY MS. YEE:
Q. Mr. Walsh, the court reporter has handed you a document marked Exhibit Number 10. This appears to be you declining the meeting invite from Mr. Greer for the strategy meeting; is that accurate?
A. It appears to be, yeah.
Q. And you previously testified, you declined the meeting invite because you felt it wasn't fair to attend the meeting while you were considering an offer of

[Page 30]

employment at Alliant; is that correct?
A. Yeah, that's fair.
Q. Is there any other reason you declined the meeting invite besides feeling that it wasn't fair to accept it?
A. Not that I recall.
Q. Did you know that Mr. -- excuse me. Strike that.
Did you know whether Mr. Engles was going to resign from USI before he actually tendered his resignation?
A. No.
Q. Did you know that Mr. Havard [ph] -- excuse me -- Mr. Havard was going to resign from USI before he tendered his resignation?
A. No.
Q. And you previously testified that you weren't aware that your service team, Ms. Hartman, Ms. Phalen or Ms. Purser, were going to resign before they tendered their resignations; correct?
MR. WAGMEISTER: Objection. Form.
THE WITNESS: That's accurate.
MS. YEE: Okay.
(Deposition Exhibit 11 was marked for identification.)

[Page 31]

BY MS. YEE:
Q. Mr. Walsh, the court reporter has handed you a document marked Exhibit Number 11. This appears to be a text message from Ms. Hartman to you dated January 25th.
Do you see that?
A. Correct.
Q. And in that text message she says, "Hey Justin, do you happen to have Cecile's email address so I can send her my resignation?"
Do you see that?
A. I do see that.
Q. Is it fair to state that Ms. Hartman texted you about her resignation before she emailed her resignation to USI?
MR. WAGMEISTER: Objection. Form.
THE WITNESS: She may have. I didn't respond to this text message.
BY MS. YEE:
Q. And if you flip to the second page of that message, it says that she messaged you a minute later and said, "I don't remember her last name by heart."
A. That's what it appears to look like, yeah.
Q. And you did not respond to this text message?
A. Correct.
Q. But is it fair to state that this text message

[Page 32]

put you on notice that Ms. Hartman was planning to send in her resignation?
MR. WAGMEISTER: Objection. Form.
THE WITNESS: It may have. I don't recall what the -- I didn't know what the context was. I didn't actually speak with her.
BY MS. YEE:
Q. You didn't follow up and call Ms. Hartman?
A. I did not.
Q. Were you surprised to receive this text message from Ms. Hartman?
A. I was.
Q. Why?
A. Because I hadn't talked to her, and then I got this text message. So I didn't know what she was up to.
Q. You can go ahead and set that exhibit aside.
When did you resign from USI?
A. On the 25th was my first attempt.
Q. And when you say "first attempt," what do you mean by that?
A. I hit send on a resignation email, but it didn't go through.
Q. And did you have a subsequent attempt to resign?
A. I did.
Q. And how did you send that?

[Page 61]

lot of -- you know, got to make sure all the sites are covered and things like that. There's numerous policies that they have.
Q. Is it fair to say that the Revantage or Blackstone account had hundreds of policies similar to what you referred to as CBRE's master chart of sites?
A. That's fair.
Q. Next in your email it says, "Do you know if we are OK to contact the Revantage team," and then there's a redaction that says "Privileged." Do you see that?
A. I do.
Q. Were you asking Saira Long a question for the purpose of obtaining legal advice?
A. No. I don't recall exactly what I said under the privileged comment.
Q. Did you follow up and contact the Revantage team about whatever the subject of this redacted line is?
A. No.
MR. WAGMEISTER: Objection to form. He just says he doesn't recall.
THE WITNESS: Yeah, I said I don't recall exactly what's in there.
BY MS. YEE:
Q. You can go ahead and set that exhibit aside.

[Page 62]

(Deposition Exhibit 21 was marked for identification.)
BY MS. YEE:
Q. Mr. Walsh, the court reporter has handed you a document marked Exhibit Number 21.
A. Um-hum.
Q. And in this document there's an email on the first page from you to Amy Phalen, Lori Hartman and Jenise Purser dated February 16, 2023.
Do you see that?
A. I do.
Q. And you inform Amy and Lori that they both have been cleared to work on accounts behind the scenes.
Do you see that?
A. I do.
Q. And you previously testified that that behind the scenes meant non client-facing work; correct?
A. Correct.
Q. And you go on to say, "Neither of you should have any direct contact with clients just yet."
Do you see that?
A. I do.
Q. Why, at the time you sent this email, should Amy and Lori have not had any direct contact with clients just yet?

[Page 63]

MR. WAGMEISTER: Objection. Form.
THE WITNESS: That's how -- that's how it was -- that's how I was instructed by my manager.
BY MS. YEE:
Q. When did you receive that instruction from Ms. Long that Amy Phalen and Lori Hartman should not have any direct contact with clients yet?
A. I don't recall the exact date.
Q. Up in the first line of that email, when you put behind the scenes in quotes, who were you quoting?
MR. WAGMEISTER: Objection. Form.
THE WITNESS: I don't recall if Saira used those words, but -- I don't recall why I put it in parentheses, so...
BY MS. YEE:
Q. Is there anybody else that you could have possibly been quoting besides your manager Saira Long --
MR. WAGMEISTER: Objection. Form.
BY MS. YEE:
Q. -- when it says, quote, "behind the scenes"?
MR. WAGMEISTER: Objection. Form.
THE WITNESS: No, because it would have been -- she was the one who gave me approval.
BY MS. YEE:
Q. Did you get paid by Alliant the first week or so

[Page 64]

when you were performing no work?
A. I don't -- I don't recall -- I don't recall if there was -- there wasn't a paycheck for that week, no.
Q. So you were employed but not getting a paycheck for your first week at Alliant?
MR. WAGMEISTER: Also, object to form.
THE WITNESS: Yeah, I don't recall. I don't know what my -- what the dates were on my first paycheck that I got from Alliant. I'm sorry.
BY MS. YEE;
Q. Okay. But you don't recall one way or another whether or not that first week of employment at Alliant was paid?
A. Again, I don't recall -- I don't know the dates of my first paycheck, what dates they actually covered.
Q. Got it. STORE Capital is another client account that you worked on during your last two years of employment at USI; correct?
A. Correct.
Q. And you provide services to STORE Capital in your employment at Alliant now; correct?
A. Yes.
Q. Who cleared you to work on STORE -- well, strike that.
Do you know who cleared you to work on

[Page 85]

for a quick break.
THE WITNESS: Sure.
VIDEOGRAPHER: We are off the record at 11:00 a.m.
(Recess ensued from 11:00 a.m. until 11:08 a.m.)
VIDEOGRAPHER: We are back on the record at 11:08 a.m.
BY MS. YEE:
Q. Mr. Walsh, you're aware that you're still under oath; correct?
A. Correct.
Q. What's your wife's name?
A. Sara, S-A-R-A.
Q. Sara...
A. Walsh.
Q. What's your address?
A. 7417 East Bonita Drive, Scottsdale, Arizona 85250.
Q. Are you taking any medications that would prevent you from giving truthful or accurate testimony here today?
A. No.
Q. Is there any other reason that you couldn't give truthful or accurate testimony here today?

[Page 86]

A. Not to my knowledge.
Q. Why did you resign from USI?
A. I was unhappy.
Q. Why were you unhappy?
A. I felt like I was underpaid, and year after year I got shorted on my bonus.
Q. How were you shorted on your bonus?
A. I was promised a 30 percent bonus, and I don't think once I got to that target repeatedly.
Q. Who promised you the 30 percent target bonus?
A. Ben Greer.
Q. Did Ben Greer ever tell you what your salary or position would have been if you stayed at USI?
A. No.
Q. Are you curious about that?
A. Nope.
MS. YEE: I pass the witness.
MR. WAGMEISTER: Nothing from me.
VIDEOGRAPHER: This concludes the deposition of Justin Walsh. We are off the record at 11:09 a.m.
(The deposition concluded at 11:09 a.m.)

[Page 87]

(Sig Waived)

______________________
JUSTIN WALSH

STATE OF ARIZONA )
) ss
County of Maricopa)

BE IT KNOWN that the foregoing proceedings were taken by me, SABRINA L. STERENFELD, a Certified Reporter, in and for the County of Maricopa, State of Arizona; that the witness before testifying was duly sworn to testify to the whole truth; that the questions propounded to the witness and the answers of the witness thereto were taken down by me in shorthand and thereafter reduced to typewriting under my direction; that the witness waived reading and signing said deposition; that the foregoing pages are a true and correct transcript of all proceedings had, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

I FURTHER CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206(J)(1)(g)(1) and (2).

Sabrina L. Sterenfeld 51002

________________________ ________________

Certified Reporter CR Number

________________________ ________________

Certified Reporter (Signature) April 10, 2023

I CERTIFY that this Registered Reporting Firm has complied with the ethical obligations set forth in ACJA 7-206(J)(1)(g)(1) and (2).

Carrie Reporting, LLC R1064

________________________ ________________

Registered Reporting Firm RRF Number

________________________ ________________

Registered Reporting Firm (Signature) April 10, 2023

Execution Copy

# CONFIDENTIALITY, NON-SOLICITATION & NON-INTERFERENCE AGREEMENT

This CONFIDENTIALITY, NON-SOLICITATION & NON-INTERFERENCE AGREEMENT ("**Agreement**"), effective as of the **Effective Date** (as defined below), is by and between Wells Fargo Insurance Services USA, Inc., a North Carolina corporation (the "**Company**") and Justin Walsh ("**Employee**"). The Company and Employee are referred to hereinafter each individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

WHEREAS, pursuant to that certain Stock Purchase Agreement (the "**Purchase Agreement**") by and between USI Insurance Services LLC, a Delaware limited liability company ("**USI LLC**") and Wells Fargo & Company, a Delaware corporation ("**Seller**"), USI LLC will purchase from Seller all of the issued and outstanding shares of capital stock of ACO Brokerage Holdings Corporation, a Delaware corporation ("**ACO**"); and

WHEREAS, ACO owns, directly or indirectly, all of the issued and outstanding equity interests of the Company; and

WHEREAS, contingent upon the closing of the transactions contemplated by the Purchase Agreement (the "**Closing**"), and provided this Agreement is accepted in full by Employee, the Company desires to employ Employee on the terms and conditions herein and Employee is willing to accept employment on such terms and conditions; and

WHEREAS, Employee's covenants herein are a material inducement for the Company to enter into an at-will employment relationship with Employee pursuant to this Agreement; and

WHEREAS, Employee hereby acknowledges and agrees that the Retention Payment (as defined below) is a separate and additional payment to which Employee is not otherwise entitled and constitutes material and sufficient consideration to induce Employee to enter into this Agreement; and

WHEREAS, Employee acknowledges and agrees that by virtue of employment with the Company, Employee will receive a direct financial benefit and other good and valuable consideration; and

WHEREAS, by virtue of past employment with the Company or any Predecessor and future employment with the Company, Employee:

(a) had, has, and will continue to have, as applicable, access to, and has gained and will continue to gain knowledge of, Confidential Information of the Company, any Predecessor and/or any USI Company, the unauthorized use and/or disclosure of which could cause material and irreparable harm to the Company or any USI Company; and



Exhibit 1
Witness Walsh, J
Date 4/5/23
Sabrina S Sterenfeld CR RPR

(b) had, has, and will have, as applicable, significant responsibility for maintaining and enhancing the Goodwill of the Company with respect to the Company's Client Accounts and relationships with prospective clients and will have training and access to certain of the Company's customers and suppliers and, as such, has developed, will develop, and/or will continue to develop close and direct relationships with such customers and suppliers; and

(c) has developed, will continue to develop and/or will develop, as applicable close and direct relationships with the officers, directors, partners, employees, agents, suppliers, licensees, and/or other business relations of the Company or any USI Company; and

(d) has benefitted, will benefit, and/or will continue to benefit, as applicable, from the Company's investment of time, money and trust in Employee and will gain a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company, and, as a result, had, has, and will continue to have, the ability to harm or threaten the Company's legitimate business interests; and

(e) has made use of, and will continue to make use, of Employee's significant skills, training and experience; and

(f) for these and other reasons, will render services to the Company that Employee acknowledges are special, unique or extraordinary; and

WHEREAS, Employee acknowledges and agrees that the Company (on behalf of itself and the USI Companies) has a reasonable, necessary and legitimate business interest in protecting its own and the USI Companies' assets, Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business, and that the terms and conditions set forth below are reasonable and necessary in order to protect these legitimate business interests; and

NOW THEREFORE, in consideration of the Employee's employment with the Company, and the recitals, representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, the receipt and adequacy of which are conclusively acknowledged, the Parties, intending to become legally bound, agree as follows:

**AGREEMENT**

1. **DEFINITIONS.** Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them, which the Company may modify from time to time:

(a) "**Active Prospective Client**" means any Person or group of Persons who the Company specifically solicited or had documented plans to solicit within the six (6) months preceding the termination of Employee's employment with the Company.

(b) "**Client Account**" means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by the Company for such carrier or other entity) which is or was serviced by the Company in connection with the Company's business, regardless of whether such services are provided by, or through the licenses of the Company or any shareholder, employee or agent of the Company.

(c) "**Competitive Business**" means any Person engaged in the production, distribution, marketing or sale of a Competitive Product. Where a Competitive Business is part of a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

(d) "**Competitive Product**" means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the Company, in existence, which Employee or the Company has sold, marketed, distributed or developed in the last two (2) years of Employee's employment with the Company, or about which Employee has acquired Confidential Information.

(e) "**Confidential Information**" means at any date, any information of the Company, any Predecessor and/or a USI Company to which Employee has access, that is not generally available to the public (unless such information has entered the public domain and become available to the public through fault of the Party to be charged hereunder), including but not limited to: (i) the identity, authority and responsibilities of key contacts and decision-makers employed by Client Accounts or Active Prospective Clients of the Company or any Predecessor; (ii) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iii) the terms and conditions of benefits and compensation plans of Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iv) the information furnished to the Company or any Predecessor in confidence by any Client Account or Active Prospective Client; (v) the business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company, its corporate affiliates or any Predecessor; (vi)

the lists of the Client Accounts or Active Prospective Clients of the Company or any Predecessor, and any analyses and compilations thereof; (vii) the information that is password-protected; (viii) all internal memoranda and other office records, including electronic and data processing files and records; (ix) any and all other proprietary information of the Company, any Predecessor or a USI Company, including any information contained within a proprietary database; and (x) any and all other information that constitutes a trade secret under applicable law.

(f) "**Effective Date**" means the Closing date.

(g) "**Goodwill**" means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's or any Predecessor's investment in repeated contacts, business transactions, Confidential Information, or other efforts to develop lasting relationships.

(h) "**Insurance Services**" means the services provided by any of the USI Companies, including, without limitation, providing any insurance agency, brokerage and related services, including, without limitation, (i) the sale or brokerage of employee benefit products and services and other related consulting and administrative services, (ii) the sale or brokerage of property and casualty products and services, risk management and loss control services, third party administration, the analysis of loss exposures and designs, loss reserves and rate reviews, self-insurance consulting, reinsurance and excess stop loss (both specific and aggregate) placement, the management of insurance programs, the management and oversight of, and responsibility for, clients in the insurance brokerage industry.

(i) "**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, or a governmental entity (or any department, agency, or political subdivision thereof).

(j) "**Predecessor**" means any Person, in its capacity as predecessor-in-interest to the assets of the Company.

(k) "**USI Business**" means the businesses provided by the Company or the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(l) "**USI Companies**" or "**USI Company**" means USI Advantage Corp., a Delaware corporation ("**USI**"), its subsidiaries (including USI LLC and the Company), and any entity under the control (as defined in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, without regard to whether

any party is a "registrant" under such Act) of USI, and any of their successors or assigns.

2. **RETENTION BONUS PAYMENT.** Employee shall be eligible for a special retention bonus payment (the "**Retention Payment**").

2.1. ***Retention Payment.*** The Company shall pay Employee $112,000.00 payable in the following two (2) installments: (i) $14,000.00 paid within forty-five (45) days following the first anniversary of the Effective Date and (ii) $98,000.00 paid within forty-five (45) days following the fourth anniversary of the Effective Date.

2.2. ***Eligibility for Retention Payment.*** Notwithstanding the foregoing, if Employee's employment with the Company terminates or Employee is not actively employed, for any reason, on the dates the installment payments under Section 2.1 are due, Employee shall not earn or be paid such installment.

3. **COMPANY PROPERTY.** Employee acknowledges and agrees that all Confidential Information of the Company, including information transferred from any Predecessor under the Purchase Agreement, and/or of the USI Companies, which Employee has access to, receives or generates in the course of providing any USI Business, shall be the sole property of the Company and/or USI Companies, as the case may be, and shall remain with the Company and/or USI Companies upon termination of Employee's employment. Employee further acknowledges and agrees that Employee has no ownership rights to any Client Accounts and that the Client Accounts are owned by the Company and/or USI Companies.

4. **COVENANTS**

4.1. ***Confidential Information.*** The Company agrees to provide Employee with Confidential Information to assist Employee in the course and scope of Employee's duties. Employee acknowledges that the Company's agreement to provide this Confidential Information to Employee is in consideration for, and ancillary to, Employee's agreement to the other terms in this Agreement.

4.2. ***Confidentiality During and Following Employment.*** During Employee's employment with the Company and for five (5) years after Employee is no longer employed with the Company, for any reason, Employee will not use or disclose any Confidential Information of the Company, any Predecessor or any USI Company except: (a) in the normal course of business on behalf of any USI Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Employee shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure).

4.3. ***Defend Trade Secrets Act Required Notice.*** Notwithstanding anything in this Agreement to the contrary, pursuant to the Defend Trade Secrets Act of 2016, Employee acknowledges and understands that:

(a) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(b) An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

4.4. ***Assignment and Ownership of Intellectual Property.*** Employee acknowledges and agrees that any Intellectual Property (as defined herein) shall be "works made for hire" under the United States Copyright Act and that the Company shall be deemed the inventor, author and exclusive owner thereof together with all related intellectual property rights and exploitation rights for the longest period permitted by law. To the extent, if any, that any Intellectual Property is not deemed a "work made for hire" or that Employee is otherwise deemed to retain any rights, title or interest in or to any Intellectual Property, Employee hereby irrevocably transfers and assigns to the Company all rights, title and interest Employee may have or acquire to such Intellectual Property, without additional compensation, and hereby irrevocably waives any so-called moral rights of authors or other special rights which Employee may have or acquire therein. "**Intellectual Property**" means any advertisements, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works of authorship, computer software programming of any nature, discoveries, techniques, copyrights, patents, trademarks or the like, conceived or made by Employee in whole or in part during Employee's employment with the Company: (a) using Employee's relationship with the Company; (b) using Confidential Information or the Company's time, resources, facilities, supplies, equipment or trade secrets; (c) relating to the Company's present or future business; or (d) resulting from Employee's work for the Company.

4.5. ***Non-Solicitation of Clients and Active Prospective Clients.*** In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees that:

(a) During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit Insurance Services in competition with the Company to any Client Account; (ii) consult for any Client Account with respect to Insurance Services in competition with the Company; (iii) sign a broker of record letter with any Client Account to provide Insurance Services in competition with the Company; or (iv) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account, which is a Client Account of the Company at the time of such solicitation, that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company. If the duration herein of two (2) years after Employee is no longer employed with the Company is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during Employee's employment with the Company and for eighteen (18) months after Employee is no longer employed with the Company, for any reason. If the duration herein of eighteen (18) months after Employee is no longer employed with the Company is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during Employee's employment with the Company and for twelve (12) months after Employee is no longer employed with the Company, for any reason.

(b) During Employee's employment with the Company and for six (6) months after Employee is no longer employed with the Company, for any reason, Employee shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit Insurance Services in competition with the Company to any Active Prospective Client; (ii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iii) sign a broker of record letter with any Active Prospective Client to provide Insurance Services in competition with the Company; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last six (6) months of Employee's employment with the Company.

4.6. ***Non-Acceptance / Non-Service of Clients and Active Prospective Clients.*** In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees that:

(a) During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide Insurance Services in competition

with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide Insurance Services in competition with the Company to any Client Account; in each case with respect to any Client Account, which is a Client Account of the Company at the time of such solicitation, that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company. If the duration herein of two (2) years after Employee is no longer employed with the Company is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during Employee's employment with the Company and for eighteen (18) months after Employee is no longer employed with the Company, for any reason. If the duration herein of eighteen (18) months after Employee is no longer employed with the Company is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during Employee's employment with the Company and for twelve (12) months after Employee is no longer employed with the Company, for any reason.

(b) During Employee's employment with the Company and for six (6) months after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide Insurance Services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide Insurance Services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last six (6) months of Employee's employment with the Company.

4.7. ***Non-Interference With Employees.*** In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees, during Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company who is employed by the Company at the time of such solicitation or hiring and with whom Employee worked or obtained knowledge about as a result of Employee's employment with the Company. If the duration herein of two (2) years after Employee is no longer employed with the Company is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during Employee's employment with the Company and for eighteen (18) months after Employee is no longer employed with the Company, for any reason. If the duration herein of eighteen (18) months after Employee is no longer employed with the

Company is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during Employee's employment with the Company and for twelve (12) months after Employee is no longer employed with the Company, for any reason.

4.8. ***Tolling***. Employee agrees the duration of the covenants in this Agreement shall be extended by any period of time in which Employee is in breach of any such obligations and the extended duration shall be measured from the date of the court order granting injunctive relief.

4.9. ***Purpose of Restrictions***. The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from Employee's knowledge of the Company's Confidential Information or misuse of the Company's Goodwill. Employee agrees that the time, geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

4.10. ***Modification***. If a court finds any covenants in this Agreement exceed the permissible time, geographic or scope limitations, such covenants shall be reformed to the maximum permissible time, geographic or scope limitations. If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the minimum extent necessary to permit the remaining terms to be enforced. The Company may unilaterally limit the scope of these covenants.

4.11. ***Independent Enforcement***. Each of the covenants in this Agreement shall be construed as an agreement independent of (a) any other agreements or (b) any other provision in this Agreement, and the existence of any claim or cause of action by Employee against the Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Employee or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants in Section 4 of this Agreement. The Company shall not be barred from enforcing any of the covenants in Section 4 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement with Employee.

5. **REMEDIES**. Employee acknowledges: (a) the services to be rendered by Employee are of a special, unique, and extraordinary character; (b) it would be extremely difficult or impracticable to replace such services; (c) the material provisions of this Agreement are of crucial importance to the Company; and (d) any damage caused by Employee's breach of Section 4 of this Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation. Accordingly, Employee agrees, if Employee violates Section 4 of this Agreement, the

Company shall, in addition to any other rights or remedies of the Company available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction. Employee agrees to waive any requirement for the Company to post a bond.

6. **EMPLOYEE'S REPRESENTATIONS AND WARRANTIES**

6.1. ***Disclosure of Agreements; No Conflict.*** Employee represents and warrants that Employee has supplied to the Company all agreements between Employee and any Person, other than the Company, that employed or otherwise retained Employee within the past five (5) years. Employee further represents and warrants that Employee's execution of this Agreement and performance of Employee's duties for the Company do not conflict with, and are not impaired by, any law, rule, regulation, or court order by which Employee is bound.

6.2. ***No Confidential Information***. Employee represents and warrants that Employee has not taken any confidential information from any Person that employed or otherwise retained Employee, that Employee has no such confidential information in Employee's possession or control, and that Employee will not use any such confidential information in the performance of Employee's duties for the Company.

6.3. ***No Copyright Materials***. Employee represents and warrants that Employee has not taken any copyrighted materials from any Person that employed or otherwise retained Employee, that Employee has no such copyrighted materials in Employee's possession or control, and that Employee will not use any such copyrighted materials in the performance of Employee's duties for the Company.

6.4. ***No Restrictive Purchase Agreements.*** Except with regard to any employment agreements with the Company, Employee represents and warrants that Employee is not and has not been subject to any agreement (e.g. asset purchase agreement, stock purchase agreement), within the past ten (10) years, whether heretofore expired or not, which prevents or restricts Employee from competing with any Person and/or soliciting any clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees).

6.5. ***Clients of Former Employers or Entities***. Employee represents and warrants that, during any period of time in which such Employee was subject to any restrictions prohibiting Employee from competing with, or soliciting the clients, customers or business of such other organization, individual or business entity, Employee has not made any contact with any clients of any Person that employed or otherwise retained Employee, within the past five (5) years, concerning Employee's business relationship with the Company or concerning a prospective business relationship with such client in violation of such restrictive covenant. Employee further represents and warrants that Employee will not,

without prior express direction of the Regional Chief Executive Officer (the "**Regional CEO**"), solicit any clients of any Person that employed or otherwise retained Employee, within the past five (5) years in violation of such restrictive covenant.

6.6. ***Employees of Former Employers or Entities.*** Employee represents and warrants that Employee has not made and will not make, without prior express direction of the Regional CEO, any contact with any employees of any Person that employed or otherwise retained Employee, within the past five (5) years, concerning a prospective employment relationship with the Company.

6.7. ***No Ownership Rights to Client Accounts.*** Employee represents and warrants that Employee has no direct or indirect ownership rights to any Client Accounts of the Company and expressly acknowledges that the Client Accounts are owned by the Company and/or a USI Company.

7. **AT-WILL EMPLOYMENT**. Employee understands and agrees that Employee's employment with the Company is at-will and that nothing in this Agreement shall be construed or considered to affect the nature of such at-will employment.

8. **ADDITIONAL TERMS**

8.1. ***Amendment***. Except as set forth in Sections 4.10, 8.5, and other provisions herein as to which the Company expressly reserved the right to modify, no amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought.

8.2. ***Assignment***. Employee may not assign any rights under this Agreement without the prior written consent of the Company. Employee's obligations under this Agreement inure to the Company, its successors and assigns. The Company may, at any time and without Employee's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor. Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

8.3. ***Entire Agreement.*** This Agreement constitutes the entire agreement between the Parties with respect to the matters specifically referred to herein. Employee affirms that, in entering into this Agreement, Employee is not relying upon any oral or written promise or statement made by anyone at any time on behalf of the Company.

8.4. ***Governing Law.*** This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona, without regard to principles of conflicts of law.

8.5. ***Severability***. The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable. In the event any provision of

this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the minimum extent and in the manner necessary to render it valid, legal, and enforceable. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

8.6. ***Waivers***. No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or a waiver of any other breach or default. Failure to enforce any provision of this Agreement shall not be deemed a waiver of that provision or any other provision of this Agreement.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**WELLS FARGO INSURANCE SERVICES USA, INC.**

By: ______________________

Name: Ernest J. Newborn, II
Title: Secretary

**EMPLOYEE**

By: ______________________

Justin Walsh

Appointment

**From:** Ben Greer [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=c293cd31ef16478f8fa2f84c21ebe20b-Ben Greer]
**Sent:** 1/24/2023 9:33:14 PM
**To:** Justin Walsh [justin.walsh@usi.com]; Jenise Purser [jenise.purser@usi.com]; Amy Phalen [amy.phalen@usi.com]; Lori Hartman [lori.hartman@usi.com]; Robert Engles [robert.engles@usi.com]; Brian Snow [brian.snow@usi.com]
**BCC:** PH2 North [PH2.North@usi.com]

**Subject:** Strategy Meeting - Re Handling of Accounts
**Location:** PH2 North

**Start:** 1/25/2023 4:00:00 PM
**End:** 1/25/2023 5:00:00 PM
**Show Time As:** Tentative

**Required Attendees:** Justin Walsh; Jenise Purser; Amy Phalen; Lori Hartman; Robert Engles; Brian Snow

Exhibit 2
Witness Walsh, J
Date 4/15/23
Sabrina S Sterenfeld CR RPR

Message

| | |
|---|---|
| **From:** | Pam Tabert [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ECBE72E1062442398E737A6BFBE2D9C5-PAMELA TABE] |
| **Sent:** | 1/24/2023 12:55:41 PM |
| **To:** | Bledion Dizdari [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=7c5c74e74e9e4861b79ed8ac74247ff6-Bledion Diz] |
| **Subject:** | AE - Lead Candidate |
| **Attachments:** | JW.Resume.01.24.23-1.pdf |

**Importance:** High

Hi Bled,

Attached is the resume for Justin Walsh for the AE Lead position. He listed his desired salary as negotiable.

**Kind regards,**

**Pam Tabert, CDR**
AVP, HR Project Specialist
Pronouns: She, Her, Hers
Human Resources

**D** (949) 260-5005
**C** (949) 258-2861
**E** ptabert@alliant.com
alliant.com

Alliant

Alliant Insurance Services, Inc.
CA License No. 0C36861

AMERICA'S BEST EMPLOYERS Forbes 2022

Exhibit 5
Witness Walsh, J
Date 4/5/23
Sabrina S Sterenfeld CR RPR

# Justin B. Walsh

7417 E Bonita Dr
Scottsdale, AZ 85250

Phone: (781) 710-4395
E-mail: jbwalsh76@yahoo.com

## Relevant Qualifications

- 18+ years of professional experience as an Environmental Risk Advisor
- 10+ years in the Insurance Industry
- Thorough understanding of Phase I ESAs, Site Remediation/Abatement system design/cost and regulatory compliance.
- Over 10 years of Management experience mentoring junior/mid-level personnel and oversight of 3rd party vendors.
- Excellent communication skills with experience working with Government Regulators across North America and Europe.

## Work Experience

**5/12-Present USI Insurance Services (Wells Fargo Insurance until 12/2017) – Phoenix, AZ**

| | |
|---|---|
| **Vice President** | **May 2017 to Present** |
| **Assistant Vice President** | **May 2014 to May 2017** |
| **Placement Specialist** | **May 2012 to May 2014** |

- Manage team of 3 employees with a focus on mentoring junior/mid-level staff and providing oversight of client submissions;
- Act as a Subject Matter Expert related to Environmental Risk assisting clients in various industries with protecting their pollution exposures using insurance products;
- Provide senior level environmental risk analysis to clients in a useable format so clients can clearly understand associated risks;
- Extensive experience assisting clients in the commercial / industrial real estate sector (buyers/sellers and lenders) with environmental insurance products that meet the needs of their transactional business;
- Negotiate customized insurance programs to mitigate client's environmental exposures - Directly involved with the placement of over $15MM in environmental premiums on an annual basis since 2013;
- Manage client's environmental claims and work with insurance carriers to ensure our clients obtain reimbursements in a timely manner and 3rd party contractors are following applicable regulatory standards

**12/03-5/12 Vertex Environmental Insurance Services, Weymouth, Massachusetts**

**Senior Project Manager (December 2008 to May 2012)**
**Project Manager (December 2005 to December 2008)**
**Assistant Project Manager (December 2003 to December 2005)**

- Supervised team of five junior to mid-level staff members being responsible for training, managing workload, maintaining budgets, and assisting junior staff with the completion of complex client deliverables.
- Provided underwriting support services to environmental liability insurance providers by identifying risks, analyzing potential losses, conducting regulatory compliance evaluations and assisting with risk mitigation.
- Assisted clients with loss control engineering services including site inspections; regulatory compliance reviews; technical support, and comprehensive risk evaluations.
- Managed environmental investigations (i.e. UST/AST releases, chemical spills, emergency response incidents) which include: identification of cause and origin; determine the nature and extent of the incident; and assist with subrogation.
- Handled environmental claim remediation including: conducting preliminary due diligence; contract reviews and revisions; consultant/contractor oversight; regulatory negotiations; and completion of applicable compliance reports.

**3/99-12/03 Rizzo Associates, Inc. Framingham, Massachusetts**
**Environmental Scientist - Assessment and Remediation Division**

- Developed & managed full scale subsurface investigation plans including soil excavations, soil boring advancements and groundwater monitoring well installations.
- Designed, constructed, and maintained various subsurface remediation systems including: oxidant injection, soil vapor extraction, and air sparging systems.
- Prepared scope of work, managed project scheduling, and negotiated with appropriate regulatory agencies and subcontractors.
- Collected and monitored air, soil, sediment, storm water, surface water, and groundwater samples using various instruments and interpreted laboratory data in regards to human health and ecological risk assessment standards.
- Prepared general due diligence assessments/regulatory compliance reports for clientele and applicable regulatory agencies.

## Other Professional Experience

## Education

**University of Rhode Island**, School of Resource Development.
B.S. in Environmental Science & Technology, December 1998.

## Accomplishments

2020 – USI Summit Award – Top 5% Award
2019 - USI Summit Award - Top 5% Award
2017 – USI Summit Award - Top 5% Award
2015 – Wells Fargo Insurance - Winner's Circle Award Recipient
2013 – Wells Fargo Insurance – Winner's Circle Award Recipient

Message

**From:** DocuSign NA3 System [dse_NA3@docusign.net]
on behalf of Lisa Kaucher via DocuSign <dse_NA3@docusign.net> [dse_NA3@docusign.net]
**Sent:** 1/25/2023 10:24:49 AM
**To:** Justin Walsh [jbwalsh76@yahoo.com]
**Subject:** Complete with DocuSign: Alliant Insurance Services, Inc. - Offer of Employment - Justin Walsh.pdf

Alliant

Lisa Kaucher sent you a document to review and sign.

REVIEW DOCUMENT

**Lisa Kaucher**
lkaucher@alliant.com

Dear Justin,

Please see the attached offer letter for your review and signature. You will receive additional information and instructions from Alliant Human Resources.

Kind regards,

Lisa D. Kaucher
First Vice President, Director
Employee Relations & Recruitment
Pronouns: She, Her, Hers
Human Resources

18100 Von Karman, 10th Floor
Irvine, CA 92612

D 949-260-5045
C 949-422-4889
F 949-809-1475
HR Solution Center 888-324-7471
E lkaucher@alliant.com

Exhibit 8
Witness Walsh, J
Date 4/5/23
Sabrina S Sterenfeld CR RPR

WALSH00000030

alliant.com

Alliant Insurance Services, Inc.
CA License No. 0C36861

Powered by **DocuSign**

**Do Not Share This Email**
This email contains a secure link to DocuSign. Please do not share this email, link, or access code with others.

**Alternate Signing Method**
Visit DocuSign.com, click 'Access Documents', and enter the security code:
7407D11029F34BA79022BF7E0C6B63433

**About DocuSign**
Sign documents electronically in just minutes. It's safe, secure, and legally binding. Whether you're in an office, at home, on-the-go -- or even across the globe -- DocuSign provides a professional trusted solution for Digital Transaction Management™.

**Questions about the Document?**
If you need to modify the document or have questions about the details in the document, please reach out to the sender by emailing them directly.

**Stop receiving this email**
Report this email or read more about Declining to sign and Managing notifications.

If you are having trouble signing the document, please visit the Help with Signing page on our Support Center.

Download the DocuSign App

This message was sent to you by Lisa Kaucher who is using the DocuSign Electronic Signature Service. If you would rather not receive email from this sender you may contact the sender with your request

Message

**From:** Justin Walsh [jbwalsh76@yahoo.com]
on behalf of Justin Walsh <jbwalsh76@yahoo.com> [jbwalsh76@yahoo.com]
**Sent:** 1/25/2023 11:52:02 AM
**To:** jbwalsh76@yahoo.com
**Subject:** Complete_with_DocuSign_Alliant_Insurance_Ser.pdf
**Attachments:** Complete_with_DocuSign_Alliant_Insurance_Ser.pdf

Alliant Employment Agreement

Sent from Yahoo Mail on Android

Exhibit 9
Witness Walsh, J
Date 4/5/23
Sabrina S Sterenfeld CR RPR

DocuSign Envelope ID: 12394270-B8D0-4B38-80BF-3B7AD0E613AA

Alliant

January 25, 2023

Justin Walsh
7417 E. Bonita Drive
Scottsdale, AZ 85250

**RE: Conditional Offer of Employment**

Dear Justin:

On behalf of Alliant Insurance Services, Inc., it is my pleasure to offer you the full-time position of Vice President, Account Executive – Lead in our Phoenix office. Your start date will be Wednesday, January 25, 2023, and you will report to Saira Long, Vice President, Senior Manager, Operations. This offer and your employment relationship will be subject to the terms and conditions of this letter.

Your compensation will be as follows:

**Compensation:** You will earn an initial base salary at the biweekly rate of $7,692.31 to be paid in accordance with the company's normal payroll practices, less required payroll deductions and tax withholdings. This position is an "exempt" position, which means you are paid based on the job and not by the hour. Accordingly, you will not receive overtime pay if you work more than 8 hours in a workday or 40 hours in a workweek. Future adjustments to your initial compensation will be at the company's discretion.

**Benefits:** You will be eligible on the first day of the month following your start date for customary and usual group health benefits as are generally afforded to other employees in your job classification who are employed by Alliant Insurance Services, in accordance with the company's benefit plan provisions. Currently, our benefits package includes medical, dental, basic life, AD&D, flexible spending accounts and a variety of voluntary benefits options. Additionally, you will be eligible to join Alliant's 401(k) Savings and Investment plan the first of the month following your start date. You will be auto-enrolled at 4% upon thirty (30) days of employment if you have not already enrolled or indicated your intent to opt out at that time.

**Signing Bonus:** You will receive a signing bonus in the gross amount of $125,000.00. This amount will be paid in one lump sum upon a regularly scheduled pay date within your initial thirty (30) days of employment.

This payment is subject to taxes at the IRS supplemental rate, along with other standard payroll tax withholdings. Notwithstanding the payment date, the signing bonus shall be earned over the twenty four (24) months following your initial date of hire. If, during your first two years of employment, Alliant terminates you for cause, or if you voluntarily resign prior to the expiration of the earning period, you shall repay the unearned portion of the bonus. Such amount shall be calculated by dividing the signing bonus by 730 days and multiplying the quotient by the number of days remaining prior to your second employment anniversary date. Repayment shall not be required in the event Alliant terminates your employment without cause, such as company downsizing, layoff, or elimination of the position as a result of an Alliant business decision.

Alliant

By your signature below and in the event your employment terminates within twelve months as outlined above, you authorize the company to withhold the appropriate prorated amount from any final pay you receive upon termination of employment. Should there not be ample funds available in your final pay to reimburse Alliant the full amount due, you agree to repay any outstanding debt within thirty (30) days of separation.

**First Year Bonus:** Upon completion of your first year of employment with Alliant, you will be eligible for a one-time bonus in the gross amount of $125,000.00, which shall be payable within thirty (30) days of your first year anniversary. If, during the following twenty four (24) months of employment, Alliant terminates you for cause, or if you voluntarily resign prior to the expiration of the earning period, you shall repay the unearned portion of the bonus. Such amount shall be calculated by dividing the signing bonus by 730 days and multiplying the quotient by the number of days remaining prior to your third employment anniversary date. Repayment shall not be required in the event Alliant terminates your employment without cause, such as company downsizing, layoff or elimination of the position as a result of an Alliant business decision.

**Equity:** Subject to consent by Alliant's Board of Directors which will not be unreasonably withheld, and subject to tenure and performance requirements, you will be eligible to receive an award of 25,000 B shares, which will be detailed in a forthcoming Award Agreement.

**Incentive**: You will be eligible to participate in the Specialty Discretionary Incentive Plan. Incentive plan objectives will be established at the time of hire.

Your employment with Alliant Insurance Services will be "at will." This means your employment is not for any specific period of time and can be terminated by you or Alliant Insurance Services, with or without cause or advance notice. In addition, we reserve the right to modify your position, duties, and compensation to meet business needs and to use discretion in deciding on appropriate discipline.

This offer is contingent upon the following:

- The execution of an Arbitration Agreement by you and Alliant Insurance Services in a form acceptable to the company;
- Your execution of a Confidentiality Agreement in a form acceptable to the company;
- Your compliance with federal I-9 requirements (please bring suitable documentation with you on your first day of work verifying your identity and legal authorization to work in the United States); and
- Our verification of the information contained in your employment application, including satisfactory references and background checks.

This letter supersedes all prior or contemporaneous agreements, understandings, negotiations or representations, whether oral or written, express or implied, on this subject. To indicate your acceptance of our offer based upon the terms and conditions set forth in this letter, please use DocuSign to sign this letter no later than January 25, 2023.

Upon hire, you will receive orientation with an HR Representative.

Alliant

We hope your employment with us will prove mutually rewarding, and we look forward to having you join our team. If you have any questions, please feel free to contact me directly.

Sincerely,

Lisa D. Kaucher
First Vice President, Human Resources

I have read this offer letter in its entirety and agree to the terms and conditions of employment. I understand and agree that my employment with Alliant Insurance Services will be at-will. In addition, I confirm that I do not have in my possession, custody, or control any materials or information belonging to my former employer. I understand that Alliant expressly prohibits the unauthorized use or disclosure of any confidential or proprietary information and such conduct is subject to disciplinary action up to and including termination of employment.

Signature: DocuSigned by: Justin Walsh C4576BDB37374F9 Date: 1/25/2023

Justin Walsh

DATE: 1/25/2023 6:56 PM

FROM: Lori Hartman <14802237130>

TO: Walsh Justin <+17817104395>

Hey Justin do you happen to have cecile's email address so I can send her my resignation

Exhibit 11
Witness Walsh, J
Date 4/5/23
Sabrina S Sterenfeld CR RPR

DATE: 1/25/2023 6:57 PM

FROM: Lori Hartman <14802237130>

TO: Walsh Justin <+17817104395>

I don't remember her last name by heart

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

USI Insurance Services, LLC, a Delaware limited liability company,

Plaintiff,

vs.

No. 2:23-cv-00192-SMB

Alliant Insurance Services, Inc., a California corporation; William J. Havard II and Sabrina Havard, husband and wife; Robert Engles and Hope Engles, husband and wife; Jenise Purser and Adam Purser, husband and wife; Justin Walsh and Sara Walsh, husband and wife,

Defendants.

VIDEO-RECORDED DEPOSITION OF JUSTIN WALSH

Phoenix, Arizona
March 8, 2024
9:02 a.m.

REPORTED BY:
Kristy A. Ceton, RPR, CRR
AZ CR No. 50200

CARRIE REPORTING, LLC
Certified Reporters
17505 N. 79th Avenue
Suite 301-C
Glendale, AZ 85308
(480) 429-7573

Page 2

VIDEO-RECORDED DEPOSITION OF JUSTIN WALSH commenced at 9:02 a.m., on March 8, 2024, at Snell & Wilmer, LLP, One East Washington Street, Suite 2700, Phoenix, Arizona, before Kristy A. Ceton, RPR, CRR, Arizona Certified Court Reporter No. 50200.

* * *

APPEARANCES:

For the Plaintiff:
SNELL & WILMER, LLP
By: Delilah R. Cassidy, Esq.
Joshua R. Woodard, Esq.
One East Washington Street
Suite 2700
Phoenix, Arizona 85004
dcassidy@swlaw.com
jwoodard@swlaw.com

For the Defendants:
MORGAN LEWIS & BOCKIUS, LLP
By: Johnathon Bramble, Esq.
1000 Louisiana Street
Suite 4000
Houston, Texas 77002
johnathon.bramble@morganlewis.com

Also Present:
Jonathan Williams, the videographer

Page 3

I N D E X


| EXAMINATION BY | PAGE |
|---|---|
| Ms. Cassidy................................. | 6 |
| Mr. Bramble................................ | 106 |

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Bates USI015782 through 015794 Confidentiality, Nonsolicitation & Noninterference Agreement | 7 |
| Exhibit 2 | Bates ALLIANT00032291 3/30/2023 e-mail from Justin Walsh to Jenny Han | 33 |
| Exhibit 3 | Bates ALLIANT00040907 through 00040916, 6/22/2023 e-mail Re: Investcorp Pool 1 & 2 - lender pollution policy - broker quote request (B of A) | 36 |
| Exhibit 4 | Bates ALLIANT00033906 through 00033907, e-mail Re: Hotel del Coronado | 39 |
| Exhibit 5 | Bates ALLIANT00043377 through 00043378, e-mail Re: Lender Enviro Insurance Policy: Benefit Street Partners/Silver Star Portfolio | 45 |
| Exhibit 6 | Bates ALLIANT00031496 through 00031497, e-mail Re: Lenders Policy - BMO/Cross Island Plaza | 49 |


Page 4


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 7 | Bates ALLIANT00037887 through 00037888, e-mail Re: For Bill Havard - Insurance Quote | 53 |
| Exhibit 8 | Bates ALLIANT00032521 through 00032571, e-mail Re: ICP-IRG Holdings Portfolio - Environmental | 56 |
| Exhibit 9 | Bates ALLIANT00030919 through 00030920, e-mail Re: KeyBank | 60 |
| Exhibit 10 | Bates ALLIANT00038536 through 00038538, e-mail Re: RUSH Industrial Portfolio - KKR - lender pollution policy feedback/quotes | 61 |
| Exhibit 11 | Bates ALLIANT00038501 through 00038503, e-mail Re: 1133 Polk Environmental insurance quote | 67 |
| Exhibit 12 | Bates ALLIANT00038165 through 00038166, e-mail Re: Ladder Capital - Pollution Insurance Request | 68 |
| Exhibit 13 | Bates ALLIANT00037976 through 00037889, e-mail Re: Lender Enviro Policy: Ladder EI Fortress, Puerto Rico | 73 |
| Exhibit 14 | Bates ALLIANT00038457 through 00038458, e-mail Re: BOR - Mail Properties | 77 |
| Exhibit 15 | Bates ALLIANT00038953 through 00038964, e-mail Re: Bayview Oceanview: Hilton Oak Brook Hotel | 86 |
| Exhibit 16 | Bates ALLIANT00001017, e-mail Re: Policy question | 91 |


Page 5

Phoenix, Arizona
March 8, 2024
9:02 a.m.

TRANSCRIPT OF PROCEEDINGS

THE VIDEOGRAPHER: Good morning. We are now on the record. Today's date is March 8th, 2024, and the time is 9:02 a.m. My name is Jonathan Williams, certified legal video specialist with K Video Productions.

Our court reporter is Kristy Ceton, representing Carrie Reporting, LLC, located at 17505 North 79th Avenue, Suite 301-C, Glendale, Arizona.

We are at Snell & Wilmer, LLP, 1 East Washington Street, Suite 2700, Phoenix, Arizona, to take the Volume II deposition of Justin Walsh in the United States District Court, District of Arizona, case of USI Insurance Services, LLC, versus Alliant Insurance Services, Incorporated, et al.

The attorneys will now introduce themselves and anyone else attending with them, noticing party first please, and then the court reporter will swear in the witness.

MS. CASSIDY: Good morning. Delilah Cassidy on behalf of USI Insurance Services. With me is Josh Woodard.

MR. BRAMBLE: Good morning. John Bramble

Page 10

THE WITNESS: In confidence, what type of information are you looking for or were you trying to get at? Sorry.
Q. BY MS. CASSIDY: Sorry.
Just if you see romanette iv.
A. Uh-huh.
Q. It says, "The information furnished to the company or any predecessor in confidence by any client account."
So my question is, in your duties at USI, did the client accounts that you worked on furnish you information in confidence?
MR. BRAMBLE: Objection. Form.
THE WITNESS: We were provided information, yes.
Q. BY MS. CASSIDY: If you could, Mr. Walsh, in April 20- --
You can put that aside, sir. Thank you.
A. Yep.
Q. In April 2023, you testified that you provided services to various clients at Alliant who you previously serviced during your last two years of employment at USI. Do you recall that testimony?
A. I do.
Q. I would like to run through that list to

Page 11

get an update on your activities with respect to those client accounts who you serviced at Alliant.
Based on the definition of confidential information in your agreement that we just reviewed, you learned confidential information about CBRE Group's business --
THE COURT REPORTER: Sorry. You learned confidential information?
Q. BY MS. CASSIDY: You learned confidential information about CBRE Group's business during your last two years of employment at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Correct.
Q. BY MS. CASSIDY: Are you still servicing CBRE at Alliant?
A. I am.
Q. Who else, if anyone, is working on -- with you on the environmental team at Alliant with respect to CBRE?
A. As of today?
Q. Since you began servicing, since your last testimony in April 2023.
A. Myself, Jenise Purser, and some time after April of 2023, Bill Havard started working on the account as well.

Page 12

Q. To your knowledge, are there any other people at Alliant that don't necessarily work with you but they, nonetheless, service CBRE's environmental policy needs?
A. Not off the top of my head, no.
Q. Why did you continue to service CBRE when you had other people on your team that could have done so?
MR. BRAMBLE: Objection. Form.
THE WITNESS: They needed my assistance.
Q. BY MS. CASSIDY: Did you inform anyone at Alliant that you had any restrictions that prevented you from servicing CBRE in the two years following your employment with USI?
A. Not that I'm aware of.
Q. Why not?
A. I don't believe I had any restrictions.
Q. I want to move on to the next -- Excuse me. Wait. Just -- Sorry. One second. One more question related to CBRE.
Did anyone at Alliant tell you to stop servicing CBRE?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Not that I'm aware of.
Q. BY MS. CASSIDY: The next line I want to

Page 13

ask you about is Store Capital Corporation. Again, based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about Store Capital Corporation's business during your last two years at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Correct.
Q. BY MS. CASSIDY: Are you still servicing Store Capital at Alliant?
A. Yes.
Q. Who else, if anyone, is working with you on the environmental service team with respect to Store Capital?
A. Currently, it would be myself, Amy Phalen, Jenise Purser at times, and Bill Havard at times.
Q. Mr. Walsh, you said Carly, do you know that person's last name?
A. Carly? I don't know who that is.
Q. Sir, I thought that was the first name that you said in your answer.
A. Oh, no. Myself.
Q. Oh.
A. Amy Phalen, Jenise Purser at times, as

well as Bill Havard.
Q. To your knowledge, are there other people at Alliant, not necessarily working with you, but, nonetheless, service Store Capital's environmental policy needs at Alliant?
A. Maybe Lori Hartman, but not that I'm aware of off the top of my head. Sorry.
Q. Why did you continue to service Store Capital when you had other people on your team that could have done so?
A. There was a need, a client need.
Q. Are there other people at Alliant that could have fulfilled that need other than you?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Not that I'm aware. Actually, no.
Q. BY MS. CASSIDY: Did you inform anyone at Alliant that you had restrictions that prevented you from servicing Store Capital in the last two years following your employment with USI?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Not aware of restrictions.
Q. BY MS. CASSIDY: Did anyone at Alliant tell you to stop servicing Store Capital Corporation?
A. Not that I'm aware of.



Q. The next client I want to ask about is Allied Aviation Service Company.
A. Sure.
Q. Based on the definition of confidential information in your agreement that we reviewed, Exhibit 1, earlier, you learned confidential information about Allied Aviation Service Company's business during your two years at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Yes.
Q. BY MS. CASSIDY: Are you still servicing Allied Aviation Service Company at Alliant?
A. I am.
Q. Who else, if anyone, is working with you on the environmental service team at Alliant with respect to Allied Aviation?
A. As of today, I would say Bill Havard, myself, Jenise Purser.
Q. When did Bill Havard begin servicing Allied Aviation along with yourself and Jenise Purser?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I don't recall an exact date. I'm sorry.
Q. BY MS. CASSIDY: Do you have an



approximate month that -- to your knowledge?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Not -- No. I wouldn't know exactly when he started. Sorry.
Q. BY MS. CASSIDY: To your knowledge, are there any other people at Alliant, not necessarily working with you, but, nonetheless, service Allied Aviation's environmental policy needs at Alliant?
A. Not with regards to environmental.
Q. Why did you continue to service Allied Aviation when you had other people on your team that could have done so?
A. It was a client need.
Q. Mr. Walsh, to your knowledge, are you the only person that would be able to fulfill the client-specific need that you reference?
A. Not that I'm aware of, no.
Q. So there -- Well, is it fair to say, then, that there are other people that could have serviced Allied Aviation's need that you -- that they wanted you to fulfill at Alliant?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I don't know who at Alliant they would use.
Q. BY MS. CASSIDY: Did you inform anyone at



Alliant that you had restrictions that prevented you from servicing Allied Aviation in the two years following your employment at USI?
MR. BRAMBLE: Objection. Form.
THE WITNESS: No. I'm not aware of any restrictions.
Q. BY MS. CASSIDY: Did anyone at Alliant tell you to stop servicing Allied Aviation?
A. Not that I'm aware of.
Q. The next client I want to ask about is The Related Companies.
A. Uh-huh.
Q. Based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about The Related Companies' business during your last two years at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Correct.
Q. BY MS. CASSIDY: And you're still servicing -- Sorry.
And you're still servicing The Related Companies at Alliant?
A. I am.
Q. Who else, if anyone, is working with you

Page 18

on the environmental service team at Alliant with respect to The Related Companies?
A. As of today, it would be myself, Jenise Purser, Bill Havard, and at times, Amy Phalen.
Q. Do you know -- To your knowledge, do you know when Mr. Havard approximately began servicing The Related Companies at Alliant along with yourself and the other individuals that you named?
A. I wouldn't be able to tell you a date as to when he started. Sorry.
Q. Who else, if anyone, is working with you -- Sorry.
To your knowledge, are there other people at Alliant who don't necessarily work with you, but, nonetheless, service The Related Companies' environmental policy needs?
A. Not that I'm aware of.
Q. Why did you continue to service The Related Companies when there are other people on the team who could have done so?
A. There's a client need for my services.
Q. And, to your knowledge, are you the only person at Alliant that could have provided that service to The Related Companies?
MR. BRAMBLE: Object to form.

Page 19

THE WITNESS: No.
Q. BY MS. CASSIDY: So then, it would be fair to state that there other individuals that would have been able to fulfill that client need at Alliant?
MR. BRAMBLE: Object to form.
THE WITNESS: There's other -- there's other employees, yeah. But I've just named them. So...
Q. BY MS. CASSIDY: Did you inform anyone at Alliant that you had restrictions that prevented you from servicing The Related Companies in the two years following your employment with USI?
A. No.
MR. BRAMBLE: Object to form.
THE WITNESS: Sorry.
MR. BRAMBLE: Object to form.
Q. BY MS. CASSIDY: Did anyone at Alliant tell you to stop servicing The Related Companies?
A. Nope.
Q. Why not?
MR. BRAMBLE: Object to form.
THE WITNESS: I -- I'm not sure.
Q. BY MS. CASSIDY: The next client I want to ask about is USAA Real Estate.

Page 20

A. Uh-huh.
Q. Based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about USAA's -- USAA Real Estate's business during your last two years at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Yes.
Q. BY MS. CASSIDY: Are you still servicing USAA at Alliant?
A. I am.
Q. Who else, if anyone, is working with you on the environmental service team at Alliant with respect to USAA?
A. That would be myself, Amy Phalen, Bill Havard, and Jenise Purser at times. That's as of current. So...
Q. To your knowledge, are there other people at Alliant, not necessarily working with you, but, nonetheless, service USAA's environmental policy needs at Alliant?
A. Not that I'm aware of.
Q. Why did you continue to service USAA when you had other people on the team who could have done so?

Page 21

A. Again, it -- There was a client need.
Q. And, to your knowledge, are you the only person at Alliant that could have fulfilled that client need?
A. No. There's other -- there's other colleagues that I just mentioned.
Q. To your knowledge, other than the colleagues that you just mentioned, are there any other individuals at Alliant who could have fulfilled that client need?
A. Possibly. I'm not sure who they are.
Q. So fair to state that there are other individuals at Alliant, other than those that you named, that could have fulfilled that client need?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Other bodies at Alliant, yeah, possibly. Yeah.
Q. BY MS. CASSIDY: Did you inform anyone at Alliant that you had restrictions that prevented you from servicing USAA in the two years following your employment with USI?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Not that I recall. No.
Q. BY MS. CASSIDY: Why not?
A. I'm not aware of any restrictions.

Q. Did anyone at Alliant tell you to stop servicing USAA?
A. I don't believe so, no.
Q. The next client I want to ask about is Western National Group. Based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about Western National Group's business during your last two years at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Correct.
Q. BY MS. CASSIDY: Are you still servicing Western National Group at Alliant?
A. I am.
Q. Who, if anyone, is working with you on the environmental service team at Alliant with respect to Western National Group?
A. As of today, it would be myself, Bill Havard, Jenise Purser, and possibly also Amy Phalen.
Q. Mr. Walsh, are there any other individuals, who since your last testimony, have worked with you to provide -- to fulfill Western National Group's environmental policy needs, other than the individuals you just named?
A. Not that I'm aware of.



Q. To your knowledge, are there any other people at Alliant, not necessarily working with you, but, nonetheless, that service Western National Group's environmental policy needs?
A. Just the people I mentioned.
Q. Why did you continue to service Western National Group when you had other people on the team who could have done so?
A. Again, there was a client need for it. So...
Q. Did you inform anyone at Alliant that you had restrictions that prevented you from servicing Western National Group at Alliant in the two years following your employment with USI?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I don't believe so.
Q. BY MS. CASSIDY: Why not?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Again, I'm not aware of any restrictions for me to service the account.
Q. BY MS. CASSIDY: Did anyone at Alliant tell you to stop servicing Western National Group?
A. Not that I'm aware of.
Q. The next client I want to ask about is Rudin Management. Based on the definition of



confidential information in the agreement that we reviewed, you learned confidential information about Rudin Management's business during your last two years of employment at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Possibly. That account -- we really didn't touch that account before we left USI. So I don't think I was really involved with the account before I left USI.
Q. BY MS. CASSIDY: Are you still servicing Rudin Management at Alliant?
A. I am servicing Rudin Management at Alliant now, yeah.
Q. Who else, if anyone, is working with you on the environmental service team at Alliant with respect to Rudin Management?
A. It would be the same colleagues. Currently, it would be like Bill Havard, Jenise Purser, myself, Amy Phalen.
Q. To your knowledge, are there other people at Alliant, not necessarily working with you, but, nonetheless, service Rudin Management's environmental policy needs?
A. Not that I'm aware of.
Q. Why did you continue to service Rudin



Management when you had other people on the team who could have done so?
A. Because there was a client need.
Q. Did you inform anyone at Alliant that you had any restrictions that prevented you from servicing Rudin Management in the two years following your employment with USI?
MR. BRAMBLE: Objection. Form.
THE WITNESS: No, I did not.
Q. BY MS. CASSIDY: Why not?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Because I'm not aware of there being a restriction against servicing the account.
Q. BY MS. CASSIDY: Did anyone at Alliant tell you to stop servicing Rudin Management?
A. Not that I'm aware of.
Q. The next client I want to ask about is Starwood Mortgage Capital.
A. Uh-huh.
Q. Based on the definition of confidential information in your agreement that we reviewed, fair to say that you learned confidential information about Starwood Mortgage Capital's business during your last two years at USI?

MR. BRAMBLE: Objection. Form.
THE WITNESS: Yes, that's accurate.
Q. BY MS. CASSIDY: Are you still servicing Starwood Mortgage Capital at Alliant?
A. I am.
Q. Who else, if anybody, is working with you on the environmental service team at Alliant with respect to Starwood Mortgage Capital?
A. As of today, it would be Bill Havard, it would be myself, Jenise Purser, and Amy Phalen.
Q. To your knowledge, are there other people at Alliant, not necessarily working with you, but, nonetheless, service Starwood Mortgage Capital's environmental policy needs?
A. Not that I'm aware of, no.
Q. Why did you continue to service Starwood Mortgage Capital when you had other people on the team who could have done so?
A. Again, it was a client need.
Q. Did you inform anyone at Alliant that you had any restrictions that prevented you from servicing Starwood Mortgage Capital in the two years following your employment with USI?
A. I did not.
Q. Why not?



A. Again, I'm not -- I wasn't aware of any restrictions with me servicing this account.
Q. Did anyone at Alliant tell you to stop servicing Starwood Mortgage Capital?
A. Not that I'm aware of, no.
Q. The next client I want to ask about is Beacon Capital. Based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about Beacon Capital's business during your last two years of employment at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I did.
Q. BY MS. CASSIDY: And you're still servicing Beacon Capital at Alliant?
A. I am.
Q. Who else, if anybody, is working with you on the environmental service team at Alliant with respect to Beacon Capital?
A. As of today, it would be Bill Havard, myself, Amy Phalen, Jenise Purser.
Q. To your knowledge, are there other people at Alliant, not necessarily working with you, but that, nonetheless, service Beacon Capital's environmental policy nodes?



A. Not that I'm aware of.
Q. Why did you continue to service Beacon Capital when you had other people on the team that could have done so?
A. There was a client need.
Q. Did you inform anyone at Alliant that you had any restrictions that prevented you from servicing Beacon Capital in the two years following your employment at USI?
A. I did not.
Q. Why not?
A. Again, I'm not aware of any restrictions to service the account.
Q. Did anyone at Alliant tell you to stop servicing Beacon Capital?
A. They did not.
Q. The next client I want to ask about is Brennan Management.
A. Okay.
Q. Based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about Brennan Management's business during your last two years of employment at USI, right?
MR. BRAMBLE: Objection. Form.



THE WITNESS: That's accurate.
Q. BY MS. CASSIDY: Are you still servicing Brennan Management at Alliant?
A. I am.
Q. Who else, if anybody, is working with you on the environmental service team at Alliant with respect to Brennan Management?
A. To be honest, I don't think we've touched Brennan Management in quite some time, so it would probably just be myself, Jenise, and -- I think that's it.
Q. To your knowledge, are there other people at Alliant, not necessarily working with you, but, nonetheless, service Brennan Management's environmental policy needs?
A. Not that I recall.
Q. Why did you continue to service Brennan Management when you had other people on the team who could have done so?
A. There was a need for the service. So...
Q. Did you inform anyone at Alliant that you had restrictions that prevented you from servicing Brennan Management in the two years following your employment with the USI?
MR. BRAMBLE: Objection. Form.

THE WITNESS: I did not.
Q. BY MS. CASSIDY: Why not?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I'm not aware of any restrictions with me servicing the account.
Q. BY MS. CASSIDY: Did anyone at Alliant tell you to stop servicing Brennan Management?
A. They did not.
Q. Why haven't you stopped providing insurance services to the client accounts that we just went through?
A. There's a client need for the service.
Q. Mr. Walsh, other than the 10 client accounts that we just discussed, there are additional clients that you serviced during your last two years at USI that you are now servicing at Alliant, correct?
A. Possibly, yeah.
Q. You serviced Angelo Gordon during your last two years of employment at USI, correct?
A. I did.
Q. Based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about Angelo Gordon's business during your last two years of



employment at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I did.
Q. BY MS. CASSIDY: When did you start servicing Angelo Gordon as an Alliant employee?
A. I don't remember the exact date, actually.
Q. Do you have an approximate month?
A. Maybe April. Maybe late March. If you have an e-mail I could look at, something to refresh my memory, glad to look at it. But I don't know off the top of my head. Sorry.
Q. Are you still servicing Angelo Gordon at Alliant?
A. Yes.
Q. Who else, if anyone, is working with you on the environmental service team at Alliant with respect to Angelo Gordon?
A. Currently, that would be myself, Jenise Purser, Bill Havard, and I'll include Amy Phalen as well.
Q. To your knowledge, are there other people at Alliant, not necessarily working with you, but, nonetheless, service Angelo Gordon's environmental policy needs?



A. Not that I'm aware of.
Q. Why did you continue to service Angelo Gordon when you had other people on your team who could have done so?
A. It was a client need.
Q. Did you inform anyone at Alliant that you had any restrictions that prevented you from servicing Angelo Gordon in the two years following your employment with USI?
A. I did not.
Q. Why not?
A. I'm not aware of there being a restriction against me servicing these accounts.
Q. Did anyone at Alliant tell you to stop servicing Angelo Gordon?
A. No, they did not.
Q. Isn't it true that Alliant told you you were cleared to work on Angelo Gordon?
A. I believe that may have been one of the accounts. I'm not entirely sure.
Q. Who would have cleared you to work on Angelo Gordon's account?
MR. BRAMBLE: Objection. Form. Foundation.
THE WITNESS: Saira Long.



THE COURT REPORTER: I'm sorry?
THE WITNESS: Saira, S-a-i-r-a.
Q. BY MS. CASSIDY: At Alliant -- Sorry. Strike that.
(Exhibit 2 was marked for identification.)
Q. BY MS. CASSIDY: Mr. Walsh, the court reporter has placed a document in front of you marked Exhibit 2.
Do you see that?
A. I do.
Q. This is an e-mail from Justin -- from yourself to Jenny Han in March of 2023. Yes?
A. It is.
Q. And the subject line reads, "Angelo Gordon, preliminary indication." Yes?
A. It does.
Q. Fair to say that this e-mail relates to a new deal at Angelo Gordon, not an existing project that you started at USI?
A. Correct.
Q. Do you know whether Alliant was paid a fee for doing this project for Angelo Gordon?
A. No. Because I don't know if this deal actually bound or not.
Q. Did you tell USI that you were servicing

Angelo Gordon at Alliant?
A. No.
Q. Why not?
A. I haven't had any contact with anybody at USI since I left.
Q. Why didn't you tell them that you were servicing Angelo Gordon at Alliant?
A. I didn't feel the need to.
Q. You serviced Bank of America during your last two years that you worked at USI, correct?
A. Correct.
Q. And based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about Bank of America's business during your last two years of employment at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Sure. Yes.
Q. BY MS. CASSIDY: When did you start servicing Bank of America as an Alliant employee?
A. I don't recall the exact date.
Q. Do you have an approximate month?
A. I don't.
If you have something for me to look at like this, I could probably tell you.



Q. Who else, if anyone, is working with you on the environmental service team at Alliant with respect to Bank of America?
A. As of today, that would be Bill Havard, myself, Jenise Purser, and Amy Phalen.
Q. To your knowledge, are there any other people at Alliant, not necessarily working with you, but, nonetheless, service Bank of America's environmental policy needs?
A. Not that I'm aware of.
Q. Why did you continue to service Bank of America when you had other people on your team who could have done so?
A. Again, there's a client need.
Q. Did you inform anyone at Alliant that you had any restrictions that prevented you from servicing bank of America in the two years following your employment at USI?
A. I did not.
Q. Why not?
A. Because I don't believe there is a restriction.
Q. Did anyone at Alliant tell you to stop servicing Bank of America?
A. No.



Q. Isn't it true that Alliant told you that you were cleared to work on Bank of America's account?
A. Not in -- not that I'm aware of with regards to Bank of America. Sorry.
(Exhibit 3 was marked for identification.)
Q. BY MS. CASSIDY: Mr. Walsh, the court reporter has placed a document in front of you marked Exhibit 3. Do you have that?
A. Yes.
Q. This appears to be an e-mail from Amber Walker at Harbor Consulting Group to Bill Havard and yourself copying Jenise Purser.
A. Uh-huh.
Q. The e-mail relates to a Bank of America pollution policy project. Fair?
A. Yeah. It was a new deal from Bank of America, yeah.
Q. At Alliant, you were working on at least one new project with Bank of America, not an existing one that started at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Not that I recall, yeah.
Q. BY MS. CASSIDY: Mr. Walsh, was this project, detailed in the e-mail in front of you, a



project that began at USI, to your knowledge?
A. Not to my knowledge, no.
Q. So, fair to say, this is a new project that you worked on for Bank of America at Alliant, not an existing one that you started at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: That's my understanding, yeah.
Q. BY MS. CASSIDY: Do you know whether Alliant was paid a fee for doing this project for Bank of America?
A. Possibly. I don't know off the top of my head if this deal bound or not. We wouldn't be paid a fee unless the deal was actually bound.
Q. Did you tell USI that you were servicing Bank of America at Alliant?
A. No, I did not.
Q. Why not?
A. I didn't feel the need to.
Q. You serviced Barclays during your last two years that you worked at USI, correct?
A. Correct.
Q. Based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about Barclays'

business during your last two years of employment at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Correct.
Q. BY MS. CASSIDY: When did you start servicing Barclays at Alliant?
A. I couldn't give you an exact date.
Q. Do you have an approximate month?
A. I don't. Again, if you have an e-mail for me to look at, I'm sure I could verify.
Q. Are you still servicing Barclays at Alliant?
A. I think that's fair to say, yeah. We don't have any active deals with them, but...
Q. Who else, if anybody, is working with you on the environmental service team at Alliant with respect to Barclays?
A. It would be myself, Jenise Purser, and Bill Havard.
Q. To your knowledge, are there other people at Alliant, not necessarily working with you, but, nonetheless, service Barclays' environmental policy needs at Alliant?
A. Not that I'm aware of.
Q. Why did you continue to service Barclays



when you had other people on your team who could have done so?
A. It was a client need.
Q. Did you inform anyone at Alliant that you had any restrictions that prevented you from servicing Barclays in the two years following your employment with USI?
A. I did not.
Q. Why not?
A. I wasn't aware of that there was a restriction for -- for me to service this account.
Q. Did anyone at Alliant tell you to stop servicing Barclays?
A. No.
Q. Isn't it true that Alliant told you that you were cleared to work on the Barclays account?
A. This may have been one of those accounts. I don't know off the top of my head. Sorry.
Q. At Alliant -- Sorry. Strike that.
(Exhibit 4 was marked for identification.)
THE WITNESS: Thank you.
Q. BY MS. CASSIDY: Mr. Walsh, in front of you is a document marked Exhibit 4, correct?
A. Correct.
Q. This appears to be an e-mail from Abbi



Cohen to David Orleans, Linda Shin, Bill Nellen, and Jenise Purser, correct?
A. That's accurate.
Q. And the subject of this e-mail concerns Hotel del Coronado. Yes?
A. Correct.
Q. If you direct your attention to the e-mail that is at the bottom of that first page.
A. Okay.
Q. You see that it copies individuals at Barclays. Yes?
A. Sure.
Q. So, fair to say, then, that the Hotel del Coronado project, as reflected on this document, came from Barclays?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I couldn't tell you that. I don't think I was involved with this one.
Q. BY MS. CASSIDY: Did you work on the Hotel del Coronado project while you were at Alliant?
A. I don't believe I did.
Q. Do you know whether Alliant completed this project for Barclays related to Hotel del Coronado?
A. I don't know.



Q. Do you know whether Alliant was paid a fee for doing this new project for Barclays?
A. I wasn't --
MR. BRAMBLE: Object to form.
THE WITNESS: Sorry.
MR. BRAMBLE: Foundation.
THE WITNESS: I wasn't involved with this project, I don't believe.
Q. BY MS. CASSIDY: Did you tell USI that you were servicing Barclays at Alliant?
A. Not that I recall.
Q. Why not?
A. I wasn't servicing Barclays with regards to this deal.
Q. Did you tell USI that you were servicing Barclays on other deals at Alliant?
A. Excuse me. Can you rephrase or repeat that?
Q. Yes.
Earlier, Mr. Walsh, you testified that you serviced Barclays at Alliant, correct?
A. I believe we have, yeah.
Q. Did you tell USI that you were servicing Barclays at Alliant?
A. No.

Q. Why not?
A. I'm not aware of there being a restriction against me servicing Barclays account.
Q. Sorry, Mr. Walsh. My question was, why didn't you tell USI that you were servicing Barclays?
A. I'm sorry. I thought I said I wasn't aware of there being a restriction against me servicing that account.
Q. You serviced Benefit Street Partners during your last two years that you worked at USI, correct?
A. Correct.
Q. And based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about Benefit Street Partner's business during your last two years at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Correct.
Q. BY MS. CASSIDY: When did you start servicing Benefit Street Partners as an Alliant employee?
A. Again, I couldn't give you an exact date on that.
Q. Are you still servicing them at Alliant?



A. I am.
Q. Who else, if anyone, is working with you on the environmental service team at Alliant with respect to -- with respect to Benefit Street Partners?
A. Currently, it would be myself, Bill Havard, Jenise Purser, Amy Phalen.
Q. To your knowledge, are there other people at Alliant, not necessarily working with you, but that, nonetheless, service Benefit Street Partners' environmental policy needs at Alliant?
A. Not that I'm aware.
Q. Why did you continue to service Benefit Street Partners when you had other people on your team who could have done so?
A. Again, there's a client need.
Q. Did you inform anyone at Alliant that you had any restrictions that prevented you from servicing Benefit Street Partners in the two years following your employment at USI?
A. I did not.
Q. Why not?
A. Because I don't believe there was a restriction against me servicing that account.
Q. Did anyone at Alliant tell you to stop



servicing Benefit Street Partners?
A. They did not.
Q. Isn't it true that Alliant told you that you were cleared to work on Benefit Street Partners' account?
A. I don't recall if that was one of the -- the accounts that I was, you know, cleared to work on.
Q. Mr. Walsh, to your knowledge, did you have to receive clearance from Alliant prior to working on any account?
A. I don't know if it was a -- I mean, I was told I could work on accounts. I don't know if there was an actual -- if I needed to or not.
Q. Was it your understanding that you could service an account before being specifically instructed by anyone at Alliant that you were permitted to work on that account?
A. I don't know. I was a new employee at Alliant. So I was waiting for clearance from somebody to -- to -- to work on certain accounts.
Q. But you could work -- To your understanding, you could have worked on Benefit Street Partners without someone at Alliant telling you, you're cleared to work on this account. Yes?



A. Yes.
Q. Did you inform anyone at Alliant that you had any restrictions that prevented you from servicing Benefit Street Partners in the two years following your employment at USI?
A. No.
Q. Did anyone at Alliant tell you to stop servicing Benefit Street Partners?
A. No.
(Exhibit 5 was marked for identification.)
Q. BY MS. CASSIDY: Mr. Walsh, the court reporter has placed a document in front of you marked Exhibit 5. Do you have that?
A. Yes.
Q. This appears to be an e-mail from Valerie Sheaffer to Bill Havard, yourself, and Jenise Purser, copying individuals from Benefit Street Partners. Yes?
A. Correct.
Q. And this e-mail, the subject concerns Benefit Street Partners' lender environmental insurance policy. Yeah?
A. That's accurate.
Q. Mr. Walsh, if you look to the first line of that e-mail, it's directed to USI team.

Do you see that?
A. Correct.
Q. As a recipient of this e-mail, do you have any understanding of who the USI team is?
A. The e-mail is addressed to Bill Havard, Justin Walsh, Jenise Purser. So I would assume that us three individuals is who she's referring to.
Q. Do you know why Ms. Sheaffer referred to yourself, Bill Havard, and Jenise Purser as the USI team?
A. You would have to ask Valerie.
Q. Why do you think -- why did you think that this e-mail was supposed to go to you, despite being directed to the USI team?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I don't understand the question. It's addressed to me. It was sent to me.
Q. BY MS. CASSIDY: Did you ever correct Ms. Sheaffer, that you're an Alliant employee rather than a USI employee?
A. No. I don't think I did.
Q. Why not?
A. I'm not even sure if I caught that, to be honest with you, at the time.
Q. Did you forward this e-mail to anyone at



USI knowing that it was supposed to go to USI team, as directed from the body of the e-mail?
MR. BRAMBLE: Objection. Form. Foundation.
THE WITNESS: Actually, it was addressed to Bill Havard, myself, and Jenise Purser at Alliant, so I think she just misspoke.
Q. BY MS. CASSIDY: Do you know whether Alliant was paid a fee for this new project for Benefit Street Partners?
MR. BRAMBLE: Objection. Form. Foundation.
THE WITNESS: That, I don't recall.
Q. BY MS. CASSIDY: At Alliant, you have worked on at least one new project for Benefit Street Partners that wasn't an existing project that started at USI, correct?
A. Correct.
Q. Did you tell USI that you were servicing Benefit Street Partners at Alliant?
A. No.
Q. Why not?
A. I don't believe I had any restrictions in my -- or any restrictions with regards to servicing this account.



Q. You serviced Bank of Montreal in your last two years that you worked at USI, correct?
A. Correct.
Q. Based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about Bank of Montreal's business during your last two years of employment at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Correct.
Q. BY MS. CASSIDY: When did you start servicing Bank of Montreal's business at Alliant?
A. I couldn't give you an exact date.
Q. Are you still servicing Bank of Montreal's business at Alliant?
A. Yes.
Q. Who else, if anyone, is working with you on the environmental service team at Alliant with respect to Bank of Montreal?
A. As of today, it would be myself, Bill Havard, Jenise Purser, and, in all likelihood, Amy Phalen as well.
Q. To your knowledge, are there other people at Alliant, not necessarily working with you, but that, nonetheless, service Bank of Montreal's



environmental policy needs at Alliant?
A. Not that I'm aware of.
Q. Why did you continue to service Bank of Montreal when other people on your team could have done so?
A. There's a need.
Q. Did you inform anyone at Alliant that you had any restrictions that prevented you from servicing Bank of Montreal in the two years following your employment at USI?
A. I did not.
Q. Why not?
A. I don't believe there was any restrictions with me servicing this account.
Q. Did anyone at Alliant tell you to stop servicing Bank of Montreal?
A. No, they did not.
Q. Isn't it true that Alliant told you that you were cleared to work on Bank of Montreal's account at Alliant?
A. I don't recall if this was one of those accounts.
(Exhibit 6 was marked for identification.)
Q. BY MS. CASSIDY: Mr. Walsh, the court reporter has placed a document in front of you marked

Exhibit 6, correct?
A. Correct.
Q. If you could direct your attention to the e-mail that is at the bottom.
A. Uh-huh.
Q. It appears to be from Sami Groff to yourself and Jenise Purser, correct?
A. That's correct.
Q. Fair to say that this e-mail concerns policy for -- a 13-year policy for Bank of Montreal?
A. Yeah. We're being asked to obtain proposals.
Q. Mr. Walsh, do you know whether Alliant was paid a fee for doing this new project for Bank of Montreal?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I can't tell you if this deal bound specifically or not.
Q. BY MS. CASSIDY: At Alliant, you've worked on at least one new project for Bank of Montreal that wasn't an existing project that started at USI, correct?
A. I'm sorry. Can you repeat that?
Q. At Alliant, you've worked on at least one new project for Bank of Montreal that wasn't an



existing project that started at USI, correct?
A. Correct.
Q. Did you tell USI that you were servicing Bank of Montreal's business at Alliant?
A. I did not.
Q. Why not?
A. I wasn't aware that there was a restriction from me servicing the Bank of Montreal account.
Q. You serviced Deutsch Bank during your last two years that you worked at USI, correct?
A. I did.
Q. Based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about Deutsch Bank's business during your last two years of employment at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Correct.
Q. BY MS. CASSIDY: When did you start servicing Deutsch Bank as an Alliant employee?
A. I couldn't give you an exact date.
Q. Are you still servicing their business at Alliant?
A. Yes.



Q. Who else, if anyone, is working with you on the environmental service team at Alliant with respect to Deutsch Bank?
A. As of today, it would be myself, Bill Havard, Jenise Purser, and Amy Phalen.
Q. To your knowledge, are there other people at Alliant, not necessarily working with you, but that, nonetheless, service Deutsch Bank's business at Alliant?
A. Not that I'm aware of.
Q. Why did you continue to service Deutsch Bank's business when you had other people on your team that could have done so?
A. There's a client need.
Q. Did you inform anyone at Alliant that you had any restrictions that prevented you from servicing Deutsch Bank's business in the two years following your employment with USI?
A. No.
Q. Why not?
A. I don't believe there was a -- any restrictions with me servicing this account.
Q. Did anyone at Alliant tell you to stop servicing Deutsch Bank?
A. Not that I'm aware of.



Q. Isn't it true that Alliant told you that you were cleared to work on Deutsch Bank's business at Alliant?
A. I don't know if that was an account that we -- that I received a verbal approval for or not.
(Exhibit 7 was marked for identification.)
Q. BY MS. CASSIDY: Mr. Walsh, the court reporter has placed a document in front of you marked Exhibit 7. Yes?
A. Correct.
Q. If you could flip to page 2 of that document. You see at the top where it says, "Hi, Eric, I guess this e-mail is meant for Bill Havard and his team"?
A. I see that.
Q. And just after that, the next sentence references Deutsch Bank. Yes?
A. It does.
Q. Fair to state that this e-mail concerns a new project that you assisted with at Alliant, not an existing project that continued from USI?
A. I believe so, yeah.
Q. Mr. Walsh, do you have any idea why Scott Reiner would reach out to Eric Harper for an e-mail meant for Bill Havard and his team?

Page 54

MR. BRAMBLE: Object to form.
THE WITNESS: I'm not sure.
Q. BY MS. CASSIDY: Did you indicate to Scott Reiner that he could contact you directly without having to go through Mr. Harper?
A. No.
Q. Why not?
A. I didn't have a -- I didn't have a need to talk to Scott up until this point.
Q. Do you know whether Alliant was paid a fee for doing this project for Deutsch Bank?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I'm not sure if this deal bound or went anywhere, to be honest.
Q. BY MS. CASSIDY: Did you tell USI that you were servicing Deutsch Bank's business at Alliant?
A. No.
Q. Why not?
A. I didn't feel the need to.
Q. You worked -- you serviced J.P. Morgan during the last two years you worked at USI, correct?
A. Correct.
Q. Based on the definition of confidential information, your agreement that we reviewed, you

Page 55

learned confidential information about J.P. Morgan's business during your last two years at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Correct.
Q. BY MS. CASSIDY: When did you start servicing J.P. Morgan's business as an Alliant employee?
A. I couldn't give you an exact date.
Q. Are you still servicing J.P. Morgan's business at Alliant?
A. I don't believe we have anything going on with J.P. Morgan, but if they call me tomorrow, I would service it.
Q. Who else, if anyone, is working with you on the environmental service team at Alliant with respect to J.P. Morgan?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Again, I don't believe we have anything going on with J.P. Morgan. But the service team would be myself, Jenise Purser, Amy Phalen, and Bill Havard.
Q. BY MS. CASSIDY: To your knowledge, are there any other people at Alliant, not necessarily working with you, but that, nonetheless, service J.P. Morgan's environmental policy needs at Alliant?

Page 56

MR. BRAMBLE: Objection. Form.
THE WITNESS: Not that I'm aware of.
Q. BY MS. CASSIDY: Why did you continue to service J.P. Morgan's business at Alliant when you had other people on your team who could have done so?
MR. BRAMBLE: Same objection.
THE WITNESS: There's a client need.
Q. BY MS. CASSIDY: Did you inform anyone at Alliant that you had restrictions that prevented you from servicing J.P. Morgan in the two years following your employment with USI?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I did not.
Q. BY MS. CASSIDY: Why not?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I don't believe there was a restriction with me servicing the J.P. Morgan account.
Q. BY MS. CASSIDY: Did anyone at Alliant tell you to stop servicing J.P. Morgan?
A. No.
Q. Isn't it true that Alliant told you that you were cleared to work on the J.P. Morgan account?
A. I don't know. I don't recall.
(Exhibit 8 was marked for identification.)

Page 57

Q. BY MS. CASSIDY: Mr. Walsh, the court reporter has placed in front of you a document marked Exhibit 8. Yes?
A. Correct.
Q. And this e-mail -- is an e-mail from Elizabeth Searl, S-e-a-r-l, to yourself, copying Jenise Purser and other individuals at Harbor Consulting Group. Yes?
A. Correct.
Q. Reviewing this e-mail, fair to state that this concerns a project with J.P. Morgan?
A. Yes, they would be the lender on this one.
Q. Do you know whether Alliant was paid a fee for doing this new project for J.P. Morgan?
MR. BRAMBLE: Objection. Form. Foundation.
THE WITNESS: Yeah. I don't know if this deal bound or not.
Q. BY MS. CASSIDY: At Alliant, you've worked on at least one new project for J.P. Morgan that did not -- that was not an existing one that started at USI, correct?
A. That's correct.
Q. Did you tell USI that you were servicing

J.P. Morgan at Alliant?
A. I did not.
Q. Why not?
A. I don't believe there was a restriction with me servicing this account.
Q. You serviced KeyBank during your last two years that you worked at USI, correct?
A. Correct.
Q. And based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about KeyBank's business during your last two years of employment at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Correct.
Q. BY MS. CASSIDY: When did you start servicing KeyBank's business at Alliant?
A. I couldn't give you an exact date.
Q. Are you still servicing KeyBank's business at Alliant?
A. We don't have anything going on with KeyBank at the moment, but I -- I guess I would have to say yes.
Q. Who else, if anybody, is working with you on the environmental service team at Alliant with



respect to KeyBank?
A. That would be myself, Jenise Purser, Amy Phalen, and Bill Havard.
Q. To your knowledge, are there other individuals at Alliant, not necessarily working with you, but that, nonetheless, service KeyBank's environmental policy needs?
A. Not that I'm aware of.
Q. Why did you continue to service KeyBank at Alliant when you had other people on your team who could have done so?
A. It was a client need.
Q. Did you inform anyone at Alliant that you had restrictions that prevented you from servicing KeyBank in the two years following your employment with USI?
A. I did not.
MR. BRAMBLE: Objection. Form.
THE WITNESS: Sorry.
Q. BY MS. CASSIDY: Why not?
MR. BRAMBLE: Same objection.
THE WITNESS: I don't believe there was a restriction against me servicing this account.
Q. BY MS. CASSIDY: Did anyone at Alliant tell you to stop servicing KeyBank?



A. They did not.
Q. Isn't it true that Alliant told you that you were cleared to work on KeyBank's account at Alliant?
A. That, I don't recall.
(Exhibit 9 was marked for identification.)
Q. BY MS. CASSIDY: Mr. Walsh, the court reporter has placed a document in front of you.
A. Uh-huh.
Q. Marked Exhibit 9, correct?
A. Correct.
Q. If you could direct your attention to the e-mail at the bottom of the first page. This is a -- appears to be an e-mail from Jessica Crutchfield to Ms. Purser and yourself concerning KeyBank. Yes?
A. Correct.
Q. Fair to state that this was a new project for KeyBank, not an existing one that started at USI?
A. That's accurate.
Q. Do you know whether Alliant was paid a fee for doing this project for KeyBank?
MR. BRAMBLE: Objection. Form. Foundation.
THE WITNESS: I don't recall if this deal bound or not.



Q. BY MS. CASSIDY: Did you tell USI that you were servicing KeyBank at Alliant?
A. I did not.
Q. Why not?
A. I didn't feel the need to.
Q. You serviced KKR during the last two years that you worked at USI, correct?
A. I may have. I don't know.
Q. Based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about KKR's business during the last two years that you worked at USI. Yes?
MR. BRAMBLE: Objection. Form.
THE WITNESS: For that account, I don't know.
Q. BY MS. CASSIDY: When did you start servicing KKR as an Alliant employee?
A. I'm not sure I have serviced KKR.
(Exhibit 10 was marked for identification.)
Q. BY MS. CASSIDY: Mr. Walsh, the court reporter has placed a document in front of you marked Exhibit 10.
Do you see that?
A. Uh-huh.

Q. If you flip to the second page of this document, at the very bottom, it starts and then continues on to the third page. This appears to be an e-mail from Amber Walker at Harbor Consulting Group to yourself --
A. Uh-huh.
Q. -- copying Ms. Purser, Mr. Havard, and other individuals at Harbor Consulting Group. Yes?
A. Uh-huh.
Q. And based on the subject line of this e-mail, it appears to concern KKR and a lender solution -- pollution policy, correct?
A. That's correct.
Q. And it's directed to the Alliant team. Yes?
A. It is.
Q. So fair to say that you have provided services to KKR while at Alliant. Yes?
A. I mean, I'm on the e-mail. I don't -- I didn't respond. I don't think I got involved with this one.
MR. BRAMBLE: You did not get my objection in. Sorry.
Object to form and foundation.
THE WITNESS: My apology.



Q. BY MS. CASSIDY: Who else, if anyone, is working on the environmental service team at Alliant with respect to KKR, to your knowledge?
A. Based on this e-mail, it appears Bill Havard was involved. And the e-mail is addressed to myself and Jenise Purser, so I would, I guess, we're all servicing as well.
Q. Did you inform anyone at Alliant that you had any restrictions that prevented you from servicing KKR's business in the two years following your employment at USI?
A. No.
Q. Why not?
A. I don't believe that there was any restrictions with me servicing the KKR account.
Q. Why didn't you respond to this e-mail concerning KKR and a request for a lender pollution policy that is directed to you?
MR. BRAMBLE: Can I just get some clarity on which e-mail you're talking about?
MS. CASSIDY: Sorry. Yes.
The bottom e-mail that begins on page 2 and then continues on to the last page that's directed to Mr. Walsh.
MR. BRAMBLE: Here. Hold up. I'm still



struggling to see it. I'm sorry.
MS. CASSIDY: On page 2, at the very bottom, it begins the "From" line at the very, very end, and then continues on to the third page. And it begins with the "To" line to Mr. Walsh.
MR. BRAMBLE: Understood. Okay. I see what you're saying.
THE WITNESS: Can you repeat the question?
Q. BY MS. CASSIDY: Of course.
Mr. Walsh, why did you not respond to this e-mail request from Amber Walker concerning a lender pollution policy for KKR?
A. I didn't need to. Bill Havard did.
Q. Fair to state that this e-mail concerns a new project for KKR that did not begin at USI. Yes?
A. I would agree with that.
Q. Do you know whether Alliant was paid a fee for doing this new project for KKR?
MR. BRAMBLE: Objection. Form. Foundation.
THE WITNESS: I couldn't tell you if this deal bound or not.
Q. BY MS. CASSIDY: You serviced KOAR Institutional Advisors during your last two years of



employment with USI, correct?
A. Correct.
Q. And based on the definition of confidential information that we reviewed in your agreement, you learned confidential information about OA -- I'm sorry. Excuse me. I'll re- -- restart the question.
Based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about KOAR Institutional Advisors' business during your last two years of employment at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I did.
Q. BY MS. CASSIDY: When did you start servicing KOAR Institutional Advisors as an Alliant employee?
A. I couldn't tell you exactly when.
Q. Are you still servicing KOAR as an Alliant employee?
A. Yes.
Q. Who else, if anyone, is working with you on the environmental service team at Alliant with respect to KOAR?
A. That would be Bill Havard, myself, Jenise

Purser, and Amy Phalen.
Q. To your knowledge, are there other people at Alliant, not necessarily working with you, but that, nonetheless, service KOAR Institutional Advisors' environmental policy needs?
A. No.
Q. Why did you continue to service KOAR when you had other people on your team who could have done so?
A. There was a client need.
Q. Could that client need, to your knowledge, have been fulfilled by any other individuals at Alliant?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Potentially, yeah.
Q. BY MS. CASSIDY: Did you inform anyone at Alliant that you had restrictions that prevented you from servicing KOAR in the two years following your employment with USI?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I did not.
Q. BY MS. CASSIDY: Why not?
MR. BRAMBLE: Same objection.
THE WITNESS: I don't believe there was a restriction from -- you know, with me servicing that



account.
Q. BY MS. CASSIDY: Did anyone at Alliant tell you to stop servicing KOAR Institutional Advisors?
A. Not that I recall.
Q. Isn't it true that Alliant told you that you were cleared to work on KOAR Institutional Advisors' account at Alliant?
A. Not that I recall.
(Exhibit 11 was marked for identification.)
Q. BY MS. CASSIDY: Mr. Walsh, the court reporter has placed a document in front of you marked Exhibit 11. Yes?
A. That's correct.
Q. If you could flip to the third page of that document, which is the last page, and direct your attention to the very bottom e-mail. It appears to be from Sonam Makker to yourself copying Bill Havard and another individual. Yes?
A. That's correct.
Q. And this e-mail is asking you to work on a new project for this account, correct?
A. Yes. It appears to be a new account.
Q. Fair to say that this e-mail concerns KOAR Institutional Advisors' account?



A. Yes, that's accurate.
Q. At Alliant, you've worked on at least one new project for KOAR, not an existing one that started at USI, correct?
A. That's accurate.
Q. Do you know whether Alliant was paid a fee for doing this new project for KOAR Institutional Advisors?
MR. BRAMBLE: Objection. Form. Foundation.
THE WITNESS: I don't recall if this deal bound or not.
Q. BY MS. CASSIDY: Did you tell USI that you were servicing KOAR at Alliant?
A. I did not.
Q. Why not?
A. I don't believe there was a restriction with me handling this account.
Q. You serviced Ladder Capital during your last two years of employment at USI, correct?
A. Correct.
(Exhibit 12 was marked for identification.)
Q. BY MS. CASSIDY: Mr. Walsh, you knew about the points of contact and other detailed information about the prior deals you did for Ladder



Capital when you were employed with USI, correct?
A. Who are you referring to as, like, points of contact?
Q. If you could direct your attention to the document in front of you marked Exhibit 12. Do you have that in front of you?
A. I do.
Q. This appears to be an e-mail from Luis Rodriguez-Santana to yourself, copying Eric Harper, Jenise Purser, and another individual, correct?
A. Correct.
Q. And this is concerning Ladder Capital's pollution insurance requests. Yes?
A. That's correct.
Q. And if you direct your attention to the bottom e-mail, it's an e-mail that you sent to Luis. Yes?
A. That's correct.
Q. And you state in that e-mail on the second line that, Ladder Capital reached out to us with a new deal, and they are in need of pollution coverage for a location in PR with the same borrower?
A. Okay.
Q. Assuming -- Sorry. Excuse me.
The individual who reached out to you for

Page 70

this deal, do you know who that person was?
A. I don't recall off the top of my head.
Q. If you were working on a deal for Ladder Capital, do you know who would be their point of contact that you would reach out to?
MR. BRAMBLE: Object to form on the question.
THE WITNESS: They have several points of contact. I don't recall specific names, but there are several points of contact with Ladder.
Q. BY MS. CASSIDY: So you're aware of points of contact with Ladder Capital based on your prior experience and working on deals with them at USI. Yes?
A. Yes. But I don't believe -- If I recall correctly, I don't believe this deal came in from Ladder Capital. I think it was a representative of Ladder. It was more like counsel for Ladder Capital.
Q. Based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about Ladder Capital's business during your last two years of employment at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: That's accurate.

Page 71

Q. BY MS. CASSIDY: When did you start servicing Ladder Capital as an Alliant employee?
A. Probably right around June 3rd, based on this e-mail.
Q. Are you still servicing Ladder Capital at Alliant?
A. We don't have anything active with Ladder Capital, but, yeah.
Q. Who else, if anyone, at Alliant works with you on the environmental policy team with respect to Ladder Capital?
A. That would be myself, Jenise Purser. I'm sure Bill Havard would get involved, as well as Amy Phalen.
Q. To your knowledge, are there any other individuals at Alliant, not necessarily working with you, but that, nonetheless, service Ladder Capital's environmental policy needs?
A. Not that I'm aware of.
Q. Why did you service Ladder Capital when you had other people on your team who could have done so?
A. There is a client need for this.
Q. Did you inform anyone at Alliant that you had any restrictions that prevented you from

Page 72

servicing Ladder Capital in the two years following your employment with USI?
A. I did not.
Q. Why not?
A. I don't believe I had any restrictions with regards to the Ladder Capital account.
Q. Did anyone at Alliant tell you to stop servicing Ladder Capital?
A. Not that I'm aware of.
Q. Isn't it true that Alliant told you that you were cleared to work on Ladder Capital account?
A. Not that I recall.
Q. The e-mail in front of you marked Exhibit 12, fair to state that this concerns a new project with Ladder Capital at Alliant, not a preexisting one at USI. Yes?
A. Yes and no.
Q. Help me understand that.
A. They came to us with a new request. I don't -- I don't believe -- I believe this deal did bind, but I don't know if it was -- I believe it -- I don't know if we bound a new policy or if it was added to a previous one. Sorry.
Q. This second line of that e-mail that you sent to Luis, you reference a new deal. Yes?

Page 73

A. Correct.
Q. So fair to state that this concerned a new deal with Ladder Capital?
A. Yes. Yeah.
(Exhibit 13 was marked for identification.)
Q. BY MS. CASSIDY: Mr. Walsh, the court reporter has placed a document in front of you marked Exhibit 13. Yes?
A. Correct.
Q. This appears to be an e-mail from Valerie Sheaffer to yourself and Ms. Purser copying several e-mails at Ladder Capital. Yes?
A. Appears to be accurate, yeah.
Q. This includes several attachments, but I want to focus on the e-mail itself. Do you see that it's directed to the USI team?
A. I do see that.
Q. Do you have any understanding of who the USI team is based on you as a recipient of this e-mail?
A. I do not.
Q. Do you know why Ms. Sheaffer referred to you as the "USI team"?
A. I do not.
Q. Why do you think this e-mail was supposed

Page 74

to go to you?
A. It was sent to me.
Q. Would you consider yourself part of the USI team?
A. No.
Q. Did you correct Ms. Sheaffer that you are not part of the USI team?
A. I may have.
Q. Would you have done that over the phone or in an e-mail?
A. I don't recall.
Q. Did you forward this e-mail to anyone at USI considering it's directed to the USI team?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I don't believe I did.
Q. BY MS. CASSIDY: Do you know whether Alliant was paid a fee for doing this project for Ladder Capital?
MR. BRAMBLE: Objection. Form. Foundation.
THE WITNESS: I believe this one bound, yeah.
Q. BY MS. CASSIDY: Did you tell USI that you were servicing Ladder Capital at Alliant?
A. No.

Page 75

Q. Why not?
A. I didn't feel the need to.
Q. Even though this e-mail is directed to the USI team, not to the Alliant team. Yes?
MR. BRAMBLE: Objection. Form.
THE WITNESS: The e-mail was sent to me.
Q. BY MS. CASSIDY: You serviced Olshan Properties, which is spelled O-l-s-h-a-n, during the last two years that you worked at USI, correct?
A. Correct.
Q. Based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about Olshan Properties' business during your last two years of employment at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Correct.
Q. BY MS. CASSIDY: When did you start servicing Olshan -- Ol -- excuse me -- Olshan Properties?
A. I'll help you out. It's Olshan.
Q. Olshan. Thank you.
A. Olshan. Yes.
Q. Properties -- Sorry. I'll restart the question.

Page 76

When did you start servicing Olshan Properties as an Alliant employee?
A. I don't recall.
Q. Are you still servicing Olshan Properties at Alliant?
A. Yes.
Q. Who, if anyone, is working with you on the environmental service team at Alliant with respect to Olshan Properties?
A. It would be myself, Jenise Purser, Amy Phalen, and I believe Bill Havard's involved as well.
Q. To your knowledge, are there other people at Alliant, not necessarily working with you, but that, nonetheless, service Olshan Properties' environmental policy needs?
A. Not that I'm aware of.
Q. Why did you continue to service Olshan Properties when you had other people on your team who could have done so?
A. It was a client need.
Q. Did you inform anyone at Alliant that you had a restriction that prevented you from servicing Olshan Properties in the two years following your employment at USI?
MR. BRAMBLE: Objection. Form.

Page 77

THE WITNESS: I did not.
Q. BY MS. CASSIDY: Why not?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I don't believe there was a restriction with me handling the Olshan Property account.
Q. BY MS. CASSIDY: Did anyone at Alliant tell you to stop servicing Olshan Properties' account?
A. I don't believe so.
Q. Isn't it true that Alliant told you that you were cleared to work on Olshan Properties?
A. I don't -- I don't recall, actually.
(Exhibit 14 was marked for identification.)
MR. BRAMBLE: At the end of your questioning on Olshan, do you mind if we take a 10-minute break?
MS. CASSIDY: Absolutely.
Q. BY MS. CASSIDY: Mr. Walsh, the court reporter has placed a document in front of you marked Exhibit 14.
Do you see that?
A. Yes.
Q. This appears to be an e-mail from Michael Power with FHS Risk to Bill Nellen, copying Eric

Page 78

Harper and other individuals at FHS Risk, correct?
A. That's correct.
Q. Based on the subject line, fair to say that this e-mail concerns a broker of record letter for Mall Properties, Inc., which is related to Olshan Properties?
MR. BRAMBLE: Objection. Form.
THE WITNESS: That's what the subject line says, yeah.
Q. BY MS. CASSIDY: At Alliant, you were working on at least one new project for Olshan Properties, not an existing one that started at USI, correct?
A. I don't recall.
Q. Do you recall what services you provided to Olshan Properties at Alliant since you've begun servicing them?
A. I don't really do a lot on this account. I don't really know if I've touched it yet, to be honest with you.
Q. Do you know whether Alliant was paid a fee for doing this new project for Olshan Properties?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I don't think this is a new project.

Page 79

Q. BY MS. CASSIDY: Did you tell USI that you were servicing Olshan Properties at Alliant?
A. I'm not aware that I am servicing Olshan Properties.
MS. CASSIDY: Okay. We can take a break, John.
THE VIDEOGRAPHER: We are off the record at 10:19 a.m.
(A break was taken at 10:19 a.m.)
THE VIDEOGRAPHER: We are back on the record at 10:37 a.m.
Q. BY MS. CASSIDY: Mr. Walsh, do you understand that you're still under oath?
A. I do.
Q. Mr. Walsh, you mentioned earlier that you believed you were the only one at Alliant that could service the Store Capital Corporation account. What is it that you do that you believe no one else at Alliant can do for Store?
A. I apologize if I said that. The other team members that I work with could also service that account.
Q. What is it that you do that you believe other -- and anyone else at Alliant, other than the individuals who are in the environmental service team

Page 80

that you named, cannot do for Store?
A. My degree is in environmental science. I'm not necessarily an insurance person. But I'm able to review data and break it down into, like, layman's terms for a lot of these clients. So that's something that a lot of people that have been in the insurance industry for a long time that don't have this background can't do.
Q. To your knowledge, is there anyone else at Alliant that has that experience that you just referenced?
A. Other colleagues.
Q. Are there -- those colleagues that you reference, are any of them outside of the environmental service team that includes Bill Havard, Jenise Purser, yourself, Amy Phalen, or Lori Hartman?
A. I'm not aware of any other people's background, to be honest, so...
Q. Mr. Walsh, I want to ask you about New Mountain Capital.
A. Uh-huh.
Q. You serviced New Mountain Capital during the last two years that you worked at USI, correct?
A. Correct.
Q. And based on the definition of

Page 81

confidential information in your agreement, which was marked as Exhibit 1 that we reviewed, you learned confidential information about New Mountain Capital's business during your last two years at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I did.
Q. BY MS. CASSIDY: When did you start servicing New Mountain Capital as an Alliant employee?
A. Again, I don't have the exact date. I don't know.
Q. Fair to say, it was around March of 2023?
A. It may have been.
Q. Are you still servicing New Mountain Capital's business at Alliant?
A. Yes.
Q. Who else, if anyone, is working with you on the environmental service team at Alliant with respect to New Mountain Capital?
A. As of today, it would be myself, Jenise Purser, Amy Phalen's involved as well, I believe, as -- as is Bill Havard.
Q. Why did you continue to service New Mountain Capital when you had other people on your team who could have done so?

you were cleared to work on Oceanview Asset Management?
A. Not that I recall.
(Exhibit 15 was marked for identification.)
Q. BY MS. CASSIDY: Mr. Walsh, the court reporter has placed a document in front of you marked Exhibit 15.
Do you see that?
A. I do.
Q. This appears to an e-mail from Valerie Sheaffer to Ms. Purser, Mr. Havard, and yourself. Yes?
A. Correct.
Q. And is it your understanding based on reviewing this e-mail that it concerns a policy for Oceanview, based on the first line of the top e-mail?
A. Yes, Valerie is asking us to obtain proposals.
Q. I would like to direct your attention to the e-mail at the bottom of that first page, from Ms. Sheaffer at 4:06 p.m. on June 15th, 2023.
Do you see that?
A. The bottom of the first page here?
Q. Correct.
A. Yes.



Q. And do you see in the body of that e-mail that it reads, "We can likely get it by Monday. I will get the ball rolling with USI"?
A. I do see that.
Q. And the e-mail at the top of this first page, which we were referencing earlier, is directed to the Alliant team.
Do you see that?
A. I do.
Q. Any idea why Ms. Sheaffer would send this e-mail to the Alliant team after saying that she would get the ball rolling with USI?
MR. BRAMBLE: Objection. Form.
THE WITNESS: I don't. It's her decision to send it to Jenise Purser, Bill Havard, and Justin Walsh.
Q. BY MS. CASSIDY: When you received this e-mail, did you read the entire chain or just the top e-mail?
A. Probably just the top e-mail. That's really the only one that concerns me.
Q. Do you know whether Alliant was paid a fee for doing this project for Oceanview Asset Management?
MR. BRAMBLE: Objection. Form.



Foundation.
THE WITNESS: I don't recall if this deal -- this deal in particular bound or not.
Q. BY MS. CASSIDY: While at Alliant, you've worked on at least one new project for Oceanview Asset Management, not an existing one that started at USI, correct?
A. Correct. It would be this deal.
Q. Did you tell USI that you were servicing Oceanview Asset Management at Alliant?
A. I did not.
Q. Why not?
A. I didn't feel the need to.
Q. You serviced PIMCO during the last two years of your employment at USI, correct?
A. Yes.
Q. And based on the definition of confidential information in your agreement that we reviewed marked as Exhibit 1, you learned confidential information about PIMCO's business during the last two years that you worked at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Sure. Yes.
Q. BY MS. CASSIDY: When did you start



servicing PIMCO as an Alliant employee?
A. I don't recall an exact date. Sorry.
Q. Are you still servicing PIMCO at Alliant?
A. We don't have any active deals with PIMCO, but, yes.
Q. Who else, if anyone, is working with you or has worked with you on the environmental service team at Alliant with respect to PIMCO?
A. I believe that would just be myself and Jenise Purser.
Q. Why did you continue to service PIMCO when you had other people on your team that could have done so?
A. There was a client need.
Q. Did you inform anyone at Alliant that you had any restrictions that prevented you from servicing PIMCO in the two years following your employment with USI?
A. No.
Q. Why not?
A. I don't believe there was any restrictions with me handling the PIMCO account.
Q. Did anyone at Alliant ever tell you to stop servicing the PIMCO account?
A. No.

Page 94

A. I did not.
Q. Why not?
A. I didn't feel the need to.
Q. You serviced Pritzker Realty Group during the last two years you worked at USI, correct?
A. Correct.
Q. And based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about Pritzker Realty Group's business during your last two years at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Correct.
Q. BY MS. CASSIDY: When did you start servicing Pritzker Realty Group as an Alliant employee?
A. I don't recall exactly.
Q. Are you still servicing Pritzker Realty group at Alliant?
A. Yes.
Q. Who else, if anyone, is working with you on the environmental service team at Alliant with respect to Pritzker Realty Group?
A. It would be myself -- excuse me. Myself, Jenise Purser, Amy Phalen, and I believe Bill Havard

Page 95

as well.
Q. Why did you continue to service Pritzker Realty Group when you had other people on your team who could have done so?
A. It was a client need.
Q. And is it your understanding that that client need could not have been fulfilled by anyone other than yourself or the individuals on the environmental service team that you referenced?
A. That's accurate.
Q. Did you inform anyone at Alliant that you had any restrictions that prevented you from servicing Pritzker Realty Group in the two years following your employment with USI?
A. I did not.
Q. Why not?
A. I'm not aware of any restrictions with regards to the Pritzker account.
Q. Did anyone at Alliant tell you to stop servicing Pritzker Realty?
A. Not that I recall.
Q. Did they ever tell you that you couldn't service that account?
A. I don't believe so.
Q. Isn't it true that they specifically

Page 96

cleared you to work on that account?
A. Not that account.
Q. What accounts did Alliant clear you to work on?
A. I don't recall exactly.
Q. At Alliant, you've worked on at least one new project for Pritzker that was not an existing one that started at USI, correct?
A. That's accurate.
Q. Did you tell USI that you were servicing Pritzker Realty at Alliant?
A. No.
Q. Why not?
A. I don't feel the need to.
Q. You serviced Thorofare Capital during your last two years that you worked at USI, correct?
A. Correct.
Q. And based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about Thorofare Capital's business during your last two years of employment at USI, correct?
A. Correct.
Q. When did you start servicing Thorofare Capital as an Alliant employee?

Page 97

A. I couldn't tell you. Not -- I don't know exactly.
Q. Fair to say it was around June 2023?
A. It may have -- may have been.
Q. Are you still servicing Thorofare Capital's business at Alliant?
A. Yeah. I don't think we have anything active going on, but yeah.
Q. Who, if anyone, is working with you on the environmental service team at Alliant with respect to Thorofare Capital?
A. As of today, it would be myself, Jenise Purser, Amy Phalen, and Bill Havard.
Q. Mr. Walsh, when you say "as of today," do you reference that because that team has changed in -- over the course since your last testimony?
A. No.
MR. BRAMBLE: Objection. Form.
THE WITNESS: No.
Q. BY MS. CASSIDY: Why did you continue to service Thorofare Capital when you had other people on the team who could have done so?
A. It was a client need.
Q. Is it your understanding that that client need could not have been fulfilled by anyone, other

than yourself, or the individuals on the environmental service team at Alliant that you referenced?
A. That's accurate.
Q. And what is it that you do that you believe no one else at Alliant, other than yourself or the individuals on the service team, can do for Thorofare Capital?
A. I believe I already answered this, but I have an environmental background, and most people in this industry do not.
Q. Did you inform anyone at Alliant that you had any restrictions that prevented you from servicing Thorofare Capital in the two years following your employment with USI?
A. No.
Q. Why not?
A. I didn't feel the need to.
Q. Did anyone at Alliant tell you to stop servicing Thorofare Capital?
A. No.
Q. Did anyone at Alliant tell you that you could not service Thorofare Capital?
A. No.
Q. Isn't it true that Alliant told you that



you were cleared to work on Thorofare Capital's account?
A. Not that I recall.
Q. At Alliant, you've worked on at least one new project for Thorofare Capital that was not an existing project at USI, correct?
A. I believe so, yes.
Q. Did you tell USI that you were servicing Thorofare Capital at Alliant?
A. I did not.
Q. Why not?
A. I don't feel the need to.
Q. You serviced Argentic Investment Management during your last two years of employment at USI, correct?
A. Correct.
Q. And based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about Argentic Investment Management's business during your last two years of employment at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Correct.
Q. BY MS. CASSIDY: When did you start servicing Argentic Investment Management as an



Alliant employee?
A. I couldn't tell you exactly when I started on that account.
Q. Are you still servicing that account at Alliant?
A. Yes.
Q. Who else, if anyone, is working with you on the environmental service team at Alliant with respect to Argentic Investment Management?
A. That would be myself, Bill Havard, Jenise Purser, Amy Phalen.
Q. Why did you continue to service Argentic Investment Management when you had other people on the team who could have done so?
A. Again, there was a client need.
Q. And is it your understanding that that client need could not have been fulfilled by anyone other than yourself or the individuals on the environmental service team that you referenced?
A. That's accurate.
Q. And with respect to Argentic Investment Management specifically, what is it that you and the environmental service team that you reference do that you believe no one else at Alliant can do?
A. Again, I have an environmental



background. My degree is in environmental science. I'm able to review data that most other people can't.
Q. Did you inform anyone at Alliant that you had any restriction that prevented you from servicing Argentic Investment Management in the two years following your employment at USI?
A. I did not.
Q. Why not?
A. I didn't feel the need to.
Q. Did anyone at Alliant tell you to stop servicing Argentic Investment Management?
A. No.
Q. Did anyone at Alliant tell you that you could not service Argentic Investment Management?
A. No.
Q. At Alliant, you have worked on at least one new project for Argentic Investment Management, not an existing one that started at USI, correct?
A. That's accurate.
Q. Did you tell USI that you were servicing Argentic Investment Management at Alliant?
A. I did not.
Q. Why not?
A. I don't feel the need to.
Q. You serviced Citi during your last two

years that you worked at USI, correct?
A. Correct.
Q. And based on the definition of confidential information in your agreement that we reviewed, you learned confidential information about Citi's business during your last two years of employment at USI, correct?
MR. BRAMBLE: Objection. Form.
THE WITNESS: Sure. Yes.
Q. BY MS. CASSIDY: When did you start servicing Citi as an Alliant employee?
A. I couldn't give you an exact date. Sorry.
Q. Do you have an approximate month?
A. I don't.
Q. Are you still servicing Citi at Alliant?
A. I am.
Q. Who else, if anybody, is working with you on the environmental service team at Alliant with respect to Citi?
A. Myself, Jenise Purser, Amy Phalen, and I believe Bill Havard as well.
Q. Why did you continue to service Citi when you had other people on your team that could have done so?



A. It's client need.
Q. Is it your understanding that that client need could not have been fulfilled by anyone at Alliant other than yourself and the individuals on the environmental service team that you referenced?
A. Yeah. That's accurate.
Q. With respect to Citi specifically, what is it that you believe that you and that members of the environmental service team that you reference can do to fulfill Citi's client need that no one else at Alliant can do?
A. We're able to review the reports, give an opinion of what we feel is right for them, and I don't believe anybody else can do it.
Q. So it's your testimony that no one else at Alliant can perform the tasks that you just referenced?
MR. BRAMBLE: Objection. Form.
Q. BY MS. CASSIDY: With respect to Citi?
MR. BRAMBLE: Same objection.
THE WITNESS: Not as well as I can.
Q. BY MS. CASSIDY: Did you inform anyone at Alliant that you had any restrictions that prevented you from servicing Citi in the two years following your employment with USI?



A. No.
Q. Why not?
A. I didn't feel the need to.
Q. Did anyone at Alliant tell you to stop servicing Citi?
A. They did not.
Q. Did anyone at Alliant tell you that you could not service Citi?
A. No.
Q. Did Alliant tell you that you were cleared to work on the Citi account?
A. Not that I recall, no.
Q. At Alliant, you've worked on at least one new project for Citi that was not an existing project at USI, correct?
A. Correct.
Q. Did you tell USI that you were servicing Citi at Alliant?
A. I did not.
Q. Why not?
A. I didn't feel the need to.
Q. Why haven't you stopped providing insurance services to the client accounts that we just went through?
A. There's still a client need.



Q. And in all of the clients that we discussed today, in addition to Store Capital, in addition to Citibank, and the others, are there others at Alliant that you believe that you are the only one, and the members of your environmental service team, that can service those clients and fulfill the client need that you have been referencing?
A. I'm sure there's others that could do it, but not as well as I can.
Q. So, fair to say, there are others at Alliant that could have fulfilled the client need?
MR. BRAMBLE: Object to form.
Q. BY MS. CASSIDY: For the client accounts that we went through?
MR. BRAMBLE: Object to form.
THE WITNESS: I would disagree.
Q. BY MS. CASSIDY: Help me understand that.
A. Like I said, I think I'm good at what I do.
Q. Are there any other client accounts that you serviced during your last two years of employment at USI that you've now serviced at Alliant that we haven't discussed today?
A. Can you repeat the question?

Q. Are there any other client accounts that you serviced during your last two years of employment at USI that you have now provided services to at Alliant that we have not discussed today?
A. There may have. Two years is a long time, so I don't -- I don't know.
MS. CASSIDY: That's all the questions I have at this time.
MR. BRAMBLE: I'm going to have very brief follow-up. Do you mind if I take five minutes?
THE VIDEOGRAPHER: We are off the record at 11:04 a.m.
(A break was taken at 11:04 a.m.)
THE VIDEOGRAPHER: We are back on the record at 11:08 a.m.

EXAMINATION

BY MR. BRAMBLE:
Q. Just a very brief follow-up.
Mr. Walsh, today, you've been asked a number of questions about whether you, quote, learned confidential information about certain client accounts during the last two years of your employment at USI.
Do you recall that?



A. I do.
Q. Okay. Where are you currently employed, Mr. Walsh?
A. Alliant.
Q. And where were you employed before that?
A. USI Southwest, Inc.
Q. Have you ever been employed at any of the accounts that we discussed today?
A. No.
Q. So do you have any idea about what measures those accounts actually take to keep their information confidential?
A. I don't.
Q. So do you have any idea about whether the information that you were discussing today is, in fact, actually confidential?
A. I don't.
Q. Do you have any idea about who owns the information we were discussing today?
A. It's the clients' information.
Q. And during your employment at Alliant, have you used any information that is confidential to USI to service those accounts?
A. Absolutely not.
MR. BRAMBLE: No further questions.



MS. CASSIDY: We're good.
THE WITNESS: We're good?
MS. CASSIDY: Yes.
THE WITNESS: Okay.
THE VIDEOGRAPHER: This concludes the deposition of Justin Walsh. We're off the record at 11:10 a.m.
MR. BRAMBLE: He will read and sign.
THE COURT REPORTER: Would you like a copy of the transcript?
MR. BRAMBLE: Yes. Can we get it by Tuesday?
THE COURT REPORTER: Yes.
MR. WOODARD: We will take it by Tuesday, too.
(The proceedings concluded at 11:10 a.m.)

________________________

JUSTIN WALSH



STATE OF ARIZONA )
) ss.
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing proceedings were taken by me, KRISTY A. CETON, a Certified Reporter, in and for the County of Maricopa, State of Arizona; that the witness before testifying was duly sworn to testify to the whole truth; that the questions propounded to the witness and the answers of the witness thereto were taken down by me in shorthand and thereafter reduced to typewriting under my direction; that the witness requested reading and signing said deposition; that the foregoing pages are a true and correct transcript of all proceedings had, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

I FURTHER CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206(J)(1)(g)(1) and (2).

Kristy A. Ceton 50200_____
Certified Reporter CR Number

________________________
Certified Reporter Signature Date

I CERTIFY that this Registered Reporting Firm has complied with the ethical obligations set forth in ACJA 7-206(J)(1)(g)(1) and (2).

Carrie Reporting, LLC R1064
Registered Reporting Firm RRF No.

Registered Reporting Firm Signature Date

**Execution Copy**

## CONFIDENTIALITY, NON-SOLICITATION & NON-INTERFERENCE AGREEMENT

This CONFIDENTIALITY, NON-SOLICITATION & NON-INTERFERENCE AGREEMENT ("**Agreement**"), effective as of the **Effective Date** (as defined below), is by and between Wells Fargo Insurance Services USA, Inc., a North Carolina corporation (the "**Company**") and Justin Walsh ("**Employee**"). The Company and Employee are referred to hereinafter each individually as a "**Party**" and collectively as the "**Parties**".

### RECITALS

WHEREAS, pursuant to that certain Stock Purchase Agreement (the "**Purchase Agreement**") by and between USI Insurance Services LLC, a Delaware limited liability company ("**USI LLC**") and Wells Fargo & Company, a Delaware corporation ("**Seller**"), USI LLC will purchase from Seller all of the issued and outstanding shares of capital stock of ACO Brokerage Holdings Corporation, a Delaware corporation ("**ACO**"); and

WHEREAS, ACO owns, directly or indirectly, all of the issued and outstanding equity interests of the Company; and

WHEREAS, contingent upon the closing of the transactions contemplated by the Purchase Agreement (the "**Closing**"), and provided this Agreement is accepted in full by Employee, the Company desires to employ Employee on the terms and conditions herein and Employee is willing to accept employment on such terms and conditions; and

WHEREAS, Employee's covenants herein are a material inducement for the Company to enter into an at-will employment relationship with Employee pursuant to this Agreement; and

WHEREAS, Employee hereby acknowledges and agrees that the Retention Payment (as defined below) is a separate and additional payment to which Employee is not otherwise entitled and constitutes material and sufficient consideration to induce Employee to enter into this Agreement; and

WHEREAS, Employee acknowledges and agrees that by virtue of employment with the Company, Employee will receive a direct financial benefit and other good and valuable consideration; and

WHEREAS, by virtue of past employment with the Company or any Predecessor and future employment with the Company, Employee:

(a) had, has, and will continue to have, as applicable, access to, and has gained and will continue to gain knowledge of, Confidential Information of the Company, any Predecessor and/or any USI Company, the unauthorized use and/or disclosure of which could cause material and irreparable harm to the Company or any USI Company; and



EXHIBIT 1
WIT: Walsh
DATE: 3/8/24
Kristy A. Ceton, RPR, CRR

(b) had, has, and will have, as applicable, significant responsibility for maintaining and enhancing the Goodwill of the Company with respect to the Company's Client Accounts and relationships with prospective clients and will have training and access to certain of the Company's customers and suppliers and, as such, has developed, will develop, and/or will continue to develop close and direct relationships with such customers and suppliers; and

(c) has developed, will continue to develop and/or will develop, as applicable close and direct relationships with the officers, directors, partners, employees, agents, suppliers, licensees, and/or other business relations of the Company or any USI Company; and

(d) has benefitted, will benefit, and/or will continue to benefit, as applicable, from the Company's investment of time, money and trust in Employee and will gain a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company, and, as a result, had, has, and will continue to have, the ability to harm or threaten the Company's legitimate business interests; and

(e) has made use of, and will continue to make use, of Employee's significant skills, training and experience; and

(f) for these and other reasons, will render services to the Company that Employee acknowledges are special, unique or extraordinary; and

WHEREAS, Employee acknowledges and agrees that the Company (on behalf of itself and the USI Companies) has a reasonable, necessary and legitimate business interest in protecting its own and the USI Companies' assets, Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business, and that the terms and conditions set forth below are reasonable and necessary in order to protect these legitimate business interests; and

NOW THEREFORE, in consideration of the Employee's employment with the Company, and the recitals, representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, the receipt and adequacy of which are conclusively acknowledged, the Parties, intending to become legally bound, agree as follows:

**AGREEMENT**

1. **DEFINITIONS.** Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them, which the Company may modify from time to time:

(a) "**Active Prospective Client**" means any Person or group of Persons who the Company specifically solicited or had documented plans to solicit within the six (6) months preceding the termination of Employee's employment with the Company.

(b) "**Client Account**" means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by the Company for such carrier or other entity) which is or was serviced by the Company in connection with the Company's business, regardless of whether such services are provided by, or through the licenses of the Company or any shareholder, employee or agent of the Company.

(c) "**Competitive Business**" means any Person engaged in the production, distribution, marketing or sale of a Competitive Product. Where a Competitive Business is part of a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

(d) "**Competitive Product**" means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the Company, in existence, which Employee or the Company has sold, marketed, distributed or developed in the last two (2) years of Employee's employment with the Company, or about which Employee has acquired Confidential Information.

(e) "**Confidential Information**" means at any date, any information of the Company, any Predecessor and/or a USI Company to which Employee has access, that is not generally available to the public (unless such information has entered the public domain and become available to the public through fault of the Party to be charged hereunder), including but not limited to: (i) the identity, authority and responsibilities of key contacts and decision-makers employed by Client Accounts or Active Prospective Clients of the Company or any Predecessor; (ii) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iii) the terms and conditions of benefits and compensation plans of Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iv) the information furnished to the Company or any Predecessor in confidence by any Client Account or Active Prospective Client; (v) the business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company, its corporate affiliates or any Predecessor; (vi)

the lists of the Client Accounts or Active Prospective Clients of the Company or any Predecessor, and any analyses and compilations thereof; (vii) the information that is password-protected; (viii) all internal memoranda and other office records, including electronic and data processing files and records; (ix) any and all other proprietary information of the Company, any Predecessor or a USI Company, including any information contained within a proprietary database; and (x) any and all other information that constitutes a trade secret under applicable law.

(f) "**Effective Date**" means the Closing date.

(g) "**Goodwill**" means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's or any Predecessor's investment in repeated contacts, business transactions, Confidential Information, or other efforts to develop lasting relationships.

(h) "**Insurance Services**" means the services provided by any of the USI Companies, including, without limitation, providing any insurance agency, brokerage and related services, including, without limitation, (i) the sale or brokerage of employee benefit products and services and other related consulting and administrative services, (ii) the sale or brokerage of property and casualty products and services, risk management and loss control services, third party administration, the analysis of loss exposures and designs, loss reserves and rate reviews, self-insurance consulting, reinsurance and excess stop loss (both specific and aggregate) placement, the management of insurance programs, the management and oversight of, and responsibility for, clients in the insurance brokerage industry.

(i) "**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, or a governmental entity (or any department, agency, or political subdivision thereof).

(j) "**Predecessor**" means any Person, in its capacity as predecessor-in-interest to the assets of the Company.

(k) "**USI Business**" means the businesses provided by the Company or the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(l) "**USI Companies**" or "**USI Company**" means USI Advantage Corp., a Delaware corporation ("**USI**"), its subsidiaries (including USI LLC and the Company), and any entity under the control (as defined in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, without regard to whether

any party is a "registrant" under such Act) of USI, and any of their successors or assigns.

2. **RETENTION BONUS PAYMENT.** Employee shall be eligible for a special retention bonus payment (the "**Retention Payment**").

2.1. ***Retention Payment.*** The Company shall pay Employee $112,000.00 payable in the following two (2) installments: (i) $14,000.00 paid within forty-five (45) days following the first anniversary of the Effective Date and (ii) $98,000.00 paid within forty-five (45) days following the fourth anniversary of the Effective Date.

2.2. ***Eligibility for Retention Payment.*** Notwithstanding the foregoing, if Employee's employment with the Company terminates or Employee is not actively employed, for any reason, on the dates the installment payments under Section 2.1 are due, Employee shall not earn or be paid such installment.

3. **COMPANY PROPERTY**. Employee acknowledges and agrees that all Confidential Information of the Company, including information transferred from any Predecessor under the Purchase Agreement, and/or of the USI Companies, which Employee has access to, receives or generates in the course of providing any USI Business, shall be the sole property of the Company and/or USI Companies, as the case may be, and shall remain with the Company and/or USI Companies upon termination of Employee's employment. Employee further acknowledges and agrees that Employee has no ownership rights to any Client Accounts and that the Client Accounts are owned by the Company and/or USI Companies.

4. **COVENANTS**

4.1. ***Confidential Information.*** The Company agrees to provide Employee with Confidential Information to assist Employee in the course and scope of Employee's duties. Employee acknowledges that the Company's agreement to provide this Confidential Information to Employee is in consideration for, and ancillary to, Employee's agreement to the other terms in this Agreement.

4.2. ***Confidentiality During and Following Employment.*** During Employee's employment with the Company and for five (5) years after Employee is no longer employed with the Company, for any reason, Employee will not use or disclose any Confidential Information of the Company, any Predecessor or any USI Company except: (a) in the normal course of business on behalf of any USI Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Employee shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure).

4.3. ***Defend Trade Secrets Act Required Notice***. Notwithstanding anything in this Agreement to the contrary, pursuant to the Defend Trade Secrets Act of 2016, Employee acknowledges and understands that:

(a) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(b) An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

4.4. ***Assignment and Ownership of Intellectual Property***. Employee acknowledges and agrees that any Intellectual Property (as defined herein) shall be "works made for hire" under the United States Copyright Act and that the Company shall be deemed the inventor, author and exclusive owner thereof together with all related intellectual property rights and exploitation rights for the longest period permitted by law. To the extent, if any, that any Intellectual Property is not deemed a "work made for hire" or that Employee is otherwise deemed to retain any rights, title or interest in or to any Intellectual Property, Employee hereby irrevocably transfers and assigns to the Company all rights, title and interest Employee may have or acquire to such Intellectual Property, without additional compensation, and hereby irrevocably waives any so-called moral rights of authors or other special rights which Employee may have or acquire therein. "**Intellectual Property**" means any advertisements, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works of authorship, computer software programming of any nature, discoveries, techniques, copyrights, patents, trademarks or the like, conceived or made by Employee in whole or in part during Employee's employment with the Company: (a) using Employee's relationship with the Company; (b) using Confidential Information or the Company's time, resources, facilities, supplies, equipment or trade secrets; (c) relating to the Company's present or future business; or (d) resulting from Employee's work for the Company.

4.5. ***Non-Solicitation of Clients and Active Prospective Clients***. In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees that:

(a) During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit Insurance Services in competition with the Company to any Client Account; (ii) consult for any Client Account with respect to Insurance Services in competition with the Company; (iii) sign a broker of record letter with any Client Account to provide Insurance Services in competition with the Company; or (iv) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account, which is a Client Account of the Company at the time of such solicitation, that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company. If the duration herein of two (2) years after Employee is no longer employed with the Company is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during Employee's employment with the Company and for eighteen (18) months after Employee is no longer employed with the Company, for any reason. If the duration herein of eighteen (18) months after Employee is no longer employed with the Company is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during Employee's employment with the Company and for twelve (12) months after Employee is no longer employed with the Company, for any reason.

(b) During Employee's employment with the Company and for six (6) months after Employee is no longer employed with the Company, for any reason, Employee shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit Insurance Services in competition with the Company to any Active Prospective Client; (ii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iii) sign a broker of record letter with any Active Prospective Client to provide Insurance Services in competition with the Company; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last six (6) months of Employee's employment with the Company.

4.6. ***Non-Acceptance / Non-Service of Clients and Active Prospective Clients.*** In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees that:

(a) During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide Insurance Services in competition

with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide Insurance Services in competition with the Company to any Client Account; in each case with respect to any Client Account, which is a Client Account of the Company at the time of such solicitation, that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company. If the duration herein of two (2) years after Employee is no longer employed with the Company is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during Employee's employment with the Company and for eighteen (18) months after Employee is no longer employed with the Company, for any reason. If the duration herein of eighteen (18) months after Employee is no longer employed with the Company is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during Employee's employment with the Company and for twelve (12) months after Employee is no longer employed with the Company, for any reason.

(b) During Employee's employment with the Company and for six (6) months after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide Insurance Services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide Insurance Services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last six (6) months of Employee's employment with the Company.

4.7. ***Non-Interference With Employees***. In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees, during Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company who is employed by the Company at the time of such solicitation or hiring and with whom Employee worked or obtained knowledge about as a result of Employee's employment with the Company. If the duration herein of two (2) years after Employee is no longer employed with the Company is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during Employee's employment with the Company and for eighteen (18) months after Employee is no longer employed with the Company, for any reason. If the duration herein of eighteen (18) months after Employee is no longer employed with the

Company is found by a court to be unreasonable, the Parties agree the restrictions set forth herein shall apply during Employee's employment with the Company and for twelve (12) months after Employee is no longer employed with the Company, for any reason.

4.8. ***Tolling***. Employee agrees the duration of the covenants in this Agreement shall be extended by any period of time in which Employee is in breach of any such obligations and the extended duration shall be measured from the date of the court order granting injunctive relief.

4.9. ***Purpose of Restrictions***. The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from Employee's knowledge of the Company's Confidential Information or misuse of the Company's Goodwill. Employee agrees that the time, geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

4.10. ***Modification***. If a court finds any covenants in this Agreement exceed the permissible time, geographic or scope limitations, such covenants shall be reformed to the maximum permissible time, geographic or scope limitations. If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the minimum extent necessary to permit the remaining terms to be enforced. The Company may unilaterally limit the scope of these covenants.

4.11. ***Independent Enforcement***. Each of the covenants in this Agreement shall be construed as an agreement independent of (a) any other agreements or (b) any other provision in this Agreement, and the existence of any claim or cause of action by Employee against the Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Employee or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants in Section 4 of this Agreement. The Company shall not be barred from enforcing any of the covenants in Section 4 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement with Employee.

5. **REMEDIES**. Employee acknowledges: (a) the services to be rendered by Employee are of a special, unique, and extraordinary character; (b) it would be extremely difficult or impracticable to replace such services; (c) the material provisions of this Agreement are of crucial importance to the Company; and (d) any damage caused by Employee's breach of Section 4 of this Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation. Accordingly, Employee agrees, if Employee violates Section 4 of this Agreement, the

Company shall, in addition to any other rights or remedies of the Company available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction. Employee agrees to waive any requirement for the Company to post a bond.

6. **EMPLOYEE'S REPRESENTATIONS AND WARRANTIES**

6.1. ***Disclosure of Agreements; No Conflict***. Employee represents and warrants that Employee has supplied to the Company all agreements between Employee and any Person, other than the Company, that employed or otherwise retained Employee within the past five (5) years. Employee further represents and warrants that Employee's execution of this Agreement and performance of Employee's duties for the Company do not conflict with, and are not impaired by, any law, rule, regulation, or court order by which Employee is bound.

6.2. ***No Confidential Information***. Employee represents and warrants that Employee has not taken any confidential information from any Person that employed or otherwise retained Employee, that Employee has no such confidential information in Employee's possession or control, and that Employee will not use any such confidential information in the performance of Employee's duties for the Company.

6.3. ***No Copyright Materials***. Employee represents and warrants that Employee has not taken any copyrighted materials from any Person that employed or otherwise retained Employee, that Employee has no such copyrighted materials in Employee's possession or control, and that Employee will not use any such copyrighted materials in the performance of Employee's duties for the Company.

6.4. ***No Restrictive Purchase Agreements***. Except with regard to any employment agreements with the Company, Employee represents and warrants that Employee is not and has not been subject to any agreement (e.g. asset purchase agreement, stock purchase agreement), within the past ten (10) years, whether heretofore expired or not, which prevents or restricts Employee from competing with any Person and/or soliciting any clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees).

6.5. ***Clients of Former Employers or Entities***. Employee represents and warrants that, during any period of time in which such Employee was subject to any restrictions prohibiting Employee from competing with, or soliciting the clients, customers or business of such other organization, individual or business entity, Employee has not made any contact with any clients of any Person that employed or otherwise retained Employee, within the past five (5) years, concerning Employee's business relationship with the Company or concerning a prospective business relationship with such client in violation of such restrictive covenant. Employee further represents and warrants that Employee will not,

without prior express direction of the Regional Chief Executive Officer (the "**Regional CEO**"), solicit any clients of any Person that employed or otherwise retained Employee, within the past five (5) years in violation of such restrictive covenant.

6.6. ***Employees of Former Employers or Entities***. Employee represents and warrants that Employee has not made and will not make, without prior express direction of the Regional CEO, any contact with any employees of any Person that employed or otherwise retained Employee, within the past five (5) years, concerning a prospective employment relationship with the Company.

6.7. ***No Ownership Rights to Client Accounts***. Employee represents and warrants that Employee has no direct or indirect ownership rights to any Client Accounts of the Company and expressly acknowledges that the Client Accounts are owned by the Company and/or a USI Company.

7. **AT-WILL EMPLOYMENT**. Employee understands and agrees that Employee's employment with the Company is at-will and that nothing in this Agreement shall be construed or considered to affect the nature of such at-will employment.

8. **ADDITIONAL TERMS**

8.1. ***Amendment***. Except as set forth in Sections 4.10, 8.5, and other provisions herein as to which the Company expressly reserved the right to modify, no amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought.

8.2. ***Assignment***. Employee may not assign any rights under this Agreement without the prior written consent of the Company. Employee's obligations under this Agreement inure to the Company, its successors and assigns. The Company may, at any time and without Employee's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor. Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

8.3. ***Entire Agreement***. This Agreement constitutes the entire agreement between the Parties with respect to the matters specifically referred to herein. Employee affirms that, in entering into this Agreement, Employee is not relying upon any oral or written promise or statement made by anyone at any time on behalf of the Company.

8.4. ***Governing Law***. This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona, without regard to principles of conflicts of law.

8.5. ***Severability***. The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable. In the event any provision of

this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the minimum extent and in the manner necessary to render it valid, legal, and enforceable. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

8.6. ***Waivers***. No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or a waiver of any other breach or default. Failure to enforce any provision of this Agreement shall not be deemed a waiver of that provision or any other provision of this Agreement.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**WELLS FARGO INSURANCE SERVICES USA, INC.**

By: ______________________

Name: Ernest J. Newborn, II
Title: Secretary

**EMPLOYEE**

By: ______________________

Justin Walsh

Message

**From:** Luis Rodriguez-Santana [luis@vyrmailpr.com]
on behalf of Luis Rodriguez-Santana <luis@vyrmailpr.com> [luis@vyrmailpr.com]
**Sent:** 6/3/2023 6:43:31 AM
**To:** Justin Walsh [Justin.Walsh@alliant.com]
**CC:** Eric Harper [Eric.Harper@alliant.com]; Jenise Purser [Jenise.Purser@alliant.com]; Luis Rodriguez-Velez [lrv@vyrmailpr.com]
**BCC:** eharper@alliantazure.mail.onmicrosoft.com; jpurser@alliantazure.mail.onmicrosoft.com; juwalsh@alliantazure.mail.onmicrosoft.com
**Subject:** Re: Ladder Capital - Pollution Insurance Request

Hi Justin:
Yes, we can help you eith this but we need to have the information by Monday so we can make the required surplus lines filings and wait 7 working days before placing this. I assume you already have a market and quote.

Please send the relevant information as to insured's name, address, required coverage and limits. Remember there js a 9% surplus lines tax.

Regards

Luis Rodríguez-Santana
Vidal & Rodríguez
Sent from my iPhone

EXHIBIT 12
WIT: Walsh
DATE: 3/8/24
Kristy A. Ceton, RPR, CRR

On Jun 2, 2023, at 3:28 PM, Justin Walsh <Justin.Walsh@alliant.com> wrote:

Hi Luis.

We have worked together in the past for Ladder Capital. We bound a deal for 5 light industrial properties back in 2019.

Ladder Capital just reached out to us with a new deal and they are in need of pollution coverage for a location in PR with the same borrower.

Would you be willing to work with us on this deal and split the commission 50/50? Depending on what limits Ladder Capital decides to bind, I am expecting the premium on this one to roughly $25k with a 17.5% commission rate.

If you are ok with the above split, we will handle the marketing/proposal summaries and correspondence with Ladder (with you copied of course). We would need you to handle the Surplus Lines piece of things in PR.

We have a tight timeframe to work with as the insured is trying to close this deal on 6/23/23.

Let me know if this would work for you and we will get things moving on our end.

Feel free to call me to discuss further.

**Justin Walsh**
Vice President
Alliant Real Estate & Hospitality
Alliant Insurance Services, Inc.

T: 623.670.6408
C: 781.710.4395
**Alliant.com**

<!--[if !vml]--> **Alliant** <!--[endif]-->
**The More Rewarding Way to Manage Risk**

**CAUTION:** This email originated from a sender outside of the Vidal & Rodriguez Insurance Brokers mail system. Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Message

**From:** Sheaffer, Valerie L. [VSheaffer@KelleyDrye.com]
on behalf of Sheaffer, Valerie L. <VSheaffer@KelleyDrye.com> [VSheaffer@KelleyDrye.com]
**Sent:** 6/1/2023 6:27:00 AM
**To:** Justin Walsh [Justin.Walsh@alliant.com]; Jenise Purser [Jenise.Purser@alliant.com]
**CC:** David Traitel (David.Traitel@laddercapital.com) [David.Traitel@laddercapital.com]; Sarah S. Gochberg [Sarah.Gochberg@laddercapital.com]; Daniel Azizi [Daniel.Azizi@laddercapital.com]; Andrew Babat [Andrew.Babat@laddercapital.com]; Justin Desiderio [Justin.Desiderio@laddercapital.com]
**BCC:** jpurser@alliantazure.mail.onmicrosoft.com
**Subject:** Lender Enviro Policy: Ladder/El Fortress, Puerto Rico
**Attachments:** FW: Draft PCA and Seismic Report links for El Fortress in Carolina, Puerto Rico -CB23US026781-1 and -2; Ladder Puerto Rico Portfolio ECLIPSE Binder.pdf

USI Team –

Ladder is adding an additional property to an existing loan on industrial properties in Puerto Rico that was originated in 2019. Ladder obtained an lender enviro policy for the existing loan (binder attached). A couple of questions:

- Can this property be added to the existing lender enviro policy? If so, can the limits be increased if needed?
- If the property cannot be added to the existing policy, would you please obtain quotes for lender policy with policy limit options of $1mm, $3mm, and $5mm and a policy term of 5 years.

Attached is an email with some financial info pertaining to the property – please let the Ladder team (cc'd) know what additional information, if any, is needed. Also, below is the link to the ESA review done by CBRE (the Phase I ESAs are attached to CBRE's review):

https://lcf.sharefile.com/d-s7865f39864f4495a907da5c247178898

Thanks,

Valerie

VALERIE SHEAFFER

Kelley Drye & Warren LLP
One Jefferson Road
Parsippany, NJ 07054
Tel: (973) 503-5997

WWW.KELLEYDRYE.COM

vsheaffer@kelleydrye.com

EXHIBIT 13
WIT: Walsh
DATE: 3/8/24
Kristy A. Ceton, RPR, CRR

This message is subject to Kelley Drye & Warren LLP's email communication policy.
KDW-Disclaimer

Message

**From:** Sheaffer, Valerie L. [VSheaffer@KelleyDrye.com]
on behalf of Sheaffer, Valerie L. <VSheaffer@KelleyDrye.com> [VSheaffer@KelleyDrye.com]
**Sent:** 6/1/2023 5:54:26 AM
**To:** Sheaffer, Valerie L. [VSheaffer@KelleyDrye.com]
**Subject:** FW: Draft PCA and Seismic Report links for El Fortress in Carolina, Puerto Rico -CB23US026781-1 and -2

**From:** Daniel Azizi <Daniel.Azizi@laddercapital.com>
**Sent:** Wednesday, May 31, 2023 12:59 PM
**To:** Sarah S. Gochberg <Sarah.Gochberg@laddercapital.com>; Sheaffer, Valerie L. <VSheaffer@KelleyDrye.com>; Andrew Babat <Andrew.Babat@laddercapital.com>
**Cc:** David Traitel <David.Traitel@laddercapital.com>; Justin Desiderio <Justin.Desiderio@laddercapital.com>
**Subject:** RE: Draft PCA and Seismic Report links for El Fortress in Carolina, Puerto Rico -CB23US026781-1 and -2

Is the below helpful? Some pieces from the exec summary.

The $9.33 million ($27/SF) floating rate upsize loan (the "Loan") is secured by an 89% occupied, 341k SF warehouse / industrial property built in 1984 located in Carolina, Puerto Rico (the "Property" or "El Fortress"). The Loan will upsize Ladder's existing $115.3 million ($52/SF) first mortgage loan secured by the Puerto Rico Industrial Portfolio, a 90% occupied, 5 industrial park portfolio consisting of 21 warehouse/distribution properties totaling 2.2 million SF located across San Juan, Puerto Rico (the "Existing Portfolio"). Total loan proceeds will be $124.7 million ($48/SF) following the upsize.

The Sponsor's business plan is to execute a $3.6 million ($11/SF) capex plan which includes structural repairs/upgrades, electrical upgrades, and parking improvements, bring 60k of offline space to market, transfer leases from modified gross to true NNN, and lease up the remaining vacancy at the Property.

The Property consists of two (2) 3-story buildings (49 loadings docs; 22" clear heights) and two (2) 1-story buildings (12 loading docs; 16" clear heights) located in the San Juan-Carolina-Caguas metro area along the west side of San Marcos Avenue and the south side of Enrique Vazquez Street. Primary access to the Property is through Puerto Rico Highway 26 (PR-26) to the East, PR-70 Highway to the North, PR-3 Highway to the South, and PR-8 Highway to the West. The Property is located off PR 26 which provides access to Luis Muñoz Marin International Airport (10-mins away), the Port of San Juan (17-mins away), and the main business district Milla de Oro Central Business District (15-mins away). The immediate neighborhood is surrounded by industrial, residential, commercial, and institutional uses, such as Costco Wholesale (8 mins away), Escorial Plaza (3 mins away), Plaza Carolina Shopping Centers (7 mins away), the University of Puerto Rico Carolina Campus (5 mins away), and various Residential Developments.

**Daniel Azizi**
Associate Director

**Ladder Capital Corp (NYSE: LADR)**
320 Park Avenue, 15th Floor, New York, NY 10022
**T** 917-369-3223 **M** 516-523-3940

www.laddercapital.com

LADDER CAPITAL

**This contract is registered and delivered as a surplus line coverage under the Insurance Code of the Commonwealth of Puerto Rico.**

beazley

21-Aug-2019

# BINDER

Luis Rodriguez Santana
Vidal and Rodriguez Insurance Brokers
I Capital Center Bldg., Suite 501
239 Arterial Hostos Avenue
San Juan, PR 00918-1478

RE: **Ladder Capital Finance, LLC, its Successors and/or Assigns**
**Beazley ECLIPSE**
ENVIRO COVERED LOCATION INSURANCE POLICY (SITE ENVIRONMENTAL)
Covered Location Pollution Liability Binder
Policy Number: W28658190101

Dear Luis,

We are pleased to offer the following conditional Binder for the above captioned account as per the quotation dated 16-Aug-2019.

## CARRIER

We are a specialist insurer with more than two decades of experience in providing clients with the highest standards of policy and claims service worldwide. All our insurance businesses are rated A (Excellent) by A.M. Best.

**Underwriter:** **Lloyd's Syndicates 623/2623 – A.M. Best's Rating A (Excellent), Class XV**

**Form:** **Beazley ECLIPSE F00738 012019**

**Authority Reference Number:** B6012BUSANMSL1901

## TERMS

**Named Insured:** Ladder Capital Finance, LLC, its Successors and/or Assigns

**Address:** 345 Park Avenue
New York, NY 10022

**Policy Period:** Effective: 21-Aug-2019
Expiration: 21-Aug-2027
*Both dates at 12:01AM local time at the Insured's Address*

beazley

**Optional ERP:** Up to 36 Months @ 200% Maximum of the Policy Premium

**Commission:** 17.5%

| Coverage | Coverage Provided |
|---|---|
| I.A.1. New Pollution Conditions – (BI/PD and Cleanup) | YES |
| I.A.2. New Pollution Conditions – 1st Party Discovery | YES |
| I.B.1. Existing Pollution Conditions – (BI/PD and Cleanup) | YES |
| I.B.2. Existing Pollution Conditions – 1st Party Discovery | YES |
| I.C. Transportation | YES |
| I.D. Non-Owned Disposal Site | YES |
| I.E. Crisis and Reputation Management Expenses | YES |
| I.F. Business Interruption Costs | YES |

| Limit Option Each Pollution Condition | Limit Option Aggregate for the Policy Period | Deductible Options Each Pollution Condition | 8 Years |
|---|---|---|---|
| $3,000,000 | $6,000,000 | $25,000 | $133,468 |

**PR Surplus Lines Tax: $12,012.12**
**Total Cost: $145,480.12**

**Retroactive Date - I.B.:** None

**Retroactive Date - I.C.:** None

**Retroactive Date - I.D.:** None

**Additional Claims Expenses Limit:** 25%

**Crisis and Reputation Expenses Coverage Each Pollution Condition Sublimit:** $250,000

**Period of Restoration:** 365 Days

**I.F. Deductible Period:** 3 Days

beazley

This binder provides coverage for the following scheduled Covered Location(s):

| Address | | | | Use |
|---|---|---|---|---|
| Hato Tejas Industrial Park | Bayamon | PR | 00961 | Light industrial |
| Puerto Nuevo Distribution Center | Cataño (Bayamon) | PR | 00961 | |
| Victoria Industrial Park | Carolina | PR | 00987 | |
| Sabana Gardens Industrial Park | Carolina | PR | 00983 | |
| La Ceramica Industrial Park | Carolina | PR | 00983 | |

## SPECIAL PROVISIONS / ENDORSEMENTS

| | |
|---|---|
| 1. SCHEDULE2019 | Lloyd's Security Schedule<br>• Syndicate 2623 82%<br>• Syndicate 623 18% |
| 2. NMA1256 | Nuclear Incident Exclusion Clause-Liability-Direct (BROAD) (U.S.A.) |
| 3. NMA1477 | Radioactive Contamination Exclusion Clause-Liability-Direct (U.S.A.) |
| 4. NMA2918 | War and Terrorism Exclusion Endorsement |
| 5. E06694012015 | U.S. Terrorism Risk Insurance Act of 2002 as Amended, Not Purchased Clause |
| 6. E06671012015 | Policyholder Disclosure Notice of Terrorism Insurance Coverage |
| 7. E12794042019 | Minimum Earned Premium<br>• 25% |
| 8. E12451012019 | Disclosed Document Schedule |
| 9. E12453012019 | Other Insurance- Primary Without Right of Contribution |
| 10. E12831042019 | Underground Storage Tank Exclusion Deletion |
| 11. E12830042019 | Delete Failure to Maintain Institutional or Engineering Controls Exclusion Endorsement |
| 12. Manuscript | Delete Insuring Clause I.B.2. – Location Specific<br>• Restriction applies to borrower only for the following locations:<br>○ Victoria Industrial Park, Carolina, PR 00987<br>○ Sabana Gardens Industrial Park, Carolina, PR 00983 |
| 13. Manuscript | Voluntary Site Investigation Exclusion – Covered Location Specific<br>• Restriction applies to borrower only for the following locations:<br>○ La Ceramica Industrial Park, Carolina, PR 00983 |
| 14. E12750032019 | Additional Named Insured<br>• MTPR WAREHOUSE HATO TEJAS LLC,<br>• MTPR WAREHOUSE LA CERAMICA LLC,<br>• MTPR WAREHOUSE PUERTO NUEVO LLC,<br>• MTPR WAREHOUSE SABANA GARDENS LLC, and<br>• TPR WAREHOUSE VICTORIA LLC, each a Puerto Rico limited liability company |

beazley

CHOICE OF LAW

**Choice of Law:** N/A

NOTICE

This conditional Binder is through a surplus lines carrier on whose behalf we are authorized to act. Compliance with applicable laws including filings and payment of taxes and fees is the responsibility of the insured, the insurance agent or insurance broker. If coverage is bound, please advise the license number of the producer making the filing.

A condition precedent to coverage afforded by this conditional Binder is that no material change in risk occurs between the date of this letter and the inception date of the proposed policy (including discovery of any pollution condition, notice of any claim or notice of circumstances which may reasonably be expected to give rise to a claim). The insured shall have an affirmative duty of disclosure of such information. In the event of such change of risk, the Underwriters may, in their sole discretion, modify and/or withdraw this conditional Binder.

Premiums must be remitted by the due date on the invoice.

This conditional Binder is valid through ninety (90) days from the date of this document. For other questions, please speak with a member of our team.

Thank you for purchasing insurance with us.

Best Regards,

Jenny F. Han
Specialty Lines – Environmental
BEAZLEY INSURANCE SERVICES
CA Lic.# 0G55497
t: +1 (415) 263-4073
c: +1 (415) 238-2574
a: 101 California Street, Suite 2920, San Francisco, CA 94111
e: jenny.han@beazley.com
w: www.beazley.com

beazley

**Effective date of this Endorsement: <Effective Date>**
**This Endorsement is attached to and forms a part of Policy Number: <Policy Number>**
**<Insurer> Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## LLOYD'S SECURITY SCHEDULE

| | |
|---|---|
| Syndicate 2623 | 82% |
| Syndicate 623 | 18% |

ALL OTHER TERMS, conditions and limitations of said Certificate shall remain unchanged.

**Effective date of this Endorsement: <Effective Date>**
**This Endorsement is attached to and forms a part of Policy Number: <Policy Number>**

**NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)**

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I. Under any Liability Coverage, to injury, sickness, disease, death or destruction:

(a) with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II. Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III. Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

(a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV. As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or by-product material;

"source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means:

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

**Effective date of this Endorsement: <Effective Date>**
**This Endorsement is attached to and forms a part of Policy Number: <Policy Number>**

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

**Effective date of this Endorsement: <Effective Date>**
**This Endorsement is attached to and forms a part of Policy Number: <Policy Number>**

**WAR AND TERRORISM EXCLUSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1. war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2. any act of terrorism.

   For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

**Effective date of this Endorsement: <Effective Date>**
**This Endorsement is attached to and forms a part of Policy Number: <Policy Number>**
**<Insurer> Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED NEW & RENEWAL BUSINESS ENDORSEMENT

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

This endorsement is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.

It is hereby noted and agreed with effect from inception that the Terrorism exclusion to which this Insurance is subject, War and Terrorism Exclusion Endorsement, shall not apply to any **Claims**, **Claims Expense** or **Cleanup Costs** directly resulting from any "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA").

The coverage afforded by this endorsement is only in respect of any **Claims**, **Claims Expense** and **Cleanup Costs** of the type insured by this Insurance directly resulting from an "act of terrorism" as defined in TRIA. The coverage provided by this endorsement shall expire at 12:00 midnight December 31, 2020, the date on which the TRIA Program is scheduled to terminate, or the expiry date of the policy whichever occurs first, and shall not cover any losses or events which arise after the earlier of these dates. The Terrorism exclusion to which this Insurance is subject, War and Terrorism Exclusion Endorsement, applies in full force and effect to any other losses and any act or events that are not included in said definition of "act of terrorism".

This endorsement only affects the Terrorism exclusion to which this Insurance is subject. All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

Furthermore the Underwriters will not be liable for any amounts for which they are not responsible under the terms of TRIA (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on the Underwriters liability for payment for terrorism losses.

All other terms, exclusions and conditions of the policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: <Effective Date>**
**This Endorsement is attached to and forms a part of Policy Number: <Policy Number>**
**<Insurer> Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED NOT PURCHASED CLAUSE

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.

It is hereby noted that the Underwriters have made available coverage for **Claims**, **Claims Expense** and **Cleanup Costs** directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for **Claims**, **Claims Expense** or **Cleanup Costs** directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

All other terms, exclusions and conditions of the policy remain unchanged.

____________________________
Authorized Representative

**POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE**

You are hereby notified that under the Terrorism Risk Insurance Act of 2002, as amended ("TRIA"), that you now have a right to purchase insurance coverage for losses arising out of acts of terrorism, **as defined in Section 102(1) of the Act, as amended:** The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Any coverage you purchase for "acts of terrorism" shall expire at 12:00 midnight December 31, 2020, the date on which the TRIA Program is scheduled to terminate, or the expiry date of the policy whichever occurs first, and shall not cover any losses or events which arise after the earlier of these dates.

YOU SHOULD KNOW THAT COVERAGE PROVIDED BY THIS POLICY FOR LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM IS PARTIALLY REIMBURSED BY THE UNITED STATES UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THIS FORMULA, THE UNITED STATES PAYS 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 AND 80% BEGINNING ON JANUARY 1, 2020; OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURER(S) PROVIDING THE COVERAGE. YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A USD100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS USD100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED USD100 BILLION, YOUR COVERAGE MAY BE REDUCED.

THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

| | |
|---|---|
| | I hereby elect to purchase coverage for acts of terrorism for a prospective premium of $<Insert Terrorism Premium>. |
| | I hereby elect to have coverage for acts of terrorism excluded from my policy. I understand that I will have no coverage for losses arising from acts of terrorism. |

Policyholder/Applicant's Signature

Lloyd's Syndicates 623/2623

Print Name

Policy Number

Date

(LMA 9104)

E06671
012015 ed.

**Effective date of this Endorsement: <Effective Date>**
**This Endorsement is attached to and forms a part of Policy Number: <Policy Number>**
**<Insurer> referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## MINIMUM EARNED PREMIUM

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that in the event of cancellation by the **Insured** or cancellation by the Underwriters, this Policy shall be subject to a minimum earned premium of <Percent>% of the amount shown in Item 5. of the Declarations.

However, in the event of any payment made by the Underwriters in excess of the **Deductible** for **Damages**, **Claims**, **Cleanup Costs** or **Claims Expenses** then the policy will be subject to a minimum earned premium of 100% at the Inception Date of the Policy.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: <Effective Date>**
**This Endorsement is attached to and forms a part of Policy Number: <Policy Number>**
**<Insurer> referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## DISCLOSED DOCUMENT SCHEDULE

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that pursuant to Section **VI. EXCLUSIONS, B. Prior Knowledge** the following Schedule of Disclosed Documents is added to this Policy:

### Schedule of Disclosed Documents

Phase I Environmental Site Assessment, La Ceramica Industrial Park, Carolina, Puerto Rico, Geosyntec consultants, Jul-2019

Phase I Environmental Site Assessment, Hato Tejas Industrial Park, Bayamon, Puerto Rico, Geosyntec consultants, Jul-2019

Phase I Environmental Site Assessment, Victoria Industrial Park, Carolina, Puerto Rico, Geosyntec consultants, Jul-2019

Phase I Environmental Site Assessment, Puerto Nuevo Distribution Center, Catano, Puerto Rico, Geosyntec consultants, Jul-2019

Phase I Environmental Site Assessment, Sabana Gardens Industrial Park, Carolina, Puerto Rico, Geosyntec consultants, Jul-2019

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: <Effective Date>**
**This Endorsement is attached to and forms a part of Policy Number: <Policy Number>**
**<Insurer> referred to in this endorsement as either the "Insurer" or the "Underwriters"**

**OTHER INSURANCE – PRIMARY WITHOUT RIGHT OF CONTRIBUTION**

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the following is added to Clause **XIII. OTHER INSURANCE**:

Notwithstanding the foregoing, where other valid and collectible Pollution Legal Liability and/or Contractor's Pollution Liability insurance is available to any **Insured** for any **Pollution Condition**, this insurance shall apply as primary insurance versus such other valid and collectable insurance, and the Underwriters will have no right of contribution against such other insurance company providing insurance for a **Pollution Condition** on a primary basis.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: <Effective Date>**
**This Endorsement is attached to and forms a part of Policy Number: <Policy Number>**
**<Insurer> referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## UNDERGROUND STORAGE TANK EXCLUSION DELETION

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Clause **VI. EXCLUSIONS** M. **Underground Storage Tank** is deleted in its entirety.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: <Effective Date>**
**This Endorsement is attached to and forms a part of Policy Number: <Policy Number>**
**Insurer: <Insurer>**

**DELETE FAILURE TO MAINTAIN INSTITUTIONAL OR ENGINEERING CONTROLS EXCLUSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Clause **VI, EXCLUSIONS**, paragraph L., **Failure to Maintain Institutional Controls or Engineering Controls** is deleted in its entirety.

All other terms and conditions of this Policy remain unchanged.

______________________________
Authorized Representative

**Effective date of this Endorsement: <Effective Date>**
**This Endorsement is attached to and forms a part of Policy Number: <Policy Number>**
**<Insurer> referred to in this endorsement as either the "Insurer" or the "Underwriters"**

**DELETE INSURING CLAUSE I.B.2**

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that solely with respect to the schedule, Clause **I. INSURING CLAUSE** B. **Covered Location Pollution Liability Coverage - Existing Pollution Conditions**, subparagraph 2. is deleted in its entirety.

Schedule

**Named Insured:** borrower

**Covered Locations:**
- Victoria Industrial Park, Carolina, PR 00987
- Sabana Gardens Industrial Park, Carolina, PR 00983

All other terms and conditions of this Policy remain unchanged.

______________________________
Authorized Representative

**Effective date of this Endorsement: <Effective Date>**
**This Endorsement is attached to and forms a part of Policy Number: <Policy Number>**
**<Insurer> referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## VOLUNTARY SITE INVESTIGATION EXCLUSION

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that, solely with respect to schedule below, the following is added to **VI. EXCLUSIONS:**

**Voluntary Site Investigation**

arising out of or resulting from the discovery of a **Pollution Condition** on, at, under or migrating from a **Covered Location**, where such **Pollution Condition** is discovered during or as a direct or indirect result of a **Voluntary Site Investigation** regardless of whether such action is undertaken as part of a property transfer or sale, state voluntary cleanup program, or a remedial investigation workplan, including but not limited to, intrusive investigations, geotechnical work and the taking or testing of soil, vapor, groundwater or surface water samples from or beyond the boundaries of a **Covered Location**.

For the purpose of this Endorsement, "**Voluntary Site Investigation**" means any activities not required by **Environmental Laws** that are undertaken by or on behalf of any **Insured**, or any owner, occupant, operator or prospective purchaser of a **Covered Location**, to determine whether there is a **Pollution Condition** on, at, under or migrating from a **Covered Location,** including any activities to investigate subsurface conditions including but not limited to geotechnical investigations or any activities required by entering a voluntary remediation program, brownfield program or similar program, absent a governmental agency order to do so.

Schedule

**Named Insured:** borrower

**Covered Locations:**

- La Ceramica Industrial Park, Carolina, PR 00983

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: <Effective Date>**
**This Endorsement is attached to and forms a part of Policy Number: <Policy Number>**
**<Insurer> referred to in this endorsement as either the "Insurer" or the "Underwriters"**

**ADDITIONAL NAMED INSURED**

This endorsement modifies insurance provided under the following:

**<PRODUCT NAME>**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Clause **III. DEFINITIONS** V. **"Named Insured"** is amended to include the following person(s) or entity(ies):

<Additional Named Insured(s)>

but only with respect to liability arising out of the ownership, operation, maintenance or use of a **Covered Location**.

All other terms and conditions of this Policy remain unchanged.

____________________________
Authorized Representative

beazley

# BEAZLEY ECLIPSE
## ENVIRO COVERED LOCATION INSURANCE POLICY (SITE ENVIRONMENTAL)

NOTICE: This Policy provides coverage on a Discovery and/or Claims Made and Reported Basis and the payment of **Claims Expenses** reduces the applicable Limits of Liability. Please review the coverage afforded under this Insurance Policy (hereinafter referred to as the "Policy" or "Insurance") carefully and discuss the coverage hereunder with your insurance agent or broker.

In consideration of the payment of the premium and reliance upon the statements in the **Application**, which is deemed a part of this Insurance Policy and subject to the Limit of Liability, Deductible, Exclusions, conditions and other terms of this Insurance, the Underwriters agree with the **First Named Insured** as follows:

**I. INSURING CLAUSE**

**THE FOLLOWING COVERAGES ARE IN EFFECT ONLY IF INDICATED WITH A "YES" IN ITEM 13. OF THE DECLARATIONS.**

A. **Covered Location Pollution Liability Coverage - New Pollution Conditions**

To pay on behalf of the **Insured**:

1. **Cleanup Costs**, **Damages** and **Claims Expenses**, in excess of the Deductible, which the **Insured** shall become legally obligated to pay because of a **Claim** for a **Pollution Condition** first made against the **Insured** and reported in writing to the Underwriters during the **Policy Period**; or within the Extended Reporting Period, if applicable; and/or

2. **Cleanup Costs**, in excess of the Deductible, because of a **Pollution Condition** first discovered by the **Insured** and reported in writing to the Underwriters during the **Policy Period**; or within the Extended Reporting Period, if applicable;

provided that, such **Pollution Condition**:

a. first commenced on or after the Inception Date stated in Item 2. of the Declarations and before the end of the **Policy Period**; and

b. is on, at, under or migrated from a **Covered Location.**

beazley

B. **Covered Location Pollution Liability Coverage - Existing Pollution Conditions**

To pay on behalf of the **Insured**:

1. **Cleanup Costs**, **Damages** and **Claims Expenses**, in excess of the Deductible which the **Insured** shall become legally obligated to pay because of a **Claim** for a **Pollution Condition** first made against the **Insured** and reported in writing to the Underwriters during the **Policy Period**; or within the Extended Reporting Period, if applicable; and/or

2. **Cleanup Costs**, in excess of the Deductible, because of a **Pollution Condition** first discovered by the **Insured** and reported in writing to the Underwriters during the **Policy Period**; or within the Extended Reporting Period, if applicable;

provided that, such **Pollution Condition**:

a. first commenced on or after the Retroactive Date, if any, set forth in Item 6.(a) of the Declarations and before the Inception Date stated in Item 2. of the Declarations; and

b. is on, at, under or migrated from a **Covered Location**.

C. **Transportation Pollution Liability Coverage**

To pay on behalf of the **Insured**:

**Cleanup Costs**, **Damages** and **Claims Expenses**, in excess of the Deductible, which the **Insured** shall become legally obligated to pay because of a **Claim** for a **Pollution Condition** first made against the **Insured** and reported in writing to the Underwriters during the **Policy Period**, or within the Extended Reporting Period, if applicable, wholly occurring during and resulting solely from **Transportation**; provided that such **Pollution Condition** first commenced on or after the Retroactive Date set forth in Item 6.(b) of the Declarations and before the end of the **Policy Period**.

This Insuring Clause shall not be utilized to evidence financial responsibility of any **Insured** under any federal, state, provincial or local law.

D. **Non-Owned Location Pollution Liability Coverage**

To pay on behalf of the **Insured**:

**Cleanup Costs**, **Damages** and **Claims Expenses**, in excess of the Deductible, which the **Insured** shall become legally obligated to pay because of a **Claim** for a **Pollution Condition** first made against the **Insured** and reported in writing to the

Underwriters during the **Policy Period**, or within the Extended Reporting Period, if applicable, provided that such **Pollution Condition**:

1. first commenced on or after the Retroactive Date stated in Item 6.(c). of the Declarations and before the end of the **Policy Period**; and

2. is on, at, under or migrated from a **Non-Owned Location**.

E. **Crisis and Reputation Management Expenses Coverage**

To pay the **Named Insured Crisis Management Expenses** and/or **Reputation Management Expenses** in excess of the Deductible because of a **Pollution Condition** that is on, at, under or migrated from a **Covered Location** that:

1. is the subject of material adverse regional or national news media coverage for the **Named Insured**;

2. results in **Cleanup Costs** and/or **Damages** for a **Pollution Condition** that is reported to the Underwriters and covered under Insuring Clause I.A or I.B of the Policy; and

3. the **Crisis Management Expenses** and/or **Reputation Management Expenses** are reported, in writing, to the Underwriters during the **Policy Period** and within seventy-two (72) hours after the **Named Insured** incurs or assumes **Reputation Management Expenses** and/or **Crisis Management Expenses** during the **Policy Period**.

In the event that **Crisis Management Expenses** and/or **Reputation Management Expenses** are caused by a **Pollution Condition** and some other cause(s), the Underwriters shall only provide coverage for that portion of **Crisis Management Expenses** and/or **Reputation Management Expenses** caused solely by the **Pollution Condition**.

F. **Business Interruption Costs Coverage**

To pay the **Named Insured Business Interruption Costs** caused directly by a **Pollution Condition** on, at or under a **Covered Location**, provided that:

1. such **Pollution Condition** results in **Cleanup Costs** covered under Insuring Clause I.A or I.B of this Policy; and

2. the **Business Interruption Costs** are reported, in writing, to the Underwriters during the **Policy Period**.

In the event that **Business Interruption Costs** are caused by a **Pollution Condition** and some other cause(s), the Underwriters shall only provide coverage for that portion of **Business Interruption Costs** caused solely by the **Pollution Condition**.

beazley

## II. SUPPLEMENTARY PAYMENTS

Supplementary Payments made under this Clause are not subject to the Deductible set forth in Item 4. of the Declarations and are payable by the Underwriters in addition to the Limits of Liability as set forth in Clause VII.

**Defendants Reimbursement**

Upon the Underwriters' request, the **Insured** shall attend mediation meetings, arbitration proceedings, hearings, depositions and trials relative to the defense of a **Claim**. Beginning on the fourth day of attendance, the Underwriters shall reimburse the **Insured**, upon written request, for actual loss of earnings and reasonable expenses that result from such attendance. The maximum aggregate amount that the Underwriters shall reimburse is $500 total per day for all **Insureds**, subject to a maximum aggregate amount of $10,000 for each **Claim**.

## III. DEFINITIONS

Wherever used in this Policy in bold face type, the following definitions shall apply.

A. "**Application**" means all signed applications, including all attachments and other materials submitted therewith or incorporated therein, and any other such documents submitted prior to the date the Policy, or as applicable, a post binding **Covered Location**, was bound, in connection with the underwriting of this Policy, including any endorsement or other part thereof, or any other policy issued by the Underwriters, of which this Policy is a renewal, replacement or which it succeeds in time.

B. "**Bodily Injury**" means physical injury, sickness or disease, including death resulting therefrom, and any accompanying mental anguish, emotional distress or shock sustained by any person.

C. "**Business Interruption Costs**" means the sum of the following:

1. the **Named Insured**'s net income, which is calculated as net profit, if any, that would have been earned before taxes (or if there is a net loss before taxes, the net loss is deducted);
2. the **Named Insured**'s continuing normal operating expenses incurred excluding payroll not deducted in 1. above;
3. **Extra Expense**; and
4. **Rental Value**

due to the reasonable and necessary suspension of the **Named Insured's** business operations during the **Period of Restoration** at a **Covered Location**. These sums will be reduced to the extent that the **Named Insured** can resume

business operations, in whole or in part, at the **Covered Location**, or by making use of other location(s).

**Business Interruption Costs** shall not include any costs associated with: 1) costs incurred as a result of unfavorable business conditions, 2) loss of market or any other consequential loss, 3) costs associated with crisis management or reputational damage, 4) revoked or modified licenses, permits or, similar types of authorizations from a governmental agency, 5) legal costs or legal expenses, or 6) any costs associated with preventing any **Pollution Condition**.

D. "**Cargo**" means waste, materials, goods or products transported by automobile, aircraft, watercraft or rolling stock for delivery by a **Named Insured**, or a third party carrier on the **Named Insured's** behalf, provided that the **Named Insured** or third party carrier is properly licensed to transport such waste, materials, goods or products.

E. "**Claim**" means:

1. a written demand received by an **Insured** for money or services or alleging liability or responsibility, including, but not limited to, the service of suit or institution of arbitration proceedings; or

2. a court or government agency order or government or regulatory action filed against the **Insured**.

F. "**Claims Expenses**" means:

1. reasonable and necessary fees charged by an attorney designated or consented to by the Underwriters, such consent not to be unreasonably withheld or delayed;

2. all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim** arising in connection therewith, if incurred by the Underwriters, or by the **Insured** with the prior written consent of the Underwriters, such consent not to be unreasonably withheld or delayed; and

3. premiums for appeal bonds for judgments or bonds to release property used to secure a legal obligation, if required for a **Claim** against any **Insured** for a **Pollution Condition** to which this Insurance applies, provided, however, that the Underwriters shall have no obligation to appeal the underlying judgment or to obtain such bonds.

Except as set forth in Clause II., **Claims Expenses** do not include any goods supplied or services performed by the staff or salaried employees of the **Insured** in connection with the investigation, adjustment, defense or appeal of a **Claim** noticed under this Insurance or in connection with the investigation or remediation of a **Pollution Condition**.

G. "**Cleanup Costs**" means:

1. reasonable and necessary costs, charges and expenses incurred (if by an **Insured**, then only with the prior written consent of the Underwriters, such consent not to be unreasonably withheld or delayed) in the investigation, assessment, removal, disposal, containment, treatment, remediation (including the associated testing and monitoring) or neutralization of a **Pollution Condition**, to the extent required by **Environmental Laws**, required by a **Licensed Site Professional** or required to satisfy the **Insured's** obligations under a federal or state voluntary cleanup program, or with respect to **Microbial Matter**, methamphetamines or other chemicals associated with methamphetamine laboratories, and legionella pneumophilia, reasonable and necessary costs, charges and expenses required by **Indoor Air Quality Clean-Up Standards**;

2. payments for civil fines, civil penalties, punitive damages, exemplary damages or any damages which are a multiple of compensatory damages, to the extent insurable by law, but only in connection with a **Claim** for **Cleanup Costs** covered under subparagraph 1. above;

3. reasonable and necessary fees charged by an attorney designated or consented to by the Underwriters, such consent not to be unreasonably withheld or delayed, incurred in connection with any such **Cleanup Costs**;

4. reasonable and necessary **Restoration Costs**; and

5. reasonable and necessary expenses incurred to respond to an imminent and substantial endangerment to the public health or welfare or to the environment because of a **Pollution Condition**; provided that, the **Named Insured** shall forward written notice to the Underwriters of any action taken and expense incurred pursuant to this section as soon as practicable, but in no event later than seventy-two (72) hours after any such **Cleanup Costs** have been incurred or assumed.

H. "**Covered Location**" means any location specified in Item 9. of the Declarations or in a Covered Location Endorsement attached to this Policy.

I. "**Crisis Management Expenses**" means the following reasonable fees, costs, charges and expenses of a qualified and licensed crisis management firm incurred by the **Named Insured** during a **Period of Crisis** for:

1. medical expenses;
2. funeral expenses;
3. psychological counseling;
4. travel expenses;
5. temporary living expenses; and
6. security expenses;

beazley

**Crisis Management Expenses** do not include **Reputation Management Expenses**, **Damages**, **Cleanup Costs**, **Business Interruption Costs** or any **Claims Expenses**.

J. "**Damages**" means a monetary judgment, award or settlement of compensatory damages, including any pre-judgment and/or post-judgment interest thereon, incurred for **Property Damage** and/or **Bodily Injury**, including any required medical monitoring when accompanied by such **Bodily Injury**.

The term **Damages** shall not include or mean:

1. taxes or loss of tax benefits;

2. criminal fines, sanctions or criminal penalties assessed against the **Insured**;

3. civil fines, civil penalties punitive damages, exemplary damages or any damages which are a multiple of compensatory damages assessed against the **Insured**, unless insurable by law and assessed in connection with a **Claim** for **Property Damage** and/or **Bodily Injury**;

4. liquidated damages;

5. any amounts for which the **Insured** is not liable, or for which there is no legal recourse against the **Insured**;

6. matters deemed uninsurable under the law pursuant to which this Policy is construed; or

7. goods supplied or services performed by the staff or salaried employees of the **Insured** in connection with the investigation, adjustment, defense or appeal of any **Claim** noticed under this Insurance or in connection with the investigation or remediation of a **Pollution Condition**, without the prior written consent of the Underwriters and in accordance with Clause II.

K. "**Engineering Controls**" means physical modifications to a **Covered Location** to reduce or eliminate the potential for exposure to **Pollution Conditions**.

L. "**Environmental Laws**" means any federal, state, provincial or local laws, including but not limited to statutes, rules, regulations, ordinances, guidance documents, and governmental, judicial or administrative orders and directives that are applicable to **Pollution Conditions** to which this Insurance applies.

M. "**Extra Expense**" means the reasonable and necessary expenses incurred by the **Named Insured**, over and above the **Named Insured**'s continuing normal operating expenses, during the **Period of Restoration**, that the **Named Insured** would not have incurred had there been no suspension of business operations,

beazley

provided that the expenses are incurred to avoid or minimize the suspension of business and to continue business operations:

1. at the **Covered Location**, or

2. at replacement or temporary location(s), including:

   i. relocation expenses; and

   ii. cost to equip and operate the replacement or temporary location(s).

**Extra Expense** shall be reduced by any salvage value of property obtained for temporary use during the **Period of Restoration** that remains after resumption of normal business operations. **Extra Expense** shall not include any amounts associated with: 1) costs, fees or expenses incurred as a result of unfavorable business conditions, 2) loss of market or any other consequential loss, 3) crisis management or reputational damage, 4) revoked or modified licenses, permits or, similar types of authorizations from a governmental agency, 5) legal and accounting costs, fees or expenses, including but not limited to any such amounts incurred in connection with defending or pursuing any litigation or in preparation for any litigation, 6) interest, including but not limited to the interest on money borrowed to finance any construction; 7) taxes, including but not limited to realty taxes and other, similar assessments; 8) advertising and promotional costs, fees or expenses; and 9) commissions and any other costs, fees or expenses resulting from the renegotiation of leases; 10) costs arising from any delay, lost opportunity, or additional overhead incurred by the contractor, 11) architect, engineering, design and consultant costs, fees and expenses and/or 12) preventing any **Pollution Condition**. Subject to the terms and conditions of this Policy, the Underwriters will pay no more for **Extra Expense** than the percentage shown below multiplied by the Limit of Liability stated in Item 3(a) of the Declarations. If the **Period of Restoration** is:

1. 30 days or less, the percentage applied to the Limit of Liability shall be 40%.

2. 31-60 days, the percentage applied to the Limit of Liability shall be 80%.

3. 61 days or more, the percentage applied to the Limit of Liability shall be 100%.

N. "**First Named Insured**" means the person or entity specified in Item 1. of the Declarations.

O. "**Indoor Air Quality Clean-Up Standards**" means standards for the investigation and remediation of **Microbial Matter**, methamphetamines or other chemicals associated with methamphetamine laboratories, and legionella pneumophilia, imposed by a federal, state, local or provincial governmental authority pursuant to a law or regulation governing the investigation and remediation of **Microbial Matter**, methamphetamines or other chemicals associated with

methamphetamine laboratories and/or legionella pneumophilia. If no standards have been imposed by such authority, then the standards for investigation and remediation shall be those necessary to protect human health at the **Covered Location** which shall be determined as follows:

1. With respect to **Microbial Matter**, methamphetamines or other chemicals associated with methamphetamine laboratories, by a Certified Industrial Hygienist, or similarly qualified health and safety professional, retained with the prior written consent of the Underwriters and experienced in performing investigation and remediation of **Microbial Matter**, methamphetamines or other chemicals associated with methamphetamine laboratories.

2. With respect to legionella pneumophilia, to the extent required in writing by the Centers for Disease Control or local health department.

The applicable standards shall be those which applied to the use of the **Covered Location** identified by the **Insured** in the statements and information contained in the **Application** submitted to the Underwriters prior to the date the Policy is bound, or prior to adding such locations as a **Covered Location** specified in Item 9 of the Declarations.

P. "**Insured**" means:

1. the **Named Insured**;

2. any other entity added as an additional **Insured** by Endorsement to the policy;

3. a present or former director or officer, or, in the case of a limited liability company, a member or manager of the **Named Insured**, but only with respect to the performance of his or her duties as such on behalf of the **Named Insured**;

4. a present or former employee of the **Named Insured**, but only for work done while acting within the scope of his or her employment and related to the conduct of the **Named Insured's** business;

5. a present or former principal if the **Named Insured** is a sole proprietorship, or a partner if the **Named Insured** is a partnership, but only with respect to the performance of his or her duties as such on behalf of the **Named Insured**; and

6. the estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be entitled to coverage under this Insurance.

Q. "**Institutional Controls**" means legal and administrative restrictions on the use of or access to a **Covered Location**, which are designed to reduce or eliminate the potential for exposure to **Pollution Conditions**.

R. "**Licensed Site Professional**" means a licensed environmental scientist or engineer that is in good standing with, and acting under the authority of federal, state, provincial or local laws for the purpose of addressing **Pollution Conditions** at a **Covered Location**.

S. "**Material Change in Use**" means any change in use or operations at a **Covered Location** from the use or operations identified by the **Insured**:

1. in the **Application** submitted to the Underwriters prior to the date the Policy was bound, or

2. prior to adding such location as a **Covered Location** specified in Item 9. of the Declarations

that materially increases the likelihood or severity of a **Pollution Condition**, or results in the imposition of more stringent remediation standards than those applicable to the **Covered Location** as of the date the Policy was bound or the date the **Covered Location** was added to the Policy, whichever is later.

T. "**Microbial Matter**" means fungi, mold or mildew.

V. "**Named Insured**" means:

1. the **First Named Insured**;

2. any other entity added as an additional **Named Insured** by endorsement to the policy; and

3. any corporations, partnerships, companies or other entities which, at the Inception Date of the Policy, or for such time during the **Policy Period,** the **First Named Insured** has at least 50% ownership interest, but solely with respect to liability arising out of the ownership, operation, maintenance or use of a **Covered Location**.

W. "**Natural Resource Damage**" means physical injury to, or destruction of, and the resulting loss of use and loss of value (and the cost for assessment and replacement as a result of such injury, destruction or loss required by law to restore the natural resources to their baseline conditions as they existed immediately prior to the **Pollution Condition**) of land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the fishery conservation zone established by the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et. seq.), any state, local or provincial government, any

foreign government, any Native American Tribe or if such resources are subject to a trust restriction on alienation, any member of a Native American Tribe.

X. "**Non-Owned Location**" means any location in the United States, its territories or possessions, which is not managed, operated, owned or leased by any **Insured** or an affiliate of any **Insured** and is used by an **Insured**:

1. for the storage, warehousing or distribution of goods or products owned by an **Insured** and which originate from a **Covered Location**, or

2. for the treatment, storage or disposal of waste or materials generated at a **Covered Location**, provided that such location:

   a. is properly permitted and/or licensed by the applicable federal, state, local or provincial authorities to accept such waste or materials as of the date the waste or materials are treated, stored or disposed of at such location; and

   b. is not listed on a proposed or final Federal National Priorities List and/or any state or provincial equivalent National Priority List, Superfund or Hazardous Waste List prior to the treatment, storage or disposal of the waste or material at such location; and

   c. is not owned or operated by a bankrupt or financially insolvent entity as of the date the waste or materials are treated, stored or disposed of at such location.

Y. "**Period of Restoration**" means the period of time that begins after the Deductible Period set forth in Item 4.(b) of the Declarations and ends with the earliest of:

1. the date the **Named Insured** may reasonably resume its normal business operations at the **Covered Location**;

2. the date the **Named Insured** should have resumed its normal business operations at the **Covered Location** had it used reasonable skill, speed, and effort to do so;

3. the date the **Named Insured** may reasonably resume its normal business operations at a new location; or

4. when the number of days shown in Item 3.(e) **Period of Restoration** Sublimit have elapsed.

The **Period of Restoration** does not include any delay in time caused by the interference by a **Named Insured** with restoring the property or with the resumption or continuation of business operations. The expiration date of this Policy will not reduce the **Period of Restoration**, nor shall the Extended Reporting Period extend it.

beazley

Z. "**Policy Period**" means the period of time between the Inception Date stated in Item 2. of the Declarations and earlier of the Expiration Date stated in Item 2. of the Declarations, or any termination, expiration or cancellation of this Insurance, if applicable, and specifically excludes any Extended Reporting Period or any prior policy period or renewal period.

AA. "**Pollution Condition**" means the

1. actual or alleged discharge, dispersal, release, escape, migration, seepage, or

   illicit abandonment on or after the Inception Date shown in Item 2. of the Declarations, by a third party without an **Insured's** consent,

   of any solid, liquid, gaseous or thermal irritant, contaminant or pollutant, including but not limited to, smoke, vapors, soot, fumes, acids, alkalis, chemicals, toxic or hazardous substances, waste materials, including medical infectious and pathological waste, low-level radioactive waste and material into or upon land or structures thereupon, the atmosphere or any watercourse, body of water or groundwater, in concentrations or amounts in excess of those naturally occurring or present in the environment, which results in **Bodily Injury**, **Property Damage** or **Cleanup Costs** to which this Insurance applies; and

2. presence of legionella pneumophilia, methamphetamines or other chemicals associated with methamphetamine laboratories, and **Microbial Matter** on, at or within any structures or buildings on or at the **Covered Location**;

**Pollution Condition** does not include any exposure to infected humans or animals, or contact with bodily fluids or infected humans or animals.

BB. "**Property Damage**" means:

1. physical injury to or destruction of any tangible property, including the loss of use thereof;

2. loss of use of tangible property that has not been physically injured or destroyed;

3. diminished value of property owned by third parties, but only where there is physical injury to or destruction of such tangible property; or

4. **Natural Resource Damage**.

**Property Damage** does not include **Cleanup Costs**.

CC. "**Rental Value**" means the loss of any anticipated rental income the **Named Insured** would have earned during the **Period of Restoration** by renting all or a

portion of the **Covered Location**(s) to a third party not owned by, affiliated with, or connected in any way to any **Named Insured**, less any rental income the **Named Insured** actually earned or could have earned during the **Period of Restoration** by renting all or a portion of the **Covered Location**(s) or by making use of other property. **Rental Value** does not apply to any loss included in subparagraphs (1)-(3) of the definition of **Business Interruption Costs**.

DD. "**Reputation Management Expenses**" means reasonable fees, costs, charges and expenses of, or at the direction of, a qualified public relations firm incurred by the **Named Insured** during a **Period of Crisis** to mitigate material adverse effects upon the **Named Insured's** reputation and to maintain and/or restore public confidence in the **Named Insured**, including but not limited to amounts for advising, printing, advertising, mailing of materials, or travel by the **Named Insured's** directors, officers, employees, or agents, or the public relations firm to the extent incurred at the direction of the public relations firm. **Reputation Management Expenses** do not include **Crisis Management Expenses**, **Damages, Cleanup Costs, Business Interruption Costs** or any **Claim Expenses**.

EE. "**Restoration Costs**" means costs incurred by an **Insured**, in order to restore, repair or replace real or personal property to substantially the same condition it was in prior to being damaged during the course of investigating, assessing, removing, disposing, containing, treating, remediating or neutralizing a covered **Pollution Condition**. Such costs shall not exceed the actual cash value of such real or personal property immediately prior to such damage, or include costs associated with improvements or betterments. Actual cash value shall be calculated by taking the cost to replace such real or personal property, immediately prior to such damage, minus the accumulated depreciation of the real or personal property.

FF. **Period of Crisis** means the period of time that begins on the date that a **Pollution Condition** covered under Insuring Clause I.A. or I.B. of this Policy results in material adverse regional or national news media coverage for the **Named Insured** and ends the earlier of the date: (1) the Underwriters, in their sole discretion, determine that there is no reasonable basis that the **Pollution Condition** has or will continue to result in material adverse regional or national news media coverage against the **Named Insured**; or (2) when the applicable Sublimits of Liability set forth in Item 3(d) of the Declarations have been exhausted.

GG. "**Responsible Insured**" means:

1. any director, officer, principal, partner, or, in the case of a limited liability company, member or manager of the **Named Insured**;

2. any manager or supervisor of the **Named Insured** responsible for environmental health and safety affairs, control or compliance;

3. any insurance manager or any member of the risk management or legal department of the **Named Insured**; and/or

4. any manager of a **Covered Location**.

HH. "**Transportation**" means the movement of **Cargo** to or from (i) a **Covered Location**, and/or (ii) any location qualifying as a **Non-Owned Location** under Clause III, **DEFINITION** X.1. only, and includes the loading and unloading of **Cargo** onto or from an automobile, aircraft, watercraft or rolling stock provided that the loading and unloading is performed by or on behalf of the **Insured**. **Transportation** does not include **Cargo** that has been unloaded from the automobile, aircraft, watercraft or rolling stock transporting it.

II. "**Underground Storage Tank**" means any stationary container or vessel, including the associated piping and ancillary equipment connected thereto, which is:

1. ten percent (10%) or more beneath the surface of the ground;

2. constructed primarily of non-earthen materials; and

3. designated to contain any substance.

## IV. DEFENSE, SETTLEMENT AND INVESTIGATION

A. The Underwriters shall have the right and duty to defend, subject to the Limit of Liability, exclusions and other terms and conditions of this Policy, any **Claim** against the **Insured** seeking **Cleanup Costs** and/or **Damages** to which this Insurance applies, even if any of the allegations of the **Claim** are groundless, false or fraudulent.

B. The Underwriters shall have the right to make any investigation they deem necessary, including, without limitation, any investigation with respect to the **Application**, statements made in the **Application** and with respect to coverage.

C. If the **Insured** refuses to consent to any settlement or compromise of a **Claim** recommended by the Underwriters and acceptable to the claimant, the Underwriters' liability associated with such **Claim** shall not exceed the amount for which the **Claim** could have been settled, less the remaining Deductible, plus the **Claims Expenses** incurred up to the time of such refusal, or the applicable Limit of Liability, whichever is less, and the Underwriters shall have the right to withdraw from the further defense of the **Claim** by tendering control of the defense to the **Insured**.

D. The Underwriters shall not be obligated to pay any **Cleanup Costs**, **Damages**, **Claims Expenses**, **Business Interruption Costs**, **Crisis Management Expenses** or **Reputation Management Expenses** or to undertake or continue defense of any suit or proceeding after the applicable Limit of Liability has been exhausted by payment of **Cleanup Costs**, **Damages**, **Claims Expenses**, **Business Interruption Costs**, **Crisis Management Expenses** and/or **Reputation Management Expenses**.

E. If an **Insured** and the Underwriters jointly agree to utilize mediation as a means to resolve a **Claim** made against the **Insured**, and if such **Claim** is resolved as a direct result of the mediation, the applicable Each **Pollution Condition** deductible shall be reduced by 50% subject to a maximum reduction of $50,000. Mediation means a formal alternative dispute resolution process involving a neutral third party.

## V. TERRITORY

Subject to Clause III.X., this Policy applies to any **Claim** made and any **Pollution Condition** arising anywhere in the world where permitted by applicable law.

## VI. EXCLUSIONS

The coverage under this Insurance does not apply to any amounts:

A. **Intentional Acts**

arising out of or resulting from any actual or alleged **Pollution Condition** that results from a **Responsible Insured's** intentional disregard of, or wilful, deliberate, or dishonest non-compliance with, any statute, regulation, ordinance, administrative complaint, notice of violation, notice letter, order or instruction by or on behalf of any governmental agency or representative.

B. **Prior Knowledge**

arising out of or resulting from any actual or alleged **Pollution Condition** existing prior to the Inception Date stated in Item 2. of the Declarations, or the date on which a post binding **Covered Location** was added by Endorsement, if applicable, and known by a **Responsible Insured**, except to the extent specifically disclosed in the **Application** for this Policy or specifically disclosed in a document listed on a Disclosed Document Endorsement scheduled to this Policy. Any **Pollution Condition** disclosed and not otherwise excluded under this Policy or by endorsement shall be deemed to have been first discovered as of the date the **Covered Location** was added to this Policy.

C. **Insured Versus Insured**

arising out of or resulting from a **Claim** made by or on behalf of any **Insured** against any other person or entity who is also an **Insured**. This exclusion does not apply to:

1. any **Claim** involving a **Named Insured** and any other person or entity who is also an **Insured**, in which the underlying action is initiated by a third party who is not an **Insured**, such as an action for contribution or cross claim; or

2. any **Claim** that arises out of an indemnification given by one **Insured** to another **Insured** as specified in a contract approved by the Underwriters and identified on a Schedule of Insured Contracts Endorsement attached to this Policy.

D. **Assumption of Contractual Liability of Others**

arising out of or resulting from the liability of others assumed by the **Insured** under any contract or agreement either oral or written, including any hold harmless or indemnity agreements, except to the extent:

1. the **Insured** would have been liable in the absence of such contract or agreement; or

2. provided under contracts approved by the Underwriters and identified on a Schedule of Insured Contracts Endorsement attached to this Policy.

E. **Asbestos / Lead**

arising out of or resulting from asbestos or lead; provided, that this exclusion does not apply to:

1. any **Claim** for **Damages**, except for **Natural Resource Damages**, and **Claims Expenses** arising therefrom, under Insuring Clause I.A. or I.B. of this Policy;

2. Insuring Clause I.A. or I.B. of this Policy to the extent of asbestos or lead, or any materials containing asbestos or lead, in soil or in any surface water or in groundwater; or

3. Insuring Clause I.C. or I.D. of this Policy.

F. **Employers Liability and Workers Compensation**

arising out of or resulting from:

1. **Bodily Injury** to any employee of any **Insured** arising out of and in the course of:

   a. employment by an **Insured**; or

   b. performing duties related to the conduct of an **Insured's** business; or

2. **Bodily Injury** to any spouse (or person living together as spouse), child, parent, brother, sister or dependent of the employee as a consequence of 1. above; or

3. any **Insured's** employment obligations, decisions, practices or policies as an employer; or

4. any obligation for which the **Insured** or its insurance carrier(s) may be liable under any workers compensation, unemployment compensation or disability benefits law or similar law.

G. **Products Liability**

arising out of or resulting from any goods or products designed, manufactured, sold, handled, distributed, installed, altered or repaired, including any container thereof, any failure to warn, or any reliance upon a representation or warranty made at any time with respect thereto, by (i) the **Insured**, (ii) others trading under the **Insured's** name; or (iii) a person or organization whose business or assets an **Insured** has acquired.

This exclusion only applies to the extent the **Pollution Condition** took place away from a **Covered Location** and after physical possession of such goods or products has been relinquished by the **Insured** to others.

This exclusion shall not apply to **Non-Owned Locations** under subparagraph X.1. provided that the **Insured** has retained uninterrupted ownership of such goods or products, or to Insuring Clause I.C. of this Policy.

H. **Property Damage to an Insured's Property**

arising out of or resulting from, any **Property Damage** to any property owned, leased or operated by, or in the care, custody or control of an **Insured**, even if such **Property Damage** is incurred to avoid or mitigate **Damages**, **Cleanup Costs**, **Business Interruption Costs**, **Crisis Management Expenses** or **Reputation Management Expenses**, to which this Insurance applies.

I. **New Pollution Conditions at Divested Property**

arising out of or resulting from a **Pollution Condition** on, at, under or migrating from a **Covered Location**, where such **Pollution Condition** first commences after such **Covered Location** was sold, given away or abandoned by the **Insured** or condemned during the **Policy Period**.

J. **Aircraft, Auto or Watercraft**

arising out of or resulting from the ownership, operation, maintenance, use, loading and unloading, or entrustment to others of any aircraft, automobile or watercraft beyond the boundaries of a **Covered Location**.

This exclusion shall not apply to Insuring Clause I.C. of this Policy.

K. **Material Change In Use**

arising out of or resulting from a **Material Change In Use**.

L. **Failure to Maintain Institutional Controls or Engineering Controls**

arising out of or resulting from:

1. the failure to monitor, maintain or enforce the **Institutional Controls** or **Engineering Controls** for a **Covered Location**; or

2. costs associated with implementing, designing, installing, operating, monitoring, maintaining or enforcing the existing **Institutional Controls** or **Engineering Controls** in place on or before the Inception Date stated in Item 2. of the Declarations.

M. **Underground Storage Tank**

arising out of or resulting from the existence of any **Underground Storage Tank** at a **Covered Location**. This exclusion shall not apply to:

1. an **Underground Storage Tank** at a **Covered Location** that is closed, abandoned in place or removed prior to the Inception Date stated in Item 2. of the Declarations, in accordance with all applicable federal, state, local or provincial regulations in effect at the time of closure, abandonment or removal;

2. an **Underground Storage Tank** identified and described in a Schedule of Underground Storage Tank Endorsement attached to the Policy;

3. an **Underground Storage Tank** at a **Covered Location**, the existence of which is not known to any **Responsible Insured** as of the Inception Date stated in Item 2. of the Declarations or the date on which a post binding **Covered Location** was added by Endorsement, if applicable;

beazley

4. a flow-through process tank, including oil/water separators and/or septic tanks at a **Covered Location**; or

5. a storage tank situated in a man-made underground area (such as a basement, cellar, mine shaft or tunnel) at a **Covered Location** if the storage tank is situated upon or above the surface of the floor.

## VII. LIMIT OF LIABILITY

A. The Each **Pollution Condition** Limit of Liability stated in Item 3.(a) of the Declarations is the limit of the Underwriters' liability for all covered amounts arising out of any single **Pollution Condition,** except as set forth in Paragraph F. below.

B. The Aggregate Limit of Liability for the **Policy Period** stated in Item 3.(b) of the Declarations is the Underwriters' total Limit of Liability for all covered amounts arising out of all **Pollution Conditions** covered by this Policy, except as set forth in Paragraph F. below.

C. The Limit of Liability available to pay **Damages**, **Cleanup Costs, Business Interruption Costs, Crisis Management Expenses** and **Reputation Management Expenses** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Cleanup Costs, Damages, Claims Expenses Business Interruption Costs, Crisis Management Expenses** and **Reputation Management Expenses** shall be applied against the applicable Deductible.

D. Neither the inclusion of more than one **Insured** under this Policy, nor the making of **Claims** by more than one person or entity shall increase the applicable Limit of Liability.

E. The **Crisis and Reputation Management Expenses Coverage** Aggregate **Pollution Condition** Sublimit stated in Item 3.(d) of the Declarations, if any, is the limit of the Underwriters' liability for all **Crisis Management Expenses** and/or **Reputation Management Expenses** under the Policy.

The Sublimit of Liability stated in Item 3.(d) is part of, reduces and is subject to the Limit of Liability stated in Item 3.(a) and (b) of the Declarations.

If the remaining Limit of Liability stated in Item 3.(a) and (b) is less than the applicable Sublimit of Liability, the remaining Each **Pollution Condition** Limit or Aggregate for the **Policy Period** Limit is the most that will be available for payment of coverage provided under the Policy subject to the Sublimit of Liability.

F. The Limit of Liability for the Extended Reporting Period shall be part of, and not be in addition to, the Limit of Liability of the Underwriters for the **Policy Period**.

G. The Additional **Claims Expenses** Limit of Liability stated in Item 3.(c) of the Declarations, if any, is separate and in addition to the Each **Pollution Condition** Limit of Liability.

Payments of **Claims Expenses** by Underwriters shall first reduce the Additional **Claims Expenses** Limit of Liability in Item 3.(c) of the Declarations, if applicable. If the Additional **Claims Expenses** Limit of Liability is fully eroded, then any additional payments of **Claims Expenses** shall reduce the applicable Each **Pollution Condition** and Aggregate Limits of Liability. The Underwriter's total liability for all **Pollution Conditions** under this Policy, inclusive of **Claims Expenses**, shall not exceed the sum of the aggregate limit amounts shown in Items 3.(b) and 3.(c) of the Declarations.

## VIII. RELATED POLLUTION CONDITIONS

A. The same, continuous repeated or related **Pollution Conditions** shall be considered a single **Pollution Condition**, irrespective of the number of claimants or **Insureds** involved in the **Claim** or the number of **Claims** made, subject to the Limit of Liability applicable in the Policy Period when the first such **Pollution Condition** was reported to the Underwriters.

B. If an **Insured**:

1. first discovered a **Pollution Condition** during the policy period of a policy issued by the Underwriters prior to the Inception Date stated in Item 2. of the Declarations, and reported it to the Underwriters in accordance with the terms of that prior policy; and/or

2. reported a **Claim** to the Underwriters during the policy period of a policy issued by the Underwriters prior to the Inception Date stated in Item 2. of the Declarations, in accordance with the terms of that prior policy,

and this Policy provides coverage on substantially the same basis as such prior policy, then all of the same, continuous repeated or related **Pollution Conditions**, and/or all **Claims** arising from the same, continuous, repeated or related **Pollution Conditions**, shall be subject only to the applicable Limits of Liability under the first such policy issued by the Underwriters.

## IX. DEDUCTIBLE

A. Except with respect to Insuring Clause I.F., the Deductible stated in Item 4.(a) of the Declarations applies separately to each **Pollution Condition** and one Deductible shall apply to all coverage under the Policy arising from the same, continuous, repeated or related **Pollution Conditions**.

beazley

The **First Named Insured** shall satisfy the Deductible by payment of amounts covered by this Policy to third parties designated by the Underwriters, with Underwriters' prior written consent (not to be unreasonably withheld). Payments of any amounts not covered by this Policy or without Underwriters' prior written consent shall not satisfy the applicable Deductible. Payments made by any **Insured** in satisfaction of deductible obligations under any other insurance shall not satisfy the applicable Deductible under this Policy.

B. With respect to Insuring Clause I.F, the Deductible stated in Item 4. (b) of the Declarations applies separately to each **Pollution Condition** with respect to all **Business Interruption Costs** covered under the Policy arising from the same, continuous, repeated or related **Pollution Conditions**.

C. Full payment of the Deductible is a condition precedent to the payment by the Underwriters of any amounts under the Policy. Underwriters shall be liable only for the amounts in excess of the Deductible, subject to the Underwriters total liability not exceeding the applicable Limits of Liability. The Deductible amount does not reduce the Limit of Liability.

## X. NOTICE OF CLAIM AND DISCOVERY OF POLLUTION CONDITION

A. With respect to Insuring Clauses I.A.1., I.B.1., I.C. and I.D., if any **Claim** is made against an **Insured**, the **Insured** shall forward written notice as soon as practicable to the Underwriters but in no event shall such notice be provided after the expiration of the **Policy Period** or the time allowed, if applicable, under Section XI. Notice shall be forwarded via facsimile, email or express or certified mail to the persons identified in Item 8.(a) of the Declarations. Such notice should include a copy of every demand, notice, summons or other process received by the **Insured** or the **Insured's** representative.

B. With respect to Insuring Clauses I.A.2. and I.B.2., the **Insured** shall forward written notice to the Underwriters as soon as practicable after a **Responsible Insured** becomes aware of any **Pollution Condition**, but in no event shall such notice be provided after the expiration of the **Policy Period** or the time allowed, if applicable, under section XI. Notice shall be forwarded via facsimile, email or express or certified mail to the persons identified in Item 8.(a) of the Declarations. Notice shall include, at a minimum, information sufficient to identify the **Insured**, the **Covered Location** affected, the names of persons with knowledge of the **Pollution Condition**, and all known and reasonably obtainable information regarding the time, place, cause, nature of and other circumstances of the **Pollution Condition**, and any resulting injuries or damages and remedial steps proposed to be undertaken by the **Insured**.

C. With respect to Insuring Clause I.E., the **Named Insured** shall forward written notice to the Underwriters of any action taken and expenses incurred as soon as practicable, but in no event later than seventy-two (72) hours after the **Named Insured** incurs or assumes **Reputation Management Expenses** and/or **Crisis Management Expenses**. The **Underwriters** reserve the right in their sole discretion after the first seventy-two (72) hours following the commencement of

beazley

the **Pollution Condition** to determine (1) if the **Pollution Condition** has or will result in material adverse regional or national news media coverage against the **Named Insured**, or (2) the reasonable type and scope of services, and rates and charges associated with **Crisis Management Expenses** and/or **Reputation Management Expenses** and thereafter the **Named Insured** shall not incur or assume any further or additional **Crisis Management Expenses** and/or **Reputation Management Expenses** without the written consent of the Underwriters.

Written notice of a **Pollution Condition** that gives rise to **Reputation Management Expenses** and/or **Crisis Management Expenses** shall be forwarded via facsimile, email or express or certified mail to the persons identified in Item 8.(a) of the Declarations. Such notice should include:

1. a description of the **Pollution Condition**;

2. the **Named Insured**'s basis for a good faith opinion of material adverse regional or national news media coverage;

3. reasonably obtainable and available information regarding any **Claim** or requests for **Cleanup Costs**; and

4. a description of any **Crisis Management Expenses** and/or **Reputation Management Expenses** incurred or planned to be incurred including identification of service providers.

Any payment under Insuring Clause I.E. shall not determine or waive any of the Underwriters' rights or obligations or create a duty to defend any **Claim** or to pay any **Cleanup Costs** under any other provision of the Policy; nor shall it waive the **Insured's** obligations to provide notice of **Claim** and/or discovery of **Pollution Condition** under the Policy as set forth in Clause X.A or X.B. of the Policy.

D. With respect to Insuring Clause I.F., the **Named Insured** shall forward written notice to the Underwriters as soon as practicable after the **Named Insured** becomes aware of any **Business Interruption Costs** loss but in no event shall such notice be provided after the expiration of the **Policy Period**. Notice shall be forwarded via facsimile, email or express or certified mail to the persons identified in Item 8.(a) of the Declarations.

Notice shall include, at a minimum, information sufficient to identify the **Named Insured**, the **Covered Location** affected, the **Pollution Condition** covered under Insuring Clause I.A or I.B associated with the **Business Interruption Costs**, the type and amount of **Business Interruption Costs**, and all known and reasonably obtainable information regarding the time, place, cause, nature and itemization of and other circumstances of the **Business Interruption Costs**.

E. A **Claim** or **Pollution Condition** shall be considered to be reported to the Underwriters when written notice is first received by any of the recipients identified in Item 8.(a) of the Declarations.

beazley

## XI. EXTENDED REPORTING PERIOD

A. Automatic Extended Reporting Period

1. If this Policy is cancelled or non-renewed by the Underwriters or by the **First Named Insured**, then the **First Named Insured** shall have the right to an Automatic Extended Reporting Period, commencing on the last day of the **Policy Period**, with respect to:

a. any **Claim** first made against any **Insured** during the **Policy Period** and reported in writing to the Underwriters during the ninety (90) day Automatic Extended Reporting Period, and otherwise covered by this Policy;

b. any **Claim** first made against any **Insured** during the ninety (90) day Automatic Extended Reporting Period, resulting from a **Pollution Condition** first discovered and reported in writing to the Underwriters during the **Policy Period**, and otherwise covered by this Policy;

c. any **Pollution Condition** first discovered by any **Insured** during the **Policy Period** and reported in writing to the Underwriters during the Automatic Extended Reporting Period, and otherwise covered by this Policy.

The above Automatic Extended Reporting Period shall not apply if the Policy is canceled by the Underwriters due to fraud or non-payment of premium, or if the **Insured** has purchased other insurance to replace the insurance provided under this Policy.

B. Optional Extended Reporting Period

1. If this Policy is cancelled or non-renewed by the Underwriters or by the **First Named Insured**, then the **First Named Insured** shall have the right, upon payment of an additional premium calculated at that percentage shown in Item 7.(a) of the Declarations of the total premium for this Policy, to an Optional Extended Reporting Period with respect to any **Claim** first made against any **Insured** and reported during the period of time set forth in Item 7.(b) of the Declarations following the end of the **Policy Period**, but only with respect to any **Pollution Condition** first discovered and reported in writing to the Underwriters during the **Policy Period,** which is otherwise covered by this Policy.

2. If the Optional Extended Reporting Period is purchased, the ninety (90) day Automatic Extended Reporting Period referred to in Clause XI.A. above shall form part of, and not be in addition to the Optional Extended Reporting Period.

beazley

3. As a condition precedent to the right to purchase the Optional Extended Reporting Period, the total premium for this Policy must have been paid and that cancelation by the Underwriters, if applicable, was not due to fraud. The right to purchase such extension of coverage shall terminate unless written notice together with full payment of the premium for such extension of coverage is given to the Underwriters within sixty (60) days after the effective date of cancellation or non-renewal. If such notice and premium payment is not so given to the Underwriters, there shall be no right to purchase such extension of coverage.

4. In the event of the purchase of the Optional Extended Reporting Period, the entire premium for the Optional Extension Period shall be deemed earned at its commencement.

5. The exercise of the Optional Extended Reporting Period shall not in any way increase the Limits of Liability set forth in Item 3. of the Declarations.

6. The offer of renewal terms, conditions or premiums different from those in effect prior to renewal shall not constitute a refusal to renew for purposes of this Clause XI.

## XII. REPRESENTATIONS

By acceptance of this Policy, all **Insureds** agree that the statements contained in the **Application** are their agreements and representations, that such statements shall be deemed material to the risk assumed by the Underwriters, and that this Policy is issued in reliance upon the truth thereof.

This entire Policy shall be void if, whether before or after a **Claim** or **Pollution Condition** is first reported to the Underwriters, any **Insured** has concealed or misrepresented any fact or circumstance material to the granting of coverage under this Policy.

## XIII. OTHER INSURANCE

A. Except as set forth in Clause XIII.C and D. below, this Insurance is primary, and the Underwriters' obligations are not affected unless any other insurance is also primary. In that case, the Underwriters will share with all such other insurance by the method described in Clause XIII.C. below.

B. When this Insurance is excess, the Underwriters will pay only its share of the amounts covered under the Policy, if any, that exceeds the total amount of such other insurance.

C. When both this Insurance and other insurance apply to amounts covered under the Policy on the same basis, whether primary or excess, the Underwriters shall not be liable under this Policy for a greater proportion of any amounts covered by this Policy than the amount resulting from the following contribution methods, whichever is lesser:

1. contribution by equal shares where each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the amounts covered by this Policy remains, whichever occurs first; or

2. contribution by limits where each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

D. Solely with respect to a **Pollution Condition** due to **Microbial Matter** Legionella pneumophila and/or methamphetamines, this insurance is excess of any other valid and collectable insurance. The Underwriters will pay only its share of the amounts covered by this Policy, if any, that exceeds the total amount of such other valid and collectible insurance. Where other insurance may be available for amounts covered by this Policy as noted above, the **Insured** shall promptly, upon request, provide the Underwriters with copies of all such policies.

## XIV. ASSIGNMENT

This Policy may be assigned by the **First Named Insured** with the prior written consent of the Underwriters, which shall not be unreasonably withheld or delayed. Assignment of the Policy shall not be effective until such assignment is endorsed to the Policy. Notwithstanding the foregoing, if an **Insured** shall die or be adjudged incompetent, such insurance shall cover that **Insured's** legal representative to the extent that the **Insured** would be covered by this Policy.

## XV. CANCELLATION

This Insurance may be cancelled by the **First Named Insured** by surrender of this Policy to the Underwriters or by mailing to the Underwriters written notice stating when thereafter cancellation shall be effective.

This Insurance may be cancelled by the Underwriters by mailing the **First Named Insured** at the address set forth in Item 1. of the Declarations, a notice stating when thereafter such cancellation shall be effective. The Underwriters may only cancel this Insurance for the following reasons:

1. fraud on the part of the **Named Insured** in the **Application**; or

2. any **Insured's** material failure to comply with the terms, conditions or contractual obligations under this Policy, including the failure to pay any premium or Deductible when due, however, the **Insured** shall have the ability, within the first sixty (60) days (ten (10) days for failure to pay any premium when due) of the ninety (90) day notice period, to cure such failure to comply with the material terms, conditions or contractual obligations under this Policy to the satisfaction of the Underwriters.

The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice either by the **Named Insured** or by the Underwriters shall be the equivalent of mailing. Notice of

pending cancellation will be provided not less than: (a) ninety (90) days prior to the effective date of cancellation for any **Insured's** failure to comply with the terms, conditions or contractual obligations under this Policy including failure to pay the Deductible when due; (b) thirty (30) days prior to the effective date of cancellation for fraud; or (c) ten (10) days prior to the effective date of cancellation for non-payment of premium.

If the Underwriters cancel, subject to any minimum earned premium that may apply, the return premium will be calculated on a pro rata basis. If the **First Named Insured** cancels, subject to any minimum earned premium that may apply, the return premium will be calculated in accordance with the customary short rate table and procedure.

## XVI. ASSISTANCE AND COOPERATION OF THE INSURED

The **Insured** shall cooperate with the Underwriters and provide all reasonable assistance in the investigation and defense of any **Claim**, **Pollution Condition,** the **Application**, **Business Interruption Cost**, **Crisis Management Expense**, **Reputation Management Expense**, and any other matters relating to coverage under this Policy.

The **Insured** shall execute or cause to be executed all papers and render all assistance as is reasonably requested by the Underwriters and related to the defense of any **Claim,** the cleanup of any **Pollution Condition**, **Business Interruption Cost**, **Crisis Management Expense** and **Reputation Management Expense**. The Underwriters may require that the **Insured** submit to examination under oath, attend hearings, depositions and trials and assist in securing and giving evidence and obtaining the attendance of witnesses in connection with the defense of any **Claim**, cleanup of **Pollution Condition**, **Business Interruption Cost**, **Crisis Management Expense** and **Reputation Management Expense**. In the course of investigation or defense of any **Claim**, the Underwriters may require written statements or the **Insured's** attendance at meetings with the Underwriters.

Upon the Underwriters request, the **Insured** shall assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **Insured** because of any **Pollution Condition** covered under this Policy.

The **Insured** shall not admit liability, enter into any settlement, stipulate to any judgment or award or dispose of any **Claim**, or, except as provided in Clause I.E. and/or III.G.5, make any payment, assume any obligations, incur any expense (including, but not limited to, any **Claims Expenses** or **Cleanup Costs**), without the written consent of the Underwriters, such consent not to be unreasonably withheld or delayed. Except as provided for in Clause II., expenses incurred by the **Insured** in assisting and cooperating with the Underwriters, as described above, do not constitute **Claims Expenses** and are not reimbursable under this Policy.

**XVII. ACTION AGAINST THE UNDERWRITERS**

No action shall lie against the Underwriters unless the **Insured** shall have fully complied with all of the terms of this Policy, nor until the amount of the **Insured's** obligation to pay shall have been fully and finally determined either by judgment against them or by written agreement between them, the claimant and the Underwriters. Nothing contained herein shall give any person or organization any right to join the Underwriters as a party to any **Claim** against the **Insured** to determine their liability, nor shall the Underwriters be impleaded by the **Insureds** or their legal representative in any **Claim**.

**XVIII. SUBROGATION**

In the event of any payment under this Insurance, the Underwriters shall be subrogated to all the **Insureds'** rights of recovery therefore against any person or organization, and the **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **Insured** shall do nothing to prejudice such rights. Any recoveries shall be applied first to subrogation expenses, second to the **Named Insured** to the extent of any payments in excess of the Limit of Liability, third to amounts covered by this Policy and paid by the Underwriters, and fourth to the Deductible. Any additional amounts recovered shall be paid to the **Named Insured**.

**XIX. ENTIRE AGREEMENT**

By acceptance of this Policy, all **Insureds** agree that this Policy embodies all agreements existing between them and the Underwriters relating to this Insurance. Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Policy or estop the Underwriters from asserting any right under the terms of this Policy; nor shall the terms of this Policy be waived or changed, except by written endorsement issued to form a part of this Policy, signed by the Underwriters.

**XX. VALUATION AND CURRENCY**

All premiums, limits, deductibles, and any amounts covered by this Policy are expressed and payable in the currency of the United States. If judgment is rendered, settlement is denominated, or another element of **Damages** under this Policy is stated in a currency other than United States dollars or if any other amounts covered by this Policy are paid in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date on which a relevant final judgment becomes incapable of appeal or payment of the settlement or other element of **Damages** is due or the date such other amounts covered by this Policy are paid.

**XXI. BANKRUPTCY**

Bankruptcy or insolvency of the **Insured** shall not relieve the Underwriters of its obligations nor deprive the Underwriters of its rights or defenses under this Policy.

beazley

**XXII. AUTHORIZATION**

By acceptance of this Policy, the **Insureds** agree that the **Named Insured** will act on their behalf with respect to the giving and receiving of any notice provided for in this Policy, the payment of premiums and the receipt of any return premiums that may become due under this Policy, and the agreement to and acceptance of endorsements.

**XXIII. RIGHT OF ACCESS AND INSPECTION**

The **Named Insured** agrees to provide the Underwriters with access to any information developed or discovered by an **Insured** concerning a **Claim**, **Pollution Condition**, **Business Interruption Costs**, **Crisis Management Expenses** or **Reputation Management Expenses** to which this Insurance applies, whether or not deemed by an **Insured** to be relevant and to provide the Underwriters with access to interview any **Insured** and review any documents of an **Insured**. Further, to the extent that an **Insured** has such rights, any of the Underwriters representatives shall have the right and opportunity but not the obligation to inspect at any reasonable time, during the **Policy Period** or thereafter, a **Covered Location** associated with a **Claim**, **Pollution Condition**, **Business Interruption Costs**, **Crisis Management Expenses**, **Reputation Management Expenses** reported to the Underwriters. Neither the Underwriters nor its representatives shall assume any responsibility or duty to the **Insured** or to any other person or entity, by reason of such right of inspection. Neither the Underwriters right to make inspections, sample and monitor, nor the actual undertaking thereof nor any report thereon shall constitute an undertaking on behalf of the **Insured** or others, to determine or warrant that the property or operations are safe, healthful or conform to acceptable engineering practices or are in compliance with any law, rule or regulation. The **Named Insured** agrees to provide appropriate personnel to assist the Underwriters' representatives during any inspection.

**XXIV. HEADINGS**

The descriptions in the headings and subheadings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

**XXV. SERVICE OF SUIT**

It is agreed that in the event of the failure of the Underwriters to pay any amount claimed to be due under this Insurance, the Underwriters, at the request of the **Insured**, will submit to the jurisdiction of any court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of the Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States. It is further agreed that service of process in such suit may be made upon Underwriters representative, designated in Item 11. of the Declarations, and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The Underwriters' representative designated in Item 11. of the Declarations is authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the **Insured** to give a written undertaking to the **Insured** that they will enter a general appearance upon Underwriters behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Underwriters designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his or her successor in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** or any beneficiary hereunder arising out of this contract of Insurance, and hereby designate the Underwriters representative, designated in Item 11. of the Declarations, as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## XXVI. CHOICE OF LAW

Any disputes involving this Policy shall be resolved applying the law designated in Item 12. of the Declarations.

## XXVII. SOLE AGENT

The **First Named Insured** shall act on behalf of all **Insureds** for all purposes, including but not limited to the payment of Deductible amounts, payment or return of premium, receipt and acceptance of any endorsement issued to form a part of this Policy, giving and receiving notice of cancellation or nonrenewal and the exercise of the rights stated in Clause XI.

## XXVIII. SANCTION LIMITATIONS

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any **Claim** or provide any benefit hereunder to the extent that the provision of such cover, payment of such **Claim** or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, law or regulations of the European Union, United Kingdom or United States of America.

## XXIX. SEVERABILITY OF INTEREST

Except with respect to the Limit of Liability, Clause XII. and any rights and duties assigned in this Policy to the **First Named Insured**, this Insurance applies as if each **Insured** were the only **Insured** and separately to each **Insured** against whom a **Claim** is made.

ALLIANT00037889

Alliant

# EXHIBIT J

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

USI Insurance Services, LLC, a Delaware limited liability company,
Plaintiff,
v.

No. 2:23-cv-00192-SMB

Alliant Insurance Services, Inc., a California corporation, William J. Havard II and Sabrina Havard, husband and wife, and Robert Engles and Hope Engles, husband and wife, Jenise Purser and Adam Purser, husband and wife, Justin Walsh and Sara Walsh, husband and wife,
Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEO-RECORDED DEPOSITION OF BENJAMIN A. GREER

June 26, 2024
11:09 a.m.

Coppersmith Brockelman
2800 North Central Avenue
Suite 1900
Phoenix, Arizona

Reported by Eve K. Burton, RPR, CRR,
Arizona CR Certificate No. 50261, California CSR No. 12527
Job No. J11385969

Page 2

The video-recorded deposition of BENJAMIN A. GREER, noticed by Defendants, was taken on June 26, 2024, from 11:09 a.m. to 2:04 p.m., at the offices of Coppersmith Brockelman, 2800 North Central Avenue, Suite 1900, Phoenix, Arizona, before Eve K. Burton, RPR, CRR, Arizona CR Certificate No. 50261, California CSR No. 12527.

APPEARANCES OF COUNSEL

For Plaintiff:
SNELL & WILMER
JOSHUA R. WOODARD, ESQ.
DELILAH R. CASSIDY, ESQ.
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
(602) 382-6281
jwoodard@swlaw.com
dcassidy@swlaw.com

For Defendants:
MORGAN, LEWIS & BOCKIUS LLP
JOHNATHON P. BRAMBLE, ESQ.
1000 Louisiana Street, Suite 4000
Houston, Texas 77002-5006
(713) 890-5000
johnathon.bramble@morganlewis.com

Also Present:
ALEX MAZURKEVICH, Videographer

Page 3

I N D E X


| WITNESS: | PAGE |
|---|---|
| BENJAMIN A. GREER | |
| Examination by Mr. Bramble | 5 |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 7 | 3/9/2023 First Amended Verified Complaint; 36 pages | 49 |
| Exhibit 8 | 1/29/2024 Plaintiff USI Insurance services, LLC's First Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiff (Non-Expedited); 39 pages | 59 |
| Exhibit 9 | Employment Agreement between Wells Fargo Insurance Services USA, Inc., and the Individual Defendants (USI015708 - USI016098); 65 pages | 54 |
| Exhibit 10 | USI IT Policy Manual (USI021437 - USI021508); 72 pages | 108 |
| Exhibit 11 | Series of emails, top one dated 5/3/2023 from Steve Ward to Ben Greer (USI017472 - U8I017473); 2 pages | 137 |


EXHIBITS PREVIOUSLY MARKED
(NOT ATTACHED)


| NUMBER | FIRST REFERENCED |
|---|---|
| Exhibit 2 | 10 |
| Exhibit 6 | 8 |


Page 4

VIDEO-RECORDED DEPOSITION OF BENJAMIN A. GREER
JUNE 26, 2024, 11:09 A.M.; PHOENIX, ARIZONA

THE VIDEOGRAPHER: Good morning. We are on the record. It's Wednesday, June 26th, 2024, at 11:09 a.m.

This is Media 1, video-recorded deposition of Benjamin Greer, in the matter of USI Insurance Services, LLC, versus Alliant Insurance Services, Incorporated, et al.

The deposition is taking place at Coppersmith Brockelman, PLC, at 2800 North Central Avenue in Phoenix, Arizona.

My name is Alex Mazurkevich. I'm a videographer, and Eve Burton is the court reporter, both with Esquire Deposition Solutions.

At this time, could I have all counsel identify yourselves for the record and state who you represent.

MR. WOODARD: Josh Woodard on behalf of the Plaintiff, and with me is my colleague, Delilah Cassidy.

MR. BRAMBLE: John Bramble with Morgan Lewis here on behalf of the Defendants.

THE VIDEOGRAPHER: And could I have the court reporter swear in the witness.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Page 25

of a team specifically designed to handle environmental business and think that they're not going to take the business and handle it when they -- when they joined them would be laughable, ridiculous. I --
BY MR. BRAMBLE:
Q. Mr. Greer, I'm not asking about Alliant here.
A. I know --
Q. My question is very specific to the Individual Defendants --
MR. WOODARD: Wait. Hold on. You just interrupted his answer. He's right in the middle of his answer answering what he knows about. Let him finish his answer.
THE WITNESS: So we know Bill left. We know Bill took the entire team. We know they handled the accounts at USI, and then broker-of-record letters just happened to go exactly where that team was. That's what I know.
And that Alliant took on significant amounts of payroll of a very specifically trained team in environmental, handling very large environmental accounts that just happened to, very shortly after they left, transfer their business to the place where they went. That's what I know.
MR. BRAMBLE: I'm going to object as

Page 26

nonresponsive.
BY MR. BRAMBLE:
Q. My question is not about Alliant. My question is about the Individual Defendants and specifically their alleged acceptance of business related to STORE Capital before January 30th of 2023. What evidence do you have that any of the Individual Defendants accepted business from STORE Capital before January 30, 2023?
A. I just answered the question. That's the evidence.
Q. Okay. What evidence do you have that Bill Havard accepted business from STORE Capital on behalf of Alliant before January 30th, 2023?
A. It's the same evidence.
Q. And what evidence is that related to Mr. Havard?
A. That Bill Havard left, went to Alliant, took his entire team, and then the accounts BO- -- the STORE Capital BOR'd their entire program over there.
Q. Okay. You're just saying circumstantial evidence. It all just happened at the same time; therefore, Mr. Havard must have accepted the business?
A. Well, the circumstance -- it is circumstantial, and that is strong evidence.
And we -- and we know, through discovery documents, that they're servicing the accounts, too.

Page 27

Q. Okay. And I'm not asking you about servicing, Mr. Greer. This is going to --
A. Not yet.
Q. -- be a long day, and I'm going to ask for more time if you continue to refuse to answer my questions.
My question is specifically related to acceptance here. Do you have any email evidence that Mr. Havard accepted business from STORE Capital before January 30th of 2023?
A. Not to my knowledge.
Q. Do you have any text messages demonstrating that Mr. Havard accepted business from STORE Capital before January 30th, 2023?
A. Not to my knowledge.
Q. Okay. What about email evidence or text message evidence showing that Mr. Engles accepted business from STORE Capital before January 30th of 2023?
A. I don't think STORE Capital was an Engles account.
Q. Okay. So no evidence, right?
A. No.
Q. Okay. And for the other two Individual Defendants, also no evidence of any acceptance of business by -- for STORE Capital before January 30th, 2023?
A. Just what I've stated.

Page 28

Q. You're familiar with USAA Real Estate, correct?
A. Somewhat.
Q. Okay. Another Bill Havard account when he was over at USI?
A. Yes.
Q. All right. I'll represent to you that Alliant was designated as USAA Real Estate's broker of record on January 25th, 2023. Do you have any reason, sitting here today, to dispute that?
A. No.
Q. Has -- based on your personal knowledge, has USI done any environmental work for USAA Real Estate since January 25th, 2023?
A. Not to my knowledge.
Q. Based on your personal knowledge, what evidence does USI have that on or before January 25th, 2023, any of the Individual Defendants encouraged USAA Real Estate to transition its business away from USI?
A. We have the email from the guy, the ca- -- the consultant, Thorne, I believe is his last name.
Q. What email are you referring to?
A. The email where he sent a document to USAA Capital basically with an org chart saying that Bill Havard and the entire team is there to transfer the broker-of-records over.

Page 29

Q. Okay. Do you have any email demonstrating that Mr. Havard encouraged Mr. Thorne to send that org chart that you referenced right now?
A. Direct communication from Bill to Mr. Thorne?
Q. Correct.
A. No.
Q. Do you have any direct communication from Mr. Walsh to Mr. Thorne encouraging him to transition the business of USAA Real Estate?
A. No.
Q. Do you have any direct communication between Ms. Purser and Mr. Thorne encouraging him to transition the business of USAA Real Estate?
A. No.
Q. Okay. So what you have right now is an email in which Mr. Thorne, who is a decision maker as to where USAA Real Estate's insurance is going to go, telling USAA Real Estate that he's going to transition the business, right?
A. The email includes a PowerPoint from Alliant that has an entire org chart of the environmental team that's going to be handling its account, and the -- all the Defendants are on that org chart. And it appears to be prepared by Alliant, given to Thorne, and Thorne to USAA Casualty, affirming that the team that was handling their account at USI would be handling it at Alliant.

Page 30

Q. Do you have any evidence that Mr. Havard was involved in preparing that presentation, or that deck?
A. No direct evidence.
Q. Okay. Any evidence that any of the other Individual Defendants were involved in preparing that deck?
A. No.
Q. What evidence, based on your personal knowledge, does USI have that on or before January 25th, 2023, any of the Individual Defendants accepted business from USAA Real Estate on behalf of Alliant?
A. The broker-of-record letters.
Q. Okay. And again, no evidence that any of the Individual Defendants drafted those broker-of-record letters, correct?
A. Correct.
Q. No evidence that any of the Individual Defendants transmitted those broker-of-record letters, correct?
A. Correct.
Q. No evidence that any of the Individual Defendants were at all involved in those broker-of-record letters, correct?
A. At all involved? They accepted them. The circumstantial evidence that the entire team went there and the broker-of-record letters shortly followed them.

Page 31

Q. When you say that they accepted these broker-of-record letters, describe for me, based on your sworn testimony, how Bill Havard accepted a broker-of-record letter related to USAA Real Estate's business.
A. Well, the org chart that was provided by Mr. Thorne showed he would be the team handling it.
Q. Okay. And --
A. So I think it's pretty fair to assume that, if he's on the org chart of the team handling it, that Bill would accept that.
I didn't talk to Bill about it. Didn't ask him, "Did you accept the business?"
Q. Okay.
A. When I attempted to talk with Bill, he wouldn't return my calls.
Q. In answering the last question, Mr. Greer, you said it's fair to assume. This is an assumption that you're making, correct?
A. Fair.
Q. Okay. You're familiar with the company referred to as Tampa Pipeline, correct?
A. I am.
Q. It's an affiliate of Allied Aviation, right?
A. I don't know that.

Page 32

Q. Okay. Do you know one way or another whether or not there's any relationship between Tampa Pipeline and Allied Aviation?
A. I don't. I don't know much about Tampa Pipeline.
Q. Do you know anything about Allied Aviation?
A. No.
Q. Do you know anyone by the name of James Harper?
A. No. I know Eric Harper.
Q. Okay. And you're not familiar with James Harper, Eric's dad?
A. No. I'm not familiar with him at all. But I think I did know that there was one account -- I think Bill told me -- Bill worked when -- he was on my team, and I think in discussing with Bill that I think I somehow knew that.
Q. I'll represent to you that Alliant was designated as the broker of record for Allied Aviation on January 26th, 2023. Do you have any reason to dispute that?
A. No.
Q. Has -- based on your personal knowledge, has USI done any environmental work for Allied Aviation since January 26th?
A. Not to my knowledge.
Q. Based on your personal knowledge, what evidence

Page 65

A. That's what it says.
Q. Okay. Let's start with the Individual Defendants. Whose agreement did Ms. Purser interfere with?
A. So which employment agreement did Purser --
Q. Whose employment agreement did Ms. Purser interfere with?
A. I don't know.
MR. WOODARD: Objection. Foundation.
THE WITNESS: I don't know.
BY MR. BRAMBLE:
Q. Whose employment agreement did Mr. Walsh interfere with?
MR. WOODARD: Objection. Foundation.
THE WITNESS: So I believe Mr. Walsh interfered with the three people who report to him: Harper -- or, Hartman. Not Harper -- Hartman, Phalen, and Purser.
And the reason I believe that is an email document that I saw where they asked him who they should send their resignation to. And if he weren't interfering with the contract, they would have just -- he's their boss. He would have -- they would have just resigned directly to him.
But they're asking him to whom they should

Page 66

send them, because they've talked and they know they're all leaving, so they shouldn't be sending it to Walsh because Walsh is leaving, too.
BY MR. BRAMBLE:
Q. Purser, Hartman, and Phalen are all at-will employees, correct?
MR. WOODARD: Objection. Foundation.
THE WITNESS: Say that again. Purser, Harper -- or, Hartman --
BY MR. BRAMBLE:
Q. Sorry. Let's start --
A. -- Phalen.
Q. -- over.
A. Yeah. Sorry. Okay.
Q. Let's start over.
Purser, Hartman, and Phalen were all at-will employees of USI, correct?
A. Correct.
Q. They didn't have a term agreement with USI, correct?
A. What's a term -- what do you mean, "term agreement"?
Q. They did not agree to remain employed with USI for a specific number of months or years.
A. Oh. Yes. Correct.

Page 67

Q. What specific covenant did Mr. Walsh interfere with for Ms. Parser -- for Ms. Purser?
MR. WOODARD: Foundation.
THE WITNESS: Well, from the email that I saw, they -- he -- they had to have known that they were leaving as a group. They were -- they were working with each other, because they didn't know who to resign to. And if they weren't working together, they would have resigned to Justin Walsh, because he was their boss.
BY MR. BRAMBLE:
Q. Let's go about it this way: What covenants do you contend that Ms. Purser owed USI?
A. What covenants?
Q. Correct.
A. Well, the employment agreement. There's all kinds of covenants in the employment agreement.
Q. Right.
A. I mean, the biggest one they violated is servicing the accounts when they went to Alliant. They covenant within those contracts not to do it, and they've done it.
Q. We have confidentiality covenants in Ms. Purser's agreement, correct? Non-solicitation covenants --
A. As of yet.
Q. -- in Ms. Purser's agreements --

Page 68

A. Yep.
Q. -- correct?
A. Non-acceptance.
Q. Just let me get my question out.
A. Yeah. Okay.
Q. Then you'll get your answer out.
So we have confidentiality covenants, correct?
A. Correct.
Q. We have non-solicitation covenants, correct?
A. Correct.
Q. We have no-accepting/no-service covenants, correct?
A. Correct.
Q. Do any other covenants come to mind for you?
A. There's a lot of stuff in there. Those are the -- those are the big ones. I'd agree with you there.
Q. All right. Those are the big ones. Which ones of the big ones -- which ones of these big covenants in Ms. Purser's agreement did Mr. Walsh interfere with?
MR. WOODARD: Foundation.
THE WITNESS: Well, so there's another big one in there, and that is not to take other employees, not solicit employees to go with you, and that's the one that he violated.

Page 97

non-acceptance and non-service of client and active prospective clients --
A. Yeah.
Q. -- provision, right?
A. It's been a while since I've read them, but yeah.
Q. Mr. Greer, should clients be allowed to do business with the broker and service team of their choice?
MR. WOODARD: Form.
THE WITNESS: So clients don't have a contract with us unless they have a fee agreement, but producers do. And so the -- I mean, the client can make the choices the client wants to make. It's the people that they ha- -- that had these contracts that are obligated by the contracts.
BY MR. BRAMBLE:
Q. Okay. And should the clients be allowed to do business with the broker and service team of their choice without the threat of being roped into litigation?
MR. WOODARD: Form.
THE WITNESS: You know, the clients can do what they want to do. It's the -- it's the -- these covenants involve the employees of USI and the producers of USI. And the clients need to take the actions they think they want to take, but these covenants control the activities of the producers and the former employees.

Page 98

So that's immaterial. They're two separate things. The client can make the choices they want to make.
BY MR. BRAMBLE:
Q. You understand that clients do not like being involved in litigation, correct?
MR. WOODARD: Foundation.
THE WITNESS: I would assume, most, that would be true.
BY MR. BRAMBLE:
Q. Okay. Has any client told you or any of the individuals that you've worked with as part of retaining Mr. Havard's or Mr. Engles' accounts that they left USI because they were involved in this litigation?
A. No client has told me that.
Q. Okay. Are you aware of any client telling anyone at USI that?
A. I heard from one person that Van Horn may have done that.
Q. Okay. And what is your perspective on whether or not you should continue including clients in litigation if it means that it's going to cause USI to lose business?
A. So clients -- clients -- it's easy to change brokers. Clients can fire brokers anytime they want. The --

Page 99

But the employment agreement, there's a lot of energy, goodwill, money, effort -- we pay these producers to build these clients, and these contracts protect that goodwill.
And so regardless of what the client wants, the salespeople involved have covenants and contracts that they're well paid for and get significant compensation under these contracts.
And so the client can do what they want to do, but the actions of the people, the producers that worked for USI come under the clauses of these agreements, and they -- and they need to obli- -- honor them.
Q. Is it your position that the Individual Defendants cannot accept business even if they did not solicit the business?
MR. WOODARD: Form.
THE WITNESS: So --
MR. WOODARD: Foundation.
Sorry.
THE WITNESS: So I mean, the non-acceptance clauses in here read as they read.
BY MR. BRAMBLE:
Q. So, Mr. Greer, my question is --
A. My understanding is, they can't accept business.
Q. Even if they did not solicit it, right?

Page 100

A. They can't accept it, can't service it. There's all kinds of things they can't do under the clauses of this contract.
Q. Mr. Greer, I understand why that is in the best financial interest of USI, but why is that in the best interest of the clients?
A. Well, so the team, the structure that we build to take care of the clients cannot -- cannot be done -- or part of the underpinning of being able to provide the services to the clients is a stable producer group. This contract helps and protects our ability to do that.
Q. Helps your ability to do what?
A. To provide services to clients.
Q. Okay. But my question is, how is it in the best interest of the client? So what's --
A. Because they --
Oh. Go ahead. Sorry.
Q. Let's focus on STORE Capital, for instance. How is it in the best interest to prohibit STORE Capital from working with Mr. Havard when he has made the decision to leave USI and when STORE Capital no longer has any interest in remaining at USI?
A. So Mr. Havard was greatly benefitted, as was STORE Capital, by the structure that USI has built because of these contracts and the stability that is given in our

Page 101

ability to deliver services, and STORE Capital was greatly benefitted by our ability to do that.
And these contracts enable us to build that -- to build goodwill, hold goodwill, have stable relationships with insurers. Everything that STORE Capital needs us to be able to do to deliver services to them is underpinned by these contracts.
Q. STORE Capital designated Alliant as its broker of record on January 30th, 2023. Do you have any reason to dispute that?
MR. WOODARD: Form.
THE WITNESS: No.
BY MR. BRAMBLE:
Q. Okay. Mr. Havard resigned from his employment on January 25th -- sorry -- January 24th, 2023. You understand that, right?
A. Okay.
Q. Okay. If Mr. Havard is no longer at USI and if STORE Capital no longer wants to receive its insurance services from USI, how is it in the best interest of the client, STORE Capital, to prohibit STORE Capital from working with Mr. Havard?
MR. WOODARD: Form.
THE WITNESS: So STORE Capital was greatly benefitted by the organization that is built by the

Page 102

stability created by these contracts, and that greatly benefits them.
BY MR. BRAMBLE:
Q. Okay. I unders- --
A. And did benefit them for many years.
Q. I understand that you're saying that they benefitted from the structure that USI purportedly has. I understand that you're saying that they did benefit for multiple years.
I'm asking, going forward, how does it benefit STORE Capital for USI to prohibit them from working with Bill Havard?
MR. WOODARD: Form.
THE WITNESS: It's the same answer. It -- the stability created by these contracts that enable us to build infrastructure, goodwill, everything we have to invest in order to deliver services to STORE Capital is unable to be done if Bill Havard can leave and just -- and STORE Capital can just follow him. And so STORE Capital was greatly benefitted, and that's the reason why.
BY MR. BRAMBLE:
Q. But USI is no longer providing services to STORE Capital. STORE Capital has already moved its business. So after STORE Capital moves its business, how is it in the best interest of STORE Capital for USI to prohibit

Page 103

Mr. Havard from servicing STORE Capital?
MR. WOODARD: Form.
THE WITNESS: So apparently I'm not clear. So USI has built a very strong infrastructure of ability to take care of accounts like STORE Capital, that has to be able to hold the goodwill, be able to have the relationships with insurers, to be able to do what we do.
The -- we need a stable producer group. Without the disruption and everything that goes with producers bouncing around and having just people follow them around. We can't do that if that's the case. And so these contracts -- so STORE Capital is benefitted because these contracts protect that and give us the ability to do it.
There was one of Bill's clients that, as soon as he was gone, she said, "I've been through this noise before. I'm not going through it," and fired us before I could even call her. Because the clients know -- know the disruption and the trouble this causes in being able to take care of clients, and that's what these contracts do.
So it benefits STORE Capital because it gives them a producer a stable, strong ability to take care of them.

Page 104

BY MR. BRAMBLE:
Q. Even though STORE Capital is no longer a client of USI and even though STORE Capital is no longer a beneficiary of this structure that USI purportedly has.
A. Even though.
MR. WOODARD: Form.
BY MR. BRAMBLE:
Q. Okay.
A. Correct.
Q. You referenced a client that fired USI before you could even call her. There is also many clients that kept their business with USI after Mr. Havard's and Mr. Engles' resignation, correct?
A. Some.
Q. Okay. Those clients made the decision to stay at USI, right?
A. They did.
Q. No one forced them to stay at USI, right?
A. No.
Q. Okay. Do you think client choice is important in this industry?
A. Of course. Clients can choose to -- whatever broker they want to choose. It's just in the -- in the context of this scenario, the contra- -- there is obligations of the -- of the team handling the account to

Page 129

months after Mr. Havard left USI; you had already demonstrated the value that USI could add even in the absence of Mr. Havard. So why do you need 24 months to lock the Individual Defendants down?
A. Yeah, so those few are anecdotal, not as a whole. I mean, it varies dramatically account by account. But frankly, I would argue that with Havard's accounts, it would -- it would -- a four-year or a five-year would be even more reasonable, because his accounts are large, they're a long ways away, and it's just hard to get a team to all those places to win them over.
But here's how that goes: So if you were a client and we were trying to -- and he was your broker and he left and I was assigned as your producer, right?
First of all, you don't know me at all. You'll look at my background. You might get comfortable with me. But where the relationship transfers and where we know that we're going to hold them or not or have a good shot at holding them depends on a whole bunch of things.
You go through a renewal; they see that you handled the renewal well, that you delivered a competitive product, you delivered it on time. You bring the team. Oh, I'm comfortable with the team.
And -- but yeah, we're selling contracts

Page 130

that really don't do anything until there's a problem, and so we may not even know you're going to stick until we handle a claim for you and a real big problem to where you call me and you say, "Hey, Ben, I've got a problem," and I do a really good job with it or my team does a really good job with it, and then you become comfortable. And over time, you get to the point that, okay, this account has transferred from one producer to another and we have a good chance of holding it.
But, you know, the bigger, the more complex the account, the more team members are involved, are the ones that we're more likely to hold when a producer leaves. And having Bill and his entire team go, if Bill had just left and Walsh and that team had stayed, we would have had a good chance of holding that whole book, because Walsh is pretty good. They're technical specialists. They're really good.
With the environmental team and the structure we have, it's a little harder, because they're not all in Phoenix, and so, in fact, there were some discussions with Glynis to say, "Okay. This works for now, but, you know, do we need to modify this structure?" And we've made some modifications to it to try to hold it.
But that transition, that two-year transition, is -- varies a lot by client. It varies on

Page 131

the complexity of the account. And usually it boils down to things occurring -- renewals, claims, and whatnot -- that enable the client to get super comfortable.
Q. Some of Mr. --
A. And that takes a while.
Q. Some of Mr. Havard's policies had long term renewals, right?
A. Yeah, we wouldn't -- yeah, we wouldn't renew one of those, but they -- or a lot of them, because they're up to ten years.
Q. Up to ten years, right.
A. He wrote a lot of threes and fives and tens.
Q. So even with the two-year non-solicit, no-accept, no-service, even then, the clients would not get to see the new producer come in or the renewal of a certain policy for a ten-year account, correct?
A. So for a business that wasn't like Bill's, you would be correct. But for business like Bill's, you're not correct, because the business that Bill would write -- he would write a policy for ten years, but they are lenders and developers, and so the policies are written on specific projects.
And so that client might be Blackstone, but the project might be 2800 South Central, LLC, which is like the owner of this building. I need an environmental

Page 132

policy ran. Well, they'll buy another building next week and another one a month after, and so even though that one policy doesn't renew for three, five, or ten years, they'll have multiple other policies written that the client is engaging with you and interacting with you seeing what you're going to do.
It's not a renewal. It's the same process. It's just because that's Bill's book.
Q. So it's not about the renewals. For Bill, it's not about the renewals.
A. Well, so some of those policies renew. Some don't. It's both. It's both. It's -- the relationship with the client is both the renewal of the -- I mean, because some of those policies -- see, so I don't mean to frustrate you, but Bill's book is not like Harp- -- or, Engles' book.
Q. I understand that.
A. Engles book is more just a renewal like your homeowners policy is, yes.
But Havard's it's both the renewal of the accounts -- and some of them go the time period and never renew. Others, the same client will write 50 policies in one year, which is why, when I looked at Bill's book of 2.6 million, he usually ran over 3, so that -- '22 was a low year.

would have been -- and I wasn't involved in that if they did that.
Q. You have no personal knowledge of --
A. That we --
Oh. Go ahead. Sorry.
Q. You have no personal knowledge of anyone at USI recruiting any environmental producer or any environmental team member to work in USI's Phoenix office to do the work that Bill Havard previously did, correct?
A. Correct. We chose to use the envir- -- the environmental team and to train internally a person to -- environmentally to do the service on the book that we kept.
Q. Who did you train?
A. Rachel Forney.
Q. Rachel Forney. Does she work in the Arizona office?
A. She's an account manage- -- she's the account manager on the environmental book.
And there's a Shane McShane also works that book.
Q. Who else?
A. So there is an assistant that I don't know who their assistant is. So there is producers, account managers, and then assistants and then service team



members that are behind, and so there is a service -- an -- they're called assistant account managers. There is one behind Rachel and Shane. I just don't know who it is.
MR. BRAMBLE: Those are my questions.
MR. WOODARD: Let's take a break for just one minute. Thanks.
THE VIDEOGRAPHER: We're off the record. It's 1:56 p.m.
(Recess taken.)
THE VIDEOGRAPHER: We're back on the record. It's 2:03 p.m.
MR. WOODARD: Thanks, John. No ques- -- no further questions from our side.
We'd like to read and sign. Thank you.
THE VIDEOGRAPHER: And we are off the record. It's 2:03 p.m., and this concludes testimony given by Benjamin Greer.
MR. WOODARD: Thank you.
THE COURT REPORTER: And then, Counsel, do you just want to let me know if you want to order both the 30(b)(6) and this one.
MR. WOODARD: We'd like both, yes, and we'd like to synch the video on both. Thank you.
(The deposition concluded at 2:04 p.m.)



REPORTER'S CERTIFICATION

I, Eve K. Burton, Registered Professional Reporter, Certified Realtime Reporter, Certified Reporter in and for the State of Arizona, and Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction, all to the best of my skill and ability; that the foregoing is a true record of the testimony and proceedings taken at that time; that the witness has requested a review pursuant to Rule 30(e)(2); that I am a disinterested person to said action.

IN WITNESS WHEREOF, I have subscribed my name this 1st day of July, 2024.

Eve K. Burton

Eve K. Burton, RPR, CRR,
AZ Certified Reporter No. 50261
CA CSR No. 12527



D E P O S I T I O N S I G N A T U R E P A G E
USI Insurance Services, LLC, v. Alliant Insurance Services, Inc., et al.
Assignment No. J11385969

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of ___________________, 20_____.

______________________
BENJAMIN A. GREER