WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| USI Insurance Services LLC, | No. CV-23-00192-PHX-SMB |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| Alliant Insurance Services Incorporated, et al., | |
| Defendants. | |

The matter before the Court stems from Plaintiff USI Insurance Services LLC's ("USI") lawsuit against Defendants Alliant Insurance Services Incorporated ("Alliant"), William J. Havard III, Robert Engles, Jenise Purser, and Justin Walsh (collectively, "Defendants," or without referring to Alliant, the "Individual Defendants") relating to allegations that, among other things, that they engaged in the improper solicitation of USI's clients on Alliant's behalf after resigning from USI. There are now four *Daubert* motions pending before the Court. This Order resolves two of those motions: USI's Motions to exclude the testimony and expert opinions of David R. Bones (Doc. 259) and James D. Vaughn (Doc. 265). The parties have fully briefed each.[1] For the following reasons, the Court will **grant** the Motions as outlined below.

**I.    LEGAL STANDARD**

A party seeking to present an expert's testimony carries the burden establishing that testimony's admissibility. *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007). Federal

---

[1] The briefings related to Mr. Bones are available at ECF Nos. 299, and 321. (*See also* Doc. 313.) The briefings for Mr. Vaugh are available at ECF Nos. 300 and 326.

Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) govern the admissibility of such testimony. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case

Fed. R. Evid. 702. Expert testimony is admissible only if it is relevant and reliable. *Daubert*, 509 U.S. at 589. Expert testimony is "relevant" if it fits the facts of the case and logically advances "a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., Inc.* (*Daubert II*), 43 F.3d 1311, 1315 (9th Cir. 1995). Further, the testimony is "reliable" if the expert's opinion is reliably based in the "knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)).

The trial judge acts as the "gatekeeper" of expert witness testimony by engaging in a two-part analysis. *Daubert*, 509 U.S. at 592–93. First, the trial judge must determine that the proposed expert witness testimony is based on scientific, technical, or other specialized knowledge. *Id.*; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). To assess reliability, courts may consider "(1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017). Second, the trial court must ensure that the proposed testimony is relevant—that it "will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592.

The Rule 702 inquiry is flexible and must focus "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. "[I]t is a matter for the finder of fact to decide what weight to accord the expert's testimony" after it has passed

the two-part analysis to determine its admissibility. *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998). Opposing experts or tests that the factfinder may be confronted with do not preclude admission but rather go to the weight of the evidence. *Id.* at 1230–31. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## II.   DISCUSSION[2]

### A. Mr. Bones

Mr. Bones is Defendants' damages expert. USI seeks to exclude his testimony related to: (1) opinions in his August 12, 2024 Supplemental Expert Report (the "Supplemental Report"); and (2) his corresponding opinions in his September 12, 2024 Rebuttal Report (the "Rebuttal Report") (together, the "Reports"). (Doc. 259 at 2.) Specifically, USI seeks to exclude his opinion that (1) USI has not established an economic causal link between the actions of Individual Defendants and any lost employees, clients, profits, or goodwill," and (2):

> Documents and testimony in this case indicate that certain USI clients changed their broker of record for reasons other than any alleged wrongful conduct by the Individual Defendants. Additionally, after the Individual Defendants departed USI and joined Alliant, USI lost fewer than the 40% of clients it typically experiences when a producer departs and adheres to postemployment restrictive covenants.

(Doc. 259-1 at 7.) Mr. Bones' Rebuttal Report similarly opines that USI has not established an economic causal link. (Doc. 259 at 4; *see also* Doc. 259-2 at 3 ("USI has not apportioned damages or established an economic causal link between the actions of each of the Individual Defendants and any lost employees, clients, profits, or goodwill.").)

USI contends that Mr. Bones' opinions are inadmissible legal conclusions, unhelpful to the jury, and not the product of reliable principles and methods. (Doc. 259 at 4.) USI argues that Mr. Bones improperly characterized the causal link as "economic" to distinguish the opinion from one on legal causation. (Doc. 259 at 7–8 (citing *Rowe v. DPI*

---

[2] The parties are familiar with the background of this case. For additional background, see this Court's April 23, 2025 Summary Judgment Order. (Doc. 332.)

- 3 -

*Specialty Foods, Inc.*, No. 2:13-CV-00708-DN-DJF, 2015 WL 4949097, at *5 (D. Utah Aug. 19, 2015), *aff'd in part*, 727 F. App'x 488 (10th Cir. 2018)).) USI further argues his report does not substantiate the concept of an "economic" causal link and his citations do not support the concept as a distinct concept. (*Id.* at 8–9.) In the same vein, USI contends that Mr. Bones' opinion on an "economic" causal link is not helpful to the jury because the jury can comprehend causation without an expert opinion. (Doc. 259 at 10–12; *see also* Doc. 321 at 11–12.) Additionally, Mr. Bones used rudimentary arithmetic, rather than a reliable expert methodology, that any jury is capable of performing without his help. (Doc. 259 at 10–12; *see also* Doc. 321 at 11–12.) Last, USI argues that the Court should exclude Mr. Bones' opinion because he "cherry-pick[ed]" documents and testimony, weighed that evidence and made credibility determinations to render factual and legal conclusions based on simple arithmetic, and did not provide explanation for evidence that he did not find credible. (Doc. 259 at 16–17; *see also* Doc. 259-3 at 27–28, 30, 34.)

      Defendants argue that Mr. Bones' opinion does not address the determination of whether causation exists. (Doc. 299 at 7–10.) Defendants characterize Mr. Bones' opinion as evaluating causation to compare the percentage of clients that left USI following the Individual Defendants' resignations to USI's expected attrition where there is no foul play. (*Id.*) To that end, Mr. Bones opined fewer clients left after their departures than USI typically expects under ordinary circumstances, which demonstrates USI experienced better than expected retention rates to the effect that there is no "economic" causal link and damages are zero. (*Id.*; *see also* Doc. 259-1 at 22.) To USI's helpfulness arguments, Defendants contend that there are multiple reasons that clients may have left USI and Mr. Bones' opinion is helpful in accounting for those reasons compared to USI's expected attrition to reach the total damages. (Doc. 299 at 10–12.) Defendants also reject that Mr. Bones' opinion uses simple arithmetic, highlighting that his analysis required compiling the relevant clients and timeframes, and even if it is, simplicity does not warrant exclusion. (*Id.* at 12–15.) Finally, Defendants posit that USI critiques of Mr. Bones' opinion do not actually call into question Mr. Bones' methodology to reach the attrition comparison. (*Id.*

at 14–15.)

USI makes valid points. Mr. Bones explains that he "estimate[s] economic losses by comparing actual (i.e., impacted) financial results to an estimate of but-for (i.e., un-impacted financial results." (Doc. 259-1 at 9.) Mr. Bones indicates that "[a]s a damages expert," he considers information "to gain an understanding as to how alleged bad acts cause the damages claimed by" USI. (*Id.*) He further explains, "[t]he actual scenario is reliant on financial results that have been impact in some way by the wrongful conduct. Without an economic causal link, damages are zero." (*Id.*) Consistent with Mr. Bones' explanation, one would expect that his analysis evaluates how the alleged wrongful conduct or bad act are attributed to the claimed damages. But Mr. Bones proceeded to determine that there was no wrongful conduct, nor bad acts, in the first place or ignores the alleged wrongful conduct to blame damages on some other cause, and therefore, he finds there are no economic causal links and damages are zero. (*See id.* at 18–21.) For example, he considers evidence that the Individual Defendants did not solicit any clients to Alliant and that other brokers lawfully solicited the clients, e.g., Mr. Harper, to conclude there no economic link between any alleged wrongful actions and losses of employees, clients, profits, or goodwill. (*Id.*) Mr. Bones then concludes that absent the link, USI's damages are zero. (*Id.*) Similar, he considered evidence that a client decided to move to a competitor after a delayed response from USI and concluded that the move was attributable to USI's failures. (*Id.*)

Defendants are adamant that Mr. Bones' opinion does not attempt to prove causation and does not offer it as such. (*See* Doc. 299 at 6.) Rather, Mr. Bones' analysis demonstrates his understanding of USI's position that the alleged wrongful conduct resulted in damages and Defendants' position that "any loss in revenue was caused by lawful conduct of others." (*Id.* at 4–5.) In this context, setting aside that USI claims and Mr. Bones evaluates damages other than just lost revenues, Defendants appear to advance that the lawful conduct of some other person negates liability. That might be true; however, Mr. Bones' analysis goes a step further to sever liability all together by attributing the cause

of losses to USI or someone else, e.g., Mr. Harper. This "economic causal link" concept as used here is no more than proximate cause repackaged with corporate jargon and added frills. *See, e.g.*, *Christensen v. Georgia-Pac. Corp.*, 279 F.3d 807, 815 (9th Cir. 2002) ("[P]roximate cause is a means of cutting off liability for consequences that are so far removed from the conduct at issue that there is no justification for imposing liability.").

Defendants posit that Mr. Bones' causation discussion led into his analysis that compared the percentage of clients that left USI following the resignations to USI's expected client attrition rate. (*See id.* at 8–9.) To that end, Mr. Bones' methodology is relatively straight forward. His ultimate guidepost is based on testimony that USI expects about 40% of a producer's clients to leave USI after the producer's departure, assuming the producer does not violate any restrictive covenants. (*See* Doc. 259-1 at 8; Doc. 299-4 at 5.) Then, Mr. Bones found that fewer clients left USI than expected to conclude "USI experienced a better-than-expected client retention rate," and therefore, there was no economic causal link and damages are zero. (Doc. 259-1 at 22.) Notably, the expected attrition percentage says nothing about the impact wrongful conduct would have on that percentage. This is an important point—it is reasonable to assume that client attrition due to wrongful conduct would fall into a separate bucket and that the expected attrition would increase overall.

Neither Defendants nor Mr. Bones explain how the expected attrition percentage figure is relevant to determining losses associated with client losses involving wrongful conduct. First, comparing the expected percentage of clients lost absent improper conduct to those lost due to improper conduct is misleading and fundamentally flawed. Evidence that USI expected some client attrition does not absolve liability for improper conduct. Second, Mr. Bones ignores the economic reality that there is a distinction between losses caused by lawful and unlawful conduct. Even if the lost client account is one in the same, e.g., the Individual Defendants engaged in wrongful conduct by using Mr. Harper as a proxy to solicit clients, although Mr. Harper did so "lawfully" under California law, Mr. Bones' opinion provides no helpful mechanism to assist the jury in evaluating the conduct

underlying a client's transfer from USI to determine the amount of appropriate damages, if any, that resulted from that transfer.

At bottom, Mr. Bones failed to tie his analysis to the facts of this case and would likely be misleading and not be helpful to the jury. Therefore, the Court will exclude Mr. Bones from opining on the two issues outlined above.

**B. Mr. Vaughn**

Mr. Vaughn is Defendants' forensics expert. USI seeks to exclude Mr. Vaughn's expert opinion on metadata relating to Walsh's purported modifications to various client summaries that listed Havard as the author. (*See* Doc. 265 at 1–3.) USI also seeks exclusion of his opinions regarding the forensic copying of various personal devices, deletion of files from Havard and Engles' devices, and whether an attachment to an email that Havard sent to Alliant was present on two of Alliant's devices. (*Id.*)

1. Metadata

By way of background, during the Preliminary Injunction Hearing in this case, USI's Chief Technology Officer, Tim Porreca, testified to the metadata from various PDF files for client renewals that Walsh allegedly sent to former USI clients, of which listed Havard as the author with the creation date and time and the last modified date and time as the same. (*See* Doc. 265 at 4–5 & n.9; *see also* Doc. 104 at 24:22–46:7.) USI contends that evidence supports that no one other than Havard touched these PDFs and that if Walsh had modified these PDFs, the metadata would show different creation and modification dates and times. (*See* Doc. 265 at 5–6.) At the hearing, Havard testified that he created Word documents (".docx") that were templates. (*See* Doc. 104 at 112:10–20.) Defendants posit these .docx templates were used by others, which resulted in the metadata listing Havard as the author and carried forward into later-saved PDF versions of the documents. (*See* Doc. 300 at 2.) Defendants explain that Walsh used these .docx templates to create the client summaries after joining Alliant and converted the .docx file to a PDF, which were sent to the clients. (*Id.*)

Defendants now offer a competing analysis of metadata in Mr. Vaughn's expert

- 7 -

opinion for the sole purpose of refuting Mr. Porreca's anticipated lay witness testimony at trial. (*See* Doc. 300 at 2–4.) Mr. Vaughn's Initial Expert Report provides the following opinion:

> I am aware that USI is alleging that Mr. Havard is servicing or has serviced certain at issue clients based on documents produced by Alliant in this litigation that contain metadata reflecting Bill Havard as the "Author". My investigation and forensic analysis revealed that USI misunderstands Havard's role in the creation of Alliant documents based on this metadata field. A different employee named Justin Walsh used templates created by Mr. Havard, then populated them with client information. I have reviewed the metadata and the content of the files listed in Exhibit D, and based on my understanding of what constitutes client data, the versions "Last Authored" by Justin Walsh contain client information, while the templates created by Bill Havard do not and appear to be templates.

(Doc. 265-1 at 7–8 ¶ 16.)[3] Exhibit D refers to a spreadsheet (the "Metadata Spreadsheet") with data produced by a third-party and provided to Mr. Vaughn by Defendants' counsel. (*See* Doc. 265-5 at 1; Doc. 265-7 at 18–19; *see also* Doc. 300-4 at 30–33.) In relevant part, the Metadata Spreadsheet lists eight .docx file-types with Havard listed as the initial author and the last author as either Havard or Walsh. (*See, e.g.*, Doc. 300-4 at 30–33.) Mr. Vaughn considered the files with Havard listed as the last author as templates and for those with Walsh listed, he considered them the final or finished products sent to clients. (Doc. 265-7 at 18–19.) Mr. Vaughn did not review the contents of the underlying .docx files listed in the Metadata Spreadsheet. (*Id.* at 20.) Instead, Mr. Vaughn testified that he received the files as converted PDFs from Defendants.[4] (*Id.* at 21–23.) Using those PDF files and based on the differences in authorship indicated in the Metadata Spreadsheet for the .docx files, Mr. Vaughn then compared the contents of the PDFs. (*Id.*)

The parties' dispute centers on Mr. Vaughn's basis for comparing the contents of the PDFs based on a distinction drawn from the metadata of the .docx files. Specifically, USI contends that Mr. Vaughn never reviewed the contents of the .docx files and never reviewed the metadata for the PDFs to verify that the .docx files were properly converted

---

[3] Plaintiff also moves to exclude Mr. Vaughn's opinion because his report does not satisfy Rule 26's requirement that an expert's report provide the opinion and *basis and reasons for it*. The Court agrees that Mr. Vaughn's does not satisfy the Rule 26 requirements.
[4] It is unclear whether the third party that produced the metadata for Mr. Vaughn and Defendants converted the files or some other individual. (*See* Doc. 326 at 7 n.4; *see also* Doc. 265-7 at 21–22.)

- 8 -

1   to PDFs. (Doc. 265 at 12–14; Doc. 326 at 6–8 & n.6.) In turn, Defendants assert that Mr.
2   Vaughn did consider the metadata of the PDFs. (Doc. 300 at 4–5.) Defendants also argue
3   that USI's criticisms of Mr. Vaughn's opinion go to the weight of his testimony that should
4   be explored during cross examination, but they do not provide an adequate basis for
5   exclusion. (*Id.* at 5.)

6   Defendants' contention that Mr. Vaughn reviewed the metadata for the PDFs
7   appears premised on the fact that metadata for the .docx files and the PDFs necessarily
8   mirror one another through a conversion, otherwise they misconstrue his testimony. To
9   the latter, Mr. Vaughn testified that:

> [He] was provided the PDF versions by counsel with the understanding that the template is the template, modified to the modified. [He] looked at those contents, and then [he] also looked at this metadata. That's how [he] gained [the] information.

13  (Doc. 265-7 at 23.) In context, the "this metadata" references the metadata identified in
14  the Metadata Spreadsheet pertaining to the .docx files. (*See id.* at 18–23 (answering the
15  question "did you review the metadata for those PDFs as well?" with "No, I have not -- I
16  may have looked at it, but I didn't -- I'm not offering an opinion on the PDFs because I
17  understand they were converted.").) His testimony establishes that he did not review the
18  metadata for the PDFs at issue.

19  Mr. Vaughn proceeded under the assumption that the .docx files were converted
20  properly to PDFs so that the metadata for the .docx files reflect the corresponding
21  authorship of the PDF documents. Mr. Vaugh, however, could not articulate a clear answer
22  for how knew the .docx files and the PDFs corresponded to one another beyond the
23  conclusion that the conversion occurred and "rel[ies] on the fact that they did not
24  conversion properly" and "has no reason to believe that they didn't convert it properly."
25  (*Id.* at 21.) He claims that he is familiar with the tool that the third used to convert the
26  .docx files and relies on the fact that the file names of the documents are the same except
27  for the file formats. (*See id.* at 19–20.) But also acknowledged than an employee could
28  have converted the files to PDF before the third party used the tool. (*See id.* at 22.) Similar,

in his testimony, Mr. Vaughn explained that "maybe it's debatable that these are document versions that were converted to PDF" and that the .docx files may have been collected, loaded, and then converted to PDFs. (*See id.* at 21–22.)

The circumstances of the conversion remain entirely unclear, both in terms of who converted what files and when those conversions occurred. Yet Mr. Vaughn relies on the assumption that the conversion was done properly. Mr. Vaughn could have compared the templates and final products.docx files to the corresponding PDF files that were purportedly converted. He could have also investigated the metadata of the PDFs to confirm relevant data mirrored the .docx files. Mr. Vaugh, however, did neither. He has not provided a sound basis to support that files have the same name but different file types reliably indicate that the contents and metadata within those files are also the same. In the end, Mr. Vaughn has failed to validate his assumption that the PDF files reflect accurate conversions of the .docx files to draw a reliable comparison between the template and final products in PDF form based on authorship indicated in the metadata of the .docx files. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting courts are not required to admit expert opinion evidence based on mere *ipse dixit* of an expert). The lack of reasoning to support the assumption here leaves too wide of an analytic gap for the Court to ignore. *See id.* Therefore, the Court will exclude Mr. Vaughn's opinion on the metadata.

### 2. Forensic Copying

USI challenges portions of Mr. Vaughn's opinion in which he discusses that iDiscovery Solutions ("iDS") was engaged by Defendants to provide digital forensics and other e-discovery services, that iDS proceeded to make forensic copies of personal devices and accounts used by the Individual Defendants, Phalen, and Hartman, collected certain data sources, and that iDS provided Defendants' counsel with file listings, text, messages, and other documents. (*See* Doc. 265 17 & n.69; Doc. 265-1 at 5–6 ¶¶ 7–9.) USI faults Mr. Vaughn for not being involved the forensics process and for not knowing what specific information was provided to Defendants' counsel. (Doc. 265 at 17.) Defendants respond by pointing out that Mr. Vaughn is the Managing Director of iDS, supervised and directed

the iDS team performing the forensics, and reviewed the evidence to generate his opinion. (Doc. 300 at 6–7.) USI does not address Defendants arguments in reply. (*See generally* Doc. 326.) The challenged statements do not appear to be offered as expert an opinion but rather are general statements. USI has not provided a basis for the Court to exclude an opinion incorporating these statements on the ground that the expert's opinion is based on work that managed and supervised. Therefore, the Court will deny excluding Mr. Vaughn's opinion on this ground.

3. Exfiltration and Subsequent Deletion of Files

USI challenges Mr. Vaughn's opinion in which, in response to allegations that the Individual Defendants took USI data with them to Alliant, the provides that iDS remediated or deleted certain documents from Engles and Havard's personal devices and accounts to ensure removal of any "USI work-related files." (Doc 265 at 17; *see also* Doc. 265-1 at 6 ¶¶ 10–11.) USI critiques Mr. Vaughn for relying only on conversations with Defendants' counsel to support these statements. (Doc. 265 at 6–7, 17.) Defendants argue that USI quibbles with how Mr. Vaughn came to know what files were "USI work-related" and iDS's basis for remediating such files but his testimony establishes that he was directed to remediate certain documents, those documents were remediated, and iDS generated a list to identify the remediated documents. (Doc. 300 at 7–8; *see also* Doc. 300-5 at 2–6.) USI acknowledges that this testimony offers statements of fact, rather than opinions, and clarifies that it seeks to exclude Mr. Vaughn's testimony about the character, contents, and nature of the "USI work-related files" that Defendants' counsel directed him to remediate, not the mere fact that the remediation occurred as instructed. (Doc. 326 at 3.)

The parties' dispute falls on Mr. Vaughn's nomenclature for the data that iDS remediated. Taking a step back, Mr. Vaughn indicated that USI did not allege any exfiltration of USI data and that he had not reviewed any evidence presented by USI that any USI data was exfiltrated. (*See* Doc. 365-1 at 6 ¶ 10.) He then provided that iDS was employed to prove the above-mentioned remedial measures and noted that his "understanding is that although these documents were not USI documents in terms of

1   anything improper being exfiltrated, they were remediated in order to remove any USI
2   work-related files." (*Id.* ¶ 11.) USI is correct that Mr. Vaughn has not reviewed any
3   evidence to support his assertions regarding whether any data was improperly exfiltrated,
4   which renders it an unsupported conclusion and an improper opinion. (*See* Doc. 326-1 at
5   8–10.)
6       Mr. Vaughn testified that he is not opining on the contents of any of these documents
7   and his opinion pertains to the fact that iDS remediated particular files and data. (*Id.*) The
8   purpose for his testimony is to support the remedial measures Defendants took related to
9   any allegations that they were involved in the exfiltration of USI's protected or confidential
10  data. Mr. Vaughn, however, has provided no basis or explanation to support that the files
11  or data that iDS remediated relate to any files or data tied to the alleged exfiltration. Having
12  offered no basis for doing so, he may not opine on these ultimate issues. Mr. Vaughn's
13  nomenclature for the files and data as "USI work-related" is problematic but such vague
14  and generalized terms may encompass both files and data relating to USI's protected
15  information and unprotected information falling outside of the allegations. USI may
16  adequately attack the loose verbiage during cross examination to dispel any potential jury
17  confusion. *Daubert*, 509 U.S. at 596.

           4. Havard's Email

19      The final challenge to Mr. Vaughn's opinions pertains his opinion about whether
20  certain Alliant employees had or disseminated an email or other information prior to
21  leaving USI. (Doc. 326 at 7–8, 17–18.) Mr. Vaughn's Initial Expert Report provides that
22  he reviewed an email, including its attachment, that Havard had sent to Mr. McDaniel.
23  (Doc. 265-1 at 6–7 ¶ 12.) Mr. McDaniel then sent the email to Bledion Dizardi with a copy
24  to Alliant's General Counsel Jennifer Baumann. (*Id.* at 7 ¶ 13.) Mr. Vaughn later received
25  a forensic image of Mr. Dizardi's laptop and McDaniel's laptop. (*Id.* ¶¶ 13–14.) After
26  analyzing both computers to see if the emails, attachments, or any files from within the
27  attachment were present or disseminated to anyone else, Mr. Vaughn concluded that none
28  of these files or data were contained on either device or were further disseminated. (*Id.* ¶

15.)

USI argues that Mr. Vaughn's opinion is unreliable because he does not explain how or when forensic copies of the computers were made, he merely searched a spreadsheet to see if there were any matching file names, and he did not review contents of the computer nor the email itself. (Doc. 265 at 17–18.) USI also contends that his report contradicts itself in that Mr. Vaughn acknowledges that Mr. McDaniel sent the email to Mr. Dizardi but concludes that it was not found on Mr. Dizdari's laptop without explaining why this was the case and concludes the email was not on McDaniel's computer but admitted that it was during his deposition. (*Id.*) In turn, Defendants argue USI's challenges go to the completeness and correctness of Mr. Vaughn's opinion, which is appropriate for cross examination and do not address flaws in his methodology. (Doc. 300 at 8–9.) In reply, USI disagrees to the methodology point, arguing methodology was unsound in that he merely searched the files for key words and after no resulted populated, he conducted no further analysis and concluded the email was not "contained" on the computers. (Doc. 326 at 4–5.) USI further highlights that Mr. Vaughn opinion relies on hyper-technicalities to draw a distinction between items "contained" on the computers and those contained within a "container." (*See id.* at 3–4 & n.3.)

USI is correct that Mr. Vaughn relies on confusing technicalities to qualify his opinion on whether the email was "contained" on Mr. McDaniel's computer. Mr. Vaughn testified that he reviewed a forensic image of Mr. McDaniel's computer hard drive. (*See* Doc. 265-7 at 9–10.) Mr. Vaugh proceeded to explain that within that image of the hard drive there is a "container" where the emails are sitting. (*Id.* at 10.) The contents of the email—a zip file and the contents within the zip file—do not exist outside of the email container. (*Id.*) In other words, the zip file and its contents were not saved onto the hard drive directly but remains in the email container. (*Id.* at 11.) He then reviewed listings of the files from an image of Mr. McDaniel and Mr. Dizdari's hard drives and a separate listing for the emails contained within that container. (*Id.* at 12–13.) Mr. Vaughn could not explain why, despite Mr. McDaniel forwarding the email to Mr. Dizdari, the listings

1   for Mr. Dizdari's hard drive and email did not populate the email. (*Id.* at 13–14.) Mr.
2   Vaugh proceeded to qualify his opinion as not going to whether the Mr. Dizdari actually
3   received the email and acknowledged that he did not evaluate whether he deleted it. (*Id.*
4   at 13–15.) He simply reviewed the file names listed in the zip file were also in the listings
5   for the hard drive. (*Id.* at 15–16.) Mr. Vaughn further testified that he did not review the
6   contents of the files within the zip file, only the email, attachment names, and file names.
7   (*Id.* at 9.)

8         Mr. Vaughn's opinion testimony that the emails and the attached zip file were not
9   contained on Mr. McDaniel's device is entirely misleading. Mr. Vaughn essentially treats
10  an internal nesting doll as if it is not contained within the larger, outside nesting doll and
11  defies common sense. In actuality, Mr. McDaniel may not have saved the zip file or
12  extracted its contents onto the hard drive but the email was within a container contained on
13  the computer.

14        As to whether the email was further disseminated, his opinion is incomplete and not
15  based on sufficient facts. Mr. Vaugh acknowledged that Mr. McDaniel sent the email and
16  its attachments to Mr. Dizdari but could not provide any explanation for why the file listing
17  for Mr. Dizdari's hard drive and email did not reveal the email. Without addressing the
18  elephant in the room, Mr. Vaughn opines that the email was not further disseminated but
19  could not provide an explanation for this fundamental issue and refused to opine whether
20  Mr. Dizdari actually received the email. He further acknowledges the possibility that the
21  email may have been deleted and would not populate in the listings or that file names within
22  the zip file could have been changed and sent, affecting his ability to identify the files by
23  the names originally listed in the zip file. (*Id.* at 15.) Ordinarily one of these issues may
24  be fit for cross examination. But a culmination of the analytical gaps in his analysis and
25  semantic gamesmanship renders his opinion that the emails were not contained in either
26  computer and not further disseminated unreliable, likely to mislead the jury, and unhelpful.

27  **III.   CONCLUSION**
28        Accordingly,

- 14 -

**IT IS HEREBY ORDERED granting** Plaintiff's Motions to exclude the testimony and expert opinions of David R. Bones (Doc. 259) and James D. Vaughn (Doc. 265) as outlined.

Dated this 25th day of June, 2025.

_____
Honorable Susan M. Brnovich
United States District Judge