**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| USI Insurance Services LLC, | No. CV-23-00192-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Alliant Insurance Services Incorporated, et al., | |
| Defendants. | |

The matter before the Court stems from Plaintiff USI Insurance Services LLC's ("USI") lawsuit against Defendants Alliant Insurance Services Incorporated ("Alliant"), William J. Havard III, Robert Engles, Jenise Purser, and Justin Walsh (collectively, "Defendants," or without referring to Alliant, the "Individual Defendants") relating to allegations that, among other things, they engaged in the improper solicitation of USI's clients on Alliant's behalf after resigning from USI. Defendants move to exclude the expert opinions of USI's damages expert, Lynton Kotzin (Doc. 263 (Defendants' Motion to Exclude Certain Trial Testimony and Opinions of Lynton Kotzin). The parties have fully briefed the Motion.[1] For the following reasons, the Court will **deny** Defendants' Motion.

I.  **LEGAL STANDARD**

A party seeking to present an expert's testimony carries the burden establishing that testimony's admissibility. *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007). Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)

---

[1] The briefings for Mr. Kotzin are available at ECF Nos. 309 and 323. (*See also* Doc. 270; Doc. 302; Doc. 303 Doc. 324.)

govern the admissibility of such testimony. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Expert testimony is admissible only if it is relevant and reliable. *Daubert*, 509 U.S. at 589. Expert testimony is "relevant" if it fits the facts of the case and logically advances "a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., Inc.* (*Daubert II*), 43 F.3d 1311, 1315 (9th Cir. 1995). Further, the testimony is "reliable" if the expert's opinion is reliably based in the "knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)).

The trial judge acts as the "gatekeeper" of expert witness testimony by engaging in a two-part analysis. *Daubert*, 509 U.S. at 592–93. First, the trial judge must determine that the proposed expert witness testimony is based on scientific, technical, or other specialized knowledge. *Id.*; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). To assess reliability, courts may consider "(1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017). Second, the trial court must ensure that the proposed testimony is relevant—that it "will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. The Rule 702 inquiry is flexible and must focus "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. "[I]t is a matter for the finder of fact to decide what weight to accord the expert's testimony" after it has passed the two-part analysis to determine its admissibility. *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998). Opposing experts or tests that the factfinder may be confronted with do not preclude admission but rather go to the weight of the

- 2 -

evidence. *Id.* at 1230–31. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## II. DISCUSSION

The parties are familiar with the background of this case and the Court will include background where relevant to the analysis. (*See generally* Doc. 332 (providing background at summary judgment).)

USI retained Mr. Kotzin to provide an expert opinion on economic damages generally pertaining to lost clients allegedly caused by Defendants. (*See* Doc. 270-1 (Mr. Kotzin's Expert Report).) The alleged wrongful conduct that remains for trial generally includes solicitation of USI's clients, tortious interference with contract and business expectancies, and failure to provide advance notice of resignations from USI. (*Id.*; *see also* Doc. 332.) Mr. Kotzin's opinion assesses the total economic damages in this case under two inquiries: first, the combined value of Havard and Engles' books of business based on their fair market value; and second, the diminution of value to the commercial lines segment of USI's Phoenix office. (Doc. 270-1 at 4.) In the end, he opines that to put USI in the same financial and economic position it would have been in but-for the alleged wrongful conduct, the diminution of value represents the appropriate damages, which is greater than the fair market value he calculated for the books of business. (*Id.*)

Defendants challenge Mr. Kotzin's opinion on multiple grounds. (*See generally* Doc. 263.) Regarding the valuations for the books, Defendants first contend that Mr. Kotzin improperly considered irrelevant assets. (Doc. 270 at 9–12.) Second, Defendants argue that he improperly relied on unverifiable multiples to reach the total damages for both the books and diminution of value opinions. (*Id.* at 12–15.) Next, Defendants fault both opinions for purportedly using inconsistent approaches to calculating the normalized income for Havard and Engles, which impacted the final calculations for the EBITDA of their books. (*Id.* at 15–16.) Last, Defendants argue Mr. Kotzin relied on an irrelevant

"platform" multiple to reach the diminution of value opinion. (*Id.* at 16–17.)[2]

## A. Valuation of Assets

To ascertain the value of a book of business, Mr. Kotzin's Expert Report notes the standard of value is fair market value, which generally involves determining the price at which property would change hands between willing buyers knowing the relevant facts. (*Id.* at 15.) Mr. Kotzin further notes that the value of a book business includes "all of the valuable intangible assets and goodwill associated" and these assets include "client relationships," "continued patronage, the assembled workforce, know-how, and competitive advantage." (*Id.*) He also notes that a damages methodology that fails to account for this value would not place USI in the same financial or economic position it would have been in but-for the wrongful conduct. (*Id.*)

Defendants challenge the relevance of including these assets in the valuation of the books of business based on the circumstances of this case. According to Defendants, USI is attempting to recover lost values that it was never entitled to because the Individual Defendants were at-will employees. (*See* Doc. 270 at 9–12 (citing *Simmons v. USI Ins. Servs.*, LLC, 721 F. Supp. 3d 1333 (M.D. Fla. 2024)); Doc. 323 at 6–7.) In turn, USI argues that under a market approach methodology, Mr. Kotzin quantified the value of the books of business that USI would have expected to retain had the Defendants not breached their contractual and common law duties, and what USI could have obtained in selling those books on the open market. (Doc. 302 at 3–5.) To that end, USI contends including these

---

[2] Defendants additionally argue that his opinion should be excluded because he failed to apportion the damages according to the relevant claims and appropriate defendant. (*Id.* at 17–18; Doc. 323 at 9–10.) Mr. Kotzin's opinion assumes liability. (Doc. 270-1 at 3.) He has further indicated that, if the jury were to find only one defendant liable, he has adequate data from his Expert Report to apportion damages. (Doc. 309-2 ¶ 5; *see also* Doc. 309 at 12–13.) In pointing to their summary judgment arguments, Defendants also argue that Arizona's economic loss rule bars recovery for tortious interference claims based on the same facts as the breach of contract claims. (*See* Doc. 323 at 1; *see also* Doc. 319.) First, Defendants improperly raise this argument for the in their Reply brief. (*See generally* Doc. 270.) Second, Defendants inadequately briefed the issue at summary judgment and did not address the issue with respect to a claim against Alliant for tortious interference with contract at all, as opposed to a claim against the Individual Defendants for tortious interference with business expectancies. (*See* Doc. 332 at 34–35.) Therefore, the Court finds Mr. Kotzin's purported failure to apportion is not a basis to exclude his opinion at this time.

assets in the value of the books of business is relevant. (*Id.*)

Defendants heavily rely on *Simmons* to support their irrelevancy arguments, but the case is inapplicable. There, applying Florida law, the district court excluded USI's expert's opinion on the fair market value of lost accounts or the lost books of business. *See Simmons*, 721 F. Supp. 3d at 1342. The court rejected USI's argument that its proposed fair market value model is a viable method of calculating lost profits for the loss of specific accounts because the model included measuring "something more that the stream of profits arising from the specific accounts that left USI." *See id.* at 1342–43. The court further reasoned that USI sought to recover damages attributable to the defendants' skills, services, and client relationships but that the defendants were under no obligation to remain with the company. *Id.* at 1343–44. As such, it further reasoned, an award would put USI in a better position than it otherwise would have been in by awarding the value of the defendants as employees as a component of damages. *Id.* at 1343–44.

The *Simmons* court was seemingly concerned with the issue of whether the fair market value that included the intangible assets could fold into a lost profits analysis. *See id.* at 1343. Defendants do not point to any authority that a fair market valuation is an inappropriate measure of damages in Arizona. (*See* Doc. 323 at 7.) As they acknowledge, the appropriate measure of damages for breaches of contract under Arizona law are those that arise naturally from the breach itself. *See All Am. Sch. Supply Co. v. Slavens*, 609 P.2d 46, 48 (Ariz. 1980). And underpinning the alleged breach of a non-solicitation provision, an employer retains legitimate interest in maintaining its customer base, i.e., it is an asset of value in the employer's view. *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1284 (1999) (noting these types of restrictive covenants prevent an employee from luring away customers while an employer is vulnerable). Although the *Simmons* court held market value was unavailable under Florida law, other courts have held that market value is an appropriate and reasonable damages calculation. See *USI Ins. Servs., LLC v. Aitkin*, No. 3:21-cv-00267-HZ, 2022 WL 4364882, at *2 (D. Or. Sept. 21, 2022); *USI Ins. Servs., LLC v. Tillman*, 4:23-CV-00054-LGW-CLR (S.D. Ga. Oct. 17, 2024), Dkt. No. 148 at *11–12.

In assuming liability, Mr. Kotzin considers USI's allegations that Defendants either breached the 60-day notice or non-solicitation provisions in their employment agreements or tortiously interfered with such obligations. (Doc. 270-1 at 3.) Mr. Kotzin's consideration of the intangible assets, like client relationships and goodwill, cover the damages that flow from a breach of these provisions. While these contractual obligations do not carry forward in perpetuity, the jury may assign a damages figure that appropriately reflects the damages USI suffered during the time the provisions would have been enforceable had Defendants not breached their obligations. Thus, the Court declines to exclude Mr. Kotzin's testimony on this ground.

### B. Market Multiples

In arriving at his opinion on total damages, Mr. Kotzin applied two multipliers to the calculated lost EBITDA to reach a total valuation relative to the loss of Havard and Engles' books of business. (*See* Doc. 270-1 at 21, 52, 65–66.) Mr. Kotzin derived the multiples from the MarshBerry Report, which provided him with average purchase prices as a multiple of EBITDA for various years that MarshBerry sourced from a database and compiled from transactions it was directly involved in, had detailed information for, or were in the public record. (*See* Doc. 303-2 at 32; Doc. 303-3 at 9.)

The first multiple at issue was part of Mr. Kotzin's analysis of "the guideline transaction method under the market approach." (Doc. 2701-1 at 19, 65–66.) Mr. Kotzin chose the applicable multiple from a variety of reports and multiples, finding that was most relevant to the valuation. (*See* Doc. 303-1 at 5, 6, 9–10, 13.) He explained that this multiple and the underlying transactions accounted for their size, roll-ins of potential books of business, realistic earn-outs rather than totals, and were more comparable to the sale of a book of business. (*See id.*)

The second multiple relates to Mr. Kotzin's alternative methodology that determined the diminution of value to the commercial lines segment of USI's Phoenix office, which applied a greater multiple that the guidelines transaction method. (Doc. 2701-1 at 20, 65.) As Mr. Kotzin did for the guideline transaction method, he reviewed

but rejected many of the other multiples and found a "platform" multiple was more appropriate because the sale of the commercial lines segment would involve the sale of assets other than just a book of business. (Doc. 303-1 at 9–11.) Mr. Kotzin explained that the higher multiple accounts for the larger size of the transaction, revenue, and profitability of USI's Phoenix office compared to rolling in a book of business. (*Id.* at 8–11.)

Defendants claim that Mr. Kotzin did not support his multiples with verifiable facts or data. (Doc. 270 at 12–14.) According to Defendants, Mr. Kotzin relied on ranges that he received from discussions with USI's industry expert, Thomas R. Linn, and from relying on a "MarshBerry Report." (*Id.*; *see also* Doc. 359.) Defendants posit that neither source identifies, discloses, or describes any of the underlying transactions that informed the multiples. (Doc. 270 at 14; Doc. 323 at 2–4.) USI argues that Mr. Kotzin analyzed EBITDA multiples from various reports "produced by preeminent insurance M&A firms," which USI produced to Defendants, and the MarshBerry Report offered appropriate detail regarding the underlying multiples to justify his reliance on the data. (Doc. 302 at 6–8 & n.7; *see also* Doc. 302-1 at 11, 15, 17, 18, 19; Doc. 303-1 at 10–13.)

Defendants complain that do not have access to the relevant data and criticize Mr. Kotzin for not verifying the data underlying those reports during his deposition. (*See* Doc. 323 at 4.) Defendants do not appear to contend that the MarshBerry Report or any of the other reports that Mr. Kotzin considered themselves are unreliable or that relying on similar market data is improper in the first place. *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). Defendants seem to argue that Mr. Kotzin's choice of multiplier is unreliable because he based in on discussions with Mr. Linn. But Mr. Kotzin did not solely rely on that information. (*See generally* Doc. 359 (excluding Mr. Linn from opinion on a specific range of multiples because he failed to identify the underlying transactions data that supported his opinion).) Mr. Kotzin testified that he reviewed a variety of other reports

and their underlying data that provided varying multiples but he concluded the MarshBerry was more comparable under each methodology. (*See* Doc. 303-1 at 5, 6, 9–10, 13.)

Additionally, Defendants contend that they were deprived of the ability to explore the reliability of the MarshBerry Report and Mr. Kotzin's reliance on it because it was disclosed after discovery closed. (*See* Doc. 270 at 15 n.1.) But as USI indicates, USI timely produced Mr. Kotzin's Expert Report and each of the underlying reports before Defendants deposed Mr. Kotzin. (*See* Doc. 302 at 7 n.6.) USI further notes that Defendants did not introduce any of the reports during his deposition. (*Id.*) Defendants' failure to delve into the various reports that Mr. Kotzin reviewed may be further explored during cross examination at trial. This failure is not a basis for the Court to find he did not base his opinion on sufficient facts or data and the reliability of the market data in the reports is not reasonably in question. Likewise, Defendants have not provided the Court with an adequate basis to conclude that Mr. Kotzin's reliance on these market reports render his opinion unreliable or based on insufficient data. Therefore, the Court declines to exclude Mr. Kotzin's opinion on this ground.

### C. Normalized Income Calculations

To calculate the EBITDA figures that informed Mr. Kotzin's guideline transaction and diminution of value damages figures, Mr. Kotzin derived Havard and Engles' "normalized lost income." (*See* Doc. 270-1 at 52–54.) For Havard, Mr. Kotzin projected this figure based on Havard's five-year average for revenue production. (*Id.*) For Engles, he used Engles' 2022 revenue production only. (*Id.*)

Defendants argue that Mr. Kotzin cherry-picked different figures for Havard and Engles to reach the highest possible normalized lost income and EBITDA, rendering his opinion as based on inconsistent approaches and thus unreliable. (Doc. 270 at 15–16.) USI counters, arguing that Mr. Kotzin testified to a technically sound decision to evaluate Havard and Engles separately based on differences in their revenue streams, reoccurring nature of their clients, and books of business generally. (Doc. 302 at 8–10.) Defendants do not appear to address this argument in reply. (*See generally* Doc. 323.)

As USI points out, Mr. Kotzin adequately explains his rationale for treating Havard and Engles differently. Mr. Kotzin explained that Engles' clients typically renewed their policies on an annual basis and that his historical revenues showed linear increases year-over-year. (*See* Doc. 302-1 at 4–5; Doc. 303-1 at 3–4; Doc. 270-1 at 52.) He further explained that based on the linear trajectory and reoccurring income, he utilized the previous twelve months of revenue for a more accurate valuation and would have used the same approach even if the trajectory showed a decrease in revenues. (Doc. 303-1 at 3–4.) Conversely, Mr. Kotzin explained that Havard's revenue production varied year-to-year and his clients purchased policies that varied in length. (*Id.*; Doc. 302-1 at 4–5; Doc. 270-1 at 52.) Additionally, he explained that Havard's clients may not renew a particular policy at the end of the term but the client would have a continuing need for additional policies that were written separately. (Doc. 302-1 at 4–5.) Defendants' characterization of Mr. Kotzin choosing to evaluate Havard and Engles' revenue streams differently as cherry-picking is therefore not accurate. The Court declines to exclude his opinion on this ground.

### D. The "Platform" Multiple

As previously noted, Mr. Kotzin used a "platform" multiple to inform his analysis for the diminution of value damages. Essentially, Mr. Kotzin used this analysis to quantify the damaged based on how the losses of Havard and Engles' EBITDA impacted the overall value of the USI's Phoenix office in a hypothetical sale. (*See* Doc. 270-2 at 43.) Mr. Kotzin defined an acquisition involving a "platform" as a "high level transactions for a buyer, typically due to new geography niche, expertise, size, talent, ect." (*See* Doc. 270-1 at 20 n.14 (citation modified).) His Expert Report further notes a "platform acquisition was deemed most relevant indication for the diminution of value calculation based on discussions with [Linn]." (*Id.* at 65 n.3.)

Defendants contend that Mr. Kotzin's use of this "platform" multiple does not fit the facts of this case and is irrelevant because it values the entire Phoenix office rather than just a book of business. (Doc. 270 at 16–17; Doc. 323 at 10–11.) Defendants also argue

1  that Mr. Kotzin's did not review the data on the size of the transaction underlying the
2  MarshBerry Report "platform" multiple but that his determination on what multiple applies
3  accounts for the relative size of an acquisition. (See Doc. 323 at 11.) USI argues that USI
4  appears to misunderstand the scope of Mr. Kotzin's analysis, in that he is not valuing the
5  Phoenix office from Alliant's perspective but that of what a willing buyer would pay. (Doc.
6  302 at 10–11.)

Defendants' characterization of Mr. Kotzin's opinion is not entirely accurate. He testified that, while he did not consider the specific data for the acquisitions underlying the MarshBerry "platform" multiple, he reviewed specific data with respect to the size of acquisition contained in other reports that corroborated the MarshBerry multiple. (*See* Doc. 270-2 at 59.) Finally, with respect to the fit, the "platform" multiple enabled Mr. Kotzin to reach the impact the loss of Havard and Engles' books of business had on the overall value of USI's Phoenix office and would tend to make USI whole from that perspective. It's an alternative method of calculating damages. The damages figure under this method is much higher but the jury may determine that this measure of damages is inappropriate to compensate USI for its losses. Defendants' criticisms are best dealt with on cross-examination. Therefore, the Court declines to exclude Mr. Kotzin's opinion on this ground.

### III. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED denying** Defendants' Motion to Exclude Certain Trial Testimony and Opinions of Lynton Kotzin (Doc. 263; Doc. 270).

Dated this 30th day of June, 2025.

_____
Honorable Susan M. Brnovich
United States District Judge